*JUDGE SCHEINDLIN*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Walker, TRUESDELL, ROTH & ASSOCIATES, )
as Trustee for and on behalf of the Extended Stay )
Litigation Trust, )

HOBART TRUESDELL, as Trustee for and on )
behalf of the Extended Stay Litigation Trust, and )

THE EXTENDED STAY LITIGATION TRUST, )

     Plaintiffs, )

vs. )

THE BLACKSTONE GROUP, L.P., *et al.* )

     Defendants. )

## 11 CIV 4549

Case No. _____



## NOTICE OF REMOVAL

    The United States Bankruptcy Court for the Southern District of New York created the Extended Stay Litigation Trust through the Plan of Reorganization to bring claims, if any, on behalf of the Debtors, relating to the sale of Extended Stay in June 2007 – and the Bankruptcy Court retained exclusive jurisdiction over those claims. On June 14, 2011, the Litigation Trustee filed this complaint in the Supreme Court of New York (the "State Court Action") bringing fiduciary duty claims against the Blackstone Defendants concerning the sale of Extended Stay.[1]

    At the same time, the Litigation Trustee filed four separate complaints in the Bankruptcy Court concerning the same transaction. (*See In re Extended Stay Inc.*, Case No. 09-13764 (JMP), Dkt. Nos. 1444, 1445, 1446, 1448.) One of those complaints brings the same fiduciary duty claims against the same Blackstone Defendants as in the State Court Action. (*Id.* Dkt. No. 1444,

---

[1]   The "Blackstone Defendants" are The Blackstone Group, L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP, Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV, LLC, BRE/HV Holdings LLC, Blackstone Hospitality Acquisitions, LLC, Prime Hospitality, LLC, Jonathan Gray, William Stein, Michael Chae, Robert Friedman, Gary Sumers, Dennis McDonagh, and Alan Miyasaki.

Adv. Case No. 11-02254, Compl. ("Bankruptcy Court Fiduciary Duty Action").)  Every factual allegation in the two complaints is word-for-word identical.  Of the more than 550 paragraphs in each complaint – the State Court Action and the Bankruptcy Court Fiduciary Duty Action – only two paragraphs differ and those relate to jurisdiction and venue.  As to those, in the Bankruptcy Court Fiduciary Duty Action, the Litigation Trustee admits that the Bankruptcy "Court has subject matter jurisdiction" over the claims, that the claims "relate[] to the [Extended Stay] Chapter 11 Cases," and that the case "constitutes a 'core' proceeding."  (*Id.* ¶ 144.)

The Extended Stay Bankruptcy Court, not the Supreme Court of New York, is the proper forum to adjudicate the Litigation Trustee's claims.  Accordingly, the Blackstone Defendants hereby remove the State Court Action from the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York, and respectfully request that the case be referred to the Bankruptcy Court.  This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1334, removal is proper under 28 U.S.C. § 1452, and referral is appropriate under 28 U.S.C. § 157(a).

## BACKGROUND

In June 2007, two Blackstone-controlled entities sold Extended Stay Hotels – a profitable and growing company – to an unrelated buyer for $8 billion.  The transaction was the culmination of a three-month sales process involving astute real estate investors with deep knowledge of the hospitality industry.  Over 150 potential buyers were contacted, and four different groups submitted indications of interest that valued Extended Stay at $7.6 to $8 billion.  Every aspect of the sale resulted from arm's-length negotiations between informed and sophisticated parties – between the seller and buyer, and between the buyer and its lenders, which were among the most sophisticated financial institutions in the world.

The $8 billion purchase price was well-supported.  The buyer's lenders obtained an appraisal that valued Extended Stay at $8.16 billion.  The implied EBITDA multiple from the $8 billion price was comparable to, and in some cases below, multiples from comparable transactions during this period.  After buyer and seller had reached an agreement, a competing bidder offered a still higher price.

The facts demonstrate the reasonableness of the financial projections in the Offering Memorandum associated with the sale.  The projected growth rates for both revenue and earnings were below Extended Stay's historical growth rates.  And those projections were consistent with contemporaneous projections by Extended Stay's competitors, banking analysts who covered Extended Stay, and industry experts who published their own projections.

Perhaps the best evidence that the purchase price was reasonable is that some of the most sophisticated institutions in the world loaned $7.4 billion to the buyer based on their view, after extensive consideration and analysis, that Extended Stay was a healthy and viable entity.  No lender would have loaned $7.4 billion believing that the borrower was doomed to fail.

Extended Stay did not declare bankruptcy until June 2009 – two years after the transaction.  (*See In re Extended Stay Inc.*, Case No. 09-13764 (JMP).)  Between the time of the transaction and the bankruptcy filing, a devastating economic downturn overwhelmed Extended Stay, and every other lodging company in the country.  The economic crisis precipitated an unprecedented – and unforeseen – drop in revenue per available room across the industry.  That drop was both the longest and deepest decline in the lodging industry since the Great Depression. No one in the sector was spared, and Extended Stay was not alone in its financial difficulties.

Undeterred by these indisputable facts, the Litigation Trustee – representing the Litigation Trust created by Extended Stay's Plan of Reorganization – has now brought fiduciary

duty and other claims in the State Court Action.  The crux of that complaint is the allegation that the transaction "left the Debtors insolvent, undercapitalized, and unable to pay their debts as they became due."  (State Court Action, Case No. 651667/2011, Compl. (Ex. 1) ¶ 2.)

At the same time, the Litigation Trustee filed four additional complaints in the Bankruptcy Court regarding the same transaction.  In one, the Litigation Trustee brought the exact same claims, against the exact same defendants, with the exact same factual allegations as the State Court Action.  (Bankruptcy Court Fiduciary Duty Action (Ex. 2).)  A comparison of that complaint with the State Court Action reveals that only two paragraphs differ at all, and those concern jurisdiction and venue.  (*See* Comparison (Ex. 3)).  In the Bankruptcy Court Fiduciary Duty Action, the Litigation Trustee acknowledges that the Bankruptcy "Court has subject matter jurisdiction over this action," that the case "constitutes a civil proceeding arising under Title 11 of the United States Code or arising in or related to the [Extended Stay] Chapter 11 Cases," and that the case "constitutes a 'core' proceeding as defined in 28 U.S.C. § 157(b)(2)(A)."  (Bankruptcy Court Fiduciary Duty Action (Ex. 2) ¶ 144.)

In a different complaint, the Litigation Trustee brings fraudulent transfer and other claims against certain Blackstone Defendants.  Those claims, too, are based on the same nucleus of allegations: that the transaction "render[ed] the[ Debtors] insolvent, undercapitalized and unable to survive."  (*In re Extended Stay, Inc.*, Case No. 09-13764, Dkt. No. 1445, Adv. Case No. 11-02255, Compl. (Ex. 4) ¶ 4.)  Indeed, all five of the Litigation Trustee's complaints arise from the same transaction and involve common questions of law and fact, in particular whether the

transaction "left the Debtors insolvent, undercapitalized, and unable to pay their debts as they became due." (State Court Action, Case No. 651667/2011, Compl. (Ex. 1) ¶ 2.)[2]

## BASIS FOR REMOVAL

I. **Removal Is Proper Because The State Court Action Arises In – And Relates To – The Extended Stay Bankruptcy.**

"A party may remove any claim or cause of action ... to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." 28 U.S.C. § 1452(a); *see also* Fed. R. Bankr. Proc. 9027. Section 1334 provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). The District Court – and the Bankruptcy Court – have original jurisdiction over the State Court Action because it "aris[es] in" and, at a minimum, "relate[s] to" the Extended Stay bankruptcy case.

### A. **The State Court Action Is a Core Proceeding Arising In the Extended Stay Bankruptcy Case.**

The Bankruptcy Court has jurisdiction to "hear and determine … all core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(b)(1). Those "core proceedings" include "matters concerning the administration of the estate." 28 U.S.C. § 157(b)(2)(A). The State Court Action is a core proceeding arising in a case under title 11 because it concerns the administration of the Extended Stay bankruptcy estate.

*First*, the Extended Stay Plan of Reorganization – approved by the Bankruptcy Court – created the Litigation Trust, and the Litigation Trustee, to pursue claims, if any, concerning the sale of Extended Stay in June 2007. (*See In re Extended Stay Inc.*, Case No. 09-13764 (JMP),

---

[2] The Blackstone Defendants reserve their right to seek consolidation of those complaints – including with the removed State Court of Action – pursuant to Federal Rule of Civil Procedure 42(a), made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7042.

Dkt. No. 1157, Fifth Am. Plan ("Fifth Am. Plan") § 6.17(a).)  The Litigation Trustee's claims, including those asserted in the State Court Action, "were transferred by the [debtors] to the Litigation Trust pursuant to the Plan and the Litigation Trust Agreement."  *In re Refco*, 628 F. Supp. 2d at 444; *see also In re Extended Stay Inc.*, Case No. 09-13764 (JMP), Dkt. No. 1138, Litigation Trust Agreement ("Litigation Trust Agreement") § 1.2(a).  The Litigation Trustee's claims are not "independent of the reorganization," *In re Petrie Retail, Inc.*, 304 F.3d 223, 229 (2d Cir. 2002), but rather "arise under the Plan" and directly implicate its "execution," *In re Refco*, 628 F. Supp. 2d at 444 (quoting *In re General Media, Inc.*, 335 B.R. 66, 73, 75 (Bankr. S.D.N.Y. 2005)).  In short, "[b]ecause interpretation, construction and enforcement of the Plan [of Reorganization] and confirmation order is implicated by the State Court Action, the State Court Action is a core proceeding 'arising in' [the Extended Stay] bankruptcy case."  *In re General Growth Props., Inc.*, 2011 WL 766129, at *3 (Bankr. S.D.N.Y. Feb. 25, 2011).

**Second**, the Bankruptcy Court expressly retained jurisdiction over the claims that the Litigation Trustee now brings in the State Court Action.  The Plan of Reorganization provides that "the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter … arising in or related to the Chapter 11 Cases or the Plan."  (Fifth Am. Plan Art. XII.)  The Litigation Trust Agreement leaves no doubt, providing that the Bankruptcy Court "shall retain exclusive jurisdiction to … decide any claims or disputes which may arise or result from, or be connected with, this Litigation Trust Agreement," including claims concerning the sale of Extended Stay in June 2007.  (Litigation Trust Agreement § 12.4.)  And the Litigation Trustee expressly "consent[ed] to and submit[ted] to the jurisdiction and venue of the Bankruptcy Court" to resolve those claims.  (*Id.*)

The Litigation Trustee cannot dispute that the State Court Action is a core proceeding that concerns the administration of the Extended Stay bankruptcy estate. The day that it filed the State Court Action, the Litigation Trustee also filed a complaint in the Bankruptcy Court that, by its own admission, is "substantially identical" to the State Court Action. (Bankruptcy Court Fiduciary Duty Action (Ex. 2) ¶ 145.) As the attached comparison of the two complaints reveals, every factual allegation, every claim, and every defendant is the same. (*See* Comparison (Ex. 3).) Only the complaints' paragraphs concerning jurisdiction and venue differ. Most telling, in the Bankruptcy Court complaint, the Litigation Trustee acknowledges that "[t]he [Bankruptcy] Court has subject matter jurisdiction over" the claims, that the claims "aris[e] in or relate[] to the [Extended Stay] Chapter 11 Cases pending in the United States Bankruptcy Court for the Southern District of New York," and that the case "constitutes a 'core' proceeding as defined in 28 U.S.C. § 157(b)(2)(A)":

---

**JURISDICTION AND VENUE**

144. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1334 and principles of pendent and ancillary jurisdiction. This action constitutes a civil proceeding arising under Title 11 of the United States Code or arising in or related to the Chapter 11 Cases pending in the United States Bankruptcy Court for the Southern District of New York. This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A). Venue is proper in this Court and this District under 28 U.S.C. §§ 1391(a)(2), (b)(2) and (c), and 1409(a) because (a) this is the District in which Extended Stay, Inc.'s jointly administered Chapter 11 Cases are pending, and (b) all or substantially all of the events and omissions giving rise to the plaintiff's claims occurred in this District.

---

(Bankruptcy Court Fiduciary Duty Action (Ex. 2) ¶ 144.)

In short, the State Court Action is a core proceeding that arises in the Extended Stay Chapter 11 cases – and the Litigation Trustee has already acknowledged as much.

### B.    The State Court Action Is Also Related To the Extended Stay Bankruptcy Case.

Even if the State Court Action is not within the Bankruptcy Court's core jurisdiction – and it is – the Bankruptcy Court nonetheless has original jurisdiction over the State Court Action because it is "related to" the Extended Stay Chapter 11 cases.  The Second Circuit employs an "expansive test for 'related to' jurisdiction articulated by the Third Circuit in *In re Pacor*."  *In re Refco, Inc. Sec. Litig.*, 628 F. Supp. 2d 432, 437 (S.D.N.Y. 2008).  "[T]he test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."  *In re Pacor*, 743 F.2d 984, 994 (3d Cir. 1984); *accord In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992) (adopting *Pacor's* "conceivable effect" test); *In re Refco*, 628 F. Supp. 2d at 437-38, 442-43 (applying *Pacor* and noting the "close nexus" to the bankruptcy).

The outcome of the Litigation Trustee's State Court Action undoubtedly will have an effect on the Extended Stay estate.  The very purpose of the State Court Action is to recover monies into the estate that would be distributed to beneficiaries of the Litigation Trust – which, by definition, hold claims in the Extended Stay bankruptcy cases.  (Fifth Am. Plan § 1.90; Litigation Trust Agreement § 3.4; *id.* Art. 6.)  In other words, whether the Litigation Trustee is successful in the State Court Action will impact distributions to the bankruptcy estate's creditors.

## II.    The Procedural Requirements For Removal Are Satisfied.

All of the procedural requirements for removal identified in Federal Rule of Bankruptcy Procedure 9027 are satisfied here.  ***First***, the State Court Action is a "core" proceeding under 28 U.S.C. § 157(b)(2), as it concerns the "administration of the estate" and the execution and

implementation of the Plan of Reorganization.  *See* Fed. R. Bankr. P. 9027(a)(1).  The Litigation Trustee concedes as much.  (Bankruptcy Court Fiduciary Duty Action (Ex. 2) ¶ 144).)

**Second**, the Blackstone Defendants' notice of removal is timely.  This Notice of Removal has been filed within 30 days of the date on which the Blackstone Defendants received a copy of the initial pleading in the State Court Action, which is the time period for removal prescribed by 28 U.S.C. § 1446(b) and Federal Rule of Bankruptcy Procedure 9027(a)(3)(A).  No previous notice of removal for the relief sought herein has been made to this or any other court.

**Finally**, as required by 28 U.S.C. § 1446(d) and Federal Rule of Bankruptcy Procedure 9027(b) and (c), a copy of this notice will be served on the Litigation Trustee's counsel and filed with the Clerk of the Court for the Supreme Court of the State of New York, New York County.  Pursuant to Federal Rule of Bankruptcy Procedure 9027(a), a copy of all process and pleadings filed in the State Court Action is attached hereto as Exhibit 5.

## CONCLUSION

For the reasons set forth above, the Blackstone Defendants hereby remove the State Court Action from the Supreme Court of the State of New York, County of New York to the United States District Court for the Southern District of New York, and respectfully request that this case be referred to the Bankruptcy Court which has retained jurisdiction over Extended Stay's Chapter 11 cases, Case No. 09-BR-13764 (JMP), pursuant to 28 U.S.C. § 157(a).

Respectfully submitted,

New York, New York

_____
Richard M. Cieri
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

- and -

Jeffrey S. Powell
Daniel T. Donovan
KIRKLAND & ELLIS LLP
655 15th Street NW, Suite 1200
Washington, D.C.  20005
Telephone:      (202) 879-5000
Facsimile:      (202) 879-5200

*Counsel to the Blackstone Defendants*

# EXHIBIT 1

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

WALKER, TRUESDELL, ROTH & ASSOCIATES, as Trustee for
and on behalf of the Extended Stay Litigation Trust,

HOBART TRUESDELL, as Trustee for and on behalf of the
Extended Stay Litigation Trust, and

THE EXTENDED STAY LITIGATION TRUST,

          Plaintiffs,

          -against-

THE BLACKSTONE GROUP, L.P., BLACKSTONE HOLDINGS I
L.P., BLACKSTONE HOLDINGS II L.P., BLACKSTONE
HOLDINGS III L.P., BLACKSTONE HOLDINGS IV L.P.,
BLACKSTONE HOLDINGS V L.P., BLACKSTONE HOLDINGS
I/II GP, INC., BLACKSTONE HOLDINGS III GP L.L.C.,
BLACKSTONE HOLDINGS IV GP L.P., BLACKSTONE
HOLDINGS V GP L.P., BLACKSTONE REAL ESTATE
PARTNERS IV L.P., BLACKSTONE CAPITAL PARTNERS IV
L.P., BHAC IV, LLC, BRE/HV HOLDINGS LLC, BLACKSTONE
HOSPITALITY ACQUISITIONS, LLC, PRIME HOSPITALITY,
LLC, DL-DW HOLDINGS, LLC, LIGHTSTONE HOLDINGS LLC,
THE LIGHTSTONE GROUP, LLC, PGRT ESH INC.,
LIGHTSTONE COMMERCIAL MANAGEMENT, ARBOR ESH II,
LLC, ARBOR COMMERCIAL MORTGAGE, LLC, PRINCETON
ESH LLC, ATMAR ASSOCIATES, LLC, GLIDA ONE LLC, RON
INVEST LLC, POLAR EXTENDED STAY (USA) L.P., BHAC
CAPITAL IV, LLC, BRE/ESH HOLDINGS, LLC, ABT-ESI LLC,
MERICASH FUNDING LLC, PARK AVENUE FUNDING LLC,
BANK OF AMERICA, N.A., CITIGROUP GLOBAL MARKETS
INC., EBURY FINANCE LIMITED, BANC OF AMERICA
SECURITIES LLC, DAVID LICHTENSTEIN, BRUNO DE
VINCK, PEYTON "CHIP" OWEN, JR., GUY R. MILONE, JR.,
JOSEPH CHETRIT, JOSEPH TEICHMAN, JOSEPH MARTELLO,
F. JOSEPH ROGERS, DAVID KIM, GARY DELAPP, JONATHAN
D. GRAY, WILLIAM STEIN, MICHAEL CHAE, ROBERT L.
FRIEDMAN, THOMAS BURDI, GARY SUMERS, DENNIS J.
MCDONAGH, ALAN MIYASAKI, and JOHN DOES 1 through
100, inclusive,

          Defendants.

INDEX NO.:     /2011

Date Purchased:  June 14, 2011

**SUMMONS**

Plaintiff designates New York
County as the place of venue
pursuant to **CPLR 503**

To the above named Defendants:

    **You are hereby summoned** to answer the complaint in this action and to serve a copy of

your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons,

exclusive of the day of service (or within 30 days after the service is complete if the summons is

not personally delivered to you within the State of New York), and in case of your failure to

appear or answer, judgment will be taken against you by default for the relief demanded in the

petition.

Dated: June 14, 2011
       New York, New York

Respectfully submitted,

**BAKER & HOSTETLER LLP**

By _____

MARC D. POWERS
MATTHEW R. GOLDMAN
BENJAMIN D. PERGAMENT
KATHRYN M. ZUNNO
45 Rockefeller Plaza
New York, New York  10111
Telephone:    212.589.4200
Facsimile:     212.589.4201
E-mail mpowers@bakerlaw.com

AND

MICHAEL A. VANNIEL (*pro hac vice*
application forthcoming)
ALEXIS C. OSBURN (*pro hac vice*
application forthcoming)
Baker & Hostetler LLP
PNC Center
1900 East 9th Street, Suite 3200
Cleveland, OH 44114-3482
Telephone:    216.621.0200
Facsimile:     216.696-0740

*Counsel for Plaintiffs Extended Stay
Litigation Trust, and Hobart Truesdell and
Walker, Truesdell, Roth & Associates, as
Trustees of the Extended Stay Litigation
Trust*

**Defendants' Addresses:**

The Blackstone Group, L.P.
345 Park Avenue
New York, New York 10154

Blackstone Holdings I L.P.
c/o The Blackstone Group
345 Park Avenue
New York, New York 10154

Blackstone Holdings II L.P.
c/o The Blackstone Group
345 Park Avenue
New York, New York 10154

Blackstone Holdings III L.P.
c/o The Blackstone Group
345 Park Avenue
New York, New York 10154

Blackstone Holdings IV L.P.
c/o The Blackstone Group
345 Park Avenue
New York, New York 10154

Blackstone Holdings V L.P.
c/o The Blackstone Group
345 Park Avenue
New York, New York 10154

Blackstone Holdings I/II GP, Inc.
c/o The Blackstone Group
345 Park Avenue
New York, New York 10154

Blackstone Holdings III GP L.L.C.
c/o The Blackstone Group
345 Park Avenue
New York, New York 10154

Blackstone Holdings IV GP L.P.
c/o The Blackstone Group
345 Park Avenue
New York, New York 10154

Blackstone Holdings V GP L.P.
c/o The Blackstone Group
345 Park Avenue
New York, New York 10154

Blackstone Real Estate Partners IV L.P.
c/o The Blackstone Group
345 Park Avenue
New York, New York 10154

Blackstone Capital Partners IV L.P.
c/o The Blackstone Group
345 Park Avenue
New York, New York 10154

BHAC IV, LLC
c/o The Blackstone Group
345 Park Avenue
New York, New York 10154

BRE/HV Holdings LLC
c/o The Blackstone Group
345 Park Avenue
New York, New York 10154

Blackstone Hospitality Acquisitions, LLC
102 Townsend Dr.
Weimar, Texas 078962

Prime Hospitality, LLC
700 Route 46 East
Fairfield, New Jersey 07004

Prime Hospitality, LLC
16850 Bear Valley Road
Victorville, California 92395

DL-DW Holdings, LLC
460 Park Avenue, Suite 1300
New York, New York 10022

Lightstone Holdings LLC
460 Park Avenue, Suite 1300
New York, New York 10022

The Lightstone Group, LLC
460 Park Avenue, Suite 1300
New York, New York 10022

PGRT ESH Inc.
Prime Group Realty Trust
330 W Wabash Ave # 2800
Chicago, Illinois 60611

Lightstone Commercial Management
460 Park Avenue, Suite 1300
New York, New York 10022

Arbor ESH II, LLC
c/o Arbor Commercial Mortgage LLC
333 Earle Ovington Blvd., Suite 900
Uniondale, New York 11553

Arbor Commercial Mortgage, LLC
333 Earle Ovington Blvd., Suite 900
Uniondale, New York 11553

Princeton ESH LLC
375 Park Avenue Suite 3401
New York, New York 10152

Atmar Associates, LLC
c/oThe Chetrit Group
404 Fifth Avenue, 4th Floor
New York, New York 10018

Glida One LLC
c/o The Chetrit Group
404 Fifth Avenue, 4th Floor
New York, New York 10018

Ron Invest LLC
c/o The Chetrit Group, LLC
404 Fifth Avenue, Fourth Flooor
New York, New York 10018

Polar Extended Stay (USA) L.P.
c/o Polar Investments Ltd.
21 Haarbaah St.
Tel Aviv, Israel 64739

BHAC Capital IV, LLC
c/o The Lightstone Group LLC
326 Third Street
Lakewood New Jersey 08701

BRE/ESH Holdings, LLC
c/o Blackstone Real Estate Acquisitions IV LLC
345 Park Avenue
New York, New York 10154

ABT-ESI LLC
c/o Arbor Commercial Mortgage LLC
333 Earle Ovington Blvd., Suite 900
Uniondale, New York 11553

Mericash Funding LLC
404 Fifth Avenue
New York, New York 10018

Park Avenue Funding LLC
460 Park Avenue
New York, New York 10022

Bank of America, N.A.
100 N. Tryon St.
Charlotte, North Carolina 28225

Citigroup Global Markets Inc.
388 Greenwich Street, 17th Floor
New York, New York 10013

Ebury Finance Limited
c/o BSN Capital Partners Ltd.
2 Broadgate
London EC2M 7 UR
UK

Banc of America Securities
600 Montgomery Street
San Francisco, CA 94111

David Lichtenstein
20 Autumn Road
Lakewood, New Jersey 08701-1619

Bruno DeVinck
128 S. Central Avenue
Ramsey, New Jersey 07446-2408

Peyton "Chip" Owen, Jr.
1150 W. Keswick Lane
Lake Forest, Illinois 60045-1132

Guy R. Milone, Jr.
29 Tremont Street
Garden City, New York 11530-6413

Joseph Chetrit
55 East 74th Street
New York, New York 10021-2734

Joseph Teichman
515 Ridge Ct.
Lakewood, New Jersey 08701-1544

Joseph Martello
430 East 58th Street
New York, New York 10022-2330

F. Joseph Rogers
405 Carleton Circle
Spartanburg, South Carolina 29301

David Kim
c/o Blackstone Group
Suite 901, Two International Finance Centre
8 Finance Street Central
Hong Kong

Gary DeLapp
409 Sweetbay Terrace
Spartanburg, South Carolina 29306-6682

Jonathan D. Gray
333 East 57th Street, Apt. 8A
New York, New York 10022-2422

William Stein
4 Rolling Hills Lane
Harrison, New York 10528

Michael Chae
1111 Park Avenue
New York, New York 10128-1234

Robert L. Friedman
68 Island Drive
Rye, New York 10580

Thomas Burdi
P.O. Box 423
Ridgewood, New Jersey 07451-0423

Gary Sumers
888 Park Avenue- Apt 11 C
New York, New York 10075-0282

Dennis J. McDonagh
138 East Shore Road
Halsite, New York 11743-1140

Alan Miyasaki
c/o Blackstone Group
345 Midtown Tower-22nd Floor
9-7-1 Akasaka, Minato-ku
Tokyo, 107-6222
Japan

Alan Miyasaki
1978 Kidd Circle
Park City, Utah 84098

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

WALKER, TRUESDELL, ROTH &
ASSOCIATES, as Trustee for and on behalf
of the Extended Stay Litigation Trust,

HOBART TRUESDELL, as Trustee for and
on behalf of the Extended Stay Litigation
Trust, and

THE EXTENDED STAY LITIGATION
TRUST,

      Plaintiffs,

      -against-

The Blackstone Group, L.P., Blackstone
Holdings I L.P., Blackstone Holdings II L.P.,
Blackstone Holdings III L.P., Blackstone
Holdings IV L.P., Blackstone Holdings V
L.P., Blackstone Holdings I/II GP, Inc.,
Blackstone Holdings III GP L.L.C.,
Blackstone Holdings IV GP L.P., Blackstone
Holdings V GP L.P., Blackstone Real Estate
Partners IV L.P., Blackstone Capital Partners
IV L.P., BHAC IV, LLC, BRE/HV Holdings
LLC, Blackstone Hospitality Acquisitions,
LLC, Prime Hospitality, LLC, DL-DW
Holdings, LLC, Lightstone Holdings LLC,
The Lightstone Group, LLC, PGRT ESH
Inc., Lightstone Commercial Management,
Arbor ESH II, LLC, Arbor Commercial
Mortgage, LLC, Princeton ESH LLC, Atmar
Associates, LLC, Glida One LLC, Ron Invest
LLC, Polar Extended Stay (USA) L.P.,
BHAC Capital IV, LLC, BRE/ESH Holdings,
LLC, ABT-ESI LLC, Mericash Funding
LLC, Park Avenue Funding LLC, Bank of
America, N.A., Citigroup Global Markets
Inc., Ebury Finance Limited, Banc of
America Securities LLC, David Lichtenstein,
Bruno de Vinck, Peyton "Chip" Owen, Jr.,
Guy R. Milone, Jr., Joseph Chetrit, Joseph
Teichman, Joseph Martello, F. Joseph

**INDEX NO.:**      **/2011**

**<u>COMPLAINT</u>**

Rogers, David Kim, Gary DeLapp, Jonathan
D. Gray, William Stein, Michael Chae,
Robert L. Friedman, Thomas Burdi, Gary
Sumers, Dennis J. McDonagh, Alan
Miyasaki, and JOHN DOES 1 through 100,
inclusive,

                    Defendants.

Plaintiffs, Walker, Truesdell, Roth & Associates ("WTR&A"), as Trustee for and

on behalf of the Extended Stay Litigation Trust (the "Trust"), Hobart Truesdell, as Trustee for

and on behalf of the Trust ("Truesdell," and together with WTR&A, the "Trustee") and the

Trust, by the undersigned counsel, hereby files this Complaint, and alleges as follows:

## NATURE OF ACTION

1.      This action arises from the financial devastation wrought upon the Extended Stay

Inc. family of companies (collectively, the "Company," which included, but was not limited to

the bankrupt "Debtor" entities identified in paragraph 10 below) in a leveraged buyout of the

Company in June 2007 (the "LBO" or "Acquisition") and thereafter.  The Sellers (as defined

below) in the LBO, comprised of affiliates of The Blackstone Group (as defined below),

siphoned over $2 billion of the value out of the Debtors, without regard for how the Debtors

would continue operations following the LBO.  After the LBO closed, the Buyer (as defined

below) and its affiliates pulled out over $100 million in improper distributions to equity from the

Debtors' remaining desperately needed post-LBO cash.

2.      The Debtors were dominated, controlled and ultimately exploited by the Sellers

and the Buyer.  The purportedly arms-length transaction was anything but.  The grossly inflated

purchase price was engineered by the Blackstone-affiliated Sellers looking to maximize their

2

profits, working in concert with a Buyer that assumed little to no risk of loss.  Indeed, each of the three rating agencies that reviewed the deal all came to the same conclusion: The total capitalization of the LBO substantially exceeded the value of the Debtors' assets.  In short, the purchase price was not justified, was paid at the Debtors' expense and left the Debtors insolvent, undercapitalized, and unable to pay their debts as they became due.

3.      While the downfall of the Debtors coincided, to some extent, with the bursting of the nation's real estate bubble and the consequent "Great Recession," that economic downturn neither explains nor excuses the Debtors' downfall or the Defendants' culpable conduct here.  As an initial matter, upon information and belief, Blackstone anticipated the downturn in advance of the LBO.  More importantly, however, the LBO would have failed regardless of the downturn; it was effectively dead-on-arrival given the gross over-leveraging and untenable cash flow restrictions that comprised the malignant terms of the deal.

4.      At the LBO's closing, Blackstone siphoned $2.1 billion of value from the Debtors, rendering them insolvent, undercapitalized and unable to survive.  The Defendants were well aware of the financial harm of the LBO, but nevertheless caused or allowed it to happen. After the LBO, the Debtors were systematically drained of no less than $100 million through the continuous payment of improper dividends and through other distributions to post-LBO equity holders and their affiliates.  Those post-LBO dividends and distributions were improper under applicable law and under the LBO loan documents themselves.  Yet, the distributions occurred time and again as the Debtors suffered multiple financial and liquidity crises and limped along toward their inevitable bankruptcy.  In the end, a group of investors including Blackstone provided the ultimate ironic coda to this story of economic havoc by swooping in after the

Debtors' bankruptcy filings to reacquire the Debtors for approximately $3.9 billion, roughly half the amount Blackstone had sold the Company for three years earlier.

5.     This lawsuit seeks redress from named Defendants that fall into two groups.  The first group consists of entities and individuals that owned, dominated, controlled or otherwise managed all aspects of the pre-LBO Debtors' businesses.  Those pre-LBO Defendants were responsible for the decision to implement the LBO, and they participated in the formulation of the post-LBO structure pursuant to which additional value was improperly siphoned off from the Debtors to insiders.  The second group consists of the entities and individuals that owned, controlled, dominated or otherwise managed all aspects of the Debtors' post-LBO businesses, and who used that ownership, control and management authority to improperly withdraw cash and assets from the financially distressed Debtors to benefit equity holders and their affiliates. This action seeks the imposition of liability for the fiduciary breaches of the parties named herein and restitution for unjust enrichment, as well as the recovery of the illegal dividends and distributions the Debtors were caused to issue, all so as to rectify the harm caused by the Defendants.

## THE PARTIES

**A.     The Extended Stay Litigation Trust, Trustee and The Debtors.**

6.     **The Extended Stay Litigation Trust** is a post-confirmation litigation trust established by the Extended Stay Litigation Trust Agreement, dated as of October 8, 2010 (the "Litigation Trust Agreement") in the United States Bankruptcy Court for the Southern District of New York, Case No.  09-13764 (JMP) (the "Bankruptcy Court").  The Trust Agreement was executed as part of the Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated as of June 8, 2010 and confirmed on or about July 20,

2010 (the "Plan") in the chapter 11 bankruptcy case of *In re Extended Stay, Inc. et al.* (the "Chapter 11 Cases").

7.      The Trust was established for the benefit of the creditors of the Debtors (collectively, the "Litigation Trust Beneficiaries").  Pursuant to the Plan and the Bankruptcy Court Order approving the Plan, the Trust has title to all assets described in Section 1.89 of the Plan as well as all assets transferred to the Trust pursuant to the "ESI Settlement Agreement," incorporated into the Plan.  These assets include, but are not limited to, any potential claims, causes of actions, charges, suits or rights of recovery of the Debtors and ESI (as defined below) referenced in the Examiner's Report of Ralph R. Mabey, examiner in the Chapter 11 Cases, filed with the Bankruptcy Court on April 8, 2010 (the "Litigation Trust Assets").  In that Examiner's Report, the examiner set forth his assertions of the facts leading up to the Chapter 11 Cases, and causes of action that could be asserted against various parties arising therefrom, including the causes of action asserted against the Defendants herein.

8.      **Hobart Truesdell and Walker, Truesdell, Roth & Associates** were duly appointed as the Trustees of the Trust in accordance with and pursuant to the Trust Agreement and the Bankruptcy Court Order confirming the Plan.  The Trustee and the Trust are authorized to commence all claims and causes of action formerly owned by the Debtors, which have now been indefeasibly vested in the Trust, including all causes of action asserted herein.  The Trustee and the Trust exercise all pertinent rights of the Debtors that may be relevant to this Complaint.

9.      The Trustee's principal place of business is located at 380 Lexington Avenue, Suite 1014, New York, New York 10168.  The Trustees were appointed as Trustees of the Trust in New York County effective as of October 8, 2010.

10.     For purposes of this Complaint, the following entities are the "Debtors:" ESA 2005 Operating Lessee Inc.; ESA 2005 Portfolio L.L.C.; ESA 2005-San Jose L.L.C.; ESA 2005-Waltham L.L.C.; ESA 2007 Operating Lessee Inc.; ESA Acquisition Properties L.L.C.; ESA Alaska L.L.C.; ESA Business Trust; ESA Canada Beneficiary Inc.; ESA Canada Operating Lessee Inc.; ESA Canada Properties Borrower L.L.C.; ESA Canada Properties Trust; ESA Canada Trustee Inc.; ESA FL Properties L.L.C.; ESA Management L.L.C.; ESA MD Beneficiary L.L.C.; ESA MD Borrower L.L.C.; ESA MD Properties Business Trust; ESA Mezz 10 L.L.C.; ESA Mezz 2 L.L.C.; ESA Mezz 3 L.L.C.; ESA Mezz 4 L.L.C.; ESA Mezz 5 L.L.C.; ESA Mezz 6 L.L.C.; ESA Mezz 7 L.L.C.; ESA Mezz 8 L.L.C.; ESA Mezz 9 L.L.C.; ESA Mezz L.L.C.; ESA MN Properties L.L.C.; ESA Operating Lessee Inc.; ESA P Mezz 10 L.L.C.; ESA P Mezz 2 L.L.C.; ESA P Mezz 3 L.L.C.; ESA P Mezz 4 L.L.C.; ESA P Mezz 5 L.L.C.; ESA P Mezz 6 L.L.C.; ESA P Mezz 7 L.L.C.; ESA P Mezz 8 L.L.C.; ESA P Mezz 9 L.L.C.; ESA P Mezz L.L.C.; ESA P Portfolio Holdings L.L.C.; ESA P Portfolio L.L.C.; ESA P Portfolio MD Beneficiary L.L.C.; ESA P Portfolio MD Borrower L.L.C.; ESA P Portfolio MD Trust; ESA P Portfolio Operating Lessee Inc.; ESA P Portfolio PA Properties L.L.C.; ESA P Portfolio TXNC GP L.L.C.; ESA P Portfolio TXNC Properties L.P.; ESA PA Properties L.L.C.; ESA Properties L.L.C.; ESA TX Properties L.P.; ESA TXGP L.L.C.; ESA UD Properties L.L.C.; ESH/Homestead Mezz 10 L.L.C.; ESH/Homestead Mezz 2 L.L.C.; ESH/Homestead Mezz 3 L.L.C.; ESH/Homestead Mezz 4 L.L.C.; ESH/Homestead Mezz 5 L.L.C.; ESH/Homestead Mezz 6 L.L.C.; ESH/Homestead Mezz 7 L.L.C.; ESH/Homestead Mezz 8 L.L.C.; ESH/Homestead Mezz 9 L.L.C.; ESH/Homestead Mezz L.L.C.; ESH/Homestead Portfolio L.L.C.; ESH/HV Properties L.L.C.; ESH/MSTX GP L.L.C.; ESH/MSTX Property L.P.; ESH/TN Member Inc.; ESH/TN Properties L.L.C.; ESH/TX Properties L.P.; ESH/TXGP L.L.C.; Extended Stay Hotels

L.L.C.; Extended Stay, Inc.; and Homestead Village L.L.C.  The Debtors began commencing their respective Chapter 11 Cases on June 15, 2009.  The Debtors' Chapter 11 Cases are administratively consolidated.

11.    Extended Stay, Inc. ("ESI") is a Delaware corporation and a Debtor in the Chapter 11 Cases.  At all times relevant to this Complaint, ESI was managed by a board of directors that was comprised exclusively of insiders, had no outside directors, and was managed by insiders.  Those directors were affiliated with direct or indirect equity holders of ESI.  A majority of the Debtors' pre- and post-LBO corporate organization was comprised of entities indirectly or directly owned by ESI, including, without limitation, all or substantially all of the REIT, or "real estate investment trust," portion of the Debtors' businesses.

12.    Upon information and belief, to the extent any direct or indirect subsidiaries of ESI were limited liability companies, the LLC operating agreements of those companies, including ESA P Mezz 3 L.L.C. and ESA Mezz 10 L.L.C., among others, expressly imposed fiduciary duties of loyalty and care on directors and officers similar to those of directors and officers of business corporations organized under the Delaware General Corporation Law.  Post-LBO, BHAC Capital was the direct majority owner of ESI.

13.    Homestead Village, L.L.C. ("Homestead") is a Delaware limited liability company and is a Debtor in the Chapter 11 Cases.  The portion of the Debtors' pre- and post-LBO corporate organization that was not within the ESI corporate chain was comprised of entities indirectly or directly owned by Homestead.

14.    At all times relevant to this Complaint, Homestead was managed by a corporate-style board of directors, had no independent, outside directors, and was managed by insiders.  Those directors were affiliated with direct or indirect equity holders of Homestead.

Those insiders were empowered to, and did in fact, carry out all aspects of Homestead's business. As of the date of the LBO, the boards of directors of all subsidiary entities within the Homestead side of the Debtors' business were to be reconstituted so that the members of those boards of directors would be identical to that of Homestead.

15.     The post-LBO Homestead board of directors was expressly required by the Homestead LLC operating agreement to act in good faith for so long as Homestead beneficially or constructively owned capital stock of ESI, and so long as ESI was a REIT. The Homestead post-LBO LLC operating agreement expressly imposed upon Homestead's directors and officers the fiduciary duties of good faith and fair dealing. The Homestead post-LBO LLC operating agreement expressly imposed corporate law fiduciary duties on Homestead's directors and officers to the extent that the directors and officers committed acts or omissions that rose to the level of fraud, gross negligence or willful misconduct. The Homestead pre-LBO LLC operating agreement did not expressly or impliedly disclaim traditional corporate law fiduciary duties.

16.     Upon information and belief, to the extent any direct or indirect subsidiaries of Homestead were limited liability companies, the LLC operating agreements of those companies, including ESH/Homestead Mezz 8 L.L.C., ESH/MSTX GP L.L.C., ESA P Portfolio MD Trust and ESH/TXGP L.L.C., among others, expressly imposed fiduciary duties of loyalty and care on directors and officers similar to those of directors and officers of business corporations organized under the Delaware General Corporation Law.

**B.     The Blackstone Pre-LBO Entity Defendants.**

17.     **The Blackstone Group L.P.** (individually, and in its capacity as a successor-in-interest to and direct or indirect parent of entities and funds within its pre-IPO Real

Estate or Corporate Private Equity operations, "Blackstone Group" or "Blackstone") was, upon information and belief, the direct or indirect owner and controlling entity of the nominal sellers in the LBO, a successor in interest to the Blackstone affiliates that were the direct or indirect owners or controlling entities of the nominal sellers in the LBO and an entity that derived a substantial benefit in connection with its IPO as a result of the LBO.

18.     From and after no later than approximately June 18, 2007, Blackstone Group was also the indirect owner of a substantial "rollover equity" interest in the post-LBO Debtors.  Blackstone Group is a publicly traded limited partnership organized under the laws of the State of Delaware.  As of March 31, 2011, according to recent SEC filings, Blackstone Group had managed assets of approximately $150 billion.   Blackstone Group's principal place of business is located at 345 Park Avenue, New York, New York 10154.

19.     At all times relevant to this Complaint, Blackstone's business was organized into four business segments:  Corporate Private Equity, Marketable Alternative Asset Management, Financial Advisory Services and Real Estate.  Upon information and belief, at all times relevant to this Complaint, Blackstone's pre-LBO investment in the Debtors was managed and controlled by a combination of the Senior Managing Directors named herein as Defendants in Blackstone's Real Estate and Corporate Private Equity business segments.   Prior to Blackstone's June 2007 IPO, Blackstone Group's entire business consisted of separately owned predecessor entities controlled directly or indirectly by Blackstone's founders, Stephen Schwarzman and Peter Peterson, and Blackstone's Senior Managing Directors, which include certain of the individual Defendants identified below.

20.     On or around March 5, 2004, two Blackstone investment funds, Blackstone Real Estate Partners IV ("BREP IV") and Blackstone Capital Partners IV ("BCP IV"

and, together with BREP IV, "BREP/BCP IV"), on their own behalves and on behalf of or through certain entities owned or controlled by BREP/BCP IV, purchased Extended Stay America, Inc.  Extended Stay America, Inc. was, at that time, a publicly traded corporation.  In connection with the acquisition, Extended Stay America, Inc. and, upon information and belief, other related entities, were "taken private" by Blackstone and were merged into certain other Blackstone entities, including, BHAC Capital and BHAC Capital Acquisition IV, Inc.  Blackstone Senior Managing Directors Jonathan Gray and Michael Chae oversaw the 2004 Extended Stay America, Inc. transactions for BREP IV and BCP IV, respectively.

21.      At all times relevant to this Complaint, the Blackstone Real Estate Group managed and controlled around six general real estate opportunity funds.  Upon information and belief, BREP IV was such a fund at the time of the LBO, and was the primary fund within which the pre-LBO Debtors and their immediate controlling Blackstone entities (as described below) were organized.  After the LBO and Blackstone's IPO, certain Blackstone SEC filings reference the Blackstone entity that nominally owned Blackstone's "rollover equity" in the post-LBO Debtors as being a part of the "BREP IV" fund.

22.      No later than June 18, 2007, Blackstone Group and its affiliates reorganized their corporate structure in preparation for Blackstone's IPO (the "Blackstone IPO Restructuring").  The Blackstone IPO Restructuring had been planned months before it was actually implemented.  Blackstone went public on June 21, 2007.  These initiatives had been started prior to the LBO's closing, and were completed within weeks of the LBO's closing.

23.      Upon information and belief, at all relevant times prior to the Blackstone IPO Restructuring, ESI and Homestead, and their respective subsidiaries and affiliates, including the pre-LBO Debtors, were nominally owned and controlled, directly or indirectly, by numerous

Blackstone affiliated entities or funds, including BREP/BCP IV.  Upon information and belief, certain of Blackstone's Senior Managing Directors, including certain of the Blackstone Group Individual Defendants identified and described below, managed or controlled, for Blackstone's benefit, all aspects of Blackstone's pre-IPO and pre-LBO investment in the Debtors through one or more nominally owned and controlled Blackstone affiliated entities, funds and predecessors-in-interest, including BREP/BCP IV.

24.    In connection with the Blackstone IPO Restructuring and IPO, Blackstone carried out a series of other reorganization transactions.  Blackstone's then-existing owners "contributed" to Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P. and Blackstone Holdings V L.P. (collectively "Blackstone Holdings," identified as Defendants below) each of the operating entities included in Blackstone Group's historical combined financial statements.  Upon information and belief, BREP IV, BCP IV and any other funds or Blackstone affiliated entities that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to one or more of the Blackstone Holdings entities.

25.    In connection with the Blackstone IPO Restructuring, four additional entities were established as the immediate parent entities of Blackstone Holdings (collectively, the "Blackstone Disregarded Entities"):  Blackstone Holdings I/II GP Inc. (the immediate parent of Blackstone Holdings I L.P. and Blackstone Holdings II L.P.), Blackstone Holdings III GP L.L.C. (the immediate parent of Blackstone Holdings III L.P.), Blackstone Holdings IV GP L.P. (the immediate parent of Blackstone Holdings IV L.P.) and Blackstone Holdings V GP L.P. (the immediate parent of Blackstone Holdings V L.P.).

11

26.     The Blackstone Group L.P. owns 100% of the equity of the Blackstone Disregarded Entities.  As of the time of the Blackstone IPO, The Blackstone Group L.P. owned no less than approximately 22% of Blackstone Holdings through the Blackstone Disregarded Entities.  As of the time of the Blackstone IPO, certain Senior Managing Directors, including certain of the individual Defendants identified below, and others, owned no less than approximately 78% of Blackstone Holdings.

27.     After the Blackstone IPO's completion, Blackstone's organizational structure was as set forth in the chart attached hereto as Exhibit A and incorporated herein by reference.  Upon information and belief, and at all times relevant to this Complaint, the BREP IV and BCP IV funds and their respective affiliated entities were included in the "Operating Entities" identified at the bottom of the post-IPO Blackstone organizational chart set forth in Exhibit A.  Upon information and belief, the post-IPO Blackstone organizational chart set forth in Exhibit A accurately and generally depicts Blackstone's organizational structure as of the date of this Complaint.

28.     In essence, as a result of the Blackstone IPO Restructuring, Blackstone was reorganized as a holding partnership.  Blackstone, through the Blackstone Disregarded Entities, holds equity interests in Blackstone Holdings, which in turn owns all Blackstone operating entities.  Through the Blackstone Disregarded Entities, Blackstone Group is the sole general partner of all Blackstone Holdings partnerships and, accordingly, operates and controls all business and affairs of Blackstone Holdings and, indirectly, all operating subsidiaries in the Blackstone business enterprise.

29.     After the Blackstone IPO Restructuring and the IPO, management fees, transaction fees, carried interest, incentive fees and other fees received by any subsidiary entities

or funds of Blackstone Group and Blackstone Holdings, including BREP IV, BCP IV and BRE.ESH (as defined below – the Blackstone entity that nominally held Blackstone's so-called "rollover equity" in the post-LBO Debtor enterprise), inured primarily to Blackstone Group's benefit and to the benefit of various Blackstone Senior Managing Directors including, upon information and belief, the individual Senior Managing Directors identified as Defendants herein.

30.     At all times relevant to this Complaint, a "real estate investment committee" at the top of Blackstone's Real Estate Group business segment was responsible for reviewing, analyzing and approving all aspects of the LBO.  Upon information and belief, at all times relevant to this Complaint, that real estate investment committee consisted in substantial part of certain Senior Managing Directors in Blackstone's Real Estate and Private Equity operations, including the Senior Managing Directors named as Blackstone Group Individual Defendants herein.  As described below, those Senior Managing Directors, and the other named Blackstone Group Individual Defendants identified below, orchestrated the LBO for Blackstone's benefit.

31.     At all times relevant to this Complaint, Blackstone Group directly or indirectly controlled or participated in, through Blackstone Group Senior Managing Directors and other principals placed into positions of authority within the Debtors' corporate organization, all major business decisions made by or on behalf of the Debtors, including the decision to enter into and implement the LBO.

32.     **Blackstone Holdings I L.P.** is a Delaware limited partnership and one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.   Upon information and belief, in connection with the Blackstone IPO

Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings I L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements.  Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings I L.P., a subsidiary of Blackstone.  Blackstone Holdings I L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

33.    **Blackstone Holdings II L.P.** is a Delaware limited partnership and one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.   Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings II L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements.  Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings II L.P., a subsidiary of Blackstone.  Blackstone Holdings II L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

34.    **Blackstone Holdings III L.P.** is a Delaware limited partnership and one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.   Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings III L.P.

14

one or more of the operating entities included in Blackstone Group's historical combined financial statements.  Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings III L.P., a subsidiary of Blackstone.  Blackstone Holdings III L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

35.     **Blackstone Holdings IV L.P.** is, upon information and belief, a limited partnership organized under the laws of Quebec or Canada, and is one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings IV L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements.  Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings IV L.P., a subsidiary of Blackstone.  Upon information and belief, Blackstone Holdings IV L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

36.     **Blackstone Holdings V L.P.** is, upon information and belief, a limited partnership organized under the laws of Quebec or Canada, and is one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-

existing owners contributed to Blackstone Holdings V L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements.  Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings V L.P., a subsidiary of Blackstone.  Upon information and belief, Blackstone Holdings V L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

37. **Blackstone Holdings I/II GP Inc.** is a Delaware corporation and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, Blackstone Holdings I/II GP Inc.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

38. **Blackstone Holdings III GP L.L.C.** is a Delaware limited liability company and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, Blackstone Holdings III GP L.L.C.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

39. **Blackstone Holdings IV GP L.P.** is a Delaware limited partnership and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, Blackstone Holdings IV GP L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

40. **Blackstone Holdings V GP L.P.** is, upon information and belief, a limited partnership organized under the laws of Quebec or Canada, and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO.   Upon

information and belief, Blackstone Holdings V GP L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

41.     **Blackstone Real Estate Partners IV L.P.** is, or was at all times relevant to this Complaint, a limited partnership organized under the laws of the State of Delaware. Blackstone Real Estate Partners IV L.P.'s principal place of business is, or was at all times relevant to this Complaint, located at 345 Park Avenue, New York, New York 10154.

42.     **Blackstone Capital Partners IV L.P.** is, or was at all times relevant to this Complaint, a limited partnership organized under the laws of the State of Delaware. Blackstone Real Estate Partners IV L.P.'s principal place of business is, or was at all times relevant to this Complaint, located at 345 Park Avenue, New York, New York 10154.

43.     **BHAC IV, LLC** ("BHAC IV") was a seller in the LBO.  At the time of the LBO, BHAC IV was an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group.  BHAC IV received distributions in connection with the LBO as a nominal seller in the LBO.  BHAC IV is a limited liability company organized under the laws of the State of Delaware and remains an affiliate of Blackstone Group. Upon information and belief, BHAC IV is a shell entity that conducts no operations.  BHAC IV's principal place of business is located at 345 Park Avenue, New York, New York 10154.

44.     **BRE/HV Holdings LLC** ("BRE.HV") was a seller in the LBO.  At the time of the LBO, BRE.HV was an affiliate of Blackstone Group.  BRE.HV received distributions in connection with the LBO as a nominal seller in the LBO.  BRE.HV is a limited liability company organized under the laws of the State of Delaware and was and remains an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group.  Upon information and belief,

BRE.HV is a shell entity that conducts no operations.  BRE.HV's principal place of business is located at 345 Park Avenue, New York, New York 10154.

45.     **Blackstone Hospitality Acquisitions, LLC** ("Blackstone Hospitality") was an affiliate of the sellers in the LBO.  Although it was not itself a "seller" in connection with the LBO, Blackstone Hospitality received significant distributions of cash proceeds in connection the LBO.  Blackstone Hospitality is a limited liability company organized under the laws of the State of Delaware.  Upon information and belief, Blackstone Hospitality is a shell entity that conducts no operations, but rather is (or at least was) used by Blackstone Group in connection with certain acquisition activities carried out by Blackstone Group in the hospitality industry.  Upon information and belief, Blackstone Hospitality was and remains an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group.  Blackstone Hospitality's principal place of business is located at 102 Townsend Dr., Weimar, TX 78962.

46.     **Prime Hospitality, LLC** ("Prime") was an affiliate of the sellers in the LBO and Blackstone Group.  Prime received distributions in connection with the LBO and was, upon information and belief, a seller of certain assets in connection with the LBO.  Prime is a limited liability company organized under the laws of the State of Delaware.  Upon information and belief, Blackstone Hospitality was and remains an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group.  Prime's principal place of business is located at 700 Route 46 East, Fairfield, New Jersey 07004 or 16850 Bear Valley Road, Victorville, California 92395.

47.     BHAC IV, BRE.HV, Blackstone Group, Blackstone Holdings, the Blackstone Disregarded Entities, BREP IV, BCP IV, Blackstone Hospitality and Prime are sometimes collectively referred to in this Complaint as the "Blackstone Pre-LBO Entity

Defendants."  BHAC IV and BRE.HV are sometimes referred to herein as the "Sellers." At all times relevant to the Complaint, BHAC IV, BRE.HV, Blackstone Hospitality and Prime were owned, controlled or dominated in all respects by Blackstone Group or Blackstone Group predecessors in interest and affiliates, and all business dealings by each of those entities were conducted solely for the benefit of Blackstone Group and to the detriment of the Debtors and their creditors.

**C.**  **The LBO Buyer Entity Defendants.**

48.  **DL-DW Holdings, LLC** ("DL-DW" or "Buyer") was the nominal buyer of the stock of BHAC IV and BRE.HV in the LBO.  DL-DW is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 460 Park Avenue, Suite 1300, New York, New York 10022.  DL-DW was formed for the purpose of carrying out the LBO and, at all times relevant to this Complaint, was owned or controlled by David Lichtenstein, a Defendant herein.  Following the closing of the LBO, DL-DW was the sole direct member of Homestead, and exercised at least indirect ownership or control over BHAC Capital, the majority shareholder of ESI, and ESI.

49.  **Lightstone Holdings, LLC** ("Lightstone Holdings") was a member of DL-DW, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Lightstone Holdings is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 460 Park Avenue, Suite 1300, New York, New York 10022. Lightstone Holdings was, at all time relevant to this Complaint, indirectly owned or controlled by Lichtenstein.

50.     **The Lightstone Group, LLC** ("Lightstone Group") was the direct or indirect corporate parent or grandparent of DL-DW, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Lightstone Group is a limited liability company organized under the laws of the State of New Jersey with its principal place of business at 460 Park Avenue, Suite 1300, New York, New York 10022.  Lightstone Group was, at all times relevant to this Complaint, at least indirectly owned or controlled by Lichtenstein.  Lightstone Group and Lightstone Holdings were, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Lightstone Group" of investors, which also included Prime Group Realty Trust, a Maryland real estate investment trust, Lichtenstein, certain members of Lichtenstein's family and certain investment funds that were, upon information and belief, owned or controlled by Lichtenstein.

51.     **PGRT ESH Inc.** ("PGRT") was a member of BHAC Capital, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  PGRT is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 330 W Wabash Ave # 2800, Chicago, Illinois 60611.  Upon information and belief, PGRT was, at all times relevant to this Complaint, owned or controlled, directly or indirectly, by Lichtenstein.

52.     **Lightstone Commercial Management** ("Lightstone Commercial") was an affiliate of The Lightstone Group and Lightstone Holdings.  Lightstone Commercial is a limited liability company organized under the laws of the State of New Jersey with its principal place of business, upon information and belief, at 460 Park Avenue, Suite 1300, New York, New York 10022.  Lightstone Commercial was, at all times relevant to this Complaint, at least

indirectly owned or controlled by Lichtenstein.  Lightstone Holdings, Lightstone Group, PGRT and Lightstone Commercial are collectively referred to in this Complaint as "Lightstone."

53.     **Arbor ESH II LLC** ("Arbor") was a member of BHAC Capital, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Arbor is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 333 Earle Ovington Boulevard, Uniondale, New York 11553.  Upon information and belief, at all times relevant to this Complaint, Arbor was an affiliate of Ivan Kaufman.  Arbor was, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Arbor Group," which included various Arbor entities owned or controlled directly or indirectly by Mr. Kaufman, and also included Joseph Tabak, Princeton (as defined below), Joseph Chetrit, Atmar (as defined below), Glida (as defined below) and Ron Invest (as defined below).

54.     Upon information and belief, Arbor was, at all time relevant to this Complaint, a direct or indirect wholly-owned subsidiary of Arbor Realty Limited Partnership, which was itself a wholly-owned operating subsidiary of Arbor Realty Trust, Inc., a publicly traded real estate investment trust with managed assets well in excess of $1.5 billion according to its recent SEC filings.  Upon information and belief, Arbor is, and was, at all times relevant to this Complaint, an affiliate of Arbor Commercial Mortgage, LLC.  Arbor and its affiliates had the right to appoint one or more Arbor designees to the consolidated board of directors for the "Extended Stay Hotels family of companies."

55.     **Arbor Commercial Mortgage, LLC** ("Arbor Commercial Mortgage") was, and is, the manager and advisor for Arbor Realty Trust, Inc., and performs loan originating, underwriting and other related services on behalf of Arbor Realty Limited Partnership.  Upon

21

information and belief, at all times relevant to this Complaint, Arbor Commercial Mortgage was an affiliate of Ivan Kaufman and Arbor.  Mr. Kaufman, Arbor and their affiliates were heavily involved in all aspects of the LBO, including, without limitation, arranging for the financing commitment made by the lenders in the LBO to Lichtenstein on or around May 1, 2007.  Arbor Commercial Mortgage is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 333 Earle Ovington Blvd., Suite 900, Uniondale, New York 11553.

56.      Upon information and belief, at all times relevant to this Complaint, Ivan Kaufman was the President and CEO of Arbor Realty Trust, Inc., the Chairman and CEO of Arbor Commercial Mortgage, LLC and owned, either individually or indirectly through various entities he wholly owns, no less than approximately 90% of Arbor Commercial Mortgage, LLC. Mr. Ivan Kaufman attended and participated in the board of directors meetings held on November 13, 2008 and January 29, 2009, among others, and also attended and participated in certain executive sessions of board of directors meetings of the Debtors.  Upon information and belief, Mr. Kaufman's attendance at those meetings was to ensure that improper equity distributions would continue to be made from the Debtors, either directly or through other entities, to the Arbor entities that Mr. Kaufman owns or controls, as described herein.

57.      **Princeton ESH LLC** ("Princeton") was a member of DL-DW, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Princeton is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 375 Park Avenue Suite 3401, New York, New York 10152.  Princeton was, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Arbor

Group" of investors, which included various Arbor entities owned or controlled directly or indirectly by Mr. Kaufman, and also included Joseph Tabak, Arbor (as defined below), Joseph Chetrit, Atmar (as defined below), Glida (as defined below) and Ron Invest (as defined below).

58.    **Atmar Associates, LLC** ("Atmar") was a member of DL-DW, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Atmar was, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Arbor Group" of investors, which included various Arbor entities owned or controlled directly or indirectly by Mr. Kaufman, and also included Joseph Tabak, Arbor, Joseph Chetrit, Glida (as defined below) and Ron Invest (as defined below).  Atmar is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 404 Fifth Avenue, 4th Floor New York, New York 10018.  Upon information and belief, Atmar is indirectly owned or controlled by Joseph Chetrit, or members of Chetrit's family.

59.    **Glida One LLC**    ("Glida") was a member of BHAC Capital, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Glida was, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Arbor Group" of investors, which included various Arbor entities owned or controlled directly or indirectly by Mr. Kaufman, and also included Joseph Tabak, Arbor, Joseph Chetrit, Atmar and Ron Invest (as defined below).  Glida is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 404 Fifth Avenue, 4th Floor, New York, New York 10018.  Glida was, at all times relevant to this Complaint, owned or controlled, directly or indirectly by Chetrit, or members of the Chetrit family.

60.     **Ron Invest LLC** ("Ron Invest") was a member of BHAC Capital, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Ron Invest was, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Arbor Group" of investors, which included various Arbor entities owned or controlled directly or indirectly by Mr. Kaufman, and also included Joseph Tabak, Arbor, Joseph Chetrit, Atmar and Glida.  Ron Invest is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 404 Fifth Avenue, Fourth Floor, New York, New York 10018.  Upon information and belief, Ron Invest is indirectly owned or controlled by Joseph Chetrit, or members of Chetrit's family.

61.     **Polar Extended Stay (USA) L.P.** ("Polar") was a member of BHAC Capital, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Polar is a limited partnership company organized under the laws of the State of Delaware with its principal place of business at 21 Haarbaah St., Tel Aviv, Israel 64739.  Polar's general partner is Poland International Trading Ltd.

62.     **BHAC Capital IV, L.L.C.** ("BHAC Capital"), was the majority shareholder of ESI (as defined below), and held, at all times relevant to this Complaint for the period after the LBO's closing, no less than approximately 99% of the equity of ESI.  BHAC Capital is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 326 Third Street, Lakewood New Jersey 08701.

63.     **BRE/ESH Holdings, LLC** ("BRE.ESH") was a member of DL-DW, and exercised at least indirect ownership, control or influence, for Blackstone Group's benefit, over

BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  BRE.ESH is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 345 Park Avenue, New York, New York 10154.  At all times relevant to this Complaint, BRE/ESH was a directly or indirectly owned affiliate of Blackstone Group.  Upon information and belief, BRE.ESH is a shell entity that conducts no operations.  BRE.ESH was the nominal holder of the $200 Million "rollover equity" interest received by Blackstone Group in connection with the LBO, as described below.

64.     DL-DW, Princeton, Atmar, Lightstone Holdings, BRE.ESH, Lightstone Group, Lightstone Commercial, BHAC Capital, Arbor, Arbor Commercial Mortgage, Polar, Glida, PGRT and Ron Invest are sometimes collectively referred to in this Complaint as the "LBO Buyer Entity Defendants."

**D.      The Individual Director and Officer Defendants.**

**1.      The Post-LBO Individual Defendants.**

65.     **David Lichtenstein** ("Lichtenstein") was, at all times relevant to this Complaint, the Chairman and Chief Executive Officer of all or substantially all of the Lightstone entities, and held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" which, according to the minutes of consolidated Meetings of the Board of Directors of "Extended Stay Hotels family of companies," included DL-DW, BHAC Capital, Homestead (a Debtor) and ESI (also a Debtor) and each of their direct and indirect subsidiaries.  All final decision-making authority for those entities and, indeed, for all of the Debtors, resided with and was exercised by the board of directors of the "Extended Stay Hotels family of companies."

66.     Lichtenstein was the Chairman of the Board of Directors and the President and CEO of the entities within the "Extended Stay Hotels family of companies."  As Chairman, CEO and President, Lichtenstein had general supervisory authority over the daily business operations and affairs of those companies and was empowered to given counsel and advice to the board of directors on all subjects concerning the welfare of those companies and the conduct of their business.

67.     Lichtenstein was also a director, Chairman of the board of directors, CEO and President of 65 of the Debtor entities and affiliates listed above.  Lichtenstein was an insider director and President of all mortgage borrower Debtors, mezzanine borrower Debtors and operating lessee Debtors at all relevant times following the closing of the LBO.  Lichtenstein authorized all aspects of the LBO for those Debtors and others.

68.     Lichtenstein regularly attended and, in most cases, chaired all meetings of the "Extended Stay Hotels family of companies'" board of directors as a director, the Chairman, President and CEO of those companies, including, without limitation, board meetings that were held on the following dates, among others:  November 15, 2007, February 14, 2008, May 15, 2008, August 14, 2008, November 13, 2008, December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009, February 25, 2009, March 17, 2009, April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009.  All board meetings identified above were conducted in New York City to the extent the meetings were in person.  Certain meetings were conducted via telephone.  At the board meetings identified above, Lichtenstein was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

69.     Lichtenstein led the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors.  In light of that status, and as an attendee at relevant board meetings from 2007 through 2009 identified above, Lichtenstein regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Lichtenstein was aware of the Debtors' financial and other difficulties at all relevant times.  Lichtenstein also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders, including affiliates of ESI and Homestead that were owned or controlled by Lichtenstein, as described herein.   As a high-ranking member of senior management, Lichtenstein knew or should have known of all relevant, material facts and events alleged herein.

70.     Lichtenstein is a resident of the State of New Jersey and may be served with process at the following address:  20 Autumn Road, Lakewood, New Jersey 08701-1619.

71.     **Bruno de Vinck** ("de Vinck") was, at all times relevant to this Complaint, Senior Vice President of Special Projects of one or more of the Lightstone entities identified herein, and held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" which, according to the Minutes of consolidated Meetings of the Board of Directors of "Extended Stay Hotels family of companies," included DL-DW, BHAC Capital, Homestead (a Debtor) and ESI (also a Debtor).  All final decision-making authority for those entities and, indeed, for all of the Debtors, resided with and was exercised by the board of directors of the "Extended Stay Hotels family of companies."

72.     De Vinck regularly attended meetings of the "Extended Stay Hotels family of companies'" board of directors as a director, including, without limitation, board meetings that were held on the following dates, among others:  November 15, 2007, February 14, 2008, May 15, 2008, August 14, 2008, November 13, 2008, December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009, February 25, 2009, March 17, 2009, April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009 (by proxy given to Joseph Teichman).  De Vinck sometimes also acted as the Secretary for those meetings, recorded the minutes of such meetings and was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

73.     De Vinck was a member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors. In light of that status, and as an attendee at relevant board meetings from 2007 through 2009 identified above, de Vinck regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, de Vinck was aware of the Debtors' financial and other difficulties at all relevant times.  De Vinck also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders as described herein.   As a high-ranking member of senior management, de Vinck knew or should have known of all relevant, material facts and events alleged herein.

74.     De Vinck is a resident of the State of New Jersey and may be served with process at the following address:  128 S. Central Avenue, Ramsey, New Jersey 07446-2408.

75.     **Peyton "Chip" Owen, Jr.** ("Owen") was, at all times relevant to this Complaint, President and Chief Operating Officer of one or more of the Lightstone entities. From and after no later than November 15, 2007, Owen held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" identified above, including, without limitation, Homestead and ESI.

76.     Owen regularly attended meetings of the "Extended Stay Hotels family of companies'" board of directors as a director, including, without limitation, board meetings that were held on the following dates, among others:  November 15, 2007 (where he was formally appointed to the board by  Lichtenstein), February 14, 2008, May 15, 2008, August 14, 2008, November 13, 2008, December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009, February 25, 2009, March 17, 2009, April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009.  At those meetings, Owen was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

77.     Owen was another member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors.  In light of that status, and as an attendee at relevant board meetings from 2007 through 2009 identified above, Owen regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Owen was aware of the Debtors' financial and other

difficulties at all relevant times.  Owen also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders as described herein.   As a high-ranking member of senior management, Owen knew or should have known of all relevant, material facts and events alleged herein.

78.     Owen is a resident of the State of Illinois and may be served with process at the following address:  1150 W. Keswick Lane, Lake Forest, Illinois 60045-1132.

79.     **Guy R. Milone, Jr.** ("Milone") held, from and after no later than May 15, 2008, interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" identified above, including, without limitation, Homestead and ESI.  Milone was appointed to his director position to replace Joseph Martello as a designee of Arbor Realty Trust, Inc. and Arbor to the board.  Upon information and belief, at all times relevant to this Complaint, Milone was also a General Counsel of Arbor Realty Trust, Inc., an indirect owner of equity in one or more of the Debtors.

80.     Milone regularly attended meetings of the "Extended Stay Hotels family of companies'" board of directors as a director, including, without limitation, board meetings that were held on the following dates, among others:  May 15, 2008, August 14, 2008, November 13, 2008, December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009, February 25, 2009, April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009.  At those meetings, Milone was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

81.     From and after no later than May 15, 2008, Milone was a member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above.  In light of that status, and as an attendee at relevant board meetings from 2008 through 2009 identified above, Milone regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Milone was aware of the Debtors' financial and other difficulties at all relevant times following his appointment to the board.  Milone also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders as described herein, including with Arbor entities and affiliates with which Milone was affiliated at the time.  As a high-ranking member of senior management, Milone knew or should have known of all relevant, material facts and events alleged herein that occurred on or after May 15, 2008.

82.     Milone is a resident of the State of New York and may be served with process at the following address:  29 Tremont Street, Garden City, New York 11530-6413.

83.     **Joseph Chetrit** ("Chetrit") was, at all times relevant to this Complaint, upon information and belief, a direct or indirect owner or member of senior management of Atmar, Glida and Ron Invest, and certain entities affiliated with each of those entities.  Chetrit held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" at times relevant to this Complaint, including Homestead and ESI.

84.     Chetrit regularly attended meetings of the "Extended Stay Hotels family of companies'" board of directors as a director or, in some cases, as an "invited guest" (although he was a director at all relevant times) including, without limitation, board meetings that were held

on the following dates, among others:  November 13, 2008 (as an "invited guest"), December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009 (as an "invited guest," despite his board position), February 25, 2009, March 17, 2009 (by proxy given to Teichman), April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009.  At those meetings, Chetrit was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

85.     During his tenure as a member of the board of directors, Chetrit was a member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors.  In light of that status, and as an attendee at relevant board meetings from 2008 through 2009 identified above, or in his capacity as a substantial indirect holder of preferred equity in BHAC Capital, Chetrit regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Chetrit was aware of the Debtors' financial and other difficulties at all relevant times following his appointment to the board, at the latest.  Chetrit also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and other improper transactions with, insiders as described herein, including entities owned or controlled by him.

86.     As a high-ranking member of senior management and an insider, Chetrit knew or should have known of all relevant, material facts and events alleged herein.

87.     Chetrit is a resident of the State of New York and may be served with process at the following address:  55 East 74th Street, New York, New York 10021-2734.

88.     **Joseph Teichman** ("Teichman") held, from and after no later than May 15, 2008, interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" identified above, including, without limitation, Homestead and ESI.  At times relevant to this Complaint, Teichman was also the Secretary and General Counsel of 65 of the Debtor entities above, including both Homestead and ESI.  Teichman was an insider director of numerous mortgage borrower Debtors, mezzanine borrower Debtors and operating lessee Debtors at all relevant times following the closing of the LBO.  At all times relevant to this Complaint, Teichman was also the Senior Corporate Counsel for all or substantially all of the Lightstone entities identified above.

89.     Teichman regularly attended meetings of the "Extended Stay Hotels family of companies'" board of directors as either a director or high-ranking senior officer of those companies, including, without limitation, board meetings that were held on the following dates, among others:  November 15, 2007, February 14, 2008, May 15, 2008, August 14, 2008, November 13, 2008, December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009, February 25, 2009, March 17, 2009, April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009.  At all meetings occurring from and after no later than May 15, 2008, Teichman was called upon to, and did in fact, vote as a director regarding material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.  At all board meetings occurring prior to May 15, 2008, Teichman attended such meetings and was called upon to, and did in fact, make recommendations to the board regarding all material facts and events described herein.

90.     At all times relevant to this Complaint, Teichman was a member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and

activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors.  In light of that status, and as an attendee at relevant board meetings from 2007 through 2009 identified above, Teichman regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Teichman was aware of the Debtors' financial and other difficulties at all relevant times.  Teichman also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and other improper transactions with, insiders as described herein, including Lightstone entities for which he was acting as a high-ranking officer.  As a high-ranking member of senior management of the Debtors, Teichman knew or should have known of all relevant, material facts and events alleged herein.

91.     Teichman is a resident of the State of New Jersey and may be served with process at the following address:  515 Ridge Ct., Lakewood, New Jersey 08701-1544.

92.     **Joseph Martello** ("Martello") held, from June 11, 2007 until, upon information and belief, approximately May of 2008, interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" identified above, including, without limitation, Homestead and ESI.  During his tenure as a director of the "Extended Stay Hotels family of companies," Martello was a designee of Arbor Realty Trust, Inc. and Arbor to the board and was an affiliate or insider of one or more entities related to Arbor, including those described above.  Martello resigned from the board of directors for the "Extended Stay Hotels family of companies" on or around May 15, 2008, after which time Milone occupied one of the "Arbor seats" on that board.

93.     During his tenure as a director, Martello attended meetings of the "Extended Stay Hotels family of companies'" board of directors that were held on the following dates, among others:  November 15, 2007 and February 14, 2008.  At those meetings, Martello was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

94.     During his tenure as a director, Martello was a member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors.  In light of that status, and as an attendee at relevant board meetings during 2007 and 2008 identified above, Martello regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Martello was aware of the Debtors' financial and other difficulties at all relevant times during his tenure as a member of the board.  Martello also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders as described herein, including with Arbor related entities with which he was affiliated at the time.  As a high-ranking member of senior management, Martello knew or should have known of all relevant, material facts and events alleged herein that occurred prior to around May of 2008.

95.     Martello is a resident of the State of New York and may be served with process at the following address:  430 East 58th Street, New York, New York 10022-2330.

96.     **F. Joseph Rogers** ("Rogers") was a high-ranking member of senior management of the "Extended Stay Hotels family of companies."   Rogers was the Assistant Secretary or Vice President of 55 of the Debtor entities listed above.  Rogers was therefore a

high-ranking officer of all or substantially all of the mortgage borrower Debtors, the mezzanine borrower Debtors and the operating lessee Debtors.   Rogers was also the Executive Vice President of Finance and Accounting of the "Extended Stay Hotels family of companies," including Homestead and ESI.

97.     Rogers regularly attended board of directors meetings for the "Extended Stay Hotels family of companies," including the following meetings, among others:   November 15, 2007, February 14, 2008, May 15, 2008 and August 14, 2008.   At one or more of those meetings, Rogers received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors. Thus, Rogers was aware of the Debtors' financial and other difficulties at all relevant times. during his tenure as a high-ranking officer of one or more of the Debtors.   Rogers likewise was aware of, but did nothing to attempt to stop, improper post-LBO dividends and other distributions to insiders, and other improper transactions with insiders, as described herein.   As a high-ranking member of senior management, Rogers knew or should have known of all relevant, material facts and events alleged herein.

98.     Rogers is a resident of the State of South Carolina and may be served with process at the following address:  405 Carleton Circle, Spartanburg, South Carolina 29301.

99.     **David Kim** ("Kim") was a high-ranking member of senior management of the "Extended Stay Hotels family of companies."   From and after no later than approximately August of 2007, Kim was the Executive Vice President and Chief Investment Officer of the "Extended Stay Hotels family of companies," including Homestead and ESI.   Kim is currently a Managing Director in Blackstone Group's Real Estate Group.   Upon information and belief, at

all times relevant to this Complaint, Kim held the same or similar position with Blackstone Group.

100.    Kim regularly attended board of directors meetings for the "Extended Stay Hotels family of companies," including the following meetings, among others:  November 15, 2007, February 14, 2008, May 15, 2008, August 14, 2008, November 13, 2008.  At one or more of those meetings, Kim delivered detailed reports of management to the board regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Kim was aware of the Debtors' financial and other difficulties at all relevant times during his tenure as a high-ranking officer of one or more of the Debtors.  Kim likewise was aware of, but did nothing to attempt to stop, improper post-LBO dividends and other distributions to insiders, and other improper transactions with insiders, as described herein.  As a high-ranking member of senior management, Kim knew or should have known of all relevant, material facts and events alleged herein.

101.    Kim is a resident of Hong Kong, Peoples' Republic of China and may be served with process at the following address:  Suite 901, Two International Finance Centre, 8 Finance Street, Central, Hong Kong, Peoples' Republic of China.

102.    **Gary DeLapp** ("DeLapp") was a high-ranking member of senior management of the "Extended Stay Hotels family of companies" at all times relevant to this Complaint.  Prior to the LBO, DeLapp was the President and CEO of ESI.  After the LBO, DeLapp was the President of the so-called "Extended Stay Hotels family of companies," including Homestead and ESI.   DeLapp also held officer-level positions with several other post-LBO Debtor entities and affiliates at all times relevant to this Complaint.

103.    DeLapp regularly attended board of directors meetings for the "Extended Stay Hotels family of companies," including the following meetings, among others:  November 15, 2007, February 14, 2008, May 15, 2008, August 14, 2008 and November 13, 2008.  At one or more of those meetings, DeLapp received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, DeLapp was aware of the Debtors' financial and other difficulties at all relevant times during his tenure as a high-ranking officer of one or more of the Debtors.  DeLapp likewise was aware of, but did nothing to attempt to stop, improper post-LBO dividends and other distributions to insiders, as described herein.  As a high-ranking member of senior management, DeLapp knew or should have known of all relevant, material facts and events alleged herein.

104.    DeLapp is a resident of the State of South Carolina and may be served with process at the following address:  409 Sweetbay Terrace, Spartanburg, South Carolina 29306-6682.

105.    Lichtenstein, de Vinck, Owen, Milone, Chetrit, Teichman, Martello, Rogers, Kim and DeLapp are sometimes collectively referred to in this Complaint as the "LBO Buyer Individual Defendants."

## 2.    Blackstone Individual Defendants.

106.    **Jonathan D. Gray** ("Gray") held, at all relevant times prior to and at the LBO's closing, the following senior management positions within the pre-LBO Debtors' and Blackstone Pre-LBO Entity Defendants' corporate organization: (a) Senior Managing Director and Vice President of BRE.HV, a Seller, (b) Senior Managing Director and Vice President of BHAC IV, a Seller, (c) Senior Managing Director and Vice President of Blackstone Hospitality,

(d) Senior Managing Director, President and a member of the board of directors of pre-LBO ESI, (e) Chairman of the Board and CEO of pre-LBO BHAC Capital, which was the wholly-owned subsidiary of BHAC IV, (f) Senior Managing Director and Vice President of Blackstone Real Estate Acquisitions IV, L.L.C., a Blackstone affiliate that managed pre-LBO HVM (as defined below), and (g) senior management or officer positions for no less than approximately 57 other separate Seller subsidiaries in the pre-LBO Debtors' corporate structure, including, without limitation, all or substantially all of the pre-LBO Debtor mezzanine borrowers.  Subsequent to the LBO's closing, Gray was also the Senior Managing Director and Vice President of BRE.ESH, a member of DL-DW and nominal holder of the $200 Million "rollover equity" interest received by Blackstone Group in connection with the LBO.

107.   During that same period of time, Gray was a Senior Managing Director, a high-ranking member of management of Blackstone Group and acted for Blackstone's benefit, as opposed to the benefit of the Debtor entities to which he owed fiduciary and other obligations. Currently, Gray is a Senior Managing Director and Co-Chairperson of Blackstone Group's Real Estate Group.  Upon information and belief, at all times relevant to this Complaint, Gray held the same or similar positions with Blackstone Group.

108.   By virtue of his high-ranking positions within the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Gray was called upon to, and did in fact, exercise management authority for those entities.  Indeed, as a high-ranking member of management and officer authorized to act on behalf of the pre-LBO Debtors and the Blackstone Pre-LBO Entity Defendants, Gray executed certain agreements and other documents in connection with the LBO on behalf of one or more of the Blackstone Pre-LBO Entity Defendants including, without limitation, Blackstone Hospitality.  Gray was also designated as

one of the persons whose "knowledge" could be charged to the Sellers under the LBO documents.  Gray also approved and authorized the LBO on behalf of pre-LBO ESI.  In certain press releases issued by Blackstone Group at or around the time the LBO closed, Gray was lauded for his lead role in consummating the transaction on behalf of the pre-LBO Debtors and Blackstone Group.

109.    Gray is a resident of the State of New York and may be served with process at the following address:  333 East 57th Street, Apt. 8A , New York, New York 10022-2422.

110.    **William Stein** ("Stein") held, at all relevant times prior to and at the LBO's closing, the following senior management positions within the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate organization: (a) Managing Director and Vice President of BRE.HV, a Seller, (b) Managing Director and Vice President of BHAC IV, a Seller, (c) a Senior Managing Director and Vice President of pre-LBO ESI, (d) Managing Director and Vice President for Blackstone Real Estate Acquisitions IV, L.L.C., a Blackstone affiliate that managed pre-LBO HVM, (e) Managing Director and Vice President of pre-LBO Homestead, and (f) senior management or officer positions with no less than approximately 53 other separate Seller subsidiaries in the pre-LBO Debtors' corporate structure, including, without limitation, all or substantially all of the pre-LBO Debtor mezzanine borrowers.  During that same period of time, Stein was an officer or employee of Blackstone Group and acted for Blackstone Group's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations.  Currently, Stein is a Senior Managing Director of Blackstone Group's Real Estate Group.  Upon information and belief, at all times relevant to this Complaint, Stein held the same or similar positions with Blackstone Group.

111.    By virtue of his high-ranking positions within the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Stein was called upon to, and did in fact, exercise management authority for those entities.  Indeed, as a high-ranking member of management and officer authorized to act on behalf of the pre-LBO Debtor or Seller entities, Stein executed certain agreements and other documents in connection with the LBO on behalf of one or more of the Sellers.  Stein was also designated as one of the persons whose "knowledge" could be charged to the Sellers under the LBO documents.  In connection with the LBO, Stein was responsible for, among other things, coordinating the redemption of common shares held by certain shareholders of pre-LBO ESI and addressing, for Blackstone and the Sellers, post-LBO disputes that arose with Lichtenstein regarding certain post-closing purchase price adjustments.

112.    Like Gray, in certain press releases issued by Blackstone Group at or around the time the LBO closed, Stein was lauded for his lead role in consummating the transaction on behalf of the pre-LBO Debtors and Blackstone Group.  After the LBO closed, Stein attended board of directors meetings for the "Extended Stay Hotels family of companies" described above on behalf of the Blackstone Group, including, without limitation, the board meeting conducted on February 14, 2008.  The minutes of certain board of directors' meetings designate Stein as an "officer" of the "Extended Stay Hotels family of companies," which included Homestead and ESI, among others.

113.    Stein is a resident of the State of New York and may be served with process at the following address: 4 Rolling Hills Lane, Harrison, New York 10528.

114.    **Michael Chae** ("Chae") was, at all relevant times prior to and at the LBO's closing, a high-ranking officer of one or more of the pre-LBO Debtor entities including, without limitation, (a) a member of the Board of Directors of pre-LBO ESI, (b) the President of

pre-LBO BHAC Capital, and (c) an officer of pre-LBO ESA Spartanburg LLC, and possibly other pre-LBO Debtors.  During that same period of time, Chae was an officer or employee of Blackstone Group and acted for Blackstone's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations.  Currently, Chae is a Senior Managing Director of Blackstone Group's Private Equity Group.  Upon information and belief, at all times relevant to this Complaint, Chae held the same or similar positions with Blackstone Group.  Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Chae was called upon to, and did in fact, exercise management authority for those entities.  Chae also approved and authorized the LBO on behalf of pre-LBO ESI.

115.    Chae is a resident of the State of New York and may be served with process at the following address:  1111 Park Avenue, New York, New York 10128-1234.

116.    **Robert L. Friedman** ("Friedman") was, at all relevant times prior to and at the LBO's closing, a high-ranking officer of one or more of the pre-LBO Debtor entities including, without limitation, (a) a member of the Board of Directors of pre-LBO ESI, (b) a Senior Managing Director and Vice President of pre-LBO BHAC Capital, and (c) an officer or director of pre-LBO ESA Spartanburg LLC, and possibly other pre-LBO Debtors.  During that same period of time, Friedman was an officer or employee of Blackstone Group and certain Blackstone Group affiliates, including Blackstone Asset Management, LLC, and acted for Blackstone's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations.  Currently, Friedman is a Senior Managing Director of Blackstone Group's Legal and Compliance Group.  Upon information and belief, at all times relevant to this Complaint, Friedman held the same or similar positions with Blackstone Group.

Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Friedman was called upon to, and did in fact, exercise management authority for those entities.  Friedman also approved and authorized the LBO on behalf of pre-LBO ESI.

117.    Friedman is a resident of the State of New York and may be served with process at the following address:  68 Island Drive, Rye, New York 10580.

118.    **Thomas Burdi** ("Burdi") was, at all relevant times prior to and at the LBO's closing, Chief Financial Officer or Executive Vice President of Finance of the "Extended Stay Hotels," which included, upon information and belief, pre-LBO ESI, and possibly other pre-LBO Debtor entities.  Upon information and belief, during that same period of time, Burdi was an officer or employee of Blackstone Group and acted for Blackstone's benefit, as opposed to the benefit of ESI and other pre-LBO Debtors to which he owed fiduciary and other obligations. Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Burdi was called upon to, and did in fact, exercise management authority for those entities.  Burdi was designated as one of the persons whose "knowledge" could be charged to the Sellers under the LBO documents.

119.    Burdi is a resident of the State of New Jersey and may be served with process at the following address:  P.O. Box 423, Ridgewood, New Jersey 07451-0423.

120.    **Gary Sumers** ("Sumers") was, at all relevant times prior to and at the LBO's closing, a high ranking officer and member of senior management of 53 of the Seller subsidiary Debtor entities, which included, upon information and belief, all or substantially all of the pre-LBO Debtor mezzanine borrower entities, and other pre-LBO Debtor entities.  Sumers

currently is a Senior Managing Director of Blackstone Group's Real Estate Group.   Upon information and belief, prior to the LBO at all times relevant to this Complaint, Sumers held the same or similar positions within Blackstone Group's corporate organization and acted for Blackstone's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations.   Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' corporate structure, Sumers was called upon to, and did in fact, exercise management authority for those pre-LBO Debtor entities and for one or more of the Blackstone Pre-LBO Entity Defendants.

121.    Sumers is a resident of the State of New York and may be served with process at the following address 888 Park Avenue- Apt 11 C, New York, New York 10075-0282.

122.    **Dennis J. McDonagh** ("McDonagh") was, at all relevant times prior to and at the LBO's closing, a high-ranking officer of one or more of the entities within the Debtors' pre-LBO corporate organization, including, without limitation, (a) Senior Managing Director, Vice President, Secretary and Treasurer of pre-LBO ESI, (b) Senior Managing Director, Vice President, Secretary and Treasurer of Blackstone Real Estate Acquisitions IV, L.L.C., and (c) an officer, director or manager of BRE.HV, a nominal Seller.   During that same period of time, McDonagh was an officer or employee of Blackstone Group and acted for Blackstone Group's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations.   Currently, McDonagh is a Senior Managing Director in Blackstone Group's Real Estate Group.   Upon information and belief, at all times relevant to this Complaint, McDonagh held the same or similar positions with Blackstone Group.   Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, McDonagh was

44

called upon to, and did in fact, exercise management authority for those entities.  McDonagh was designated as one of the persons whose "knowledge" could be charged to the Sellers under the LBO documents.

123.    McDonagh is a resident of the State of New York and may be served with process at the following address:  138 East Shore Road, Halsite, New York 11743-1140.

124.    **Alan Miyasaki** ("Miyasaki") was, upon information and belief, at all relevant times prior to and at the LBO's closing, a high-ranking officer of one or more of the entities within the Debtors' pre-LBO corporate organization.  Miyasaki was the Vice President and Assistant Secretary for pre-LBO BHAC Capital and several other pre-LBO Debtor entities. During that same period of time,  Miyasaki was, upon information and belief, an officer or employee of Blackstone Group and acted for Blackstone Group's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations.

125.    Currently, Miyasaki is a Senior Managing Director in Blackstone Group's Real Estate Group.   Upon information and belief, at all times relevant to this Complaint, Miyasaki held the same or similar positions with Blackstone Group.  Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Miyasaki was called upon to, and did in fact, exercise management authority for those entities.  Miyasaki was designated as one of the persons whose "knowledge" could be charged to the Sellers under the LBO documents.  At all times relevant to this Complaint, after the LBO closed, Miyasaki was also a Vice President of BRE.ESH, a member of DL-DW and nominal holder of the $200 Million "rollover equity" interest received by Blackstone Group in connection with the LBO.

126.     Miyasaki is a resident of the State of Utah and may be served with process at the following address:  1978 Kidd Circle, Park City, Utah 84098.

127.     Gray, Stein, Chae, Friedman, Burdi, Sumers, McDonagh and Miyasaki are sometimes collectively referred to in this Complaint as the "Blackstone Group Individual Defendants."

**E.     Additional Insider "Lender" Defendants.**

128.     **ABT-ESI LLC** ("ABT") is an affiliate and insider of the Buyer.  As Lead Lender/Servicer of the 25% Note, ABT received subsequent transfers of the LIBOR Floor Certificates (as that term is defined below) and their proceeds.   ABT is a limited liability company organized under the laws of the State of Delaware with its principal place of business at c/o Arbor Commercial Mortgage LLC, 333 Earle Ovington Boulevard, Uniondale, New York 11553.

129.     **Mericash Funding, LLC** ("Mericash") is an affiliate and insider of the Buyer.  As a lender on the 25% Note, Mericash received subsequent transfers of the LIBOR Floor Certificates and their proceeds.  Mericash is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 404 Fifth Avenue, New York, New York 10018.

130.     **Park Avenue Funding LLC** ("Park Avenue") is an affiliate and insider of the Buyer.  As a lender on the 25% Note, Park Avenue received subsequent transfers of the proceeds  of  the  LIBOR  Floor  Certificates  until  the  transfer  of  its  interests  to  Lightstone

Commercial.  Mericash is a limited liability company organized under the laws of the State of New York with its principal place of business at 460 Park Avenue, New York, New York 10022.

**F.    Buyer's and Sellers' Professional Defendants.**

131.    **Bank of America, N.A.** ("Bank of America") is a national banking association with its principal place of business at 100 N. Tryon St., Charlotte, North Carolina 28225.  Bank of America was, together with Wachovia Bank, N.A. ("Wachovia") and Bear Stearns Commercial Mortgage Inc., one of the original co-lenders on each of the mezzanine loans made pursuant to the LBO.  Bank of America received substantial improper payments in connection with the LBO from the Debtors' LBO loan proceeds.

132.    **Banc of America Securities LLC** is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 100 N. Tryon St., Charlotte, North Carolina 28225.  Banc of America Securities LLC acted as an advisor to the Sellers in the LBO.

133.    **Citigroup Global Markets Inc.** ("Citigroup") is a corporation organized under the laws of the State of Delaware with its principal place of business at 388 Greenwich Street, 17th Floor, New York, New York 10013.  Citigroup provided services to the Buyer in connection with the LBO for which it received substantial improper payments from the Debtors' LBO loan proceeds.

134.    **Ebury Finance Limited** ("Ebury") is, upon information and belief, a corporation organized under the laws of the United Kingdom with its principal place of business at 2 Broadgate, London EC2M 7 UR, United Kingdom.  Ebury became a co-lender on each of the LBO mezzanine loans pursuant to August 2007 amendments to each of the mezzanine loans.

Ebury also succeeded to part of J.P. Morgan Commercial Mortgage Inc.'s ("JP Morgan") position in each of the mezzanine loans as a result of a transfer of such position from JP Morgan. On information and belief, at the time of its initial involvement, Ebury held 16.665% of the mortgage and mezzanine loans described in this Complaint.   Ebury received approximately $9,341,984 in fees and disbursements in connection with the mortgage and mezzanine loans made to the Debtors as part of the LBO, despite the fact that those loans did not provide any direct or indirect benefit to the Debtors.

135.   The true names and capacities of Defendants sued as DOES 1 through 100, inclusive, are presently unknown to Plaintiff.   Plaintiff therefore sues those Defendants under such fictitious names.   When their true names and capacities are ascertained, leave will be asked to amend this Complaint by inserting the same.   Plaintiff is informed and therefore believes that each of the fictitiously named Defendants is responsible in some manner for the misconduct herein alleged, and that the Debtors' damages herein alleged were directly and proximately caused by those DOE Defendants, either acting in concert with the other Defendants or acting individually.   Each reference in this Complaint to Defendant or Defendants refers also to all Defendants sued under fictitious names.

136.   Each Defendant is sued individually and in his or its role as an officer, director, member or other controlling person of one or more of the Debtors.   As described herein, each of the Defendants committed, participated in, approved, adopted, instructed, ratified or acquiesced in various acts or failures to act.   In the case of the named defendants who are individuals, the misconduct that proximately caused damages to the Debtors took place prior to any individual Defendant's resignation from the high-ranking director, officer, member or other controlling positions each individual Defendant held.

137.     To the extent that any of the identified conduct occurred while any of the Defendants was acting in his, her or its capacity as a director, officer, member or other controlling person of any other corporate entity, including any direct or indirect parent of the Debtors, that Defendant should be held equally responsible as though he, she or it was acting in his, her or its capacity as a director, officer, member or other controlling person of one or more of the Debtors.

138.     The identified Defendants, to the extent they may purport to have acted or omitted to act in their capacities as directors, officers, members or other controlling persons of any non-Debtor entity, (i) acted for all practical and functional purposes as directors, officers, members or other controlling persons of one or more of the Debtors; (ii) were de facto directors, officers, members or other controlling persons of one or more of the Debtors; or (iii) assumed fiduciary and other duties to one or more of the Debtors and the Debtors' constituencies as a result of their affirmative acts of controlling, dominating and otherwise directing one or more of the Debtors at all times relevant to this Complaint.

139.     At all times relevant to the allegations herein, from and after the date on which each Defendant assumed and continued to hold the high-ranking officer, director, member or other controlling positions identified herein, each of the Defendants was the co-conspirator, agent, servant, representative, ostensible agent, partner, joint venturer, employee, trustee, trustor, or beneficiary of each of the other Defendants.

140.     In acting or omitting to act, as described herein, each Defendant was acting within the course and scope of his or its authority as such co-conspirator, agent, servant, representative, ostensible agency, partnership, joint venture, trust or employment and authorized, consented to, acquiesced in or ratified each act and omission of each of the other Defendants.

141.    At all times relevant to the allegations herein, each Defendant was the alter ego, joint venturer, successor-in-interest, parent or successor, or was jointly, severally, or otherwise responsible, for the acts, omissions, and liability of each of the remaining Defendants.

142.    Except as may be otherwise expressly alleged herein, (i) each Defendant is liable for each and every wrong committed by each and every other Defendant; (ii) each Defendant is responsible for the events herein alleged, and (iii) each Defendant's acts and omissions proximately caused the damages suffered by the Debtors.

143.    Each Defendant, as a result of his or its respective acts and omissions, is liable either by agency, joint and several liability, joint liability, several liability, joint enterprise liability, co-conspirator liability, alter ego liability, proportionate liability or direct liability for the damages suffered by the Debtors.

## JURISDICTION AND VENUE

144.    The Defendants identified above all conduct substantial, systematic, and continuous business within the State of New York, and all claims asserted herein arise out of, flow from, or relate to the LBO transaction and post-LBO acts or transactions that were negotiated, consummated, financed, engaged in and carried out in the State of New York and generally arise out of the Defendants' contact with and transaction of business in New York. Accordingly, all Defendants can reasonably anticipate being hailed into court in the State of New York.

145.    Venue is proper under: CPLR 503(a) because parties reside in New York County; CPLR 503(b) because each Trustee resides in New York County and was appointed within New York County; and CPLR 503(c) as many defendant entities transact business, and, at all times relevant to the Complaint, transacted business, in New York County.

## FACTS COMMON TO ALL CAUSES OF ACTION

**A.      The Debtors Were Profitable Prior to the LBO.**

146.    Prior to the LBO, the Debtors owned the leading mid-priced extended-stay hotel business in the U.S., with 684 hotels located in 44 states.  Prior to the LBO, the Debtors were profitable and able to pay their debts in the ordinary course of business.  The Debtors' financial performance from 2005 through the date of the LBO was generally positive.  The Debtors' business was encumbered by secured debt totaling approximately $3.3 billion and mezzanine debt totaling approximately $1.9 billion.  The Debtors also owed approximately $39 million to certain subordinated noteholders.

147.    Prior to the LBO, the Debtors' corporate organization was similar to their organization after the LBO.  All or substantially all of the Debtors' entities and operations ran through either the Homestead or ESI corporate ownership chain, as described above.  Homestead and ESI were directly and nominally owned by BRE.HV and BHAC IV, respectively.  BHAC IV and BRE.HV were, in turn, directly or indirectly owned and controlled by Blackstone Group (or Blackstone Group's predecessor-in-interest, as described above), their ultimate parent and the ultimate parent of all pre-LBO entities related to the pre-LBO Debtors and relevant to this Complaint.

148.    By the end of 2006, the Debtors' portfolio of hotels had an average age of approximately 7.5 years, though many of the hotels were around nine years old and were showing signs of significant wear and tear.  In January 2007, a Confidential Information Memorandum was prepared to provide information to a limited number of parties regarding a possible acquisition of "Extended Stay Hotels" (the "Information Memorandum," as described and discussed more fully below).  The Information Memorandum was created by The Blackstone

Group, L.P., Bear Stearns & Co., Inc., Banc of America Securities LLC and Merrill Lynch & Co., Inc. and characterized the hotels' condition as "excellent."  But it was or ought to have been clear to Blackstone, the Debtors' pre-LBO management and others involved in the LBO that substantial capital expenditures would be needed in the near future.

149.    Pre-LBO, the Debtors' hotel properties were managed by HVM, L.L.C. ("HVM"). The Debtors' hotels were then operated under six different brand names, although Blackstone had begun re-branding the portfolio to change all of the properties to one of three names: ExtendedStay Deluxe, ExtendedStay America, or ExtendedStay Economy. Around one-third of the portfolio remained to be re-branded at the time Blackstone commenced efforts to sell the pre-LBO Debtors.  At the time, the cost to conclude the re-branding was expected to be substantial, although those costs were never provided for in the post-LBO budgets.

150.    While economic trends in the hospitality industry generally had been positive in the years leading up to the LBO, certain of those trends reversed in late-2006, and continued the decline in early-2007.  This led some analysts to project a downturn in the hospitality industry as a whole for the near-term.  In certain key industry performance metrics at the time, the Debtors lagged behind their competitors during 2006.

151.    It was or ought to have been clear to the Blackstone Pre-LBO Entity Defendants, the Blackstone Group Individual Defendants and others involved in preparing to market the LBO that (i) the Debtors' financial performance was declining in early-2007 as part of industry and economic trends that had begun in 2006, (ii) those trends were likely to continue after the LBO concluded, and (iii) the Debtors were already lagging behind their competitors.

**B.      Blackstone Decides to Sell the Debtors.**

1.     **Blackstone Prepares and Circulates An Information Memorandum That Contains Intentionally Misleading Financial Information and Projections Designed to Sell The Debtors Prior to Blackstone's IPO.**

152.    Blackstone Group commenced its marketing effort by preparing the Information Memorandum for a sale of ownership of the Debtors as part of "Extended Stay Hotels."   Upon information and belief, preparation of the Information Memorandum was commenced during the latter half of 2006.   The timing of Blackstone's decision to sell the Debtors was driven in part, upon information and belief, by Blackstone's initial public offering, or IPO, which was imminent at the time.

153.    Blackstone Group filed its IPO registration statement with the SEC on or around March 22, 2007, and eventually went public on June 21, 2007, ten days after the LBO closed.   Upon information and belief, Blackstone desired to carry out the sale of the Company prior to the IPO, and stood to enhance its IPO valuation by the sale of the Debtors.

154.    The Information Memorandum represented that it was prepared from information furnished by the Debtors and from publicly available sources.   However, upon information and belief, Blackstone Group, with the assistance of its professionals and advisors (i) created or compiled the financial information and projections in the Information Memorandum, (ii) prepared the non-financial, narrative content of the Information Memorandum, and (iii) was responsible for distribution of the Information Memorandum to potential buyers.

155.    The Information Memorandum contained an overview of the Debtors, and the reasons why Blackstone Group claimed the Debtors were a good investment opportunity for buyers.  The Information Memorandum represented that Extended Stay would increase revenues through re-branding, marketing and acquisition initiatives.  Blackstone and the others involved in

the marketing of the Debtors knew or should have known at all relevant times that these initiatives could be successful only if the Debtors were left with sufficient capital and liquidity after the transaction to implement them.

156.    Prior to the LBO, the Debtors' capital expenditures generally fell into two categories.  The first category was maintenance associated with 444 hotels that were initially branded as "Homestead" or "Extended Stay America."  As to those 444 hotels, the five year historical investment in maintenance capital expenditures averaged approximately 4.3% of revenues, or $145.3 Million in the aggregate from 2002 to 2006.  The second category was capital upgrades for the Debtors' remaining 238 hotels – branded as StudioPlus, Crossland, Wellesley and others.  As to those 238 hotels, capital expenditures totaled approximately $129.6 Million from 2004 to 2006.  Total capital expenditures as a percentage of revenues were, in fact, approximately 10.2% for 2006 and 8.3% for 2005, both of which were significantly higher than the 4.5% projected capital expenditure levels that were set forth in the Blackstone Information Memorandum.  Indeed, actual capital expenditures for the period from January 2007 through June 10, 2007, the eve of the LBO, were approximately 5.3% of revenues, higher than that projected by the Information Memorandum.

157.    The Information Memorandum contained materially misleading projections regarding the Debtors' future financial performance.  The Information Memorandum projected total revenue and property-level EBITDA growth rates of approximately 9.84% and 13.35%, respectively.  However, Blackstone knew or should have known that the Debtors' actual financial performance at the time was, and was expected to be in light of performance trends in late-2006 and early-2007, well below the projections set forth in the Information Memorandum.

158.   Upon information and belief, all of this information was available to the Defendants involved in the transaction prior to the LBO's closing.  At the time, the Debtors used Smith Travel Research ("STR") reports to benchmark their aggregate financial performance against the Debtors' chosen competitive set.  On a weekly basis, the Debtors reported their hotel activity to STR. STR then provided the Debtors with weekly trend reports that displayed up to six years of monthly performance data for the Debtors and their competitors.

159.   The STR reports, and other weekly financial reports shared with the Blackstone Pre-LBO Entity Defendants and the Blackstone Group Individual Defendants, included detailed analyses regarding the Debtors' basic financial performance metrics, including occupancy rates (or "OCC:" the quotient of the total number of nights stayed by all customers divided by the total available room nights), average daily rate ("ADR:"  the quotient of total room revenues divided by occupied room nights (which provides the "room rate" for all occupied rooms)), revenue per available room ("RevPAR:" the product of OCC and ADR, which shows the revenue efficiency of a hotel), demand (the total of all room nights stayed by all hotel customers), and supply (the product of total available rooms and the number of total days in a year).  The STR reports also measured each hotel property's performance, and the aggregated performance of the chosen competitive set with indices and rankings.  In light of these and other reports, the Blackstone Pre-LBO Entity Defendants and the Blackstone Group Individual Defendants knew or should have known that the projections they were presenting in the Information Memorandum were unachievable and, therefore, misleading.

160.   The projections contained in the Information Memorandum also improperly accounted for significant operating expenses, upon information and belief so as to "hide" those expenses and make the operating hotels appear to be more profitable than they

55

actually were.   Among other things, the Information Memorandum inappropriately placed a significant amount of property-related expenses, including occupancy taxes, "above the line" at the corporate level.  This had the practical effect of overstating the net operating income of the hotel properties.  Since the lenders were prepared to lend based upon the property-level financial performance of the hotels, the effect of this misstatement was to increase the available debt in the LBO to amounts which would be impossible for the Debtors to service.

161.   Likewise, the growth projections in the Information Memorandum were ostensibly based upon the post-LBO Debtors having adequate capital and liquidity to complete the re-branding, marketing and other initiatives that had been commenced by Blackstone prior to the LBO, as detailed in the Information Memorandum.   However, based upon information available at the time the Blackstone Pre-LBO Entity Defendants and the Blackstone Group Individual Defendants (i) knew or should have known that the numbers contained in the Information Memorandum were inaccurate, (ii) nevertheless intended that prospective buyers rely upon those misleading numbers, and (iii) knew or should have foreseen that, given the artificially increased debt to be imposed upon the Debtors in connection with the transaction (including the increased debt attributable to overstatement of net operating income, as described above) the post-LBO Debtors would not have sufficient capital or liquidity to carry out these strategies.

### 2.  The Stapled Financing Package Attached to the Information Memorandum Anticipated a Much Smaller Debt Load Than The LBO Ultimately Imposed.

162.   Blackstone had arranged for so-called "stapled financing" through several lenders (collectively, the "Stapled Financing Lenders") in connection with the LBO.  "Stapled" financing refers to a financing package that is "stapled" to an information memorandum and is available to a buyer for a specific transaction.   Among other things, the stapled financing

typically indicates the expected debt capacity of the business being sold, and how much equity the buyer will need to provide to obtain the stapled financing.

163.    The Stapled Financing Lenders were prepared to finance up to $6.8 billion of the purchase price for a transaction. The stapled financing provided that the loan-to-value ratio could not exceed 87.5% when combined with the assumption of certain capital lease obligations of $200 million.  As described more fully below, the loan-to-value ratio following the eventual LBO's closing (based on the price paid by the Buyer) was at least 95%, substantially more than that contemplated by the stapled financing attached to the Information Memorandum.  This additional debt was fatal to the Debtors' continued profitable existence.

### 3.    Lichtenstein "Wins" an Accelerated Bidding Process After Woefully Inadequate Due Diligence.

164.    Blackstone coordinated the distribution of the misleading Information Memorandum to approximately 150 potential buyers.  A Lightstone affiliate and an Arbor affiliate, among others, signed confidentiality agreements in February 2007, permitting them access to due diligence information.

165.    Around that same time, Blackstone informed potential purchasers that written, non-binding indications of interest had to be submitted within an accelerated time frame. Upon information and belief, Blackstone accelerated the time frame for bid submission (versus a typical time frame for a transaction of the LBO's size and complexity) in an attempt to coordinate the LBO closing with the launch of Blackstone's IPO planned for June 2007.

166.    Citigroup or an affiliate of Citigroup was at the time engaged, or about to be engaged, as one of two Global Coordinators on Blackstone's IPO, at the same time as it was acting as the Buyer's advisor for the LBO.  This engagement meant Citigroup would share with

Morgan Stanley the largest split of the approximately $170 million of fees associated with the IPO, as well as have the ability to purchase a significant number of Blackstone IPO shares on "insider" terms.  Citigroup had a vested interest in the success of the Blackstone IPO.  Upon information and belief, Citigroup and some or all of Blackstone's other professionals sought to optimally position Blackstone prior to launching the IPO.  Among other things, they sought to do so by announcing, around the time of the IPO, consummation of a large, marquee sale of "Extended Stay Hotels," for which Blackstone stood to reap substantial gains above its original equity investment.

167.    Upon information and belief Citigroup and Blackstone were therefore highly motivated to identify a buyer willing to pay a significant premium to the then-current value of the Company.  Fortunately for Citigroup and Blackstone, there was a client in Citigroup's client base that would serve as the "mark:"  Lichtenstein.

168.    Citigroup brought Lichtenstein into the deal in or around February 2007. Thereafter, Citigroup was instrumental in encouraging Lichtenstein to embark on the LBO, and was instrumental in keeping Lichtenstein in the deal.  Citigroup assured Lichtenstein that it had previously underwritten the properties to be acquired in the LBO, that the deal was "substantiated" by an appraisal, and that Citigroup's team had already vetted the deal.  Indeed, when Lichtenstein commissioned an independent valuation of the Company which contradicted the information and projections in the Information Memorandum, Citigroup dismissed that valuation and questioned Lichtenstein's judgment in relying on a relatively obscure source over the collective "wisdom" of Citigroup and the other financial institutions involved in the deal. Lichtenstein, ultimately, did not care, as the LBO was to be done using funds borrowed by the Debtors, and Lichtenstein and his affiliates were going to put little cash into the deal.

169.    On or around March 1, 2007, Blackstone received four indications of interest, including one from Lichtenstein that proposed to pay $7.6 billion.  Subsequently, the field was narrowed further to the two parties willing and able to consider concluding a transaction within a short time frame imposed by Blackstone.  On March 25, 2007, Blackstone and its advisors demanded that definitive proposals for a transaction be submitted by the remaining potential buyers by no later than April 11, 2007.

170.    On April 12, 2007, Lightstone formally offered to purchase 100% of the membership interests of one or more of the Sellers for $8 billion, net of the assumption of certain capital lease obligations.  This was the only definitive proposal Blackstone received.  Blackstone quickly accepted Lightstone's proposal.  On or around April 17, 2007, DL-DW and one or more of the Sellers executed a definitive acquisition agreement (the "Acquisition Agreement").

171.    Lightstone proposed to finance the overwhelming majority of the purchase price with debt of $7.4 billion and, at best, cash of only $400 million into the deal.  This cash component was used to pay Blackstone and closing costs.  The amount was therefore woefully insufficient to support the artificially inflated purchase price and the future needs of the now highly leveraged Company.  An additional equity amount of $200 million was "rollover equity" provided to BRE.ESH for Blackstone's benefit.  That interest did not represent any new cash or other value for the Debtors.  The $200 million of Blackstone "rollover equity" in the "new" Debtors was included because it was the only way to reach the $8 billion purchase price insisted upon by Blackstone.

172.    Notwithstanding the dangerous debt levels of the proposed LBO, the sale was nevertheless structured to allow the Buyer's insiders to siphon value from the post-LBO Debtors regardless of their performance.  One of Lichtenstein's affiliated entities was to reap

substantial "asset management" fees post-LBO, even though HVM was to continue managing all aspects of the Debtors' day-to-day business.  The sale proposed a cash management system that would allow post-LBO equity holders to receive improper distributions from the Debtors even if the Debtors' financial condition deteriorated.  And, the Buyer obtained ownership of the Debtors while putting in little cash.

173.    Blackstone, at best, turned a blind eye to the post-LBO structure because Blackstone was eager to strip out $1.9 billion of cash from the Debtors while maintaining a post-LBO equity interest that Blackstone would receive in the LBO in exchange for nothing.  Counsel advising the Debtors in the transaction was simultaneously representing Blackstone Group and Blackstone Group affiliates in the same transaction.

174.    The financial institutions advocating and knowingly participating in the transaction sought the significant fees they would receive in connection with financing the transaction.  Those financial institutions were also planning to simply sell the debt as soon as the LBO closed, and thereafter have no risk for the failure they knew or should have known was likely to occur.

175.    Moreover, upon information and belief, the financial institutions agreeing to fund the LBO had long-standing relationships with Blackstone and sought to curry favor with Blackstone so as to cement possible roles in Blackstone's IPO and possible future transactions Blackstone might carry out with respect to its portfolio companies.  Indeed, affiliates of Wachovia (as defined below) and Bank of America, among others, each were involved in Blackstone's IPO.

176.    Three rating agencies, Fitch Ratings ("Fitch"), Standard & Poor's ("S&P") and Moody's Investors Service ("Moody's"), issued presale reports relating to the securitization

of the $4.1 billion of senior secured debt.  In these reports, each of the rating agencies noted that the total debt of the LBO substantially exceeded the value of the Company's underlying assets.

177.   Specifically, Fitch, S&P, and Moody's concluded that the LBO total debt was, respectively, 141.6%, 153.4% and 158.4% of the value of the Company's underlying assets. In fact, these three rating agencies approximated the loan-to-value of the senior secured debt alone to be in the range of 78.4% and 87.8% of the value of the Company's underlying assets.

178.   These three rating agencies also estimated the implied value of the Company to be substantially <u>less</u> than the approximately $8 billion purchase price.  According to these third-party rating agencies, the $8 billion purchase price exceeded the Company's actual value by approximately $3 billion.

179.   Upon information and belief, the parties involved in negotiating, documenting and closing the LBO knew or should have known of the rating agencies' likely determinations well in advance of the LBO's closing.

180.   Lichtenstein later aptly summarized the improper conduct of the various parties involved in formulating the LBO and their attitudes about what was about to be done to the Debtors and their creditors:

> at the end of the day, nobody put a gun to my head and said sign the documents. But it was like a lot of— it was - it was a brew that was cooked with a lot of people's help. Like the banks just said it's not - you know, blow the damn stuff out. It's - we really don't care, just sell the paper as fast as you can. Citibank just said pay us as many fees as you can. And I said I'm getting 95, 99 percent financing. Okay? So it was a combination; there were a lot of people who [erred] here.

181.   In short, no one involved at the time was looking out for the Debtors' interests.

4.     **The LBO Debt Increases Prior to Closing.**

182.   The initial Acquisition Agreement required that most of the pre-LBO debt be satisfied by DL-DW at closing of the LBO, including two sets of subordinated notes owed by ESI at the time.  One set, known as the "9.15% Notes," was due on March 15, 2008 (only nine months later) and totaled approximately $31 million.  The second set, known as the "9.875% Notes," was due in June 2011 and totaled approximately $8.2 million.

183.   However, on May 31, 2007, on the eve of the LBO's closing, the parties entered into an Amendment to the Acquisition Agreement in which they removed entirely any obligation to ensure that the outstanding subordinated notes were paid off as part of the LBO.  Thus, when the LBO closed, no funds were escrowed to pay those notes, the notes remained unsatisfied and were reflected on the June 11, 2007 balance sheet of the "new" Debtors as assumed obligations.

184.   Although Lightstone's April 12, 2007 LBO proposal had contemplated that certain capital lease obligations would be assumed by the Buyer in the LBO, and that the post-LBO Debtors ultimately would purchase the hotel properties to which the capital lease related, this, similarly, did not happen.  As a result, and as described more fully below, the landlord under that capital lease declared defaults under that lease within a few days after the LBO closed.

C.     **The LBO Closes, Blackstone Receives Approximately $1.9 Billion of Cash and the Debtors Receive Nothing But Substantial Additional Debt and a New Owner With No Hotel Industry Experience.**

1.      **The Debtors' Post-LBO Corporate and Debt Structure Generally.**

185.    The LBO closed on June 11, 2007 at the law offices of Blackstone and the pre-LBO Debtors' counsel, Simpson Thacher & Bartlett LLP, both located in New York, New York.

186.    On or around June 29, 2007, the Debtors' ownership structure was "restructured," as had been contemplated previously by one or more of the LBO Buyer Individual Defendants and the LBO Buyer Entity Defendants.   Pursuant to that planned "restructuring," DL-DW's direct membership interests in BHAC Capital were transferred to Homestead.  In addition, several of the LBO Buyer Entity Defendants invested in BHAC Capital and therefore received a percentage of BHAC Capital's membership interests, resulting in DL-DW's and, indirectly, Homestead's membership interests in BHAC Capital, being reduced. Upon information and belief, the new investors in BHAC Capital paid less than fair consideration or reasonably equivalent value for their membership interests in that entity.

187.    A chart showing the Debtors' corporate organizational structure following the restructuring described in the preceding paragraph is attached as Exhibit B and incorporated herein by reference.   Upon information and belief, the corporate organizational structure described in Exhibit B hereto existed until the Debtors eventually (and inevitably) filed bankruptcy beginning on June 15, 2009.

188.    The Debtor's post-LBO debt structure can be summarized as follows: (a) a mortgage loan in the amount of $4.1 billion, secured by encumbrances on the mortgaged properties; and (b) ten tranches of mezzanine loans, in an aggregate amount of $3.3 billion, each tranche owed by an indirect owner of the operating hotels secured by the equity in the borrower beneath that owner. The debt structure was designed to permit the securitization of the mortgage

loan by the mortgage lenders' sale of so-called "CMBS" (commercial mortgage backed securities) to third parties, many of which currently are Litigation Trust Beneficiaries.

### a.    The Mortgage Loan Structure.

189.    The mortgage loan agreement was between the mortgage lenders and 21 mortgage borrowers, as summarized on the chart attached hereto as Exhibit C and incorporated herein by reference. The entities listed in Exhibit C are all Debtors.  After the LBO, their names were changed to drop "BRE/," as was also done with he various mezzanine borrowers.  Exhibit C reflects these name changes.  All but three of the mortgage borrowers owned properties. The parent entities of the three non property-owning mortgage borrowers were also parties to, but not borrowers under, the mortgage loan agreement. In addition, four Debtor operating lessee entities were parties to, but not borrowers under, the mortgage loan agreement.  The mortgage borrowers signed a single consolidated mortgage note in the amount of $4.1 billion, and the mortgage borrowers were jointly and severally liable for the mortgage debt.

190.    Each of the 18 property-owning mortgage borrowers and property owners secured the mortgage loan by first-priority encumbrances on their respective properties.  The mortgage lenders, however, did not begin perfecting their mortgage liens with appropriate filings until June 22, 2007, and continuing thereafter through at least July 2007.  The mortgage loan agreement, mortgage note, and related security instruments were cross-collateralized and cross-defaulted.  Therefore, upon information and belief, although the entities that actually owned the Debtors' hotel properties were not all borrowers under the new mortgage loan agreements, all properties owned by any of the Debtors were nevertheless directly pledged as collateral for the mortgage loans.  Upon information and belief, the entities that owned the hotel properties

received none of the mortgage loan proceeds and, like the rest of the Debtors, received no value from the LBO.

### b.    The Mezzanine Loan Structure.

191.    Several mezzanine loan agreements were executed in connection with the LBO.  The total mezzanine debt borrowed in the LBO was approximately $3.3 billion.  Each mezzanine loan agreement was between the applicable mezzanine lender and three equal-level mezzanine entities, as reflected on the chart attached as Exhibit D and incorporated herein by reference.  Each set of mezzanine borrowers signed a single consolidated mezzanine note in the amount of its mezzanine loan.  Each of the mezzanine borrowers was jointly and severally liable under the mezzanine note and mezzanine loan agreement.  Each of the mezzanine borrowers was the legal and beneficial owner of all direct interests in the borrower beneath it.  Each mezzanine borrower entered into a pledge and security agreement in connection with the LBO granting the mezzanine lender a first priority security interest in its equity interests in the borrower directly beneath it in its respective ownership chain.

192.    Although the mezzanine loans did not directly encumber the mortgaged hotels and the hotels' owner entities were not borrowers under the mezzanine loans, the mezzanine loan structure indirectly and improperly gave the mezzanine lenders subordinate interests in the hotels by (i) causing or allowing the mezzanine lenders to be paid directly from the proceeds of the operating hotels out of the Cash Management Account (as defined and described below), (ii) requiring the most junior mezzanine lender's approval of the Debtors' proposed annual budget even though the most junior mezzanine lender was not a lender to the mortgage borrowers, (iii) requiring the mezzanine borrowers to repay the mezzanine loans before any mortgaged properties could be released, and (iv) providing that, if any mortgage borrower

paid more than its allocable share of the mortgage loan, such mortgage borrower could not exercise its contribution rights against other mortgage borrowers unless the mezzanine loans were paid in full.  Moreover, as alleged below, debt service on the mezzanine loans was set up to be paid from the Cash Management Account before certain critical operating expenses.

193.    As described above, the rating agencies reviewing the LBO, even prior to its consummation, concluded that the Debtors' value was woefully insufficient to support the mezzanine loans on the date the LBO closed.

### c.    The Cash Management Account.

194.    The LBO imposed requirements that all cash generated by the hotels be swept and used to pay debt service on both the new mortgage loans and the new mezzanine loans, even though the entities that owned the hotels were neither borrowers nor obligors under the mortgage loans.  Those requirements were reflected in the main cash management agreement ("Cash Management Agreement") executed in connection with the LBO that established a "Cash Management Account."  That Cash Management Account was in the name of "ESP P Portfolio LLC [a Debtor] for the Benefit of Wachovia Bank" ("Wachovia").  The Cash Management Account was located at Wachovia at all times relevant to this Complaint.

195.    The mortgage lenders were granted a first priority security interest in the Cash Management Account. The mortgage borrowers, property owners, operating lessees, and HVM, as the Debtors' management company, were required to deposit all rents, receipts payable, and all other amounts received in connection with the hotels' operations into applicable property and clearing accounts, which were to be swept daily into the single, commingled Cash Management Account. Distribution of funds from the Cash Management Account was governed by the Cash Management Agreement.

196.     The mezzanine loan agreements acknowledged that the Cash Management Account was controlled by the mortgage lenders.  Provided no event of default had occurred, the mortgage lenders were to apply all funds in the Cash Management Account in accordance with the Cash Management Agreement. Although the mezzanine lenders had no direct interest in the hotels, the mezzanine lenders were nevertheless paid directly with funds from the commingled Cash Management Account, which contained cash assets of the operating hotels only.  The funds did not belong to the mezzanine borrowers (as described below).  The mezzanine lenders were nevertheless paid with those funds, prior to the payment of critical hotel operating expenses.

197.     The Cash Management Agreement contained detailed requirements regarding the flow of funds through the cash management system.  Numerous subaccounts of the Cash Management Account (each a "Subaccount") were maintained by the agent for the mortgage lenders on a ledger-entry basis.  All such Subaccounts were merely book entries, and all the funds were commingled in the single Cash Management Account at all times relevant to this Complaint.  On each business day, the agent for the mortgage lenders was required to apply all funds on deposit in the Cash Management Account in the amounts and according to the priorities set forth in the Cash Management Agreement.  A chart showing the flow of funds through the Debtors' post-LBO cash management system is attached as Exhibit E and incorporated by reference.

### d.     Pertinent Guarantee Obligations of the Debtors' Insiders.

198.     Lichtenstein, Lightstone, ESI and Homestead (collectively, the "Guarantors") executed guarantees in favor of the respective lenders, guaranteeing certain of the respective borrowers' obligations under the mortgage loan and each mezzanine loan.  The Guarantors were liable under the guarantees to the extent of the lenders' damages arising out of

various "bad boy" circumstances, including: (a) the borrowers' breach of any of the special purpose entity/separateness covenants (described below); and (b) the borrowers' filing for bankruptcy.   To the extent the Guarantors' obligations were triggered by a borrower's bankruptcy filing, the Guarantors' aggregate liability was capped at $100 million.

### e.    Blackstone's Improper Receipt of Loan Proceeds.

199.    At closing, the Sellers, who were owned, controlled, managed or dominated by Blackstone Group and the Blackstone Group Individual Defendants at the time, instructed that the funds borrowed by the Debtors in the LBO were to be used to retire certain, but not all, existing debt and pay the Sellers' fees and expenses associated with the transaction. After retiring some, but not all, of the existing pre-LBO debt and paying the Sellers' fees and expenses associated with the LBO, the Sellers, which were Blackstone affiliates, received cash totaling nearly $1.9 billion (apart from Blackstone's rollover equity interest), as follows:

**Blackstone Entities' Cash Receipts**

| | | |
|---|---|---|
| BHAC IV, LLC | Purchase price payable to Seller | $1,282,764,450 |
| Blackstone Hospitality Acquisitions LLC | Purchase price payable to "Seller" | $489,546,290 |
| Prime Hospitality LLC | Balance of Gwinnet purchase price after payment of debt costs and closing costs | $4,110,604 |
| BHAC IV, LLC | Earnest money deposit payable to Seller | $85,611,012 |
| **Blackstone Entities' Cash Receipts** | **Total** | **$1,862,032,356** |

The reference above to cash receipts by Prime for the Gwinnett purchase price relates to a hotel that was owned by a Blackstone affiliate. The Gwinnett hotel was included in the hotels sold to the Buyer.  The closing of the Gwinnett property sale occurred simultaneously with the closing

of the LBO.   In addition, even though Blackstone Hospitality was not a seller under the Acquisition Agreement, it received over $489 million of loan proceeds.

200.   The borrower Debtors were not required under the Acquisition Agreement to pay the purchase price to the Sellers.   That was the Buyer's responsibility.   Moreover, as described below, under the loan agreements the Debtors appear to have been *prohibited* from using loan proceeds for that purpose, even though everyone knew that the money being borrowed by the Debtors was the only source of funding for the LBO purchase price. Nevertheless, all Defendants caused the Debtors to improperly pay the purchase price on the Buyer's behalf with substantial borrowings the Debtors were obligated to repay.   Upon information and belief, the Debtors then were caused to improperly, and in violation of the loan agreements, distribute these funds to the Blackstone Pre-LBO Entity Defendants even though they no longer owned the Company.

201.   In addition to the payments made to the Blackstone Pre-LBO Entity Defendants described above, the Debtors used borrowed funds to pay a total of no less than approximately $150 million of fees and other amounts to the lenders, professionals and advisors involved in the deal.   Those fees included lender loan and underwriting fees, so-called "hedge costs," property specific escrowed amounts, which included taxes, insurance, escrow fees, an interest payment due at closing, environmental fees and holdbacks, certain reserves, title-related expenses and the professionals' fees incurred by all involved parties.

      **f.**      **The Debtors Become Encumbered by Substantial Additional Debt for Blackstone's Benefit.**

202.   All but $200 million of the $1.9 billion payments to the Blackstone Group entities identified above came from loans made to the Debtors that they were unable to repay,

and that rendered them insolvent and undercapitalized at closing.  The total post-LBO mortgage debt borne by the Debtors (for Blackstone's benefit) increased over pre-LBO levels by $749.4 million and the total mezzanine debt increased over pre-LBO levels by $905.3 million.

203.    After the LBO, the Debtors were overleveraged as a result of being subject to a significantly greater amount of debt than they were immediately prior to the LBO.  Virtually all of the Debtors' assets were over-levered.  The Debtors' debt load was significantly higher than that typical for hospitality REITs at the time.  Given these facts, the Defendants involved in the transaction or with the Debtors at the time knew or should have known that the Debtors would have no cash for necessary operating, marketing, maintenance, capital improvements and other expenditures, and no ability to secure additional loans or liquidity to meet their ongoing needs.

204.    The borrowing capacity of the Debtors post-LBO was almost non-existent. Although the Debtors did maintain a working capital reserve of approximately $50 million, a pre-LBO line of credit in the amount of up to $105 Million that previously provided for hotel acquisition funding was not available post-LBO.  Moreover, there were no provisions in the limited liability company agreements for DL-DW or BHAC to make additional capital calls from any investors after the LBO's closing, nor were there any commitments for capital infusions in the loan agreements.  Therefore, the liquidity needed for capital expenditures, maintenance, upgrades, re-branding and expansion (all of which were critical if the Debtors were to have any chance whatsoever to achieve the financial performance "projected" by Blackstone in the Information Memorandum) was likely, and foreseeably, unavailable.

205.    The parties involved in the LBO attempted to justify their conduct with an appraisal of the Debtors' assets, performed by HVS International ("HVS"), which purported to

value the Debtors' assets at approximately $8 billion.  That HVS appraisal was flawed for the following reasons, among others: the projected total revenue growth was overstated; the appraisal improperly assumed that the Debtors' room expense rate would continue to decrease; EBITDA growth was unreasonably projected; the appraisal assumed financing which was much less expensive than actually incurred in the LBO; and the appraisal's projected capital expenditures were dramatically underestimated.

206.    As a result of the foregoing, among other errors, the value of the mortgage properties contained in the HVS appraisal was grossly overstated.  The parties involved in the LBO knew or should have known the HVS appraisal was flawed, resulted in a purported "fair value" of the mortgaged properties that was artificially inflated by billions of dollars, and therefore could not be relied upon.  Upon information and belief, many of the key assumptions made by HVS were provided to HVS by the Blackstone Pre-LBO Entity Defendants or the Blackstone Group Pre-LBO Individual Defendants in order to allow the values set forth in the HVS appraisal to be inflated.

207.    In short, the Blackstone Pre-LBO Entity Defendants, as equity holders in the pre-LBO Debtors, took all the cash they could get, while the Debtors and their estates were left insolvent, and the Debtors' new owners prepared to pay themselves hundreds of millions of dollars of the Debtors' desperately needed cash.  Both groups knew that the LBO was structured to fail.

2.     **The Company Intentionally Ignores the Separateness of Its Related Entities and the Requirements of the LBO Loan Documents.**

a.     **The Loan Proceeds' Uses Were Restricted.  But The Parties Ignored The Restrictions and Paid Loan Proceeds Directly to the Sellers.**

208.     The mortgage loan agreement restricted the use of proceeds from the new mortgage loans, as follows:

> [B]orrower shall use the proceeds of the Loan solely to (a) repay or discharge any existing loans relating to the Properties, (b) pay all past-due Basic Carrying Costs, if any, with respect to the Properties, (c) make deposits into the Reserve Funds on the Closing Date in the amounts provided herein, (d) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, (e) fund any working capital requirements of the Properties and (f) distribute the balance, if any, to borrower.

209.     The authorized uses, therefore, did not include making payments to the Blackstone Sellers and other Blackstone affiliates that received sale proceeds, as described above. Notwithstanding this provision, the mortgage loan proceeds were not received by any mortgage borrower. To the contrary, all mortgage loan proceeds were deposited into an escrow account and a substantial portion was paid out directly to one or more of the Blackstone Pre-LBO Entity Defendants, as described above, in violation of the restrictions contained in the mortgage loan agreement.

210.     The mezzanine loan agreements also restricted the use of proceeds from the new debt resulting from the LBO. The mezzanine loan agreements provided that the mezzanine loan proceeds were to be paid first to the more senior mezzanine borrower, then, ultimately, provided to the mortgage borrowers as equity contributions:

> Borrower shall use the proceeds of the Loan solely to (a) make an equity contribution to Mortgage Borrower [through Senior Mezzanine Borrower] in order to cause Mortgage Borrower to use such amounts for any use permitted pursuant to Section 2.1.5 of the Mortgage Loan Agreement, (b) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender and (c) distribute the balance, if any, to Borrower.

Notwithstanding these provisions, the mezzanine loan proceeds were not received by any mezzanine borrower and were never contributed, by equity contributions or otherwise, to the mortgage borrowers through any senior mezzanine borrower. To the contrary, all mezzanine loan proceeds were, like the mortgage loan proceeds, deposited into an escrow account and, as with the mortgage loan proceeds, a substantial portion was paid out directly to one or more of the Blackstone Pre-LBO Entity Defendants, as described above, in violation of the restrictions contained in the mezzanine loan agreements.

      **b.**     **Formalities Regarding the Post-LBO Debtors' Separateness and Accounting Are Violated.**

211.    The applicable loan agreements contained extensive "special purpose" entity and separateness representations and other covenants requiring, among other things, that each mortgage borrower, operating lessee entity and property owning entity would (i) not make any loans or advances to any person; (ii) pay debts from its assets as such debts become due; (iii) do all things necessary to observe organizational formalities; (iv) maintain all of its books, records, financial statements, and bank accounts separate from those of any other person; (v) except as expressly permitted under the applicable loan agreement or the Cash Management Agreement, not commingle assets; (vi) not guarantee or become obligated for the debts of any other person; (vii) not pledge assets for the benefit of any other person other than with respect to the applicable mortgage or mezzanine loans; (viii) remain solvent and maintain adequate capital in light of its contemplated business operations; (ix) maintain a sufficient number of employees in light of its contemplated business operations and pay the salaries of its own employees from its own funds; (x) not assume or incur any liabilities except the mortgage and mezzanine loans, certain other specified liabilities not germane to this Complaint, and "liabilities incurred in the ordinary course of business," subject to certain liability caps, which liabilities would not be more

than 60 days past the date incurred; and (xi) maintain its assets and liabilities in such a manner that it would not be costly or difficult to segregate, ascertain or identify its individual assets and liabilities from those of any other person.

212.    These requirements, however, were disregarded.  For example, after the closing, an opening balance sheet for DL-DW showed the impact of the LBO on DL-DW and the appropriate allocation of the price paid for the LBO. The mortgage and mezzanine debt was recorded at the ESI and Homestead accounting database levels, as opposed to being recorded by each legal entity mortgage borrower or mezzanine borrower.  Similarly, the subsidiaries' assets and liabilities, including hotel property and equipment, were recorded at the ESI and Homestead database level, rather than being recorded at the individual entity level and treated as owned by that entity.  In short, the Company ignored the fiction of legal separateness of its entities.

213.    If the Debtors had established and maintained separate books for each of the individual mortgage borrowers and mezzanine borrowers as of the LBO, then the accounting by the mortgage borrowers and mezzanine borrowers should have reflected:

- The mortgage debt and the related proceeds - at each legal entity level for the individual mortgage borrowers; allocated based on the release amounts included in the mortgage loan agreement; and

- The mezzanine debt and the related proceeds - at the legal entity level for the individual mezzanine borrowers - allocated based on the sum of the allocated release amounts included in the mortgage loan agreement for the mortgage borrowers directly below the relevant mezzanine borrower.

214.    The Debtors made no effort to maintain their separateness or fulfill the covenants of the LBO loan agreements.  The Debtors were treated internally at all relevant times as part of one company.   The Debtors had common officers and directors, and had no separate governance.  The Debtors conducted all material board of directors meetings on a consolidated

basis for the so-called "Extended Stay Hotels family of companies," which included the Debtors'
direct equity owners.  In addition:

- The daily business and affairs of each of the Debtors were managed and controlled by HVM Manager, of which Lichtenstein was the sole member;

- The Debtors' operations were integrated and interdependent and each of the Debtors was run in the interest of the Buyer and the Debtors' ultimate equity owners;

- With few exceptions, all of the Debtors were wholly-owned by the Buyer;

- The Debtors did not have specific general ledger codes in their accounting system to track specific accounting activity for the mezzanine borrowers;

- None of the mortgage borrower entities or mezzanine borrower entities kept their own books and records, and adequate records of complete accounting activity related to each legal entity were not maintained;

- Debt to the mortgage and mezzanine lenders was recorded only at the ESI and Homestead levels, debt service was paid only from the Debtors' consolidated Cash Management Account, and the Debtors failed to properly record any financial or accounting activities (including debt service) relating to the mezzanine or mortgage loans;

- The Debtors' expenses were generally funded from the consolidated Cash Management Account and a single working capital reserve account;

- The Debtors failed to observe corporate formalities for intercompany transfers, which generally were not properly recorded;

- The mortgage borrowers were jointly and severally liable on the mortgage debt, and yet paid the mezzanine debt for which the mortgage borrowers had no liability;

- Mezzanine borrower entities were prevented from enforcing contribution rights against other Debtors until after all of the mezzanine debt and mortgage debt had been paid in full;

- The Debtors made substantial payments for the benefit of insiders;

- The Debtors failed to pay debts as they came due in the ordinary course, with certain liabilities being greater than 60 days outstanding at all relevant times from and after the date the LBO closed; and

- The Debtors were insolvent and undercapitalized on the date the LBO closed and at all relevant times thereafter.

**D.     Debt Yield and Financial Covenants Are Violated The Day The LBO Closed, and Key Differences Between the Debtors' Pre- and Post-LBO Debt Structures Cause Immediate Financial Distress.**

**1.     The Significance of a Debt Yield Event.**

215.    The Debtors' loan agreements provided for severe consequences if a "Debt Yield Event" occurred.  The loan agreements defined "Debt Yield" roughly as a fraction: (a) the numerator of which was net operating income less (i) assumed management, marketing, and franchise fees equal to 4% gross income, (ii) replacement reserve fund contributions equal to 4% gross income, and (iii) income generated by leased properties; and (b) the denominator of which was the combined total outstanding principal balances on the mortgage and mezzanine loans.  In essence, the Debt Yield calculation was intended to provide an indication of the amount of cash generated by the mortgaged properties compared to the level of debt associated with those properties, and to measure the debtors' ability to generate enough cash to service the LBO debt.

216.    The Debtors' failure to meet specific Debt Yield benchmarks under the LBO loan agreements would cause the Debtors to have insufficient cash to pay their obligations as follows:

(1)    A so-called "Debt Yield Event" triggered a "Cash Trap Event."  This meant that excess cash from operations (after taxes, reserves, and debt service) was "trapped" as additional collateral for the lenders.  The cash was not available to pay costs of operations outside of the annual budget approved by the lenders under the Cash Management Agreement, including capital expenditures beyond a small reserve.  The annual budget did not allow for the payment of crucial expenses such as occupancy taxes, reserves and management fees, among other things;

> (2)    If the Debt Yield fell below the so-called "Debt Yield Amortization Threshold," then the borrowers had to make substantial amortization payments to the lenders beginning on June 12, 2009; and
>
> (3)    No equity distributions could be made (except to holders of Series A-1 preferred equity in BHAC Capital) by either the mortgage borrowers, the property owner entities, the operating lessee entities, or the mezzanine borrowers unless the Debt Yield equaled or exceeded 7.75%.

217.    A Cash Trap Event, triggering a "Cash Trap Event Period," occurred upon: (a) an event of default under the mortgage loan agreement or any mezzanine loan agreement; (b) a Debt Yield Event; or (c) HVM's filing for bankruptcy. A Cash Trap Event could be cured under certain circumstances including, if it was caused by a Debt Yield Event, the mortgage borrowers' achievement of certain Debt Yield numbers for six (6) consecutive months.

218.    On June 30, 2007, the Debt Yield was only 7.09%. Therefore, the Debt Yield was less than 7.5% immediately after the date the LBO closed, and there was, in substance if not form, a continuous Cash Trap Event Period within the meaning of the mortgage loan agreement. For the first six months after the LBO's closing (including the day the LBO closed) the only reason there was no technical Cash Trap Event Period was because a Debt Yield Event had no consequences under the pertinent loan agreements until the seventh payment date, scheduled to occur in January 2008. The Debt Yield percentage, however, was required to be reported to the Debtors' lenders on as monthly basis, including during the first six months after the LBO closed. But the LBO Buyer Entity Defendants and the LBO Buyer Individual Defendants (to the extent they were directors, officers or otherwise in control at the relevant times) did not report the Debt Yield percentage to the lenders as should have been done. Upon information and belief, this failure to report was intentional and allowed improper distributions to continue to be made to equity holders.

219.    The Debt Yield Event percentage would become even more difficult to achieve over time, as the required percentage was scheduled to grow from 7.5% (on the seventh payment date) to 8.1% (on the LBO loans' maturity date if certain options to extend the loans had been exercised by the Debtors).  In short, the Debtors immediately failed the Debt Yield test under the LBO loan documents on the date the LBO closed, were unlikely to meet the test when it was first scheduled to formally occur in January 2008, and the LBO Buyer Entity Defendants and the LBO Buyer Individual Defendants, during their tenures as fiduciaries, knew or should have known it.

### 2.    The Post-LBO Debt Structure Improperly Restricts the Debtors' Cash.

220.    Two significant differences between the pre- and post-LBO Cash Management Agreement and related agreements placed the Debtors at even graver risk of failure. First, the pre-LBO cash management agreement provided that management fees were higher in priority on the so-called "waterfall" than debt service on the mezzanine loans, and thus management fees would be paid before mezzanine loan debt service if there were insufficient funds to pay both.  The post-LBO Cash Management Agreement provided just the opposite: mezzanine loan debt service was higher in priority than management fees, and was paid first if there were insufficient funds to pay both.  This severely threatened the post-LBO Debtors' ability to maintain operations.

221.    Management fees are not discretionary expenses for a hotel chain.  Most of the hotels were indirectly owned by ESI, which was a REIT.  A REIT is required to have an outside management company operate its hotels.  However, management fees could be paid only if cash was available after debt service under the post-LBO structure.  Therefore, any cash difficulties, and especially a Cash Trap Event, made it likely the Debtors would be unable to pay

critical management fees and costs necessary to keep the Debtors' hotels open.  If those fees and costs were not paid, the Debtors' hotels would close and the Debtors' entire business would abruptly shut down, causing waste and destruction of the Debtors' hotels' value.  Nevertheless, the Blackstone Group Individual Defendants, Blackstone Group Pre-LBO Entity Defendants, DL-DW and the LBO Buyer Individual Defendants that became directors or officers of the Debtors at the time the LBO closed agreed to terms placing the Debtors, and their creditors, improperly at risk.

222.   The post-LBO Cash Management Agreement trapped 100% of excess cash flow during every Cash Trap Event Period, and defined excess cash flow in such a way as to trap the Debtors' cash prior to the payment of critical operating expenses.  The pre-LBO Cash Management Agreement provided for a similar formula, but the excess cash flow concept was different:  the cash trap occurred only after critical operating expenses were paid.  Therefore, the post-LBO Debtors were placed in an untenable financial position to further the interests of the Defendants that were the Debtors' pre- and post-LBO owners, insiders or insiders' affiliates.

223.   Under the pre-LBO mortgage loan agreement, in proposing each annual budget, the borrowers needed to obtain the approval of only the servicer for the mortgage loan. Post-LBO, in proposing an annual budget, the borrowers were required to obtain the approval of both the mortgage lenders (and after securitization of the CMBS, the servicer for the debt certificate holders) and the most junior mezzanine lender.  This requirement placed the Debtors' need for cash to operate subordinate to the profit return for the junior mezzanine lenders, a situation which quite predictably caused great harm to the Debtors and their estates.

224.   All of these problems were or should have been foreseen by the Defendants involved in the LBO.

3.     **The Debtors Immediately Violate Covenants Regarding The Payment of Ordinary Course Debts.**

225.     The mortgage and mezzanine loan agreements contained extensive financial reporting covenants, which included:  (i) within 60 days after the end of each fiscal year, each borrower had to furnish its respective lender with certain annual financial statements audited by a "Big Four" accounting firm and prepared according to GAAP, along with an Officer's Certificate certifying whether there was an event of default under the applicable loan agreement and if so, what it was, how long it had existed, and what actions had been taken to remedy it; (ii) within 20 days after each month, each borrower had to furnish its respective lender an occupancy report, monthly and year-to-date operating statements, a calculation of the Debt Yield on the last day of the month and the amount of all operating rent due for the month; (iii) within 30 days after each quarter and each month, each borrower had to furnish its respective lender with an officer's certificate stating that the monthly financials provided were accurate, that the representations and warranties with respect to certain special purpose entity requirements were correct and that ordinary course of business liabilities had not exceeded certain amounts and had been paid within 60 days of the date they were incurred; and (iv) within 30 days before the start of each fiscal year, the mortgage borrowers and property owner entities had to submit a proposed annual budget, which was subject to the written approval of the mortgage lenders and the "Most Junior Mezzanine Lender."  Until the proposed annual budget was approved by that lender, the most recent "Approved Annual Budget" applied.

226.     Several of these covenants were ignored or violated.  For example, no monthly Debt Yield reports were prepared or furnished during 2007 following the LBO, and the first such report was not prepared until January 2008.  Also, Rogers routinely submitted officer's certificates certifying each month after the LBO closed that ordinary course liabilities had not

exceeded certain amounts and had been paid within 60 days of their incurrence.  In fact, there were ordinary course liabilities outstanding for longer than 60 days on the date the LBO closed and each month thereafter until the Debtors' eventual bankruptcy filing.  Each of these events was an event of default under the loan agreements.  In short, the Debtors were in technical default of their obligations the day the LBO closed.

E.    **The Lenders Make Demands of Lichtenstein to Facilitate the Sale of Loan Certificates.**

     1.    **The Lenders Experience Difficulty Selling the LBO Debt.**

     227.    The lenders that had committed to finance the LBO had always intended to sell most or all of the mortgage and mezzanine debt to third parties. Those efforts, however, were unsuccessful. As of the LBO's closing on June 11, 2007, the banks that financed the LBO held all or substantially all of the mezzanine and mortgage debt.

     228.    Immediately after the LBO closed, the mortgage lenders marketed the CMBS for sale.  At the beginning of those efforts, the market was active.  However, the market quickly softened, starting no later than late-July or early-August 2007. As a result, the banks were forced to take more aggressive steps to sell the CMBS debt including, for example, as early as August 2007, discounting the CMBS debt.

     229.    The mezzanine debt also was not selling, and was being discounted by the mezzanine lenders.  The mezzanine lenders began offering to provide buyers of the mezzanine debt with financing ("repo financing") to help buyers purchase the debt.

     230.    In addition to offering incentives to potential buyers of the CMBS and mezzanine debt, the lenders made certain demands on Lichtenstein and Lightstone regarding

actions that the lenders claimed were needed to make the CMBS and mezzanine debt more marketable.

> 2.      **The Lenders Demand that Lightstone Stop Efforts to Sell Preferred Equity.**

231.    Before the LBO had closed, in May 2007  Lichtenstein was in discussions with certain entities regarding a sale of a substantial piece of equity in the post-LBO Debtors. Among others, Centerbridge Partners, L.P ("Centerbridge") was supposedly interested in purchasing equity, and was discussing with  Lichtenstein the need to relieve the Debtors from a $200 Million junior tranche of LBO debt.   Other potential investors being solicited on the Buyer's behalf at the time commented to  Lichtenstein or Lichtenstein's advisors that the proposed LBO was "too levered," that it "wouldn't take much to wipe them out," and thus declined interest.  Unsurprisingly, those pre-LBO discussions did not result in a sale of preferred equity.  Nevertheless, the LBO proceeded.

232.    After the LBO closed, Lichtenstein continued efforts to sell equity. However, the lenders demanded that Lichtenstein cease those efforts because it was interfering with the lenders' efforts to sell their debt.  Upon information and belief, Lichtenstein complied with the lenders' demands, and ceased efforts to sell equity shortly after the LBO closed.

233.    In or around August 2007, in connection with the securitization of the mortgage loan that resulted from the LBO, Banc of America Securities LLC, together with three other banks, offered Commercial Mortgage Pass-Through Certificates in the amount of the $4.1 billion mortgage loan to institutional third-parties through a Confidential Offering Memorandum, dated August 17, 2007 (the "Mortgage Loan Issuance Offering Memorandum").

234.    Although the Mortgage Loan Issuance Offering Memorandum noted the ratings of the mortgage loan debt by Fitch, S&P, and Moody's as between BB and AAA,

noticeably absent from the Mortgage Loan Issuance Offering Memorandum was any reference to the fact that, as described above, these rating agencies' July 2007 reports noted that the total debt of the LBO substantially exceeded the value of the Company's underlying assets.  According to S&P's and Fitch's July 2007 reports, they expressly valued the Company at $4.8 billion and $5.2 billion, respectively – approximately $3 billion less than the $8 billion purchase price.

235.    Moreover, the Mortgage Loan Issuance Offering Memorandum cited the results of the HVS appraisal, which the Sellers, the Buyer, participating lenders, and others involved in the LBO, as discussed above, knew or should have known was flawed, and which was based upon assumptions provided to HVS by the Blackstone Pre-LBO Entity Defendants or the Blackstone Group Pre-LBO Individual Defendants in order to inflate the values in the HVS appraisal, as described above.

**3.      The Alleged HPT Capital Lease is Declared in Default and The Lenders Demand That  Lichtenstein "Resolve The Defaults or Else" to Facilitate The Banks' Efforts to Sell Their Paper.**

236.    Prior to the LBO, HVI(2) Incorporated ("HVI"), an entity under the Debtors' corporate umbrella, entered into a lease agreement ("HPT Lease"), pursuant to which HPT HSD Properties Trust ("HPT HSD") leased eighteen hotels to HVI. The HPT Lease ran through December 31, 2015, subject to renewal options. HVI was required by the HPT Lease to, among other things, (i) maintain certain specified net worth, and (ii) adhere to certain requirements if a change of control, such as the LBO, was to be effected.

237.    Immediately after the LBO closed, HPT HSD alleged that Lightstone had failed to comply with one or more of these requirements.  The Blackstone Group Individual Defendants, Blackstone Pre-LBO Entity Defendants and, to the extent they were directors, officers or anticipated equity owners at the time, the LBO Buyer Entity Defendants and LBO

Buyer Individual Defendants were or should have been well aware of this issue prior to the LBO's closing.

238.    One week after the LBO closed, on June 18, 2007, HPT HSD issued a notice of default under the HPT Lease and terminated the lease.  That same day, HPT HSD issued a press release announcing the alleged defaults and that it had terminated the lease.  This default was foreseeable prior to the LBO, caused great concern among the Debtors' lenders and caused the lenders to place further demands upon the Debtors.

239.    Shortly thereafter,  HPT HSD offered Lichtenstein the option to purchase the properties that were subject to the HPT Lease. To resolve the dispute, and to address the lenders' demands, on or around July 26, 2007, HFI Acquisitions Company LLC ("HFI"), an affiliate of  Lichtenstein, purchased 17 of the 18 leased hotel properties under the HPT Lease for approximately $192 Million.  Approximately $170.5 Million of the $192 Million used in the HPT HSD transaction came from new mortgage and mezzanine loans to HFI from certain of the Debtors' lenders. In connection with the transaction, HFI was assigned all of HPT HSD's rights under the HPT Lease, including HPT HSD's rights in a $15.6 million security deposit.  Upon information and belief, one or more of the Debtors had an interest in those funds.  Also, Homestead guaranteed a portion of the rent under the HPT Lease and posted cash collateral for that guaranty totaling approximately $10 million.  Upon information and belief, Blackstone Hospitality was also released from its obligations under a letter of credit that Blackstone Hospitality had, prior to the LBO, posted as security for rent and other obligations owed under the HPT Lease.

240.    After the HFI transaction closed, HFI subsequently leased the purchased hotel properties to one or more of the Debtors.   Upon information and belief, this enabled

Lichtenstein, as the owner of HFI, to receive additional payments from the Debtors in the form of rents on those hotels.

**4.      DL-DW's Acquisition of the "LIBOR Floor Certificates."**

241.     Because the mortgage lenders were having so much difficulty selling their debt, Wachovia and the borrower Debtors entered into a letter agreement amendment, dated August 31, 2007, that amended the mortgage loan agreement and the mezzanine loan agreements. The amendment adjusted provisions relating to the application of the proceeds from prepayments of the mortgage and mezzanine loans to make the debt more palatable to potential buyers. In exchange for the borrowers' consent to the amendment, the lenders agreed to issue to the Debtor borrowers (or their designees) Class X-A and X-B certificates from the securitization (collectively, the "LIBOR Floor Certificates").  The LIBOR Floor Certificates were investment grade (AAA), and represented the right to receive a payment stream, derived from the mortgage loan payments, of the difference between the LIBOR "floor" amount, on the one hand, and actual LIBOR on the other hand.  Therefore, whenever LIBOR dropped below the floor, part of the money paid by the borrower Debtors on the mortgage debt would be paid over, in turn, to the holder of the LIBOR Floor Certificates.

242.     On November 2, 2007, the LIBOR Floor Certificates were issued, in physical form, and transferred directly to DL-DW, one of the ultimate equity owners of the Debtors, rather than to the Debtor borrowers making concessions and providing all payments under the loan agreements. Upon information and belief, no value was provided by DL-DW to the borrowers in exchange for these certificates and no accounting entries were made to reflect that property rightfully belonging to Debtor borrowers was being diverted to DL-DW.  At the time, the LIBOR Floor Certificates were valued at no less than approximately $25 Million.

243.     As LIBOR began dropping throughout 2008 and 2009, the LIBOR Floor Certificates became increasingly valuable to DL-DW because the amount of the "floor" was higher than the actual LIBOR-based loan payments.  This value, however, should have belonged to the Debtors, not DL-DW, because the Debtors were the obligors under the mortgage and mezzanine agreements, and were the parties who contracted to receive the certificates. The LIBOR Floor Certificates' issuance to DL-DW was an improper transfer of the Debtors' value to the Debtors' equity owners.

**F.     The Debtors' Post-LBO Performance Continues to be Predictably Dismal, But Substantial Distributions Are Nevertheless Made to Equity Holders.**

     **1.     2007 Post-LBO Financial Performance.**

244.     Immediately after the LBO, the Debtors' financial performance continued to decline, performance metrics set forth in its budgets were missed, and the Debtors encountered significant (and predictable) economic problems.  The LBO Buyer Entity Defendants and, during their tenures as directors or officers of one or more of the Debtors, the LBO Buyer Individual Defendants, received regular financial and other reports on both a weekly and monthly basis (depending on the nature of the reports) after the LBO and therefore knew or should have known of relevant, material events relating to the Debtors' performance and inevitable downward spiral.

     **a.     2007 Financial Results.**

245.     The Debtors' 2007 post-LBO revenues were approximately $623 million, below the pro-forma budget of approximately $655 million prepared in connection with the LBO.  The 2007 post-LBO EBITDA was approximately $327 million (or a 52% margin), as compared to a pro-forma budget EBITDA of $364 million (or a 56% margin).   During the second half of 2007, the Debtors experienced a continuing reduction in room demand, and the monthly ADR, OCC, and RevPAR were at or below budget in every month following the LBO

in 2007.   Revenue growth reversed in the second half of 2007, and the Debtors missed projections for room revenue and property-level EBITDA in each of the last three quarters of 2007.

246.    The Debtors' performance relative to its selected competitive peer group reflected that, while the Debtors' occupancy rate was higher than those of some of their peers, the Debtors' revenue and room rates (as evidenced by RevPAR and ADR at the time) was below its peers by a significant amount:  10% to 22%.

247.    In addition to regular industry reports, the Debtors' management received weekly reports showing how the Debtors' deteriorating performance compared to the Debtors' peer group in the second half of 2007.   During the November 15, 2007 board of directors meeting for the Debtors, it was reported that during the third quarter, certain metrics were below budget: RevPAR was below budget by 3% and property-level EBITDA was below budget by 5.7% year to date through September; RevPAR was below budget by 5.9% and property-level EBITDA was below budget by 10.5% for the third quarter 2007.   The LBO Buyer Entity Defendants and, during their tenures as directors or officers of one or more of the Debtors, the LBO Buyer Individual Defendants, were thus aware that the Debtors' performance was not only below their peer group, but was also below internal targets.

248.    However, at a November 15, 2007 board meeting of the "Extended Stay Hotels family of companies," Kim "anticipated" double digit corporate EBITDA growth for 2008 and 2009, driven by anticipated RevPAR growth of more than 7% in both years, based on the Debtors' "re-branding" strategy. This re-branding strategy, however, was based upon having substantial funds available to spend on brand strategy initiatives in the first quarter of 2008. However, the projected Debt Yield calculation for the fourth quarter of 2007 and the first two

quarters of 2008 were expected at that time to be below the minimum requirement under the LBO loan agreements.  Funding for re-branding was not likely to be available because the Debt Yield calculations would in turn trigger a Cash Trap Event, depriving the Debtors of the much needed cash.

249.    In addition, the Debtors' financial projections at the time reflected negative cash flows for the fourth quarter of 2007 and the first quarter of 2008. These projected results should have alerted anyone looking at them with an unjaundiced eye that the optimistic growth "anticipated" by Kim was not going to occur in the short term, nor was the cash going to be available to fund the rebranding expenditures from operations.

250.    The Debtors' actual performance in late 2007 was below budgeted ADR, was not strong enough to mitigate the decline in OCC (also below budget at the time), and was adversely impacting the Debtors' liquidity situation.

### b.    Critical Capital Expenditures Are Not Funded.

251.    In 2007, prior to the LBO, the Company spent approximately $67.1 million on capital expenditures.  However, during the post-LBO period, the Debtors did not (and, indeed, could not) fund any of the incremental capital expenditures critical to the Debtors' achievement of the inflated projections discussed in Blackstone's January 2007 Information Memorandum. In fact, the Debtors were changing the pre-LBO re-branding strategy and re-branding their hotels under the Homestead name rather than the Extended Stay brand, contrary to the recommended strategy stated in Blackstone's Information Memorandum, and this new re-branding strategy was not going smoothly.

**c.      Late-2007:  A Cash Trap Event is Imminent.**

252.    At a November 2007 board meeting, the LBO Buyer Individual Defendants finally acknowledged the Debt Yield Event and the pending Cash Trap Event as imminent issues. Senior management knew or should have known the Debtors would likely face a Debt Yield Event when the Debt Yield was to be reported on January 12, 2008.   The anticipated Debt Yield was below the required monthly Debt Yield from the fourth quarter 2007 through the second quarter 2008.

253.    The Debtors submitted a proposed 2008 budget for approval by the lenders in early-December 2007. This budget reflected an increase in the overall property-level expenses. The budget submitted also included significant anticipated future costs related to non-recurring, discretionary capital expenditures associated with the Debtors' proposed re-branding strategy. Due to the anticipated Debt Yield Event and the pending Cash Trap Event that would be triggered in early 2008, the budget sought to ensure that all costs would be covered through funds available in the "waterfall" described above and on the attached Exhibit E (the "Waterfall") through the 2008 budget submitted for lender approval.

**d.      2008 Budget Negotiations:  The Debtors Unsuccessfully Attempt to Gain Access to Cash They Should Have Had From the Closing of the Loans.**

254.    In November 2007, the proposed annual budget for 2008 was due.  HVM prepared annual and monthly financial budgets for the Debtors, which were required to be approved by certain of the Debtors' lenders.  If the proposed annual budget was not approved by the lenders, then the most recently approved annual budget governed the Debtors' operations. This, however, meant that the Debtors' cash was subject to the flawed Waterfall, and the Debtors were on the verge of a Cash Trap Event.  Any cash remaining after the Waterfall was funded

would not be provided to the Debtors. During a Cash Trap Event Period, excess cash that could have been transferred to the Debtors for operating expenses would be held by the lenders as additional collateral, leaving the Debtors unable to pay crucial operating expenses.  Lichtenstein, Kim, Teichman, DeLapp and Rogers, among others, were directly involved in the negotiations with the lenders regarding the 2008 proposed annual budget.

255.    The 2007 approved annual budget had been created prior to the LBO. That budget had certain flaws that all parties should have known about.  However, the post-LBO Company had not been provided with the 2007 annual budget being used at the time.  That 2007 approved annual budget (i) did not include trust fund occupancy taxes (which totaled approximately $6-8 Million, or approximately 9.2% of room revenues, per month, and were collected by the Debtors and held in trust for taxing authorities), and (ii) did not allow for payment of necessary corporate overhead costs (e.g., reservation services, travel agent commissions and certain management fees), all of which were critical to the Debtors' ongoing operations because excess cash was to be trapped, and none of which could be paid during a Cash Trap Event Period.

256.    In November 2007, when it became apparent that trust fund occupancy taxes were being swept into the Cash Management Account for application in accordance with the Waterfall,  Rogers asked the lenders to treat those taxes as pass-through amounts, and to have the amounts distributed back to the Debtors for payment to applicable governmental authorities. The lenders responded that the occupancy taxes would have to be handled through the Debtors' working capital account. In other words, the occupancy taxes collected would come into the lender's cash collateral, but no disbursements would be made to pay them. Upon information and belief, these were "trust fund" obligations, meaning that they were not the Debtors' property.

That money belonged to various governments.  The taxes were collected by the Debtors and held "in trust" for the benefit of taxing authorities.  The lenders, however, knowingly expropriated the government's funds, held all cash and placed the Debtors in the position of wrongfully converting the government's funds to pay their lenders, all of which was pursuant to the agreements and documents executed in connection with the LBO.

257.     Corporate overhead represented approximately 16% of the total property and corporate expenses of the Debtors in late 2007. Without any changes to the budget for 2008, the Debtors were about to experience significant cash flow constraints during a Cash Trap Event Period, which, under the pertinent loan agreements, would last for a minimum of six months. Further, during a Cash Trap Event Period, the Debtors would have had to fund corporate overhead and occupancy taxes from working capital, if any was available, as those expenses would not be paid through the Waterfall.  These facts and circumstances were, or should have been, known to the LBO Buyer Entity Defendants and, to the extent they were directors or officers at the time, the LBO Buyer Individual Defendants, by late 2007, at the latest.

**e.     Despite the Debtors' Financial Distress, Improper Distributions Are Made to Equity Holders in 2007.**

258.     The mortgage loan agreement provided that the Debt Yield, measured on a quarterly basis, had to be greater than 7.75% for equity distributions to be made.  But other agreements entered into in connection with the LBO provided that the holders of Series A-1 preferred equity in the Debtors would receive their equity distributions regardless of the Debtors' financial condition, and regardless of whether those distributions were in violation of applicable law.

259.   Upon information and belief, although the first Debt Yield calculation should have been completed and reported in July 2007, and monthly thereafter, no such calculation was reported to the lenders at any point in 2007.  Had the Debtors' management performed an appropriate Debt Yield calculation in July 2007, that calculation would have shown that, immediately following the LBO's closing, the Debt Yield was 7.09%, compared to a requirement of 7.5% needed to avoid a Cash Trap Event in early 2008 and 7.75% for any equity distributions to be permitted.  The first calculation of the Debt Yield performed and reported to the lenders was in January 2008 for the 12 month period ending December 31, 2007.  Foreseeably, the Debtors did not meet the minimum requirement of 7.75%..

260.   Notwithstanding the Debt Yield failure, the lack of any surplus, the Debtors' insolvency, and the future financial and operational declines that were or should have been foreseen by those running the Debtors at the time, the Debtors, directly or indirectly through affiliated entities, made the following cash distributions directly or indirectly through other entities in the Debtors' corporate structure totaling $8,835,000 to equity holders other than the A-1 Series Unit holders from June 11, 2007 through December 31, 2007:

**2007 Dividends or Distributions to A-2 and A-3 Series Units**

| Recipient | Date Paid | Amount |
|---|---|---|
| **Series A-2 Units** | | |
| PGRT ESH Inc. | 7/30/2007 | $1,067,000 |
| PGRT ESH Inc. | 8/30/2007 | $1,033,000 |
| PGRT ESH Inc. | 9/27/2007 | $1,000,000 |
| PGRT ESH Inc. | 10/30/2007 | $1,033,000 |
| PGRT ESH Inc. | 11/29/2007 | $1,000,000 |
| PGRT ESH Inc. | 12/28/2007 | $1,033,000 |
| | **2007 A-2 Total** | $6,167,000 |
| | | |
| **Series A-3 Units** | | |
| Lightstone Holdings LLC | 8/31/2007 | $2,668,000 |
| | **2007 A-3 Total** | $2,668,000 |

261.    In addition, during 2007 after the LBO closed, the Debtors made the following cash distributions directly or indirectly through other entities in the Debtors' corporate structure to the A-1 Series equity holders, totaling approximately $13.1 million, in violation of the loan agreements and applicable law:

| RECIPIENT | DATE PAID | AMOUNT |
|---|---|---|
| Arbor Commercial Mortgage LLC | 6/11/2007 | $233,333.33 |
| Polar Extended Stay (USA) L.P. | 7/13/2007 | 44,444.44 |
| Princeton ESH, LLC | 7/13/2007 | 44,444.44 |
| Arbor Commercial Mortgage LLC | 7/13/2007 | 1,661,111.11 |
| Polar Extended Stay (USA) L.P. | 7/26/2007 | 18,888.89 |
| Princeton ESH, LLC | 7/26/2007 | 18,888.89 |
| Arbor Commercial Mortgage LLC | 7/26/2007 | 358,888.89 |
| Arbor Commercial Mortgage LLC | 8/15/2007 | 713,333.33 |
| Arbor Commercial Mortgage LLC | 8/15/2007 | 20,000.00 |
| Polar Extended Stay (USA) L.P. | 8/15/2007 | 93,333.33 |
| Princeton ESH, LLC | 8/15/2007 | 93,333.33 |
| Arbor Commercial Mortgage LLC | 8/15/2007 | 1,250,000.00 |
| Arbor Commercial Mortgage LLC | 9/17/2007 | 713,333.33 |
| Polar Extended Stay (USA) L.P. | 9/17/2007 | 103,333.33 |
| Princeton ESH, LLC | 9/17/2007 | 103,333.33 |
| Arbor Commercial Mortgage LLC | 9/17/2007 | 1,250,000.00 |
| Arbor Commercial Mortgage LLC | 10/15/2007 | 450,000.00 |
| Glida One LLC | 10/15/2007 | 550,000.00 |
| Polar Extended Stay (USA) L.P. | 10/15/2007 | 100,000.00 |
| Princeton ESH, LLC | 10/15/2007 | 100,000.00 |
| Arbor Commercial Mortgage LLC | 10/15/2007 | 900,000.00 |
| Arbor Commercial Mortgage LLC | 11/15/2007 | 495,000.00 |
| Glida One LLC | 11/15/2007 | 568,333.33 |
| Polar Extended Stay (USA) L.P. | 11/13/2007 | 103,333.33 |
| Princeton ESH, LLC | 11/15/2007 | 103,333.33 |
| Arbor Commercial Mortgage LLC | 11/15/2007 | 900,000.00 |
| Arbor Commercial Mortgage LLC | 12/17/2007 | 450,000.00 |
| Glida One LLC | 12/17/2007 | 550,000.00 |
| Polar Extended Stay (USA) L.P. | 12/17/2007 | 100,000.00 |
| Princeton ESH, LLC | 12/17/2007 | 100,000.00 |
| Arbor Commercial Mortgage LLC | 12/17/2007 | 900,000.00 |
| **2007 A-1 Total** | | $13,089,999.96 |

262.    Also, (i) on July 17, 2007, DL-DW received a wire transfer from an LBO closing account totaling approximately $77,366,984, which amount, upon information and belief,

represented an apparent "overfunding" of an LBO closing account, and (ii) on October 17, 2007, a post-LBO "purchase price adjustment" resulted in a $2,342,000 payment from Blackstone to DL-DW.  Notwithstanding the fact that the LBO purchase price had been funded and paid on behalf of DL-DW with borrowings by the Debtors, these funds were improperly distributed to equity holders instead of being turned over to the Debtors.  Upon information and belief, these amounts constituted additional improper value that was siphoned from the Debtors for DL-DW's and Lichtenstein's benefit at times when the Debtors were insolvent, inadequately capitalized and without adequate surplus.

> **2.  The Debtors' Condition Further Deteriorates Throughout 2008, But Prohibited Equity Distributions Continue.**

> > **a.  2008 Debt Yield Test and Formal Cash Trap Event.**

263.   The first Debt Yield calculation reported to the lenders was provided to the lenders on January 21, 2008 for the period ending December 31, 2007. As alleged above, since the calculation reflected that the Debtors did not meet the minimum Debt Yield of 7.5% at that time, both a Debt Yield Event and a Cash Trap Event were triggered. Therefore, as of February 2008, any unallocated cash available after the Waterfall had been satisfied on a monthly basis was "trapped" by the lenders in a restricted cash collateral account. The fact that cash was now "trapped" put significant strain on the Debtors, and required the use of over $27 Million from a working capital reserve account in order to keep the Debtors temporarily afloat.

264.   In addition, in November 2007, the Debtors' projections reflected that the Debt Yield could not be maintained above the cure amount of 7.6% for a period of six months in order to eliminate the Cash Trap and reinstate the opportunity to receive any unallocated cash available after the Waterfall had been satisfied on a monthly basis.

b.      **March 2008 – the 9.15% Notes Become Due.**

265.    On March 15, 2008, the 9.15% Notes matured and the principal balance of $30.9 million, together with accrued interest of approximately $1.4 million, came due. The Debtors failed to pay those amounts when due, and a default was declared by the trustee for the noteholders, on March 24, 2008.

266.    On April 16, 2008, DL-DW secured a $22 million "loan" from affiliated investors in the Debtors.  All of the affiliated investors were insiders of the Debtors.  This new $22 million loan, together with additional funds from DL-DW, were used to pay off the matured 9.15% Notes.  But the new insider loan came with onerous terms: it was guaranteed by BHAC Capital and secured by the valuable LIBOR Floor Certificates owned by DL-DW, which should have been property of the Debtors.  Though the "loan" was therefore well collateralized, it nevertheless accrued interest at an annual rate of 25%.  The "loan" was to mature on May 1, 2011 (the "25% Note"). The following table is a summary of the insider "lenders" and participation in the 25% Note:

**Insiders' Interest in the 25% Note**

| Lender | Affiliate Relation | Participation | Amount |
|--------|-------------------|---------------|-------:|
| ABT-ESI LLC | Arbor | Lead Lender / Servicer | $  5,225,000 |
| Park Avenue Funding | Lichtenstein | Co-Lender | 11,000,000 |
| Princeton ESH LLC | Princeton | Co-Lender | 550,000 |
| Mericash Funding LLC | Joseph Chetrit | Co-Lender | 5,225,000 |
| | | | $22,000,000 |

267.    Arbor,  Lichtenstein, Princeton and Chetrit structured this transaction as a "loan" with onerous terms to benefit themselves to the Debtors' detriment, even though they should have put the funds into the Debtors as equity at the time the LBO closed so as to pay off the 9.15% Notes at that time, as had been originally contemplated.

268.    Concurrently with the execution of the 25% Note on April 16, 2008, the Debtors paid off the $31 million outstanding principal balance of the 9.15% Notes, together with the accrued interest of approximately $1.7 million and $100,000 of professional fees. The total payments of approximately $33 million were made using (a) the proceeds from the 25% Note of $22 million; plus (b) approximately $10.6 million of additional funds from DL-DW.   The Debtors accounted for activities related to the repayment of the 9.15% Notes and the securing of the 25% Note by recording the $22 million as additional "paid in capital" on the Debtors' books, with a corresponding intercompany note payable to DL-DW of approximately $10.6 million.

269.    DL-DW pledged the LIBOR Floor Certificates to the lenders of the 25% Note.   The income generated from the LIBOR Floor Certificates went directly to make all interest and principal payments on the 25% Note, rather than DL-DW making payments separately. The maximum monthly principal repayment under the 25% Note was $416,666. Because cash income from the LIBOR Floor Certificates was greater than the principal and interest payments due (or even allowable) on the 25% Note, the excess income from the LIBOR Floor Certificates was deposited into a reserve bank account for the benefit of BHAC Capital Series A-1 Unitholders ("Floor Bonds Reserve Account"). As of December 31, 2008, $3.3 million of the principal on the 25% Note had been repaid in this fashion, leaving a remaining principal balance outstanding of $18.7 million, and an additional $3.6 million had been paid during 2008 as interest.   Despite these payments, the Floor Bonds Reserve Account contained a balance of $2.1 million as of December 31, 2008.

c.    **The Debtors' Proposed 2008 Annual Budget.**

270.    The Debtors had submitted a proposed 2008 annual budget for approval by the lenders in early December of 2007. The pertinent lenders objected to certain aspects of

that proposed annual budget, including (a) certain revenue projections in light of the then-current economic climate and poor outlook for the industry; (b) proposed one-time capital expenditure expenses or corporate overhead costs that did not constitute property-level operating expenses; and (c) other costs that were not explained by the Debtors.   The Debtors then conducted discussions with the lenders regarding the objections.

271.    While those discussions were ongoing, the lenders continued to use the 2007 approved annual budget when administering the Waterfall throughout early 2008. This created additional financial strain on the Debtors, as funding for certain operating costs was not available through the Waterfall (e.g., reservation system, occupancy taxes, as described above), and the amounts disbursed were to the Debtors were lower than what was needed at the time to pay operating expenses.

272.    On April 16, 2008, certain issues relating to the 2008 annual budget were resolved.  As a result, the Debtors received some of the cash to which they should have been entitled dating back to January 1, 2008.  However, no provision was made to repair the damage caused to the Debtors during the latter half of 2007, when the Debtors were forced to operate under the 2007 approved annual budget of which the Debtors had never been provided a copy. Thus, the Debtors' cash problems were far from solved, and both the LBO Buyer Entity Defendants and the LBO Buyer Individual Defendants that held fiduciary positions at that time, knew or should have known it.  In fact, on May 1, 2008, after the 2008 annual budget had been approved, Lichtenstein himself remarked that vendor payments were being delayed and that ". . . its demoralizing for the staff to have to be dodging vendors and local tax authorities who want their payments."

273.    On April 15, 2008, in exchange for the concessions granted by the lenders to facilitate budgeting of operating expenses, an amendment to the mortgage loan agreement was executed (the "Mortgage Loan Second Amendment"). The Mortgage Loan Second Amendment was between the same parties to the mortgage loan, except that by that time the original mortgage lenders had transferred their interest to Wachovia Bank Commercial Mortgage Trust in connection with the post-LBO securitization of the mortgage loan debt through CMBS.

274.    The Mortgage Loan Second Amendment added a new Section 5.2.14 to the original mortgage loan agreement, which contained extensive restrictions on the mortgage borrowers' use of income, cash, fees, proceeds, property or revenue from the mortgaged hotels (including disbursements to the mortgage borrowers of excess cash flow under the Cash Management Agreement) ("Restricted Excess Cash Flow").  The new Section 5.2.14 prohibited the mortgage borrowers' distribution of Restricted Excess Cash Flow except in limited circumstances.

275.    The Debtors finally retained both Weil Gotshal & Manges ("Weil") and Lazard Freres ("Lazard") in or around early 2008 as restructuring and insolvency professionals to assist with efforts to restructure the Debtors' suffocating LBO debt structure.

      d.      **As Events Unfold, the Debtors' Financial Condition Worsens and Liquidity Problems Become More Acute.**

276.    The softening of room demand experienced by the Debtors in 2007 continued into early 2008. OCC decreased again.  The extended-stay industry as a whole generally experienced ADR increase in the first half of 2008.  However, overall supply in the industry increased at rates far exceeding only modest increases in demand.  The 2008 approved

annual budget was not finalized until April 2008, and the Debtors were operating in a Cash Trap Event Period.  All of these factors, among others, had a severe impact on the Debtors' liquidity.

277.    In the first quarter of 2008, liquidity became more constrained.  In January of 2008, the Debtors were required to transfer $8.1 million from their main operating account to the Cash Management Account to cover a shortfall in the Waterfall and ensure that certain obligations were met, including interest payments on the mezzanine loan. Consequently, the general ledger balance of cash available to the Debtors to fund operating expenses as of March 31, 2008 decreased to $42.0 million from $52.4 million as of December 31, 2007.

278.    In the second quarter of 2008, OCC and RevPAR declined further. An "Audit Update" included in the May 15, 2008 board of directors package noted that: (a) debt waivers were required; and (b) significant liquidity concerns had to be addressed for audit issuance.  In addition, a cash flow forecast prepared by the Debtors predicted that the effect of LIBOR rates would significantly impact liquidity, such that cash at year end was projected to range from $19.5 million to $49.8 million, at best, depending on the LIBOR rates assumed.

279.    In fact, the LBO Buyer Entity Defendants and the LBO Buyer Individual Defendants that held director or officer positions as of July 2008, knew or should have known that the Debtors could be completely out of cash as soon as January 2009. The Company also anticipated that it would not meet certain Debt Yield amortization avoidance thresholds by June 2009, thereby triggering a requirement that the Debtors make amortization payments to the lenders, estimated at $51 million for 2009. This increase in anticipated cash needs when the Debtors' financial condition was rapidly declining caused the Debtors serious concern, as (i) all cash flows were subject to a Cash Trap and the Debtors were not projected to achieve a Debt Yield cure in 2008 or 2009, (ii)  the Debtors would have difficulty obtaining an unqualified audit

opinion at the end of 2008, which could result in a default under the pertinent LBO loan agreements, and (iii) approval of the 2009 proposed annual budget posed critical challenges given the questions raised by certain of the lenders with respect to the annual budget in late-2007 and early-2008.

280.    In the third quarter of 2008, as conditions worsened in part as a result of the Great Recession, RevPAR decreased again, and was lower than the Debtors' budget for that time.    In the fourth quarter of 2008, ADR and OCC continued to decline, and RevPAR performance was far off of budgeted projections. As a result, fourth quarter 2008 revenue and property-level EBITDA performance had double-digit declines over the prior year.  By the end of 2008, the Debtors' total revenue and EBITDA had also dramatically declined.

281.    As a result of these financial difficulties, the Debtors' liquidity continued to deteriorate, and by December 31, 2008 the general ledger balance of cash available to fund operations had slipped to $26.5 million.  The LBO Buyer Entity Defendants and LBO Buyer Individual Defendants that were directors and officers at the time were all well aware of these events.

      e.      **Dividends and Distributions to Equity Holders Continue in 2008, Despite the Debtors' Financial Distress.**

282.    Notwithstanding the Debtors' precipitous financial and operational declines, the Debtors, directly or indirectly through affiliated entities, made the following substantial cash distributions directly, or indirectly through other entities in the Debtors' corporate structure, to equity holders or equity holders' affiliates, in violation of the loan agreements and applicable law:

## 2008 Improper Equity and Related Distributions

| RECIPIENT | DATE PAID | AMOUNT |
|---|---|---|
| Arbor Commercial Mortgage LLC & Ron Invest LLC | 1/15/2008 | $262,500.00 |
| Glida One LLC | 1/15/2008 | 473,611.11 |
| Polar Extended Stay (USA) L.P. | 1/15/2008 | 86,111.11 |
| Princeton ESH, LLC | 1/15/2008 | 86,111.11 |
| Arbor Commercial Mortgage LLC | 1/11/2008 | 900,000.00 |
| Arbor Commercial Mortgage LLC | 2/20/2008 | 1,808,333.33 |
| Arbor Commercial Mortgage LLC | 3/17/2008 | 241,865.08 |
| Ron Invest LLC | 3/17/2008 | 42,063.49 |
| Glida One LLC | 3/17/2008 | 115,674.61 |
| Polar Extended Stay (USA) L.P. | 3/17/2008 | 21,031.75 |
| Princeton ESH, LLC | 3/17/2008 | 21,031.75 |
| Arbor Commercial Mortgage LLC | 3/12/2008 | 684,523.81 |
| Ron Invest LLC | 3/12/2008 | 119,047.62 |
| Glida One LLC | 3/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 3/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 3/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 4/15/2008 | 305,753.97 |
| Ron Invest LLC | 4/15/2008 | 53,174.60 |
| Glida One LLC | 4/15/2008 | 146,230.16 |
| Polar Extended Stay (USA) L.P. | 4/15/2008 | 26,587.30 |
| Princeton ESH, LLC | 4/15/2008 | 26,587.30 |
| Arbor Commercial Mortgage LLC | 4/11/2008 | 684,523.81 |
| Ron Invest LLC | 4/11/2008 | 119,047.62 |
| Glida One LLC | 4/11/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 4/11/2008 | 59,523.81 |
| Princeton ESH, LLC | 4/11/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 5/15/2008 | 500,000.00 |
| Arbor Commercial Mortgage LLC | 5/12/2008 | 684,523.81 |
| Ron Invest LLC | 5/12/2008 | 119,047.62 |
| Glida One LLC | 5/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 5/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 5/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 6/16/2008 | 27,418.63 |
| Ron Invest LLC | 6/16/2008 | 4,768.45 |
| Glida One LLC | 6/16/2008 | 13,113.26 |
| Polar Extended Stay (USA) L.P. | 6/16/2008 | 2,384.23 |
| Princeton ESH, LLC | 6/16/2008 | 2,384.23 |
| Arbor Commercial Mortgage LLC | 6/16/2008 | 508,264.53 |
| Arbor Commercial Mortgage LLC | 6/12/2008 | 684,523.81 |
| Ron Invest LLC | 6/12/2008 | 119,047.62 |
| Glida One LLC | 6/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 6/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 6/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 7/15/2008 | 500,000.00 |
| Arbor Commercial Mortgage LLC | 7/11/2008 | 684,523.81 |
| Ron Invest LLC | 7/11/2008 | 119,047.62 |
| Glida One LLC | 7/11/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 7/11/2008 | 59,523.81 |
| Princeton ESH, LLC | 7/11/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 8/15/2008 | 558,333.33 |
| Arbor Commercial Mortgage LLC | 8/12/2008 | 684,523.81 |
| Ron Invest LLC | 8/12/2008 | 119,047.62 |

| | | |
|---|---|---|
| Glida One LLC | 8/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 8/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 8/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 9/15/2008 | 558,333.33 |
| Arbor Commercial Mortgage LLC | 9/12/2008 | 684,523.81 |
| Ron Invest LLC | 9/12/2008 | 119,047.62 |
| Glida One LLC | 9/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 9/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 9/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 10/15/2008 | 500,000.00 |
| Arbor Commercial Mortgage LLC | 10/10/2008 | 684,523.81 |
| Ron Invest LLC | 10/10/2008 | 119,047.62 |
| Glida One LLC | 10/10/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 10/10/2008 | 59,523.81 |
| Princeton ESH, LLC | 10/10/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 11/17/2008 | 558,333.33 |
| Arbor Commercial Mortgage LLC | 11/12/2008 | 684,523.81 |
| Ron Invest LLC | 11/12/2008 | 119,047.62 |
| Glida One LLC | 11/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 11/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 11/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 12/18/2008 | 1,750,000.00 |
| | 2008 A-1 Total | $21,349,999.99 |

283.    On August 14, 2008, the board of directors of the "Extended Stay Hotels family of companies" discussed that they had declared all dividends required to pay distributions to equity holders, and had also ratified all dividends paid by any of the companies up to that date. In fact, at that meeting, Teichman moved to declare dividends that were to be paid in the fourth quarter of 2008. That motion passed unanimously. At the same time, the board "tabled" certain rebranding initiatives due to the companies' poor financial performance, and received detailed reports regarding the Debtors' poor financial performance in 2008 and anticipated continued decline in 2009.

284.    On November 13, 2008, the board of directors belatedly passed a resolution that purported to stop improper equity distributions, recognizing at that board meeting the "divergence of interests of the equity parties" from the interests of the Debtors and the "Extended Stay Hotels family of companies."

285.    In early December of 2008, the Debtors submitted for the lenders' approval a proposed 2009 annual budget that assumed a significant decline in room revenues and property-level EBITDA.   At this point, the Debtors were simply trying to "stay[] alive for another few weeks," as Lichtenstein later stated.   At a board meeting held on December 16, 2008, Chetrit suggested that there be "staff reduction[s] of hours . . . and that staff should be asked for a 20% reduction to make a significant impact upon cash flow."   Upon information and belief, this suggestion was made, *inter alia*, to increase cash available to continue improper distributions to equity holders, including entities owned or controlled by Chetrit, all to the detriment of the Debtors.

286.    Although the Debtors passed a resolution stopping equity distributions in late-2008 in light of the financial and liquidity crises, improper distributions to equity actually continued even after that resolution from a so-called "Preferred Equity Holder Reserve Account" that had been created at the LBO's closing and was "security" for certain equity holders. The Preferred Equity Holder Reserve Account was funded with $20 million of Debtors' funds at the LBO's closing, and certain equity holders could instruct that distributions be made from that reserve account to them. If the account was used for such distributions, then BHAC Capital, using the Debtors' cash, was required to replenish the reserve back up to $20 million. The following table represents the distributions from the preferred equity reserve account to an Arbor affiliate *following* the November 13, 2008 board of directors meeting at which equity distributions were resolved to be stopped:

**Summary of Improper Distributions from the Preferred Equity Reserve Account**

| | | | |
|---|---|---|---|
| 12/18/2008 | Arbor Commercial Mortgage | $ | 1,750,000 |
| 1/20/2009 | Arbor Commercial Mortgage | | 1,808,333 |
| 2/20/2009 | Arbor Commercial Mortgage | | 1,808,333 |
| 3/11/2009 | Arbor Commercial Mortgage | | 15,178,971 |
| | | $ | 20,545,637 |

Eventually, in March 2009, as the Debtors continued their downward spiral, the Preferred Equity Reserve Account was liquidated and the balance was wired to the A-1 Series unit holders, as shown above.

287.    From the LBO's closing through the date the Preferred Equity Reserve Account was liquidated and given to the A-1 series unit holders, a total of no less than $100 million was improperly distributed to equity holders during periods of tremendous financial and liquidity stress.

288.    In addition to those amounts, upon information and belief Lightstone received so-called "asset management fees"  throughout that same period totaling approximately $1 million per year.  This occurred even though Lightstone was not the Debtors' management company and HVM managed all aspects of the Debtors' daily operations.

289.    Before the LBO's closing, HVM and HVM Canada provided the operational, management, and administrative functions for all of the Extended Stay hotels. After the LBO's closing, all Extended Stay hotels continued to be managed by HVM, except for three properties in Canada, which were operated by HVM Canada.   HVM's management fee arrangement was different from the industry practice, and provided significantly higher management fees than those typically seen in the industry.  In spite of the substantial fees being paid to HVM and HVM's management of all aspects of the Debtors' day-to-day business, Lightstone (i.e., Lichtenstein) received management fees after the LBO totaling approximately $1 Million per year, for doing nothing.  Moreover, HVM was managed by an entity known as "HVM Manager," which was itself owned and managed by Lichtenstein, HVM Manager's sole member.

3.      **2009 Post-LBO Performance through the Bankruptcy Filing Date.**

     a.      **Shortfalls in the Waterfall Are Experienced.**

290.      As a result of declining performance in December 2008 and January 2009, the receipts transferred to the Waterfall were not sufficient to cover the interest due on the mezzanine debt in January 2009. Consequently, the Debtors were forced to transfer $5.9 million from their main operating account to the Cash Management Account to cover the shortfall.  Only $19 million was distributed from the Cash Management Account to the Debtors for budgeted operating expenses in January 2009. This was the lowest monthly amount distributed to the Debtors since the LBO's closing. From mid December 2008 to late March 2009, the Debtors were forced to fund occupancy taxes and other expenses totaling approximately $20 million out of a cash reserve account.

     b.      **Insider Obligations Are Paid In Full.**

291.      In February 2009, the Debtors' advisors issued a memorandum to the Debtors' independent directors regarding the deteriorating liquidity situation, and on March 11, 2009, the boards of directors of DL-DW, BHAC, Homestead, and ESI met to discuss the insider 25% Note.   Teichman inexplicably informed the Boards that the 25% Note needed to be refinanced, even though it was not scheduled to mature until May 1, 2011, and thus should not have been considered a pressing issue at the time, and proposed that the 25% Note be paid off by transferring the LIBOR Floor Certificates (which had been stolen from the Debtors by DL-DW) to the holders of the 25% Note. That same day, the board approved this proposed transaction.

292.      On March 12, 2009, one day later, the so-called "Floor Bonds Agreement" was executed, pursuant to which the LIBOR Floor Certificates were assigned to ABT-ESI LLC, as lead lender under the insider 25% Note.  In connection with that agreement, all insider note

interests (including those held by Lightstone Commercial, as successor by transfer to the interests originally possessed by Park Avenue Funding LLC) were contributed by the other 25% Note lenders to ABT-ESI LLC.  ABT-ESI LLC was simultaneously restructured so that each of the other lenders became owners of ABT-ESI LLC in proportion to their respective rights and interests in the 25% Note.  Similarly, as part of the deal, the Series A-1 equity holders waived their rights to the $4,817,986 balance of the so-called "Floor Bonds Reserve Account," and the entire balance was required to be wire transferred to an account designated by Lightstone Commercial, which was to receive a Form 1099 in respect of this distribution.

293.    At the time the Floor Bonds Agreement was executed, the outstanding principal balance on the 25% Note was $17,416,674. The Floor Bonds Reserve Account then contained a balance of $4,817,986.   The LIBOR Floor Certificates, which had apparently brought in at least $13 million in less than a year, were assigned an artificial value of $17,416,674, exactly equal to the balance of the 25% Note.  Upon information and belief, the actual value of the LIBOR Floor Certificates was significantly greater.

294.    The LIBOR Floor Certificates were therefore transferred to pay the 25% Note, and the Floor Bonds Reserve Account was emptied to make a separate payment to Lightstone Commercial.  In short, the valuable LIBOR Floor Certificates that should have belonged to the Debtors were transferred to DL-DW for no consideration, and then to insiders as ostensible repayment for the $22 million "loan" to DL-DW.  The remaining accumulated proceeds of the LIBOR Floor Certificates that had not been previously transferred to the insiders as payments on the $22 million loan, were diverted to insider Lightstone Commercial.  Insiders were thus paid richly as the Debtors moved toward their inevitable bankruptcy.  As described

more fully below, bankruptcy was delayed for just over ninety days after the 25% Note was paid off, thus allowing the ninety-day preference period under the federal Bankruptcy Code to expire.

### c.     2009 Performance Worsens.

295.    During the first and second quarters of 2009, the Debtors experienced steep declines in ADR, OCC, room revenue and property-level EBITDA.  As a result, the general ledger balance of cash available to the Debtors to fund operating expenses as of March 31, 2009 decreased to only approximately $16.2 million, from approximately $26.5 million as of December 31, 2008.

296.    In the second quarter of 2009, the Debtors continued capital expenditure freezes and instituted hiring freezes related to all full-time and part-time personnel. As the liquidity situation worsened, the LBO Buyer Individual Defendants that remained as officers and directors at the time discussed actions to conserve cash. For example, in April of 2009, the board of directors of the "Extended Stay Hotels family of companies" discussed that vendor payments were being stretched to conserve cash. On April 30, 2009 the Debtors' outstanding accounts payable balance over 60 days old of $1.3 million was more than 10% of the total accounts payable balance of approximately $11 million, the highest percentage since the LBO.

297.    By no later than May 14, 2009, the board was aware that the Debtors might not have enough unrestricted cash to fund operations through the end of May 2009. Further, the Debtors' declining cash position was expected to be exacerbated by the pending amortization triggered by the anticipated breach of the Debt Yield amortization threshold covenant, as described above.  These additional payments would have to be funded through the Cash Management Account beginning with the June 13, 2009 Waterfall cycle. Although restructuring alternatives were discussed by the board, none identified how, in the absence of a

restructuring or bankruptcy, the Debtors might obtain the funds needed to make the upcoming Debt Yield amortization payments, which would total over $50 million for the remainder of 2009.

298.   As of May 31, 2009, the general ledger cash balance available to fund operating expenses had dropped to approximately $4.6 million, down from approximately $26.5 million as of December 31, 2008. In addition, the Debtors were incurring extensive restructuring expenses.   In June 2009, as a result of the severe liquidity situation and the imminent amortization payments, the Debtors were projected to completely deplete liquidity by the end of June 2009, and would be unable to meet payroll of approximately $9 million on Tuesday, June 19, 2009.

**G.     The Debtors File for Chapter 11 Protection Two Years and Four Days After the LBO's Closing, Just Over Ninety Days After Paying Off Insider Debt, and A Group of Investors Including Blackstone "Re-Acquires" the Debtors for $3.9 Billion.**

299.   Shortly after the June 11, 2009 two-year anniversary of the closing of the LBO, and after months of failed workout negotiations, the Debtors had to report whether the Debt Yield for 2009 was below the Debt Yield amortization threshold.  If so, the borrowers were going to be liable for the payment of additional monthly amortization payments estimated to total as much as $51 million for the remainder of 2009.  Given the Debtors' cash flow at the time, those amortization payments could not be made.

300.   In addition, a significant interest payment was due to be made to the mezzanine lenders as soon as Friday, June 12, 2009.  If that payment was made, then (i) the Debtors would be unable to survive the upcoming week, when payroll was due, and (ii) the Debtors would not have access to those funds as cash collateral in a chapter 11 case.

301.    The only way to avoid these issues was to file for chapter 11 bankruptcy protection.  However, the first group of the Debtors' chapter 11 cases were filed on Monday, June 15, 2009, two years and four days after the LBO closed on June 11, 2007, and 93 days after paying off the insider 25% Note in full.

302.    Upon information and belief, at least part of senior management's motivation in 2009 for delaying the inevitable bankruptcy filings was to (i) do so after the statute of limitations under 11 U.S.C. § 548 expired and the ninety day preference look-back period ran, and (ii) give equity holders as much time as possible to consummate a restructuring transaction that preserved at least some of their equity in the Debtors and, more importantly, extricated equity holders from their significant guarantee obligations under the LBO debt.

303.    Ironically, during the Debtors' bankruptcy cases, a group of investors including Blackstone "re-acquired" the Debtors for $3.9 billion, substantially less than the total amount of crushing debt the Debtors were caused to incur in the LBO for Blackstone's benefit prior to the bankruptcy.  The post-bankruptcy transaction involving Blackstone was announced on or about April 2, 2010 and subsequently approved by the Bankruptcy Court as part of the Debtors' Plan on July 20, 2010.

**H.     The Debtors Were Dominated, Controlled and Manipulated by The Blackstone Group, The Buyer, and their Respective Affiliates, for Their Sole Benefit.**

304.    Throughout the process that eventually drove them into bankruptcy, the Debtors were dominated and controlled by the Blackstone Pre-LBO Entity Defendants and Blackstone Group Individual Defendants before and in connection with the LBO, and by the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants post-LBO, in an attempt to siphon as much value from the Debtors as possible for the sole benefit of those parties and their

affiliates, and without regard to the best interests or financial welfare of the Debtors and their creditors. The Debtors were treated as nothing more than a collective vehicle to be exploited.

305. From the start, the Blackstone Pre-LBO Entity Defendants and Blackstone Group Individual Defendants manipulated the Debtors by preparing financial information and projections in connection with the Information Memorandum that positioned the Debtors for a sale that would leave them, insolvent and with crushing debt and insufficient capital for ongoing operations. Indeed, the projections provided by the Blackstone Pre-LBO Entity Defendants and Blackstone Group Individual Defendants were based on strategies which they knew or should have known the Debtors would be unable to implement as a result of their foreseeable poor performance, financial condition and restricted cash flow following the LBO.

306. As described above, the LBO was structured so as to allow the Blackstone Pre-LBO Entity Defendants to pull as much value out of the Debtors as possible without regard to the Debtors' solvency or ability to conduct profitable operations post-LBO. The requirements and formalities under the LBO loan documents were ignored, thus allowing the Blackstone Pre-LBO Entity Defendants and Blackstone Group Individual Defendants to direct the distribution of $1.9 billion to themselves or their affiliates out of the Debtors' loan proceeds, after they had artificially driven up the sale price and the resulting amount of debt to be borne by the Debtors.

307. Post-LBO, the formalities of the Debtors' separateness and accounting were ignored, as were the formalities regarding the flow of funds through the Cash Management Account, as the priority became paying and making distributions to equity holders at all costs. Further, the LBO was structured so as to allow the siphoning of value from the Debtors in the form of "asset management fees" for Lightstone entities, although the Debtors were managed by HVM (which was itself managed by HVM Manager, also a Lichtenstein entity after the LBO).

308.     The Debtors, meanwhile, were forced to pledge their assets as collateral for mortgage loans, despite the fact that they received none of the proceeds nor any benefit from the LBO.  The Debtors were further saddled with new, onerous restrictions on their cash flow, which was now directed toward servicing the debt that benefited all of the Defendants instead of being available for the Debtors' operations.

309.     Ultimately, even the timing of the Debtors' eventual and inevitable bankruptcy filing was manipulated by the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants that were directors, officers or persons otherwise in control of the Debtors at the time, so as to attempt to insulate themselves from certain federal clawback claims to the detriment of the Debtors' estates and the Debtors' creditors.  The Debtors were therefore thoroughly dominated and controlled by the Defendants at all times relevant to this Complaint, and their respective affiliates, in a greed-driven scheme that served only to enrich the Blackstone Pre-LBO Entity Defendants and to bestow ownership and control, and the associated benefits derived therefrom, on the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants, all at the sole expense of the Debtors.

310.     Despite the fact that the Debtors' financial distress detailed throughout this Complaint was or should have been known to the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants during their respective tenures as directors, officers or persons otherwise in control of the Debtors, the bleeding of the Debtors' assets continued after the LBO was consummated by illegal distributions and dividends to the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants.

311.     In addition to the improper distributions of the Debtors' assets that were made to the Blackstone Pre-LBO Entity Defendants under the direction of the Blackstone Group

Individual Defendants in connection with the LBO, the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants helped themselves to the Debtors' assets at a time when the Debtors did not have a surplus and/or were insolvent, as described herein.  From the closing of the LBO in June 2007 through the filing of bankruptcy beginning in June 2009, the Debtors' assets were depleted by more than $100 million of substantial additional illegal and improper distributions, all of which were made when the authorizing and receiving parties knew or should have known that the Debtors did not have a surplus and were insolvent because the Debtors' poor performance, distressed financial condition, cash flow issues and their resulting impact on Debtors' operations and expenditures was readily apparent.

312.    The LBO and its aftermath were orchestrated, negotiated, structured and carried out by the Defendants as nothing more than a sham to enrich themselves and affiliates they owned or controlled at the expense of the Debtors, the Debtors' estates and the Debtors' creditors.

**I.     The Debtors' Assets Were Depleted By The Improper Distributions and Dividends.**

313.    Despite the fact that the Debtors' financial distress and the debt yield issues detailed above were or should have been known to senior management as well as the Debtors' equity holders, the willful bleeding of the Debtors' assets continued after the LBO's consummation in the form of improper distributions and dividends.

314.    In addition to the improper distributions of Debtor assets that were made to the Sellers in connection with the LBO, numerous other parties helped themselves to the Debtors' assets at a time when the Debtors did not have a surplus and/or were insolvent.

315.     As is detailed above well over $100 million of improper dividends and other distributions of the Debtors' assets were made from the date the LBO closed in June 2007 and the date the Debtors began filing bankruptcy in June 2009.

**J.      The Sellers' and Buyer's Professionals Were Unjustly Enriched As Well.**

316.     The Sellers, the Buyer and the equity unit holders were not the only parties to gorge themselves at the trough on the proceeds of the Debtors' loans.  Without regard to the fact that the Debtors obtained no direct or indirect benefit from the purported services they provided, the fees for the Buyer's and Sellers' Professionals were also paid directly by the Debtors from loan proceeds the Debtors borrowed at the LBO's closing.

317.     Bank of America received approximately $3,971,658 in fees on behalf of the Sellers out of the loan proceeds.

318.     Citigroup received approximately $6,350,000 in fees on behalf of the Buyer out of the loan proceeds.

319.     Although they served only to advise on and facilitate a transaction that financially doomed the Debtors and which provided no value to the Debtors, Bank of America and Citigroup have been enriched by fees that were ultimately paid by the Debtors.

320.     Ebury received approximately $9,341,984 in fees and disbursements in connection with the loans made to the Debtors as part of the LBO.  These fees and disbursements were paid out of the proceeds of the loans the Debtors were forced to incur, despite the fact that the loans did not provide any direct or indirect benefit to the Debtors.

321.     The Trust is thus also entitled to recover the professional fees identified herein.

## CAUSES OF ACTION

## AS FOR A FIRST CAUSE OF ACTION

### (Breach Of Fiduciary and Contractual Duties Of Care, Loyalty and Good Faith – Blackstone Pre-LBO Entity Defendants)

322.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 321 as though fully set forth herein.

323.    Up to the date and time the LBO closed, and at all times relevant to this Complaint prior to that date, the Blackstone Pre-LBO Entity Defendants, as entities that owned, controlled and otherwise dominated the pre-LBO Debtors owed the pre-LBO Debtors the fiduciary and contractual duties of good faith, care and loyalty.

324.    The Debtors were either rendered insolvent or placed in the zone of insolvency as a result of or in connection with the LBO.  Each of the Blackstone Pre-LBO Entity Defendants therefore owed fiduciary and contractual duties to the Debtors and the Debtors' creditors and not just to the Debtors' pre-LBO direct and indirect equity owners at the time of the LBO.

325.    Each of the Blackstone Pre-LBO Entity Defendants had the authority to control the management, affairs and direction of the Debtors up to the date the LBO closed. Each Blackstone Pre-LBO Entity Defendant, by virtue of its position, was capable of influencing and did in fact influence the acts and omissions giving rise to the claims alleged herein.

326.    Each Blackstone Pre-LBO Entity Defendant, acting both individually and collectively, breached its fiduciary and contractual duties to the Debtors by acting or omitting to act, as follows:

(a)    As to all Blackstone Pre-LBO Entity Defendants, orchestrating, negotiating and documenting, and causing or allowing the Debtors and the

Debtors' affiliates to enter into, the LBO and incur substantial amounts of ruinous debt solely for the benefit of the Blackstone Pre-LBO Entity Defendants, and rendering the Debtors insolvent;

(b)     As to all Blackstone Pre-LBO Entity Defendants, causing or allowing one or more of the Blackstone Pre-LBO Entity Defendants to receive improper distributions from the Debtors in connection with the LBO totaling no less than approximately $1.9 billion in the aggregate, which distributions were paid for the Blackstone Pre-LBO Entity Defendants' benefit, out of the proceeds of loans the Debtors were forced to take on exclusively for the benefit of the Blackstone Pre-LBO Entity Defendants;

(c)     As to all Blackstone Pre-LBO Entity Defendants, engaging in multiple acts of self-dealing through the siphoning of $1.9 billion of value from the Debtors for the benefit of the Blackstone Pre-LBO Entity Defendants;

(d)     As to all Blackstone Pre-LBO Entity Defendants, causing or allowing the Debtors to enter into the LBO loan and other transaction documents that contained provisions that severely and adversely impacted the Debtors' ability to operate their businesses after the LBO closed;

(e)     As to all Blackstone Pre-LBO Entity Defendants, causing, allowing and otherwise actively participating in the dissemination of the materially misleading Information Memorandum in furtherance of the Blackstone Pre-LBO Entity Defendants' systematic effort to improperly drain over $1.9 billion of value from the Debtors;

(f)     As to all Blackstone Pre-LBO Entity Defendants, causing or allowing BRE.ESH, their affiliate, to receive the $200 million "rollover equity" interest in the post-LBO Debtors in exchange for nothing, while pre-LBO creditors of the Debtors remained unpaid at the time of and following the LBO's closing; and

(g)     As to BHAC IV and BRE.HV, engaging in multiple acts of self-dealing, as direct controlling shareholders or members of the Debtors' entire pre-LBO enterprise, allowing themselves to be systematically dominated and controlled at all relevant times by Blackstone Group, and acting or omitting to act solely out of concern for the interests of the Blackstone Group, as the Debtors' ultimate parent controlling shareholder or member.

327.    Each Blackstone Pre-LBO Entity Defendant's acts or omissions described herein was, alternatively, either fraudulent, willful, deliberate, knowing, in bad faith, reckless, or grossly negligent and in derogation of applicable law.  Each Blackstone Pre-LBO Entity Defendant's acts and omissions fell substantially below the standards generally practiced and accepted by other fiduciaries in similar circumstances.

328.    Each Blackstone Pre-LBO Entity Defendant's acts and omissions described herein directly and proximately caused harm to the Debtors, the Debtors' estates and the Debtors' creditors who are beneficiaries of the Trust, in an amount to be determined at trial but not less than $2.1 billion.

329.    By reason of each Blackstone Pre-LBO Entity Defendant's acts and omissions described herein, the Trust is entitled to recovery of actual, compensatory and

consequential damages from the Blackstone Pre-LBO Entity Defendants, jointly and severally, in an amount to be determined at trial, but not less than $2.1 billion.

330.    Because the acts and omissions of the Blackstone Pre-LBO Entity Defendants were gross, wanton and malicious, the Trust is entitled to punitive damages of at least three times the actual damage, or $6.3 billion, or such other amount as the Court may determine after trial.

## AS FOR A SECOND CAUSE OF ACTION

### (Breach Of Fiduciary and Contractual Duties Of Care, Loyalty and Good Faith – LBO Buyer Entity Defendants)

331.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 321 as though fully set forth herein.

332.    From and after no later than the date and time the LBO closed, and at all relevant times thereafter, the LBO Buyer Entity Defendants, as entities that owned, controlled and otherwise dominated the post-LBO Debtors, owed the post-LBO Debtors and the Debtors' creditors the fiduciary and contractual duties of good faith, care and loyalty.

333.    The Debtors were either rendered insolvent or placed in the zone of insolvency as a result of or in connection with the LBO, and remained insolvent at all times from and after the date the LBO closed.  Each of the LBO Buyer Entity Defendants therefore owed fiduciary and contractual duties to the Debtors and the Debtors' creditors, and not just to the Debtors' post-LBO direct and indirect equity owners at all times after the date the LBO closed.

334.    Each of the LBO Buyer Entity Defendants had the authority to control the management, affairs and direction of the Debtors at all relevant times following the LBO's closing.  Each LBO Buyer Entity Defendants, by virtue of its position of control, was capable of

influencing and did in fact influence the acts and omissions giving rise to the claims alleged herein.

335.     Each of the LBO Buyer Entity Defendants, acting both individually and collectively, breached its fiduciary and contractual duties, as follows:

(a)     As to each LBO Buyer Entity Defendant, causing or allowing the Debtors to improperly pay substantial illegal dividends or other improper distributions of value from Debtors to the applicable LBO Buyer Entity Defendants and their affiliates described in this Complaint at times when the Debtors were insolvent, including, without limitation, the payment of the following value from the Debtors:

(i)     distribution of the LIBOR Floor Certificates, which had a value at the time of no less than approximately $25 million, to DL-DW on or around no later than November 2, 2007, and subsequent payments received by DL-DW on account of those certificates, totaling no less than approximately $13 million;

(ii)     substantial payments of rent to Lightstone entities through HFI following the HFI acquisition of the hotel properties formerly subject to the HPT Capital Lease, beginning no later than approximately late-July 2007;

(iii)     distribution of over $77 million to DL-DW from the LBO closing account on or around July 17, 2007;

(iv)    distribution of approximately $2.3 million to DL-DW as a post-LBO "purchase price adjustment" on or around no later than October 17, 2007;

(v)    carrying out substantial equity distributions and dividends throughout 2007 totaling no less than approximately $23 million;

(vi)    causing the Debtors to take on the onerous obligations under the insider 25% Note on or around April 16, 2008, including, without limitation, collateralizing the 25% Note with the LIBOR Floor Certificates that had been stolen from the Debtors by DL-DW, and causing the Debtors to make substantial "interest payments" and other payments to insiders or for insiders' benefit on account of the 25% Note totaling no less than approximately $5.7 million through the end of 2008;

(vii)    carrying out substantial equity distributions and dividends to one or more of the LBO Buyer Entity Defendants throughout 2008, totaling no less than approximately $21.3 million;

(viii)    causing or allowing the distribution of funds held in the Preferred Equity Reserve Account to insiders on the eve of bankruptcy, totaling no less than approximately $20.5 million in early 2009;

(ix)    causing or allowing the full, accelerated payoff of the insider 25% Note, which payoff totaled no less than approximately $17.4 million on the eve of the Debtors' eventual bankruptcy filing;

(x)     causing or allowing the distribution of funds from the Floor Bonds Reserve Account on the eve of the Debtors' eventual bankruptcy filing totaling approximately $4.8 million;

(xi)    causing or allowing the payment of substantial "asset management" fees totaling no less than approximately $1 million annually to Lightstone entities or Lichtenstein, despite the fact that HVM was managing the Debtors' daily business affairs; and

(xii)   causing or allowing the Debtors to delay the commencement of bankruptcy proceedings, with self-dealing motives, until (a) slightly more than two years after the LBO's closing, and (b) slightly more than 90 days after the payoff of the insider 25% Note, in an attempt to adversely impact the Debtors' ability to avoid and recover those transfers under the Bankruptcy Code for the benefit of the Debtors, the Debtors' estates and the Debtors' creditors.

(b)    As to each LBO Buyer Entity Defendant, orchestrating, negotiating and documenting, and causing or allowing the Debtors and the Debtors' affiliates to enter into, the LBO and incur substantial amounts of ruinous

debt solely for the benefit of the Blackstone Pre-LBO Entity Defendants, and rendering the Debtors insolvent;

(c) As to each LBO Buyer Entity Defendant, causing or allowing one or more of the Blackstone Pre-LBO Entity Defendants to receive improper distributions from the Debtors in connection with the LBO totaling no less than approximately $1.9 billion in the aggregate, which distributions were paid for the Blackstone Pre-LBO Entity Defendants' benefit, out of the proceeds of loans the Debtors were forced to take on exclusively for the benefit of the Blackstone Pre-LBO Entity Defendants;

(d) As to each LBO Buyer Entity Defendant, causing or allowing BRE.ESH, an affiliate of the Blackstone Pre-LBO Entity Defendants, to receive the $200 million "rollover equity" interest in the post-LBO Debtors in exchange for nothing, while pre-LBO creditors of the Debtors remained unpaid at the time of and following the LBO's closing; and

(e) As to each LBO Buyer Entity Defendant, causing or allowing the Debtors to enter into the LBO loan and other transaction documents that contained provisions that severely and adversely impacted the Debtors' ability to operate their businesses after the LBO closed while arranging for the Debtors to agree to provisions in the LBO loan and other transaction documents that would cause or allow the Debtors to be forced to make improper distributions to one or more of the LBO Buyer Entity

Defendants regardless of the Debtors' dire financial condition or poor performance.

336.   Each LBO Buyer Entity Defendant's acts or omissions described herein was, alternatively, either fraudulent, willful, deliberate, knowing, in bad faith, reckless, or grossly negligent and in derogation of applicable law.  Each LBO Buyer Entity Defendant's acts and omissions fell substantially below the standards generally practiced and accepted by other fiduciaries in similar circumstances.

337.   Each LBO Buyer Entity Defendant's acts and omissions described herein directly and proximately caused harm to the Debtors, the Debtors' estates and the Debtors' creditors who are beneficiaries of the Trust, in an amount to be determined at trial but not less than $2.1 billion.

338.   By reason of each LBO Buyer Entity Defendant's acts and omissions described herein, the Trust is entitled to recovery of actual, compensatory and consequential damages from the LBO Buyer Entity Defendants, jointly and severally, in an amount to be determined at trial, but not less than $2.1 billion.

339.   Because the acts and omissions of the LBO Buyer Entity Defendants were gross, wanton and malicious, the Trust is entitled to punitive damages of at least three times the actual damage, or $6.3 billion, or such other amount as the Court may determine after trial.

### AS FOR A THIRD CAUSE OF ACTION

### (Breach Of Fiduciary and Contractual Duties Of Care, Loyalty and Good Faith – Blackstone Group Individual Defendants)

340.   Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 321 as though fully set forth herein.

341.    Up to the date the LBO closed, and at all relevant times prior to that date, the Blackstone Group Individual Defendants, as the individuals that were directors or officers, or otherwise controlled and managed the pre-LBO Debtors, owed the pre-LBO Debtors the fiduciary and contractual duties of good faith, care and loyalty.

342.    The Debtors were either rendered insolvent or placed in the zone of insolvency as a result of or in connection with the LBO.  Each of the Blackstone Group Individual Defendants therefore owed fiduciary and contractual duties to the Debtors and the Debtors' creditors and not just to the Debtors' pre-LBO direct and indirect equity owners for which each of the Blackstone Group Individual Defendants also served as insiders.

343.    Each of the Blackstone Group Individual Defendants had the authority to control the management, affairs and direction of the Debtors up to the date the LBO closed. Each Blackstone Group Individual Defendant, by virtue of his position, was capable of influencing and did in fact influence the acts and omissions giving rise to the claims alleged herein.

344.    Each Blackstone Group Individual Defendant, acting both individually and collectively, breached his fiduciary and contractual duties to the Debtors by acting or omitting to act, as follows:

> (a)    As to all Blackstone Group Individual Defendants, orchestrating, negotiating and documenting, and causing or allowing the Debtors and the Debtors' affiliates to enter into, the LBO and incur substantial amounts of ruinous debt solely for the benefit of the Blackstone Pre-LBO Entity Defendants, for which the Blackstone Group Individual Defendants also

served as directors, officer or members of management, and rendering the Debtors insolvent;

(b)     As to all Blackstone Group Individual Defendants, causing or allowing one or more of the Blackstone Pre-LBO Entity Defendants to receive improper distributions from the Debtors in connection with the LBO totaling no less than approximately $1.9 billion in the aggregate, which distributions were paid for the Blackstone Pre-LBO Entity Defendants' benefit, out of the proceeds of loans the Debtors were forced to take on exclusively for the benefit of the Blackstone Pre-LBO Entity Defendants for which the Blackstone Group Individual Defendants also served as directors, officer or members of management;

(c)     As to all Blackstone Group Individual Defendants, engaging in multiple acts of self-dealing and conflict of interest transactions through the siphoning of $1.9 billion of value from the Debtors for the benefit of the Blackstone Pre-LBO Entity Defendants for which the Blackstone Group Individual Defendants also served as directors, officer or members of management;

(d)     As to all Blackstone Group Individual Defendants, causing or allowing the Debtors to enter into the LBO loan and other transaction documents that contained provisions that severely and adversely impacted the Debtors' ability to operate their businesses after the LBO closed;

(e)     As to all Blackstone Group Individual Defendants, causing, allowing and otherwise actively participating in the dissemination of the materially misleading Information Memorandum in furtherance of the Blackstone Pre-LBO Entity Defendants' systematic effort to improperly drain over $1.9 billion of value from the Debtors;

(f)     As to all Blackstone Group Individual Defendants, causing or allowing BRE.ESH to receive the $200 million "rollover equity" interest in the post-LBO Debtors in exchange for nothing, while pre-LBO creditors of the Debtors remained unpaid at the time of and following the LBO's closing; and

(f)     As to all Blackstone Group Individual Defendants, engaging in multiple acts of self-dealing and bad faith, allowing themselves to be systematically dominated and controlled at all relevant times by Blackstone Group, and acting or omitting to act solely out of concern for the interests of the Blackstone Group, the Debtors' ultimate parent controlling shareholder or member.

345.    Each Blackstone Group Individual Defendant's acts or omissions described herein was, alternatively, either fraudulent, willful, deliberate, knowing, in bad faith, reckless, or grossly negligent and in derogation of applicable law.  Each Blackstone Group Individual Defendant's acts and omissions fell substantially below the standards generally practiced and accepted by other fiduciaries in similar circumstances.

346.    Each Blackstone Group Individual Defendant's acts and omissions described herein directly and proximately caused harm to the Debtors, the Debtors' estates and

the Debtors' creditors who are beneficiaries of the Trust, in an amount to be determined at trial but not less than $2.1 billion.

347.   By reason of each Blackstone Group Individual Defendant's acts and omissions described herein, the Trust is entitled to recovery of actual, compensatory and consequential damages from the Blackstone Group Individual Defendants, jointly and severally, in an amount to be determined at trial, but not less than $2.1 billion.

348.   Because the acts and omissions of the Blackstone Group Individual Defendants were gross, wanton and malicious, the Trust is entitled to punitive damages of at least three times the actual damage, or $6.3 billion, or such other amount as the Court may determine after trial.

### AS FOR A FOURTH CAUSE OF ACTION

### (Breach Of Fiduciary and Contractual Duties Of Care, Loyalty and Good Faith – LBO Buyer Individual Defendants)

349.   Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 321 as though fully set forth herein.

350.   From and after no later than the date the LBO closed, and at all relevant times thereafter, the LBO Buyer Individual Defendants, during their respective tenures as directors, officers or persons that otherwise managed, owned, controlled and dominated the Debtors, owed the Debtors and the Debtors' creditors the fiduciary and contractual duties of good faith, care and loyalty.

351.   The Debtors were either rendered insolvent or placed in the zone of insolvency as a result of or in connection with the LBO, and remained insolvent at all times from and after the date the LBO closed.  Each of the LBO Buyer Individual Defendants, during their

respective tenures as directors, officers or persons that otherwise managed, owned, controlled and dominated the Debtors, therefore owed fiduciary and contractual duties to the Debtors and the Debtors' creditors, and not just to the Debtors' post-LBO direct and indirect equity owners at all times after the date the LBO closed.

352.   Each of the LBO Buyer Individual Defendants, during their respective tenures as directors, officers or persons that otherwise managed, owned, controlled and dominated the Debtors, had the authority to control the management, affairs and direction of the Debtors at all relevant times following the LBO's closing.   Each LBO Buyer Individual Defendant, during his tenure as a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors, by virtue of his position of control, was capable of influencing and did in fact influence the acts and omissions giving rise to the claims alleged herein.

353.   Each of the LBO Buyer Individual Defendants, during his tenure as a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors, acting both individually and collectively, breached his fiduciary and contractual duties, as follows:

(a)   As to each LBO Buyer Individual Defendant, causing or allowing the Debtors to improperly pay substantial illegal dividends or other improper distributions of value from Debtors to the applicable LBO Buyer Entity Defendants and, upon information and belief, in some cases, to himself, as described in this Complaint, at times when the Debtors were insolvent, including, without limitation, the payment of the following value from the Debtors:

(i)    distribution of the LIBOR Floor Certificates, which had a value at the time of no less than approximately $25 million, to DL-DW on or around no later than November 2, 2007, and subsequent payments received by DL-DW on account of those certificates, totaling no less than approximately $13 million;

(ii)   substantial payments of rent to Lightstone entities through HFI following the HFI acquisition of the hotel properties formerly subject to the HPT Capital Lease, beginning no later than approximately late-July 2007;

(iii)  distribution of over $77 million to DL-DW from the LBO closing account on or around July 17, 2007;

(iv)   distribution of approximately $2.3 million to DL-DW as a post-LBO "purchase price adjustment" on or around no later than October 17, 2007;

(v)    carrying out substantial equity distributions and dividends throughout 2007 totaling no less than approximately $23 million;

(vi)   causing the Debtors to take on the onerous obligations under the insider 25% Note on or around April 16, 2008, including, without limitation, collateralizing the 25% Note with the LIBOR Floor Certificates that had been stolen from the Debtors by DL-DW, and causing the Debtors to make substantial "interest payments" and

other payments to insiders or for insiders' benefit on account of the 25% Note totaling no less than approximately $5.7 million through the end of 2008;

(vii) carrying out substantial equity distributions and dividends to one or more of the LBO Buyer Entity Defendants throughout 2008, totaling no less than approximately $21.3 million;

(viii) causing or allowing the distribution of funds held in the Preferred Equity Reserve Account to insiders on the eve of bankruptcy, totaling no less than approximately $20.5 million in early 2009;

(ix) causing or allowing the full, accelerated payoff of the insider 25% Note, which payoff totaled no less than approximately $17.4 million on the eve of the Debtors' eventual bankruptcy filing;

(x) causing or allowing the distribution of funds from the Floor Bonds Reserve Account on the eve of the Debtors' eventual bankruptcy filing totaling approximately $4.8 million;

(xi) causing or allowing the payment of substantial "asset management" fees totaling no less than approximately $1 million annually to Lightstone entities or Lichtenstein, despite the fact that HVM was managing the Debtors' daily business affairs; and

(xii) causing or allowing the Debtors to delay the commencement of bankruptcy proceedings, with self-dealing motives, until (a)

129

slightly more than two years after the LBO's closing, and (b) slightly more than 90 days after the payoff of the insider 25% Note, in an attempt to adversely impact the Debtors' ability to avoid and recover those transfers under the Bankruptcy Code for the benefit of the Debtors, the Debtors' estates and the Debtors' creditors.

(b)     As to each LBO Buyer Individual Defendant, to the extent he was a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors at the time, orchestrating, negotiating and documenting, and causing or allowing the Debtors and the Debtors' affiliates to enter into, the LBO and incur substantial amounts of ruinous debt solely for the benefit of the Blackstone Pre-LBO Entity Defendants, and rendering the Debtors insolvent;

(c)     As to each LBO Buyer Individual Defendant, to the extent he was a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors at the time, causing or allowing one or more of the Blackstone Pre-LBO Entity Defendants to receive improper distributions from the Debtors in connection with the LBO totaling no less than approximately $1.9 billion in the aggregate, which distributions were paid for the Blackstone Pre-LBO Entity Defendants' benefit, out of the proceeds of loans the Debtors were forced to take on exclusively for the benefit of the Blackstone Pre-LBO Entity Defendants;

(d)     As to each LBO Buyer Individual Defendant, to the extent he was a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors at the time, causing or allowing BRE.ESH to receive the $200 million "rollover equity" interest in the post-LBO Debtors in exchange for nothing, while pre-LBO creditors of the Debtors remained unpaid at the time of and following the LBO's closing; and

(e)     As to each LBO Buyer Individual Defendant, to the extent he was a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors at the time, causing or allowing the Debtors to enter into the LBO loan and other transaction documents that contained provisions that severely and adversely impacted the Debtors' ability to operate their businesses after the LBO closed while arranging for the Debtors to agree to provisions in the LBO loan and other transaction documents that would cause or allow the Debtors to be forced to make improper distributions to one or more of the LBO Buyer Entity Defendants regardless of the Debtors' dire financial condition or poor performance.

354.   Each LBO Buyer Individual Defendant's acts or omissions described herein was, alternatively, either fraudulent, willful, deliberate, knowing, in bad faith, reckless, or grossly negligent and in derogation of applicable law.  Each LBO Buyer Individual Defendant's acts and omissions fell substantially below the standards generally practiced and accepted by other fiduciaries in similar circumstances.

355.    Each LBO Buyer Individual Defendant's acts and omissions described herein directly and proximately caused harm to the Debtors, the Debtors' estates and the Debtors' creditors who are beneficiaries of the Trust, in an amount to be determined at trial but not less than $2.1 billion.

356.    By reason of each LBO Buyer Individual Defendant's acts and omissions described herein, the Trust is entitled to recovery of actual, compensatory and consequential damages from the LBO Buyer Individual Defendants, jointly and severally, in an amount to be determined at trial, but not less than $2.1 billion.

357.    Because the acts and omissions of the LBO Buyer Individual Defendants were gross, wanton and malicious, the Trust is entitled to punitive damages of at least three times the actual damage, or $6.3 billion, or such other amount as the Court may determine after trial.

## AS FOR A FIFTH CAUSE OF ACTION

### (Aiding, Abetting, Inducing or Participating in Breaches of Fiduciary Duties and Other Misconduct – All Defendants)

358.    Plaintiff incorporates by reference, repeats and re-alleges each and every allegation contained in paragraphs 1 through 357 of this Complaint as though fully set forth herein.

359.    Pleading in the alternative, each Defendant aided, abetted, induced, participated in or conspired to commit the breaches of fiduciary and contractual duties by one or more of the other Defendants,  as described above.

360.    Each Defendant knew or knew should have known that the other Defendants' acts and omissions constituted breaches of fiduciary and contractual duties.

361.    With that knowledge, each Defendant provided material and substantial assistance in connection with, and knowingly participated in, the other Defendants' breach of their fiduciary duties and misconduct identified above.

362.    In providing such assistance, each of the Defendants acted in bad faith and with the actual intent to assist the other Defendants in their respective breaches of fiduciary duties.

363.    As a result, each of the Defendants is liable to the Plaintiff as an aider and abettor.  Each Defendant's independent tortious acts or omissions as an aider and abettor directly and proximately caused harm to the Debtors, the Debtors' creditors and the Debtors' estates in an amount to be determined at trial, but not less than $2.1 billion.

364.    By reason of Defendants' aiding and abetting activities, the Plaintiff is entitled to recovery of actual, compensatory, and consequential damages from Defendants, jointly and severally, in the amount estimated to be no less than $2.1 billion.

## AS FOR A SIXTH CAUSE OF ACTION

### (Waste – All Defendants)

365.    Plaintiff incorporates by reference, repeats, and re-alleges each and every allegation contained in paragraphs 1 through 357 of this Complaint as though fully set forth herein.

366.    Pleading in the alternative, each of the Defendant's acts or omissions described herein constituted a waste of assets of the Debtors.

367.    Each of the Defendant's acts or omissions described herein was, alternatively, either fraudulent, willful, deliberate, knowing, in bad faith, reckless, grossly negligent or negligent and in derogation of applicable law.

368.    Each of the Defendant's acts or omissions identified herein constituted the irrational squandering of the Debtors' assets and the value thereof. There was no good faith basis upon which any of the Defendants could have concluded that those acts or omissions were beneficial to the Debtors.

369.    Each of the Defendants' acts or omissions identified herein directly and proximately caused harm to the Debtors in an amount no less than $2.1 billion.

370.    By reason of the Defendants' acts or omissions described herein, Plaintiff is entitled to recovery of actual, compensatory and consequential damages from Defendants, jointly and severally, in the amount to be determined at trial, but no less than $2.1 billion.

### AS FOR A SEVENTH CAUSE OF ACTION

### (Breaches of Fiduciary Duties Owed to Creditors – All Defendants)

371.    Plaintiff incorporates by reference, repeats and re-alleges each and every allegation contained in paragraphs 1 through 357 of this Complaint as though fully set forth herein.

372.    Pleading in the alternative, under applicable law, Defendants owed all creditors of the Debtors the fiduciary duties identified herein once the Debtors either became insolvent or entered the zone or vicinity of insolvency on or around no later than June 11, 2007 and at all relevant times thereafter.

373.    Defendants breached the fiduciary duties identified herein owed to the Debtors' creditors by committing the acts or omissions described herein.

374.    Each of the Defendant's acts or omissions described herein was, alternatively either fraudulent, willful, deliberate, knowing, in bad faith, reckless, grossly negligent or negligent and in derogation of applicable law.

375.    Each of the Defendant's acts or omissions identified herein directly and proximately caused generalized harm to all of the Debtors' creditors and claimant in the amount no less than $2.1 billion.

376.    By reason of the Defendants' acts or omissions described herein, Plaintiff is entitled to recovery of actual, compensatory and consequential damages from Defendants, jointly and severally, in an amount to be determined at trial, but not less than $2.1 billion on behalf of all of the Debtors' creditors and claimants.

377.    Because the acts or omissions of Defendants described herein were gross, wanton and malicious, the Trust is entitled to punitive damages of at least three times the actual damage, or $6.3 billion, or such other amount as the Court may determine after trial.

## AS FOR AN EIGHTH CAUSE OF ACTION

**(Unjust Enrichment – Against BHAC IV, LLC and BRE.HV Holdings LLC (the "Sellers"))**

378.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

379.    The Sellers have been unjustly enriched.  The Sellers wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors as well as indebtedness incurred by the Debtors.

380.    As is set forth above, the Sellers received approximately $1.9 billion in connection with the LBO, which in turn resulted in a significant depletion of the Debtors' assets in that the Debtors provided liens on all their assets for no consideration and incurred approximately $1.7 billion in additional secured debt.  After the proceeds of the loans made to Debtors in connection with the LBO were applied to extant debt, the Debtors received nothing and received no direct or indirect benefit for assuming the additional secured debt.

381.    All of the approximately $1.9 billion that enriched the Sellers came at the expense of the Debtors, and the Sellers have retained those monies.

382.    Equity and good conscience require full restitution of the monies received by the Sellers in connection with the Acquisition.  This includes not only the money itself that the Sellers received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A NINTH CAUSE OF ACTION

### (Illegal Distributions – Against BHAC IV, LLC and BRE.HV Holdings LLC (the "Sellers"))

383.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

384.    As is set forth above, the Sellers received distributions totaling approximately $1.9 billion in connection with the LBO.  These distributions were made to the Sellers from funds that ultimately came from the Debtors.

385.    Each and every distribution made to the Sellers was made at a time when the Debtors did not have a surplus or were insolvent.

386.    The Sellers were on notice of the impropriety of every distribution they received in that the Sellers knew the Debtors did not have a surplus and/or would be rendered insolvent as a result of the LBO and the distributions made in connection therewith.

387.    The Sellers are therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the Delaware General Corporations Law  ("DGCL") and/or Section 18-607 of the Delaware Limited Liability Company Act ("DLLCA").

## AS FOR A TENTH CAUSE OF ACTION

**(Illegal Dividends – Against Jonathan D. Gray, Robert L. Friedman, William Stein and Michael Chae (together, the "Pre-LBO Director Defendants"))**

388.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

389.    As is set forth above, the Sellers received distributions totaling approximately $1.9 billion in connection with the LBO, which were authorized and allowed by the Pre-LBO Director Defendants.  These distributions were made to the Sellers from funds that came from ESI, Homestead or other Debtors, which are each Delaware entities.

390.    Each and every distribution that the Pre-LBO Director Defendants authorized to be paid to the Sellers was made at a time when the Debtors did not have a surplus or were insolvent.

391.    These distributions were willfully or negligently made by the Pre-LBO Director Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors.

392.    The Pre-LBO Director Defendants are therefore liable for repayment of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR AN ELEVENTH CAUSE OF ACTION

**(Unjust Enrichment – Against BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC )**

393.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

394.    BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC have been unjustly enriched.    BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC each wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors as well as indebtedness incurred by the Debtors.

395.    As is set forth above, BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC are the three entities that actually received the approximately $1.9 billion in connection with the LBO.    BHAC IV, LLC received $1,282,764,449 at the closing; Blackstone Hospitality Acquisitions, LLC received $489,546,289 at the closing; and Prime Hospitality, LLC received $4,110,604 at the closing, each from an LBO closing account at First American Title Insurance Company.    In addition, BHAC IV, LLC received the earnest money of $85,611,012 directly from a Chicago Title Insurance Company escrow account used in connection with the LBO.    The payment of these monies to BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC resulted in a significant depletion of the Debtors' assets in that the Debtors provided liens on all their assets for no consideration and incurred approximately $1.7 billion in additional secured debt.    After the proceeds of the loans made to Debtors in connection with the LBO were applied to extant debt, the Debtors received nothing and received no direct or indirect benefit for assuming the additional secured debt.

396.    All of the approximately $1.9 billion that enriched the BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC came at the expense of the Debtors, and BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC have retained those monies.

397.    Equity and good conscience require full restitution of the monies received by BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC in connection with the LBO.  This includes not only the money itself that BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A TWELFTH CAUSE OF ACTION

### (Illegal Distributions – Against BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC)

398.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

399.    As is set forth above, BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC received distributions totaling approximately $1.9 billion in connection with the LBO.  These distributions were made to BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC from funds that ultimately came from the Debtors.

400.    Each and every distribution made to BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC was made at a time when the Debtors did not have a surplus or were insolvent.

401.    BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC were on notice of the impropriety of every distribution they received in that BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC knew the

Debtors did not have a surplus and/or would be rendered insolvent as a result of the LBO and the distributions made in connection therewith.

402.   BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC are therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A THIRTEENTH CAUSE OF ACTION

**(Illegal Dividends – Against Jonathan D. Gray, Robert L. Friedman, William Stein and Michael Chae (together, the "Pre-LBO Director Defendants"))**

403.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

404.   As is set forth above, BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC received distributions totaling approximately $1.9 billion in connection with the LBO, which were authorized and allowed by the Pre-LBO Director Defendants.  These distributions were made to BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC from funds that came from ESI, Homestead or other Debtors, which are each Delaware entities.

405.   Each and every distribution that the Pre-LBO Director Defendants authorized to be paid to BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC was made at a time when the Debtors did not have a surplus or were insolvent.

406.   These distributions were willfully or negligently made by the Pre-LBO Director Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors.

407.    The Pre-LBO Director Defendants are therefore liable for repayment of the unlawful distributions under Sections 160 and 174 of the DGCL and/or the DLLCA.

## AS FOR A FOURTEENTH CAUSE OF ACTION

**(Alter Ego Liability – The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC, and BRE/HV Holdings LLC (the "Blackstone Alter Ego Defendants"))**

408.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

409.    The Blackstone Alter Ego Defendants should be held liable for the debts and obligations of the Debtors because the Blackstone Alter Ego Defendants were the alter egos of the Debtors prior to and in connection with the LBO.

410.    The Blackstone Alter Ego Defendants dominated and controlled the Debtors and used that domination and control to cause the Debtors to incur extensive additional indebtedness of at least $1.7 billion and to make substantial transfers in connection with the LBO as set forth above.

411.    The Blackstone Alter Ego Defendants caused the Debtors to incur the additional indebtedness and to make the transfers in connection with the LBO all for the sole benefit of the Blackstone Alter Ego Defendants and to the detriment of the Debtors.

412.    The Blackstone Alter Ego Defendants are therefore liable for the debts and obligations of the Debtors.

## AS FOR A FIFTEENTH CAUSE OF ACTION

**(Alter Ego Liability – Against DL-DW Holdings LLC, Princeton ESH LLC, Atmar Associates, LLC, Lightstone Holdings, LLC and BRE/ESH Holdings, LLC (the "DL-DW Alter Ego Defendants"))**

413.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

414.    The DL-DW Alter Ego Defendants should be held liable for the debts and obligations of the Debtors because the DL-DW Alter Ego Defendants were the alter egos of the Debtors in connection with and following the LBO.

415.    The DL-DW Alter Ego Defendants dominated and controlled the Debtors and used that domination and control to cause the Debtors to incur extensive additional indebtedness of at least $1.7 billion, to make substantial transfers in connection with the LBO as set forth above, and to make the other improper equity dividends, distributions and other transfers, totaling in excess of $170 million, as described herein.

416.    The DL-DW Alter Ego Defendants caused the Debtors to incur the additional indebtedness and to make the transfers in connection with the LBO all for the sole benefit of the DL-DW Alter Ego Defendants and to the detriment of the Debtors.

417.    The DL-DW Alter Ego Defendants are therefore liable for the debts and obligations of the Debtors.

## AS FOR A SIXTEENTH CAUSE OF ACTION

**(Illegal Dividends and Distributions – Against BHAC Capital IV, LLC)**

418.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

419.     As is set forth above, BHAC Capital IV, LLC received dividends and distributions totaling approximately $40,607,000 during 2007 and 2008.   These dividend payments were made to BHAC Capital IV, LLC from funds that came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc.

420.     Each and every dividend and distribution paid to BHAC Capital IV, LLC was made at a time when the Debtors did not have a surplus or were insolvent.

421.     BHAC Capital IV, LLC was on notice of the distressed condition of the Debtors as well as the fact that every dividend and distribution it received violated the terms of the applicable mortgage loan documents, and thus BHAC Capital IV, LLC was on notice of the impropriety of the dividends and distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those dividends.

422.     BHAC Capital IV, LLC is therefore liable for repayment of the unlawful dividends under Sections 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR AN SEVENTEENTH CAUSE OF ACTION

### (Unjust Enrichment – Against BHAC Capital IV, LLC)

423.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

424.     BHAC Capital IV, LLC has been unjustly enriched.   BHAC Capital IV, LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

425.     BHAC Capital IV, LLC depleted the assets of the Debtors by receiving dividends and distributions totaling approximately $40,607,000 during 2007 and 2008.   BHAC Capital IV, LLC was aware that the Debtors did not have a surplus and/or was insolvent at the

time of the dividends, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

426.    BHAC Capital IV, LLC have been enriched at the expense of the Debtors and have retained the dividends and distributions totaling approximately $40,607,000.

427.    Equity and good conscience require full restitution of the monies received by the BHAC Capital IV from the Debtors.  This includes not only the money itself that BHAC Capital IV, LLC received, but also the proceeds of that money.  Any profits earned with the money it received must be returned to the Litigation Trust.

## AS FOR A EIGHTEENTH CAUSE OF ACTION

**(Illegal Distributions –Against Arbor Commercial Mortgage LLC and Arbor ESH II, LLC)**

428.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

429.    As is set forth above, Arbor Commercial Mortgage LLC received distributions totaling approximately $44,231,000 between 2007 and 2009.  This total includes approximately $10,295,000 in 2007; $15,140,000 in 2008; and $18,796,000 in 2009.

430.    These distributions were made to Arbor Commercial Mortgage LLC by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc.  Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

431.    These distributions also include approximately $20,545,637 made to Arbor Commercial Mortgage LLC in 2008 and 2009 out of the Preferred Equity Reserve Account (the "PERA"), which were made after the ESI Board had passed a resolution halting

equity distributions, and at a time when the Debtors did not have a surplus or were insolvent, from funds that ultimately came from ESI or other Debtors.  The PERA was funded as part of the LBO with money that was borrowed by the Debtors.

432.    Arbor ESH II LLC, as a member of BHAC Capital IV, LLC, was, upon information and belief, entitled to receive any distributions made to Arbor Commercial Mortgage LLC.  To the extent any distributions made to Arbor Commercial Mortgage LLC were received by Arbor ESH II LLC, Arbor ESH III is liable for such distributions.

433.    Each and every distribution made to Arbor Commercial Mortgage LLC was made at a time when the Debtors did not have a surplus or were insolvent.

434.    Arbor Commercial Mortgage LLC was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus Arbor Commercial Mortgage LLC was on notice of the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

435.    Arbor Commercial Mortgage LLC is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

### AS FOR A NINETEENTH CAUSE OF ACTION

**(Unjust Enrichment – Against Arbor Commercial Mortgage LLC and Arbor ESH II, LLC)**

436.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

437.    Arbor Commercial Mortgage LLC has been unjustly enriched.   Arbor Commercial Mortgage LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

438.    Arbor Commercial Mortgage LLC depleted the assets of the Debtors by taking distributions totaling approximately $44,231,000 between 2007 and 2009.   Arbor Commercial Mortgage LLC was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

439.    Arbor ESH II LLC, as a member of BHAC Capital IV, LLC, was, upon information and belief, entitled to receive any distributions made to Arbor Commercial Mortgage LLC.   To the extent any distributions made to Arbor Commercial Mortgage LLC were received by Arbor ESH II LLC, Arbor ESH III has been unjustly enriched as well and is liable for such distributions.

440.    Arbor Commercial Mortgage LLC has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $44,231,000.

441.    Equity and good conscience require full restitution of the monies received by Arbor Commercial Mortgage LLC, directly and indirectly, from the Debtors.   This includes not only the money itself that Arbor Commercial Mortgage LLC received, but also the proceeds of that money.   Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A TWENTIETH CAUSE OF ACTION

### (Illegal Distributions – Against PGRT ESH Inc.)

442.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

443.   As is set forth above, PGRT ESH Inc. received distributions totaling approximately $6,167,000 in 2007.  These distributions were made to PGRT ESH Inc. by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc.  Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

444.   Each and every distribution made to PGRT ESH Inc. was made at a time when the Debtors did not have a surplus or were insolvent.

445.   PGRT ESH Inc. was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus PGRT ESH Inc. was on notice of the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

446.   PGRT ESH Inc. is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A TWENTY-FIRST CAUSE OF ACTION

### (Unjust Enrichment – Against PGRT ESH Inc.)

447.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

448.     PGRT ESH Inc. has been unjustly enriched.  PGRT ESH Inc. wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

449.     PGRT ESH Inc. depleted the assets of the Debtors by taking distributions totaling approximately $6,167,000 in 2007.  PGRT ESH Inc. was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

450.     PGRT ESH Inc. has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $6,167,000.

451.     Equity and good conscience require full restitution of the monies received by PGRT ESH Inc., directly and indirectly, from the Debtors.  This includes not only the money itself that PGRT ESH Inc. received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

### AS FOR A TWENTY-SECOND CAUSE OF ACTION

**(Illegal Distributions – Against Glida One LLC)**

452.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

453.     As is set forth above, Glida One LLC received distributions totaling approximately $5,363,000 in 2007 and 2008.  This total includes approximately $1,668,000 in 2007 and $3,695,000 in 2008.

454.     These distributions were made to Glida One LLC by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc.

Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

455.    Each and every distribution made to Glida One LLC was made at a time when the Debtors did not have a surplus or were insolvent.

456.    Glida One LLC was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus Glida One LLC was on notice of the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

457.    Glida One LLC is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A TWENTY-THIRD CAUSE OF ACTION

### (Unjust Enrichment – Against Glida One LLC)

458.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

459.    Glida One LLC has been unjustly enriched.  Glida One LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

460.    Glida One LLC depleted the assets of the Debtors by taking distributions totaling approximately $5,363,000 in 2007 and 2008.  Glida One LLC was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

461.    Glida One LLC has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $5,363,000.

462.    Equity and good conscience require full restitution of the monies received by Glida One LLC, directly and indirectly, from the Debtors.  This includes not only the money itself that Glida One LLC. received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

### AS FOR A TWENTY-FOURTH CAUSE OF ACTION

**(Illegal Distributions – Against Polar Extended Stay (USA) L.P.)**

463.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

464.    As is set forth above, Polar Extended Stay (USA) L.P. received distributions totaling approximately $1,235,161 in 2007 and 2008.   This total includes approximately $563,333 in 2007 and $671,828 in 2008.

465.    These distributions were made to Polar Extended Stay (USA) L.P. by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc.  Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

466.    Each and every distribution made to Polar Extended Stay (USA) L.P. was made at a time when the Debtors did not have a surplus or were insolvent.

467.    Polar Extended Stay (USA) L.P. was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus Polar Extended Stay (USA) L.P. was on notice of

the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

468.   Polar Extended Stay (USA) L.P. is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

### AS FOR A TWENTY-FIFTH CAUSE OF ACTION

**(Unjust Enrichment – Against Polar Extended Stay (USA) L.P.)**

469.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

470.   Polar Extended Stay (USA) L.P. has been unjustly enriched.   Polar Extended Stay (USA) L.P. wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

471.   Polar Extended Stay (USA) L.P. depleted the assets of the Debtors by taking distributions totaling approximately $1,235,161 in 2007 and 2008.  Polar Extended Stay (USA) L.P. was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

472.   Polar Extended Stay (USA) L.P. has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $1,235,161.

473.   Equity and good conscience require full restitution of the monies received by Polar Extended Stay (USA) L.P., directly and indirectly, from the Debtors.  This includes not only the money itself that Polar Extended Stay (USA) L.P. received, but also the proceeds of that

money.  Any profits earned with the money they received must be returned to the Litigation Trust.

### AS FOR A TWENTY-SIXTH CAUSE OF ACTION

### (Illegal Distributions – Against Princeton ESH, LLC)

474.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

475.    As is set forth above, Princeton ESH, LLC received distributions totaling approximately $1,235,161 in 2007 and 2008.  This total includes approximately $563,333 in 2007 and $671,828 in 2008.

476.    These distributions were made to Princeton ESH, LLC by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc. Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

477.    Each and every distribution made to Princeton ESH, LLC was made at a time when the Debtors did not have a surplus or were insolvent.

478.    Princeton ESH, LLC was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus Princeton ESH, LLC was on notice of the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

479.     Princeton ESH, LLC is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A TWENTY-SEVENTH CAUSE OF ACTION

### (Unjust Enrichment – Against Princeton ESH, LLC)

480.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

481.     Princeton ESH, LLC has been unjustly enriched.  Princeton ESH, LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

482.     Princeton ESH, LLC depleted the assets of the Debtors by taking distributions totaling approximately $1,235,161 in 2007 and 2008.  Princeton ESH, LLC was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

483.     Princeton ESH, LLC has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $1,235,161.

484.     Equity and good conscience require full restitution of the monies received by Princeton ESH, LLC, directly and indirectly, from the Debtors.  This includes not only the money itself that Princeton ESH, LLC received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A TWENTY-EIGHTH CAUSE OF ACTION

### (Illegal Distributions – Against Ron Invest LLC)

485.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

486.    As is set forth above, Ron Invest LLC received distributions totaling approximately $1,172,000 in 2008.

487.    These distributions were made to Ron Invest LLC by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc. Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

488.    Each and every distribution made to Ron Invest LLC was made at a time when the Debtors did not have a surplus or were insolvent.

489.    Ron Invest LLC was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus Ron Invest LLC was on notice of the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

490.    Ron Invest LLC is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A TWENTY-NINTH CAUSE OF ACTION

### (Unjust Enrichment – Against Ron Invest LLC)

491.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

492.     Ron Invest LLC has been unjustly enriched.  Ron Invest LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

493.     Ron Invest LLC depleted the assets of the Debtors by taking distributions totaling approximately $1,172,000 in 2008.  Ron Invest LLC was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

494.     Ron Invest LLC has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $1,172,000.

495.     Equity and good conscience require full restitution of the monies received by Ron Invest LLC, directly and indirectly, from the Debtors.  This includes not only the money itself that Ron Invest LLC received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A THIRTIETH CAUSE OF ACTION

### (Illegal Distributions – Against Lightstone Holdings LLC)

496.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

497.     As is set forth above, Lightstone Holdings LLC received a distribution of approximately $2,668,000 on or about August 31, 2007.  This distribution was made to

155

Lightstone Holdings LLC by the shell entity DL-DW Holdings, LLC from funds that, upon information and belief, ultimately came from ESI or other Debtors.

498.    The  distribution made to Lightstone Holdings LLC was made at a time when the Debtors did not have a surplus or were insolvent.

499.    Lightstone Holdings LLC was on notice of the distressed condition of the Debtors as well as the fact that the distribution it received violated the terms of the applicable mortgage loan documents, and thus Lightstone Holdings LLC was on notice of the impropriety of the distribution it received and the fact that the Debtors would be rendered further insolvent as a result of that distribution.

500.    Lightstone Holdings LLC is therefore liable for repayment of the unlawful distribution under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

### AS FOR A THIRTY-FIRST CAUSE OF ACTION

**(Unjust Enrichment – Against Lightstone Holdings LLC)**

501.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

502.    Lightstone Holdings LLC has been unjustly enriched.   Lightstone Holdings LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

503.    Lightstone Holdings LLC depleted the assets of the Debtors by taking a distribution of approximately $2,668,000 on or about August 31, 2007.  Lightstone Holdings LLC was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

504.    Lightstone Holdings LLC has been enriched at the expense of the Debtors and has retained the distribution of approximately $2,668,000.

505.    Lightstone Holdings LLC has also been unjustly enriched by the management fees of $1 million per year it received from the Debtors despite the fact that HVM, and not Lightstone Holdings LLC, managed all aspects of the Debtors' daily operations.

506.    Equity and good conscience require full restitution of the monies received by Lightstone Holdings LLC, directly and indirectly, from the Debtors. This includes not only the money itself that Lightstone Holdings LLC received, but also the proceeds of that money. Any profits earned with the money it received must be returned to the Litigation Trust.

## AS FOR A THIRTY-SECOND CAUSE OF ACTION

### (Illegal Distributions – Against Princeton ESH LLC, Atmar Associates LLC, Lightstone Holdings LLC and BRE.ESH Holdings LLC (together, the "DL-DW Holdings LLC Member Defendants"))

507.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

508.    As is set forth above, Lightstone Holdings LLC received a distribution of approximately $2,668,000 on or about August 31, 2007. This distribution was made to Lightstone Holdings LLC by the shell entity DL-DW Holdings, LLC and upon information and belief was authorized by the DL-DW Holdings LLC Member Defendants from funds that, upon information and belief, ultimately came from ESI or other Debtors.

509.    The distribution made to Lightstone Holdings LLC was made at a time when the Debtors did not have a surplus or were insolvent.

510.    This distribution was willfully or negligently made by the DL-DW Holdings LLC Member Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors.

511.    The DL-DW Holdings LLC Member Defendants are therefore liable for repayment of the unlawful distribution under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

### AS FOR A THIRTY-THIRD CAUSE OF ACTION

**(Unjust Enrichment – Against ABT-ESI LLC, Park Avenue Funding LLC, Princeton ESH LLC, and Mericash Funding LLC, and Lightstone Commercial Management (together, the "25% Note Lender Defendants"))**

512.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

513.    The 25% Note Lender Defendants have been unjustly enriched.  The 25% Note Lender Defendants wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

514.    As is detailed above, in connection with the onerous terms of the 25% Note set by the 25% Note Lender Defendants and their insider affiliates, the 25% Note Lender Defendants in 2008 were paid an additional 15.85% interest (above the 9.15% interest on the original 9.15% Note) on the 25% Note from income generated by the LIBOR Floor Certificates whose value should have belonged to the Debtors.

515.    The 25% Note Lender Defendants have been enriched at the expense of the Debtors and have retained interest payments paid out of income generated by the LIBOR Floor Certificates, an amount equal to approximately $3,487,000.

516.     Equity and good conscience require full restitution of the monies received by the 25% Note Lender Defendants from the Debtors.  This includes not only the money itself that the 25% Note Lender Defendants received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A THIRTY-FOURTH CAUSE OF ACTION

### (Illegal Distributions – Against the 25% Note Lender Defendants)

517.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

518.     As is set forth above, in connection with the onerous terms of the 25% Note set by the 25% Note Lender Defendants and their insider affiliates, the 25% Note Lender Defendants in 2008 received distributions totaling approximately $3,487,000.   These distributions were paid using income derived by the LIBOR Floor Certificates that belonged to the Debtors.

519.     Each and every distribution made to the 25% Note Lender Defendants in 2008 was made at a time when the Debtors did not have a surplus or were insolvent.

520.     The 25% Note Lender Defendants were on notice of the distressed condition of the Debtors, the impropriety of the distributions they received, and that the Debtors would be rendered further insolvent as a result of those distributions.

521.     The 25% Note Lender Defendants are therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A THIRTY-FIFTH CAUSE OF ACTION

### (Illegal Distributions – Against the 25% Note Lender Defendants)

522.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

523.    As is set forth above, the 25% Note Lender Defendants received distributions in the form of the LIBOR Floor Certificates and the balance of the Floor Bonds Reserve Account as part of an insider payoff of the 25% Note just before Debtor's bankruptcy totaling no less than $25,000,000.  These distributions were paid from assets and funds that ultimately belonged to one or more of the Debtors, which are each Delaware entities.

524.    Each and every distribution made to 25% Note Lender Defendants was made at a time when the Debtors did not have a surplus or were insolvent.

525.    The 25% Note Lender Defendants were on notice of the distressed condition of the Debtors, the impropriety of the distributions they received, and that the Debtors would be rendered further insolvent as a result of those distributions.

526.    The 25% Note Lender Defendants are therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A THIRTY-SIXTH CAUSE OF ACTION

### (Unjust Enrichment – Against the 25% Note Lender Defendants)

527.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

528.     The 25% Note Lender Defendants have been unjustly enriched.  The 25% Note Lender Defendants wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

529.     As is detailed above, the 25% Note Lender Defendants received the LIBOR Floor Certificates and the balance of the Floor Bonds Reserve Account as part of an insider payoff just before the bankruptcy of the Debtors.

530.     The 25% Note Lender Defendants have been enriched at the expense of the Debtors and have retained the proceeds of the LIBOR Floor Certificates and the Floor Bonds Reserve Account, an amount equal to no less than $25,000,000.

531.     Equity and good conscience require full restitution of the monies received by the 25% Note Lender Defendants from the Debtors.  This includes not only the money itself that the 25% Note Lender Defendants received, but also the proceeds of that money.  Any profits earned with the money it received must be returned to the Litigation Trust.

### AS FOR A THIRTY-SEVENTH CAUSE OF ACTION

**(Illegal Dividends – Against David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy R. Milone, Jr., Joseph Chetrit, Joseph Teichman and Joseph Martello (together, the "Extended Stay Director Defendants"))**

532.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

533.     As is set forth above, distributions and/or dividends totaling approximately $62,071,000 were made between 2007 and 2009, which were authorized and allowed by the Extended Stay Director Defendants.  These dividend and distributions were made from funds that came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc., which are each Delaware entities.

534.   Each and every dividend that the Extended Stay Director Defendants authorized to be paid was made at a time when the Debtors did not have a surplus or were insolvent.

535.   These dividend payments were willfully or negligently made by the Extended Stay Director Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors, and despite the fact that these dividend payments violated the terms of the applicable mortgage loan documents.

536.   Upon information and belief, each of the various entities served by the interlocking Extended Stay Director Defendants adopted corporate standards of governance.

537.   The Extended Stay Director Defendants are therefore each individually liable for repayment of the unlawful dividends and distributions authorized when they were directors under Sections 160 and 174 of the DGCL.

## AS FOR A THIRTY-EIGHTH CAUSE OF ACTION

**(Illegal Dividends – Against David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Joseph Teichman, and Joseph Martello (together, the "Excessive Interest Director Defendants"))**

538.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

539.   As is set forth above, the 25% Note Lender Defendants in 2008 received distributions totaling approximately $3,487,000, which were authorized and allowed by the Excessive Interest Director Defendants.  These dividend and distributions were made from funds that came from ESI or other Debtors.

540. The distributions that the Excessive Interest Director Defendants authorized to be paid were made at a time when the Debtors did not have a surplus or were insolvent.

541. These distributions were willfully or negligently made by the Excessive Interest Director Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors.

542. Upon information and belief, each of the various entities served by the interlocking Excessive Interest Director Defendants adopted corporate standards of governance.

543. The Excessive Interest Director Defendants are therefore each individually liable for repayment of the unlawful dividends authorized when they were directors under Sections 160 and 174 of the DGCL.

## AS FOR A THIRTY-NINTH CAUSE OF ACTION

**(Illegal Dividends – Against David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy R. Milone, Joseph Chetrit, and Joseph Teichman(together, the "LIBOR Floor Certificate Director Defendants"))**

544. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

545. As is set forth above, the 25% Note Lender Defendants received distributions in the form of the LIBOR Floor Certificates and the balance of the Floor Bonds Reserve Account as part of an insider payoff of the 25% Note just before Debtor's bankruptcy totaling no less than $25,000,000, which were authorized and allowed by the LIBOR Floor Certificate Director Defendants. These dividend and distributions were made from funds that came from ESI or other Debtors.

546.    The distributions that the LIBOR Floor Certificate Director Defendants authorized to be paid were made at a time when the Debtors did not have a surplus or were insolvent.

547.    These distributions were willfully or negligently made by the LIBOR Floor Certificate Director Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors.

548.    Upon information and belief, each of the various entities served by the interlocking LIBOR Floor Certificate Director Defendants adopted corporate standards of governance.

549.    The LIBOR Floor Certificate Director Defendants are therefore each individually liable for repayment of the unlawful dividends authorized when they were directors under Sections 160 and 174 of the Delaware General Corporations Law ("DGCL").

### AS FOR A FORTIETH CAUSE OF ACTION

**(Unjust Enrichment – Against Bank of America, N.A ("Bank of America"))**

550.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

551.    Bank of America has been unjustly enriched.   Bank of America wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

552.    Bank of America received approximately $3,971,658 in servicer fees from the Seller.  These fees were paid out of the $7.4 billion the Debtors were caused to borrow from the mortgage and mezzanine lenders.   However, the Debtors received no direct or indirect benefits in exchange for the monies borrowed or the payments made to Bank of America.

553.    Bank of America has been enriched at the expense of the Debtors and has retained the fees totaling approximately $3,971,658.

554.    Equity and good conscience require full restitution of the monies received by Bank of America from the Debtors.  This includes not only the money itself that Bank of America received, but also the proceeds of that money.  Any profits earned with the money it received must be returned to the Litigation Trust.

### AS FOR A FORTY-FIRST CAUSE OF ACTION

**(Unjust Enrichment – Against Citigroup Global Markets Inc. ("Citigroup"))**

555.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

556.    Citigroup has been unjustly enriched.   Citigroup wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

557.    Citigroup received approximately $6,350,000 in fees in connection with services for the Buyer.  These fees were paid out of the $7.4 billion the Debtors were caused to borrow from the mortgage and mezzanine lenders.  However, the Debtors received no direct or indirect benefits in exchange for the monies borrowed or the payments made to Citigroup.

558.    Citigroup has been enriched at the expense of the Debtors and has retained the fees totaling approximately $6,350,000.

559.    Equity and good conscience require full restitution of the monies received by Citigroup from the Debtors.  This includes not only the money itself that Citigroup received, but also the proceeds of that money.  Any profits earned with the money it received must be returned to the Litigation Trust.

## AS FOR A FORTY-SECOND CAUSE OF ACTION

### (Unjust Enrichment – Against Ebury Finance Limited ("Ebury") )

560.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

561.    Ebury has been unjustly enriched.  Ebury wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

562.    Ebury received approximately $9,341,984 in fees and disbursements in connection with loans the Debtors were forced to incur as a result of the LBO.  These fees were paid out of the loan proceeds despite the fact that the Debtors received no direct or indirect benefits as a result of the loans.

563.    Ebury has been enriched at the expense of the Debtors and has retained the fees and disbursements totaling approximately $9,341,984.

564.    Equity and good conscience require full restitution of the monies received by Ebury from the Debtors.  This includes not only the money itself that Ebury received, but also the proceeds of that money.  Any profits earned with the money it received must be returned to the Litigation Trust.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff demands judgment against Defendants, as to the causes of action set forth above, as follows:

(i)     on the first cause of action, declaring that defendants The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP

L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC, BRE/HV Holdings LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC, in their own right or as successors-in-interest to and direct or indirect parent entities and funds that owned or controlled the Debtors prior to the LBO grossly, wantonly and maliciously breached their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors and the Debtors' creditors in light of the misconduct identified above, and awarding, jointly and severally, both compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion and punitive damages of three times the actual damage caused to the Debtors, or $6.3 billion, or such other amount as the Court may determine after trial; and

(ii)   on the second cause of action, declaring that defendants DL-DW Holdings, LLC, Lightstone Holdings, LLC, The Lightstone Group, LLC, PGRT ESH Inc., Lightstone Commercial Management, Arbor ESH II LLC, Arbor Commercial Mortgage, LLC, Princeton ESH LLC, Atmar Associates, LLC, Glida One LLC, Ron Invest LLC, Polar Extended Stay (USA) L.P., BHAC Capital IV, L.L.C. and BRE/ESH Holdings, LLC grossly, wantonly and maliciously breached their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors and the Debtors' creditors in light of the misconduct identified above, and awarding, jointly and severally, both compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion and punitive damages of three times the actual damage caused to the Debtors, or $6.3 billion, or such other amount as the Court may determine after trial; and

(iii)   on the third cause of action, declaring that defendants David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy Milone, Jr., Joseph Chetrit, Joseph Teichman, Joseph Martello, F. Joseph Rogers, David Kim and Gary DeLapp grossly, wantonly and maliciously

breached their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors and the Debtors' creditors in light of the misconduct identified above, and awarding, jointly and severally, both compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion and punitive damages of three times the actual damage caused to the Debtors, or $6.3 billion, or such other amount as the Court may determine after trial; and

(iv)     on the fourth cause of action, declaring that defendants Jonathan D. Gray, William Stein, Michael Chae, Robert L. Friedman, Thomas Burdi, Gary Sumers, Dennis J. McDonagh and Alan Miyasaki grossly, wantonly and maliciously breached their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors and the Debtors' creditors in light of the misconduct identified above, and awarding, jointly and severally, both compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion and punitive damages of three times the actual damage caused to the Debtors, or $6.3 billion, or such other amount as the Court may determine after trial; and

(v)      on the fifth cause of action, declaring that defendants The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC, BRE/HV Holdings LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC, in their own right or as successors-in-interest to and direct or indirect parent entities and funds that owned or controlled the Debtors prior to the LBO, DL-DW Holdings, LLC, Lightstone Holdings, LLC, The Lightstone Group, LLC, PGRT ESH Inc., Lightstone Commercial Management, Arbor ESH II LLC, Arbor Commercial Mortgage, LLC, Princeton

ESH LLC, Atmar Associates, LLC, Glida One LLC, Ron Invest LLC, Polar Extended Stay (USA) L.P., BHAC Capital IV, L.L.C. and BRE/ESH Holdings, LLC, as the entities that owned or controlled the Debtors on the date of and after the LBO, David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy Milone, Jr., Joseph Chetrit, Joseph Teichman, Joseph Martello, F. Joseph Rogers, David Kim and Gary DeLapp, as directors, officers, managers and control persons after the LBO, Jonathan D. Gray, William Stein, Michael Chae, Robert L. Friedman, Thomas Burdi, Gary Sumers, Dennis J. McDonagh and Alan Miyasaki, as directors, officers, managers or persons that owned or controlled the Debtors prior to the LBO, and Bank of America, N.A., Citigroup Global Markets Inc. and Ebury Finance Limited, knew or should have known that the other defendants' acts and omissions described above constituted breaches of fiduciary and contractual duties owed to the Debtors, knowingly provided material assistance in connection with, and knowingly participated in, the other defendants' breaches of fiduciary and contractual duties in bad faith and with the actual intent to assist the other defendants in their respective breaches of fiduciary and contractual duties, and awarding, jointly and severally, compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion, or such other amount as the Court may determine after trial; and

(vi)      on the sixth cause of action, declaring that defendants The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC, BRE/HV Holdings LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC, in their own right or as successors-in-interest to and direct or indirect parent entities and

funds that owned or controlled the Debtors prior to the LBO, DL-DW Holdings, LLC, Lightstone Holdings, LLC, The Lightstone Group, LLC, PGRT ESH Inc., Lightstone Commercial Management, Arbor ESH II LLC, Arbor Commercial Mortgage, LLC, Princeton ESH LLC, Atmar Associates, LLC, Glida One LLC, Ron Invest LLC, Polar Extended Stay (USA) L.P., BHAC Capital IV, L.L.C. and BRE/ESH Holdings, LLC, as the entities that owned or controlled the Debtors on the date of and after the LBO, David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy Milone, Jr., Joseph Chetrit, Joseph Teichman, Joseph Martello, F. Joseph Rogers, David Kim and Gary DeLapp, as directors, officers, managers and control persons after the LBO, and Jonathan D. Gray, William Stein, Michael Chae, Robert L. Friedman, Thomas Burdi, Gary Sumers, Dennis J. McDonagh and Alan Miyasaki, as directors, officers, managers or persons that owned or controlled the Debtors prior to the LBO, irrationally squandered the Debtors' assets and the value thereof and thus committed corporate waste, and awarding, jointly and severally, compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion, or such other amount as the Court may determine after trial; and

(vii)    as to the seventh causes of action, declaring that defendants The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC, BRE/HV Holdings LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC, in their own right or as successors-in-interest to and direct or indirect parent entities and funds that owned or controlled the Debtors prior to the LBO,  DL-DW Holdings,

LLC, Lightstone Holdings, LLC, The Lightstone Group, LLC, PGRT ESH Inc., Lightstone Commercial Management, Arbor ESH II LLC, Arbor Commercial Mortgage, LLC, Princeton ESH LLC, Atmar Associates, LLC, Glida One LLC, Ron Invest LLC, Polar Extended Stay (USA) L.P., BHAC Capital IV, L.L.C. and BRE/ESH Holdings, LLC, as the entities that owned or controlled the Debtors on the date of and after the LBO, David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy Milone, Jr., Joseph Chetrit, Joseph Teichman, Joseph Martello, F. Joseph Rogers, David Kim and Gary DeLapp, as directors, officers, managers and control persons after the LBO, and Jonathan D. Gray, William Stein, Michael Chae, Robert L. Friedman, Thomas Burdi, Gary Sumers, Dennis J. McDonagh and Alan Miyasaki, as directors, officers, managers or persons that owned or controlled the Debtors prior to the LBO, grossly, wantonly and maliciously breached their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors' creditors in light of the misconduct identified above, and awarding, jointly and severally, both compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion and punitive damages of three times the actual damage caused to the Debtors, or $6.3 billion, or such other amount as the Court may determine after trial; and

(viii)   on the eighth cause of action, declaring that defendants BHAC IV, LLC and BRE.HV Holdings LLC have been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1.9 billion to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(ix)    on the ninth cause of action, declaring that defendants BHAC IV LLC and BRE.HV Holdings LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1.9 billion; and

(x)      on the tenth cause of action, declaring that defendants Gray, Friedman, Chae and Stein authorized illegal dividends and distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1.9 billion; and

(xi)      on the eleventh cause of action, declaring that defendants BHAC IV, LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC have been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount up to $1.9 billion and to be determined at trial to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xii)      on the twelfth cause of action, declaring that defendants BHAC IV, LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount up to $1.9 billion and to be determined at trial; and

(xiii)      on the thirteenth cause of action, declaring that defendants Gray, Friedman, Chae and Stein authorized illegal dividends and distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1.9 billion; and

(xiv)      on the fourteenth cause of action, declaring that defendants The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC and BRE/HV Holdings LLC were the alter egos of the Debtors and are responsible for the debts and obligations of the Debtors, and awarding plaintiff compensatory damages in an amount to be determined at trial but not less than $1.7 billion; and

(xv)    on the fifteenth cause of action, declaring that defendants DL-DW Holdings LLC, Princeton ESH LLC, Atmar Associates, LLC, Lightstone Holdings LLC and BRE.ESH Holdings, LLC were the alter egos of the Debtors and are responsible for the debts and obligations of the Debtors, and awarding plaintiff compensatory damages in an amount to be determined at trial but not less than $1.9 billion; and

(xvi)   on the sixteenth cause of action, declaring that defendant BHAC Capital IV, LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $40,607,000; and

(xvii)  on the seventeenth cause of action, declaring that defendant BHAC Capital IV, LLC has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $40,607,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xviii) on the eighteenth cause of action, declaring that defendants Arbor Commercial Mortgage LLC and Arbor ESH II, LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $44,231,000; and

(xix)   on the nineteenth cause of action, declaring that defendants Arbor Commercial Mortgage LLC and Arbor ESH II,  LLC have been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $44,231,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xx)    on the twentieth cause of action, declaring that defendant PGRT ESH Inc. received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $6,167,000; and

(xxi)   on the twenty-first cause of action, declaring that defendant PGRT ESH Inc. has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $6,167,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxii)  on the twenty-second cause of action, declaring that defendant Glida One LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $5,363,000; and

(xxiii) on the twenty-third cause of action, declaring that defendant Glida One LLC has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $5,363,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxiv)  on the twenty-fourth cause of action, declaring that defendant Polar Extended Stay (USA) L.P. received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1,235,000; and

(xxv)   on the twenty-fifth cause of action, declaring that defendant Polar Extended Stay (USA) L.P. has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1,235,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxvi)  on the twenty-sixth cause of action, declaring that defendant Princeton ESH, LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1,235,000; and

(xxvii) on the twenty-seventh cause of action, declaring that defendant Princeton ESH, LLC has been unjustly enriched at the Debtors' expense and awarding compensatory damages to

174

plaintiff in an amount to be determined at trial but not less than $1,235,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxviii) on the twenty-eighth cause of action, declaring that defendant Ron Invest LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1,172,000; and

(xxix)  on the twenty-ninth cause of action, declaring that defendant Ron Invest LLC has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1,172,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

 (xxx)  on the thirtieth cause of action, declaring that defendant Lightstone Holdings LLC received an illegal distribution and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $2,668,000; and

(xxxi)  on the thirty-first cause of action, declaring that defendant Lightstone Holdings LLC has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $2,668,000 plus any management fees paid by Debtors to Lightstone Holdings LLC to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxxii) on the thirty-second cause of action, declaring that the DL-DW Holdings LLC Member Defendants authorized illegal dividends and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $2,668,000; and

(xxxiii) on the thirty-third cause of action, declaring that the 25% Note Lender Defendants have been unjustly enriched at the Debtors' expense and awarding compensatory

damages to plaintiff in an amount to be determined at trial but not less than $3,487,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxxiv) on the thirty-fourth cause of action, declaring that the 25% Lender Defendants received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $3,487,000; and

(xxxv) on the thirty-fifth cause of action, declaring that the 25% Note Lender Defendants received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $25,000,000; and

(xxxvi) on the thirty-sixth cause of action, declaring that the 25% Note Lender Defendants have been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $25,000,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxxvii) on the thirty-seventh cause of action, declaring that defendants Lichtenstein, de Vinck, Owen, Milone, Chetrit, Teichman, and Martello authorized illegal dividends and distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $62,071,000; and

(xxxviii) on the thirty-eighth cause of action, declaring that defendants Lichtenstein, de Vinck, Owen, Teichman, and Martello authorized illegal dividends and distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $3,487,000; and

(xxxix) on the thirty-ninth cause of action, declaring that defendants Lichtenstein, de Vinck, Owen, Milone, Chetrit, and Teichman authorized illegal dividends and distributions and

awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $25,000,000; and

(xl)      on the fortieth cause of action, declaring that defendant Bank of America has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $3,971,658 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xli)   on the forty-first cause of action, declaring that defendant Citigroup has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $6,350,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment;

(xlii)   on the forty-second cause of action, declaring that defendant Ebury has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $9,341,984 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xliii)   awarding the plaintiff such other and further relief as the Court may deem just and proper.

Dated: June 14, 2011
       New York, New York

Respectfully submitted,

**BAKER & HOSTETLER LLP**

By _____

MARC D. POWERS
MATTHEW R. GOLDMAN
BENJAMIN D. PERGAMENT
KATHRYN M. ZUNNO
45 Rockefeller Plaza
New York, New York  10111
Telephone:    212.589.4200
Facsimile:    212.589.4201
E-mail mpowers@bakerlaw.com

AND

MICHAEL A. VANNIEL (*pro hac vice*
application forthcoming)
ALEXIS C. OSBURN (*pro hac vice*
application forthcoming)
Baker & Hostetler LLP
PNC Center
1900 East 9th Street, Suite 3200
Cleveland, OH 44114-3482
Telephone:    216.621.0200
Facsimile:    216.696-0740

*Counsel for Plaintiffs Extended Stay*
*Litigation Trust, and Hobart Truesdell and*
*Walker, Truesdell, Roth & Associates, as*
*Trustees of the Extended Stay Litigation*
*Trust*

178

# EXHIBIT A



**OPERATING ENTITIES**

(1)   The Blackstone Group L.P. common unitholders will have only limited voting rights and will have no right to elect our general partner or its directors, except for the State Investment Company, which will have no voting rights in respect of any of its common units. Our existing owners will indirectly hold special voting units in The Blackstone Group L.P. that will entitle them, on those few matters that may be submitted for a vote of The Blackstone Group L.P. common unitholders, to participate in the vote on the same basis as the common unitholders. We will initially issue a single special voting unit to Blackstone Partners L.L.C., an entity wholly-owned by our senior managing directors, that provides it with an aggregate number of votes that is equal to the aggregate number of vested and unvested Blackstone Holdings partnership units held by the limited partners of Blackstone Holdings on the relevant record date. See "Material Provisions of The Blackstone Group L.P. Partnership Agreement—Meetings; Voting."

(2)   Blackstone Holdings I/II GP Inc. holds a portion of its interests in Blackstone Holdings I L.P. and Blackstone Holdings II L.P. through wholly-owned subsidiaries organized as Delaware limited partnerships and Delaware limited liability companies.

(3)   The Blackstone Group L.P. holds Blackstone Holdings IV GP L.P. and Blackstone Holdings V GP L.P. through wholly-owned subsidiaries organized as Delaware limited partnerships and Delaware limited liability companies.

# EXHIBIT B



Corporate Structure of Debtors

# EXHIBIT C

**Summary of Pre and Post-LBO Mortgage Debt**

| Mortgage Borrower | Payoff Amount | New Debt | Difference |
|---|---|---|---|
| ESA 2005 Portfolio L.L.C. | $83,175,203 | $73,966,369 | (9,208,834) |
| ESA 2005-San Jose L.L.C. | 11,092,362 | 14,909,595 | 3,817,233 |
| ESA 2005- Waltham L.L.C. | 12,215,677 | 10,611,061 | (1,604,616) |
| ESA Alaska L.LC. | 36,721,553 | 42,129,064 | 5,407,511 |
| ESA Acquisition Properties L.L.C. | 32,285,382 | 37,039,636 | 4,754,254 |
| ESA Canada Properties Trust | 42,680,978 | - | (42,680,978) |
| ESA Canada Properties borrower L.L.C. | - | 43,074,603 | 43,074,603 |
| ESA FL Properties, L.L.C. | 29,694,951 | 53,588,108 | 23,893,157 |
| ESA MD Borrower L.L.C. | 0,09,3 | 51,742,056 | 11,532,745 |
| ESA MN Properties L.L.C | 5,943,985 | 11,077,201 | 5,133,216 |
| ESA P Portfolio L.L.C. | 1,454,513,493 | 1,644,091,269 | 189,577,776 |
| ESA P Portfolio MD Borrower L.L.C. | 62,765,385 | 67,868,768 | 5,103,383 |
| ESA P Portfolio PA Properties L.LC. | 49,945,630 | 56,883,343 | 6,937,713 |
| ESA P Portfolio TXNC Properties L.P. | 165,258,912 | 231,919,959 | 66,661,047 |
| ESA PA Properties L.L.C | 15,442,706 | 23,660,878 | 8,218,172 |
| ESA Properties, L.L.C. | 524,163,473 | 788,096,085 | 263,932,612 |
| ESA TX Properties L.P. | 76,406,016 | 133,373,679 | 56,967,663 |
| ESH/Homestead Portfolio L.L.C. | 83,781,941 | 90,901,914 | 7,119,973 |
| ESH/HV Properties L.L.C. | 544,241,841 | 620,741,761 | 76,499,920 |
| ESH/MSTX Property L.P. | 2,872,538 | 4,359,990 | 1,487,452 |
| ESH/TN Properties L.L.C. | 16,496,143 | 21,064,531 | 4,568,388 |
| ESA TX Properties LP. | 60,676,727 | 78,900,066 | 18,223,339 |
| **Total Mortgage Debt of borrowers** | **$3,350,584,208** | **$4,099,999,936** | **$749,415,728** |

# EXHIBIT D

**Chart of Mezzanine Borrowers**
**For Each of the 10 Mezzanine Loans**

| Mezzanine Loan | Borrowers |
|---|---|
| | |
| Mezzanine Loan A | ESA Mezz, LLC<br>ESA P Mezz, LLC<br>ESH/Homestead Mezz, LLC |
| Mezzanine Loan B | ESA Mezz 2, LLC<br>ESA P Mezz 2, LLC<br>ESH/Homestead Mezz 2, LLC |
| Mezzanine Loan C | ESA Mezz 3, LLC<br>ESA P Mezz 3, LLC<br>ESH/Homestead Mezz 3, LLC |
| Mezzanine Loan D | ESA Mezz 4, LLC<br>ESA P Mezz 4, LLC<br>ESH/Homestead Mezz 4, LLC |
| Mezzanine Loan E | ESA Mezz 5, LLC<br>ESA P Mezz 5, LLC<br>ESH/Homestead Mezz 5, LLC |
| Mezzanine Loan F | ESA Mezz 6, LLC<br>ESA P Mezz 6, LLC<br>ESH/Homestead Mezz 6, LLC |
| Mezzanine Loan G | ESA Mezz 7, LLC<br>ESA P Mezz 7, LLC<br>ESH/Homestead Mezz 7, LLC |
| Mezzanine Loan H | ESA Mezz 8, LLC<br>ESA P Mezz 8, LLC<br>ESH/Homestead Mezz 8, LLC |
| Mezzanine Loan I | ESA Mezz 9, LLC<br>ESA P Mezz 9, LLC<br>ESH/Homestead Mezz 9, LLC |
| Mezzanine Loan J | ESA Mezz 10, LLC<br>ESA P Mezz 10, LLC<br>ESH/Homestead Mezz 10, LLC |

# EXHIBIT E

## Flow of Funds pursuant to the Cash Management Agreement and Mortgage Loan Agreement



EXHIBIT 2

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Marc D. Powers
mpowers@bakerlaw.com
Matthew R. Goldman
mgoldman@bakerlaw.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 Case No. 09-13764 (JMP) |
| EXTENDED STAY, INC., *et al.*, | |
| Debtors. | (Jointly Administered) |
| WALKER, TRUESDELL, ROTH & ASSOCIATES, as Trustee for and on behalf of the Extended Stay Litigation Trust, | |
| HOBART TRUESDELL, as Trustee for and on behalf of the Extended Stay Litigation Trust, and | Adv. Pro. No. _____ |
| THE EXTENDED STAY LITIGATION TRUST, | |
| Plaintiffs, | |
| -against- | |
| The Blackstone Group, L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP, Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV, LLC, BRE/HV Holdings | **COMPLAINT** |

LLC, Blackstone Hospitality Acquisitions, LLC, Prime Hospitality, LLC, DL-DW Holdings, LLC, Lightstone Holdings LLC, The Lightstone Group, LLC, PGRT ESH Inc., Lightstone Commercial Management, Arbor ESH II, LLC, Arbor Commercial Mortgage, LLC, Princeton ESH LLC, Atmar Associates, LLC, Glida One LLC, Ron Invest LLC, Polar Extended Stay (USA) L.P., BHAC Capital IV, LLC, BRE/ESH Holdings, LLC, ABT-ESI LLC, Mericash Funding LLC, Park Avenue Funding LLC, Bank of America, N.A., Citigroup Global Markets Inc., Ebury Finance Limited, Banc of America Securities LLC, David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy R. Milone, Jr., Joseph Chetrit, Joseph Teichman, Joseph Martello, F. Joseph Rogers, David Kim, Gary DeLapp, Jonathan D. Gray, William Stein, Michael Chae, Robert L. Friedman, Thomas Burdi, Gary Sumers, Dennis J. McDonagh, Alan Miyasaki, and JOHN DOES 1 through 100, inclusive,

Defendants.

Plaintiffs, Walker, Truesdell, Roth & Associates ("WTR&A"), as Trustee for and on behalf of the Extended Stay Litigation Trust (the "Trust"), Hobart Truesdell, as Trustee for and on behalf of the Trust ("Truesdell," and together with WTR&A, the "Trustee") and the Trust, by the undersigned counsel, hereby files this Complaint, and alleges as follows:

## NATURE OF ACTION

1.     This action arises from the financial devastation wrought upon the Extended Stay Inc. family of companies (collectively, the "Company," which included, but was not limited to the bankrupt "Debtor" entities identified in paragraph 10 below) in a leveraged buyout of the Company in June 2007 (the "LBO" or "Acquisition") and thereafter.  The Sellers (as defined below) in the LBO, comprised of affiliates of The Blackstone Group (as defined below),

siphoned over $2 billion of the value out of the Debtors, without regard for how the Debtors would continue operations following the LBO.  After the LBO closed, the Buyer (as defined below) and its affiliates pulled out over $100 million in improper distributions to equity from the Debtors' remaining desperately needed post-LBO cash.

2.      The Debtors were dominated, controlled and ultimately exploited by the Sellers and the Buyer.  The purportedly arms-length transaction was anything but.  The grossly inflated purchase price was engineered by the Blackstone-affiliated Sellers looking to maximize their profits, working in concert with a Buyer that assumed little to no risk of loss.  Indeed, each of the three rating agencies that reviewed the deal all came to the same conclusion: The total capitalization of the LBO substantially exceeded the value of the Debtors' assets.  In short, the purchase price was not justified, was paid at the Debtors' expense and left the Debtors insolvent, undercapitalized, and unable to pay their debts as they became due.

3.      While the downfall of the Debtors coincided, to some extent, with the bursting of the nation's real estate bubble and the consequent "Great Recession," that economic downturn neither explains nor excuses the Debtors' downfall or the Defendants' culpable conduct here.  As an initial matter, upon information and belief, Blackstone anticipated the downturn in advance of the LBO.  More importantly, however, the LBO would have failed regardless of the downturn; it was effectively dead-on-arrival given the gross over-leveraging and untenable cash flow restrictions that comprised the malignant terms of the deal.

4.      At the LBO's closing, Blackstone siphoned $2.1 billion of value from the Debtors, rendering them insolvent, undercapitalized and unable to survive.  The Defendants were well aware of the financial harm of the LBO, but nevertheless caused or allowed it to happen.  After the LBO, the Debtors were systematically drained of no less than $100 million through the

continuous payment of improper dividends and through other distributions to post-LBO equity holders and their affiliates.  Those post-LBO dividends and distributions were improper under applicable law and under the LBO loan documents themselves.  Yet, the distributions occurred time and again as the Debtors suffered multiple financial and liquidity crises and limped along toward their inevitable bankruptcy.  In the end, a group of investors including Blackstone provided the ultimate ironic coda to this story of economic havoc by swooping in after the Debtors' bankruptcy filings to reacquire the Debtors for approximately $3.9 billion, roughly half the amount Blackstone had sold the Company for three years earlier.

5.     This lawsuit seeks redress from named Defendants that fall into two groups.  The first group consists of entities and individuals that owned, dominated, controlled or otherwise managed all aspects of the pre-LBO Debtors' businesses.  Those pre-LBO Defendants were responsible for the decision to implement the LBO, and they participated in the formulation of the post-LBO structure pursuant to which additional value was improperly siphoned off from the Debtors to insiders.  The second group consists of the entities and individuals that owned, controlled, dominated or otherwise managed all aspects of the Debtors' post-LBO businesses, and who used that ownership, control and management authority to improperly withdraw cash and assets from the financially distressed Debtors to benefit equity holders and their affiliates. This action seeks the imposition of liability for the fiduciary breaches of the parties named herein and restitution for unjust enrichment, as well as the recovery of the illegal dividends and distributions the Debtors were caused to issue, all so as to rectify the harm caused by the Defendants.

## THE PARTIES

**A.     The Extended Stay Litigation Trust, Trustee and The Debtors.**

6.      **The Extended Stay Litigation Trust** is a post-confirmation litigation trust established by the Extended Stay Litigation Trust Agreement, dated as of October 8, 2010 (the "Litigation Trust Agreement") in the United States Bankruptcy Court for the Southern District of New York, Case No.  09-13764 (JMP) (the "Bankruptcy Court").   The Trust Agreement was executed as part of the Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated as of June 8, 2010 and confirmed on or about July 20, 2010 (the "Plan") in the chapter 11 bankruptcy case of *In re Extended Stay, Inc.  et al.*  (the "Chapter 11 Cases").

7.      The Trust was established for the benefit of the creditors of the Debtors (collectively, the "Litigation Trust Beneficiaries").   Pursuant to the Plan and the Bankruptcy Court Order approving the Plan, the Trust has title to all assets described in Section 1.89 of the Plan as well as all assets transferred to the Trust pursuant to the "ESI Settlement Agreement," incorporated into the Plan.   These assets include, but are not limited to, any potential claims, causes of actions, charges, suits or rights of recovery of the Debtors and ESI (as defined below) referenced in the Examiner's Report of Ralph R. Mabey, examiner in the Chapter 11 Cases, filed with the Bankruptcy Court on April 8, 2010 (the "Litigation Trust Assets").   In that Examiner's Report, the examiner set forth his assertions of the facts leading up to the Chapter 11 Cases, and causes of action that could be asserted against various parties arising therefrom, including the causes of action asserted against the Defendants herein.

8.      **Hobart Truesdell and Walker, Truesdell, Roth & Associates** were duly appointed as the Trustees of the Trust in accordance with and pursuant to the Trust Agreement and the Bankruptcy Court Order confirming the Plan.   The Trustee and the Trust are authorized to commence all claims and causes of action formerly owned by the Debtors, which have now

been indefeasibly vested in the Trust, including all causes of action asserted herein.  The Trustee and the Trust exercise all pertinent rights of the Debtors that may be relevant to this Complaint.

9.     The Trustee's principal place of business is located at 380 Lexington Avenue, Suite 1014, New York, New York 10168.  The Trustees were appointed as Trustees of the Trust in New York County effective as of October 8, 2010.

10.     For purposes of this Complaint, the following entities are the "Debtors:" ESA 2005 Operating Lessee Inc.; ESA 2005 Portfolio L.L.C.; ESA 2005-San Jose L.L.C.; ESA 2005-Waltham L.L.C.; ESA 2007 Operating Lessee Inc.; ESA Acquisition Properties L.L.C.; ESA Alaska L.L.C.; ESA Business Trust; ESA Canada Beneficiary Inc.; ESA Canada Operating Lessee Inc.; ESA Canada Properties Borrower L.L.C.; ESA Canada Properties Trust; ESA Canada Trustee Inc.; ESA FL Properties L.L.C.; ESA Management L.L.C.; ESA MD Beneficiary L.L.C.; ESA MD Borrower L.L.C.; ESA MD Properties Business Trust; ESA Mezz 10 L.L.C.; ESA Mezz 2 L.L.C.; ESA Mezz 3 L.L.C.; ESA Mezz 4 L.L.C.; ESA Mezz 5 L.L.C.; ESA Mezz 6 L.L.C.; ESA Mezz 7 L.L.C.; ESA Mezz 8 L.L.C.; ESA Mezz 9 L.L.C.; ESA Mezz L.L.C.; ESA MN Properties L.L.C.; ESA Operating Lessee Inc.; ESA P Mezz 10 L.L.C.; ESA P Mezz 2 L.L.C.; ESA P Mezz 3 L.L.C.; ESA P Mezz 4 L.L.C.; ESA P Mezz 5 L.L.C.; ESA P Mezz 6 L.L.C.; ESA P Mezz 7 L.L.C.; ESA P Mezz 8 L.L.C.; ESA P Mezz 9 L.L.C.; ESA P Mezz L.L.C.; ESA P Portfolio Holdings L.L.C.; ESA P Portfolio L.L.C.; ESA P Portfolio MD Beneficiary L.L.C.; ESA P Portfolio MD Borrower L.L.C.; ESA P Portfolio MD Trust; ESA P Portfolio Operating Lessee Inc.; ESA P Portfolio PA Properties L.L.C.; ESA P Portfolio TXNC GP L.L.C.; ESA P Portfolio TXNC Properties L.P.; ESA PA Properties L.L.C.; ESA Properties L.L.C.; ESA TX Properties L.P.; ESA TXGP L.L.C.; ESA UD Properties L.L.C.; ESH/Homestead Mezz 10 L.L.C.; ESH/Homestead Mezz 2 L.L.C.; ESH/Homestead Mezz 3

L.L.C.; ESH/Homestead Mezz 4 L.L.C.; ESH/Homestead Mezz 5 L.L.C.; ESH/Homestead Mezz 6 L.L.C.; ESH/Homestead Mezz 7 L.L.C.; ESH/Homestead Mezz 8 L.L.C.; ESH/Homestead Mezz 9 L.L.C.; ESH/Homestead Mezz L.L.C.; ESH/Homestead Portfolio L.L.C.; ESH/HV Properties L.L.C.; ESH/MSTX GP L.L.C.; ESH/MSTX Property L.P.; ESH/TN Member Inc.; ESH/TN Properties L.L.C.; ESH/TX Properties L.P.; ESH/TXGP L.L.C.; Extended Stay Hotels L.L.C.; Extended Stay, Inc.; and Homestead Village L.L.C.  The Debtors began commencing their respective Chapter 11 Cases on June 15, 2009.  The Debtors' Chapter 11 Cases are administratively consolidated.

11.    Extended Stay, Inc. ("ESI") is a Delaware corporation and a Debtor in the Chapter 11 Cases.  At all times relevant to this Complaint, ESI was managed by a board of directors that was comprised exclusively of insiders, had no outside directors, and was managed by insiders.  Those directors were affiliated with direct or indirect equity holders of ESI.  A majority of the Debtors' pre- and post-LBO corporate organization was comprised of entities indirectly or directly owned by ESI, including, without limitation, all or substantially all of the REIT, or "real estate investment trust," portion of the Debtors' businesses.

12.    Upon information and belief, to the extent any direct or indirect subsidiaries of ESI were limited liability companies, the LLC operating agreements of those companies, including ESA P Mezz 3 L.L.C. and ESA Mezz 10 L.L.C., among others, expressly imposed fiduciary duties of loyalty and care on directors and officers similar to those of directors and officers of business corporations organized under the Delaware General Corporation Law. Post-LBO, BHAC Capital was the direct majority owner of ESI.

13.    Homestead Village, L.L.C. ("Homestead") is a Delaware limited liability company and is a Debtor in the Chapter 11 Cases.  The portion of the Debtors' pre- and post-

7

LBO corporate organization that was not within the ESI corporate chain was comprised of entities indirectly or directly owned by Homestead.

14.     At all times relevant to this Complaint, Homestead was managed by a corporate-style board of directors, had no independent, outside directors, and was managed by insiders.  Those directors were affiliated with direct or indirect equity holders of Homestead. Those insiders were empowered to, and did in fact, carry out all aspects of Homestead's business.  As of the date of the LBO, the boards of directors of all subsidiary entities within the Homestead side of the Debtors' business were to be reconstituted so that the members of those boards of directors would be identical to that of Homestead.

15.     The post-LBO Homestead board of directors was expressly required by the Homestead LLC operating agreement to act in good faith for so long as Homestead beneficially or constructively owned capital stock of ESI, and so long as ESI was a REIT.  The Homestead post-LBO LLC operating agreement expressly imposed upon Homestead's directors and officers the fiduciary duties of good faith and fair dealing.  The Homestead post-LBO LLC operating agreement expressly imposed corporate law fiduciary duties on Homestead's directors and officers to the extent that the directors and officers committed acts or omissions that rose to the level of fraud, gross negligence or willful misconduct.  The Homestead pre-LBO LLC operating agreement did not expressly or impliedly disclaim traditional corporate law fiduciary duties.

16.     Upon information and belief, to the extent any direct or indirect subsidiaries of Homestead were limited liability companies, the LLC operating agreements of those companies, including ESH/Homestead Mezz 8 L.L.C., ESH/MSTX GP L.L.C., ESA P Portfolio MD Trust and ESH/TXGP L.L.C., among others, expressly imposed fiduciary duties of

loyalty and care on directors and officers similar to those of directors and officers of business corporations organized under the Delaware General Corporation Law.

**B.      The Blackstone Pre-LBO Entity Defendants.**

17.      **The Blackstone Group L.P.** (individually, and in its capacity as a successor-in-interest to and direct or indirect parent of entities and funds within its pre-IPO Real Estate or Corporate Private Equity operations, "Blackstone Group" or "Blackstone") was, upon information and belief, the direct or indirect owner and controlling entity of the nominal sellers in the LBO, a successor in interest to the Blackstone affiliates that were the direct or indirect owners or controlling entities of the nominal sellers in the LBO and an entity that derived a substantial benefit in connection with its IPO as a result of the LBO.

18.      From and after no later than approximately June 18, 2007, Blackstone Group was also the indirect owner of a substantial "rollover equity" interest in the post-LBO Debtors.  Blackstone Group is a publicly traded limited partnership organized under the laws of the State of Delaware.  As of March 31, 2011, according to recent SEC filings, Blackstone Group had managed assets of approximately $150 billion.  Blackstone Group's principal place of business is located at 345 Park Avenue, New York, New York 10154.

19.      At all times relevant to this Complaint, Blackstone's business was organized into four business segments:  Corporate Private Equity, Marketable Alternative Asset Management, Financial Advisory Services and Real Estate.  Upon information and belief, at all times relevant to this Complaint, Blackstone's pre-LBO investment in the Debtors was managed and controlled by a combination of the Senior Managing Directors named herein as Defendants in Blackstone's Real Estate and Corporate Private Equity business segments.  Prior to Blackstone's June 2007 IPO, Blackstone Group's entire business consisted of separately owned

9

predecessor entities controlled directly or indirectly by Blackstone's founders, Stephen Schwarzman and Peter Peterson, and Blackstone's Senior Managing Directors, which include certain of the individual Defendants identified below.

20.     On or around March 5, 2004, two Blackstone investment funds, Blackstone Real Estate Partners IV ("BREP IV") and Blackstone Capital Partners IV ("BCP IV" and, together with BREP IV, "BREP/BCP IV"), on their own behalves and on behalf of or through certain entities owned or controlled by BREP/BCP IV, purchased Extended Stay America, Inc.  Extended Stay America, Inc. was, at that time, a publicly traded corporation.  In connection with the acquisition, Extended Stay America, Inc. and, upon information and belief, other related entities, were "taken private" by Blackstone and were merged into certain other Blackstone entities, including, BHAC Capital and BHAC Capital Acquisition IV, Inc. Blackstone Senior Managing Directors Jonathan Gray and Michael Chae oversaw the 2004 Extended Stay America, Inc. transactions for BREP IV and BCP IV, respectively.

21.     At all times relevant to this Complaint, the Blackstone Real Estate Group managed and controlled around six general real estate opportunity funds.  Upon information and belief, BREP IV was such a fund at the time of the LBO, and was the primary fund within which the pre-LBO Debtors and their immediate controlling Blackstone entities (as described below) were organized.  After the LBO and Blackstone's IPO, certain Blackstone SEC filings reference the Blackstone entity that nominally owned Blackstone's "rollover equity" in the post-LBO Debtors as being a part of the "BREP IV" fund.

22.     No later than June 18, 2007, Blackstone Group and its affiliates reorganized their corporate structure in preparation for Blackstone's IPO (the "Blackstone IPO Restructuring").  The Blackstone IPO Restructuring had been planned months before it was

actually implemented.  Blackstone went public on June 21, 2007.  These initiatives had been started prior to the LBO's closing, and were completed within weeks of the LBO's closing.

23.    Upon information and belief, at all relevant times prior to the Blackstone IPO Restructuring, ESI and Homestead, and their respective subsidiaries and affiliates, including the pre-LBO Debtors, were nominally owned and controlled, directly or indirectly, by numerous Blackstone affiliated entities or funds, including BREP/BCP IV.  Upon information and belief, certain of Blackstone's Senior Managing Directors, including certain of the Blackstone Group Individual Defendants identified and described below, managed or controlled, for Blackstone's benefit, all aspects of Blackstone's pre-IPO and pre-LBO investment in the Debtors through one or more nominally owned and controlled Blackstone affiliated entities, funds and predecessors-in-interest, including BREP/BCP IV.

24.    In connection with the Blackstone IPO Restructuring and IPO, Blackstone carried out a series of other reorganization transactions.  Blackstone's then-existing owners "contributed" to Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P. and Blackstone Holdings V L.P. (collectively "Blackstone Holdings," identified as Defendants below) each of the operating entities included in Blackstone Group's historical combined financial statements.  Upon information and belief, BREP IV, BCP IV and any other funds or Blackstone affiliated entities that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to one or more of the Blackstone Holdings entities.

25.    In connection with the Blackstone IPO Restructuring, four additional entities were established as the immediate parent entities of Blackstone Holdings (collectively, the "Blackstone Disregarded Entities"):  Blackstone Holdings I/II GP Inc. (the immediate parent

of Blackstone Holdings I L.P. and Blackstone Holdings II L.P.), Blackstone Holdings III GP

L.L.C. (the immediate parent of Blackstone Holdings III L.P.), Blackstone Holdings IV GP L.P.

(the immediate parent of Blackstone Holdings IV L.P.) and Blackstone Holdings V GP L.P. (the

immediate parent of Blackstone Holdings V L.P.).

26.     The Blackstone Group L.P. owns 100% of the equity of the Blackstone

Disregarded Entities.  As of the time of the Blackstone IPO, The Blackstone Group L.P. owned

no less than approximately 22% of Blackstone Holdings through the Blackstone Disregarded

Entities.  As of the time of the Blackstone IPO, certain Senior Managing Directors, including

certain of the individual Defendants identified below, and others, owned no less than

approximately 78% of Blackstone Holdings.

27.     After the Blackstone IPO's completion, Blackstone's organizational

structure was as set forth in the chart attached hereto as Exhibit A and incorporated herein by

reference.  Upon information and belief, and at all times relevant to this Complaint, the BREP IV

and BCP IV funds and their respective affiliated entities were included in the "Operating

Entities" identified at the bottom of the post-IPO Blackstone organizational chart set forth in

Exhibit A.  Upon information and belief, the post-IPO Blackstone organizational chart set forth

in Exhibit A accurately and generally depicts Blackstone's organizational structure as of the date

of this Complaint.

28.     In essence, as a result of the Blackstone IPO Restructuring, Blackstone

was reorganized as a holding partnership.  Blackstone, through the Blackstone Disregarded

Entities, holds equity interests in Blackstone Holdings, which in turn owns all Blackstone

operating entities.  Through the Blackstone Disregarded Entities, Blackstone Group is the sole

general partner of all Blackstone Holdings partnerships and, accordingly, operates and controls

all business and affairs of Blackstone Holdings and, indirectly, all operating subsidiaries in the Blackstone business enterprise.

29.     After the Blackstone IPO Restructuring and the IPO, management fees, transaction fees, carried interest, incentive fees and other fees received by any subsidiary entities or funds of Blackstone Group and Blackstone Holdings, including BREP IV, BCP IV and BRE.ESH (as defined below – the Blackstone entity that nominally held Blackstone's so-called "rollover equity" in the post-LBO Debtor enterprise), inured primarily to Blackstone Group's benefit and to the benefit of various Blackstone Senior Managing Directors including, upon information and belief, the individual Senior Managing Directors identified as Defendants herein.

30.     At all times relevant to this Complaint, a "real estate investment committee" at the top of Blackstone's Real Estate Group business segment was responsible for reviewing, analyzing and approving all aspects of the LBO.  Upon information and belief, at all times relevant to this Complaint, that real estate investment committee consisted in substantial part of certain Senior Managing Directors in Blackstone's Real Estate and Private Equity operations, including the Senior Managing Directors named as Blackstone Group Individual Defendants herein.  As described below, those Senior Managing Directors, and the other named Blackstone Group Individual Defendants identified below, orchestrated the LBO for Blackstone's benefit.

31.     At all times relevant to this Complaint, Blackstone Group directly or indirectly controlled or participated in, through Blackstone Group Senior Managing Directors and other principals placed into positions of authority within the Debtors' corporate organization,

13

all major business decisions made by or on behalf of the Debtors, including the decision to enter into and implement the LBO.

32.     **Blackstone Holdings I L.P.** is a Delaware limited partnership and one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.   Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings I L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements.   Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings I L.P., a subsidiary of Blackstone.   Blackstone Holdings I L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

33.     **Blackstone Holdings II L.P.** is a Delaware limited partnership and one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.   Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings II L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements.   Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings II L.P., a subsidiary of

14

Blackstone.  Blackstone Holdings II L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

34.     **Blackstone Holdings III L.P.** is a Delaware limited partnership and one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.   Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings III L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements.  Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings III L.P., a subsidiary of Blackstone.  Blackstone Holdings III L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

35.     **Blackstone Holdings IV L.P.** is, upon information and belief, a limited partnership organized under the laws of Quebec or Canada, and is one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings IV L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements.  Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings IV L.P., a subsidiary of Blackstone.  Upon information

15

and belief, Blackstone Holdings IV L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

36.     **Blackstone Holdings V L.P.** is, upon information and belief, a limited partnership organized under the laws of Quebec or Canada, and is one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings V L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements.  Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings V L.P., a subsidiary of Blackstone.  Upon information and belief, Blackstone Holdings V L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

37.     **Blackstone Holdings I/II GP Inc.** is a Delaware corporation and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO.   Upon information and belief, Blackstone Holdings I/II GP Inc.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

38.     **Blackstone Holdings III GP L.L.C.** is a Delaware limited liability company and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO.   Upon information and belief, Blackstone Holdings III GP L.L.C.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

39.     **Blackstone Holdings IV GP L.P.** is a Delaware limited partnership and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO.   Upon information and belief, Blackstone Holdings IV GP L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

40.     **Blackstone Holdings V GP L.P.** is, upon information and belief, a limited partnership organized under the laws of Quebec or Canada, and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO.   Upon information and belief, Blackstone Holdings V GP L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

41.     **Blackstone Real Estate Partners IV L.P.** is, or was at all times relevant to this Complaint, a limited partnership organized under the laws of the State of Delaware. Blackstone Real Estate Partners IV L.P.'s principal place of business is, or was at all times relevant to this Complaint, located at 345 Park Avenue, New York, New York 10154.

42.     **Blackstone Capital Partners IV L.P.** is, or was at all times relevant to this Complaint, a limited partnership organized under the laws of the State of Delaware. Blackstone Real Estate Partners IV L.P.'s principal place of business is, or was at all times relevant to this Complaint, located at 345 Park Avenue, New York, New York 10154.

43.     **BHAC IV, LLC** ("BHAC IV") was a seller in the LBO.  At the time of the LBO, BHAC IV was an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group.  BHAC IV received distributions in connection with the LBO as a nominal seller in the LBO.  BHAC IV is a limited liability company organized under the laws of the State of Delaware and remains an affiliate of Blackstone Group. Upon information and belief, BHAC

17

IV is a shell entity that conducts no operations.  BHAC IV's principal place of business is located at 345 Park Avenue, New York, New York 10154.

44.  **BRE/HV Holdings LLC** ("BRE.HV") was a seller in the LBO.  At the time of the LBO, BRE.HV was an affiliate of Blackstone Group.  BRE.HV received distributions in connection with the LBO as a nominal seller in the LBO.  BRE.HV is a limited liability company organized under the laws of the State of Delaware and was and remains an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group.  Upon information and belief, BRE.HV is a shell entity that conducts no operations.  BRE.HV's principal place of business is located at 345 Park Avenue, New York, New York 10154.

45.  **Blackstone Hospitality Acquisitions, LLC** ("Blackstone Hospitality") was an affiliate of the sellers in the LBO.  Although it was not itself a "seller" in connection with the LBO, Blackstone Hospitality received significant distributions of cash proceeds in connection with the LBO.  Blackstone Hospitality is a limited liability company organized under the laws of the State of Delaware.  Upon information and belief, Blackstone Hospitality is a shell entity that conducts no operations, but rather is (or at least was) used by Blackstone Group in connection with certain acquisition activities carried out by Blackstone Group in the hospitality industry.  Upon information and belief, Blackstone Hospitality was and remains an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group.  Blackstone Hospitality's principal place of business is located at 102 Townsend Dr., Weimar, TX 78962.

46.  **Prime Hospitality, LLC** ("Prime") was an affiliate of the sellers in the LBO and Blackstone Group.  Prime received distributions in connection with the LBO and was, upon information and belief, a seller of certain assets in connection with the LBO.  Prime is a limited liability company organized under the laws of the State of Delaware.  Upon information

and belief, Blackstone Hospitality was and remains an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group. Prime's principal place of business is located at 700 Route 46 East, Fairfield, New Jersey 07004 or 16850 Bear Valley Road, Victorville, California 92395.

47.     BHAC IV, BRE.HV, Blackstone Group, Blackstone Holdings, the Blackstone Disregarded Entities, BREP IV, BCP IV, Blackstone Hospitality and Prime are sometimes collectively referred to in this Complaint as the "Blackstone Pre-LBO Entity Defendants." BHAC IV and BRE.HV are sometimes referred to herein as the "Sellers." At all times relevant to the Complaint, BHAC IV, BRE.HV, Blackstone Hospitality and Prime were owned, controlled or dominated in all respects by Blackstone Group or Blackstone Group predecessors in interest and affiliates, and all business dealings by each of those entities were conducted solely for the benefit of Blackstone Group and to the detriment of the Debtors and their creditors.

## C.     The LBO Buyer Entity Defendants.

48.     **DL-DW Holdings, LLC** ("DL-DW" or "Buyer") was the nominal buyer of the stock of BHAC IV and BRE.HV in the LBO. DL-DW is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 460 Park Avenue, Suite 1300, New York, New York 10022. DL-DW was formed for the purpose of carrying out the LBO and, at all times relevant to this Complaint, was owned or controlled by David Lichtenstein, a Defendant herein. Following the closing of the LBO, DL-DW was the sole direct member of Homestead, and exercised at least indirect ownership or control over BHAC Capital, the majority shareholder of ESI, and ESI.

49. **Lightstone Holdings, LLC** ("Lightstone Holdings") was a member of DL-DW, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Lightstone Holdings is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 460 Park Avenue, Suite 1300, New York, New York 10022. Lightstone Holdings was, at all time relevant to this Complaint, indirectly owned or controlled by Lichtenstein.

50. **The Lightstone Group, LLC** ("Lightstone Group") was the direct or indirect corporate parent or grandparent of DL-DW, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Lightstone Group is a limited liability company organized under the laws of the State of New Jersey with its principal place of business at 460 Park Avenue, Suite 1300, New York, New York 10022.  Lightstone Group was, at all times relevant to this Complaint, at least indirectly owned or controlled by Lichtenstein.  Lightstone Group and Lightstone Holdings were, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Lightstone Group" of investors, which also included Prime Group Realty Trust, a Maryland real estate investment trust, Lichtenstein, certain members of Lichtenstein's family and certain investment funds that were, upon information and belief, owned or controlled by Lichtenstein.

51. **PGRT ESH Inc.** ("PGRT") was a member of BHAC Capital, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  PGRT is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 330 W Wabash Ave # 2800, Chicago, Illinois 60611.  Upon information and belief, PGRT was,

at all times relevant to this Complaint, owned or controlled, directly or indirectly, by Lichtenstein.

52.     **Lightstone Commercial Management** ("Lightstone Commercial") was an affiliate of The Lightstone Group and Lightstone Holdings.  Lightstone Commercial is a limited liability company organized under the laws of the State of New Jersey with its principal place of business, upon information and belief, at 460 Park Avenue, Suite 1300, New York, New York 10022.  Lightstone Commercial was, at all times relevant to this Complaint, at least indirectly owned or controlled by Lichtenstein.  Lightstone Holdings, Lightstone Group, PGRT and Lightstone Commercial are collectively referred to in this Complaint as "Lightstone."

53.     **Arbor ESH II LLC** ("Arbor") was a member of BHAC Capital, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Arbor is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 333 Earle Ovington Boulevard, Uniondale, New York 11553.  Upon information and belief, at all times relevant to this Complaint, Arbor was an affiliate of Ivan Kaufman.  Arbor was, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Arbor Group," which included various Arbor entities owned or controlled directly or indirectly by Mr. Kaufman, and also included Joseph Tabak, Princeton (as defined below), Joseph Chetrit, Atmar (as defined below), Glida (as defined below) and Ron Invest (as defined below).

54.     Upon information and belief, Arbor was, at all time relevant to this Complaint, a direct or indirect wholly-owned subsidiary of Arbor Realty Limited Partnership, which was itself a wholly-owned operating subsidiary of Arbor Realty Trust, Inc., a publicly traded real estate investment trust with managed assets well in excess of $1.5 billion according to

its recent SEC filings.  Upon information and belief, Arbor is, and was, at all times relevant to this Complaint, an affiliate of Arbor Commercial Mortgage, LLC.  Arbor and its affiliates had the right to appoint one or more Arbor designees to the consolidated board of directors for the "Extended Stay Hotels family of companies."

55.    **Arbor Commercial Mortgage, LLC** ("Arbor Commercial Mortgage") was, and is, the manager and advisor for Arbor Realty Trust, Inc., and performs loan originating, underwriting and other related services on behalf of Arbor Realty Limited Partnership.  Upon information and belief, at all times relevant to this Complaint, Arbor Commercial Mortgage was an affiliate of Ivan Kaufman and Arbor.  Mr. Kaufman, Arbor and their affiliates were heavily involved in all aspects of the LBO, including, without limitation, arranging for the financing commitment made by the lenders in the LBO to Lichtenstein on or around May 1, 2007.  Arbor Commercial Mortgage is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 333 Earle Ovington Blvd., Suite 900, Uniondale, New York 11553.

56.    Upon information and belief, at all times relevant to this Complaint, Ivan Kaufman was the President and CEO of Arbor Realty Trust, Inc., the Chairman and CEO of Arbor Commercial Mortgage, LLC and owned, either individually or indirectly through various entities he wholly owns, no less than approximately 90% of Arbor Commercial Mortgage, LLC. Mr. Ivan Kaufman attended and participated in the board of directors meetings held on November 13, 2008 and January 29, 2009, among others, and also attended and participated in certain executive sessions of board of directors meetings of the Debtors.  Upon information and belief, Mr. Kaufman's attendance at those meetings was to ensure that improper equity

distributions would continue to be made from the Debtors, either directly or through other entities, to the Arbor entities that Mr. Kaufman owns or controls, as described herein.

57. **Princeton ESH LLC** ("Princeton") was a member of DL-DW, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint. Princeton is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 375 Park Avenue Suite 3401, New York, New York 10152. Princeton was, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Arbor Group" of investors, which included various Arbor entities owned or controlled directly or indirectly by Mr. Kaufman, and also included Joseph Tabak, Arbor (as defined below), Joseph Chetrit, Atmar (as defined below), Glida (as defined below) and Ron Invest (as defined below).

58. **Atmar Associates, LLC** ("Atmar") was a member of DL-DW, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint. Atmar was, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Arbor Group" of investors, which included various Arbor entities owned or controlled directly or indirectly by Mr. Kaufman, and also included Joseph Tabak, Arbor, Joseph Chetrit, Glida (as defined below) and Ron Invest (as defined below). Atmar is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 404 Fifth Avenue, 4th Floor New York, New York 10018. Upon information and belief, Atmar is indirectly owned or controlled by Joseph Chetrit, or members of Chetrit's family.

59. **Glida One LLC** ("Glida") was a member of BHAC Capital, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead

following the LBO closing at all times relevant to this Complaint.  Glida was, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Arbor Group" of investors, which included various Arbor entities owned or controlled directly or indirectly by Mr. Kaufman, and also included Joseph Tabak, Arbor, Joseph Chetrit, Atmar and Ron Invest (as defined below).  Glida is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 404 Fifth Avenue, 4th Floor, New York, New York 10018.  Glida was, at all times relevant to this Complaint, owned or controlled, directly or indirectly by Chetrit, or members of the Chetrit family.

60. **Ron Invest LLC** ("Ron Invest") was a member of BHAC Capital, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Ron Invest was, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Arbor Group" of investors, which included various Arbor entities owned or controlled directly or indirectly by Mr. Kaufman, and also included Joseph Tabak, Arbor, Joseph Chetrit, Atmar and Glida.  Ron Invest is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 404 Fifth Avenue, Fourth Floor, New York, New York 10018.  Upon information and belief, Ron Invest is indirectly owned or controlled by Joseph Chetrit, or members of Chetrit's family.

61. **Polar Extended Stay (USA) L.P.** ("Polar") was a member of BHAC Capital, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Polar is a limited partnership company organized under the laws of the State of Delaware with its principal place

of business at 21 Haarbaah St., Tel Aviv, Israel 64739.   Polar's general partner is Poland International Trading Ltd.

62.     **BHAC Capital IV, L.L.C.** ("BHAC Capital"), was the majority shareholder of ESI (as defined below), and held, at all times relevant to this Complaint for the period after the LBO's closing, no less than approximately 99% of the equity of ESI.   BHAC Capital is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 326 Third Street, Lakewood New Jersey 08701.

63.     **BRE/ESH Holdings, LLC** ("BRE.ESH") was a member of DL-DW, and exercised at least indirect ownership, control or influence, for Blackstone Group's benefit, over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.   BRE.ESH is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 345 Park Avenue, New York, New York 10154. At all times relevant to this Complaint, BRE/ESH was a directly or indirectly owned affiliate of Blackstone Group.   Upon information and belief, BRE.ESH is a shell entity that conducts no operations.   BRE.ESH was the nominal holder of the $200 Million "rollover equity" interest received by Blackstone Group in connection with the LBO, as described below.

64.     DL-DW, Princeton, Atmar, Lightstone Holdings, BRE.ESH, Lightstone Group, Lightstone Commercial, BHAC Capital, Arbor, Arbor Commercial Mortgage, Polar, Glida, PGRT and Ron Invest are sometimes collectively referred to in this Complaint as the "LBO Buyer Entity Defendants."

**D.      The Individual Director and Officer Defendants.**

      **1.      The Post-LBO Individual Defendants.**

      65.      **David Lichtenstein** ("Lichtenstein") was, at all times relevant to this Complaint, the Chairman and Chief Executive Officer of all or substantially all of the Lightstone entities, and held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" which, according to the minutes of consolidated Meetings of the Board of Directors of "Extended Stay Hotels family of companies," included DL-DW, BHAC Capital, Homestead (a Debtor) and ESI (also a Debtor) and each of their direct and indirect subsidiaries.  All final decision-making authority for those entities and, indeed, for all of the Debtors, resided with and was exercised by the board of directors of the "Extended Stay Hotels family of companies."

      66.      Lichtenstein was the Chairman of the Board of Directors and the President and CEO of the entities within the "Extended Stay Hotels family of companies."  As Chairman, CEO and President, Lichtenstein had general supervisory authority over the daily business operations and affairs of those companies and was empowered to given counsel and advice to the board of directors on all subjects concerning the welfare of those companies and the conduct of their business.

      67.      Lichtenstein was also a director, Chairman of the board of directors, CEO and President of 65 of the Debtor entities and affiliates listed above.  Lichtenstein was an insider director and President of all mortgage borrower Debtors, mezzanine borrower Debtors and operating lessee Debtors at all relevant times following the closing of the LBO.  Lichtenstein authorized all aspects of the LBO for those Debtors and others.

68.     Lichtenstein regularly attended and, in most cases, chaired all meetings of the "Extended Stay Hotels family of companies'" board of directors as a director, the Chairman, President and CEO of those companies, including, without limitation, board meetings that were held on the following dates, among others:  November 15, 2007, February 14, 2008, May 15, 2008, August 14, 2008, November 13, 2008, December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009, February 25, 2009, March 17, 2009, April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009.  All board meetings identified above were conducted in New York City to the extent the meetings were in person. Certain meetings were conducted via telephone.  At the board meetings identified above, Lichtenstein was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

69.     Lichtenstein led the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors.  In light of that status, and as an attendee at relevant board meetings from 2007 through 2009 identified above, Lichtenstein regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Lichtenstein was aware of the Debtors' financial and other difficulties at all relevant times.  Lichtenstein also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders, including affiliates of ESI and Homestead that were owned or controlled by

Lichtenstein, as described herein.   As a high-ranking member of senior management, Lichtenstein knew or should have known of all relevant, material facts and events alleged herein.

70.     Lichtenstein is a resident of the State of New Jersey and may be served with process at the following address:  20 Autumn Road, Lakewood, New Jersey 08701-1619.

71.     **Bruno de Vinck** ("de Vinck") was, at all times relevant to this Complaint, Senior Vice President of Special Projects of one or more of the Lightstone entities identified herein, and held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" which, according to the Minutes of consolidated Meetings of the Board of Directors of "Extended Stay Hotels family of companies," included DL-DW, BHAC Capital, Homestead (a Debtor) and ESI (also a Debtor).  All final decision-making authority for those entities and, indeed, for all of the Debtors, resided with and was exercised by the board of directors of the "Extended Stay Hotels family of companies."

72.     De Vinck regularly attended meetings of the "Extended Stay Hotels family of companies'" board of directors as a director, including, without limitation, board meetings that were held on the following dates, among others:  November 15, 2007, February 14, 2008, May 15, 2008, August 14, 2008, November 13, 2008, December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009, February 25, 2009, March 17, 2009, April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009 (by proxy given to Joseph Teichman).  De Vinck sometimes also acted as the Secretary for those meetings, recorded the minutes of such meetings and was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

73.    De Vinck was a member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors. In light of that status, and as an attendee at relevant board meetings from 2007 through 2009 identified above, de Vinck regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, de Vinck was aware of the Debtors' financial and other difficulties at all relevant times.  De Vinck also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders as described herein.   As a high-ranking member of senior management, de Vinck knew or should have known of all relevant, material facts and events alleged herein.

74.    De Vinck is a resident of the State of New Jersey and may be served with process at the following address:  128 S. Central Avenue, Ramsey, New Jersey 07446-2408.

75.    **Peyton "Chip" Owen, Jr.** ("Owen") was, at all times relevant to this Complaint, President and Chief Operating Officer of one or more of the Lightstone entities. From and after no later than November 15, 2007, Owen held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" identified above, including, without limitation, Homestead and ESI.

76.    Owen regularly attended meetings of the "Extended Stay Hotels family of companies'" board of directors as a director, including, without limitation, board meetings that were held on the following dates, among others:  November 15, 2007 (where he was formally appointed to the board by  Lichtenstein), February 14, 2008, May 15, 2008, August 14, 2008,

November 13, 2008, December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009, February 25, 2009, March 17, 2009, April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009.  At those meetings, Owen was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

77.     Owen was another member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors.  In light of that status, and as an attendee at relevant board meetings from 2007 through 2009 identified above, Owen regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Owen was aware of the Debtors' financial and other difficulties at all relevant times.  Owen also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders as described herein.   As a high-ranking member of senior management, Owen knew or should have known of all relevant, material facts and events alleged herein.

78.     Owen is a resident of the State of Illinois and may be served with process at the following address:  1150 W. Keswick Lane, Lake Forest, Illinois 60045-1132.

79.     **Guy R. Milone, Jr.** ("Milone") held, from and after no later than May 15, 2008, interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" identified above, including, without limitation, Homestead and ESI.  Milone was appointed to his director position to replace Joseph Martello as a designee of Arbor Realty Trust,

Inc. and Arbor to the board.  Upon information and belief, at all times relevant to this Complaint, Milone was also a General Counsel of Arbor Realty Trust, Inc., an indirect owner of equity in one or more of the Debtors.

80.     Milone regularly attended meetings of the "Extended Stay Hotels family of companies'" board of directors as a director, including, without limitation, board meetings that were held on the following dates, among others:  May 15, 2008, August 14, 2008, November 13, 2008, December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009, February 25, 2009, April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009.  At those meetings, Milone was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

81.     From and after no later than May 15, 2008, Milone was a member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above.  In light of that status, and as an attendee at relevant board meetings from 2008 through 2009 identified above, Milone regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Milone was aware of the Debtors' financial and other difficulties at all relevant times following his appointment to the board.  Milone also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders as described herein, including with Arbor entities and affiliates with which Milone was affiliated at the time.  As a

high-ranking member of senior management, Milone knew or should have known of all relevant, material facts and events alleged herein that occurred on or after May 15, 2008.

82.     Milone is a resident of the State of New York and may be served with process at the following address:  29 Tremont Street, Garden City, New York 11530-6413.

83.     **Joseph Chetrit** ("Chetrit") was, at all times relevant to this Complaint, upon information and belief, a direct or indirect owner or member of senior management of Atmar, Glida and Ron Invest, and certain entities affiliated with each of those entities.  Chetrit held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" at times relevant to this Complaint, including Homestead and ESI.

84.     Chetrit regularly attended meetings of the "Extended Stay Hotels family of companies'" board of directors as a director or, in some cases, as an "invited guest" (although he was a director at all relevant times) including, without limitation, board meetings that were held on the following dates, among others:  November 13, 2008 (as an "invited guest"), December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009 (as an "invited guest," despite his board position), February 25, 2009, March 17, 2009 (by proxy given to Teichman), April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009.  At those meetings, Chetrit was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

85.     During his tenure as a member of the board of directors, Chetrit was a member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors.  In light of that status, and as an attendee at

relevant board meetings from 2008 through 2009 identified above, or in his capacity as a substantial indirect holder of preferred equity in BHAC Capital, Chetrit regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Chetrit was aware of the Debtors' financial and other difficulties at all relevant times following his appointment to the board, at the latest.  Chetrit also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and other improper transactions with, insiders as described herein, including entities owned or controlled by him.

86.     As a high-ranking member of senior management and an insider, Chetrit knew or should have known of all relevant, material facts and events alleged herein.

87.     Chetrit is a resident of the State of New York and may be served with process at the following address:  55 East 74th Street, New York, New York 10021-2734.

88.     **Joseph Teichman** ("Teichman") held, from and after no later than May 15, 2008, interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" identified above, including, without limitation, Homestead and ESI.  At times relevant to this Complaint, Teichman was also the Secretary and General Counsel of 65 of the Debtor entities above, including both Homestead and ESI.  Teichman was an insider director of numerous mortgage borrower Debtors, mezzanine borrower Debtors and operating lessee Debtors at all relevant times following the closing of the LBO.  At all times relevant to this Complaint, Teichman was also the Senior Corporate Counsel for all or substantially all of the Lightstone entities identified above.

89.     Teichman regularly attended meetings of the "Extended Stay Hotels family of companies'" board of directors as either a director or high-ranking senior officer of

33

those companies, including, without limitation, board meetings that were held on the following dates, among others:  November 15, 2007, February 14, 2008, May 15, 2008, August 14, 2008, November 13, 2008, December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009, February 25, 2009, March 17, 2009, April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009.  At all meetings occurring from and after no later than May 15, 2008, Teichman was called upon to, and did in fact, vote as a director regarding material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.  At all board meetings occurring prior to May 15, 2008, Teichman attended such meetings and was called upon to, and did in fact, make recommendations to the board regarding all material facts and events described herein.

90.     At all times relevant to this Complaint, Teichman was a member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors.  In light of that status, and as an attendee at relevant board meetings from 2007 through 2009 identified above, Teichman regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Teichman was aware of the Debtors' financial and other difficulties at all relevant times.  Teichman also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and other improper transactions with, insiders as described herein, including Lightstone entities for which he was acting as a high-ranking officer.  As a high-ranking member of senior management of the Debtors, Teichman knew or should have known of all relevant, material facts and events alleged herein.

34

91.     Teichman is a resident of the State of New Jersey and may be served with process at the following address:  515 Ridge Ct., Lakewood, New Jersey 08701-1544.

92.     **Joseph Martello** ("Martello") held, from June 11, 2007 until, upon information and belief, approximately May of 2008, interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" identified above, including, without limitation, Homestead and ESI.  During his tenure as a director of the "Extended Stay Hotels family of companies," Martello was a designee of Arbor Realty Trust, Inc. and Arbor to the board and was an affiliate or insider of one or more entities related to Arbor, including those described above.  Martello resigned from the board of directors for the "Extended Stay Hotels family of companies" on or around May 15, 2008, after which time Milone occupied one of the "Arbor seats" on that board.

93.     During his tenure as a director, Martello attended meetings of the "Extended Stay Hotels family of companies'" board of directors that were held on the following dates, among others:  November 15, 2007 and February 14, 2008.  At those meetings, Martello was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

94.     During his tenure as a director, Martello was a member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors.  In light of that status, and as an attendee at relevant board meetings during 2007 and 2008 identified above, Martello regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Martello was aware of the Debtors' financial and

other difficulties at all relevant times during his tenure as a member of the board.  Martello also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders as described herein, including with Arbor related entities with which he was affiliated at the time.  As a high-ranking member of senior management, Martello knew or should have known of all relevant, material facts and events alleged herein that occurred prior to around May of 2008.

95.    Martello is a resident of the State of New York and may be served with process at the following address:  430 East 58th Street, New York, New York 10022-2330.

96.    **F. Joseph Rogers** ("Rogers") was a high-ranking member of senior management of the "Extended Stay Hotels family of companies."    Rogers was the Assistant Secretary or Vice President of 55 of the Debtor entities listed above.  Rogers was therefore a high-ranking officer of all or substantially all of the mortgage borrower Debtors, the mezzanine borrower Debtors and the operating lessee Debtors.  Rogers was also the Executive Vice President of Finance and Accounting of the "Extended Stay Hotels family of companies," including Homestead and ESI.

97.    Rogers regularly attended board of directors meetings for the "Extended Stay Hotels family of companies," including the following meetings, among others:  November 15, 2007, February 14, 2008, May 15, 2008 and August 14, 2008.  At one or more of those meetings, Rogers received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Rogers was aware of the Debtors' financial and other difficulties at all relevant times. during his tenure as a high-ranking officer of one or more of the Debtors.  Rogers likewise was aware of, but did nothing to attempt to stop, improper post-LBO dividends and other

distributions to insiders, and other improper transactions with insiders, as described herein. As a high-ranking member of senior management, Rogers knew or should have known of all relevant, material facts and events alleged herein.

98.     Rogers is a resident of the State of South Carolina and may be served with process at the following address: 405 Carleton Circle, Spartanburg, South Carolina 29301.

99.     **David Kim** ("Kim") was a high-ranking member of senior management of the "Extended Stay Hotels family of companies." From and after no later than approximately August of 2007, Kim was the Executive Vice President and Chief Investment Officer of the "Extended Stay Hotels family of companies," including Homestead and ESI. Kim is currently a Managing Director in Blackstone Group's Real Estate Group. Upon information and belief, at all times relevant to this Complaint, Kim held the same or similar position with Blackstone Group.

100.     Kim regularly attended board of directors meetings for the "Extended Stay Hotels family of companies," including the following meetings, among others: November 15, 2007, February 14, 2008, May 15, 2008, August 14, 2008, November 13, 2008. At one or more of those meetings, Kim delivered detailed reports of management to the board regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors. Thus, Kim was aware of the Debtors' financial and other difficulties at all relevant times during his tenure as a high-ranking officer of one or more of the Debtors. Kim likewise was aware of, but did nothing to attempt to stop, improper post-LBO dividends and other distributions to insiders, and other improper transactions with insiders, as described herein. As a high-ranking member of senior management, Kim knew or should have known of all relevant, material facts and events alleged herein.

101.    Kim is a resident of Hong Kong, Peoples' Republic of China and may be served with process at the following address:  Suite 901, Two International Finance Centre, 8 Finance Street, Central, Hong Kong, Peoples' Republic of China.

102.    **Gary DeLapp** ("DeLapp") was a high-ranking member of senior management of the "Extended Stay Hotels family of companies" at all times relevant to this Complaint.  Prior to the LBO, DeLapp was the President and CEO of ESI.  After the LBO, DeLapp was the President of the so-called "Extended Stay Hotels family of companies," including Homestead and ESI.   DeLapp also held officer-level positions with several other post-LBO Debtor entities and affiliates at all times relevant to this Complaint.

103.    DeLapp regularly attended board of directors meetings for the "Extended Stay Hotels family of companies," including the following meetings, among others:  November 15, 2007, February 14, 2008, May 15, 2008, August 14, 2008 and November 13, 2008.  At one or more of those meetings, DeLapp received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, DeLapp was aware of the Debtors' financial and other difficulties at all relevant times during his tenure as a high-ranking officer of one or more of the Debtors.  DeLapp likewise was aware of, but did nothing to attempt to stop, improper post-LBO dividends and other distributions to insiders, as described herein.  As a high-ranking member of senior management, DeLapp knew or should have known of all relevant, material facts and events alleged herein.

104.    DeLapp is a resident of the State of South Carolina and may be served with process at the following address:  409 Sweetbay Terrace, Spartanburg, South Carolina 29306-6682.

105.    Lichtenstein, de Vinck, Owen, Milone, Chetrit, Teichman, Martello, Rogers, Kim and DeLapp are sometimes collectively referred to in this Complaint as the "LBO Buyer Individual Defendants."

### 2.    Blackstone Individual Defendants.

106.    **Jonathan D. Gray** ("Gray") held, at all relevant times prior to and at the LBO's closing, the following senior management positions within the pre-LBO Debtors' and Blackstone Pre-LBO Entity Defendants' corporate organization: (a) Senior Managing Director and Vice President of BRE.HV, a Seller, (b) Senior Managing Director and Vice President of BHAC IV, a Seller, (c) Senior Managing Director and Vice President of Blackstone Hospitality, (d) Senior Managing Director, President and a member of the board of directors of pre-LBO ESI, (e) Chairman of the Board and CEO of pre-LBO BHAC Capital, which was the wholly-owned subsidiary of BHAC IV, (f) Senior Managing Director and Vice President of Blackstone Real Estate Acquisitions IV, L.L.C., a Blackstone affiliate that managed pre-LBO HVM (as defined below), and (g) senior management or officer positions for no less than approximately 57 other separate Seller subsidiaries in the pre-LBO Debtors' corporate structure, including, without limitation, all or substantially all of the pre-LBO Debtor mezzanine borrowers.  Subsequent to the LBO's closing, Gray was also the Senior Managing Director and Vice President of BRE.ESH, a member of DL-DW and nominal holder of the $200 Million "rollover equity" interest received by Blackstone Group in connection with the LBO.

107.    During that same period of time, Gray was a Senior Managing Director, a high-ranking member of management of Blackstone Group and acted for Blackstone's benefit, as opposed to the benefit of the Debtor entities to which he owed fiduciary and other obligations. Currently, Gray is a Senior Managing Director and Co-Chairperson of Blackstone Group's Real

Estate Group.  Upon information and belief, at all times relevant to this Complaint, Gray held the same or similar positions with Blackstone Group.

108.    By virtue of his high-ranking positions within the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Gray was called upon to, and did in fact, exercise management authority for those entities.  Indeed, as a high-ranking member of management and officer authorized to act on behalf of the pre-LBO Debtors and the Blackstone Pre-LBO Entity Defendants, Gray executed certain agreements and other documents in connection with the LBO on behalf of one or more of the Blackstone Pre-LBO Entity Defendants including, without limitation, Blackstone Hospitality.  Gray was also designated as one of the persons whose "knowledge" could be charged to the Sellers under the LBO documents.  Gray also approved and authorized the LBO on behalf of pre-LBO ESI.  In certain press releases issued by Blackstone Group at or around the time the LBO closed, Gray was lauded for his lead role in consummating the transaction on behalf of the pre-LBO Debtors and Blackstone Group.

109.    Gray is a resident of the State of New York and may be served with process at the following address:  333 East 57th Street, Apt. 8A , New York, New York 10022-2422.

110.    **William Stein** ("Stein") held, at all relevant times prior to and at the LBO's closing, the following senior management positions within the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate organization: (a) Managing Director and Vice President of BRE.HV, a Seller, (b) Managing Director and Vice President of BHAC IV, a Seller, (c) a Senior Managing Director and Vice President of pre-LBO ESI, (d) Managing Director and Vice President for Blackstone Real Estate Acquisitions IV, L.L.C., a Blackstone affiliate that

managed pre-LBO HVM, (e) Managing Director and Vice President of pre-LBO Homestead, and (f) senior management or officer positions with no less than approximately 53 other separate Seller subsidiaries in the pre-LBO Debtors' corporate structure, including, without limitation, all or substantially all of the pre-LBO Debtor mezzanine borrowers.  During that same period of time, Stein was an officer or employee of Blackstone Group and acted for Blackstone Group's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations.  Currently, Stein is a Senior Managing Director of Blackstone Group's Real Estate Group.  Upon information and belief, at all times relevant to this Complaint, Stein held the same or similar positions with Blackstone Group.

111.    By virtue of his high-ranking positions within the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Stein was called upon to, and did in fact, exercise management authority for those entities.  Indeed, as a high-ranking member of management and officer authorized to act on behalf of the pre-LBO Debtor or Seller entities, Stein executed certain agreements and other documents in connection with the LBO on behalf of one or more of the Sellers.  Stein was also designated as one of the persons whose "knowledge" could be charged to the Sellers under the LBO documents.  In connection with the LBO, Stein was responsible for, among other things, coordinating the redemption of common shares held by certain shareholders of pre-LBO ESI and addressing, for Blackstone and the Sellers, post-LBO disputes that arose with Lichtenstein regarding certain post-closing purchase price adjustments.

112.    Like Gray, in certain press releases issued by Blackstone Group at or around the time the LBO closed, Stein was lauded for his lead role in consummating the transaction on behalf of the pre-LBO Debtors and Blackstone Group.  After the LBO closed, Stein attended board of directors meetings for the "Extended Stay Hotels family of companies"

described above on behalf of the Blackstone Group, including, without limitation, the board meeting conducted on February 14, 2008.  The minutes of certain board of directors' meetings designate Stein as an "officer" of the "Extended Stay Hotels family of companies," which included Homestead and ESI, among others.

113.    Stein is a resident of the State of New York and may be served with process at the following address: 4 Rolling Hills Lane, Harrison, New York 10528.

114.    **Michael Chae** ("Chae") was, at all relevant times prior to and at the LBO's closing, a high-ranking officer of one or more of the pre-LBO Debtor entities including, without limitation, (a) a member of the Board of Directors of pre-LBO ESI, (b) the President of pre-LBO BHAC Capital, and (c) an officer of pre-LBO ESA Spartanburg LLC, and possibly other pre-LBO Debtors.  During that same period of time, Chae was an officer or employee of Blackstone Group and acted for Blackstone's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations.  Currently, Chae is a Senior Managing Director of Blackstone Group's Private Equity Group.  Upon information and belief, at all times relevant to this Complaint, Chae held the same or similar positions with Blackstone Group.  Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Chae was called upon to, and did in fact, exercise management authority for those entities.  Chae also approved and authorized the LBO on behalf of pre-LBO ESI.

115.    Chae is a resident of the State of New York and may be served with process at the following address:  1111 Park Avenue, New York, New York 10128-1234.

116.    **Robert L. Friedman** ("Friedman") was, at all relevant times prior to and at the LBO's closing, a high-ranking officer of one or more of the pre-LBO Debtor entities

including, without limitation, (a) a member of the Board of Directors of pre-LBO ESI, (b) a Senior Managing Director and Vice President of pre-LBO BHAC Capital, and (c) an officer or director of pre-LBO ESA Spartanburg LLC, and possibly other pre-LBO Debtors. During that same period of time, Friedman was an officer or employee of Blackstone Group and certain Blackstone Group affiliates, including Blackstone Asset Management, LLC, and acted for Blackstone's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations. Currently, Friedman is a Senior Managing Director of Blackstone Group's Legal and Compliance Group. Upon information and belief, at all times relevant to this Complaint, Friedman held the same or similar positions with Blackstone Group. Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Friedman was called upon to, and did in fact, exercise management authority for those entities. Friedman also approved and authorized the LBO on behalf of pre-LBO ESI.

117.    Friedman is a resident of the State of New York and may be served with process at the following address:  68 Island Drive, Rye, New York 10580.

118.    **Thomas Burdi** ("Burdi") was, at all relevant times prior to and at the LBO's closing, Chief Financial Officer or Executive Vice President of Finance of the "Extended Stay Hotels," which included, upon information and belief, pre-LBO ESI, and possibly other pre-LBO Debtor entities. Upon information and belief, during that same period of time, Burdi was an officer or employee of Blackstone Group and acted for Blackstone's benefit, as opposed to the benefit of ESI and other pre-LBO Debtors to which he owed fiduciary and other obligations. Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Burdi was

43

called upon to, and did in fact, exercise management authority for those entities.  Burdi was designated as one of the persons whose "knowledge" could be charged to the Sellers under the LBO documents.

119.    Burdi is a resident of the State of New Jersey and may be served with process at the following address:  P.O. Box 423, Ridgewood, New Jersey 07451-0423.

120.    **Gary Sumers** ("Sumers") was, at all relevant times prior to and at the LBO's closing, a high ranking officer and member of senior management of 53 of the Seller subsidiary Debtor entities, which included, upon information and belief, all or substantially all of the pre-LBO Debtor mezzanine borrower entities, and other pre-LBO Debtor entities.  Sumers currently is a Senior Managing Director of Blackstone Group's Real Estate Group.  Upon information and belief, prior to the LBO at all times relevant to this Complaint, Sumers held the same or similar positions within Blackstone Group's corporate organization and acted for Blackstone's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations.  Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' corporate structure, Sumers was called upon to, and did in fact, exercise management authority for those pre-LBO Debtor entities and for one or more of the Blackstone Pre-LBO Entity Defendants.

121.    Sumers is a resident of the State of New York and may be served with process at the following address 888 Park Avenue- Apt 11 C, New York, New York 10075-0282.

122.    **Dennis J. McDonagh** ("McDonagh") was, at all relevant times prior to and at the LBO's closing, a high-ranking officer of one or more of the entities within the Debtors' pre-LBO corporate organization, including, without limitation, (a) Senior Managing Director, Vice President, Secretary and Treasurer of pre-LBO ESI, (b) Senior Managing

Director, Vice President, Secretary and Treasurer of Blackstone Real Estate Acquisitions IV, L.L.C., and (c) an officer, director or manager of BRE.HV, a nominal Seller.  During that same period of time, McDonagh was an officer or employee of Blackstone Group and acted for Blackstone Group's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations.  Currently, McDonagh is a Senior Managing Director in Blackstone Group's Real Estate Group.  Upon information and belief, at all times relevant to this Complaint, McDonagh held the same or similar positions with Blackstone Group.  Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, McDonagh was called upon to, and did in fact, exercise management authority for those entities.  McDonagh was designated as one of the persons whose "knowledge" could be charged to the Sellers under the LBO documents.

123.    McDonagh is a resident of the State of New York and may be served with process at the following address:  138 East Shore Road, Halsite, New York 11743-1140.

124.    **Alan Miyasaki** ("Miyasaki") was, upon information and belief, at all relevant times prior to and at the LBO's closing, a high-ranking officer of one or more of the entities within the Debtors' pre-LBO corporate organization.  Miyasaki was the Vice President and Assistant Secretary for pre-LBO BHAC Capital and several other pre-LBO Debtor entities.  During that same period of time,  Miyasaki was, upon information and belief, an officer or employee of Blackstone Group and acted for Blackstone Group's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations.

125.    Currently, Miyasaki is a Senior Managing Director in Blackstone Group's Real Estate Group.   Upon information and belief, at all times relevant to this Complaint,

Miyasaki held the same or similar positions with Blackstone Group.  Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Miyasaki was called upon to, and did in fact, exercise management authority for those entities.  Miyasaki was designated as one of the persons whose "knowledge" could be charged to the Sellers under the LBO documents.  At all times relevant to this Complaint, after the LBO closed, Miyasaki was also a Vice President of BRE.ESH, a member of DL-DW and nominal holder of the $200 Million "rollover equity" interest received by Blackstone Group in connection with the LBO.

126.    Miyasaki is a resident of the State of Utah and may be served with process at the following address:  1978 Kidd Circle, Park City, Utah 84098.

127.    Gray, Stein, Chae, Friedman, Burdi, Sumers, McDonagh and Miyasaki are sometimes collectively referred to in this Complaint as the "Blackstone Group Individual Defendants."

**E.      Additional Insider "Lender" Defendants.**

128.    **ABT-ESI LLC** ("ABT") is an affiliate and insider of the Buyer.  As Lead Lender/Servicer of the 25% Note, ABT received subsequent transfers of the LIBOR Floor Certificates (as that term is defined below) and their proceeds.   ABT is a limited liability company organized under the laws of the State of Delaware with its principal place of business at c/o Arbor Commercial Mortgage LLC, 333 Earle Ovington Boulevard, Uniondale, New York 11553.

129.    **Mericash Funding, LLC** ("Mericash") is an affiliate and insider of the Buyer.  As a lender on the 25% Note, Mericash received subsequent transfers of the LIBOR

Floor Certificates and their proceeds.  Mericash is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 404 Fifth Avenue, New York, New York 10018.

130.  **Park Avenue Funding LLC** ("Park Avenue") is an affiliate and insider of the Buyer.  As a lender on the 25% Note, Park Avenue received subsequent transfers of the proceeds of the LIBOR Floor Certificates until the transfer of its interests to Lightstone Commercial.  Mericash is a limited liability company organized under the laws of the State of New York with its principal place of business at 460 Park Avenue, New York, New York 10022.

F.   **Buyer's and Sellers' Professional Defendants.**

131.  **Bank of America, N.A.** ("Bank of America") is a national banking association with its principal place of business at 100 N. Tryon St., Charlotte, North Carolina 28225.  Bank of America was, together with Wachovia Bank, N.A. ("Wachovia") and Bear Stearns Commercial Mortgage Inc., one of the original co-lenders on each of the mezzanine loans made pursuant to the LBO.  Bank of America received substantial improper payments in connection with the LBO from the Debtors' LBO loan proceeds.

132.  **Banc of America Securities LLC** is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 100 N. Tryon St., Charlotte, North Carolina 28225.  Banc of America Securities LLC acted as an advisor to the Sellers in the LBO.

133.  **Citigroup Global Markets Inc.** ("Citigroup") is a corporation organized under the laws of the State of Delaware with its principal place of business at 388 Greenwich Street, 17th Floor, New York, New York 10013.  Citigroup provided services to the Buyer in

connection with the LBO for which it received substantial improper payments from the Debtors' LBO loan proceeds.

134.    **Ebury Finance Limited** ("Ebury") is, upon information and belief, a corporation organized under the laws of the United Kingdom with its principal place of business at 2 Broadgate, London EC2M 7 UR, United Kingdom.  Ebury became a co-lender on each of the LBO mezzanine loans pursuant to August 2007 amendments to each of the mezzanine loans. Ebury also succeeded to part of J.P. Morgan Commercial Mortgage Inc.'s ("JP Morgan") position in each of the mezzanine loans as a result of a transfer of such position from JP Morgan. On information and belief, at the time of its initial involvement, Ebury held 16.665% of the mortgage and mezzanine loans described in this Complaint.  Ebury received approximately $9,341,984 in fees and disbursements in connection with the mortgage and mezzanine loans made to the Debtors as part of the LBO, despite the fact that those loans did not provide any direct or indirect benefit to the Debtors.

135.    The true names and capacities of Defendants sued as DOES 1 through 100, inclusive, are presently unknown to Plaintiff.  Plaintiff therefore sues those Defendants under such fictitious names.  When their true names and capacities are ascertained, leave will be asked to amend this Complaint by inserting the same.  Plaintiff is informed and therefore believes that each of the fictitiously named Defendants is responsible in some manner for the misconduct herein alleged, and that the Debtors' damages herein alleged were directly and proximately caused by those DOE Defendants, either acting in concert with the other Defendants or acting individually.  Each reference in this Complaint to Defendant or Defendants refers also to all Defendants sued under fictitious names.

136.    Each Defendant is sued individually and in his or its role as an officer, director, member or other controlling person of one or more of the Debtors.  As described herein, each of the Defendants committed, participated in, approved, adopted, instructed, ratified or acquiesced in various acts or failures to act.  In the case of the named defendants who are individuals, the misconduct that proximately caused damages to the Debtors took place prior to any individual Defendant's resignation from the high-ranking director, officer, member or other controlling positions each individual Defendant held.

137.    To the extent that any of the identified conduct occurred while any of the Defendants was acting in his, her or its capacity as a director, officer, member or other controlling person of any other corporate entity, including any direct or indirect parent of the Debtors, that Defendant should be held equally responsible as though he, she or it was acting in his, her or its capacity as a director, officer, member or other controlling person of one or  more of the Debtors.

138.    The identified Defendants, to the extent they may purport to have acted or omitted to act in their capacities as directors, officers, members or other controlling persons of any non-Debtor entity, (i) acted for all practical and functional purposes as directors, officers, members or other controlling persons of one or more of the Debtors; (ii) were de facto directors, officers, members or other controlling persons of one or more of the Debtors; or (iii) assumed fiduciary and other duties to one or more of the Debtors and the Debtors' constituencies as a result of their affirmative acts of controlling, dominating and otherwise directing one or more of the Debtors at all times relevant to this Complaint.

139.    At all times relevant to the allegations herein, from and after the date on which each Defendant assumed and continued to hold the high-ranking officer, director, member

or other controlling positions identified herein, each of the Defendants was the co-conspirator, agent, servant, representative, ostensible agent, partner, joint venturer, employee, trustee, trustor, or beneficiary of each of the other Defendants.

140.    In acting or omitting to act, as described herein, each Defendant was acting within the course and scope of his or its authority as such co-conspirator, agent, servant, representative, ostensible agency, partnership, joint venture, trust or employment and authorized, consented to, acquiesced in or ratified each act and omission of each of the other Defendants.

141.    At all times relevant to the allegations herein, each Defendant was the alter ego, joint venturer, successor-in-interest, parent or successor, or was jointly, severally, or otherwise responsible, for the acts, omissions, and liability of each of the remaining Defendants.

142.    Except as may be otherwise expressly alleged herein, (i) each Defendant is liable for each and every wrong committed by each and every other Defendant; (ii) each Defendant is responsible for the events herein alleged, and (iii) each Defendant's acts and omissions proximately caused the damages suffered by the Debtors.

143.    Each Defendant, as a result of his or its respective acts and omissions, is liable either by agency, joint and several liability, joint liability, several liability, joint enterprise liability, co-conspirator liability, alter ego liability, proportionate liability or direct liability for the damages suffered by the Debtors.

## JURISDICTION AND VENUE

144.    The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1334 and principles of pendent and ancillary jurisdiction.  This action constitutes a civil proceeding arising under Title 11 of the United States Code or arising in or related to the Chapter 11 Cases pending in the United States Bankruptcy Court for the Southern District of New York.

50

This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A). Venue is proper in this Court and this District under 28 U.S.C. §§ 1391(a)(2), (b)(2) and (c), and 1409(a) because (a) this is the District in which Extended Stay, Inc.'s jointly administered Chapter 11 Cases are pending, and (b) all or substantially all of the events and omissions giving rise to the plaintiff's claims occurred in this District.

145.    The Trustee has filed a substantially identical complaint asserting all of the causes of action asserted herein against the same defendants herein in the Supreme Court of the State of New York ("New York State Court").  The Trustee believes that the causes of action asserted herein are more appropriately asserted and adjudicated in the New York State Court, that venue is proper in the New York State Court and that the New York State Court has jurisdiction over all of the causes of action asserted herein and the defendants against which such causes of action are asserted.  Out of an abundance of caution and in order to avoid the risk of a possible forfeiture of valuable estate causes of action on technical grounds, the Trustee has filed the complaint herein.  The Trustee believes that the New York State Court will, and should, exercise jurisdiction over the causes of action and defendants herein.  Upon a final determination that the New York State Court will and may exercise jurisdiction over the causes of action and defendants herein, the Trustee anticipates a voluntary dismissal of the instant action.  If, on the other hand, the New York State Court dismisses the action filed in New York State Court because jurisdiction is proper only in federal Court, then this action will proceed.

## FACTS COMMON TO ALL CAUSES OF ACTION

**A.      The Debtors Were Profitable Prior to the LBO.**

146.    Prior to the LBO, the Debtors owned the leading mid-priced extended-stay hotel business in the U.S., with 684 hotels located in 44 states.  Prior to the LBO, the Debtors

were profitable and able to pay their debts in the ordinary course of business. The Debtors' financial performance from 2005 through the date of the LBO was generally positive. The Debtors' business was encumbered by secured debt totaling approximately $3.3 billion and mezzanine debt totaling approximately $1.9 billion. The Debtors also owed approximately $39 million to certain subordinated noteholders.

147.   Prior to the LBO, the Debtors' corporate organization was similar to their organization after the LBO. All or substantially all of the Debtors' entities and operations ran through either the Homestead or ESI corporate ownership chain, as described above. Homestead and ESI were directly and nominally owned by BRE.HV and BHAC IV, respectively. BHAC IV and BRE.HV were, in turn, directly or indirectly owned and controlled by Blackstone Group (or Blackstone Group's predecessor-in-interest, as described above), their ultimate parent and the ultimate parent of all pre-LBO entities related to the pre-LBO Debtors and relevant to this Complaint.

148.   By the end of 2006, the Debtors' portfolio of hotels had an average age of approximately 7.5 years, though many of the hotels were around nine years old and were showing signs of significant wear and tear. In January 2007, a Confidential Information Memorandum was prepared to provide information to a limited number of parties regarding a possible acquisition of "Extended Stay Hotels" (the "Information Memorandum," as described and discussed more fully below). The Information Memorandum was created by The Blackstone Group, L.P., Bear Stearns & Co., Inc., Banc of America Securities LLC and Merrill Lynch & Co., Inc. and characterized the hotels' condition as "excellent." But it was or ought to have been clear to Blackstone, the Debtors' pre-LBO management and others involved in the LBO that substantial capital expenditures would be needed in the near future.

149.    Pre-LBO, the Debtors' hotel properties were managed by HVM, L.L.C. ("HVM"). The Debtors' hotels were then operated under six different brand names, although Blackstone had begun re-branding the portfolio to change all of the properties to one of three names: ExtendedStay Deluxe, ExtendedStay America, or ExtendedStay Economy. Around one-third of the portfolio remained to be re-branded at the time Blackstone commenced efforts to sell the pre-LBO Debtors.  At the time, the cost to conclude the re-branding was expected to be substantial, although those costs were never provided for in the post-LBO budgets.

150.    While economic trends in the hospitality industry generally had been positive in the years leading up to the LBO, certain of those trends reversed in late-2006, and continued the decline in early-2007.  This led some analysts to project a downturn in the hospitality industry as a whole for the near-term.  In certain key industry performance metrics at the time, the Debtors lagged behind their competitors during 2006.

151.    It was or ought to have been clear to the Blackstone Pre-LBO Entity Defendants, the Blackstone Group Individual Defendants and others involved in preparing to market the LBO that (i) the Debtors' financial performance was declining in early-2007 as part of industry and economic trends that had begun in 2006, (ii) those trends were likely to continue after the LBO concluded, and (iii) the Debtors were already lagging behind their competitors.

**B.     Blackstone Decides to Sell the Debtors.**

**1.     Blackstone Prepares and Circulates An Information Memorandum That Contains Intentionally Misleading Financial Information and Projections Designed to Sell The Debtors Prior to Blackstone's IPO.**

152.    Blackstone Group commenced its marketing effort by preparing the Information Memorandum for a sale of ownership of the Debtors as part of "Extended Stay Hotels."   Upon information and belief, preparation of the Information Memorandum was

commenced during the latter half of 2006. The timing of Blackstone's decision to sell the Debtors was driven in part, upon information and belief, by Blackstone's initial public offering, or IPO, which was imminent at the time.

153.   Blackstone Group filed its IPO registration statement with the SEC on or around March 22, 2007, and eventually went public on June 21, 2007, ten days after the LBO closed. Upon information and belief, Blackstone desired to carry out the sale of the Company prior to the IPO, and stood to enhance its IPO valuation by the sale of the Debtors.

154.   The Information Memorandum represented that it was prepared from information furnished by the Debtors and from publicly available sources. However, upon information and belief, Blackstone Group, with the assistance of its professionals and advisors (i) created or compiled the financial information and projections in the Information Memorandum, (ii) prepared the non-financial, narrative content of the Information Memorandum, and (iii) was responsible for distribution of the Information Memorandum to potential buyers.

155.   The Information Memorandum contained an overview of the Debtors, and the reasons why Blackstone Group claimed the Debtors were a good investment opportunity for buyers. The Information Memorandum represented that Extended Stay would increase revenues through re-branding, marketing and acquisition initiatives. Blackstone and the others involved in the marketing of the Debtors knew or should have known at all relevant times that these initiatives could be successful only if the Debtors were left with sufficient capital and liquidity after the transaction to implement them.

156.   Prior to the LBO, the Debtors' capital expenditures generally fell into two categories. The first category was maintenance associated with 444 hotels that were initially

branded as "Homestead" or "Extended Stay America."  As to those 444 hotels, the five year historical investment in maintenance capital expenditures averaged approximately 4.3% of revenues, or $145.3 Million in the aggregate from 2002 to 2006.  The second category was capital upgrades for the Debtors' remaining 238 hotels – branded as StudioPlus, Crossland, Wellesley and others.  As to those 238 hotels, capital expenditures totaled approximately $129.6 Million from 2004 to 2006.  Total capital expenditures as a percentage of revenues were, in fact, approximately 10.2% for 2006 and 8.3% for 2005, both of which were significantly higher than the 4.5% projected capital expenditure levels that were set forth in the Blackstone Information Memorandum.  Indeed, actual capital expenditures for the period from January 2007 through June 10, 2007, the eve of the LBO, were approximately 5.3% of revenues, higher than that projected by the Information Memorandum.

157.    The Information Memorandum contained materially misleading projections regarding the Debtors' future financial performance.  The Information Memorandum projected total revenue and property-level EBITDA growth rates of approximately 9.84% and 13.35%, respectively.  However, Blackstone knew or should have known that the Debtors' actual financial performance at the time was, and was expected to be in light of performance trends in late-2006 and early-2007, well below the projections set forth in the Information Memorandum.

158.    Upon information and belief, all of this information was available to the Defendants involved in the transaction prior to the LBO's closing.  At the time, the Debtors used Smith Travel Research ("STR") reports to benchmark their aggregate financial performance against the Debtors' chosen competitive set.  On a weekly basis, the Debtors reported their hotel activity to STR. STR then provided the Debtors with weekly trend reports that displayed up to six years of monthly performance data for the Debtors and their competitors.

159.    The STR reports, and other weekly financial reports shared with the Blackstone Pre-LBO Entity Defendants and the Blackstone Group Individual Defendants, included detailed analyses regarding the Debtors' basic financial performance metrics, including occupancy rates (or "OCC:" the quotient of the total number of nights stayed by all customers divided by the total available room nights), average daily rate ("ADR:"  the quotient of total room revenues divided by occupied room nights (which provides the "room rate" for all occupied rooms)), revenue per available room ("RevPAR:" the product of OCC and ADR, which shows the revenue efficiency of a hotel), demand (the total of all room nights stayed by all hotel customers), and supply (the product of total available rooms and the number of total days in a year).  The STR reports also measured each hotel property's performance, and the aggregated performance of the chosen competitive set with indices and rankings.  In light of these and other reports, the Blackstone Pre-LBO Entity Defendants and the Blackstone Group Individual Defendants knew or should have known that the projections they were presenting in the Information Memorandum were unachievable and, therefore, misleading.

160.    The projections contained in the Information Memorandum also improperly accounted for significant operating expenses, upon information and belief so as to "hide" those expenses and make the operating hotels appear to be more profitable than they actually were.  Among other things, the Information Memorandum inappropriately placed a significant amount of property-related expenses, including occupancy taxes, "above the line" at the corporate level.  This had the practical effect of overstating the net operating income of the hotel properties.  Since the lenders were prepared to lend based upon the property-level financial performance of the hotels, the effect of this misstatement was to increase the available debt in the LBO to amounts which would be impossible for the Debtors to service.

161.    Likewise, the growth projections in the Information Memorandum were ostensibly based upon the post-LBO Debtors having adequate capital and liquidity to complete the re-branding, marketing and other initiatives that had been commenced by Blackstone prior to the LBO, as detailed in the Information Memorandum.   However, based upon information available at the time the Blackstone Pre-LBO Entity Defendants and the Blackstone Group Individual Defendants (i) knew or should have known that the numbers contained in the Information Memorandum were inaccurate, (ii) nevertheless intended that prospective buyers rely upon those misleading numbers, and (iii) knew or should have foreseen that, given the artificially increased debt to be imposed upon the Debtors in connection with the transaction (including the increased debt attributable to overstatement of net operating income, as described above) the post-LBO Debtors would not have sufficient capital or liquidity to carry out these strategies.

### 2.    The Stapled Financing Package Attached to the Information Memorandum Anticipated a Much Smaller Debt Load Than The LBO Ultimately Imposed.

162.    Blackstone had arranged for so-called "stapled financing" through several lenders (collectively, the "Stapled Financing Lenders") in connection with the LBO.   "Stapled" financing refers to a financing package that is "stapled" to an information memorandum and is available to a buyer for a specific transaction.   Among other things, the stapled financing typically indicates the expected debt capacity of the business being sold, and how much equity the buyer will need to provide to obtain the stapled financing.

163.    The Stapled Financing Lenders were prepared to finance up to $6.8 billion of the purchase price for a transaction. The stapled financing provided that the loan-to-value ratio could not exceed 87.5% when combined with the assumption of certain capital lease obligations of $200 million.  As described more fully below, the loan-to-value ratio following the eventual

LBO's closing (based on the price paid by the Buyer) was at least 95%, substantially more than that contemplated by the stapled financing attached to the Information Memorandum.  This additional debt was fatal to the Debtors' continued profitable existence.

### 3.   Lichtenstein "Wins" an Accelerated Bidding Process After Woefully Inadequate Due Diligence.

164.   Blackstone coordinated the distribution of the misleading Information Memorandum to approximately 150 potential buyers.  A Lightstone affiliate and an Arbor affiliate, among others, signed confidentiality agreements in February 2007, permitting them access to due diligence information.

165.   Around that same time, Blackstone informed potential purchasers that written, non-binding indications of interest had to be submitted within an accelerated time frame. Upon information and belief, Blackstone accelerated the time frame for bid submission (versus a typical time frame for a transaction of the LBO's size and complexity) in an attempt to coordinate the LBO closing with the launch of Blackstone's IPO planned for June 2007.

166.   Citigroup or an affiliate of Citigroup was at the time engaged, or about to be engaged, as one of two Global Coordinators on Blackstone's IPO, at the same time as it was acting as the Buyer's advisor for the LBO.  This engagement meant Citigroup would share with Morgan Stanley the largest split of the approximately $170 million of fees associated with the IPO, as well as have the ability to purchase a significant number of Blackstone IPO shares on "insider" terms.  Citigroup had a vested interest in the success of the Blackstone IPO.  Upon information and belief, Citigroup and some or all of Blackstone's other professionals sought to optimally position Blackstone prior to launching the IPO.  Among other things, they sought to do so by announcing, around the time of the IPO, consummation of a large, marquee sale of

"Extended Stay Hotels," for which Blackstone stood to reap substantial gains above its original equity investment.

167.    Upon information and belief Citigroup and Blackstone were therefore highly motivated to identify a buyer willing to pay a significant premium to the then-current value of the Company.   Fortunately for Citigroup and Blackstone, there was a client in Citigroup's client base that would serve as the "mark:"  Lichtenstein.

168.    Citigroup brought Lichtenstein into the deal in or around February 2007. Thereafter, Citigroup was instrumental in encouraging Lichtenstein to embark on the LBO, and was instrumental in keeping Lichtenstein in the deal.  Citigroup assured Lichtenstein that it had previously underwritten the properties to be acquired in the LBO, that the deal was "substantiated" by an appraisal, and that Citigroup's team had already vetted the deal.  Indeed, when Lichtenstein commissioned an independent valuation of the Company which contradicted the information and projections in the Information Memorandum, Citigroup dismissed that valuation and questioned Lichtenstein's judgment in relying on a relatively obscure source over the collective "wisdom" of Citigroup and the other financial institutions involved in the deal. Lichtenstein, ultimately, did not care, as the LBO was to be done using funds borrowed by the Debtors, and Lichtenstein and his affiliates were going to put little cash into the deal.

169.    On or around March 1, 2007, Blackstone received four indications of interest, including one from Lichtenstein that proposed to pay $7.6 billion.  Subsequently, the field was narrowed further to the two parties willing and able to consider concluding a transaction within a short time frame imposed by Blackstone.  On March 25, 2007, Blackstone and its advisors demanded that definitive proposals for a transaction be submitted by the remaining potential buyers by no later than April 11, 2007.

170.    On April 12, 2007, Lightstone formally offered to purchase 100% of the membership interests of one or more of the Sellers for $8 billion, net of the assumption of certain capital lease obligations.  This was the only definitive proposal Blackstone received.  Blackstone quickly accepted Lightstone's proposal.  On or around April 17, 2007, DL-DW and one or more of the Sellers executed a definitive acquisition agreement (the "Acquisition Agreement").

171.    Lightstone proposed to finance the overwhelming majority of the purchase price with debt of $7.4 billion and, at best, cash of only $400 million into the deal.  This cash component was used to pay Blackstone and closing costs.  The amount was therefore woefully insufficient to support the artificially inflated purchase price and the future needs of the now highly leveraged Company.  An additional equity amount of $200 million was "rollover equity" provided to BRE.ESH for Blackstone's benefit.  That interest did not represent any new cash or other value for the Debtors.  The $200 million of Blackstone "rollover equity" in the "new" Debtors was included because it was the only way to reach the $8 billion purchase price insisted upon by Blackstone.

172.    Notwithstanding the dangerous debt levels of the proposed LBO, the sale was nevertheless structured to allow the Buyer's insiders to siphon value from the post-LBO Debtors regardless of their performance.  One of Lichtenstein's affiliated entities was to reap substantial "asset management" fees post-LBO, even though HVM was to continue managing all aspects of the Debtors' day-to-day business.  The sale proposed a cash management system that would allow post-LBO equity holders to receive improper distributions from the Debtors even if the Debtors' financial condition deteriorated.  And, the Buyer obtained ownership of the Debtors while putting in little cash.

173.    Blackstone, at best, turned a blind eye to the post-LBO structure because Blackstone was eager to strip out $1.9 billion of cash from the Debtors while maintaining a post-LBO equity interest that Blackstone would receive in the LBO in exchange for nothing.  Counsel advising the Debtors in the transaction was simultaneously representing Blackstone Group and Blackstone Group affiliates in the same transaction.

174.    The financial institutions advocating and knowingly participating in the transaction sought the significant fees they would receive in connection with financing the transaction.  Those financial institutions were also planning to simply sell the debt as soon as the LBO closed, and thereafter have no risk for the failure they knew or should have known was likely to occur.

175.    Moreover, upon information and belief, the financial institutions agreeing to fund the LBO had long-standing relationships with Blackstone and sought to curry favor with Blackstone so as to cement possible roles in Blackstone's IPO and possible future transactions Blackstone might carry out with respect to its portfolio companies.  Indeed, affiliates of Wachovia (as defined below) and Bank of America, among others, each were involved in Blackstone's IPO.

176.    Three rating agencies, Fitch Ratings ("Fitch"), Standard & Poor's ("S&P") and Moody's Investors Service ("Moody's"), issued presale reports relating to the securitization of the $4.1 billion of senior secured debt.  In these reports, each of the rating agencies noted that the total debt of the LBO substantially exceeded the value of the Company's underlying assets.

177.    Specifically, Fitch, S&P, and Moody's concluded that the LBO total debt was, respectively, 141.6%, 153.4% and 158.4% of the value of the Company's underlying assets.

In fact, these three rating agencies approximated the loan-to-value of the senior secured debt alone to be in the range of 78.4% and 87.8% of the value of the Company's underlying assets.

178.    These three rating agencies also estimated the implied value of the Company to be substantially <u>less</u> than the approximately $8 billion purchase price.  According to these third-party rating agencies, the $8 billion purchase price exceeded the Company's actual value by approximately $3 billion.

179.    Upon information and belief, the parties involved in negotiating, documenting and closing the LBO knew or should have known of the rating agencies' likely determinations well in advance of the LBO's closing.

180.    Lichtenstein later aptly summarized the improper conduct of the various parties involved in formulating the LBO and their attitudes about what was about to be done to the Debtors and their creditors:

> at the end of the day, nobody put a gun to my head and said sign the documents. But it was like a lot of— it was - it was a brew that was cooked with a lot of people's help. Like the banks just said it's not - you know, blow the damn stuff out. It's - we really don't care, just sell the paper as fast as you can. Citibank just said pay us as many fees as you can. And I said I'm getting 95, 99 percent financing. Okay? So it was a combination; there were a lot of people who [erred] here.

181.    In short, no one involved at the time was looking out for the Debtors' interests.

**4.    The LBO Debt Increases Prior to Closing.**

182.    The initial Acquisition Agreement required that most of the pre-LBO debt be satisfied by DL-DW at closing of the LBO, including two sets of subordinated notes owed by ESI at the time.  One set, known as the "9.15% Notes," was due on March 15, 2008 (only nine

months later) and totaled approximately $31 million.  The second set, known as the "9.875%

Notes," was due in June 2011 and totaled approximately $8.2 million.

183.    However, on May 31, 2007, on the eve of the LBO's closing, the parties

entered into an Amendment to the Acquisition Agreement in which they removed entirely any

obligation to ensure that the outstanding subordinated notes were paid off as part of the LBO.

Thus, when the LBO closed, no funds were escrowed to pay those notes, the notes remained

unsatisfied and were reflected on the June 11, 2007 balance sheet of the "new" Debtors as

assumed obligations.

184.    Although Lightstone's April 12, 2007 LBO proposal had contemplated

that certain capital lease obligations would be assumed by the Buyer in the LBO, and that the

post-LBO Debtors ultimately would purchase the hotel properties to which the capital lease

related, this, similarly, did not happen.  As a result, and as described more fully below, the

landlord under that capital lease declared defaults under that lease within a few days after the

LBO closed.

## C.    The LBO Closes, Blackstone Receives Approximately $1.9 Billion of Cash and the Debtors Receive Nothing But Substantial Additional Debt and a New Owner With No Hotel Industry Experience.

### 1.    The Debtors' Post-LBO Corporate and Debt Structure Generally.

185.    The LBO closed on June 11, 2007 at the law offices of Blackstone and the

pre-LBO Debtors' counsel, Simpson Thacher & Bartlett LLP, both located in New York, New

York.

186.    On or around June 29, 2007, the Debtors' ownership structure was

"restructured," as had been contemplated previously by one or more of the LBO Buyer

Individual Defendants and the LBO Buyer Entity Defendants.  Pursuant to that planned

"restructuring," DL-DW's direct membership interests in BHAC Capital were transferred to Homestead.  In addition, several of the LBO Buyer Entity Defendants invested in BHAC Capital and therefore received a percentage of BHAC Capital's membership interests, resulting in DL-DW's and, indirectly, Homestead's membership interests in BHAC Capital, being reduced. Upon information and belief, the new investors in BHAC Capital paid less than fair consideration or reasonably equivalent value for their membership interests in that entity.

187.    A chart showing the Debtors' corporate organizational structure following the restructuring described in the preceding paragraph is attached as Exhibit B and incorporated herein by reference.  Upon information and belief, the corporate organizational structure described in Exhibit B hereto existed until the Debtors eventually (and inevitably) filed bankruptcy beginning on June 15, 2009.

188.    The Debtor's post-LBO debt structure can be summarized as follows: (a) a mortgage loan in the amount of $4.1 billion, secured by encumbrances on the mortgaged properties; and (b) ten tranches of mezzanine loans, in an aggregate amount of $3.3 billion, each tranche owed by an indirect owner of the operating hotels secured by the equity in the borrower beneath that owner. The debt structure was designed to permit the securitization of the mortgage loan by the mortgage lenders' sale of so-called "CMBS" (commercial mortgage backed securities) to third parties, many of which currently are Litigation Trust Beneficiaries.

### a.      The Mortgage Loan Structure.

189.    The mortgage loan agreement was between the mortgage lenders and 21 mortgage borrowers, as summarized on the chart attached hereto as Exhibit C and incorporated herein by reference. The entities listed in Exhibit C are all Debtors.  After the LBO, their names were changed to drop "BRE/," as was also done with he various mezzanine borrowers.  Exhibit

C reflects these name changes.  All but three of the mortgage borrowers owned properties. The parent entities of the three non property-owning mortgage borrowers were also parties to, but not borrowers under, the mortgage loan agreement. In addition, four Debtor operating lessee entities were parties to, but not borrowers under, the mortgage loan agreement.  The mortgage borrowers signed a single consolidated mortgage note in the amount of $4.1 billion, and the mortgage borrowers were jointly and severally liable for the mortgage debt.

190.    Each of the 18 property-owning mortgage borrowers and property owners secured the mortgage loan by first-priority encumbrances on their respective properties.  The mortgage lenders, however, did not begin perfecting their mortgage liens with appropriate filings until June 22, 2007, and continuing thereafter through at least July 2007.  The mortgage loan agreement, mortgage note, and related security instruments were cross-collateralized and cross-defaulted.  Therefore, upon information and belief, although the entities that actually owned the Debtors' hotel properties were not all borrowers under the new mortgage loan agreements, all properties owned by any of the Debtors were nevertheless directly pledged as collateral for the mortgage loans.  Upon information and belief, the entities that owned the hotel properties received none of the mortgage loan proceeds and, like the rest of the Debtors, received no value from the LBO.

### b.    The Mezzanine Loan Structure.

191.    Several mezzanine loan agreements were executed in connection with the LBO.  The total mezzanine debt borrowed in the LBO was approximately $3.3 billion.  Each mezzanine loan agreement was between the applicable mezzanine lender and three equal-level mezzanine entities, as reflected on the chart attached as Exhibit D and incorporated herein by reference.  Each set of mezzanine borrowers signed a single consolidated mezzanine note in the

amount of its mezzanine loan.  Each of the mezzanine borrowers was jointly and severally liable under the mezzanine note and mezzanine loan agreement.  Each of the mezzanine borrowers was the legal and beneficial owner of all direct interests in the borrower beneath it.  Each mezzanine borrower entered into a pledge and security agreement in connection with the LBO granting the mezzanine lender a first priority security interest in its equity interests in the borrower directly beneath it in its respective ownership chain.

192.    Although the mezzanine loans did not directly encumber the mortgaged hotels and the hotels' owner entities were not borrowers under the mezzanine loans, the mezzanine loan structure indirectly and improperly gave the mezzanine lenders subordinate interests in the hotels by (i) causing or allowing the mezzanine lenders to be paid directly from the proceeds of the operating hotels out of the Cash Management Account (as defined and described below), (ii) requiring the most junior mezzanine lender's approval of the Debtors' proposed annual budget even though the most junior mezzanine lender was not a lender to the mortgage borrowers, (iii) requiring the mezzanine borrowers to repay the mezzanine loans before any mortgaged properties could be released, and (iv) providing that, if any mortgage borrower paid more than its allocable share of the mortgage loan, such mortgage borrower could not exercise its contribution rights against other mortgage borrowers unless the mezzanine loans were paid in full.  Moreover, as alleged below, debt service on the mezzanine loans was set up to be paid from the Cash Management Account before certain critical operating expenses.

193.    As described above, the rating agencies reviewing the LBO, even prior to its consummation, concluded that the Debtors' value was woefully insufficient to support the mezzanine loans on the date the LBO closed.

66

c.      The Cash Management Account.

194.    The LBO imposed requirements that all cash generated by the hotels be swept and used to pay debt service on both the new mortgage loans and the new mezzanine loans, even though the entities that owned the hotels were neither borrowers nor obligors under the mortgage loans.  Those requirements were reflected in the main cash management agreement ("Cash Management Agreement") executed in connection with the LBO that established a "Cash Management Account."  That Cash Management Account was in the name of "ESP P Portfolio LLC [a Debtor] for the Benefit of Wachovia Bank" ("Wachovia").  The Cash Management Account was located at Wachovia at all times relevant to this Complaint.

195.    The mortgage lenders were granted a first priority security interest in the Cash Management Account. The mortgage borrowers, property owners, operating lessees, and HVM, as the Debtors' management company, were required to deposit all rents, receipts payable, and all other amounts received in connection with the hotels' operations into applicable property and clearing accounts, which were to be swept daily into the single, commingled Cash Management Account. Distribution of funds from the Cash Management Account was governed by the Cash Management Agreement.

196.    The mezzanine loan agreements acknowledged that the Cash Management Account was controlled by the mortgage lenders.  Provided no event of default had occurred, the mortgage lenders were to apply all funds in the Cash Management Account in accordance with the Cash Management Agreement. Although the mezzanine lenders had no direct interest in the hotels, the mezzanine lenders were nevertheless paid directly with funds from the commingled Cash Management Account, which contained cash assets of the operating hotels only.  The funds

did not belong to the mezzanine borrowers (as described below).  The mezzanine lenders were nevertheless paid with those funds, prior to the payment of critical hotel operating expenses.

197.   The Cash Management Agreement contained detailed requirements regarding the flow of funds through the cash management system.  Numerous subaccounts of the Cash Management Account (each a "Subaccount") were maintained by the agent for the mortgage lenders on a ledger-entry basis.  All such Subaccounts were merely book entries, and all the funds were commingled in the single Cash Management Account at all times relevant to this Complaint.  On each business day, the agent for the mortgage lenders was required to apply all funds on deposit in the Cash Management Account in the amounts and according to the priorities set forth in the Cash Management Agreement.  A chart showing the flow of funds through the Debtors' post-LBO cash management system is attached as Exhibit E and incorporated by reference.

### d.    Pertinent Guarantee Obligations of the Debtors' Insiders.

198.   Lichtenstein, Lightstone, ESI and Homestead (collectively, the "Guarantors") executed guarantees in favor of the respective lenders, guaranteeing certain of the respective borrowers' obligations under the mortgage loan and each mezzanine loan.  The Guarantors were liable under the guarantees to the extent of the lenders' damages arising out of various "bad boy" circumstances, including: (a) the borrowers' breach of any of the special purpose entity/separateness covenants (described below); and (b) the borrowers' filing for bankruptcy.   To the extent the Guarantors' obligations were triggered by a borrower's bankruptcy filing, the Guarantors' aggregate liability was capped at $100 million.

**e.      Blackstone's Improper Receipt of Loan Proceeds.**

199.    At closing, the Sellers, who were owned, controlled, managed or dominated by Blackstone Group and the Blackstone Group Individual Defendants at the time, instructed that the funds borrowed by the Debtors in the LBO were to be used to retire certain, but not all, existing debt and pay the Sellers' fees and expenses associated with the transaction. After retiring some, but not all, of the existing pre-LBO debt and paying the Sellers' fees and expenses associated with the LBO, the Sellers, which were Blackstone affiliates, received cash totaling nearly $1.9 billion (apart from Blackstone's rollover equity interest), as follows:

**Blackstone Entities' Cash Receipts**

| | | |
|---|---|---|
| BHAC IV, LLC | Purchase price payable to Seller | $1,282,764,450 |
| Blackstone Hospitality Acquisitions LLC | Purchase price payable to "Seller" | $489,546,290 |
| Prime Hospitality LLC | Balance of Gwinnet purchase price after payment of debt costs and closing costs | $4,110,604 |
| BHAC IV, LLC | Earnest money deposit payable to Seller | $85,611,012 |
| **Blackstone Entities' Cash Receipts** | **Total** | **$1,862,032,356** |

The reference above to cash receipts by Prime for the Gwinnett purchase price relates to a hotel that was owned by a Blackstone affiliate. The Gwinnett hotel was included in the hotels sold to the Buyer.  The closing of the Gwinnett property sale occurred simultaneously with the closing of the LBO.   In addition, even though Blackstone Hospitality was not a seller under the Acquisition Agreement, it received over $489 million of loan proceeds.

200.    The borrower Debtors were not required under the Acquisition Agreement to pay the purchase price to the Sellers.  That was the Buyer's responsibility.  Moreover, as

described below, under the loan agreements the Debtors appear to have been *prohibited* from using loan proceeds for that purpose, even though everyone knew that the money being borrowed by the Debtors was the only source of funding for the LBO purchase price. Nevertheless, all Defendants caused the Debtors to improperly pay the purchase price on the Buyer's behalf with substantial borrowings the Debtors were obligated to repay.  Upon information and belief, the Debtors then were caused to improperly, and in violation of the loan agreements, distribute these funds to the Blackstone Pre-LBO Entity Defendants even though they no longer owned the Company.

201.    In addition to the payments made to the Blackstone Pre-LBO Entity Defendants described above, the Debtors used borrowed funds to pay a total of no less than approximately $150 million of fees and other amounts to the lenders, professionals and advisors involved in the deal.  Those fees included lender loan and underwriting fees, so-called "hedge costs," property specific escrowed amounts, which included taxes, insurance, escrow fees, an interest payment due at closing, environmental fees and holdbacks, certain reserves, title-related expenses and the professionals' fees incurred by all involved parties.

### f.    The Debtors Become Encumbered by Substantial Additional Debt for Blackstone's Benefit.

202.    All but $200 million of the $1.9 billion payments to the Blackstone Group entities identified above came from loans made to the Debtors that they were unable to repay, and that rendered them insolvent and undercapitalized at closing.  The total post-LBO mortgage debt borne by the Debtors (for Blackstone's benefit) increased over pre-LBO levels by $749.4 million and the total mezzanine debt increased over pre-LBO levels by $905.3 million.

203.    After the LBO, the Debtors were overleveraged as a result of being subject to a significantly greater amount of debt than they were immediately prior to the LBO.  Virtually all of the Debtors' assets were over-levered.  The Debtors' debt load was significantly higher than that typical for hospitality REITs at the time.  Given these facts, the Defendants involved in the transaction or with the Debtors at the time knew or should have known that the Debtors would have no cash for necessary operating, marketing, maintenance, capital improvements and other expenditures, and no ability to secure additional loans or liquidity to meet their ongoing needs.

204.    The borrowing capacity of the Debtors post-LBO was almost non-existent.  Although the Debtors did maintain a working capital reserve of approximately $50 million, a pre-LBO line of credit in the amount of up to $105 Million that previously provided for hotel acquisition funding was not available post-LBO.  Moreover, there were no provisions in the limited liability company agreements for DL-DW or BHAC to make additional capital calls from any investors after the LBO's closing, nor were there any commitments for capital infusions in the loan agreements.  Therefore, the liquidity needed for capital expenditures, maintenance, upgrades, re-branding and expansion (all of which were critical if the Debtors were to have any chance whatsoever to achieve the financial performance "projected" by Blackstone in the Information Memorandum) was likely, and foreseeably, unavailable.

205.    The parties involved in the LBO attempted to justify their conduct with an appraisal of the Debtors' assets, performed by HVS International ("HVS"), which purported to value the Debtors' assets at approximately $8 billion.  That HVS appraisal was flawed for the following reasons, among others: the projected total revenue growth was overstated; the appraisal improperly assumed that the Debtors' room expense rate would continue to decrease;

EBITDA growth was unreasonably projected; the appraisal assumed financing which was much less expensive than actually incurred in the LBO; and the appraisal's projected capital expenditures were dramatically underestimated.

206.    As a result of the foregoing, among other errors, the value of the mortgage properties contained in the HVS appraisal was grossly overstated.  The parties involved in the LBO knew or should have known the HVS appraisal was flawed, resulted in a purported "fair value" of the mortgaged properties that was artificially inflated by billions of dollars, and therefore could not be relied upon.  Upon information and belief, many of the key assumptions made by HVS were provided to HVS by the Blackstone Pre-LBO Entity Defendants or the Blackstone Group Pre-LBO Individual Defendants in order to allow the values set forth in the HVS appraisal to be inflated.

207.    In short, the Blackstone Pre-LBO Entity Defendants, as equity holders in the pre-LBO Debtors, took all the cash they could get, while the Debtors and their estates were left insolvent, and the Debtors' new owners prepared to pay themselves hundreds of millions of dollars of the Debtors' desperately needed cash.  Both groups knew that the LBO was structured to fail.

**2.    The Company Intentionally Ignores the Separateness of Its Related Entities and the Requirements of the LBO Loan Documents.**

**a.    The Loan Proceeds' Uses Were Restricted.  But The Parties Ignored The Restrictions and Paid Loan Proceeds Directly to the Sellers.**

208.    The mortgage loan agreement restricted the use of proceeds from the new mortgage loans, as follows:

> [B]orrower shall use the proceeds of the Loan solely to (a) repay or discharge any existing loans relating to the Properties, (b) pay all past-due Basic Carrying Costs, if any, with respect to the Properties, (c) make deposits into the Reserve Funds on the Closing

Date in the amounts provided herein, (d) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, (e) fund any working capital requirements of the Properties and (f) distribute the balance, if any, to borrower.

209.    The authorized uses, therefore, did not include making payments to the Blackstone Sellers and other Blackstone affiliates that received sale proceeds, as described above. Notwithstanding this provision, the mortgage loan proceeds were not received by any mortgage borrower. To the contrary, all mortgage loan proceeds were deposited into an escrow account and a substantial portion was paid out directly to one or more of the Blackstone Pre-LBO Entity Defendants, as described above, in violation of the restrictions contained in the mortgage loan agreement.

210.    The mezzanine loan agreements also restricted the use of proceeds from the new debt resulting from the LBO. The mezzanine loan agreements provided that the mezzanine loan proceeds were to be paid first to the more senior mezzanine borrower, then, ultimately, provided to the mortgage borrowers as equity contributions:

> Borrower shall use the proceeds of the Loan solely to (a) make an equity contribution to Mortgage Borrower [through Senior Mezzanine Borrower] in order to cause Mortgage Borrower to use such amounts for any use permitted pursuant to Section 2.1.5 of the Mortgage Loan Agreement, (b) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender and (c) distribute the balance, if any, to Borrower.

Notwithstanding these provisions, the mezzanine loan proceeds were not received by any mezzanine borrower and were never contributed, by equity contributions or otherwise, to the mortgage borrowers through any senior mezzanine borrower. To the contrary, all mezzanine loan proceeds were, like the mortgage loan proceeds, deposited into an escrow account and, as with the mortgage loan proceeds, a substantial portion was paid out directly to one or more of the Blackstone Pre-LBO Entity Defendants, as described above, in violation of the restrictions contained in the mezzanine loan agreements.

### b. Formalities Regarding the Post-LBO Debtors' Separateness and Accounting Are Violated.

211. The applicable loan agreements contained extensive "special purpose" entity and separateness representations and other covenants requiring, among other things, that each mortgage borrower, operating lessee entity and property owning entity would (i) not make any loans or advances to any person; (ii) pay debts from its assets as such debts become due; (iii) do all things necessary to observe organizational formalities; (iv) maintain all of its books, records, financial statements, and bank accounts separate from those of any other person; (v) except as expressly permitted under the applicable loan agreement or the Cash Management Agreement, not commingle assets; (vi) not guarantee or become obligated for the debts of any other person; (vii) not pledge assets for the benefit of any other person other than with respect to the applicable mortgage or mezzanine loans; (viii) remain solvent and maintain adequate capital in light of its contemplated business operations; (ix) maintain a sufficient number of employees in light of its contemplated business operations and pay the salaries of its own employees from its own funds; (x) not assume or incur any liabilities except the mortgage and mezzanine loans, certain other specified liabilities not germane to this Complaint, and "liabilities incurred in the ordinary course of business," subject to certain liability caps, which liabilities would not be more than 60 days past the date incurred; and (xi) maintain its assets and liabilities in such a manner that it would not be costly or difficult to segregate, ascertain or identify its individual assets and liabilities from those of any other person.

212. These requirements, however, were disregarded. For example, after the closing, an opening balance sheet for DL-DW showed the impact of the LBO on DL-DW and the appropriate allocation of the price paid for the LBO. The mortgage and mezzanine debt was recorded at the ESI and Homestead accounting database levels, as opposed to being recorded by

each legal entity mortgage borrower or mezzanine borrower.  Similarly, the subsidiaries' assets and liabilities, including hotel property and equipment, were recorded at the ESI and Homestead database level, rather than being recorded at the individual entity level and treated as owned by that entity.  In short, the Company ignored the fiction of legal separateness of its entities.

213.   If the Debtors had established and maintained separate books for each of the individual mortgage borrowers and mezzanine borrowers as of the LBO, then the accounting by the mortgage borrowers and mezzanine borrowers should have reflected:

- The mortgage debt and the related proceeds - at each legal entity level for the individual mortgage borrowers; allocated based on the release amounts included in the mortgage loan agreement; and

- The mezzanine debt and the related proceeds - at the legal entity level for the individual mezzanine borrowers - allocated based on the sum of the allocated release amounts included in the mortgage loan agreement for the mortgage borrowers directly below the relevant mezzanine borrower.

214.   The Debtors made no effort to maintain their separateness or fulfill the covenants of the LBO loan agreements.  The Debtors were treated internally at all relevant times as part of one company.   The Debtors had common officers and directors, and had no separate governance.  The Debtors conducted all material board of directors meetings on a consolidated basis for the so-called "Extended Stay Hotels family of companies," which included the Debtors' direct equity owners.  In addition:

- The daily business and affairs of each of the Debtors were managed and controlled by HVM Manager, of which Lichtenstein was the sole member;

- The Debtors' operations were integrated and interdependent and each of the Debtors was run in the interest of the Buyer and the Debtors' ultimate equity owners;

- With few exceptions, all of the Debtors were wholly-owned by the Buyer;

- The Debtors did not have specific general ledger codes in their accounting system to track specific accounting activity for the mezzanine borrowers;

- None of the mortgage borrower entities or mezzanine borrower entities kept their own books and records, and adequate records of complete accounting activity related to each legal entity were not maintained;

- Debt to the mortgage and mezzanine lenders was recorded only at the ESI and Homestead levels, debt service was paid only from the Debtors' consolidated Cash Management Account, and the Debtors failed to properly record any financial or accounting activities (including debt service) relating to the mezzanine or mortgage loans;

- The Debtors' expenses were generally funded from the consolidated Cash Management Account and a single working capital reserve account;

- The Debtors failed to observe corporate formalities for intercompany transfers, which generally were not properly recorded;

- The mortgage borrowers were jointly and severally liable on the mortgage debt, and yet paid the mezzanine debt for which the mortgage borrowers had no liability;

- Mezzanine borrower entities were prevented from enforcing contribution rights against other Debtors until after all of the mezzanine debt and mortgage debt had been paid in full;

- The Debtors made substantial payments for the benefit of insiders;

- The Debtors failed to pay debts as they came due in the ordinary course, with certain liabilities being greater than 60 days outstanding at all relevant times from and after the date the LBO closed; and

- The Debtors were insolvent and undercapitalized on the date the LBO closed and at all relevant times thereafter.

**D.     Debt Yield and Financial Covenants Are Violated The Day The LBO Closed, and Key Differences Between the Debtors' Pre- and Post-LBO Debt Structures Cause Immediate Financial Distress.**

**1.     The Significance of a Debt Yield Event.**

215.     The Debtors' loan agreements provided for severe consequences if a "Debt Yield Event" occurred.  The loan agreements defined "Debt Yield" roughly as a fraction: (a) the numerator of which was net operating income less (i) assumed management, marketing,

and franchise fees equal to 4% gross income, (ii) replacement reserve fund contributions equal to 4% gross income, and (iii) income generated by leased properties; and (b) the denominator of which was the combined total outstanding principal balances on the mortgage and mezzanine loans.   In essence, the Debt Yield calculation was intended to provide an indication of the amount of cash generated by the mortgaged properties compared to the level of debt associated with those properties, and to measure the debtors' ability to generate enough cash to service the LBO debt.

216.   The Debtors' failure to meet specific Debt Yield benchmarks under the LBO loan agreements would cause the Debtors to have insufficient cash to pay their obligations as follows:

(1)   A so-called "Debt Yield Event" triggered a "Cash Trap Event."  This meant that excess cash from operations (after taxes, reserves, and debt service) was "trapped" as additional collateral for the lenders.  The cash was not available to pay costs of operations outside of the annual budget approved by the lenders under the Cash Management Agreement, including capital expenditures beyond a small reserve.  The annual budget did not allow for the payment of crucial expenses such as occupancy taxes, reserves and management fees, among other things;

(2)   If the Debt Yield fell below the so-called "Debt Yield Amortization Threshold," then the borrowers had to make substantial amortization payments to the lenders beginning on June 12, 2009; and

(3)   No equity distributions could be made (except to holders of Series A-1 preferred equity in BHAC Capital) by either the mortgage borrowers, the property owner entities, the operating lessee entities, or the mezzanine borrowers unless the Debt Yield equaled or exceeded 7.75%.

217.   A Cash Trap Event, triggering a "Cash Trap Event Period," occurred upon: (a) an event of default under the mortgage loan agreement or any mezzanine loan agreement; (b) a Debt Yield Event; or (c) HVM's filing for bankruptcy. A Cash Trap Event

could be cured under certain circumstances including, if it was caused by a Debt Yield Event, the mortgage borrowers' achievement of certain Debt Yield numbers for six (6) consecutive months.

218.   On June 30, 2007, the Debt Yield was only 7.09%.   Therefore, the Debt Yield was less than 7.5% immediately after the date the LBO closed, and there was, in substance if not form, a continuous Cash Trap Event Period within the meaning of the mortgage loan agreement.   For the first six months after the LBO's closing (including the day the LBO closed) the only reason there was no technical Cash Trap Event Period was because a Debt Yield Event had no consequences under the pertinent loan agreements until the seventh payment date, scheduled to occur in January 2008.   The Debt Yield percentage, however, was required to be reported to the Debtors' lenders on as monthly basis, including during the first six months after the LBO closed.   But the LBO Buyer Entity Defendants and the LBO Buyer Individual Defendants (to the extent they were directors, officers or otherwise in control at the relevant times) did not report the Debt Yield percentage to the lenders as should have been done.   Upon information and belief, this failure to report was intentional and allowed improper distributions to continue to be made to equity holders.

219.   The Debt Yield Event percentage would become even more difficult to achieve over time, as the required percentage was scheduled to grow from 7.5% (on the seventh payment date) to 8.1% (on the LBO loans' maturity date if certain options to extend the loans had been exercised by the Debtors).   In short, the Debtors immediately failed the Debt Yield test under the LBO loan documents on the date the LBO closed, were unlikely to meet the test when it was first scheduled to formally occur in January 2008, and the LBO Buyer Entity Defendants and the LBO Buyer Individual Defendants, during their tenures as fiduciaries, knew or should have known it.

2.        **The Post-LBO Debt Structure Improperly Restricts the Debtors' Cash.**

220.    Two significant differences between the pre- and post-LBO Cash Management Agreement and related agreements placed the Debtors at even graver risk of failure. First, the pre-LBO cash management agreement provided that management fees were higher in priority on the so-called "waterfall" than debt service on the mezzanine loans, and thus management fees would be paid before mezzanine loan debt service if there were insufficient funds to pay both. The post-LBO Cash Management Agreement provided just the opposite: mezzanine loan debt service was higher in priority than management fees, and was paid first if there were insufficient funds to pay both. This severely threatened the post-LBO Debtors' ability to maintain operations.

221.    Management fees are not discretionary expenses for a hotel chain. Most of the hotels were indirectly owned by ESI, which was a REIT. A REIT is required to have an outside management company operate its hotels. However, management fees could be paid only if cash was available after debt service under the post-LBO structure. Therefore, any cash difficulties, and especially a Cash Trap Event, made it likely the Debtors would be unable to pay critical management fees and costs necessary to keep the Debtors' hotels open. If those fees and costs were not paid, the Debtors' hotels would close and the Debtors' entire business would abruptly shut down, causing waste and destruction of the Debtors' hotels' value. Nevertheless, the Blackstone Group Individual Defendants, Blackstone Group Pre-LBO Entity Defendants, DL-DW and the LBO Buyer Individual Defendants that became directors or officers of the Debtors at the time the LBO closed agreed to terms placing the Debtors, and their creditors, improperly at risk.

222.     The post-LBO Cash Management Agreement trapped 100% of excess cash flow during every Cash Trap Event Period, and defined excess cash flow in such a way as to trap the Debtors' cash prior to the payment of critical operating expenses.  The pre-LBO Cash Management Agreement provided for a similar formula, but the excess cash flow concept was different:  the cash trap occurred only after critical operating expenses were paid.  Therefore, the post-LBO Debtors were placed in an untenable financial position to further the interests of the Defendants that were the Debtors' pre- and post-LBO owners, insiders or insiders' affiliates.

223.     Under the pre-LBO mortgage loan agreement, in proposing each annual budget, the borrowers needed to obtain the approval of only the servicer for the mortgage loan.  Post-LBO, in proposing an annual budget, the borrowers were required to obtain the approval of both the mortgage lenders (and after securitization of the CMBS, the servicer for the debt certificate holders) and the most junior mezzanine lender.  This requirement placed the Debtors' need for cash to operate subordinate to the profit return for the junior mezzanine lenders, a situation which quite predictably caused great harm to the Debtors and their estates.

224.     All of these problems were or should have been foreseen by the Defendants involved in the LBO.

**3.      The Debtors Immediately Violate Covenants Regarding The Payment of Ordinary Course Debts.**

225.     The mortgage and mezzanine loan agreements contained extensive financial reporting covenants, which included:  (i) within 60 days after the end of each fiscal year, each borrower had to furnish its respective lender with certain annual financial statements audited by a "Big Four" accounting firm and prepared according to GAAP, along with an Officer's Certificate certifying whether there was an event of default under the applicable loan

agreement and if so, what it was, how long it had existed, and what actions had been taken to remedy it; (ii) within 20 days after each month, each borrower had to furnish its respective lender an occupancy report, monthly and year-to-date operating statements, a calculation of the Debt Yield on the last day of the month and the amount of all operating rent due for the month; (iii) within 30 days after each quarter and each month, each borrower had to furnish its respective lender with an officer's certificate stating that the monthly financials provided were accurate, that the representations and warranties with respect to certain special purpose entity requirements were correct and that ordinary course of business liabilities had not exceeded certain amounts and had been paid within 60 days of the date they were incurred; and (iv) within 30 days before the start of each fiscal year, the mortgage borrowers and property owner entities had to submit a proposed annual budget, which was subject to the written approval of the mortgage lenders and the "Most Junior Mezzanine Lender."   Until the proposed annual budget was approved by that lender, the most recent "Approved Annual Budget" applied.

226.    Several of these covenants were ignored or violated.   For example, no monthly Debt Yield reports were prepared or furnished during 2007 following the LBO, and the first such report was not prepared until January 2008.   Also, Rogers routinely submitted officer's certificates certifying each month after the LBO closed that ordinary course liabilities had not exceeded certain amounts and had been paid within 60 days of their incurrence.   In fact, there were ordinary course liabilities outstanding for longer than 60 days on the date the LBO closed and each month thereafter until the Debtors' eventual bankruptcy filing.   Each of these events was an event of default under the loan agreements.   In short, the Debtors were in technical default of their obligations the day the LBO closed.

E.      **The Lenders Make Demands of Lichtenstein to Facilitate the Sale of Loan Certificates.**

      1.      **The Lenders Experience Difficulty Selling the LBO Debt.**

      227.      The lenders that had committed to finance the LBO had always intended to sell most or all of the mortgage and mezzanine debt to third parties. Those efforts, however, were unsuccessful. As of the LBO's closing on June 11, 2007, the banks that financed the LBO held all or substantially all of the mezzanine and mortgage debt.

      228.      Immediately after the LBO closed, the mortgage lenders marketed the CMBS for sale.  At the beginning of those efforts, the market was active.  However, the market quickly softened, starting no later than late-July or early-August 2007. As a result, the banks were forced to take more aggressive steps to sell the CMBS debt including, for example, as early as August 2007, discounting the CMBS debt.

      229.      The mezzanine debt also was not selling, and was being discounted by the mezzanine lenders.  The mezzanine lenders began offering to provide buyers of the mezzanine debt with financing ("repo financing") to help buyers purchase the debt.

      230.      In addition to offering incentives to potential buyers of the CMBS and mezzanine debt, the lenders made certain demands on Lichtenstein and Lightstone regarding actions that the lenders claimed were needed to make the CMBS and mezzanine debt more marketable.

      2.      **The Lenders Demand that Lightstone Stop Efforts to Sell Preferred Equity.**

      231.      Before the LBO had closed, in May 2007  Lichtenstein was in discussions with certain entities regarding a sale of a substantial piece of equity in the post-LBO Debtors. Among others, Centerbridge Partners, L.P ("Centerbridge") was supposedly interested in

purchasing equity, and was discussing with  Lichtenstein the need to relieve the Debtors from a $200 Million junior tranche of LBO debt.   Other potential investors being solicited on the Buyer's behalf at the time commented to  Lichtenstein or Lichtenstein's advisors that the proposed LBO was "too levered," that it "wouldn't take much to wipe them out," and thus declined interest.  Unsurprisingly, those pre-LBO discussions did not result in a sale of preferred equity.  Nevertheless, the LBO proceeded.

232.    After the LBO closed, Lichtenstein continued efforts to sell equity.  However, the lenders demanded that Lichtenstein cease those efforts because it was interfering with the lenders' efforts to sell their debt.  Upon information and belief, Lichtenstein complied with the lenders' demands, and ceased efforts to sell equity shortly after the LBO closed.

233.    In or around August 2007, in connection with the securitization of the mortgage loan that resulted from the LBO, Banc of America Securities LLC, together with three other banks, offered Commercial Mortgage Pass-Through Certificates in the amount of the $4.1 billion mortgage loan to institutional third-parties through a Confidential Offering Memorandum, dated August 17, 2007 (the "Mortgage Loan Issuance Offering Memorandum").

234.    Although the Mortgage Loan Issuance Offering Memorandum noted the ratings of the mortgage loan debt by Fitch, S&P, and Moody's as between BB and AAA, noticeably absent from the Mortgage Loan Issuance Offering Memorandum was any reference to the fact that, as described above, these rating agencies' July 2007 reports noted that the total debt of the LBO substantially exceeded the value of the Company's underlying assets.  According to S&P's and Fitch's July 2007 reports, they expressly valued the Company at $4.8 billion and $5.2 billion, respectively – approximately $3 billion less than the $8 billion purchase price.

235.    Moreover, the Mortgage Loan Issuance Offering Memorandum cited the results of the HVS appraisal, which the Sellers, the Buyer, participating lenders, and others involved in the LBO, as discussed above, knew or should have known was flawed, and which was based upon assumptions provided to HVS by the Blackstone Pre-LBO Entity Defendants or the Blackstone Group Pre-LBO Individual Defendants in order to inflate the values in the HVS appraisal, as described above.

**3.      The Alleged HPT Capital Lease is Declared in Default and The Lenders Demand That  Lichtenstein "Resolve The Defaults or Else" to Facilitate The Banks' Efforts to Sell Their Paper.**

236.    Prior to the LBO, HVI(2) Incorporated ("HVI"), an entity under the Debtors' corporate umbrella, entered into a lease agreement ("HPT Lease"), pursuant to which HPT HSD Properties Trust ("HPT HSD") leased eighteen hotels to HVI. The HPT Lease ran through December 31, 2015, subject to renewal options. HVI was required by the HPT Lease to, among other things, (i) maintain certain specified net worth, and (ii) adhere to certain requirements if a change of control, such as the LBO, was to be effected.

237.    Immediately after the LBO closed, HPT HSD alleged that Lightstone had failed to comply with one or more of these requirements.  The Blackstone Group Individual Defendants, Blackstone Pre-LBO Entity Defendants and, to the extent they were directors, officers or anticipated equity owners at the time, the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants were or should have been well aware of this issue prior to the LBO's closing.

238.    One week after the LBO closed, on June 18, 2007, HPT HSD issued a notice of default under the HPT Lease and terminated the lease.  That same day, HPT HSD issued a press release announcing the alleged defaults and that it had terminated the lease.  This

default was foreseeable prior to the LBO, caused great concern among the Debtors' lenders and caused the lenders to place further demands upon the Debtors.

239.    Shortly thereafter,  HPT HSD offered Lichtenstein the option to purchase the properties that were subject to the HPT Lease. To resolve the dispute, and to address the lenders' demands, on or around July 26, 2007, HFI Acquisitions Company LLC ("HFI"), an affiliate of  Lichtenstein, purchased 17 of the 18 leased hotel properties under the HPT Lease for approximately $192 Million.  Approximately $170.5 Million of the $192 Million used in the HPT HSD transaction came from new mortgage and mezzanine loans to HFI from certain of the Debtors' lenders. In connection with the transaction, HFI was assigned all of HPT HSD's rights under the HPT Lease, including HPT HSD's rights in a $15.6 million security deposit.  Upon information and belief, one or more of the Debtors had an interest in those funds.  Also, Homestead guaranteed a portion of the rent under the HPT Lease and posted cash collateral for that guaranty totaling approximately $10 million.  Upon information and belief, Blackstone Hospitality was also released from its obligations under a letter of credit that Blackstone Hospitality had, prior to the LBO, posted as security for rent and other obligations owed under the HPT Lease.

240.    After the HFI transaction closed, HFI subsequently leased the purchased hotel properties to one or more of the Debtors.  Upon information and belief, this enabled Lichtenstein, as the owner of HFI, to receive additional payments from the Debtors in the form of rents on those hotels.

### 4.    DL-DW's Acquisition of the "LIBOR Floor Certificates."

241.    Because the mortgage lenders were having so much difficulty selling their debt, Wachovia and the borrower Debtors entered into a letter agreement amendment, dated

August 31, 2007, that amended the mortgage loan agreement and the mezzanine loan agreements. The amendment adjusted provisions relating to the application of the proceeds from prepayments of the mortgage and mezzanine loans to make the debt more palatable to potential buyers. In exchange for the borrowers' consent to the amendment, the lenders agreed to issue to the Debtor borrowers (or their designees) Class X-A and X-B certificates from the securitization (collectively, the "LIBOR Floor Certificates"). The LIBOR Floor Certificates were investment grade (AAA), and represented the right to receive a payment stream, derived from the mortgage loan payments, of the difference between the LIBOR "floor" amount, on the one hand, and actual LIBOR on the other hand. Therefore, whenever LIBOR dropped below the floor, part of the money paid by the borrower Debtors on the mortgage debt would be paid over, in turn, to the holder of the LIBOR Floor Certificates.

242.    On November 2, 2007, the LIBOR Floor Certificates were issued, in physical form, and transferred directly to DL-DW, one of the ultimate equity owners of the Debtors, rather than to the Debtor borrowers making concessions and providing all payments under the loan agreements. Upon information and belief, no value was provided by DL-DW to the borrowers in exchange for these certificates and no accounting entries were made to reflect that property rightfully belonging to Debtor borrowers was being diverted to DL-DW. At the time, the LIBOR Floor Certificates were valued at no less than approximately $25 Million.

243.    As LIBOR began dropping throughout 2008 and 2009, the LIBOR Floor Certificates became increasingly valuable to DL-DW because the amount of the "floor" was higher than the actual LIBOR-based loan payments. This value, however, should have belonged to the Debtors, not DL-DW, because the Debtors were the obligors under the mortgage and mezzanine agreements, and were the parties who contracted to receive the certificates. The

LIBOR Floor Certificates' issuance to DL-DW was an improper transfer of the Debtors' value to the Debtors' equity owners.

**F.     The Debtors' Post-LBO Performance Continues to be Predictably Dismal, But Substantial Distributions Are Nevertheless Made to Equity Holders.**

**1.     2007 Post-LBO Financial Performance.**

244.    Immediately after the LBO, the Debtors' financial performance continued to decline, performance metrics set forth in its budgets were missed, and the Debtors encountered significant (and predictable) economic problems.  The LBO Buyer Entity Defendants and, during their tenures as directors or officers of one or more of the Debtors, the LBO Buyer Individual Defendants, received regular financial and other reports on both a weekly and monthly basis (depending on the nature of the reports) after the LBO and therefore knew or should have known of relevant, material events relating to the Debtors' performance and inevitable downward spiral.

**a.     2007 Financial Results.**

245.    The Debtors' 2007 post-LBO revenues were approximately $623 million, below the pro-forma budget of approximately $655 million prepared in connection with the LBO.  The 2007 post-LBO EBITDA was approximately $327 million (or a 52% margin), as compared to a pro-forma budget EBITDA of $364 million (or a 56% margin).  During the second half of 2007, the Debtors experienced a continuing reduction in room demand, and the monthly ADR, OCC, and RevPAR were at or below budget in every month following the LBO in 2007.  Revenue growth reversed in the second half of 2007, and the Debtors missed projections for room revenue and property-level EBITDA in each of the last three quarters of 2007.

246.    The Debtors' performance relative to its selected competitive peer group reflected that, while the Debtors' occupancy rate was higher than those of some of their peers,

the Debtors' revenue and room rates (as evidenced by RevPAR and ADR at the time) was below its peers by a significant amount:  10% to 22%.

247.    In addition to regular industry reports, the Debtors' management received weekly reports showing how the Debtors' deteriorating performance compared to the Debtors' peer group in the second half of 2007.   During the November 15, 2007 board of directors meeting for the Debtors, it was reported that during the third quarter, certain metrics were below budget: RevPAR was below budget by 3% and property-level EBITDA was below budget by 5.7% year to date through September; RevPAR was below budget by 5.9% and property-level EBITDA was below budget by 10.5% for the third quarter 2007.   The LBO Buyer Entity Defendants and, during their tenures as directors or officers of one or more of the Debtors, the LBO Buyer Individual Defendants, were thus aware that the Debtors' performance was not only below their peer group, but was also below internal targets.

248.    However, at a November 15, 2007 board meeting of the "Extended Stay Hotels family of companies," Kim "anticipated" double digit corporate EBITDA growth for 2008 and 2009, driven by anticipated RevPAR growth of more than 7% in both years, based on the Debtors' "re-branding" strategy. This re-branding strategy, however, was based upon having substantial funds available to spend on brand strategy initiatives in the first quarter of 2008. However, the projected Debt Yield calculation for the fourth quarter of 2007 and the first two quarters of 2008 were expected at that time to be below the minimum requirement under the LBO loan agreements.  Funding for re-branding was not likely to be available because the Debt Yield calculations would in turn trigger a Cash Trap Event, depriving the Debtors of the much needed cash.

249. In addition, the Debtors' financial projections at the time reflected negative cash flows for the fourth quarter of 2007 and the first quarter of 2008. These projected results should have alerted anyone looking at them with an unjaundiced eye that the optimistic growth "anticipated" by Kim was not going to occur in the short term, nor was the cash going to be available to fund the rebranding expenditures from operations.

250. The Debtors' actual performance in late 2007 was below budgeted ADR, was not strong enough to mitigate the decline in OCC (also below budget at the time), and was adversely impacting the Debtors' liquidity situation.

**b.      Critical Capital Expenditures Are Not Funded.**

251. In 2007, prior to the LBO, the Company spent approximately $67.1 million on capital expenditures.  However, during the post-LBO period, the Debtors did not (and, indeed, could not) fund any of the incremental capital expenditures critical to the Debtors' achievement of the inflated projections discussed in Blackstone's January 2007 Information Memorandum. In fact, the Debtors were changing the pre-LBO re-branding strategy and re-branding their hotels under the Homestead name rather than the Extended Stay brand, contrary to the recommended strategy stated in Blackstone's Information Memorandum, and this new re-branding strategy was not going smoothly.

**c.      Late-2007:  A Cash Trap Event is Imminent.**

252. At a November 2007 board meeting, the LBO Buyer Individual Defendants finally acknowledged the Debt Yield Event and the pending Cash Trap Event as imminent issues. Senior management knew or should have known the Debtors would likely face a Debt Yield Event when the Debt Yield was to be reported on January 12, 2008.  The

anticipated Debt Yield was below the required monthly Debt Yield from the fourth quarter 2007 through the second quarter 2008.

253.    The Debtors submitted a proposed 2008 budget for approval by the lenders in early-December 2007. This budget reflected an increase in the overall property-level expenses. The budget submitted also included significant anticipated future costs related to non-recurring, discretionary capital expenditures associated with the Debtors' proposed re-branding strategy. Due to the anticipated Debt Yield Event and the pending Cash Trap Event that would be triggered in early 2008, the budget sought to ensure that all costs would be covered through funds available in the "waterfall" described above and on the attached Exhibit E (the "Waterfall") through the 2008 budget submitted for lender approval.

**d.    2008 Budget Negotiations:  The Debtors Unsuccessfully Attempt to Gain Access to Cash They Should Have Had From the Closing of the Loans.**

254.    In November 2007, the proposed annual budget for 2008 was due.  HVM prepared annual and monthly financial budgets for the Debtors, which were required to be approved by certain of the Debtors' lenders.  If the proposed annual budget was not approved by the lenders, then the most recently approved annual budget governed the Debtors' operations. This, however, meant that the Debtors' cash was subject to the flawed Waterfall, and the Debtors were on the verge of a Cash Trap Event.  Any cash remaining after the Waterfall was funded would not be provided to the Debtors. During a Cash Trap Event Period, excess cash that could have been transferred to the Debtors for operating expenses would be held by the lenders as additional collateral, leaving the Debtors unable to pay crucial operating expenses.  Lichtenstein, Kim, Teichman, DeLapp and Rogers, among others, were directly involved in the negotiations with the lenders regarding the 2008 proposed annual budget.

90

255.    The 2007 approved annual budget had been created prior to the LBO. That budget had certain flaws that all parties should have known about.  However, the post-LBO Company had not been provided with the 2007 annual budget being used at the time.  That 2007 approved annual budget (i) did not include trust fund occupancy taxes (which totaled approximately $6-8 Million, or approximately 9.2% of room revenues, per month, and were collected by the Debtors and held in trust for taxing authorities), and (ii) did not allow for payment of necessary corporate overhead costs (e.g., reservation services, travel agent commissions and certain management fees), all of which were critical to the Debtors' ongoing operations because excess cash was to be trapped, and none of which could be paid during a Cash Trap Event Period.

256.    In November 2007, when it became apparent that trust fund occupancy taxes were being swept into the Cash Management Account for application in accordance with the Waterfall,  Rogers asked the lenders to treat those taxes as pass-through amounts, and to have the amounts distributed back to the Debtors for payment to applicable governmental authorities. The lenders responded that the occupancy taxes would have to be handled through the Debtors' working capital account. In other words, the occupancy taxes collected would come into the lender's cash collateral, but no disbursements would be made to pay them. Upon information and belief, these were "trust fund" obligations, meaning that they were not the Debtors' property. That money belonged to various governments.  The taxes were collected by the Debtors and held "in trust" for the benefit of taxing authorities.  The lenders, however, knowingly expropriated the government's funds, held all cash and placed the Debtors in the position of wrongfully converting the government's funds to pay their lenders, all of which was pursuant to the agreements and documents executed in connection with the LBO.

257.    Corporate overhead represented approximately 16% of the total property and corporate expenses of the Debtors in late 2007. Without any changes to the budget for 2008, the Debtors were about to experience significant cash flow constraints during a Cash Trap Event Period, which, under the pertinent loan agreements, would last for a minimum of six months. Further, during a Cash Trap Event Period, the Debtors would have had to fund corporate overhead and occupancy taxes from working capital, if any was available, as those expenses would not be paid through the Waterfall.  These facts and circumstances were, or should have been, known to the LBO Buyer Entity Defendants and, to the extent they were directors or officers at the time, the LBO Buyer Individual Defendants, by late 2007, at the latest.

e.    **Despite the Debtors' Financial Distress, Improper Distributions Are Made to Equity Holders in 2007.**

258.    The mortgage loan agreement provided that the Debt Yield, measured on a quarterly basis, had to be greater than 7.75% for equity distributions to be made.  But other agreements entered into in connection with the LBO provided that the holders of Series A-1 preferred equity in the Debtors would receive their equity distributions regardless of the Debtors' financial condition, and regardless of whether those distributions were in violation of applicable law.

259.    Upon information and belief, although the first Debt Yield calculation should have been completed and reported in July 2007, and monthly thereafter, no such calculation was reported to the lenders at any point in 2007.  Had the Debtors' management performed an appropriate Debt Yield calculation in July 2007, that calculation would have shown that, immediately following the LBO's closing, the Debt Yield was 7.09%, compared to a requirement of 7.5% needed to avoid a Cash Trap Event in early 2008 and 7.75% for any equity distributions to be permitted.  The first calculation of the Debt Yield performed and reported to

the lenders was in January 2008 for the 12 month period ending December 31, 2007. Foreseeably, the Debtors did not meet the minimum requirement of 7.75%..

260.    Notwithstanding the Debt Yield failure, the lack of any surplus, the Debtors' insolvency, and the future financial and operational declines that were or should have been foreseen by those running the Debtors at the time, the Debtors, directly or indirectly through affiliated entities, made the following cash distributions directly or indirectly through other entities in the Debtors' corporate structure totaling $8,835,000 to equity holders other than the A-1 Series Unit holders from June 11, 2007 through December 31, 2007:

### 2007 Dividends or Distributions to A-2 and A-3 Series Units

| Recipient | Date Paid | Amount |
|---|---|---|
| **Series A-2 Units** | | |
| PGRT ESH Inc. | 7/30/2007 | $1,067,000 |
| PGRT ESH Inc. | 8/30/2007 | $1,033,000 |
| PGRT ESH Inc. | 9/27/2007 | $1,000,000 |
| PGRT ESH Inc. | 10/30/2007 | $1,033,000 |
| PGRT ESH Inc. | 11/29/2007 | $1,000,000 |
| PGRT ESH Inc. | 12/28/2007 | $1,033,000 |
| | **2007 A-2 Total** | $6,167,000 |
| | | |
| **Series A-3 Units** | | |
| Lightstone Holdings LLC | 8/31/2007 | $2,668,000 |
| | **2007 A-3 Total** | $2,668,000 |

261.    In addition, during 2007 after the LBO closed, the Debtors made the following cash distributions directly or indirectly through other entities in the Debtors' corporate structure to the A-1 Series equity holders, totaling approximately $13.1 million, in violation of the loan agreements and applicable law:

| RECIPIENT | DATE PAID | AMOUNT |
|---|---|---|
| Arbor Commercial Mortgage LLC | 6/11/2007 | $233,333.33 |
| Polar Extended Stay (USA) L.P. | 7/13/2007 | 44,444.44 |
| Princeton ESH, LLC | 7/13/2007 | 44,444.44 |

| | | |
|---|---|---|
| Arbor Commercial Mortgage LLC | 7/13/2007 | 1,661,111.11 |
| Polar Extended Stay (USA) L.P. | 7/26/2007 | 18,888.89 |
| Princeton ESH, LLC | 7/26/2007 | 18,888.89 |
| Arbor Commercial Mortgage LLC | 7/26/2007 | 358,888.89 |
| Arbor Commercial Mortgage LLC | 8/15/2007 | 713,333.33 |
| Arbor Commercial Mortgage LLC | 8/15/2007 | 20,000.00 |
| Polar Extended Stay (USA) L.P. | 8/15/2007 | 93,333.33 |
| Princeton ESH, LLC | 8/15/2007 | 93,333.33 |
| Arbor Commercial Mortgage LLC | 8/15/2007 | 1,250,000.00 |
| Arbor Commercial Mortgage LLC | 9/17/2007 | 713,333.33 |
| Polar Extended Stay (USA) L.P. | 9/17/2007 | 103,333.33 |
| Princeton ESH, LLC | 9/17/2007 | 103,333.33 |
| Arbor Commercial Mortgage LLC | 9/17/2007 | 1,250,000.00 |
| Arbor Commercial Mortgage LLC | 10/15/2007 | 450,000.00 |
| Glida One LLC | 10/15/2007 | 550,000.00 |
| Polar Extended Stay (USA) L.P. | 10/15/2007 | 100,000.00 |
| Princeton ESH, LLC | 10/15/2007 | 100,000.00 |
| Arbor Commercial Mortgage LLC | 10/15/2007 | 900,000.00 |
| Arbor Commercial Mortgage LLC | 11/15/2007 | 495,000.00 |
| Glida One LLC | 11/15/2007 | 568,333.33 |
| Polar Extended Stay (USA) L.P. | 11/13/2007 | 103,333.33 |
| Princeton ESH, LLC | 11/15/2007 | 103,333.33 |
| Arbor Commercial Mortgage LLC | 11/15/2007 | 900,000.00 |
| Arbor Commercial Mortgage LLC | 12/17/2007 | 450,000.00 |
| Glida One LLC | 12/17/2007 | 550,000.00 |
| Polar Extended Stay (USA) L.P. | 12/17/2007 | 100,000.00 |
| Princeton ESH, LLC | 12/17/2007 | 100,000.00 |
| Arbor Commercial Mortgage LLC | 12/17/2007 | 900,000.00 |
| | **2007 A-1 Total** | **$13,089,999.96** |

262.    Also, (i) on July 17, 2007, DL-DW received a wire transfer from an LBO closing account totaling approximately $77,366,984, which amount, upon information and belief, represented an apparent "overfunding" of an LBO closing account, and (ii) on October 17, 2007, a post-LBO "purchase price adjustment" resulted in a $2,342,000 payment from Blackstone to DL-DW.  Notwithstanding the fact that the LBO purchase price had been funded and paid on behalf of DL-DW with borrowings by the Debtors, these funds were improperly distributed to equity holders instead of being turned over to the Debtors.  Upon information and belief, these amounts constituted additional improper value that was siphoned from the Debtors for DL-DW's

and Lichtenstein's benefit at times when the Debtors were insolvent, inadequately capitalized and without adequate surplus.

2.     **The Debtors' Condition Further Deteriorates Throughout 2008, But Prohibited Equity Distributions Continue.**

a.     **2008 Debt Yield Test and Formal Cash Trap Event.**

263.     The first Debt Yield calculation reported to the lenders was provided to the lenders on January 21, 2008 for the period ending December 31, 2007. As alleged above, since the calculation reflected that the Debtors did not meet the minimum Debt Yield of 7.5% at that time, both a Debt Yield Event and a Cash Trap Event were triggered. Therefore, as of February 2008, any unallocated cash available after the Waterfall had been satisfied on a monthly basis was "trapped" by the lenders in a restricted cash collateral account. The fact that cash was now "trapped" put significant strain on the Debtors, and required the use of over $27 Million from a working capital reserve account in order to keep the Debtors temporarily afloat.

264.     In addition, in November 2007, the Debtors' projections reflected that the Debt Yield could not be maintained above the cure amount of 7.6% for a period of six months in order to eliminate the Cash Trap and reinstate the opportunity to receive any unallocated cash available after the Waterfall had been satisfied on a monthly basis.

b.     **March 2008 – the 9.15% Notes Become Due.**

265.     On March 15, 2008, the 9.15% Notes matured and the principal balance of $30.9 million, together with accrued interest of approximately $1.4 million, came due. The Debtors failed to pay those amounts when due, and a default was declared by the trustee for the noteholders, on March 24, 2008.

266.   On April 16, 2008, DL-DW secured a $22 million "loan" from affiliated investors in the Debtors.  All of the affiliated investors were insiders of the Debtors.  This new $22 million loan, together with additional funds from DL-DW, were used to pay off the matured 9.15% Notes.  But the new insider loan came with onerous terms: it was guaranteed by BHAC Capital and secured by the valuable LIBOR Floor Certificates owned by DL-DW, which should have been property of the Debtors.  Though the "loan" was therefore well collateralized, it nevertheless accrued interest at an annual rate of 25%.  The "loan" was to mature on May 1, 2011 (the "25% Note").  The following table is a summary of the insider "lenders" and participation in the 25% Note:

### Insiders' Interest in the 25% Note

| Lender | Affiliate Relation | Participation | Amount |
|--------|--------------------|--------------|-------:|
| ABT-ESI LLC | Arbor | Lead Lender / Servicer | $  5,225,000 |
| Park Avenue Funding | Lichtenstein | Co-Lender | 11,000,000 |
| Princeton ESH LLC | Princeton | Co-Lender | 550,000 |
| Mericash Funding LLC | Joseph Chetrit | Co-Lender | 5,225,000 |
| | | | $22,000,000 |

267.   Arbor,  Lichtenstein, Princeton and Chetrit structured this transaction as a "loan" with onerous terms to benefit themselves to the Debtors' detriment, even though they should have put the funds into the Debtors as equity at the time the LBO closed so as to pay off the 9.15% Notes at that time, as had been originally contemplated.

268.   Concurrently with the execution of the 25% Note on April 16, 2008, the Debtors paid off the $31 million outstanding principal balance of the 9.15% Notes, together with the accrued interest of approximately $1.7 million and $100,000 of professional fees. The total payments of approximately $33 million were made using (a) the proceeds from the 25% Note of $22 million; plus (b) approximately $10.6 million of additional funds from DL-DW.  The

Debtors accounted for activities related to the repayment of the 9.15% Notes and the securing of the 25% Note by recording the $22 million as additional "paid in capital" on the Debtors' books, with a corresponding intercompany note payable to DL-DW of approximately $10.6 million.

269.     DL-DW pledged the LIBOR Floor Certificates to the lenders of the 25% Note.   The income generated from the LIBOR Floor Certificates went directly to make all interest and principal payments on the 25% Note, rather than DL-DW making payments separately. The maximum monthly principal repayment under the 25% Note was $416,666. Because cash income from the LIBOR Floor Certificates was greater than the principal and interest payments due (or even allowable) on the 25% Note, the excess income from the LIBOR Floor Certificates was deposited into a reserve bank account for the benefit of BHAC Capital Series A-1 Unitholders ("Floor Bonds Reserve Account"). As of December 31, 2008, $3.3 million of the principal on the 25% Note had been repaid in this fashion, leaving a remaining principal balance outstanding of $18.7 million, and an additional $3.6 million had been paid during 2008 as interest.   Despite these payments, the Floor Bonds Reserve Account contained a balance of $2.1 million as of December 31, 2008.

### c.     The Debtors' Proposed 2008 Annual Budget.

270.     The Debtors had submitted a proposed 2008 annual budget for approval by the lenders in early December of 2007. The pertinent lenders objected to certain aspects of that proposed annual budget, including (a) certain revenue projections in light of the then-current economic climate and poor outlook for the industry; (b) proposed one-time capital expenditure expenses or corporate overhead costs that did not constitute property-level operating expenses; and (c) other costs that were not explained by the Debtors.   The Debtors then conducted discussions with the lenders regarding the objections.

271.    While those discussions were ongoing, the lenders continued to use the 2007 approved annual budget when administering the Waterfall throughout early 2008. This created additional financial strain on the Debtors, as funding for certain operating costs was not available through the Waterfall (e.g., reservation system, occupancy taxes, as described above), and the amounts disbursed were to the Debtors were lower than what was needed at the time to pay operating expenses.

272.    On April 16, 2008, certain issues relating to the 2008 annual budget were resolved.  As a result, the Debtors received some of the cash to which they should have been entitled dating back to January 1, 2008.  However, no provision was made to repair the damage caused to the Debtors during the latter half of 2007, when the Debtors were forced to operate under the 2007 approved annual budget of which the Debtors had never been provided a copy. Thus, the Debtors' cash problems were far from solved, and both the LBO Buyer Entity Defendants and the LBO Buyer Individual Defendants that held fiduciary positions at that time, knew or should have known it.  In fact, on May 1, 2008, after the 2008 annual budget had been approved, Lichtenstein himself remarked that vendor payments were being delayed and that ". . . its demoralizing for the staff to have to be dodging vendors and local tax authorities who want their payments."

273.    On April 15, 2008, in exchange for the concessions granted by the lenders to facilitate budgeting of operating expenses, an amendment to the mortgage loan agreement was executed (the "Mortgage Loan Second Amendment"). The Mortgage Loan Second Amendment was between the same parties to the mortgage loan, except that by that time the original mortgage lenders had transferred their interest to Wachovia Bank Commercial Mortgage Trust in connection with the post-LBO securitization of the mortgage loan debt through CMBS.

274.    The Mortgage Loan Second Amendment added a new Section 5.2.14 to the original mortgage loan agreement, which contained extensive restrictions on the mortgage borrowers' use of income, cash, fees, proceeds, property or revenue from the mortgaged hotels (including disbursements to the mortgage borrowers of excess cash flow under the Cash Management Agreement) ("Restricted Excess Cash Flow").  The new Section 5.2.14 prohibited the mortgage borrowers' distribution of Restricted Excess Cash Flow except in limited circumstances.

275.    The Debtors finally retained both Weil Gotshal & Manges ("Weil") and Lazard Freres ("Lazard") in or around early 2008 as restructuring and insolvency professionals to assist with efforts to restructure the Debtors' suffocating LBO debt structure.

d.    **As Events Unfold, the Debtors' Financial Condition Worsens and Liquidity Problems Become More Acute.**

276.    The softening of room demand experienced by the Debtors in 2007 continued into early 2008. OCC decreased again.   The extended-stay industry as a whole generally experienced ADR increase in the first half of 2008.  However, overall supply in the industry increased at rates far exceeding only modest increases in demand.  The 2008 approved annual budget was not finalized until April 2008, and the Debtors were operating in a Cash Trap Event Period.  All of these factors, among others, had a severe impact on the Debtors' liquidity.

277.    In the first quarter of 2008, liquidity became more constrained.  In January of 2008, the Debtors were required to transfer $8.1 million from their main operating account to the Cash Management Account to cover a shortfall in the Waterfall and ensure that certain obligations were met, including interest payments on the mezzanine loan. Consequently, the

general ledger balance of cash available to the Debtors to fund operating expenses as of March 31, 2008 decreased to $42.0 million from $52.4 million as of December 31, 2007.

278.    In the second quarter of 2008, OCC and RevPAR declined further. An "Audit Update" included in the May 15, 2008 board of directors package noted that: (a) debt waivers were required; and (b) significant liquidity concerns had to be addressed for audit issuance.  In addition, a cash flow forecast prepared by the Debtors predicted that the effect of LIBOR rates would significantly impact liquidity, such that cash at year end was projected to range from $19.5 million to $49.8 million, at best, depending on the LIBOR rates assumed.

279.    In fact, the LBO Buyer Entity Defendants and the LBO Buyer Individual Defendants that held director or officer positions as of July 2008, knew or should have known that the Debtors could be completely out of cash as soon as January 2009. The Company also anticipated that it would not meet certain Debt Yield amortization avoidance thresholds by June 2009, thereby triggering a requirement that the Debtors make amortization payments to the lenders, estimated at $51 million for 2009. This increase in anticipated cash needs when the Debtors' financial condition was rapidly declining caused the Debtors serious concern, as (i) all cash flows were subject to a Cash Trap and the Debtors were not projected to achieve a Debt Yield cure in 2008 or 2009, (ii)  the Debtors would have difficulty obtaining an unqualified audit opinion at the end of 2008, which could result in a default under the pertinent LBO loan agreements, and (iii) approval of the 2009 proposed annual budget posed critical challenges given the questions raised by certain of the lenders with respect to the annual budget in late-2007 and early-2008.

280.    In the third quarter of 2008, as conditions worsened in part as a result of the Great Recession, RevPAR decreased again, and was lower than the Debtors' budget for that

time.   In the fourth quarter of 2008, ADR and OCC continued to decline, and RevPAR performance was far off of budgeted projections. As a result, fourth quarter 2008 revenue and property-level EBITDA performance had double-digit declines over the prior year.  By the end of 2008, the Debtors' total revenue and EBITDA had also dramatically declined.

281.   As a result of these financial difficulties, the Debtors' liquidity continued to deteriorate, and by December 31, 2008 the general ledger balance of cash available to fund operations had slipped to $26.5 million.  The LBO Buyer Entity Defendants and LBO Buyer Individual Defendants that were directors and officers at the time were all well aware of these events.

e.      **Dividends and Distributions to Equity Holders Continue in 2008, Despite the Debtors' Financial Distress.**

282.   Notwithstanding the Debtors' precipitous financial and operational declines, the Debtors, directly or indirectly through affiliated entities, made the following substantial cash distributions directly, or indirectly through other entities in the Debtors' corporate structure, to equity holders or equity holders' affiliates, in violation of the loan agreements and applicable law:

### 2008 Improper Equity and Related Distributions

| RECIPIENT | DATE PAID | AMOUNT |
|---|---|---|
| Arbor Commercial Mortgage LLC & Ron Invest LLC | 1/15/2008 | $262,500.00 |
| Glida One LLC | 1/15/2008 | 473,611.11 |
| Polar Extended Stay (USA) L.P. | 1/15/2008 | 86,111.11 |
| Princeton ESH, LLC | 1/15/2008 | 86,111.11 |
| Arbor Commercial Mortgage LLC | 1/11/2008 | 900,000.00 |
| Arbor Commercial Mortgage LLC | 2/20/2008 | 1,808,333.33 |
| Arbor Commercial Mortgage LLC | 3/17/2008 | 241,865.08 |
| Ron Invest LLC | 3/17/2008 | 42,063.49 |
| Glida One LLC | 3/17/2008 | 115,674.61 |
| Polar Extended Stay (USA) L.P. | 3/17/2008 | 21,031.75 |
| Princeton ESH, LLC | 3/17/2008 | 21,031.75 |
| Arbor Commercial Mortgage LLC | 3/12/2008 | 684,523.81 |
| Ron Invest LLC | 3/12/2008 | 119,047.62 |

| | | |
|---|---|---|
| Glida One LLC | 3/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 3/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 3/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 4/15/2008 | 305,753.97 |
| Ron Invest LLC | 4/15/2008 | 53,174.60 |
| Glida One LLC | 4/15/2008 | 146,230.16 |
| Polar Extended Stay (USA) L.P. | 4/15/2008 | 26,587.30 |
| Princeton ESH, LLC | 4/15/2008 | 26,587.30 |
| Arbor Commercial Mortgage LLC | 4/11/2008 | 684,523.81 |
| Ron Invest LLC | 4/11/2008 | 119,047.62 |
| Glida One LLC | 4/11/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 4/11/2008 | 59,523.81 |
| Princeton ESH, LLC | 4/11/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 5/15/2008 | 500,000.00 |
| Arbor Commercial Mortgage LLC | 5/12/2008 | 684,523.81 |
| Ron Invest LLC | 5/12/2008 | 119,047.62 |
| Glida One LLC | 5/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 5/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 5/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 6/16/2008 | 27,418.63 |
| Ron Invest LLC | 6/16/2008 | 4,768.45 |
| Glida One LLC | 6/16/2008 | 13,113.26 |
| Polar Extended Stay (USA) L.P. | 6/16/2008 | 2,384.23 |
| Princeton ESH, LLC | 6/16/2008 | 2,384.23 |
| Arbor Commercial Mortgage LLC | 6/16/2008 | 508,264.53 |
| Arbor Commercial Mortgage LLC | 6/12/2008 | 684,523.81 |
| Ron Invest LLC | 6/12/2008 | 119,047.62 |
| Glida One LLC | 6/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 6/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 6/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 7/15/2008 | 500,000.00 |
| Arbor Commercial Mortgage LLC | 7/11/2008 | 684,523.81 |
| Ron Invest LLC | 7/11/2008 | 119,047.62 |
| Glida One LLC | 7/11/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 7/11/2008 | 59,523.81 |
| Princeton ESH, LLC | 7/11/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 8/15/2008 | 558,333.33 |
| Arbor Commercial Mortgage LLC | 8/12/2008 | 684,523.81 |
| Ron Invest LLC | 8/12/2008 | 119,047.62 |
| Glida One LLC | 8/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 8/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 8/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 9/15/2008 | 558,333.33 |
| Arbor Commercial Mortgage LLC | 9/12/2008 | 684,523.81 |
| Ron Invest LLC | 9/12/2008 | 119,047.62 |
| Glida One LLC | 9/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 9/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 9/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 10/15/2008 | 500,000.00 |
| Arbor Commercial Mortgage LLC | 10/10/2008 | 684,523.81 |
| Ron Invest LLC | 10/10/2008 | 119,047.62 |
| Glida One LLC | 10/10/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 10/10/2008 | 59,523.81 |
| Princeton ESH, LLC | 10/10/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 11/17/2008 | 558,333.33 |
| Arbor Commercial Mortgage LLC | 11/12/2008 | 684,523.81 |

| | | |
|---|---|---:|
| Ron Invest LLC | 11/12/2008 | 119,047.62 |
| Glida One LLC | 11/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 11/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 11/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 12/18/2008 | 1,750,000.00 |
| | 2008 A-1 Total | $21,349,999.99 |

283.   On August 14, 2008, the board of directors of the "Extended Stay Hotels family of companies" discussed that they had declared all dividends required to pay distributions to equity holders, and had also ratified all dividends paid by any of the companies up to that date. In fact, at that meeting, Teichman moved to declare dividends that were to be paid in the fourth quarter of 2008.  That motion passed unanimously.  At the same time, the board "tabled" certain rebranding initiatives due to the companies' poor financial performance, and received detailed reports regarding the Debtors' poor financial performance in 2008 and anticipated continued decline in 2009.

284.   On November 13, 2008, the board of directors belatedly passed a resolution that purported to stop improper equity distributions, recognizing at that board meeting the "divergence of interests of the equity parties" from the interests of the Debtors and the "Extended Stay Hotels family of companies."

285.   In early December of 2008, the Debtors submitted for the lenders' approval a proposed 2009 annual budget that assumed a significant decline in room revenues and property-level EBITDA.  At this point, the Debtors were simply trying to "stay[] alive for another few weeks," as Lichtenstein later stated.  At a board meeting held on December 16, 2008, Chetrit suggested that there be "staff reduction[s] of hours . . . and that staff should be asked for a 20% reduction to make a significant impact upon cash flow."  Upon information and belief, this suggestion was made, *inter alia*, to increase cash available to continue improper

distributions to equity holders, including entities owned or controlled by Chetrit, all to the detriment of the Debtors.

286. Although the Debtors passed a resolution stopping equity distributions in late-2008 in light of the financial and liquidity crises, improper distributions to equity actually continued even after that resolution from a so-called "Preferred Equity Holder Reserve Account" that had been created at the LBO's closing and was "security" for certain equity holders. The Preferred Equity Holder Reserve Account was funded with $20 million of Debtors' funds at the LBO's closing, and certain equity holders could instruct that distributions be made from that reserve account to them. If the account was used for such distributions, then BHAC Capital, using the Debtors' cash, was required to replenish the reserve back up to $20 million. The following table represents the distributions from the preferred equity reserve account to an Arbor affiliate *following* the November 13, 2008 board of directors meeting at which equity distributions were resolved to be stopped:

**Summary of Improper Distributions from the Preferred Equity Reserve Account**

| | | | |
|---|---|---|---|
| 12/18/2008 | Arbor Commercial Mortgage | $ | 1,750,000 |
| 1/20/2009 | Arbor Commercial Mortgage | | 1,808,333 |
| 2/20/2009 | Arbor Commercial Mortgage | | 1,808,333 |
| 3/11/2009 | Arbor Commercial Mortgage | | 15,178,971 |
| | | $ | 20,545,637 |

Eventually, in March 2009, as the Debtors continued their downward spiral, the Preferred Equity Reserve Account was liquidated and the balance was wired to the A-1 Series unit holders, as shown above.

287. From the LBO's closing through the date the Preferred Equity Reserve Account was liquidated and given to the A-1 series unit holders, a total of no less than $100

million was improperly distributed to equity holders during periods of tremendous financial and liquidity stress.

288.    In addition to those amounts, upon information and belief Lightstone received so-called "asset management fees"  throughout that same period totaling approximately $1 million per year.  This occurred even though Lightstone was not the Debtors' management company and HVM managed all aspects of the Debtors' daily operations.

289.    Before the LBO's closing, HVM and HVM Canada provided the operational, management, and administrative functions for all of the Extended Stay hotels. After the LBO's closing, all Extended Stay hotels continued to be managed by HVM, except for three properties in Canada, which were operated by HVM Canada.   HVM's management fee arrangement was different from the industry practice, and provided significantly higher management fees than those typically seen in the industry.  In spite of the substantial fees being paid to HVM and HVM's management of all aspects of the Debtors' day-to-day business, Lightstone (i.e., Lichtenstein) received management fees after the LBO totaling approximately $1 Million per year, for doing nothing.  Moreover, HVM was managed by an entity known as "HVM Manager," which was itself owned and managed by Lichtenstein, HVM Manager's sole member.

### 3.    2009 Post-LBO Performance through the Bankruptcy Filing Date.

### a.    Shortfalls in the Waterfall Are Experienced.

290.    As a result of declining performance in December 2008 and January 2009, the receipts transferred to the Waterfall were not sufficient to cover the interest due on the mezzanine debt in January 2009. Consequently, the Debtors were forced to transfer $5.9 million from their main operating account to the Cash Management Account to cover the shortfall.  Only

$19 million was distributed from the Cash Management Account to the Debtors for budgeted operating expenses in January 2009. This was the lowest monthly amount distributed to the Debtors since the LBO's closing. From mid December 2008 to late March 2009, the Debtors were forced to fund occupancy taxes and other expenses totaling approximately $20 million out of a cash reserve account.

### b.     Insider Obligations Are Paid In Full.

291.    In February 2009, the Debtors' advisors issued a memorandum to the Debtors' independent directors regarding the deteriorating liquidity situation, and on March 11, 2009, the boards of directors of DL-DW, BHAC, Homestead, and ESI met to discuss the insider 25% Note.   Teichman inexplicably informed the Boards that the 25% Note needed to be refinanced, even though it was not scheduled to mature until May 1, 2011, and thus should not have been considered a pressing issue at the time, and proposed that the 25% Note be paid off by transferring the LIBOR Floor Certificates (which had been stolen from the Debtors by DL-DW) to the holders of the 25% Note. That same day, the board approved this proposed transaction.

292.    On March 12, 2009, one day later, the so-called "Floor Bonds Agreement" was executed, pursuant to which the LIBOR Floor Certificates were assigned to ABT-ESI LLC, as lead lender under the insider 25% Note.   In connection with that agreement, all insider note interests (including those held by Lightstone Commercial, as successor by transfer to the interests originally possessed by Park Avenue Funding LLC) were contributed by the other 25% Note lenders to ABT-ESI LLC.   ABT-ESI LLC was simultaneously restructured so that each of the other lenders became owners of ABT-ESI LLC in proportion to their respective rights and interests in the 25% Note.   Similarly, as part of the deal, the Series A-1 equity holders waived their rights to the $4,817,986 balance of the so-called "Floor Bonds Reserve Account," and the

entire balance was required to be wire transferred to an account designated by Lightstone Commercial, which was to receive a Form 1099 in respect of this distribution.

293. At the time the Floor Bonds Agreement was executed, the outstanding principal balance on the 25% Note was $17,416,674. The Floor Bonds Reserve Account then contained a balance of $4,817,986. The LIBOR Floor Certificates, which had apparently brought in at least $13 million in less than a year, were assigned an artificial value of $17,416,674, exactly equal to the balance of the 25% Note. Upon information and belief, the actual value of the LIBOR Floor Certificates was significantly greater.

294. The LIBOR Floor Certificates were therefore transferred to pay the 25% Note, and the Floor Bonds Reserve Account was emptied to make a separate payment to Lightstone Commercial. In short, the valuable LIBOR Floor Certificates that should have belonged to the Debtors were transferred to DL-DW for no consideration, and then to insiders as ostensible repayment for the $22 million "loan" to DL-DW. The remaining accumulated proceeds of the LIBOR Floor Certificates that had not been previously transferred to the insiders as payments on the $22 million loan, were diverted to insider Lightstone Commercial. Insiders were thus paid richly as the Debtors moved toward their inevitable bankruptcy. As described more fully below, bankruptcy was delayed for just over ninety days after the 25% Note was paid off, thus allowing the ninety-day preference period under the federal Bankruptcy Code to expire.

c. 2009 Performance Worsens.

295. During the first and second quarters of 2009, the Debtors experienced steep declines in ADR, OCC, room revenue and property-level EBITDA. As a result, the general ledger balance of cash available to the Debtors to fund operating expenses as of March

31, 2009 decreased to only approximately $16.2 million, from approximately $26.5 million as of December 31, 2008.

296.    In the second quarter of 2009, the Debtors continued capital expenditure freezes and instituted hiring freezes related to all full-time and part-time personnel. As the liquidity situation worsened, the LBO Buyer Individual Defendants that remained as officers and directors at the time discussed actions to conserve cash. For example, in April of 2009, the board of directors of the "Extended Stay Hotels family of companies" discussed that vendor payments were being stretched to conserve cash. On April 30, 2009 the Debtors' outstanding accounts payable balance over 60 days old of $1.3 million was more than 10% of the total accounts payable balance of approximately $11 million, the highest percentage since the LBO.

297.    By no later than May 14, 2009, the board was aware that the Debtors might not have enough unrestricted cash to fund operations through the end of May 2009. Further, the Debtors' declining cash position was expected to be exacerbated by the pending amortization triggered by the anticipated breach of the Debt Yield amortization threshold covenant, as described above.  These additional payments would have to be funded through the Cash Management Account beginning with the June 13, 2009 Waterfall cycle. Although restructuring alternatives were discussed by the board, none identified how, in the absence of a restructuring or bankruptcy, the Debtors might obtain the funds needed to make the upcoming Debt Yield amortization payments, which would total over $50 million for the remainder of 2009.

298.    As of May 31, 2009, the general ledger cash balance available to fund operating expenses had dropped to approximately $4.6 million, down from approximately $26.5 million as of December 31, 2008. In addition, the Debtors were incurring extensive restructuring

expenses. In June 2009, as a result of the severe liquidity situation and the imminent amortization payments, the Debtors were projected to completely deplete liquidity by the end of June 2009, and would be unable to meet payroll of approximately $9 million on Tuesday, June 19, 2009.

**G.     The Debtors File for Chapter 11 Protection Two Years and Four Days After the LBO's Closing, Just Over Ninety Days After Paying Off Insider Debt, and A Group of Investors Including Blackstone "Re-Acquires" the Debtors for $3.9 Billion.**

299.    Shortly after the June 11, 2009 two-year anniversary of the closing of the LBO, and after months of failed workout negotiations, the Debtors had to report whether the Debt Yield for 2009 was below the Debt Yield amortization threshold. If so, the borrowers were going to be liable for the payment of additional monthly amortization payments estimated to total as much as $51 million for the remainder of 2009. Given the Debtors' cash flow at the time, those amortization payments could not be made.

300.    In addition, a significant interest payment was due to be made to the mezzanine lenders as soon as Friday, June 12, 2009. If that payment was made, then (i) the Debtors would be unable to survive the upcoming week, when payroll was due, and (ii) the Debtors would not have access to those funds as cash collateral in a chapter 11 case.

301.    The only way to avoid these issues was to file for chapter 11 bankruptcy protection. However, the first group of the Debtors' chapter 11 cases were filed on Monday, June 15, 2009, two years and four days after the LBO closed on June 11, 2007, and 93 days after paying off the insider 25% Note in full.

302.    Upon information and belief, at least part of senior management's motivation in 2009 for delaying the inevitable bankruptcy filings was to (i) do so after the statute of limitations under 11 U.S.C. § 548 expired and the ninety day preference look-back period ran,

and (ii) give equity holders as much time as possible to consummate a restructuring transaction that preserved at least some of their equity in the Debtors and, more importantly, extricated equity holders from their significant guarantee obligations under the LBO debt.

303.   Ironically, during the Debtors' bankruptcy cases, a group of investors including Blackstone "re-acquired" the Debtors for $3.9 billion, substantially less than the total amount of crushing debt the Debtors were caused to incur in the LBO for Blackstone's benefit prior to the bankruptcy.  The post-bankruptcy transaction involving Blackstone was announced on or about April 2, 2010 and subsequently approved by the Bankruptcy Court as part of the Debtors' Plan on July 20, 2010.

## H.   The Debtors Were Dominated, Controlled and Manipulated by The Blackstone Group, The Buyer, and their Respective Affiliates, for Their Sole Benefit.

304.   Throughout the process that eventually drove them into bankruptcy, the Debtors were dominated and controlled by the Blackstone Pre-LBO Entity Defendants and Blackstone Group Individual Defendants before and in connection with the LBO, and by the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants post-LBO, in an attempt to siphon as much value from the Debtors as possible for the sole benefit of those parties and their affiliates, and without regard to the best interests or financial welfare of the Debtors and their creditors.  The Debtors were treated as nothing more than a collective vehicle to be exploited.

305.   From the start, the Blackstone Pre-LBO Entity Defendants and Blackstone Group Individual Defendants manipulated the Debtors by preparing financial information and projections in connection with the Information Memorandum that positioned the Debtors for a sale that would leave them, insolvent and with crushing debt and insufficient capital for ongoing operations.  Indeed, the projections provided by the Blackstone Pre-LBO Entity Defendants and

Blackstone Group Individual Defendants were based on strategies which they knew or should have known the Debtors would be unable to implement as a result of their foreseeable poor performance, financial condition and restricted cash flow following the LBO.

306.    As described above, the LBO was structured so as to allow the Blackstone Pre-LBO Entity Defendants to pull as much value out of the Debtors as possible without regard to the Debtors' solvency or ability to conduct profitable operations post-LBO.  The requirements and formalities under the LBO loan documents were ignored, thus allowing the Blackstone Pre-LBO Entity Defendants and Blackstone Group Individual Defendants to direct the distribution of $1.9 billion to themselves or their affiliates out of the Debtors' loan proceeds, after they had artificially driven up the sale price and the resulting amount of debt to be borne by the Debtors.

307.    Post-LBO, the formalities of the Debtors' separateness and accounting were ignored, as were the formalities regarding the flow of funds through the Cash Management Account, as the priority became paying and making distributions to equity holders at all costs. Further, the LBO was structured so as to allow the siphoning of value from the Debtors in the form of "asset management fees" for Lightstone entities, although the Debtors were managed by HVM (which was itself managed by HVM Manager, also a Lichtenstein entity after the LBO).

308.    The Debtors, meanwhile, were forced to pledge their assets as collateral for mortgage loans, despite the fact that they received none of the proceeds nor any benefit from the LBO.  The Debtors were further saddled with new, onerous restrictions on their cash flow, which was now directed toward servicing the debt that benefited all of the Defendants instead of being available for the Debtors' operations.

309.    Ultimately, even the timing of the Debtors' eventual and inevitable bankruptcy filing was manipulated by the LBO Buyer Entity Defendants and LBO Buyer

Individual Defendants that were directors, officers or persons otherwise in control of the Debtors at the time, so as to attempt to insulate themselves from certain federal clawback claims to the detriment of the Debtors' estates and the Debtors' creditors.  The Debtors were therefore thoroughly dominated and controlled by the Defendants at all times relevant to this Complaint, and their respective affiliates, in a greed-driven scheme that served only to enrich the Blackstone Pre-LBO Entity Defendants and to bestow ownership and control, and the associated benefits derived therefrom, on the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants, all at the sole expense of the Debtors.

310.    Despite the fact that the Debtors' financial distress detailed throughout this Complaint was or should have been known to the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants during their respective tenures as directors, officers or persons otherwise in control of the Debtors, the bleeding of the Debtors' assets continued after the LBO was consummated by illegal distributions and dividends to the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants.

311.    In addition to the improper distributions of the Debtors' assets that were made to the Blackstone Pre-LBO Entity Defendants under the direction of the Blackstone Group Individual Defendants in connection with the LBO, the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants helped themselves to the Debtors' assets at a time when the Debtors did not have a surplus and/or were insolvent, as described herein.  From the closing of the LBO in June 2007 through the filing of bankruptcy beginning in June 2009, the Debtors' assets were depleted by more than $100 million of substantial additional illegal and improper distributions, all of which were made when the authorizing and receiving parties knew or should have known that the Debtors did not have a surplus and were insolvent because the Debtors'

poor performance, distressed financial condition, cash flow issues and their resulting impact on Debtors' operations and expenditures was readily apparent.

312.    The LBO and its aftermath were orchestrated, negotiated, structured and carried out by the Defendants as nothing more than a sham to enrich themselves and affiliates they owned or controlled at the expense of the Debtors, the Debtors' estates and the Debtors' creditors.

## I.    The Debtors' Assets Were Depleted By The Improper Distributions and Dividends.

313.    Despite the fact that the Debtors' financial distress and the debt yield issues detailed above were or should have been known to senior management as well as the Debtors' equity holders, the willful bleeding of the Debtors' assets continued after the LBO's consummation in the form of improper distributions and dividends.

314.    In addition to the improper distributions of Debtor assets that were made to the Sellers in connection with the LBO, numerous other parties helped themselves to the Debtors' assets at a time when the Debtors did not have a surplus and/or were insolvent.

315.    As is detailed above well over $100 million of improper dividends and other distributions of the Debtors' assets were made from the date the LBO closed in June 2007 and the date the Debtors began filing bankruptcy in June 2009.

## J.    The Sellers' and Buyer's Professionals Were Unjustly Enriched As Well.

316.    The Sellers, the Buyer and the equity unit holders were not the only parties to gorge themselves at the trough on the proceeds of the Debtors' loans.  Without regard to the fact that the Debtors obtained no direct or indirect benefit from the purported services they provided, the fees for the Buyer's and Sellers' Professionals were also paid directly by the Debtors from loan proceeds the Debtors borrowed at the LBO's closing.

317.    Bank of America received approximately $3,971,658 in fees on behalf of the Sellers out of the loan proceeds.

318.    Citigroup received approximately $6,350,000 in fees on behalf of the Buyer out of the loan proceeds.

319.    Although they served only to advise on and facilitate a transaction that financially doomed the Debtors and which provided no value to the Debtors, Bank of America and Citigroup have been enriched by fees that were ultimately paid by the Debtors.

320.    Ebury received approximately $9,341,984 in fees and disbursements in connection with the loans made to the Debtors as part of the LBO.  These fees and disbursements were paid out of the proceeds of the loans the Debtors were forced to incur, despite the fact that the loans did not provide any direct or indirect benefit to the Debtors.

321.    The Trust is thus also entitled to recover the professional fees identified herein.

## CAUSES OF ACTION

### AS FOR A FIRST CAUSE OF ACTION

#### (Breach Of Fiduciary and Contractual Duties Of Care, Loyalty and Good Faith – Blackstone Pre-LBO Entity Defendants)

322.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 321 as though fully set forth herein.

323.    Up to the date and time the LBO closed, and at all times relevant to this Complaint prior to that date, the Blackstone Pre-LBO Entity Defendants, as entities that owned, controlled and otherwise dominated the pre-LBO Debtors owed the pre-LBO Debtors the fiduciary and contractual duties of good faith, care and loyalty.

324.     The Debtors were either rendered insolvent or placed in the zone of insolvency as a result of or in connection with the LBO.  Each of the Blackstone Pre-LBO Entity Defendants therefore owed fiduciary and contractual duties to the Debtors and the Debtors' creditors and not just to the Debtors' pre-LBO direct and indirect equity owners at the time of the LBO.

325.     Each of the Blackstone Pre-LBO Entity Defendants had the authority to control the management, affairs and direction of the Debtors up to the date the LBO closed. Each Blackstone Pre-LBO Entity Defendant, by virtue of its position, was capable of influencing and did in fact influence the acts and omissions giving rise to the claims alleged herein.

326.     Each Blackstone Pre-LBO Entity Defendant, acting both individually and collectively, breached its fiduciary and contractual duties to the Debtors by acting or omitting to act, as follows:

(a)     As to all Blackstone Pre-LBO Entity Defendants, orchestrating, negotiating and documenting, and causing or allowing the Debtors and the Debtors' affiliates to enter into, the LBO and incur substantial amounts of ruinous debt solely for the benefit of the Blackstone Pre-LBO Entity Defendants, and rendering the Debtors insolvent;

(b)     As to all Blackstone Pre-LBO Entity Defendants, causing or allowing one or more of the Blackstone Pre-LBO Entity Defendants to receive improper distributions from the Debtors in connection with the LBO totaling no less than approximately $1.9 billion in the aggregate, which distributions were paid for the Blackstone Pre-LBO Entity Defendants' benefit, out of the

proceeds of loans the Debtors were forced to take on exclusively for the benefit of the Blackstone Pre-LBO Entity Defendants;

(c)   As to all Blackstone Pre-LBO Entity Defendants, engaging in multiple acts of self-dealing through the siphoning of $1.9 billion of value from the Debtors for the benefit of the Blackstone Pre-LBO Entity Defendants;

(d)   As to all Blackstone Pre-LBO Entity Defendants, causing or allowing the Debtors to enter into the LBO loan and other transaction documents that contained provisions that severely and adversely impacted the Debtors' ability to operate their businesses after the LBO closed;

(e)   As to all Blackstone Pre-LBO Entity Defendants, causing, allowing and otherwise actively participating in the dissemination of the materially misleading Information Memorandum in furtherance of the Blackstone Pre-LBO Entity Defendants' systematic effort to improperly drain over $1.9 billion of value from the Debtors;

(f)   As to all Blackstone Pre-LBO Entity Defendants, causing or allowing BRE.ESH, their affiliate, to receive the $200 million "rollover equity" interest in the post-LBO Debtors in exchange for nothing, while pre-LBO creditors of the Debtors remained unpaid at the time of and following the LBO's closing; and

(g)   As to BHAC IV and BRE.HV, engaging in multiple acts of self-dealing, as direct controlling shareholders or members of the Debtors' entire pre-LBO enterprise, allowing themselves to be systematically dominated and controlled at all relevant times by Blackstone Group, and acting or

116

omitting to act solely out of concern for the interests of the Blackstone Group, as the Debtors' ultimate parent controlling shareholder or member.

327.    Each Blackstone Pre-LBO Entity Defendant's acts or omissions described herein was, alternatively, either fraudulent, willful, deliberate, knowing, in bad faith, reckless, or grossly negligent and in derogation of applicable law.   Each Blackstone Pre-LBO Entity Defendant's acts and omissions fell substantially below the standards generally practiced and accepted by other fiduciaries in similar circumstances.

328.    Each Blackstone Pre-LBO Entity Defendant's acts and omissions described herein directly and proximately caused harm to the Debtors, the Debtors' estates and the Debtors' creditors who are beneficiaries of the Trust, in an amount to be determined at trial but not less than $2.1 billion.

329.    By reason of each Blackstone Pre-LBO Entity Defendant's acts and omissions described herein, the Trust is entitled to recovery of actual, compensatory and consequential damages from the Blackstone Pre-LBO Entity Defendants, jointly and severally, in an amount to be determined at trial, but not less than $2.1 billion.

330.    Because the acts and omissions of the Blackstone Pre-LBO Entity Defendants were gross, wanton and malicious, the Trust is entitled to punitive damages of at least three times the actual damage, or $6.3 billion, or such other amount as the Court may determine after trial.

## AS FOR A SECOND CAUSE OF ACTION

### (Breach Of Fiduciary and Contractual Duties Of Care, Loyalty and Good Faith – LBO Buyer Entity Defendants)

331.   Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 321 as though fully set forth herein.

332.   From and after no later than the date and time the LBO closed, and at all relevant times thereafter, the LBO Buyer Entity Defendants, as entities that owned, controlled and otherwise dominated the post-LBO Debtors, owed the post-LBO Debtors and the Debtors' creditors the fiduciary and contractual duties of good faith, care and loyalty.

333.   The Debtors were either rendered insolvent or placed in the zone of insolvency as a result of or in connection with the LBO, and remained insolvent at all times from and after the date the LBO closed.  Each of the LBO Buyer Entity Defendants therefore owed fiduciary and contractual duties to the Debtors and the Debtors' creditors, and not just to the Debtors' post-LBO direct and indirect equity owners at all times after the date the LBO closed.

334.   Each of the LBO Buyer Entity Defendants had the authority to control the management, affairs and direction of the Debtors at all relevant times following the LBO's closing.  Each LBO Buyer Entity Defendants, by virtue of its position of control, was capable of influencing and did in fact influence the acts and omissions giving rise to the claims alleged herein.

335.   Each of the LBO Buyer Entity Defendants, acting both individually and collectively, breached its fiduciary and contractual duties, as follows:

(a)   As to each LBO Buyer Entity Defendant, causing or allowing the Debtors to improperly pay substantial illegal dividends or other improper

distributions of value from Debtors to the applicable LBO Buyer Entity Defendants and their affiliates described in this Complaint at times when the Debtors were insolvent, including, without limitation, the payment of the following value from the Debtors:

(i)    distribution of the LIBOR Floor Certificates, which had a value at the time of no less than approximately $25 million, to DL-DW on or around no later than November 2, 2007, and subsequent payments received by DL-DW on account of those certificates, totaling no less than approximately $13 million;

(ii)   substantial payments of rent to Lightstone entities through HFI following the HFI acquisition of the hotel properties formerly subject to the HPT Capital Lease, beginning no later than approximately late-July 2007;

(iii)  distribution of over $77 million to DL-DW from the LBO closing account on or around July 17, 2007;

(iv)   distribution of approximately $2.3 million to DL-DW as a post-LBO "purchase price adjustment" on or around no later than October 17, 2007;

(v)    carrying out substantial equity distributions and dividends throughout 2007 totaling no less than approximately $23 million;

(vi)     causing the Debtors to take on the onerous obligations under the insider 25% Note on or around April 16, 2008, including, without limitation, collateralizing the 25% Note with the LIBOR Floor Certificates that had been stolen from the Debtors by DL-DW, and causing the Debtors to make substantial "interest payments" and other payments to insiders or for insiders' benefit on account of the 25% Note totaling no less than approximately $5.7 million through the end of 2008;

(vii)    carrying out substantial equity distributions and dividends to one or more of the LBO Buyer Entity Defendants throughout 2008, totaling no less than approximately $21.3 million;

(viii)   causing or allowing the distribution of funds held in the Preferred Equity Reserve Account to insiders on the eve of bankruptcy, totaling no less than approximately $20.5 million in early 2009;

(ix)     causing or allowing the full, accelerated payoff of the insider 25% Note, which payoff totaled no less than approximately $17.4 million on the eve of the Debtors' eventual bankruptcy filing;

(x)      causing or allowing the distribution of funds from the Floor Bonds Reserve Account on the eve of the Debtors' eventual bankruptcy filing totaling approximately $4.8 million;

(xi)  causing or allowing the payment of substantial "asset management" fees totaling no less than approximately $1 million annually to Lightstone entities or Lichtenstein, despite the fact that HVM was managing the Debtors' daily business affairs; and

(xii)  causing or allowing the Debtors to delay the commencement of bankruptcy proceedings, with self-dealing motives, until (a) slightly more than two years after the LBO's closing, and (b) slightly more than 90 days after the payoff of the insider 25% Note, in an attempt to adversely impact the Debtors' ability to avoid and recover those transfers under the Bankruptcy Code for the benefit of the Debtors, the Debtors' estates and the Debtors' creditors.

(b)  As to each LBO Buyer Entity Defendant, orchestrating, negotiating and documenting, and causing or allowing the Debtors and the Debtors' affiliates to enter into, the LBO and incur substantial amounts of ruinous debt solely for the benefit of the Blackstone Pre-LBO Entity Defendants, and rendering the Debtors insolvent;

(c)  As to each LBO Buyer Entity Defendant, causing or allowing one or more of the Blackstone Pre-LBO Entity Defendants to receive improper distributions from the Debtors in connection with the LBO totaling no less than approximately $1.9 billion in the aggregate, which distributions were paid for the Blackstone Pre-LBO Entity Defendants' benefit, out of the

proceeds of loans the Debtors were forced to take on exclusively for the benefit of the Blackstone Pre-LBO Entity Defendants;

(d)     As to each LBO Buyer Entity Defendant, causing or allowing BRE.ESH, an affiliate of the Blackstone Pre-LBO Entity Defendants, to receive the $200 million "rollover equity" interest in the post-LBO Debtors in exchange for nothing, while pre-LBO creditors of the Debtors remained unpaid at the time of and following the LBO's closing; and

(e)     As to each LBO Buyer Entity Defendant, causing or allowing the Debtors to enter into the LBO loan and other transaction documents that contained provisions that severely and adversely impacted the Debtors' ability to operate their businesses after the LBO closed while arranging for the Debtors to agree to provisions in the LBO loan and other transaction documents that would cause or allow the Debtors to be forced to make improper distributions to one or more of the LBO Buyer Entity Defendants regardless of the Debtors' dire financial condition or poor performance.

336.    Each LBO Buyer Entity Defendant's acts or omissions described herein was, alternatively, either fraudulent, willful, deliberate, knowing, in bad faith, reckless, or grossly negligent and in derogation of applicable law.  Each LBO Buyer Entity Defendant's acts and omissions fell substantially below the standards generally practiced and accepted by other fiduciaries in similar circumstances.

337.     Each LBO Buyer Entity Defendant's acts and omissions described herein directly and proximately caused harm to the Debtors, the Debtors' estates and the Debtors' creditors who are beneficiaries of the Trust, in an amount to be determined at trial but not less than $2.1 billion.

338.     By reason of each LBO Buyer Entity Defendant's acts and omissions described herein, the Trust is entitled to recovery of actual, compensatory and consequential damages from the LBO Buyer Entity Defendants, jointly and severally, in an amount to be determined at trial, but not less than $2.1 billion.

339.     Because the acts and omissions of the LBO Buyer Entity Defendants were gross, wanton and malicious, the Trust is entitled to punitive damages of at least three times the actual damage, or $6.3 billion, or such other amount as the Court may determine after trial.

### AS FOR A THIRD CAUSE OF ACTION

#### (Breach Of Fiduciary and Contractual Duties Of Care, Loyalty and Good Faith – Blackstone Group Individual Defendants)

340.     Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 321 as though fully set forth herein.

341.     Up to the date the LBO closed, and at all relevant times prior to that date, the Blackstone Group Individual Defendants, as the individuals that were directors or officers, or otherwise controlled and managed the pre-LBO Debtors, owed the pre-LBO Debtors the fiduciary and contractual duties of good faith, care and loyalty.

342.     The Debtors were either rendered insolvent or placed in the zone of insolvency as a result of or in connection with the LBO.   Each of the Blackstone Group Individual Defendants therefore owed fiduciary and contractual duties to the Debtors and the

Debtors' creditors and not just to the Debtors' pre-LBO direct and indirect equity owners for which each of the Blackstone Group Individual Defendants also served as insiders.

343.     Each of the Blackstone Group Individual Defendants had the authority to control the management, affairs and direction of the Debtors up to the date the LBO closed. Each Blackstone Group Individual Defendant, by virtue of his position, was capable of influencing and did in fact influence the acts and omissions giving rise to the claims alleged herein.

344.     Each Blackstone Group Individual Defendant, acting both individually and collectively, breached his fiduciary and contractual duties to the Debtors by acting or omitting to act, as follows:

(a)     As to all Blackstone Group Individual Defendants, orchestrating, negotiating and documenting, and causing or allowing the Debtors and the Debtors' affiliates to enter into, the LBO and incur substantial amounts of ruinous debt solely for the benefit of the Blackstone Pre-LBO Entity Defendants, for which the Blackstone Group Individual Defendants also served as directors, officer or members of management, and rendering the Debtors insolvent;

(b)     As to all Blackstone Group Individual Defendants, causing or allowing one or more of the Blackstone Pre-LBO Entity Defendants to receive improper distributions from the Debtors in connection with the LBO totaling no less than approximately $1.9 billion in the aggregate, which distributions were paid for the Blackstone Pre-LBO Entity Defendants'

benefit, out of the proceeds of loans the Debtors were forced to take on exclusively for the benefit of the Blackstone Pre-LBO Entity Defendants for which the Blackstone Group Individual Defendants also served as directors, officer or members of management;

(c)     As to all Blackstone Group Individual Defendants, engaging in multiple acts of self-dealing and conflict of interest transactions through the siphoning of $1.9 billion of value from the Debtors for the benefit of the Blackstone Pre-LBO Entity Defendants for which the Blackstone Group Individual Defendants also served as directors, officer or members of management;

(d)     As to all Blackstone Group Individual Defendants, causing or allowing the Debtors to enter into the LBO loan and other transaction documents that contained provisions that severely and adversely impacted the Debtors' ability to operate their businesses after the LBO closed;

(e)     As to all Blackstone Group Individual Defendants, causing, allowing and otherwise actively participating in the dissemination of the materially misleading Information Memorandum in furtherance of the Blackstone Pre-LBO Entity Defendants' systematic effort to improperly drain over $1.9 billion of value from the Debtors;

(f)     As to all Blackstone Group Individual Defendants, causing or allowing BRE.ESH to receive the $200 million "rollover equity" interest in the post-LBO Debtors in exchange for nothing, while pre-LBO creditors of

the Debtors remained unpaid at the time of and following the LBO's closing; and

(f)     As to all Blackstone Group Individual Defendants, engaging in multiple acts of self-dealing and bad faith, allowing themselves to be systematically dominated and controlled at all relevant times by Blackstone Group, and acting or omitting to act solely out of concern for the interests of the Blackstone Group, the Debtors' ultimate parent controlling shareholder or member.

345.    Each Blackstone Group Individual Defendant's acts or omissions described herein was, alternatively, either fraudulent, willful, deliberate, knowing, in bad faith, reckless, or grossly negligent and in derogation of applicable law.   Each Blackstone Group Individual Defendant's acts and omissions fell substantially below the standards generally practiced and accepted by other fiduciaries in similar circumstances.

346.    Each Blackstone Group Individual Defendant's acts and omissions described herein directly and proximately caused harm to the Debtors, the Debtors' estates and the Debtors' creditors who are beneficiaries of the Trust, in an amount to be determined at trial but not less than $2.1 billion.

347.    By reason of each Blackstone Group Individual Defendant's acts and omissions described herein, the Trust is entitled to recovery of actual, compensatory and consequential damages from the Blackstone Group Individual Defendants, jointly and severally, in an amount to be determined at trial, but not less than $2.1 billion.

348.    Because the acts and omissions of the Blackstone Group Individual Defendants were gross, wanton and malicious, the Trust is entitled to punitive damages of at least three times the actual damage, or $6.3 billion, or such other amount as the Court may determine after trial.

## AS FOR A FOURTH CAUSE OF ACTION

### (Breach Of Fiduciary and Contractual Duties Of Care, Loyalty and Good Faith – LBO Buyer Individual Defendants)

349.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 321 as though fully set forth herein.

350.    From and after no later than the date the LBO closed, and at all relevant times thereafter, the LBO Buyer Individual Defendants, during their respective tenures as directors, officers or persons that otherwise managed, owned, controlled and dominated the Debtors, owed the Debtors and the Debtors' creditors the fiduciary and contractual duties of good faith, care and loyalty.

351.    The Debtors were either rendered insolvent or placed in the zone of insolvency as a result of or in connection with the LBO, and remained insolvent at all times from and after the date the LBO closed.  Each of the LBO Buyer Individual Defendants, during their respective tenures as directors, officers or persons that otherwise managed, owned, controlled and dominated the Debtors, therefore owed fiduciary and contractual duties to the Debtors and the Debtors' creditors, and not just to the Debtors' post-LBO direct and indirect equity owners at all times after the date the LBO closed.

352.    Each of the LBO Buyer Individual Defendants, during their respective tenures as directors, officers or persons that otherwise managed, owned, controlled and

dominated the Debtors, had the authority to control the management, affairs and direction of the Debtors at all relevant times following the LBO's closing.   Each LBO Buyer Individual Defendant, during his tenure as a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors, by virtue of his position of control, was capable of influencing and did in fact influence the acts and omissions giving rise to the claims alleged herein.

353.   Each of the LBO Buyer Individual Defendants, during his tenure as a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors, acting both individually and collectively, breached his fiduciary and contractual duties, as follows:

(a)   As to each LBO Buyer Individual Defendant, causing or allowing the Debtors to improperly pay substantial illegal dividends or other improper distributions of value from Debtors to the applicable LBO Buyer Entity Defendants and, upon information and belief, in some cases, to himself, as described in this Complaint, at times when the Debtors were insolvent, including, without limitation, the payment of the following value from the Debtors:

(i)   distribution of the LIBOR Floor Certificates, which had a value at the time of no less than approximately $25 million, to DL-DW on or around no later than November 2, 2007, and subsequent payments received by DL-DW on account of those certificates, totaling no less than approximately $13 million;

(ii)     substantial payments of rent to Lightstone entities through HFI following the HFI acquisition of the hotel properties formerly subject to the HPT Capital Lease, beginning no later than approximately late-July 2007;

(iii)    distribution of over $77 million to DL-DW from the LBO closing account on or around July 17, 2007;

(iv)    distribution of approximately $2.3 million to DL-DW as a post-LBO "purchase price adjustment" on or around no later than October 17, 2007;

(v)     carrying out substantial equity distributions and dividends throughout 2007 totaling no less than approximately $23 million;

(vi)    causing the Debtors to take on the onerous obligations under the insider 25% Note on or around April 16, 2008, including, without limitation, collateralizing the 25% Note with the LIBOR Floor Certificates that had been stolen from the Debtors by DL-DW, and causing the Debtors to make substantial "interest payments" and other payments to insiders or for insiders' benefit on account of the 25% Note totaling no less than approximately $5.7 million through the end of 2008;

(vii)  carrying out substantial equity distributions and dividends to one or more of the LBO Buyer Entity Defendants throughout 2008, totaling no less than approximately $21.3 million;

(viii)  causing or allowing the distribution of funds held in the Preferred Equity Reserve Account to insiders on the eve of bankruptcy, totaling no less than approximately $20.5 million in early 2009;

(ix)  causing or allowing the full, accelerated payoff of the insider 25% Note, which payoff totaled no less than approximately $17.4 million on the eve of the Debtors' eventual bankruptcy filing;

(x)   causing or allowing the distribution of funds from the Floor Bonds Reserve Account on the eve of the Debtors' eventual bankruptcy filing totaling approximately $4.8 million;

(xi)  causing or allowing the payment of substantial "asset management" fees totaling no less than approximately $1 million annually to Lightstone entities or Lichtenstein, despite the fact that HVM was managing the Debtors' daily business affairs; and

(xii)  causing or allowing the Debtors to delay the commencement of bankruptcy proceedings, with self-dealing motives, until (a) slightly more than two years after the LBO's closing, and (b) slightly more than 90 days after the payoff of the insider 25% Note, in an attempt to adversely impact the Debtors' ability to

avoid and recover those transfers under the Bankruptcy Code for the benefit of the Debtors, the Debtors' estates and the Debtors' creditors.

(b)    As to each LBO Buyer Individual Defendant, to the extent he was a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors at the time, orchestrating, negotiating and documenting, and causing or allowing the Debtors and the Debtors' affiliates to enter into, the LBO and incur substantial amounts of ruinous debt solely for the benefit of the Blackstone Pre-LBO Entity Defendants, and rendering the Debtors insolvent;

(c)    As to each LBO Buyer Individual Defendant, to the extent he was a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors at the time, causing or allowing one or more of the Blackstone Pre-LBO Entity Defendants to receive improper distributions from the Debtors in connection with the LBO totaling no less than approximately $1.9 billion in the aggregate, which distributions were paid for the Blackstone Pre-LBO Entity Defendants' benefit, out of the proceeds of loans the Debtors were forced to take on exclusively for the benefit of the Blackstone Pre-LBO Entity Defendants;

(d)    As to each LBO Buyer Individual Defendant, to the extent he was a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors at the time, causing or allowing BRE.ESH to receive the $200 million "rollover equity" interest in the post-LBO

Debtors in exchange for nothing, while pre-LBO creditors of the Debtors remained unpaid at the time of and following the LBO's closing; and

(e)     As to each LBO Buyer Individual Defendant, to the extent he was a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors at the time, causing or allowing the Debtors to enter into the LBO loan and other transaction documents that contained provisions that severely and adversely impacted the Debtors' ability to operate their businesses after the LBO closed while arranging for the Debtors to agree to provisions in the LBO loan and other transaction documents that would cause or allow the Debtors to be forced to make improper distributions to one or more of the LBO Buyer Entity Defendants regardless of the Debtors' dire financial condition or poor performance.

354.   Each LBO Buyer Individual Defendant's acts or omissions described herein was, alternatively, either fraudulent, willful, deliberate, knowing, in bad faith, reckless, or grossly negligent and in derogation of applicable law.  Each LBO Buyer Individual Defendant's acts and omissions fell substantially below the standards generally practiced and accepted by other fiduciaries in similar circumstances.

355.   Each LBO Buyer Individual Defendant's acts and omissions described herein directly and proximately caused harm to the Debtors, the Debtors' estates and the Debtors' creditors who are beneficiaries of the Trust, in an amount to be determined at trial but not less than $2.1 billion.

356.    By reason of each LBO Buyer Individual Defendant's acts and omissions described herein, the Trust is entitled to recovery of actual, compensatory and consequential damages from the LBO Buyer Individual Defendants, jointly and severally, in an amount to be determined at trial, but not less than $2.1 billion.

357.    Because the acts and omissions of the LBO Buyer Individual Defendants were gross, wanton and malicious, the Trust is entitled to punitive damages of at least three times the actual damage, or $6.3 billion, or such other amount as the Court may determine after trial.

## AS FOR A FIFTH CAUSE OF ACTION

### (Aiding, Abetting, Inducing or Participating in Breaches of Fiduciary Duties and Other Misconduct – All Defendants)

358.    Plaintiff incorporates by reference, repeats and re-alleges each and every allegation contained in paragraphs 1 through 357 of this Complaint as though fully set forth herein.

359.    Pleading in the alternative, each Defendant aided, abetted, induced, participated in or conspired to commit the breaches of fiduciary and contractual duties by one or more of the other Defendants, as described above.

360.    Each Defendant knew or knew should have known that the other Defendants' acts and omissions constituted breaches of fiduciary and contractual duties.

361.    With that knowledge, each Defendant provided material and substantial assistance in connection with, and knowingly participated in, the other Defendants' breach of their fiduciary duties and misconduct identified above.

362.     In providing such assistance, each of the Defendants acted in bad faith and with the actual intent to assist the other Defendants in their respective breaches of fiduciary duties.

363.     As a result, each of the Defendants is liable to the Plaintiff as an aider and abettor.  Each Defendant's independent tortious acts or omissions as an aider and abettor directly and proximately caused harm to the Debtors, the Debtors' creditors and the Debtors' estates in an amount to be determined at trial, but not less than $2.1 billion.

364.     By reason of Defendants' aiding and abetting activities, the Plaintiff is entitled to recovery of actual, compensatory, and consequential damages from Defendants, jointly and severally, in the amount estimated to be no less than $2.1 billion.

## AS FOR A SIXTH CAUSE OF ACTION

### (Waste – All Defendants)

365.     Plaintiff incorporates by reference, repeats, and re-alleges each and every allegation contained in paragraphs 1 through 357 of this Complaint as though fully set forth herein.

366.     Pleading in the alternative, each of the Defendant's acts or omissions described herein constituted a waste of assets of the Debtors.

367.     Each of the Defendant's acts or omissions described herein was, alternatively, either fraudulent, willful, deliberate, knowing, in bad faith, reckless, grossly negligent or negligent and in derogation of applicable law.

368.     Each of the Defendant's acts or omissions identified herein constituted the irrational squandering of the Debtors' assets and the value thereof. There was no good faith basis

upon which any of the Defendants could have concluded that those acts or omissions were beneficial to the Debtors.

369.    Each of the Defendants' acts or omissions identified herein directly and proximately caused harm to the Debtors in an amount no less than $2.1 billion.

370.    By reason of the Defendants' acts or omissions described herein, Plaintiff is entitled to recovery of actual, compensatory and consequential damages from Defendants, jointly and severally, in the amount to be determined at trial, but no less than $2.1 billion.

### AS FOR A SEVENTH CAUSE OF ACTION

### (Breaches of Fiduciary Duties Owed to Creditors – All Defendants)

371.    Plaintiff incorporates by reference, repeats and re-alleges each and every allegation contained in paragraphs 1 through 357 of this Complaint as though fully set forth herein.

372.    Pleading in the alternative, under applicable law, Defendants owed all creditors of the Debtors the fiduciary duties identified herein once the Debtors either became insolvent or entered the zone or vicinity of insolvency on or around no later than June 11, 2007 and at all relevant times thereafter.

373.    Defendants breached the fiduciary duties identified herein owed to the Debtors' creditors by committing the acts or omissions described herein.

374.    Each of the Defendant's acts or omissions described herein was, alternatively either fraudulent, willful, deliberate, knowing, in bad faith, reckless, grossly negligent or negligent and in derogation of applicable law.

375.    Each of the Defendant's acts or omissions identified herein directly and proximately caused generalized harm to all of the Debtors' creditors and claimant in the amount no less than $2.1 billion.

376.    By reason of the Defendants' acts or omissions described herein, Plaintiff is entitled to recovery of actual, compensatory and consequential damages from Defendants, jointly and severally, in an amount to be determined at trial, but not less than $2.1 billion on behalf of all of the Debtors' creditors and claimants.

377.    Because the acts or omissions of Defendants described herein were gross, wanton and malicious, the Trust is entitled to punitive damages of at least three times the actual damage, or $6.3 billion, or such other amount as the Court may determine after trial.

## AS FOR AN EIGHTH CAUSE OF ACTION

**(Unjust Enrichment – Against BHAC IV, LLC and BRE.HV Holdings LLC (the "Sellers"))**

378.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

379.    The Sellers have been unjustly enriched.  The Sellers wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors as well as indebtedness incurred by the Debtors.

380.    As is set forth above, the Sellers received approximately $1.9 billion in connection with the LBO, which in turn resulted in a significant depletion of the Debtors' assets in that the Debtors provided liens on all their assets for no consideration and incurred approximately $1.7 billion in additional secured debt.  After the proceeds of the loans made to Debtors in connection with the LBO were applied to extant debt, the Debtors received nothing and received no direct or indirect benefit for assuming the additional secured debt.

381.   All of the approximately $1.9 billion that enriched the Sellers came at the expense of the Debtors, and the Sellers have retained those monies.

382.   Equity and good conscience require full restitution of the monies received by the Sellers in connection with the Acquisition.  This includes not only the money itself that the Sellers received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A NINTH CAUSE OF ACTION

### (Illegal Distributions – Against BHAC IV, LLC and BRE.HV Holdings LLC (the "Sellers"))

383.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

384.   As is set forth above, the Sellers received distributions totaling approximately $1.9 billion in connection with the LBO.  These distributions were made to the Sellers from funds that ultimately came from the Debtors.

385.   Each and every distribution made to the Sellers was made at a time when the Debtors did not have a surplus or were insolvent.

386.   The Sellers were on notice of the impropriety of every distribution they received in that the Sellers knew the Debtors did not have a surplus and/or would be rendered insolvent as a result of the LBO and the distributions made in connection therewith.

387.   The Sellers are therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the Delaware General Corporations Law  ("DGCL") and/or Section 18-607 of the Delaware Limited Liability Company Act ("DLLCA").

## AS FOR A TENTH CAUSE OF ACTION

### (Illegal Dividends – Against Jonathan D. Gray, Robert L. Friedman, William Stein and Michael Chae (together, the "Pre-LBO Director Defendants"))

388.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

389.    As is set forth above, the Sellers received distributions totaling approximately $1.9 billion in connection with the LBO, which were authorized and allowed by the Pre-LBO Director Defendants.  These distributions were made to the Sellers from funds that came from ESI, Homestead or other Debtors, which are each Delaware entities.

390.    Each and every distribution that the Pre-LBO Director Defendants authorized to be paid to the Sellers was made at a time when the Debtors did not have a surplus or were insolvent.

391.    These distributions were willfully or negligently made by the Pre-LBO Director Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors.

392.    The Pre-LBO Director Defendants are therefore liable for repayment of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR AN ELEVENTH CAUSE OF ACTION

### (Unjust Enrichment – Against BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC )

393.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

394.   BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC have been unjustly enriched.   BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC each wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors as well as indebtedness incurred by the Debtors.

395.   As is set forth above, BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC are the three entities that actually received the approximately $1.9 billion in connection with the LBO.   BHAC IV, LLC received $1,282,764,449 at the closing; Blackstone Hospitality Acquisitions, LLC received $489,546,289 at the closing; and Prime Hospitality, LLC received $4,110,604 at the closing, each from an LBO closing account at First American Title Insurance Company.   In addition, BHAC IV, LLC received the earnest money of $85,611,012 directly from a Chicago Title Insurance Company escrow account used in connection with the LBO.   The payment of these monies to BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC resulted in a significant depletion of the Debtors' assets in that the Debtors provided liens on all their assets for no consideration and incurred approximately $1.7 billion in additional secured debt.   After the proceeds of the loans made to Debtors in connection with the LBO were applied to extant debt, the Debtors received nothing and received no direct or indirect benefit for assuming the additional secured debt.

396.   All of the approximately $1.9 billion that enriched the BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC came at the expense of the Debtors, and BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC have retained those monies.

397.    Equity and good conscience require full restitution of the monies received by BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC in connection with the LBO.   This includes not only the money itself that BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC received, but also the proceeds of that money.   Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A TWELFTH CAUSE OF ACTION

**(Illegal Distributions – Against BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC)**

398.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

399.    As is set forth above, BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC received distributions totaling approximately $1.9 billion in connection with the LBO.   These distributions were made to BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC from funds that ultimately came from the Debtors.

400.    Each and every distribution made to BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC was made at a time when the Debtors did not have a surplus or were insolvent.

401.    BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC were on notice of the impropriety of every distribution they received in that BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC knew the

Debtors did not have a surplus and/or would be rendered insolvent as a result of the LBO and the distributions made in connection therewith.

402.     BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC are therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A THIRTEENTH CAUSE OF ACTION

**(Illegal Dividends – Against Jonathan D. Gray, Robert L. Friedman, William Stein and Michael Chae (together, the "Pre-LBO Director Defendants"))**

403.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

404.     As is set forth above, BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC received distributions totaling approximately $1.9 billion in connection with the LBO, which were authorized and allowed by the Pre-LBO Director Defendants.  These distributions were made to BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC from funds that came from ESI, Homestead or other Debtors, which are each Delaware entities.

405.     Each and every distribution that the Pre-LBO Director Defendants authorized to be paid to BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC was made at a time when the Debtors did not have a surplus or were insolvent.

406.     These distributions were willfully or negligently made by the Pre-LBO Director Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors.

407.   The Pre-LBO Director Defendants are therefore liable for repayment of the unlawful distributions under Sections 160 and 174 of the DGCL and/or the DLLCA.

## AS FOR A FOURTEENTH CAUSE OF ACTION

**(Alter Ego Liability – The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC, and BRE/HV Holdings LLC (the "Blackstone Alter Ego Defendants"))**

408.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

409.   The Blackstone Alter Ego Defendants should be held liable for the debts and obligations of the Debtors because the Blackstone Alter Ego Defendants were the alter egos of the Debtors prior to and in connection with the LBO.

410.   The Blackstone Alter Ego Defendants dominated and controlled the Debtors and used that domination and control to cause the Debtors to incur extensive additional indebtedness of at least $1.7 billion and to make substantial transfers in connection with the LBO as set forth above.

411.   The Blackstone Alter Ego Defendants caused the Debtors to incur the additional indebtedness and to make the transfers in connection with the LBO all for the sole benefit of the Blackstone Alter Ego Defendants and to the detriment of the Debtors.

412.   The Blackstone Alter Ego Defendants are therefore liable for the debts and obligations of the Debtors.

## AS FOR A FIFTEENTH CAUSE OF ACTION

**(Alter Ego Liability – Against DL-DW Holdings LLC, Princeton ESH LLC, Atmar Associates, LLC, Lightstone Holdings, LLC and BRE/ESH Holdings, LLC (the "DL-DW Alter Ego Defendants"))**

413.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

414.     The DL-DW Alter Ego Defendants should be held liable for the debts and obligations of the Debtors because the DL-DW Alter Ego Defendants were the alter egos of the Debtors in connection with and following the LBO.

415.     The DL-DW Alter Ego Defendants dominated and controlled the Debtors and used that domination and control to cause the Debtors to incur extensive additional indebtedness of at least $1.7 billion, to make substantial transfers in connection with the LBO as set forth above, and to make the other improper equity dividends, distributions and other transfers, totaling in excess of $170 million, as described herein.

416.     The DL-DW Alter Ego Defendants caused the Debtors to incur the additional indebtedness and to make the transfers in connection with the LBO all for the sole benefit of the DL-DW Alter Ego Defendants and to the detriment of the Debtors.

417.     The DL-DW Alter Ego Defendants are therefore liable for the debts and obligations of the Debtors.

## AS FOR A SIXTEENTH CAUSE OF ACTION

**(Illegal Dividends and Distributions – Against BHAC Capital IV, LLC)**

418.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

419.    As is set forth above, BHAC Capital IV, LLC received dividends and distributions totaling approximately $40,607,000 during 2007 and 2008.  These dividend payments were made to BHAC Capital IV, LLC from funds that came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc.

420.    Each and every dividend and distribution paid to BHAC Capital IV, LLC was made at a time when the Debtors did not have a surplus or were insolvent.

421.    BHAC Capital IV, LLC was on notice of the distressed condition of the Debtors as well as the fact that every dividend and distribution it received violated the terms of the applicable mortgage loan documents, and thus BHAC Capital IV, LLC was on notice of the impropriety of the dividends and distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those dividends.

422.    BHAC Capital IV, LLC is therefore liable for repayment of the unlawful dividends under Sections 174 of the DGCL and/or Section 18-607 of the DLLCA.

### AS FOR AN SEVENTEENTH CAUSE OF ACTION

### (Unjust Enrichment – Against BHAC Capital IV, LLC)

423.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

424.    BHAC Capital IV, LLC has been unjustly enriched.  BHAC Capital IV, LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

425.    BHAC Capital IV, LLC depleted the assets of the Debtors by receiving dividends and distributions totaling approximately $40,607,000 during 2007 and 2008.  BHAC Capital IV, LLC was aware that the Debtors did not have a surplus and/or was insolvent at the

time of the dividends, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

426.    BHAC Capital IV, LLC have been enriched at the expense of the Debtors and have retained the dividends and distributions totaling approximately $40,607,000.

427.    Equity and good conscience require full restitution of the monies received by the BHAC Capital IV from the Debtors.  This includes not only the money itself that BHAC Capital IV, LLC received, but also the proceeds of that money.  Any profits earned with the money it received must be returned to the Litigation Trust.

## AS FOR A EIGHTEENTH CAUSE OF ACTION

**(Illegal Distributions –Against Arbor Commercial Mortgage LLC and Arbor ESH II, LLC)**

428.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

429.    As is set forth above, Arbor Commercial Mortgage LLC received distributions totaling approximately $44,231,000 between 2007 and 2009.  This total includes approximately $10,295,000 in 2007; $15,140,000 in 2008; and $18,796,000 in 2009.

430.    These distributions were made to Arbor Commercial Mortgage LLC by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc.  Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

431.    These distributions also include approximately $20,545,637 made to Arbor Commercial Mortgage LLC in 2008 and 2009 out of the Preferred Equity Reserve Account (the "PERA"), which were made after the ESI Board had passed a resolution halting

equity distributions, and at a time when the Debtors did not have a surplus or were insolvent, from funds that ultimately came from ESI or other Debtors. The PERA was funded as part of the LBO with money that was borrowed by the Debtors.

432. Arbor ESH II LLC, as a member of BHAC Capital IV, LLC, was, upon information and belief, entitled to receive any distributions made to Arbor Commercial Mortgage LLC. To the extent any distributions made to Arbor Commercial Mortgage LLC were received by Arbor ESH II LLC, Arbor ESH III is liable for such distributions.

433. Each and every distribution made to Arbor Commercial Mortgage LLC was made at a time when the Debtors did not have a surplus or were insolvent.

434. Arbor Commercial Mortgage LLC was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus Arbor Commercial Mortgage LLC was on notice of the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

435. Arbor Commercial Mortgage LLC is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A NINETEENTH CAUSE OF ACTION

**(Unjust Enrichment – Against Arbor Commercial Mortgage LLC and Arbor ESH II, LLC)**

436. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

437.     Arbor Commercial Mortgage LLC has been unjustly enriched.   Arbor Commercial Mortgage LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

438.     Arbor Commercial Mortgage LLC depleted the assets of the Debtors by taking distributions totaling approximately $44,231,000 between 2007 and 2009.   Arbor Commercial Mortgage LLC was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

439.     Arbor ESH II LLC, as a member of BHAC Capital IV, LLC, was, upon information and belief, entitled to receive any distributions made to Arbor Commercial Mortgage LLC.   To the extent any distributions made to Arbor Commercial Mortgage LLC were received by Arbor ESH II LLC, Arbor ESH III has been unjustly enriched as well and is liable for such distributions.

440.     Arbor Commercial Mortgage LLC has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $44,231,000.

441.     Equity and good conscience require full restitution of the monies received by Arbor Commercial Mortgage LLC, directly and indirectly, from the Debtors.   This includes not only the money itself that Arbor Commercial Mortgage LLC received, but also the proceeds of that money.   Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A TWENTIETH CAUSE OF ACTION

### (Illegal Distributions – Against PGRT ESH Inc.)

442.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

443.    As is set forth above, PGRT ESH Inc. received distributions totaling approximately $6,167,000 in 2007.  These distributions were made to PGRT ESH Inc. by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc.  Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

444.    Each and every distribution made to PGRT ESH Inc. was made at a time when the Debtors did not have a surplus or were insolvent.

445.    PGRT ESH Inc. was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus PGRT ESH Inc. was on notice of the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

446.    PGRT ESH Inc. is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A TWENTY-FIRST CAUSE OF ACTION

### (Unjust Enrichment – Against PGRT ESH Inc.)

447.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

448.    PGRT ESH Inc. has been unjustly enriched.  PGRT ESH Inc. wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

449.    PGRT ESH Inc. depleted the assets of the Debtors by taking distributions totaling approximately $6,167,000 in 2007.  PGRT ESH Inc. was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

450.    PGRT ESH Inc. has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $6,167,000.

451.    Equity and good conscience require full restitution of the monies received by PGRT ESH Inc., directly and indirectly, from the Debtors.  This includes not only the money itself that PGRT ESH Inc. received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

### AS FOR A TWENTY-SECOND CAUSE OF ACTION

**(Illegal Distributions – Against Glida One LLC)**

452.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

453.    As is set forth above, Glida One LLC received distributions totaling approximately $5,363,000 in 2007 and 2008.  This total includes approximately $1,668,000 in 2007 and $3,695,000 in 2008.

454.    These distributions were made to Glida One LLC by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc.

Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

455.    Each and every distribution made to Glida One LLC was made at a time when the Debtors did not have a surplus or were insolvent.

456.    Glida One LLC was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus Glida One LLC was on notice of the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

457.    Glida One LLC is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A TWENTY-THIRD CAUSE OF ACTION

### (Unjust Enrichment – Against Glida One LLC)

458.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

459.    Glida One LLC has been unjustly enriched.  Glida One LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

460.    Glida One LLC depleted the assets of the Debtors by taking distributions totaling approximately $5,363,000 in 2007 and 2008.  Glida One LLC was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

461.   Glida One LLC has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $5,363,000.

462.   Equity and good conscience require full restitution of the monies received by Glida One LLC, directly and indirectly, from the Debtors.  This includes not only the money itself that Glida One LLC. received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

### AS FOR A TWENTY-FOURTH CAUSE OF ACTION

**(Illegal Distributions – Against Polar Extended Stay (USA) L.P.)**

463.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

464.   As is set forth above, Polar Extended Stay (USA) L.P. received distributions totaling approximately $1,235,161 in 2007 and 2008.   This total includes approximately $563,333 in 2007 and $671,828 in 2008.

465.   These distributions were made to Polar Extended Stay (USA) L.P. by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc.  Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

466.   Each and every distribution made to Polar Extended Stay (USA) L.P. was made at a time when the Debtors did not have a surplus or were insolvent.

467.   Polar Extended Stay (USA) L.P. was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus Polar Extended Stay (USA) L.P. was on notice of

the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

468.    Polar Extended Stay (USA) L.P. is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A TWENTY-FIFTH CAUSE OF ACTION

### (Unjust Enrichment – Against Polar Extended Stay (USA) L.P.)

469.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

470.    Polar Extended Stay (USA) L.P. has been unjustly enriched.  Polar Extended Stay (USA) L.P. wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

471.    Polar Extended Stay (USA) L.P. depleted the assets of the Debtors by taking distributions totaling approximately $1,235,161 in 2007 and 2008.  Polar Extended Stay (USA) L.P. was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

472.    Polar Extended Stay (USA) L.P. has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $1,235,161.

473.    Equity and good conscience require full restitution of the monies received by Polar Extended Stay (USA) L.P., directly and indirectly, from the Debtors.  This includes not only the money itself that Polar Extended Stay (USA) L.P. received, but also the proceeds of that

money.  Any profits earned with the money they received must be returned to the Litigation Trust.

### AS FOR A TWENTY-SIXTH CAUSE OF ACTION

### (Illegal Distributions – Against Princeton ESH, LLC)

474.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

475.    As is set forth above, Princeton ESH, LLC received distributions totaling approximately $1,235,161 in 2007 and 2008.  This total includes approximately $563,333 in 2007 and $671,828 in 2008.

476.    These distributions were made to Princeton ESH, LLC by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc. Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

477.    Each and every distribution made to Princeton ESH, LLC was made at a time when the Debtors did not have a surplus or were insolvent.

478.    Princeton ESH, LLC was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus Princeton ESH, LLC was on notice of the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

479.     Princeton ESH, LLC is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

### AS FOR A TWENTY-SEVENTH CAUSE OF ACTION

### (Unjust Enrichment – Against Princeton ESH, LLC)

480.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

481.     Princeton ESH, LLC has been unjustly enriched.  Princeton ESH, LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

482.     Princeton ESH, LLC depleted the assets of the Debtors by taking distributions totaling approximately $1,235,161 in 2007 and 2008.  Princeton ESH, LLC was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

483.     Princeton ESH, LLC has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $1,235,161.

484.     Equity and good conscience require full restitution of the monies received by Princeton ESH, LLC, directly and indirectly, from the Debtors.  This includes not only the money itself that Princeton ESH, LLC received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

### AS FOR A TWENTY-EIGHTH CAUSE OF ACTION

**(Illegal Distributions – Against Ron Invest LLC)**

485.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

486.    As is set forth above, Ron Invest LLC received distributions totaling approximately $1,172,000 in 2008.

487.    These distributions were made to Ron Invest LLC by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc. Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

488.    Each and every distribution made to Ron Invest LLC was made at a time when the Debtors did not have a surplus or were insolvent.

489.    Ron Invest LLC was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus Ron Invest LLC was on notice of the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

490.    Ron Invest LLC is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A TWENTY-NINTH CAUSE OF ACTION

### (Unjust Enrichment – Against Ron Invest LLC)

491.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

492.     Ron Invest LLC has been unjustly enriched.  Ron Invest LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

493.     Ron Invest LLC depleted the assets of the Debtors by taking distributions totaling approximately $1,172,000 in 2008.  Ron Invest LLC was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

494.     Ron Invest LLC has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $1,172,000.

495.     Equity and good conscience require full restitution of the monies received by Ron Invest LLC, directly and indirectly, from the Debtors.  This includes not only the money itself that Ron Invest LLC received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A THIRTIETH CAUSE OF ACTION

### (Illegal Distributions – Against Lightstone Holdings LLC)

496.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

497.     As is set forth above, Lightstone Holdings LLC received a distribution of approximately $2,668,000 on or about August 31, 2007.  This distribution was made to

156

Lightstone Holdings LLC by the shell entity DL-DW Holdings, LLC from funds that, upon information and belief, ultimately came from ESI or other Debtors.

498.    The  distribution made to Lightstone Holdings LLC was made at a time when the Debtors did not have a surplus or were insolvent.

499.    Lightstone Holdings LLC was on notice of the distressed condition of the Debtors as well as the fact that the distribution it received violated the terms of the applicable mortgage loan documents, and thus Lightstone Holdings LLC was on notice of the impropriety of the distribution it received and the fact that the Debtors would be rendered further insolvent as a result of that distribution.

500.    Lightstone Holdings LLC is therefore liable for repayment of the unlawful distribution under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

### AS FOR A THIRTY-FIRST CAUSE OF ACTION

**(Unjust Enrichment – Against Lightstone Holdings LLC)**

501.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

502.    Lightstone  Holdings  LLC  has  been  unjustly  enriched.    Lightstone Holdings LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

503.    Lightstone Holdings LLC depleted the assets of the Debtors by taking a distribution of approximately $2,668,000 on or about August 31, 2007.  Lightstone Holdings LLC was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

504.    Lightstone Holdings LLC has been enriched at the expense of the Debtors and has retained the distribution of approximately $2,668,000.

505.    Lightstone Holdings LLC has also been unjustly enriched by the management fees of $1 million per year it received from the Debtors despite the fact that HVM, and not Lightstone Holdings LLC, managed all aspects of the Debtors' daily operations.

506.    Equity and good conscience require full restitution of the monies received by Lightstone Holdings LLC, directly and indirectly, from the Debtors.  This includes not only the money itself that Lightstone Holdings LLC received, but also the proceeds of that money. Any profits earned with the money it received must be returned to the Litigation Trust.

## AS FOR A THIRTY-SECOND CAUSE OF ACTION

### (Illegal Distributions – Against Princeton ESH LLC, Atmar Associates LLC, Lightstone Holdings LLC and BRE.ESH Holdings LLC (together, the "DL-DW Holdings LLC Member Defendants"))

507.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

508.    As is set forth above, Lightstone Holdings LLC received a distribution of approximately $2,668,000 on or about August 31, 2007.  This distribution was made to Lightstone Holdings LLC by the shell entity DL-DW Holdings, LLC and upon information and belief was authorized by the DL-DW Holdings LLC Member Defendants from funds that, upon information and belief, ultimately came from ESI or other Debtors.

509.    The  distribution made to Lightstone Holdings LLC was made at a time when the Debtors did not have a surplus or were insolvent.

510.    This distribution was willfully or negligently made by the DL-DW Holdings LLC Member Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors.

511.    The DL-DW Holdings LLC Member Defendants are therefore liable for repayment of the unlawful distribution under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A THIRTY-THIRD CAUSE OF ACTION

**(Unjust Enrichment – Against ABT-ESI LLC, Park Avenue Funding LLC, Princeton ESH LLC, and Mericash Funding LLC, and Lightstone Commercial Management (together, the "25% Note Lender Defendants"))**

512.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

513.    The 25% Note Lender Defendants have been unjustly enriched.  The 25% Note Lender Defendants wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

514.    As is detailed above, in connection with the onerous terms of the 25% Note set by the 25% Note Lender Defendants and their insider affiliates, the 25% Note Lender Defendants in 2008 were paid an additional 15.85% interest (above the 9.15% interest on the original 9.15% Note) on the 25% Note from income generated by the LIBOR Floor Certificates whose value should have belonged to the Debtors.

515.    The 25% Note Lender Defendants have been enriched at the expense of the Debtors and have retained interest payments paid out of income generated by the LIBOR Floor Certificates, an amount equal to approximately $3,487,000.

516.     Equity and good conscience require full restitution of the monies received by the 25% Note Lender Defendants from the Debtors.  This includes not only the money itself that the 25% Note Lender Defendants received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

### AS FOR A THIRTY-FOURTH CAUSE OF ACTION

**(Illegal Distributions – Against the 25% Note Lender Defendants)**

517.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

518.     As is set forth above, in connection with the onerous terms of the 25% Note set by the 25% Note Lender Defendants and their insider affiliates, the 25% Note Lender Defendants in 2008 received distributions totaling approximately $3,487,000.   These distributions were paid using income derived by the LIBOR Floor Certificates that belonged to the Debtors.

519.     Each and every distribution made to the 25% Note Lender Defendants in 2008 was made at a time when the Debtors did not have a surplus or were insolvent.

520.     The 25% Note Lender Defendants were on notice of the distressed condition of the Debtors, the impropriety of the distributions they received, and that the Debtors would be rendered further insolvent as a result of those distributions.

521.     The 25% Note Lender Defendants are therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A THIRTY-FIFTH CAUSE OF ACTION

### (Illegal Distributions – Against the 25% Note Lender Defendants)

522.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

523.    As is set forth above, the 25% Note Lender Defendants received distributions in the form of the LIBOR Floor Certificates and the balance of the Floor Bonds Reserve Account as part of an insider payoff of the 25% Note just before Debtor's bankruptcy totaling no less than $25,000,000.  These distributions were paid from assets and funds that ultimately belonged to one or more of the Debtors, which are each Delaware entities.

524.    Each and every distribution made to 25% Note Lender Defendants was made at a time when the Debtors did not have a surplus or were insolvent.

525.    The 25% Note Lender Defendants were on notice of the distressed condition of the Debtors, the impropriety of the distributions they received, and that the Debtors would be rendered further insolvent as a result of those distributions.

526.    The 25% Note Lender Defendants are therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A THIRTY-SIXTH CAUSE OF ACTION

### (Unjust Enrichment – Against the 25% Note Lender Defendants)

527.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

528.    The 25% Note Lender Defendants have been unjustly enriched.  The 25% Note Lender Defendants wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

529.    As is detailed above, the 25% Note Lender Defendants received the LIBOR Floor Certificates and the balance of the Floor Bonds Reserve Account as part of an insider payoff just before the bankruptcy of the Debtors.

530.    The 25% Note Lender Defendants have been enriched at the expense of the Debtors and have retained the proceeds of the LIBOR Floor Certificates and the Floor Bonds Reserve Account, an amount equal to no less than $25,000,000.

531.    Equity and good conscience require full restitution of the monies received by the 25% Note Lender Defendants from the Debtors.  This includes not only the money itself that the 25% Note Lender Defendants received, but also the proceeds of that money.  Any profits earned with the money it received must be returned to the Litigation Trust.

## AS FOR A THIRTY-SEVENTH CAUSE OF ACTION

**(Illegal Dividends – Against David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy R. Milone, Jr., Joseph Chetrit, Joseph Teichman and Joseph Martello (together, the "Extended Stay Director Defendants"))**

532.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

533.    As is set forth above, distributions and/or dividends totaling approximately $62,071,000 were made between 2007 and 2009, which were authorized and allowed by the Extended Stay Director Defendants.  These dividend and distributions were made from funds that came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc., which are each Delaware entities.

534.    Each and every dividend that the Extended Stay Director Defendants authorized to be paid was made at a time when the Debtors did not have a surplus or were insolvent.

535.    These dividend payments were willfully or negligently made by the Extended Stay Director Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors, and despite the fact that these dividend payments violated the terms of the applicable mortgage loan documents.

536.    Upon information and belief, each of the various entities served by the interlocking Extended Stay Director Defendants adopted corporate standards of governance.

537.    The Extended Stay Director Defendants are therefore each individually liable for repayment of the unlawful dividends and distributions authorized when they were directors under Sections 160 and 174 of the DGCL.

## AS FOR A THIRTY-EIGHTH CAUSE OF ACTION

**(Illegal Dividends – Against David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Joseph Teichman, and Joseph Martello (together, the "Excessive Interest Director Defendants"))**

538.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

539.    As is set forth above, the 25% Note Lender Defendants in 2008 received distributions totaling approximately $3,487,000, which were authorized and allowed by the Excessive Interest Director Defendants.  These dividend and distributions were made from funds that came from ESI or other Debtors.

540. The distributions that the Excessive Interest Director Defendants authorized to be paid were made at a time when the Debtors did not have a surplus or were insolvent.

541. These distributions were willfully or negligently made by the Excessive Interest Director Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors.

542. Upon information and belief, each of the various entities served by the interlocking Excessive Interest Director Defendants adopted corporate standards of governance.

543. The Excessive Interest Director Defendants are therefore each individually liable for repayment of the unlawful dividends authorized when they were directors under Sections 160 and 174 of the DGCL.

## AS FOR A THIRTY-NINTH CAUSE OF ACTION

**(Illegal Dividends – Against David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy R. Milone, Joseph Chetrit, and Joseph Teichman(together, the "LIBOR Floor Certificate Director Defendants"))**

544. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

545. As is set forth above, the 25% Note Lender Defendants received distributions in the form of the LIBOR Floor Certificates and the balance of the Floor Bonds Reserve Account as part of an insider payoff of the 25% Note just before Debtor's bankruptcy totaling no less than $25,000,000, which were authorized and allowed by the LIBOR Floor Certificate Director Defendants. These dividend and distributions were made from funds that came from ESI or other Debtors.

546.     The distributions that the LIBOR Floor Certificate Director Defendants authorized to be paid were made at a time when the Debtors did not have a surplus or were insolvent.

547.     These distributions were willfully or negligently made by the LIBOR Floor Certificate Director Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors.

548.     Upon information and belief, each of the various entities served by the interlocking LIBOR Floor Certificate Director Defendants adopted corporate standards of governance.

549.     The LIBOR Floor Certificate Director Defendants are therefore each individually liable for repayment of the unlawful dividends authorized when they were directors under Sections 160 and 174 of the Delaware General Corporations Law ("DGCL").

### AS FOR A FORTIETH CAUSE OF ACTION

**(Unjust Enrichment – Against Bank of America, N.A ("Bank of America"))**

550.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

551.     Bank of America has been unjustly enriched.   Bank of America wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

552.     Bank of America received approximately $3,971,658 in servicer fees from the Seller.  These fees were paid out of the $7.4 billion the Debtors were caused to borrow from the mortgage and mezzanine lenders.   However, the Debtors received no direct or indirect benefits in exchange for the monies borrowed or the payments made to Bank of America.

553.    Bank of America has been enriched at the expense of the Debtors and has retained the fees totaling approximately $3,971,658.

554.    Equity and good conscience require full restitution of the monies received by Bank of America from the Debtors.  This includes not only the money itself that Bank of America received, but also the proceeds of that money.  Any profits earned with the money it received must be returned to the Litigation Trust.

### AS FOR A FORTY-FIRST CAUSE OF ACTION

**(Unjust Enrichment – Against Citigroup Global Markets Inc. ("Citigroup"))**

555.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

556.    Citigroup has been unjustly enriched.   Citigroup wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

557.    Citigroup received approximately $6,350,000 in fees in connection with services for the Buyer.  These fees were paid out of the $7.4 billion the Debtors were caused to borrow from the mortgage and mezzanine lenders.  However, the Debtors received no direct or indirect benefits in exchange for the monies borrowed or the payments made to Citigroup.

558.    Citigroup has been enriched at the expense of the Debtors and has retained the fees totaling approximately $6,350,000.

559.    Equity and good conscience require full restitution of the monies received by Citigroup from the Debtors.  This includes not only the money itself that Citigroup received, but also the proceeds of that money.  Any profits earned with the money it received must be returned to the Litigation Trust.

## AS FOR A FORTY-SECOND CAUSE OF ACTION

### (Unjust Enrichment – Against Ebury Finance Limited ("Ebury") )

560.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

561.    Ebury has been unjustly enriched.  Ebury wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

562.    Ebury received approximately $9,341,984 in fees and disbursements in connection with loans the Debtors were forced to incur as a result of the LBO.  These fees were paid out of the loan proceeds despite the fact that the Debtors received no direct or indirect benefits as a result of the loans.

563.    Ebury has been enriched at the expense of the Debtors and has retained the fees and disbursements totaling approximately $9,341,984.

564.    Equity and good conscience require full restitution of the monies received by Ebury from the Debtors.  This includes not only the money itself that Ebury received, but also the proceeds of that money.  Any profits earned with the money it received must be returned to the Litigation Trust.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff demands judgment against Defendants, as to the causes of action set forth above, as follows:

(i)    on the first cause of action, declaring that defendants The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP

L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC, BRE/HV Holdings LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC, in their own right or as successors-in-interest to and direct or indirect parent entities and funds that owned or controlled the Debtors prior to the LBO grossly, wantonly and maliciously breached their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors and the Debtors' creditors in light of the misconduct identified above, and awarding, jointly and severally, both compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion and punitive damages of three times the actual damage caused to the Debtors, or $6.3 billion, or such other amount as the Court may determine after trial; and

(ii)     on the second cause of action, declaring that defendants DL-DW Holdings, LLC, Lightstone Holdings, LLC, The Lightstone Group, LLC, PGRT ESH Inc., Lightstone Commercial Management, Arbor ESH II LLC, Arbor Commercial Mortgage, LLC, Princeton ESH LLC, Atmar Associates, LLC, Glida One LLC, Ron Invest LLC, Polar Extended Stay (USA) L.P., BHAC Capital IV, L.L.C. and BRE/ESH Holdings, LLC grossly, wantonly and maliciously breached their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors and the Debtors' creditors in light of the misconduct identified above, and awarding, jointly and severally, both compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion and punitive damages of three times the actual damage caused to the Debtors, or $6.3 billion, or such other amount as the Court may determine after trial; and

(iii)     on the third cause of action, declaring that defendants David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy Milone, Jr., Joseph Chetrit, Joseph Teichman, Joseph Martello, F. Joseph Rogers, David Kim and Gary DeLapp grossly, wantonly and maliciously

breached their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors and the Debtors' creditors in light of the misconduct identified above, and awarding, jointly and severally, both compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion and punitive damages of three times the actual damage caused to the Debtors, or $6.3 billion, or such other amount as the Court may determine after trial; and

(iv)    on the fourth cause of action, declaring that defendants Jonathan D. Gray, William Stein, Michael Chae, Robert L. Friedman, Thomas Burdi, Gary Sumers, Dennis J. McDonagh and Alan Miyasaki grossly, wantonly and maliciously breached their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors and the Debtors' creditors in light of the misconduct identified above, and awarding, jointly and severally, both compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion and punitive damages of three times the actual damage caused to the Debtors, or $6.3 billion, or such other amount as the Court may determine after trial; and

(v)    on the fifth cause of action, declaring that defendants The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC, BRE/HV Holdings LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC, in their own right or as successors-in-interest to and direct or indirect parent entities and funds that owned or controlled the Debtors prior to the LBO, DL-DW Holdings, LLC, Lightstone Holdings, LLC, The Lightstone Group, LLC, PGRT ESH Inc., Lightstone Commercial Management, Arbor ESH II LLC, Arbor Commercial Mortgage, LLC, Princeton

ESH LLC, Atmar Associates, LLC, Glida One LLC, Ron Invest LLC, Polar Extended Stay (USA) L.P., BHAC Capital IV, L.L.C. and BRE/ESH Holdings, LLC, as the entities that owned or controlled the Debtors on the date of and after the LBO, David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy Milone, Jr., Joseph Chetrit, Joseph Teichman, Joseph Martello, F. Joseph Rogers, David Kim and Gary DeLapp, as directors, officers, managers and control persons after the LBO, Jonathan D. Gray, William Stein, Michael Chae, Robert L. Friedman, Thomas Burdi, Gary Sumers, Dennis J. McDonagh and Alan Miyasaki, as directors, officers, managers or persons that owned or controlled the Debtors prior to the LBO, and Bank of America, N.A., Citigroup Global Markets Inc. and Ebury Finance Limited, knew or should have known that the other defendants' acts and omissions described above constituted breaches of fiduciary and contractual duties owed to the Debtors, knowingly provided material assistance in connection with, and knowingly participated in, the other defendants' breaches of fiduciary and contractual duties in bad faith and with the actual intent to assist the other defendants in their respective breaches of fiduciary and contractual duties, and awarding, jointly and severally, compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion, or such other amount as the Court may determine after trial; and

(vi)     on the sixth cause of action, declaring that defendants The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC, BRE/HV Holdings LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC, in their own right or as successors-in-interest to and direct or indirect parent entities and

funds that owned or controlled the Debtors prior to the LBO, DL-DW Holdings, LLC, Lightstone Holdings, LLC, The Lightstone Group, LLC, PGRT ESH Inc., Lightstone Commercial Management, Arbor ESH II LLC, Arbor Commercial Mortgage, LLC, Princeton ESH LLC, Atmar Associates, LLC, Glida One LLC, Ron Invest LLC, Polar Extended Stay (USA) L.P., BHAC Capital IV, L.L.C. and BRE/ESH Holdings, LLC, as the entities that owned or controlled the Debtors on the date of and after the LBO, David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy Milone, Jr., Joseph Chetrit, Joseph Teichman, Joseph Martello, F. Joseph Rogers, David Kim and Gary DeLapp, as directors, officers, managers and control persons after the LBO, and Jonathan D. Gray, William Stein, Michael Chae, Robert L. Friedman, Thomas Burdi, Gary Sumers, Dennis J. McDonagh and Alan Miyasaki, as directors, officers, managers or persons that owned or controlled the Debtors prior to the LBO, irrationally squandered the Debtors' assets and the value thereof and thus committed corporate waste, and awarding, jointly and severally, compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion, or such other amount as the Court may determine after trial; and

(vii)    as to the seventh causes of action, declaring that defendants The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC, BRE/HV Holdings LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC, in their own right or as successors-in-interest to and direct or indirect parent entities and funds that owned or controlled the Debtors prior to the LBO,  DL-DW Holdings,

LLC, Lightstone Holdings, LLC, The Lightstone Group, LLC, PGRT ESH Inc., Lightstone Commercial Management, Arbor ESH II LLC, Arbor Commercial Mortgage, LLC, Princeton ESH LLC, Atmar Associates, LLC, Glida One LLC, Ron Invest LLC, Polar Extended Stay (USA) L.P., BHAC Capital IV, L.L.C. and BRE/ESH Holdings, LLC, as the entities that owned or controlled the Debtors on the date of and after the LBO, David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy Milone, Jr., Joseph Chetrit, Joseph Teichman, Joseph Martello, F. Joseph Rogers, David Kim and Gary DeLapp, as directors, officers, managers and control persons after the LBO, and Jonathan D. Gray, William Stein, Michael Chae, Robert L. Friedman, Thomas Burdi, Gary Sumers, Dennis J. McDonagh and Alan Miyasaki, as directors, officers, managers or persons that owned or controlled the Debtors prior to the LBO, grossly, wantonly and maliciously breached their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors' creditors in light of the misconduct identified above, and awarding, jointly and severally, both compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion and punitive damages of three times the actual damage caused to the Debtors, or $6.3 billion, or such other amount as the Court may determine after trial; and

(viii)   on the eighth cause of action, declaring that defendants BHAC IV, LLC and BRE.HV Holdings LLC have been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1.9 billion to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(ix)     on the ninth cause of action, declaring that defendants BHAC IV LLC and BRE.HV Holdings LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1.9 billion; and

(x)    on the tenth cause of action, declaring that defendants Gray, Friedman, Chae and Stein authorized illegal dividends and distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1.9 billion; and

(xi)    on the eleventh cause of action, declaring that defendants BHAC IV, LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC have been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount up to $1.9 billion and to be determined at trial to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xii)    on the twelfth cause of action, declaring that defendants BHAC IV, LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount up to $1.9 billion and to be determined at trial; and

(xiii)    on the thirteenth cause of action, declaring that defendants Gray, Friedman, Chae and Stein authorized illegal dividends and distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1.9 billion; and

(xiv)    on the fourteenth cause of action, declaring that defendants The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC and BRE/HV Holdings LLC were the alter egos of the Debtors and are responsible for the debts and obligations of the Debtors, and awarding plaintiff compensatory damages in an amount to be determined at trial but not less than $1.7 billion; and

(xv)     on the fifteenth cause of action, declaring that defendants DL-DW Holdings LLC, Princeton ESH LLC, Atmar Associates, LLC, Lightstone Holdings LLC and BRE.ESH Holdings, LLC were the alter egos of the Debtors and are responsible for the debts and obligations of the Debtors, and awarding plaintiff compensatory damages in an amount to be determined at trial but not less than $1.9 billion; and

(xvi)    on the sixteenth cause of action, declaring that defendant BHAC Capital IV, LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $40,607,000; and

(xvii)   on the seventeenth cause of action, declaring that defendant BHAC Capital IV, LLC has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $40,607,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xviii) on the eighteenth cause of action, declaring that defendants Arbor Commercial Mortgage LLC and Arbor ESH II, LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $44,231,000; and

(xix)    on the nineteenth cause of action, declaring that defendants Arbor Commercial Mortgage LLC and Arbor ESH II,  LLC have been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $44,231,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xx)     on the twentieth cause of action, declaring that defendant PGRT ESH Inc. received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $6,167,000; and

(xxi)   on the twenty-first cause of action, declaring that defendant PGRT ESH Inc. has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $6,167,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxii)   on the twenty-second cause of action, declaring that defendant Glida One LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $5,363,000; and

(xxiii)  on the twenty-third cause of action, declaring that defendant Glida One LLC has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $5,363,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxiv)  on the twenty-fourth cause of action, declaring that defendant Polar Extended Stay (USA) L.P. received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1,235,000; and

(xxv)   on the twenty-fifth cause of action, declaring that defendant Polar Extended Stay (USA) L.P. has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1,235,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxvi)  on the twenty-sixth cause of action, declaring that defendant Princeton ESH, LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1,235,000; and

(xxvii) on the twenty-seventh cause of action, declaring that defendant Princeton ESH, LLC has been unjustly enriched at the Debtors' expense and awarding compensatory damages to

plaintiff in an amount to be determined at trial but not less than $1,235,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxviii) on the twenty-eighth cause of action, declaring that defendant Ron Invest LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1,172,000; and

(xxix)  on the twenty-ninth cause of action, declaring that defendant Ron Invest LLC has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1,172,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

 (xxx)  on the thirtieth cause of action, declaring that defendant Lightstone Holdings LLC received an illegal distribution and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $2,668,000; and

(xxxi)  on the thirty-first cause of action, declaring that defendant Lightstone Holdings LLC has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $2,668,000 plus any management fees paid by Debtors to Lightstone Holdings LLC to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxxii) on the thirty-second cause of action, declaring that the DL-DW Holdings LLC Member Defendants authorized illegal dividends and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $2,668,000; and

(xxxiii) on the thirty-third cause of action, declaring that the 25% Note Lender Defendants have been unjustly enriched at the Debtors' expense and awarding compensatory

damages to plaintiff in an amount to be determined at trial but not less than $3,487,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxxiv) on the thirty-fourth cause of action, declaring that the 25% Lender Defendants received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $3,487,000; and

(xxxv) on the thirty-fifth cause of action, declaring that the 25% Note Lender Defendants received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $25,000,000; and

(xxxvi) on the thirty-sixth cause of action, declaring that the 25% Note Lender Defendants have been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $25,000,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxxvii) on the thirty-seventh cause of action, declaring that defendants Lichtenstein, de Vinck, Owen, Milone, Chetrit, Teichman, and Martello authorized illegal dividends and distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $62,071,000; and

(xxxviii) on the thirty-eighth cause of action, declaring that defendants Lichtenstein, de Vinck, Owen, Teichman, and Martello authorized illegal dividends and distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $3,487,000; and

(xxxix) on the thirty-ninth cause of action, declaring that defendants Lichtenstein, de Vinck, Owen, Milone, Chetrit, and Teichman authorized illegal dividends and distributions and

awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $25,000,000; and

(xl)     on the fortieth cause of action, declaring that defendant Bank of America has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $3,971,658 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xli)   on the forty-first cause of action, declaring that defendant Citigroup has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $6,350,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment;

(xlii)   on the forty-second cause of action, declaring that defendant Ebury has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $9,341,984 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xliii)   awarding the plaintiff such other and further relief as the Court may deem just and proper.

Dated:  June 14, 2011                                  Respectfully submitted,
New York, New York

                                                       **BAKER & HOSTETLER LLP**


                                                       */s/ Marc D. Powers*

                                                       MARC D. POWERS
                                                       Email: mpowers@bakerlaw.com
                                                       MATTHEW R. GOLDMAN
                                                       Email: mgoldman@bakerlaw.com
                                                       BENJAMIN D. PERGAMENT
                                                       Email: bpergament@bakerlaw.com
                                                       KATHRYN M. ZUNNO

Email: kzunno@bakerlaw.com
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York  10111
Telephone:     212.589.4200
Facsimile:      212.589.4201

AND

BRIAN A. BASH (*pro hac vice*
application forthcoming)
MICHAEL A. VANNIEL (*pro hac vice*
application forthcoming)
ALEXIS C. OSBURN (*pro hac vice*
application forthcoming)
Baker & Hostetler LLP
PNC Center
1900 East 9th Street, Suite 3200
Cleveland, OH 44114-3482
Telephone:     216.621.0200
Facsimile:      216.696-0740

*Counsel for Plaintiffs Extended Stay
Litigation Trust, and Hobart Truesdell and
Walker, Truesdell, Roth & Associates, as
Trustees of the Extended Stay Litigation
Trust*

# EXHIBIT A



## OPERATING ENTITIES

(1) The Blackstone Group L.P. common unitholders will have only limited voting rights and will have no right to elect our general partner or its directors, except for the State Investment Company, which will have no voting rights in respect of any of its common units. Our existing owners will indirectly hold special voting units in The Blackstone Group L.P. that will entitle them, on those few matters that may be submitted for a vote of The Blackstone Group L.P. common unitholders, to participate in the vote on the same basis as the common unitholders. We will initially issue a single special voting unit to Blackstone Partners L.L.C., an entity wholly-owned by our senior managing directors, that provides it with an aggregate number of votes that is equal to the aggregate number of vested and unvested Blackstone Holdings partnership units held by the limited partners of Blackstone Holdings on the relevant record date. See "Material Provisions of The Blackstone Group L.P. Partnership Agreement—Meetings; Voting."

(2) Blackstone Holdings I/II GP Inc. holds a portion of its interests in Blackstone Holdings I L.P. and Blackstone Holdings II L.P. through wholly-owned subsidiaries organized as Delaware limited partnerships and Delaware limited liability companies.

(3) The Blackstone Group L.P. holds Blackstone Holdings IV GP L.P. and Blackstone Holdings V GP L.P. through wholly-owned subsidiaries organized as Delaware limited partnerships and Delaware limited liability companies.

# EXHIBIT B



**Corporate Structure of Debtors**

# EXHIBIT C

**Summary of Pre and Post-LBO Mortgage Debt**

| Mortgage Borrower | Payoff Amount | New Debt | Difference |
|---|---|---|---|
| ESA 2005 Portfolio L.L.C. | $83,175,203 | $73,966,369 | (9,208,834) |
| ESA 2005-San Jose L.L.C. | 11,092,362 | 14,909,595 | 3,817,233 |
| ESA 2005- Waltham L.L.C. | 12,215,677 | 10,611,061 | (1,604,616) |
| ESA Alaska L.LC. | 36,721,553 | 42,129,064 | 5,407,511 |
| ESA Acquisition Properties L.L.C. | 32,285,382 | 37,039,636 | 4,754,254 |
| ESA Canada Properties Trust | 42,680,978 | - | (42,680,978) |
| ESA Canada Properties borrower L.L.C. | - | 43,074,603 | 43,074,603 |
| ESA FL Properties, L.L.C. | 29,694,951 | 53,588,108 | 23,893,157 |
| ESA MD Borrower L.L.C. | 0,09,3 | 51,742,056 | 11,532,745 |
| ESA MN Properties L.L.C | 5,943,985 | 11,077,201 | 5,133,216 |
| ESA P Portfolio L.L.C. | 1,454,513,493 | 1,644,091,269 | 189,577,776 |
| ESA P Portfolio MD Borrower L.L.C. | 62,765,385 | 67,868,768 | 5,103,383 |
| ESA P Portfolio PA Properties L.LC. | 49,945,630 | 56,883,343 | 6,937,713 |
| ESA P Portfolio TXNC Properties L.P. | 165,258,912 | 231,919,959 | 66,661,047 |
| ESA PA Properties L.L.C | 15,442,706 | 23,660,878 | 8,218,172 |
| ESA Properties, L.L.C. | 524,163,473 | 788,096,085 | 263,932,612 |
| ESA TX Properties L.P. | 76,406,016 | 133,373,679 | 56,967,663 |
| ESH/Homestead Portfolio L.L.C. | 83,781,941 | 90,901,914 | 7,119,973 |
| ESH/HV Properties L.L.C. | 544,241,841 | 620,741,761 | 76,499,920 |
| ESH/MSTX Property L.P. | 2,872,538 | 4,359,990 | 1,487,452 |
| ESH/TN Properties L.L.C. | 16,496,143 | 21,064,531 | 4,568,388 |
| ESA TX Properties LP. | 60,676,727 | 78,900,066 | 18,223,339 |
| **Total Mortgage Debt of borrowers** | **$3,350,584,208** | **$4,099,999,936** | **$749,415,728** |

# EXHIBIT D

**Chart of Mezzanine Borrowers**
**For Each of the 10 Mezzanine Loans**

| Mezzanine Loan | Borrowers |
|---|---|
| | |
| Mezzanine Loan A | ESA Mezz, LLC<br>ESA P Mezz, LLC<br>ESH/Homestead Mezz, LLC |
| Mezzanine Loan B | ESA Mezz 2, LLC<br>ESA P Mezz 2, LLC<br>ESH/Homestead Mezz 2, LLC |
| Mezzanine Loan C | ESA Mezz 3, LLC<br>ESA P Mezz 3, LLC<br>ESH/Homestead Mezz 3, LLC |
| Mezzanine Loan D | ESA Mezz 4, LLC<br>ESA P Mezz 4, LLC<br>ESH/Homestead Mezz 4, LLC |
| Mezzanine Loan E | ESA Mezz 5, LLC<br>ESA P Mezz 5, LLC<br>ESH/Homestead Mezz 5, LLC |
| Mezzanine Loan F | ESA Mezz 6, LLC<br>ESA P Mezz 6, LLC<br>ESH/Homestead Mezz 6, LLC |
| Mezzanine Loan G | ESA Mezz 7, LLC<br>ESA P Mezz 7, LLC<br>ESH/Homestead Mezz 7, LLC |
| Mezzanine Loan H | ESA Mezz 8, LLC<br>ESA P Mezz 8, LLC<br>ESH/Homestead Mezz 8, LLC |
| Mezzanine Loan I | ESA Mezz 9, LLC<br>ESA P Mezz 9, LLC<br>ESH/Homestead Mezz 9, LLC |
| Mezzanine Loan J | ESA Mezz 10, LLC<br>ESA P Mezz 10, LLC<br>ESH/Homestead Mezz 10, LLC |

# EXHIBIT E

## Flow of Funds pursuant to the Cash Management Agreement and Mortgage Loan Agreement



EXHIBIT 3

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York  10111
Telephone:     212.589.4200
Facsimile:     212.589.4201
Marc D. Powers
mpowers@bakerlaw.com
Matthew D. Powers
mgoldman@bakerlaw.comUNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT**SUPREME COURT OF THE STATE OF NEW YORK COUNTY** OF NEW YORK

| | |
|---|---|
| In re:<br><br>EXTENDED STAY, INC., *et al.*,<br><br>Debtors. | Chapter 11 Case No. 09-13764 (JMP)<br><br>(Jointly Administered) |

| | |
|---|---|
| WALKER, TRUESDELL, ROTH & ASSOCIATES, as Trustee for and on behalf of the Extended Stay Litigation Trust,<br><br>HOBART TRUESDELL, as Trustee for and on behalf of the Extended Stay Litigation Trust, and<br><br>THE EXTENDED STAY LITIGATION TRUST,<br><br>              Plaintiffs,<br><br>         -against-<br><br>The Blackstone Group, L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP, Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV, LLC, BRE/HV Holdings LLC, Blackstone Hospitality Acquisitions, | Adv. Pro. No. _____<br><br><br><br>**INDEX NO.:** _____/2011<br><br><br><br>**COMPLAINT** |

LLC, Prime Hospitality, LLC, DL-DW
Holdings, LLC, Lightstone Holdings LLC,
The Lightstone Group, LLC, PGRT ESH Inc.,
Lightstone Commercial Management, Arbor
ESH II, LLC, Arbor Commercial Mortgage,
LLC, Princeton ESH LLC, Atmar Associates,
LLC, Glida One LLC, Ron Invest LLC, Polar
Extended Stay (USA) L.P., BHAC Capital IV,
LLC, BRE/ESH Holdings, LLC, ABT-ESI
LLC, Mericash Funding LLC, Park Avenue
Funding LLC, Bank of America, N.A.,
Citigroup Global Markets Inc., Ebury Finance
Limited, Banc of America Securities LLC,
David Lichtenstein, Bruno de Vinck, Peyton
"Chip" Owen, Jr., Guy R. Milone, Jr., Joseph
Chetrit, Joseph Teichman, Joseph Martello, F.
Joseph Rogers, David Kim, Gary DeLapp,
Jonathan D. Gray, William Stein, Michael
Chae, Robert L. Friedman, Thomas Burdi,
Gary Sumers, Dennis J. McDonagh, Alan
Miyasaki, and JOHN DOES 1 through 100,
inclusive,

   Defendants.

   Plaintiffs, Walker, Truesdell, Roth & Associates ("WTR&A"), as Trustee for and

on behalf of the Extended Stay Litigation Trust (the "Trust"), Hobart Truesdell, as Trustee for and

on behalf of the Trust ("Truesdell," and together with WTR&A, the "Trustee") and the Trust, by

the undersigned counsel, hereby files this Complaint, and alleges as follows:

## NATURE OF ACTION

   1. This action arises from the financial devastation wrought upon the Extended Stay

Inc. family of companies (collectively, the "Company," which included, but was not limited to the

bankrupt "Debtor" entities identified in paragraph 10 below) in a leveraged buyout of the

2

Company in June 2007 (the "LBO" or "Acquisition") and thereafter.  The Sellers (as defined below) in the LBO, comprised of affiliates of The Blackstone Group (as defined below), siphoned over $2 billion of the value out of the Debtors, without regard for how the Debtors would continue operations following the LBO. After the LBO closed, the Buyer (as defined below) and its affiliates pulled out over $100 million in improper distributions to equity from the Debtors' remaining desperately needed post-LBO cash.

2.      The Debtors were dominated, controlled and ultimately exploited by the Sellers and the Buyer.  The purportedly arms-length transaction was anything but.  The grossly inflated purchase price was engineered by the Blackstone-affiliated Sellers looking to maximize their profits, working in concert with a Buyer that assumed little to no risk of loss.  Indeed, each of the three rating agencies that reviewed the deal all came to the same conclusion: The total capitalization of the LBO substantially exceeded the value of the Debtors' assets.  In short, the purchase price was not justified, was paid at the Debtors' expense and left the Debtors insolvent, undercapitalized, and unable to pay their debts as they became due.

3.      While the downfall of the Debtors coincided, to some extent, with the bursting of the nation's real estate bubble and the consequent "Great Recession," that economic downturn neither explains nor excuses the Debtors' downfall or the Defendants' culpable conduct here.  As an initial matter, upon information and belief, Blackstone anticipated the downturn in advance of the LBO. More importantly, however, the LBO would have failed regardless of the downturn; it was effectively dead-on-arrival given the gross over-leveraging and untenable cash flow restrictions that comprised the malignant terms of the deal.

4.      At the LBO's closing, Blackstone siphoned $2.1 billion of value from the Debtors, rendering them insolvent, undercapitalized and unable to survive.  The Defendants were well

aware of the financial harm of the LBO, but nevertheless caused or allowed it to happen. After the LBO, the Debtors were systematically drained of no less than $100 million through the continuous payment of improper dividends and through other distributions to post-LBO equity holders and their affiliates. Those post-LBO dividends and distributions were improper under applicable law and under the LBO loan documents themselves.  Yet, the distributions occurred time and again as the Debtors suffered multiple financial and liquidity crises and limped along toward their inevitable bankruptcy.  In the end, a group of investors including Blackstone provided the ultimate ironic coda to this story of economic havoc by swooping in after the Debtors' bankruptcy filings to reacquire the Debtors for approximately $3.9 billion, roughly half the amount Blackstone had sold the Company for three years earlier.

5.    This lawsuit seeks redress from named Defendants that fall into two groups.  The first group consists of entities and individuals that owned, dominated, controlled or otherwise managed all aspects of the pre-LBO Debtors' businesses.  Those pre-LBO Defendants were responsible for the decision to implement the LBO, and they participated in the formulation of the post-LBO structure pursuant to which additional value was improperly siphoned off from the Debtors to insiders. The second group consists of the entities and individuals that owned, controlled, dominated or otherwise managed all aspects of the Debtors' post-LBO businesses, and who used that ownership, control and management authority to improperly withdraw cash and assets from the financially distressed Debtors to benefit equity holders and their affiliates. This action seeks the imposition of liability for the fiduciary breaches of the parties named herein and restitution for unjust enrichment, as well as the recovery of the illegal dividends and distributions the Debtors were caused to issue, all so as to rectify the harm caused by the Defendants.

## THE PARTIES

**A.    The Extended Stay Litigation Trust, Trustee and The Debtors.**

4

6.     **The Extended Stay Litigation Trust** is a post-confirmation litigation trust established by the Extended Stay Litigation Trust Agreement, dated as of October 8, 2010 (the "Litigation Trust Agreement") in the United States Bankruptcy Court for the Southern District of New York, Case No. 09-13764 (JMP) (the "Bankruptcy Court").   The Trust Agreement was executed as part of the Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated as of June 8, 2010 and confirmed on or about July 20, 2010 (the "Plan") in the chapter 11 bankruptcy case of *In re Extended Stay, Inc. et al*. (the "Chapter 11 Cases").

7.     The Trust was established for the benefit of the creditors of the Debtors (collectively, the "Litigation Trust Beneficiaries").   Pursuant to the Plan and the Bankruptcy Court Order approving the Plan, the Trust has title to all assets described in Section 1.89 of the Plan as well as all assets transferred to the Trust pursuant to the "ESI Settlement Agreement," incorporated into the Plan.   These assets include, but are not limited to, any potential claims, causes of actions, charges, suits or rights of recovery of the Debtors and ESI (as defined below) referenced in the Examiner's Report of Ralph R. Mabey, examiner in the Chapter 11 Cases, filed with the Bankruptcy Court on April 8, 2010 (the "Litigation Trust Assets").   In that Examiner's Report, the examiner set forth his assertions of the facts leading up to the Chapter 11 Cases, and causes of action that could be asserted against various parties arising therefrom, including the causes of action asserted against the Defendants herein.

8.     **Hobart Truesdell and Walker, Truesdell, Roth & Associates** were duly appointed as the Trustees of the Trust in accordance with and pursuant to the Trust Agreement and the Bankruptcy Court Order confirming the Plan.   The Trustee and the Trust are authorized to commence all claims and causes of action formerly owned by the Debtors, which have now been

indefeasibly vested in the Trust, including all causes of action asserted herein.  The Trustee and the Trust exercise all pertinent rights of the Debtors that may be relevant to this Complaint.

       9.     The Trustee's principal place of business is located at 380 Lexington Avenue, Suite 1014, New York, New York 10168. The Trustees were appointed as Trustees of the Trust in New York County effective as of October 8, 2010.

       10.    For purposes of this Complaint, the following entities are the "Debtors:" ESA 2005 Operating Lessee Inc.; ESA 2005 Portfolio L.L.C.; ESA 2005-San Jose L.L.C.; ESA 2005-Waltham L.L.C.; ESA 2007 Operating Lessee Inc.; ESA Acquisition Properties L.L.C.; ESA Alaska L.L.C.; ESA Business Trust; ESA Canada Beneficiary Inc.; ESA Canada Operating Lessee Inc.; ESA Canada Properties Borrower L.L.C.; ESA Canada Properties Trust; ESA Canada Trustee Inc.; ESA FL Properties L.L.C.; ESA Management L.L.C.; ESA MD Beneficiary L.L.C.; ESA MD Borrower L.L.C.; ESA MD Properties Business Trust; ESA Mezz 10 L.L.C.; ESA Mezz 2 L.L.C.; ESA Mezz 3 L.L.C.; ESA Mezz 4 L.L.C.; ESA Mezz 5 L.L.C.; ESA Mezz 6 L.L.C.; ESA Mezz 7 L.L.C.; ESA Mezz 8 L.L.C.; ESA Mezz 9 L.L.C.; ESA Mezz L.L.C.; ESA MN Properties L.L.C.; ESA Operating Lessee Inc.; ESA P Mezz 10 L.L.C.; ESA P Mezz 2 L.L.C.; ESA P Mezz 3 L.L.C.; ESA P Mezz 4 L.L.C.; ESA P Mezz 5 L.L.C.; ESA P Mezz 6 L.L.C.; ESA P Mezz 7 L.L.C.; ESA P Mezz 8 L.L.C.; ESA P Mezz 9 L.L.C.; ESA P Mezz L.L.C.; ESA P Portfolio Holdings L.L.C.; ESA P Portfolio L.L.C.; ESA P Portfolio MD Beneficiary L.L.C.; ESA P Portfolio MD Borrower L.L.C.; ESA P Portfolio MD Trust; ESA P Portfolio Operating Lessee Inc.; ESA P Portfolio PA Properties L.L.C.; ESA P Portfolio TXNC GP L.L.C.; ESA P Portfolio TXNC Properties L.P.; ESA PA Properties L.L.C.; ESA Properties L.L.C.; ESA TX Properties L.P.; ESA TXGP L.L.C.; ESA UD Properties L.L.C.; ESH/Homestead Mezz 10 L.L.C.; ESH/Homestead Mezz 2 L.L.C.; ESH/Homestead Mezz 3 L.L.C.; ESH/Homestead Mezz 4

L.L.C.; ESH/Homestead Mezz 5 L.L.C.; ESH/Homestead Mezz 6 L.L.C.; ESH/Homestead Mezz 7 L.L.C.; ESH/Homestead Mezz 8 L.L.C.; ESH/Homestead Mezz 9 L.L.C.; ESH/Homestead Mezz L.L.C.; ESH/Homestead Portfolio L.L.C.; ESH/HV Properties L.L.C.; ESH/MSTX GP L.L.C.; ESH/MSTX Property L.P.; ESH/TN Member Inc.; ESH/TN Properties L.L.C.; ESH/TX Properties L.P.; ESH/TXGP L.L.C.; Extended Stay Hotels L.L.C.; Extended Stay, Inc.; and Homestead Village L.L.C.  The Debtors began commencing their respective Chapter 11 Cases on June 15, 2009. The Debtors' Chapter 11 Cases are administratively consolidated.

11.     Extended Stay, Inc. ("ESI") is a Delaware corporation and a Debtor in the Chapter 11 Cases. At all times relevant to this Complaint, ESI was managed by a board of directors that was comprised exclusively of insiders, had no outside directors, and was managed by insiders. Those directors were affiliated with direct or indirect equity holders of ESI.  A majority of the Debtors' pre- and post-LBO corporate organization was comprised of entities indirectly or directly owned by ESI, including, without limitation, all or substantially all of the REIT, or "real estate investment trust," portion of the Debtors' businesses.

12.     Upon information and belief, to the extent any direct or indirect subsidiaries of ESI were limited liability companies, the LLC operating agreements of those companies, including ESA P Mezz 3 L.L.C. and ESA Mezz 10 L.L.C., among others, expressly imposed fiduciary duties of loyalty and care on directors and officers similar to those of directors and officers of business corporations organized under the Delaware General Corporation Law. Post-LBO, BHAC Capital was the direct majority owner of ESI.

13.     Homestead Village, L.L.C. ("Homestead") is a Delaware limited liability company and is a Debtor in the Chapter 11 Cases.  The portion of the Debtors' pre- and post-LBO

corporate organization that was not within the ESI corporate chain was comprised of entities indirectly or directly owned by Homestead.

14.     At all times relevant to this Complaint, Homestead was managed by a corporate-style board of directors, had no independent, outside directors, and was managed by insiders.  Those directors were affiliated with direct or indirect equity holders of Homestead. Those insiders were empowered to, and did in fact, carry out all aspects of Homestead's business. As of the date of the LBO, the boards of directors of all subsidiary entities within the Homestead side of the Debtors' business were to be reconstituted so that the members of those boards of directors would be identical to that of Homestead.

15.     The post-LBO Homestead board of directors was expressly required by the Homestead LLC operating agreement to act in good faith for so long as Homestead beneficially or constructively owned capital stock of ESI, and so long as ESI was a REIT.  The Homestead post-LBO LLC operating agreement expressly imposed upon Homestead's directors and officers the fiduciary duties of good faith and fair dealing.  The Homestead post-LBO LLC operating agreement expressly imposed corporate law fiduciary duties on Homestead's directors and officers to the extent that the directors and officers committed acts or omissions that rose to the level of fraud, gross negligence or willful misconduct.  The Homestead pre-LBO LLC operating agreement did not expressly or impliedly disclaim traditional corporate law fiduciary duties.

16.     Upon information and belief, to the extent any direct or indirect subsidiaries of Homestead were limited liability companies, the LLC operating agreements of those companies, including ESH/Homestead Mezz 8 L.L.C., ESH/MSTX GP L.L.C., ESA P Portfolio MD Trust and ESH/TXGP L.L.C., among others, expressly imposed fiduciary duties of loyalty

and care on directors and officers similar to those of directors and officers of business corporations organized under the Delaware General Corporation Law.

**B.      The Blackstone Pre-LBO Entity Defendants.**

17.     **The Blackstone Group L.P.** (individually, and in its capacity as a successor-in-interest to and direct or indirect parent of entities and funds within its pre-IPO Real Estate or Corporate Private Equity operations, "Blackstone Group" or "Blackstone") was, upon information and belief, the direct or indirect owner and controlling entity of the nominal sellers in the LBO, a successor in interest to the Blackstone affiliates that were the direct or indirect owners or controlling entities of the nominal sellers in the LBO and an entity that derived a substantial benefit in connection with its IPO as a result of the LBO.

18.     From and after no later than approximately June 18, 2007, Blackstone Group was also the indirect owner of a substantial "rollover equity" interest in the post-LBO Debtors. Blackstone Group is a publicly traded limited partnership organized under the laws of the State of Delaware. As of March 31, 2011, according to recent SEC filings, Blackstone Group had managed assets of approximately $150 billion.  Blackstone Group's principal place of business is located at 345 Park Avenue, New York, New York 10154.

19.     At all times relevant to this Complaint, Blackstone's business was organized into four business segments:  Corporate Private Equity, Marketable Alternative Asset Management, Financial Advisory Services and Real Estate.  Upon information and belief, at all times relevant to this Complaint, Blackstone's pre-LBO investment in the Debtors was managed and controlled by a combination of the Senior Managing Directors named herein as Defendants in Blackstone's Real Estate and Corporate Private Equity business segments.  Prior to Blackstone's June 2007 IPO, Blackstone Group's entire business consisted of separately owned predecessor entities controlled directly or indirectly by Blackstone's founders, Stephen Schwarzman and Peter

9

Peterson, and Blackstone's Senior Managing Directors, which include certain of the individual Defendants identified below.

20.     On or around March 5, 2004, two Blackstone investment funds, Blackstone Real Estate Partners IV ("BREP IV") and Blackstone Capital Partners IV ("BCP IV" and, together with BREP IV, "BREP/BCP IV"), on their own behalves and on behalf of or through certain entities owned or controlled by BREP/BCP IV, purchased Extended Stay America, Inc.  Extended Stay America, Inc. was, at that time, a publicly traded corporation.   In connection with the acquisition, Extended Stay America, Inc. and, upon information and belief, other related entities, were "taken private" by Blackstone and were merged into certain other Blackstone entities, including, BHAC Capital and BHAC Capital Acquisition IV, Inc. Blackstone Senior Managing Directors Jonathan Gray and Michael Chae oversaw the 2004 Extended Stay America, Inc. transactions for BREP IV and BCP IV, respectively.

21.     At all times relevant to this Complaint, the Blackstone Real Estate Group managed and controlled around six general real estate opportunity funds.  Upon information and belief, BREP IV was such a fund at the time of the LBO, and was the primary fund within which the pre-LBO Debtors and their immediate controlling Blackstone entities (as described below) were organized. After the LBO and Blackstone's IPO, certain Blackstone SEC filings reference the Blackstone entity that nominally owned Blackstone's "rollover equity" in the post-LBO Debtors as being a part of the "BREP IV" fund.

22.     No later than June 18, 2007, Blackstone Group and its affiliates reorganized their corporate structure in preparation for Blackstone's IPO (the "Blackstone IPO Restructuring").  The Blackstone IPO Restructuring had been planned months before it was

actually implemented.  Blackstone went public on June 21, 2007.  These initiatives had been started prior to the LBO's closing, and were completed within weeks of the LBO's closing.

23.     Upon information and belief, at all relevant times prior to the Blackstone IPO Restructuring, ESI and Homestead, and their respective subsidiaries and affiliates, including the pre-LBO Debtors, were nominally owned and controlled, directly or indirectly, by numerous Blackstone affiliated entities or funds, including BREP/BCP IV.  Upon information and belief, certain of Blackstone's Senior Managing Directors, including certain of the Blackstone Group Individual Defendants identified and described below, managed or controlled, for Blackstone's benefit, all aspects of Blackstone's pre-IPO and pre-LBO investment in the Debtors through one or more nominally owned and controlled Blackstone affiliated entities, funds and predecessors-in-interest, including BREP/BCP IV.

24.     In connection with the Blackstone IPO Restructuring and IPO, Blackstone carried out a series of other reorganization transactions.  Blackstone's then-existing owners "contributed" to Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P. and Blackstone Holdings V L.P. (collectively "Blackstone Holdings," identified as Defendants below) each of the operating entities included in Blackstone Group's historical combined financial statements.  Upon information and belief, BREP IV, BCP IV and any other funds or Blackstone affiliated entities that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to one or more of the Blackstone Holdings entities.

25.     In connection with the Blackstone IPO Restructuring, four additional entities were established as the immediate parent entities of Blackstone Holdings (collectively, the "Blackstone Disregarded Entities"):  Blackstone Holdings I/II GP Inc. (the immediate parent of

11

Blackstone Holdings I L.P. and Blackstone Holdings II L.P.), Blackstone Holdings III GP L.L.C. (the immediate parent of Blackstone Holdings III L.P.), Blackstone Holdings IV GP L.P. (the immediate parent of Blackstone Holdings IV L.P.) and Blackstone Holdings V GP L.P. (the immediate parent of Blackstone Holdings V L.P.).

26.     The Blackstone Group L.P. owns 100% of the equity of the Blackstone Disregarded Entities.  As of the time of the Blackstone IPO, The Blackstone Group L.P. owned no less than approximately 22% of Blackstone Holdings through the Blackstone Disregarded Entities. As of the time of the Blackstone IPO, certain Senior Managing Directors, including certain of the individual Defendants identified below, and others, owned no less than approximately 78% of Blackstone Holdings.

27.     After the Blackstone IPO's completion, Blackstone's organizational structure was as set forth in the chart attached hereto as Exhibit A and incorporated herein by reference.  Upon information and belief, and at all times relevant to this Complaint, the BREP IV and BCP IV funds and their respective affiliated entities were included in the "Operating Entities" identified at the bottom of the post-IPO Blackstone organizational chart set forth in Exhibit A. Upon information and belief, the post-IPO Blackstone organizational chart set forth in Exhibit A accurately and generally depicts Blackstone's organizational structure as of the date of this Complaint.

28.     In essence, as a result of the Blackstone IPO Restructuring, Blackstone was reorganized as a holding partnership.  Blackstone, through the Blackstone Disregarded Entities, holds equity interests in Blackstone Holdings, which in turn owns all Blackstone operating entities.  Through the Blackstone Disregarded Entities, Blackstone Group is the sole general partner of all Blackstone Holdings partnerships and, accordingly, operates and controls all

business and affairs of Blackstone Holdings and, indirectly, all operating subsidiaries in the Blackstone business enterprise.

29.     After the Blackstone IPO Restructuring and the IPO, management fees, transaction fees, carried interest, incentive fees and other fees received by any subsidiary entities or funds of Blackstone Group and Blackstone Holdings, including BREP IV, BCP IV and BRE.ESH (as defined below – the Blackstone entity that nominally held Blackstone's so-called "rollover equity" in the post-LBO Debtor enterprise), inured primarily to Blackstone Group's benefit and to the benefit of various Blackstone Senior Managing Directors including, upon information and belief, the individual Senior Managing Directors identified as Defendants herein.

30.     At all times relevant to this Complaint, a "real estate investment committee" at the top of Blackstone's Real Estate Group business segment was responsible for reviewing, analyzing and approving all aspects of the LBO.  Upon information and belief, at all times relevant to this Complaint, that real estate investment committee consisted in substantial part of certain Senior Managing Directors in Blackstone's Real Estate and Private Equity operations, including the Senior Managing Directors named as Blackstone Group Individual Defendants herein. As described below, those Senior Managing Directors, and the other named Blackstone Group Individual Defendants identified below, orchestrated the LBO for Blackstone's benefit.

31.     At all times relevant to this Complaint, Blackstone Group directly or indirectly controlled or participated in, through Blackstone Group Senior Managing Directors and other principals placed into positions of authority within the Debtors' corporate organization, all major business decisions made by or on behalf of the Debtors, including the decision to enter into and implement the LBO.

32.     **Blackstone Holdings I L.P.** is a Delaware limited partnership and one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings I L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements.  Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings I L.P., a subsidiary of Blackstone. Blackstone Holdings I L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

33.     **Blackstone Holdings II L.P.** is a Delaware limited partnership and one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings II L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements.  Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings II L.P., a subsidiary of Blackstone. Blackstone Holdings II L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

34.     **Blackstone Holdings III L.P.** is a Delaware limited partnership and one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, in connection with the Blackstone IPO Restructuring,

Blackstone's then-existing owners contributed to Blackstone Holdings III L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements.  Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings III L.P., a subsidiary of Blackstone.   Blackstone Holdings III L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

35.     **Blackstone Holdings IV L.P.** is, upon information and belief, a limited partnership organized under the laws of Quebec or Canada, and is one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings IV L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements.   Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings IV L.P., a subsidiary of Blackstone.   Upon information and belief, Blackstone Holdings IV L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

36.     **Blackstone Holdings V L.P.** is, upon information and belief, a limited partnership organized under the laws of Quebec or Canada, and is one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's

then-existing owners contributed to Blackstone Holdings V L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements. Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings V L.P., a subsidiary of Blackstone. Upon information and belief, Blackstone Holdings V L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

37.     **Blackstone Holdings I/II GP Inc.** is a Delaware corporation and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO. Upon information and belief, Blackstone Holdings I/II GP Inc.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

38.     **Blackstone Holdings III GP L.L.C.** is a Delaware limited liability company and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO. Upon information and belief, Blackstone Holdings III GP L.L.C.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

39.     **Blackstone Holdings IV GP L.P.** is a Delaware limited partnership and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO. Upon information and belief, Blackstone Holdings IV GP L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

40.     **Blackstone Holdings V GP L.P.** is, upon information and belief, a limited partnership organized under the laws of Quebec or Canada, and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO. Upon information

16

and belief, Blackstone Holdings V GP L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

41.    **Blackstone Real Estate Partners IV L.P.** is, or was at all times relevant to this Complaint, a limited partnership organized under the laws of the State of Delaware. Blackstone Real Estate Partners IV L.P.'s principal place of business is, or was at all times relevant to this Complaint, located at 345 Park Avenue, New York, New York 10154.

42.    **Blackstone Capital Partners IV L.P.** is, or was at all times relevant to this Complaint, a limited partnership organized under the laws of the State of Delaware. Blackstone Real Estate Partners IV L.P.'s principal place of business is, or was at all times relevant to this Complaint, located at 345 Park Avenue, New York, New York 10154.

43.    **BHAC IV, LLC** ("BHAC IV") was a seller in the LBO.  At the time of the LBO, BHAC IV was an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group.  BHAC IV received distributions in connection with the LBO as a nominal seller in the LBO.  BHAC IV is a limited liability company organized under the laws of the State of Delaware and remains an affiliate of Blackstone Group. Upon information and belief, BHAC IV is a shell entity that conducts no operations.  BHAC IV's principal place of business is located at 345 Park Avenue, New York, New York 10154.

44.    **BRE/HV Holdings LLC** ("BRE.HV") was a seller in the LBO.  At the time of the LBO, BRE.HV was an affiliate of Blackstone Group.  BRE.HV received distributions in connection with the LBO as a nominal seller in the LBO.  BRE.HV is a limited liability company organized under the laws of the State of Delaware and was and remains an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group.  Upon information and belief, BRE.HV is

a shell entity that conducts no operations.  BRE.HV's principal place of business is located at 345 Park Avenue, New York, New York 10154.

45.    **Blackstone Hospitality Acquisitions, LLC** ("Blackstone Hospitality") was an affiliate of the sellers in the LBO.  Although it was not itself a "seller" in connection with the LBO, Blackstone Hospitality received significant distributions of cash proceeds in connection with the LBO. Blackstone Hospitality is a limited liability company organized under the laws of the State of Delaware. Upon information and belief, Blackstone Hospitality is a shell entity that conducts no operations, but rather is (or at least was) used by Blackstone Group in connection with certain acquisition activities carried out by Blackstone Group in the hospitality industry.  Upon information and belief, Blackstone Hospitality was and remains an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group.  Blackstone Hospitality's principal place of business is located at 102 Townsend Dr., Weimar, TX 78962.

46.    **Prime Hospitality, LLC** ("Prime") was an affiliate of the sellers in the LBO and Blackstone Group.  Prime received distributions in connection with the LBO and was, upon information and belief, a seller of certain assets in connection with the LBO.  Prime is a limited liability company organized under the laws of the State of Delaware.  Upon information and belief, Blackstone Hospitality was and remains an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group.  Prime's principal place of business is located at 700 Route 46 East, Fairfield, New Jersey 07004 or 16850 Bear Valley Road, Victorville, California 92395.

47.    BHAC IV, BRE.HV, Blackstone Group, Blackstone Holdings, the Blackstone Disregarded Entities, BREP IV, BCP IV, Blackstone Hospitality and Prime are sometimes collectively referred to in this Complaint as the "Blackstone Pre-LBO Entity

18

Defendants."  BHAC IV and BRE.HV are sometimes referred to herein as the "Sellers."  At all times relevant to the Complaint, BHAC IV, BRE.HV, Blackstone Hospitality and Prime were owned, controlled or dominated in all respects by Blackstone Group or Blackstone Group predecessors in interest and affiliates, and all business dealings by each of those entities were conducted solely for the benefit of Blackstone Group and to the detriment of the Debtors and their creditors.

**C.      The LBO Buyer Entity Defendants.**

48.     **DL-DW Holdings, LLC** ("DL-DW" or "Buyer") was the nominal buyer of the stock of BHAC IV and BRE.HV in the LBO.  DL-DW is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 460 Park Avenue, Suite 1300, New York, New York 10022.  DL-DW was formed for the purpose of carrying out the LBO and, at all times relevant to this Complaint, was owned or controlled by David Lichtenstein, a Defendant herein.  Following the closing of the LBO, DL-DW was the sole direct member of Homestead, and exercised at least indirect ownership or control over BHAC Capital, the majority shareholder of ESI, and ESI.

49.     **Lightstone Holdings, LLC** ("Lightstone Holdings") was a member of DL-DW, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Lightstone Holdings is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 460 Park Avenue, Suite 1300, New York, New York 10022.  Lightstone Holdings was, at all time relevant to this Complaint, indirectly owned or controlled by Lichtenstein.

50.     **The Lightstone Group, LLC** ("Lightstone Group") was the direct or indirect corporate parent or grandparent of DL-DW, and exercised at least indirect ownership or

19

control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint. Lightstone Group is a limited liability company organized under the laws of the State of New Jersey with its principal place of business at 460 Park Avenue, Suite 1300, New York, New York 10022. Lightstone Group was, at all times relevant to this Complaint, at least indirectly owned or controlled by Lichtenstein.  Lightstone Group and Lightstone Holdings were, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Lightstone Group" of investors, which also included Prime Group Realty Trust, a Maryland real estate investment trust, Lichtenstein, certain members of Lichtenstein's family and certain investment funds that were, upon information and belief, owned or controlled by Lichtenstein.

51.      **PGRT ESH Inc.** ("PGRT") was a member of BHAC Capital, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  PGRT is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 330 W Wabash Ave # 2800, Chicago, Illinois 60611.  Upon information and belief, PGRT was, at all times relevant to this Complaint, owned or controlled, directly or indirectly, by Lichtenstein.

52.      **Lightstone Commercial Management** ("Lightstone Commercial") was an affiliate of The Lightstone Group and Lightstone Holdings.  Lightstone Commercial is a limited liability company organized under the laws of the State of New Jersey with its principal place of business, upon information and belief, at 460 Park Avenue, Suite 1300, New York, New York 10022.  Lightstone Commercial was, at all times relevant to this Complaint, at least indirectly owned or controlled by Lichtenstein.  Lightstone Holdings, Lightstone Group, PGRT and Lightstone Commercial are collectively referred to in this Complaint as "Lightstone."

53.     **Arbor ESH II LLC** ("Arbor") was a member of BHAC Capital, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Arbor is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 333 Earle Ovington Boulevard, Uniondale, New York 11553.  Upon information and belief, at all times relevant to this Complaint, Arbor was an affiliate of Ivan Kaufman.  Arbor was, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Arbor Group," which included various Arbor entities owned or controlled directly or indirectly by Mr. Kaufman, and also included Joseph Tabak, Princeton (as defined below), Joseph Chetrit, Atmar (as defined below), Glida (as defined below) and Ron Invest (as defined below).

54.     Upon information and belief, Arbor was, at all time relevant to this Complaint, a direct or indirect wholly-owned subsidiary of Arbor Realty Limited Partnership, which was itself a wholly-owned operating subsidiary of Arbor Realty Trust, Inc., a publicly traded real estate investment trust with managed assets well in excess of $1.5 billion according to its recent SEC filings.  Upon information and belief, Arbor is, and was, at all times relevant to this Complaint, an affiliate of Arbor Commercial Mortgage, LLC.  Arbor and its affiliates had the right to appoint one or more Arbor designees to the consolidated board of directors for the "Extended Stay Hotels family of companies."

55.     **Arbor Commercial Mortgage, LLC** ("Arbor Commercial Mortgage") was, and is, the manager and advisor for Arbor Realty Trust, Inc., and performs loan originating, underwriting and other related services on behalf of Arbor Realty Limited Partnership.  Upon information and belief, at all times relevant to this Complaint, Arbor Commercial Mortgage was an affiliate of Ivan Kaufman and Arbor.  Mr. Kaufman, Arbor and their affiliates were heavily

involved in all aspects of the LBO, including, without limitation, arranging for the financing commitment made by the lenders in the LBO to Lichtenstein on or around May 1, 2007.  Arbor Commercial Mortgage is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 333 Earle Ovington Blvd., Suite 900, Uniondale, New York 11553.

56.     Upon information and belief, at all times relevant to this Complaint, Ivan Kaufman was the President and CEO of Arbor Realty Trust, Inc., the Chairman and CEO of Arbor Commercial Mortgage, LLC and owned, either individually or indirectly through various entities he wholly owns, no less than approximately 90% of Arbor Commercial Mortgage, LLC. Mr. Ivan Kaufman attended and participated in the board of directors meetings held on November 13, 2008 and January 29, 2009, among others, and also attended and participated in certain executive sessions of board of directors meetings of the Debtors.  Upon information and belief, Mr. Kaufman's attendance at those meetings was to ensure that improper equity distributions would continue to be made from the Debtors, either directly or through other entities, to the Arbor entities that Mr. Kaufman owns or controls, as described herein.

57.     **Princeton ESH LLC** ("Princeton") was a member of DL-DW, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Princeton is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 375 Park Avenue Suite 3401, New York, New York 10152.  Princeton was, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Arbor Group" of investors, which included various Arbor entities owned or controlled directly or indirectly by Mr. Kaufman,

and also included Joseph Tabak, Arbor (as defined below), Joseph Chetrit, Atmar (as defined

below), Glida (as defined below) and Ron Invest (as defined below).

58.    **Atmar Associates, LLC** ("Atmar") was a member of DL-DW, and

exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following

the LBO closing at all times relevant to this Complaint.  Atmar was, within the "Extended Stay

Hotels family of companies," treated as a member of the so-called "Arbor Group" of investors,

which included various Arbor entities owned or controlled directly or indirectly by Mr. Kaufman,

and also included Joseph Tabak, Arbor, Joseph Chetrit, Glida (as defined below) and Ron Invest

(as defined below).  Atmar is a limited liability company organized under the laws of the State of

Delaware with its principal place of business at 404 Fifth Avenue, 4th Floor New York, New York

10018.  Upon information and belief, Atmar is indirectly owned or controlled by Joseph Chetrit, or

members of Chetrit's family.

59.    **Glida One LLC** ("Glida") was a member of BHAC Capital, and exercised

at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO

closing at all times relevant to this Complaint.  Glida was, within the "Extended Stay Hotels family

of companies," treated as a member of the so-called "Arbor Group" of investors, which included

various Arbor entities owned or controlled directly or indirectly by Mr. Kaufman, and also

included Joseph Tabak, Arbor, Joseph Chetrit, Atmar and Ron Invest (as defined below).  Glida is

a limited liability company organized under the laws of the State of Delaware with its principal

place of business at 404 Fifth Avenue, 4th Floor, New York, New York 10018. Glida was, at all

times relevant to this Complaint, owned or controlled, directly or indirectly by Chetrit, or members

of the Chetrit family.

60.     **Ron Invest LLC** ("Ron Invest") was a member of BHAC Capital, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Ron Invest was, within the "Extended Stay Hotels family of companies," treated as a member of the so-called "Arbor Group" of investors, which included various Arbor entities owned or controlled directly or indirectly by Mr. Kaufman, and also included Joseph Tabak, Arbor, Joseph Chetrit, Atmar and Glida. Ron Invest is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 404 Fifth Avenue, Fourth Floor, New York, New York 10018.   Upon information and belief, Ron Invest is indirectly owned or controlled by Joseph Chetrit, or members of Chetrit's family.

61.     **Polar Extended Stay (USA) L.P.** ("Polar") was a member of BHAC Capital, and exercised at least indirect ownership or control over BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  Polar is a limited partnership company organized under the laws of the State of Delaware with its principal place of business at 21 Haarbaah St., Tel Aviv, Israel 64739.  Polar's general partner is Poland International Trading Ltd.

62.     **BHAC Capital IV, L.L.C.** ("BHAC Capital"), was the majority shareholder of ESI (as defined below), and held, at all times relevant to this Complaint for the period after the LBO's closing, no less than approximately 99% of the equity of ESI.   BHAC Capital is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 326 Third Street, Lakewood New Jersey 08701.

63.     **BRE/ESH Holdings, LLC** ("BRE.ESH") was a member of DL-DW, and exercised at least indirect ownership, control or influence, for Blackstone Group's benefit, over

BHAC Capital, ESI and Homestead following the LBO closing at all times relevant to this Complaint.  BRE.ESH is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 345 Park Avenue, New York, New York 10154. At all times relevant to this Complaint, BRE/ESH was a directly or indirectly owned affiliate of Blackstone Group. Upon information and belief, BRE.ESH is a shell entity that conducts no operations. BRE.ESH was the nominal holder of the $200 Million "rollover equity" interest received by Blackstone Group in connection with the LBO, as described below.

64.     DL-DW, Princeton, Atmar, Lightstone Holdings, BRE.ESH, Lightstone Group, Lightstone Commercial, BHAC Capital, Arbor, Arbor Commercial Mortgage, Polar, Glida, PGRT and Ron Invest are sometimes collectively referred to in this Complaint as the "LBO Buyer Entity Defendants."

**D.      The Individual Director and Officer Defendants.**

**1.      The Post-LBO Individual Defendants.**

65.     **David Lichtenstein** ("Lichtenstein") was, at all times relevant to this Complaint, the Chairman and Chief Executive Officer of all or substantially all of the Lightstone entities, and held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" which, according to the minutes of consolidated Meetings of the Board of Directors of "Extended Stay Hotels family of companies," included DL-DW, BHAC Capital, Homestead (a Debtor) and ESI (also a Debtor) and each of their direct and indirect subsidiaries.  All final decision-making authority for those entities and, indeed, for all of the Debtors, resided with and was exercised by the board of directors of the "Extended Stay Hotels family of companies."

66.     Lichtenstein was the Chairman of the Board of Directors and the President and CEO of the entities within the "Extended Stay Hotels family of companies."  As Chairman,

CEO and President, Lichtenstein had general supervisory authority over the daily business operations and affairs of those companies and was empowered to given counsel and advice to the board of directors on all subjects concerning the welfare of those companies and the conduct of their business.

67. Lichtenstein was also a director, Chairman of the board of directors, CEO and President of 65 of the Debtor entities and affiliates listed above.  Lichtenstein was an insider director and President of all mortgage borrower Debtors, mezzanine borrower Debtors and operating lessee Debtors at all relevant times following the closing of the LBO.  Lichtenstein authorized all aspects of the LBO for those Debtors and others.

68. Lichtenstein regularly attended and, in most cases, chaired all meetings of the "Extended Stay Hotels family of companies'" board of directors as a director, the Chairman, President and CEO of those companies, including, without limitation, board meetings that were held on the following dates, among others:  November 15, 2007, February 14, 2008, May 15, 2008, August 14, 2008, November 13, 2008, December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009, February 25, 2009, March 17, 2009, April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009.  All board meetings identified above were conducted in New York City to the extent the meetings were in person. Certain meetings were conducted via telephone.  At the board meetings identified above, Lichtenstein was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

69. Lichtenstein led the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors.  In light of

26

that status, and as an attendee at relevant board meetings from 2007 through 2009 identified above, Lichtenstein regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors. Thus, Lichtenstein was aware of the Debtors' financial and other difficulties at all relevant times. Lichtenstein also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders, including affiliates of ESI and Homestead that were owned or controlled by Lichtenstein, as described herein. As a high-ranking member of senior management, Lichtenstein knew or should have known of all relevant, material facts and events alleged herein.

70.     Lichtenstein is a resident of the State of New Jersey and may be served with process at the following address:  20 Autumn Road, Lakewood, New Jersey 08701-1619.

71.     **Bruno de Vinck** ("de Vinck") was, at all times relevant to this Complaint, Senior Vice President of Special Projects of one or more of the Lightstone entities identified herein, and held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" which, according to the Minutes of consolidated Meetings of the Board of Directors of "Extended Stay Hotels family of companies," included DL-DW, BHAC Capital, Homestead (a Debtor) and ESI (also a Debtor).  All final decision-making authority for those entities and, indeed, for all of the Debtors, resided with and was exercised by the board of directors of the "Extended Stay Hotels family of companies."

72.     De Vinck regularly attended meetings of the "Extended Stay Hotels family of companies'" board of directors as a director, including, without limitation, board meetings that were held on the following dates, among others:  November 15, 2007, February 14, 2008, May 15, 2008, August 14, 2008, November 13, 2008, December 16, 2008, December 23, 2008, January 6,

2009, January 15, 2009, January 27, 2009, January 29, 2009, February 25, 2009, March 17, 2009, April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009 (by proxy given to Joseph Teichman).  De Vinck sometimes also acted as the Secretary for those meetings, recorded the minutes of such meetings and was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

      73.    De Vinck was a member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors. In light of that status, and as an attendee at relevant board meetings from 2007 through 2009 identified above, de Vinck regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors. Thus, de Vinck was aware of the Debtors' financial and other difficulties at all relevant times.  De Vinck also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders as described herein.  As a high-ranking member of senior management, de Vinck knew or should have known of all relevant, material facts and events alleged herein.

      74.    De Vinck is a resident of the State of New Jersey and may be served with process at the following address: 128 S. Central Avenue, Ramsey, New Jersey 07446-2408.

      75.    **Peyton "Chip" Owen, Jr.** ("Owen") was, at all times relevant to this Complaint, President and Chief Operating Officer of one or more of the Lightstone entities. From and after no later than November 15, 2007, Owen held interlocking director positions with

28

numerous entities in the "Extended Stay Hotels family of companies" identified above, including, without limitation, Homestead and ESI.

76.     Owen regularly attended meetings of the "Extended Stay Hotels family of companies'" board of directors as a director, including, without limitation, board meetings that were held on the following dates, among others:  November 15, 2007 (where he was formally appointed to the board by Lichtenstein), February 14, 2008, May 15, 2008, August 14, 2008, November 13, 2008, December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009, February 25, 2009, March 17, 2009, April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009.  At those meetings, Owen was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

77.     Owen was another member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors. In light of that status, and as an attendee at relevant board meetings from 2007 through 2009 identified above, Owen regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Owen was aware of the Debtors' financial and other difficulties at all relevant times.  Owen also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders as described herein.  As a high-ranking member of senior management, Owen knew or should have known of all relevant, material facts and events alleged herein.

78.     Owen is a resident of the State of Illinois and may be served with process at the following address: 1150 W. Keswick Lane, Lake Forest, Illinois 60045-1132.

79.     **Guy R. Milone, Jr.** ("Milone") held, from and after no later than May 15, 2008, interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" identified above, including, without limitation, Homestead and ESI.  Milone was appointed to his director position to replace Joseph Martello as a designee of Arbor Realty Trust, Inc. and Arbor to the board.  Upon information and belief, at all times relevant to this Complaint, Milone was also a General Counsel of Arbor Realty Trust, Inc., an indirect owner of equity in one or more of the Debtors.

80.     Milone regularly attended meetings of the "Extended Stay Hotels family of companies'" board of directors as a director, including, without limitation, board meetings that were held on the following dates, among others:  May 15, 2008, August 14, 2008, November 13, 2008, December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009, February 25, 2009, April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009. At those meetings, Milone was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

81.     From and after no later than May 15, 2008, Milone was a member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above. In light of that status, and as an attendee at relevant board meetings from 2008 through 2009 identified above, Milone regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business

issues relating to the Debtors. Thus, Milone was aware of the Debtors' financial and other difficulties at all relevant times following his appointment to the board. Milone also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders as described herein, including with Arbor entities and affiliates with which Milone was affiliated at the time. As a high-ranking member of senior management, Milone knew or should have known of all relevant, material facts and events alleged herein that occurred on or after May 15, 2008.

82.     Milone is a resident of the State of New York and may be served with process at the following address: 29 Tremont Street, Garden City, New York 11530-6413.

83.     **Joseph Chetrit** ("Chetrit") was, at all times relevant to this Complaint, upon information and belief, a direct or indirect owner or member of senior management of Atmar, Glida and Ron Invest, and certain entities affiliated with each of those entities. Chetrit held interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" at times relevant to this Complaint, including Homestead and ESI.

84.     Chetrit regularly attended meetings of the "Extended Stay Hotels family of companies'" board of directors as a director or, in some cases, as an "invited guest" (although he was a director at all relevant times) including, without limitation, board meetings that were held on the following dates, among others:  November 13, 2008 (as an "invited guest"), December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009 (as an "invited guest," despite his board position), February 25, 2009, March 17, 2009 (by proxy given to Teichman), April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009. At those meetings, Chetrit was called upon to, and did in fact, vote as a director regarding all material

decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

85.     During his tenure as a member of the board of directors, Chetrit was a member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors.  In light of that status, and as an attendee at relevant board meetings from 2008 through 2009 identified above, or in his capacity as a substantial indirect holder of preferred equity in BHAC Capital, Chetrit regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Chetrit was aware of the Debtors' financial and other difficulties at all relevant times following his appointment to the board, at the latest.  Chetrit also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and other improper transactions with, insiders as described herein, including entities owned or controlled by him.

86.     As a high-ranking member of senior management and an insider, Chetrit knew or should have known of all relevant, material facts and events alleged herein.

87.     Chetrit is a resident of the State of New York and may be served with process at the following address: 55 East 74th Street, New York, New York 10021-2734.

88.     **Joseph Teichman** ("Teichman") held, from and after no later than May 15, 2008, interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" identified above, including, without limitation, Homestead and ESI.  At times relevant to this Complaint, Teichman was also the Secretary and General Counsel of 65 of the Debtor entities above, including both Homestead and ESI.  Teichman was an insider director of

numerous mortgage borrower Debtors, mezzanine borrower Debtors and operating lessee Debtors at all relevant times following the closing of the LBO.  At all times relevant to this Complaint, Teichman was also the Senior Corporate Counsel for all or substantially all of the Lightstone entities identified above.

89.     Teichman regularly attended meetings of the "Extended Stay Hotels family of companies'" board of directors as either a director or high-ranking senior officer of those companies, including, without limitation, board meetings that were held on the following dates, among others:   November 15, 2007, February 14, 2008, May 15, 2008, August 14, 2008, November 13, 2008, December 16, 2008, December 23, 2008, January 6, 2009, January 15, 2009, January 27, 2009, January 29, 2009, February 25, 2009, March 17, 2009, April 21, 2009, May 20, 2009, June 12, 2009, and June 14, 2009.  At all meetings occurring from and after no later than May 15, 2008, Teichman was called upon to, and did in fact, vote as a director regarding material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.  At all board meetings occurring prior to May 15, 2008, Teichman attended such meetings and was called upon to, and did in fact, make recommendations to the board regarding all material facts and events described herein.

90.     At all times relevant to this Complaint, Teichman was a member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors.  In light of that status, and as an attendee at relevant board meetings from 2007 through 2009 identified above, Teichman regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Teichman was aware of the

Debtors' financial and other difficulties at all relevant times.  Teichman also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and other improper transactions with, insiders as described herein, including Lightstone entities for which he was acting as a high-ranking officer.  As a high-ranking member of senior management of the Debtors, Teichman knew or should have known of all relevant, material facts and events alleged herein.

91.     Teichman is a resident of the State of New Jersey and may be served with process at the following address: 515 Ridge Ct., Lakewood, New Jersey 08701-1544.

92.     **Joseph Martello** ("Martello") held, from June 11, 2007 until, upon information and belief, approximately May of 2008, interlocking director positions with numerous entities in the "Extended Stay Hotels family of companies" identified above, including, without limitation, Homestead and ESI.  During his tenure as a director of the "Extended Stay Hotels family of companies," Martello was a designee of Arbor Realty Trust, Inc. and Arbor to the board and was an affiliate or insider of one or more entities related to Arbor, including those described above.  Martello resigned from the board of directors for the "Extended Stay Hotels family of companies" on or around May 15, 2008, after which time Milone occupied one of the "Arbor seats" on that board.

93.     During his tenure as a director, Martello attended meetings of the "Extended Stay Hotels family of companies'" board of directors that were held on the following dates, among others:  November 15, 2007 and February 14, 2008.  At those meetings, Martello was called upon to, and did in fact, vote as a director regarding all material decisions made by the board on behalf of DL-DW, BHAC Capital, Homestead, ESI and other Debtors.

94.     During his tenure as a director, Martello was a member of the select group of individuals that managed or controlled all aspects of the post-LBO operations and activities of the "Extended Stay Hotels family of companies," which included the entities identified above as well as all of the Debtors.  In light of that status, and as an attendee at relevant board meetings during 2007 and 2008 identified above, Martello regularly received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, Martello was aware of the Debtors' financial and other difficulties at all relevant times during his tenure as a member of the board.  Martello also approved, caused or allowed the Debtors to pay and make the improper post-LBO dividends and distributions to, and to engage in other improper transactions with, insiders as described herein, including with Arbor related entities with which he was affiliated at the time.  As a high-ranking member of senior management, Martello knew or should have known of all relevant, material facts and events alleged herein that occurred prior to around May of 2008.

95.     Martello is a resident of the State of New York and may be served with process at the following address: 430 East 58th Street, New York, New York 10022-2330.

96.     **F. Joseph Rogers** ("Rogers") was a high-ranking member of senior management of the "Extended Stay Hotels family of companies."  Rogers was the Assistant Secretary or Vice President of 55 of the Debtor entities listed above.  Rogers was therefore a high-ranking officer of all or substantially all of the mortgage borrower Debtors, the mezzanine borrower Debtors and the operating lessee Debtors.  Rogers was also the Executive Vice President of Finance and Accounting of the "Extended Stay Hotels family of companies," including Homestead and ESI.

97.    Rogers regularly attended board of directors meetings for the "Extended Stay Hotels family of companies," including the following meetings, among others:  November 15, 2007, February 14, 2008, May 15, 2008 and August 14, 2008.   At one or more of those meetings, Rogers received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors. Thus, Rogers was aware of the Debtors' financial and other difficulties at all relevant times. during his tenure as a high-ranking officer of one or more of the Debtors.  Rogers likewise was aware of, but did nothing to attempt to stop, improper post-LBO dividends and other distributions to insiders, and other improper transactions with insiders, as described herein.  As a high-ranking member of senior management, Rogers knew or should have known of all relevant, material facts and events alleged herein.

98.    Rogers is a resident of the State of South Carolina and may be served with process at the following address: 405 Carleton Circle, Spartanburg, South Carolina 29301.

99.    **David Kim** ("Kim") was a high-ranking member of senior management of the "Extended Stay Hotels family of companies."  From and after no later than approximately August of 2007, Kim was the Executive Vice President and Chief Investment Officer of the "Extended Stay Hotels family of companies," including Homestead and ESI.  Kim is currently a Managing Director in Blackstone Group's Real Estate Group.  Upon information and belief, at all times relevant to this Complaint, Kim held the same or similar position with Blackstone Group.

100.    Kim regularly attended board of directors meetings for the "Extended Stay Hotels family of companies," including the following meetings, among others:  November 15, 2007, February 14, 2008, May 15, 2008, August 14, 2008, November 13, 2008.  At one or more of those meetings, Kim delivered detailed reports of management to the board regarding the Debtors'

financial and operational performance, their extensive problems, and other material business issues relating to the Debtors. Thus, Kim was aware of the Debtors' financial and other difficulties at all relevant times during his tenure as a high-ranking officer of one or more of the Debtors. Kim likewise was aware of, but did nothing to attempt to stop, improper post-LBO dividends and other distributions to insiders, and other improper transactions with insiders, as described herein. As a high-ranking member of senior management, Kim knew or should have known of all relevant, material facts and events alleged herein.

101.    Kim is a resident of Hong Kong, Peoples' Republic of China and may be served with process at the following address:  Suite 901, Two International Finance Centre, 8 Finance Street, Central, Hong Kong, Peoples' Republic of China.

102.    **Gary DeLapp** ("DeLapp") was a high-ranking member of senior management of the "Extended Stay Hotels family of companies" at all times relevant to this Complaint.  Prior to the LBO, DeLapp was the President and CEO of ESI.  After the LBO, DeLapp was the President of the so-called "Extended Stay Hotels family of companies," including Homestead and ESI.  DeLapp also held officer-level positions with several other post-LBO Debtor entities and affiliates at all times relevant to this Complaint.

103.    DeLapp regularly attended board of directors meetings for the "Extended Stay Hotels family of companies," including the following meetings, among others:  November 15, 2007, February 14, 2008, May 15, 2008, August 14, 2008 and November 13, 2008.  At one or more of those meetings, DeLapp received detailed reports regarding the Debtors' financial and operational performance, their extensive problems, and other material business issues relating to the Debtors.  Thus, DeLapp was aware of the Debtors' financial and other difficulties at all relevant times during his tenure as a high-ranking officer of one or more of the Debtors.  DeLapp

likewise was aware of, but did nothing to attempt to stop, improper post-LBO dividends and other distributions to insiders, as described herein.  As a high-ranking member of senior management, DeLapp knew or should have known of all relevant, material facts and events alleged herein.

104.    DeLapp is a resident of the State of South Carolina and may be served with process at the following address:   409 Sweetbay Terrace, Spartanburg, South Carolina 29306-6682.

105.    Lichtenstein, de Vinck, Owen, Milone, Chetrit, Teichman, Martello, Rogers, Kim and DeLapp are sometimes collectively referred to in this Complaint as the "LBO Buyer Individual Defendants."

**2.    Blackstone Individual Defendants.**

106.    **Jonathan D. Gray** ("Gray") held, at all relevant times prior to and at the LBO's closing, the following senior management positions within the pre-LBO Debtors' and Blackstone Pre-LBO Entity Defendants' corporate organization: (a) Senior Managing Director and Vice President of BRE.HV, a Seller, (b) Senior Managing Director and Vice President of BHAC IV, a Seller, (c) Senior Managing Director and Vice President of Blackstone Hospitality, (d) Senior Managing Director, President and a member of the board of directors of pre-LBO ESI, (e) Chairman of the Board and CEO of pre-LBO BHAC Capital, which was the wholly-owned subsidiary of BHAC IV, (f) Senior Managing Director and Vice President of Blackstone Real Estate Acquisitions IV, L.L.C., a Blackstone affiliate that managed pre-LBO HVM (as defined below), and (g) senior management or officer positions for no less than approximately 57 other separate Seller subsidiaries in the pre-LBO Debtors' corporate structure, including, without limitation, all or substantially all of the pre-LBO Debtor mezzanine borrowers.  Subsequent to the LBO's closing, Gray was also the Senior Managing Director and Vice President of BRE.ESH, a

member of DL-DW and nominal holder of the $200 Million "rollover equity" interest received by Blackstone Group in connection with the LBO.

107.   During that same period of time, Gray was a Senior Managing Director, a high-ranking member of management of Blackstone Group and acted for Blackstone's benefit, as opposed to the benefit of the Debtor entities to which he owed fiduciary and other obligations. Currently, Gray is a Senior Managing Director and Co-Chairperson of Blackstone Group's Real Estate Group. Upon information and belief, at all times relevant to this Complaint, Gray held the same or similar positions with Blackstone Group.

108.   By virtue of his high-ranking positions within the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Gray was called upon to, and did in fact, exercise management authority for those entities.   Indeed, as a high-ranking member of management and officer authorized to act on behalf of the pre-LBO Debtors and the Blackstone Pre-LBO Entity Defendants, Gray executed certain agreements and other documents in connection with the LBO on behalf of one or more of the Blackstone Pre-LBO Entity Defendants including, without limitation, Blackstone Hospitality.  Gray was also designated as one of the persons whose "knowledge" could be charged to the Sellers under the LBO documents.  Gray also approved and authorized the LBO on behalf of pre-LBO ESI.  In certain press releases issued by Blackstone Group at or around the time the LBO closed, Gray was lauded for his lead role in consummating the transaction on behalf of the pre-LBO Debtors and Blackstone Group.

109.   Gray is a resident of the State of New York and may be served with process at the following address: 333 East 57th Street, Apt. 8A , New York, New York 10022¬2422.

110.   **William Stein** ("Stein") held, at all relevant times prior to and at the LBO's closing,  the  following  senior  management  positions  within  the  pre-LBO  Debtors'  and  the

Blackstone Pre-LBO Entity Defendants' corporate organization: (a) Managing Director and Vice President of BRE.HV, a Seller, (b) Managing Director and Vice President of BHAC IV, a Seller, (c) a Senior Managing Director and Vice President of pre-LBO ESI, (d) Managing Director and Vice President for Blackstone Real Estate Acquisitions IV, L.L.C., a Blackstone affiliate that managed pre-LBO HVM, (e) Managing Director and Vice President of pre-LBO Homestead, and (f) senior management or officer positions with no less than approximately 53 other separate Seller subsidiaries in the pre-LBO Debtors' corporate structure, including, without limitation, all or substantially all of the pre-LBO Debtor mezzanine borrowers.  During that same period of time, Stein was an officer or employee of Blackstone Group and acted for Blackstone Group's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations. Currently, Stein is a Senior Managing Director of Blackstone Group's Real Estate Group. Upon information and belief, at all times relevant to this Complaint, Stein held the same or similar positions with Blackstone Group.

111.    By virtue of his high-ranking positions within the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Stein was called upon to, and did in fact, exercise management authority for those entities.  Indeed, as a high-ranking member of management and officer authorized to act on behalf of the pre-LBO Debtor or Seller entities, Stein executed certain agreements and other documents in connection with the LBO on behalf of one or more of the Sellers.  Stein was also designated as one of the persons whose "knowledge" could be charged to the Sellers under the LBO documents.  In connection with the LBO, Stein was responsible for, among other things, coordinating the redemption of common shares held by certain shareholders of pre-LBO ESI and addressing, for Blackstone and the Sellers, post-LBO disputes that arose with Lichtenstein regarding certain post-closing purchase price adjustments.

112.   Like Gray, in certain press releases issued by Blackstone Group at or around the time the LBO closed, Stein was lauded for his lead role in consummating the transaction on behalf of the pre-LBO Debtors and Blackstone Group.  After the LBO closed, Stein attended board of directors meetings for the "Extended Stay Hotels family of companies" described above on behalf of the Blackstone Group, including, without limitation, the board meeting conducted on February 14, 2008.  The minutes of certain board of directors' meetings designate Stein as an "officer" of the "Extended Stay Hotels family of companies," which included Homestead and ESI, among others.

113.   Stein is a resident of the State of New York and may be served with process at the following address: 4 Rolling Hills Lane, Harrison, New York 10528.

114.   **Michael Chae** ("Chae") was, at all relevant times prior to and at the LBO's closing, a high-ranking officer of one or more of the pre-LBO Debtor entities including, without limitation, (a) a member of the Board of Directors of pre-LBO ESI, (b) the President of pre-LBO BHAC Capital, and (c) an officer of pre-LBO ESA Spartanburg LLC, and possibly other pre-LBO Debtors.  During that same period of time, Chae was an officer or employee of Blackstone Group and acted for Blackstone's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations.  Currently, Chae is a Senior Managing Director of Blackstone Group's Private Equity Group.  Upon information and belief, at all times relevant to this Complaint, Chae held the same or similar positions with Blackstone Group.  Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Chae was called upon to, and did in fact, exercise management authority for those entities.  Chae also approved and authorized the LBO on behalf of pre-LBO ESI.

115.    Chae is a resident of the State of New York and may be served with process at the following address:  1111 Park Avenue, New York, New York 10128-1234.

116.    **Robert L. Friedman** ("Friedman") was, at all relevant times prior to and at the LBO's closing, a high-ranking officer of one or more of the pre-LBO Debtor entities including, without limitation, (a) a member of the Board of Directors of pre-LBO ESI, (b) a Senior Managing Director and Vice President of pre-LBO BHAC Capital, and (c) an officer or director of pre-LBO ESA Spartanburg LLC, and possibly other pre-LBO Debtors.  During that same period of time, Friedman was an officer or employee of Blackstone Group and certain Blackstone Group affiliates, including Blackstone Asset Management, LLC, and acted for Blackstone's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations.  Currently, Friedman is a Senior Managing Director of Blackstone Group's Legal and Compliance Group. Upon information and belief, at all times relevant to this Complaint, Friedman held the same or similar positions with Blackstone Group.  Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Friedman was called upon to, and did in fact, exercise management authority for those entities.  Friedman also approved and authorized the LBO on behalf of pre-LBO ESI.

117.    Friedman is a resident of the State of New York and may be served with process at the following address:  68 Island Drive, Rye, New York 10580.

118.    **Thomas Burdi** ("Burdi") was, at all relevant times prior to and at the LBO's closing, Chief Financial Officer or Executive Vice President of Finance of the "Extended Stay Hotels," which included, upon information and belief, pre-LBO ESI, and possibly other pre-LBO Debtor entities. Upon information and belief, during that same period of time, Burdi was

an officer or employee of Blackstone Group and acted for Blackstone's benefit, as opposed to the benefit of ESI and other pre-LBO Debtors to which he owed fiduciary and other obligations.  Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Burdi was called upon to, and did in fact, exercise management authority for those entities.  Burdi was designated as one of the persons whose "knowledge" could be charged to the Sellers under the LBO documents.

119.    Burdi is a resident of the State of New Jersey and may be served with process at the following address:  P.O. Box 423, Ridgewood, New Jersey 07451-0423.

120.    **Gary Sumers** ("Sumers") was, at all relevant times prior to and at the LBO's closing, a high ranking officer and member of senior management of 53 of the Seller subsidiary Debtor entities, which included, upon information and belief, all or substantially all of the pre-LBO Debtor mezzanine borrower entities, and other pre-LBO Debtor entities.  Sumers currently is a Senior Managing Director of Blackstone Group's Real Estate Group.  Upon information and belief, prior to the LBO at all times relevant to this Complaint, Sumers held the same or similar positions within Blackstone Group's corporate organization and acted for Blackstone's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations.  Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' corporate structure, Sumers was called upon to, and did in fact, exercise management authority for those pre-LBO Debtor entities and for one or more of the Blackstone Pre-LBO Entity Defendants.

121.    Sumers is a resident of the State of New York and may be served with process at the following address 888 Park Avenue- Apt 11 C, New York, New York 10075-0282.

122.   **Dennis J. McDonagh** ("McDonagh") was, at all relevant times prior to and at the LBO's closing, a high-ranking officer of one or more of the entities within the Debtors' pre-LBO corporate organization, including, without limitation, (a) Senior Managing Director, Vice President, Secretary and Treasurer of pre-LBO ESI, (b) Senior Managing Director, Vice President, Secretary and Treasurer of Blackstone Real Estate Acquisitions IV, L.L.C., and (c) an officer, director or manager of BRE.HV, a nominal Seller.   During that same period of time, McDonagh was an officer or employee of Blackstone Group and acted for Blackstone Group's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations.   Currently, McDonagh is a Senior Managing Director in Blackstone Group's Real Estate Group.   Upon information and belief, at all times relevant to this Complaint, McDonagh held the same or similar positions with Blackstone Group.   Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, McDonagh was called upon to, and did in fact, exercise management authority for those entities.   McDonagh was designated as one of the persons whose "knowledge" could be charged to the Sellers under the LBO documents.

123.   McDonagh is a resident of the State of New York and may be served with process at the following address: 138 East Shore Road, Halsite, New York 11743-1140.

124.   **Alan Miyasaki** ("Miyasaki") was, upon information and belief, at all relevant times prior to and at the LBO's closing, a high-ranking officer of one or more of the entities within the Debtors' pre-LBO corporate organization.  Miyasaki was the Vice President and Assistant Secretary for pre-LBO BHAC Capital and several other pre-LBO Debtor entities. During that same period of time,  Miyasaki was, upon information and belief, an officer or employee of

Blackstone Group and acted for Blackstone Group's benefit, as opposed to the benefit of the pre-LBO Debtor entities to which he owed fiduciary and other obligations.

125.    Currently, Miyasaki is a Senior Managing Director in Blackstone Group's Real Estate Group. Upon information and belief, at all times relevant to this Complaint, Miyasaki held the same or similar positions with Blackstone Group.  Upon information and belief, by virtue of his high-ranking positions within certain of the pre-LBO Debtors' and the Blackstone Pre-LBO Entity Defendants' corporate structure, Miyasaki was called upon to, and did in fact, exercise management authority for those entities.  Miyasaki was designated as one of the persons whose "knowledge" could be charged to the Sellers under the LBO documents.  At all times relevant to this Complaint, after the LBO closed, Miyasaki was also a Vice President of BRE.ESH, a member of DL-DW and nominal holder of the $200 Million "rollover equity" interest received by Blackstone Group in connection with the LBO.

126.    Miyasaki is a resident of the State of Utah and may be served with process at the following address:  1978 Kidd Circle, Park City, Utah 84098.

127.    Gray, Stein, Chae, Friedman, Burdi, Sumers, McDonagh and Miyasaki are sometimes collectively referred to in this Complaint as the "Blackstone Group Individual Defendants."

E.    **Additional Insider "Lender" Defendants.**

128.    **ABT-ESI LLC** ("ABT") is an affiliate and insider of the Buyer.  As Lead Lender/Servicer of the 25% Note, ABT received subsequent transfers of the LIBOR Floor Certificates (as that term is defined below) and their proceeds.  ABT is a limited liability company organized under the laws of the State of Delaware with its principal place of business at c/o Arbor Commercial Mortgage LLC, 333 Earle Ovington Boulevard, Uniondale, New York 11553.

129.     **Mericash Funding, LLC** ("Mericash") is an affiliate and insider of the Buyer.  As a lender on the 25% Note, Mericash received subsequent transfers of the LIBOR Floor Certificates and their proceeds.  Mericash is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 404 Fifth Avenue, New York, New York 10018.

130.     **Park Avenue Funding LLC** ("Park Avenue") is an affiliate and insider of the Buyer.  As a lender on the 25% Note, Park Avenue received subsequent transfers of the proceeds of the LIBOR Floor Certificates until the transfer of its interests to Lightstone Commercial.  Mericash is a limited liability company organized under the laws of the State of New York with its principal place of business at 460 Park Avenue, New York, New York 10022.

**F.     Buyer's and Sellers' Professional Defendants.**

131.     **Bank of America, N.A.** ("Bank of America") is a national banking association with its principal place of business at 100 N. Tryon St., Charlotte, North Carolina 28225. Bank of America was, together with Wachovia Bank, N.A. ("Wachovia") and Bear Stearns Commercial Mortgage Inc., one of the original co-lenders on each of the mezzanine loans made pursuant to the LBO.  Bank of America received substantial improper payments in connection with the LBO from the Debtors' LBO loan proceeds.

132.     **Banc of America Securities LLC** is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 100 N. Tryon St., Charlotte, North Carolina 28225.  Banc of America Securities LLC acted as an advisor to the Sellers in the LBO.

133.     **Citigroup Global Markets Inc.** ("Citigroup") is a corporation organized under the laws of the State of Delaware with its principal place of business at 388 Greenwich Street, 17th Floor, New York, New York 10013.  Citigroup provided services to the Buyer in

connection with the LBO for which it received substantial improper payments from the Debtors' LBO loan proceeds.

134.    **Ebury Finance Limited** ("Ebury") is, upon information and belief, a corporation organized under the laws of the United Kingdom with its principal place of business at 2 Broadgate, London EC2M 7 UR, United Kingdom.  Ebury became a co-lender on each of the LBO mezzanine loans pursuant to August 2007 amendments to each of the mezzanine loans. Ebury also succeeded to part of J.P. Morgan Commercial Mortgage Inc.'s ("JP Morgan") position in each of the mezzanine loans as a result of a transfer of such position from JP Morgan. On information and belief, at the time of its initial involvement, Ebury held 16.665% of the mortgage and mezzanine loans described in this Complaint.  Ebury received approximately $9,341,984 in fees and disbursements in connection with the mortgage and mezzanine loans made to the Debtors as part of the LBO, despite the fact that those loans did not provide any direct or indirect benefit to the Debtors.

135.    The true names and capacities of Defendants sued as DOES 1 through 100, inclusive, are presently unknown to Plaintiff.  Plaintiff therefore sues those Defendants under such fictitious names.  When their true names and capacities are ascertained, leave will be asked to amend this Complaint by inserting the same.  Plaintiff is informed and therefore believes that each of the fictitiously named Defendants is responsible in some manner for the misconduct herein alleged, and that the Debtors' damages herein alleged were directly and proximately caused by those DOE Defendants, either acting in concert with the other Defendants or acting individually. Each reference in this Complaint to Defendant or Defendants refers also to all Defendants sued under fictitious names.

136.    Each Defendant is sued individually and in his or its role as an officer, director, member or other controlling person of one or more of the Debtors.  As described herein, each of the Defendants committed, participated in, approved, adopted, instructed, ratified or acquiesced in various acts or failures to act. In the case of the named defendants who are individuals, the misconduct that proximately caused damages to the Debtors took place prior to any individual Defendant's resignation from the high-ranking director, officer, member or other controlling positions each individual Defendant held.

137.    To the extent that any of the identified conduct occurred while any of the Defendants was acting in his, her or its capacity as a director, officer, member or other controlling person of any other corporate entity, including any direct or indirect parent of the Debtors, that Defendant should be held equally responsible as though he, she or it was acting in his, her or its capacity as a director, officer, member or other controlling person of one or  more of the Debtors.

138.    The identified Defendants, to the extent they may purport to have acted or omitted to act in their capacities as directors, officers, members or other controlling persons of any non-Debtor entity, (i) acted for all practical and functional purposes as directors, officers, members or other controlling persons of one or more of the Debtors; (ii) were de facto directors, officers, members or other controlling persons of one or more of the Debtors; or (iii) assumed fiduciary and other duties to one or more of the Debtors and the Debtors' constituencies as a result of their affirmative acts of controlling, dominating and otherwise directing one or more of the Debtors at all times relevant to this Complaint.

139.    At all times relevant to the allegations herein, from and after the date on which each Defendant assumed and continued to hold the high-ranking officer, director, member or other controlling positions identified herein, each of the Defendants was the co-conspirator,

48

agent, servant, representative, ostensible agent, partner, joint venturer, employee, trustee, trustor, or beneficiary of each of the other Defendants.

140.    In acting or omitting to act, as described herein, each Defendant was acting within the course and scope of his or its authority as such co-conspirator, agent, servant, representative, ostensible agency, partnership, joint venture, trust or employment and authorized, consented to, acquiesced in or ratified each act and omission of each of the other Defendants.

141.    At all times relevant to the allegations herein, each Defendant was the alter ego, joint venturer, successor-in-interest, parent or successor, or was jointly, severally, or otherwise responsible, for the acts, omissions, and liability of each of the remaining Defendants.

142.    Except as may be otherwise expressly alleged herein, (i) each Defendant is liable for each and every wrong committed by each and every other Defendant; (ii) each Defendant is responsible for the events herein alleged, and (iii) each Defendant's acts and omissions proximately caused the damages suffered by the Debtors.

143.    Each Defendant, as a result of his or its respective acts and omissions, is liable either by agency, joint and several liability, joint liability, several liability, joint enterprise liability, co-conspirator liability, alter ego liability, proportionate liability or direct liability for the damages suffered by the Debtors.

**JURISDICTION AND VENUE**

144.    The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1334 and principles of pendent and ancillary jurisdiction.   This action constitutes a civil proceeding arising under Title 11 of the United States Code or arising in or related to the Chapter 11 Cases pending in the United States Bankruptcy Court for the Southern District of New York. This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A). Venue is proper in this Court and this District under 28 U.S.C. §§ 1391(a)(2), (b)(2) and (c), and

1409(a) because (a) this is the District in which Extended Stay, Inc.'s jointly administered Chapter 11 Cases are pending, and (b) all or substantially all of the events and omissions giving rise to the plaintiff's claims occurred in this District.**Defendants identified above all conduct substantial, systematic, and continuous business within the State of New York, and all claims asserted herein arise out of, flow from, or relate to the LBO transaction and post-LBO acts or transactions that were negotiated, consummated, financed, engaged in and carried out in the State of New York and generally arise out of the Defendants' contact with and transaction of business in New York. Accordingly, all Defendants can reasonably anticipate being hailed into court in the State of New York.**

145.    The Trustee has filed a substantially identical complaint asserting all of the causes of action asserted herein against the same defendants herein in the Supreme Court of the State of New York ("New York State Court").   The Trustee believes that the causes of action asserted herein are more appropriately asserted and adjudicated in the New York State Court, that venue is proper in the New York State Court and that the New York State Court has jurisdiction over all of the causes of action asserted herein and the defendants against which such causes of action are asserted. Out of an abundance of caution and in order to avoid the risk of a possible forfeiture of valuable estate causes of action on technical grounds, the Trustee has filed the complaint herein.   The Trustee believes that the New York State Court will, and should, exercise jurisdiction over the causes of action and defendants herein.   Upon a final determination that the New York State Court will and may exercise jurisdiction over the causes of action and defendants herein, the Trustee anticipates a voluntary dismissal of the instant action.   If, on the other hand, the New York State Court dismisses the action filed in New York State Court because jurisdiction is proper only in federal Court, then this action will proceed.**Venue is proper under: CPLR 503(a)**

**because parties reside in New York County; CPLR 503(b) because each Trustee resides in New York County and was appointed within New York County; and CPLR 503(c) as many defendant entities transact business, and, at all times relevant to the Complaint, transacted business, in New York County.**

<div align="center">

**FACTS COMMON TO ALL CAUSES OF ACTION**

</div>

**A.     The Debtors Were Profitable Prior to the LBO.**

146.     Prior to the LBO, the Debtors owned the leading mid-priced extended-stay hotel business in the U.S., with 684 hotels located in 44 states.  Prior to the LBO, the Debtors were profitable and able to pay their debts in the ordinary course of business.  The Debtors' financial performance from 2005 through the date of the LBO was generally positive.  The Debtors' business was encumbered by secured debt totaling approximately $3.3 billion and mezzanine debt totaling approximately $1.9 billion.  The Debtors also owed approximately $39 million to certain subordinated noteholders.

147.     Prior to the LBO, the Debtors' corporate organization was similar to their organization after the LBO. All or substantially all of the Debtors' entities and operations ran through either the Homestead or ESI corporate ownership chain, as described above.  Homestead and ESI were directly and nominally owned by BRE.HV and BHAC IV, respectively.  BHAC IV and BRE.HV were, in turn, directly or indirectly owned and controlled by Blackstone Group (or Blackstone Group's predecessor-in-interest, as described above), their ultimate parent and the ultimate parent of all pre-LBO entities related to the pre-LBO Debtors and relevant to this Complaint.

148.     By the end of 2006, the Debtors' portfolio of hotels had an average age of approximately 7.5 years, though many of the hotels were around nine years old and were showing signs of significant wear and tear.  In January 2007, a Confidential Information Memorandum was

prepared to provide information to a limited number of parties regarding a possible acquisition of "Extended Stay Hotels" (the "Information Memorandum," as described and discussed more fully below).  The Information Memorandum was created by The Blackstone Group, L.P., Bear Stearns & Co., Inc., Banc of America Securities LLC and Merrill Lynch & Co., Inc. and characterized the hotels' condition as "excellent."  But it was or ought to have been clear to Blackstone, the Debtors' pre-LBO management and others involved in the LBO that substantial capital expenditures would be needed in the near future.

149.    Pre-LBO, the Debtors' hotel properties were managed by HVM, L.L.C. ("HVM"). The Debtors' hotels were then operated under six different brand names, although Blackstone had begun re-branding the portfolio to change all of the properties to one of three names: ExtendedStay Deluxe, ExtendedStay America, or ExtendedStay Economy. Around one-third of the portfolio remained to be re-branded at the time Blackstone commenced efforts to sell the pre-LBO Debtors.  At the time, the cost to conclude the re-branding was expected to be substantial, although those costs were never provided for in the post-LBO budgets.

150.    While economic trends in the hospitality industry generally had been positive in the years leading up to the LBO, certain of those trends reversed in late-2006, and continued the decline in early-2007.  This led some analysts to project a downturn in the hospitality industry as a whole for the near-term.  In certain key industry performance metrics at the time, the Debtors lagged behind their competitors during 2006.

151.    It was or ought to have been clear to the Blackstone Pre-LBO Entity Defendants, the Blackstone Group Individual Defendants and others involved in preparing to market the LBO that (i) the Debtors' financial performance was declining in early-2007 as part of

industry and economic trends that had begun in 2006, (ii) those trends were likely to continue after

the LBO concluded, and (iii) the Debtors were already lagging behind their competitors.

**B.      Blackstone Decides to Sell the Debtors.**

      **1.      Blackstone Prepares and Circulates An Information Memorandum That Contains Intentionally Misleading Financial Information and Projections Designed to Sell The Debtors Prior to Blackstone's IPO.**

      152.   Blackstone Group commenced its marketing effort by preparing the

Information Memorandum for a sale of ownership of the Debtors as part of "Extended Stay

Hotels." Upon information and belief, preparation of the Information Memorandum was

commenced during the latter half of 2006. The timing of Blackstone's decision to sell the Debtors

was driven in part, upon information and belief, by Blackstone's initial public offering, or IPO,

which was imminent at the time.

      153.   Blackstone Group filed its IPO registration statement with the SEC on or

around March 22, 2007, and eventually went public on June 21, 2007, ten days after the LBO

closed. Upon information and belief, Blackstone desired to carry out the sale of the Company prior

to the IPO, and stood to enhance its IPO valuation by the sale of the Debtors.

      154.   The Information Memorandum represented that it was prepared from

information furnished by the Debtors and from publicly available sources.  However, upon

information and belief, Blackstone Group, with the assistance of its professionals and advisors (i)

created or compiled the financial information and projections in the Information Memorandum,

(ii) prepared the non-financial, narrative content of the Information Memorandum, and (iii) was

responsible for distribution of the Information Memorandum to potential buyers.

      155.   The Information Memorandum contained an overview of the Debtors, and

the reasons why Blackstone Group claimed the Debtors were a good investment opportunity for

buyers.  The Information Memorandum represented that Extended Stay would increase revenues

through re-branding, marketing and acquisition initiatives.  Blackstone and the others involved in the marketing of the Debtors knew or should have known at all relevant times that these initiatives could be successful only if the Debtors were left with sufficient capital and liquidity after the transaction to implement them.

156.    Prior to the LBO, the Debtors' capital expenditures generally fell into two categories. The first category was maintenance associated with 444 hotels that were initially branded as "Homestead" or "Extended Stay America."  As to those 444 hotels, the five year historical investment in maintenance capital expenditures averaged approximately 4.3% of revenues, or $145.3 Million in the aggregate from 2002 to 2006.  The second category was capital upgrades for the Debtors' remaining 238 hotels – branded as StudioPlus, Crossland, Wellesley and others.  As to those 238 hotels, capital expenditures totaled approximately $129.6 Million from 2004 to 2006. Total capital expenditures as a percentage of revenues were, in fact, approximately 10.2% for 2006 and 8.3% for 2005, both of which were significantly higher than the 4.5% projected capital expenditure levels that were set forth in the Blackstone Information Memorandum.  Indeed, actual capital expenditures for the period from January 2007 through June 10, 2007, the eve of the LBO, were approximately 5.3% of revenues, higher than that projected by the Information Memorandum.

157.    The Information Memorandum contained materially misleading projections regarding the Debtors' future financial performance.  The Information Memorandum projected total revenue and property-level EBITDA growth rates of approximately 9.84% and 13.35%, respectively.  However, Blackstone knew or should have known that the Debtors' actual financial performance at the time was, and was expected to be in light of performance trends in late-2006 and early-2007, well below the projections set forth in the Information Memorandum.

54

158.    Upon information and belief, all of this information was available to the Defendants involved in the transaction prior to the LBO's closing.  At the time, the Debtors used Smith Travel Research ("STR") reports to benchmark their aggregate financial performance against the Debtors' chosen competitive set.  On a weekly basis, the Debtors reported their hotel activity to STR. STR then provided the Debtors with weekly trend reports that displayed up to six years of monthly performance data for the Debtors and their competitors.

159.    The STR reports, and other weekly financial reports shared with the Blackstone Pre-LBO Entity Defendants and the Blackstone Group Individual Defendants, included detailed analyses regarding the Debtors' basic financial performance metrics, including occupancy rates (or "OCC:" the quotient of the total number of nights stayed by all customers divided by the total available room nights), average daily rate ("ADR:"  the quotient of total room revenues divided by occupied room nights (which provides the "room rate" for all occupied rooms)), revenue per available room ("RevPAR:" the product of OCC and ADR, which shows the revenue efficiency of a hotel), demand (the total of all room nights stayed by all hotel customers), and supply (the product of total available rooms and the number of total days in a year).  The STR reports also measured each hotel property's performance, and the aggregated performance of the chosen competitive set with indices and rankings.   In light of these and other reports, the Blackstone Pre-LBO Entity Defendants and the Blackstone Group Individual Defendants knew or should have known that the projections they were presenting in the Information Memorandum were unachievable and, therefore, misleading.

160.    The projections contained in the Information Memorandum also improperly accounted for significant operating expenses, upon information and belief so as to "hide" those expenses and make the operating hotels appear to be more profitable than they actually were.

Among other things, the Information Memorandum inappropriately placed a significant amount of property-related expenses, including occupancy taxes, "above the line" at the corporate level.  This had the practical effect of overstating the net operating income of the hotel properties.  Since the lenders were prepared to lend based upon the property-level financial performance of the hotels, the effect of this misstatement was to increase the available debt in the LBO to amounts which would be impossible for the Debtors to service.

161.    Likewise, the growth projections in the Information Memorandum were ostensibly based upon the post-LBO Debtors having adequate capital and liquidity to complete the re-branding, marketing and other initiatives that had been commenced by Blackstone prior to the LBO, as detailed in the Information Memorandum.  However, based upon information available at the time the Blackstone Pre-LBO Entity Defendants and the Blackstone Group Individual Defendants (i) knew or should have known that the numbers contained in the Information Memorandum were inaccurate, (ii) nevertheless intended that prospective buyers rely upon those misleading numbers, and (iii) knew or should have foreseen that, given the artificially increased debt to be imposed upon the Debtors in connection with the transaction (including the increased debt attributable to overstatement of net operating income, as described above) the post-LBO Debtors would not have sufficient capital or liquidity to carry out these strategies.

## 2.    The Stapled Financing Package Attached to the Information Memorandum Anticipated a Much Smaller Debt Load Than The LBO Ultimately Imposed.

162.    Blackstone had arranged for so-called "stapled financing" through several lenders (collectively, the "Stapled Financing Lenders") in connection with the LBO.  "Stapled" financing refers to a financing package that is "stapled" to an information memorandum and is available to a buyer for a specific transaction.  Among other things, the stapled financing typically

indicates the expected debt capacity of the business being sold, and how much equity the buyer will need to provide to obtain the stapled financing.

163.    The Stapled Financing Lenders were prepared to finance up to $6.8 billion of the purchase price for a transaction. The stapled financing provided that the loan-to-value ratio could not exceed 87.5% when combined with the assumption of certain capital lease obligations of $200 million.   As described more fully below, the loan-to-value ratio following the eventual LBO's closing (based on the price paid by the Buyer) was at least 95%, substantially more than that contemplated by the stapled financing attached to the Information Memorandum.   This additional debt was fatal to the Debtors' continued profitable existence.

### 3.    Lichtenstein "Wins" an Accelerated Bidding Process After Woefully Inadequate Due Diligence.

164.    Blackstone coordinated the distribution of the misleading Information Memorandum to approximately 150 potential buyers.  A Lightstone affiliate and an Arbor affiliate, among others, signed confidentiality agreements in February 2007, permitting them access to due diligence information.

165.    Around that same time, Blackstone informed potential purchasers that written, non-binding indications of interest had to be submitted within an accelerated time frame. Upon information and belief, Blackstone accelerated the time frame for bid submission (versus a typical time frame for a transaction of the LBO's size and complexity) in an attempt to coordinate the LBO closing with the launch of Blackstone's IPO planned for June 2007.

166.    Citigroup or an affiliate of Citigroup was at the time engaged, or about to be engaged, as one of two Global Coordinators on Blackstone's IPO, at the same time as it was acting as the Buyer's advisor for the LBO.  This engagement meant Citigroup would share with Morgan Stanley the largest split of the approximately $170 million of fees associated with the IPO, as well

as have the ability to purchase a significant number of Blackstone IPO shares on "insider" terms. Citigroup had a vested interest in the success of the Blackstone IPO. Upon information and belief, Citigroup and some or all of Blackstone's other professionals sought to optimally position Blackstone prior to launching the IPO. Among other things, they sought to do so by announcing, around the time of the IPO, consummation of a large, marquee sale of "Extended Stay Hotels," for which Blackstone stood to reap substantial gains above its original equity investment.

167.    Upon information and belief Citigroup and Blackstone were therefore highly motivated to identify a buyer willing to pay a significant premium to the then-current value of the Company. Fortunately for Citigroup and Blackstone, there was a client in Citigroup's client base that would serve as the "mark:" Lichtenstein.

168.    Citigroup brought Lichtenstein into the deal in or around February 2007. Thereafter, Citigroup was instrumental in encouraging Lichtenstein to embark on the LBO, and was instrumental in keeping Lichtenstein in the deal. Citigroup assured Lichtenstein that it had previously underwritten the properties to be acquired in the LBO, that the deal was "substantiated" by an appraisal, and that Citigroup's team had already vetted the deal. Indeed, when Lichtenstein commissioned an independent valuation of the Company which contradicted the information and projections in the Information Memorandum, Citigroup dismissed that valuation and questioned Lichtenstein's judgment in relying on a relatively obscure source over the collective "wisdom" of Citigroup and the other financial institutions involved in the deal. Lichtenstein, ultimately, did not care, as the LBO was to be done using funds borrowed by the Debtors, and Lichtenstein and his affiliates were going to put little cash into the deal.

169.    On or around March 1, 2007, Blackstone received four indications of interest, including one from Lichtenstein that proposed to pay $7.6 billion. Subsequently, the field

was narrowed further to the two parties willing and able to consider concluding a transaction within a short time frame imposed by Blackstone.  On March 25, 2007, Blackstone and its advisors demanded that definitive proposals for a transaction be submitted by the remaining potential buyers by no later than April 11, 2007.

170.    On April 12, 2007, Lightstone formally offered to purchase 100% of the membership interests of one or more of the Sellers for $8 billion, net of the assumption of certain capital lease obligations.  This was the only definitive proposal Blackstone received. Blackstone quickly accepted Lightstone's proposal.  On or around April 17, 2007, DL-DW and one or more of the Sellers executed a definitive acquisition agreement (the "Acquisition Agreement").

171.    Lightstone proposed to finance the overwhelming majority of the purchase price with debt of $7.4 billion and, at best, cash of only $400 million into the deal.  This cash component was used to pay Blackstone and closing costs.  The amount was therefore woefully insufficient to support the artificially inflated purchase price and the future needs of the now highly leveraged Company.  An additional equity amount of $200 million was "rollover equity" provided to BRE.ESH for Blackstone's benefit. That interest did not represent any new cash or other value for the Debtors. The $200 million of Blackstone "rollover equity" in the "new" Debtors was included because it was the only way to reach the $8 billion purchase price insisted upon by Blackstone.

172.    Notwithstanding the dangerous debt levels of the proposed LBO, the sale was nevertheless structured to allow the Buyer's insiders to siphon value from the post-LBO Debtors regardless of their performance.  One of Lichtenstein's affiliated entities was to reap substantial "asset management" fees post-LBO, even though HVM was to continue managing all aspects of the Debtors' day-to-day business.  The sale proposed a cash management system that

would allow post-LBO equity holders to receive improper distributions from the Debtors even if the Debtors' financial condition deteriorated.  And, the Buyer obtained ownership of the Debtors while putting in little cash.

173.    Blackstone, at best, turned a blind eye to the post-LBO structure because Blackstone was eager to strip out $1.9 billion of cash from the Debtors while maintaining a post-LBO equity interest that Blackstone would receive in the LBO in exchange for nothing. Counsel advising the Debtors in the transaction was simultaneously representing Blackstone Group and Blackstone Group affiliates in the same transaction.

174.    The financial institutions advocating and knowingly participating in the transaction sought the significant fees they would receive in connection with financing the transaction. Those financial institutions were also planning to simply sell the debt as soon as the LBO closed, and thereafter have no risk for the failure they knew or should have known was likely to occur.

175.    Moreover, upon information and belief, the financial institutions agreeing to fund the LBO had long-standing relationships with Blackstone and sought to curry favor with Blackstone so as to cement possible roles in Blackstone's IPO and possible future transactions Blackstone might carry out with respect to its portfolio companies.  Indeed, affiliates of Wachovia (as defined below) and Bank of America, among others, each were involved in Blackstone's IPO.

176.    Three rating agencies, Fitch Ratings ("Fitch"), Standard & Poor's ("S&P") and Moody's Investors Service ("Moody's"), issued presale reports relating to the securitization of the $4.1 billion of senior secured debt.  In these reports, each of the rating agencies noted that the total debt of the LBO substantially exceeded the value of the Company's underlying assets.

177.    Specifically, Fitch, S&P, and Moody's concluded that the LBO total debt was, respectively, 141.6%, 153.4% and 158.4% of the value of the Company's underlying assets. In fact, these three rating agencies approximated the loan-to-value of the senior secured debt alone to be in the range of 78.4% and 87.8% of the value of the Company's underlying assets.

178.    These three rating agencies also estimated the implied value of the Company to be substantially <u>less</u> than the approximately $8 billion purchase price.  According to these third-party rating agencies, the $8 billion purchase price exceeded the Company's actual value by approximately $3 billion.

179.    Upon information and belief, the parties involved in negotiating, documenting and closing the LBO knew or should have known of the rating agencies' likely determinations well in advance of the LBO's closing.

180.    Lichtenstein later aptly summarized the improper conduct of the various parties involved in formulating the LBO and their attitudes about what was about to be done to the Debtors and their creditors:

> at the end of the day, nobody put a gun to my head and said sign the documents.  But it was like a lot of— it was - it was a brew that was cooked with a lot of people's help. Like the banks just said it's not - you know, blow the damn stuff out. It's - we really don't care, just sell the paper as fast as you can. Citibank just said pay us as many fees as you can. And I said I'm getting 95, 99 percent financing. Okay? So it was a combination; there were a lot of people who [erred] here.

181.    In short, no one involved at the time was looking out for the Debtors' interests.

**4.    The LBO Debt Increases Prior to Closing.**

182.    The initial Acquisition Agreement required that most of the pre-LBO debt be satisfied by DL-DW at closing of the LBO, including two sets of subordinated notes owed by ESI at the time.  One set, known as the "9.15% Notes," was due on March 15, 2008 (only nine

months later) and totaled approximately $31 million.  The second set, known as the "9.875%

Notes," was due in June 2011 and totaled approximately $8.2 million.

184.    However, on May 31, 2007, on the eve of the LBO's closing, the parties

entered into an Amendment to the Acquisition Agreement in which they removed entirely any

obligation to ensure that the outstanding subordinated notes were paid off as part of the LBO.

Thus, when the LBO closed, no funds were escrowed to pay those notes, the notes remained

unsatisfied and were reflected on the June 11, 2007 balance sheet of the "new" Debtors as assumed

obligations.

184.    Although Lightstone's April 12, 2007 LBO proposal had contemplated that

certain capital lease obligations would be assumed by the Buyer in the LBO, and that the

post-LBO Debtors ultimately would purchase the hotel properties to which the capital lease

related, this, similarly, did not happen.  As a result, and as described more fully below, the landlord

under that capital lease declared defaults under that lease within a few days after the LBO closed.

**C.    The LBO Closes, Blackstone Receives Approximately $1.9 Billion of Cash and the Debtors Receive Nothing But Substantial Additional Debt and a New Owner With No Hotel Industry Experience.**

**1.    The Debtors' Post-LBO Corporate and Debt Structure Generally.**

185.    The LBO closed on June 11, 2007 at the law offices of Blackstone and the

pre-LBO Debtors' counsel, Simpson Thacher & Bartlett LLP, both located in New York, New

York.

186.    On or around June 29, 2007, the Debtors' ownership structure was

"restructured," as had been contemplated previously by one or more of the LBO Buyer Individual

Defendants and the LBO Buyer Entity Defendants.  Pursuant to that planned "restructuring,"

DL-DW's direct membership interests in BHAC Capital were transferred to Homestead.  In

addition, several of the LBO Buyer Entity Defendants invested in BHAC Capital and therefore

received a percentage of BHAC Capital's membership interests, resulting in DL¬DW's and, indirectly, Homestead's membership interests in BHAC Capital, being reduced. Upon information and belief, the new investors in BHAC Capital paid less than fair consideration or reasonably equivalent value for their membership interests in that entity.

187.   A chart showing the Debtors' corporate organizational structure following the restructuring described in the preceding paragraph is attached as Exhibit B and incorporated herein by reference.  Upon information and belief, the corporate organizational structure described in Exhibit B hereto existed until the Debtors eventually (and inevitably) filed bankruptcy beginning on June 15, 2009.

188.   The Debtor's post-LBO debt structure can be summarized as follows: (a) a mortgage loan in the amount of $4.1 billion, secured by encumbrances on the mortgaged properties; and (b) ten tranches of mezzanine loans, in an aggregate amount of $3.3 billion, each tranche owed by an indirect owner of the operating hotels secured by the equity in the borrower beneath that owner. The debt structure was designed to permit the securitization of the mortgage loan by the mortgage lenders' sale of so-called "CMBS" (commercial mortgage backed securities) to third parties, many of which currently are Litigation Trust Beneficiaries.

   a.   **The Mortgage Loan Structure.**

189.   The mortgage loan agreement was between the mortgage lenders and 21 mortgage borrowers, as summarized on the chart attached hereto as Exhibit C and incorporated herein by reference. The entities listed in Exhibit C are all Debtors.  After the LBO, their names were changed to drop "BRE/," as was also done with he various mezzanine borrowers.  Exhibit C reflects these name changes.  All but three of the mortgage borrowers owned properties.  The parent entities of the three non property-owning mortgage borrowers were also parties to, but not borrowers under, the mortgage loan agreement. In addition, four Debtor operating lessee entities

were parties to, but not borrowers under, the mortgage loan agreement.  The mortgage borrowers signed a single consolidated mortgage note in the amount of $4.1 billion, and the mortgage borrowers were jointly and severally liable for the mortgage debt.

190.    Each of the 18 property-owning mortgage borrowers and property owners secured the mortgage loan by first-priority encumbrances on their respective properties.  The mortgage lenders, however, did not begin perfecting their mortgage liens with appropriate filings until June 22, 2007, and continuing thereafter through at least July 2007.  The mortgage loan agreement, mortgage note, and related security instruments were cross-collateralized and cross-defaulted.  Therefore, upon information and belief, although the entities that actually owned the Debtors' hotel properties were not all borrowers under the new mortgage loan agreements, all properties owned by any of the Debtors were nevertheless directly pledged as collateral for the mortgage loans.  Upon information and belief, the entities that owned the hotel properties received none of the mortgage loan proceeds and, like the rest of the Debtors, received no value from the LBO.

### b.    The Mezzanine Loan Structure.

191.    Several mezzanine loan agreements were executed in connection with the LBO. The total mezzanine debt borrowed in the LBO was approximately $3.3 billion.  Each mezzanine loan agreement was between the applicable mezzanine lender and three equal-level mezzanine entities, as reflected on the chart attached as Exhibit D and incorporated herein by reference. Each set of mezzanine borrowers signed a single consolidated mezzanine note in the amount of its mezzanine loan.  Each of the mezzanine borrowers was jointly and severally liable under the mezzanine note and mezzanine loan agreement.  Each of the mezzanine borrowers was the legal and beneficial owner of all direct interests in the borrower beneath it.  Each mezzanine borrower entered into a pledge and security agreement in connection with the LBO granting the

mezzanine lender a first priority security interest in its equity interests in the borrower directly beneath it in its respective ownership chain.

192.    Although the mezzanine loans did not directly encumber the mortgaged hotels and the hotels' owner entities were not borrowers under the mezzanine loans, the mezzanine loan structure indirectly and improperly gave the mezzanine lenders subordinate interests in the hotels by (i) causing or allowing the mezzanine lenders to be paid directly from the proceeds of the operating hotels out of the Cash Management Account (as defined and described below), (ii) requiring the most junior mezzanine lender's approval of the Debtors' proposed annual budget even though the most junior mezzanine lender was not a lender to the mortgage borrowers, (iii) requiring the mezzanine borrowers to repay the mezzanine loans before any mortgaged properties could be released, and (iv) providing that, if any mortgage borrower paid more than its allocable share of the mortgage loan, such mortgage borrower could not exercise its contribution rights against other mortgage borrowers unless the mezzanine loans were paid in full.  Moreover, as alleged below, debt service on the mezzanine loans was set up to be paid from the Cash Management Account before certain critical operating expenses.

193.    As described above, the rating agencies reviewing the LBO, even prior to its consummation, concluded that the Debtors' value was woefully insufficient to support the mezzanine loans on the date the LBO closed.

c.    **The Cash Management Account.**

194.    The LBO imposed requirements that all cash generated by the hotels be swept and used to pay debt service on both the new mortgage loans and the new mezzanine loans, even though the entities that owned the hotels were neither borrowers nor obligors under the mortgage loans.  Those requirements were reflected in the main cash management agreement ("Cash Management Agreement") executed in connection with the LBO that established a "Cash

Management Account." That Cash Management Account was in the name of "ESP P Portfolio LLC [a Debtor] for the Benefit of Wachovia Bank" ("Wachovia"). The Cash Management Account was located at Wachovia at all times relevant to this Complaint.

195. The mortgage lenders were granted a first priority security interest in the Cash Management Account. The mortgage borrowers, property owners, operating lessees, and HVM, as the Debtors' management company, were required to deposit all rents, receipts payable, and all other amounts received in connection with the hotels' operations into applicable property and clearing accounts, which were to be swept daily into the single, commingled Cash Management Account. Distribution of funds from the Cash Management Account was governed by the Cash Management Agreement.

196. The mezzanine loan agreements acknowledged that the Cash Management Account was controlled by the mortgage lenders. Provided no event of default had occurred, the mortgage lenders were to apply all funds in the Cash Management Account in accordance with the Cash Management Agreement. Although the mezzanine lenders had no direct interest in the hotels, the mezzanine lenders were nevertheless paid directly with funds from the commingled Cash Management Account, which contained cash assets of the operating hotels only. The funds did not belong to the mezzanine borrowers (as described below). The mezzanine lenders were nevertheless paid with those funds, prior to the payment of critical hotel operating expenses.

197. The Cash Management Agreement contained detailed requirements regarding the flow of funds through the cash management system. Numerous subaccounts of the Cash Management Account (each a "Subaccount") were maintained by the agent for the mortgage lenders on a ledger-entry basis. All such Subaccounts were merely book entries, and all the funds were commingled in the single Cash Management Account at all times relevant to this Complaint.

On each business day, the agent for the mortgage lenders was required to apply all funds on deposit in the Cash Management Account in the amounts and according to the priorities set forth in the Cash Management Agreement.  A chart showing the flow of funds through the Debtors' post-LBO cash management system is attached as Exhibit E and incorporated by reference.

### d.     Pertinent Guarantee Obligations of the Debtors' Insiders.

198.     Lichtenstein, Lightstone, ESI and Homestead (collectively, the "Guarantors") executed guarantees in favor of the respective lenders, guaranteeing certain of the respective borrowers' obligations under the mortgage loan and each mezzanine loan.   The Guarantors were liable under the guarantees to the extent of the lenders' damages arising out of various "bad boy" circumstances, including: (a) the borrowers' breach of any of the special purpose entity/separateness covenants (described below); and (b) the borrowers' filing for bankruptcy.  To the extent the Guarantors' obligations were triggered by a borrower's bankruptcy filing, the Guarantors' aggregate liability was capped at $100 million.

### e.     Blackstone's Improper Receipt of Loan Proceeds.

199.     At closing, the Sellers, who were owned, controlled, managed or dominated by Blackstone Group and the Blackstone Group Individual Defendants at the time, instructed that the funds borrowed by the Debtors in the LBO were to be used to retire certain, but not all, existing debt and pay the Sellers' fees and expenses associated with the transaction. After retiring some, but not all, of the existing pre-LBO debt and paying the Sellers' fees and expenses associated with the LBO, the Sellers, which were Blackstone affiliates, received cash totaling nearly $1.9 billion (apart from Blackstone's rollover equity interest), as follows:

**Blackstone Entities' Cash Receipts**

| BHAC IV, LLC | Purchase price payable to Seller | $1,282,764,450 |
|---|---|---|
| Blackstone Hospitality | Purchase price payable to "Seller" | $489,546,290 |

| | | |
|---|---|---|
| Acquisitions LLC | | |
| Prime Hospitality LLC | Balance of Gwinnet purchase price after payment of debt costs and closing costs | $4,110,604 |
| BHAC IV, LLC | Earnest money deposit payable to Seller | $85,611,012 |
| **Blackstone Entities' Cash Receipts** | **Total** | **$1,862,032,356** |

The reference above to cash receipts by Prime for the Gwinnett purchase price relates to a hotel that was owned by a Blackstone affiliate.  The Gwinnett hotel was included in the hotels sold to the Buyer.  The closing of the Gwinnett property sale occurred simultaneously with the closing of the LBO.  In addition, even though Blackstone Hospitality was not a seller under the Acquisition Agreement, it received over $489 million of loan proceeds.

200.    The borrower Debtors were not required under the Acquisition Agreement to pay the purchase price to the Sellers.  That was the Buyer's responsibility.  Moreover, as described below, under the loan agreements the Debtors appear to have been prohibited from using loan proceeds for that purpose, even though everyone knew that the money being borrowed by the Debtors was the only source of funding for the LBO purchase price. Nevertheless, all Defendants caused the Debtors to improperly pay the purchase price on the Buyer's behalf with substantial borrowings the Debtors were obligated to repay.  Upon information and belief, the Debtors then were caused to improperly, and in violation of the loan agreements, distribute these funds to the Blackstone Pre-LBO Entity Defendants even though they no longer owned the Company.

201.    In addition to the payments made to the Blackstone Pre-LBO Entity Defendants described above, the Debtors used borrowed funds to pay a total of no less than approximately $150 million of fees and other amounts to the lenders, professionals and advisors involved in the deal. Those fees included lender loan and underwriting fees, so-called "hedge

costs," property specific escrowed amounts, which included taxes, insurance, escrow fees, an interest payment due at closing, environmental fees and holdbacks, certain reserves, title-related expenses and the professionals' fees incurred by all involved parties.

**f.    The Debtors Become Encumbered by Substantial Additional Debt for Blackstone's Benefit.**

202.    All but $200 million of the $1.9 billion payments to the Blackstone Group entities identified above came from loans made to the Debtors that they were unable to repay, and that rendered them insolvent and undercapitalized at closing.  The total post-LBO mortgage debt borne by the Debtors (for Blackstone's benefit) increased over pre-LBO levels by $749.4 million and the total mezzanine debt increased over pre-LBO levels by $905.3 million.

203.    After the LBO, the Debtors were overleveraged as a result of being subject to a significantly greater amount of debt than they were immediately prior to the LBO.  Virtually all of the Debtors' assets were over-levered.  The Debtors' debt load was significantly higher than that typical for hospitality REITs at the time.  Given these facts, the Defendants involved in the transaction or with the Debtors at the time knew or should have known that the Debtors would have no cash for necessary operating, marketing, maintenance, capital improvements and other expenditures, and no ability to secure additional loans or liquidity to meet their ongoing needs.

204.    The borrowing capacity of the Debtors post-LBO was almost non-existent. Although the Debtors did maintain a working capital reserve of approximately $50 million, a pre-LBO line of credit in the amount of up to $105 Million that previously provided for hotel acquisition funding was not available post-LBO.  Moreover, there were no provisions in the limited liability company agreements for DL-DW or BHAC to make additional capital calls from any investors after the LBO's closing, nor were there any commitments for capital infusions in the loan agreements.  Therefore, the liquidity needed for capital expenditures, maintenance, upgrades,

re-branding and expansion (all of which were critical if the Debtors were to have any chance whatsoever to achieve the financial performance "projected" by Blackstone in the Information Memorandum) was likely, and foreseeably, unavailable.

205.   The parties involved in the LBO attempted to justify their conduct with an appraisal of the Debtors' assets, performed by HVS International ("HVS"), which purported to value the Debtors' assets at approximately $8 billion.  That HVS appraisal was flawed for the following reasons, among others: the projected total revenue growth was overstated; the appraisal improperly assumed that the Debtors' room expense rate would continue to decrease; EBITDA growth was unreasonably projected; the appraisal assumed financing which was much less expensive than actually incurred in the LBO; and the appraisal's projected capital expenditures were dramatically underestimated.

206.   As a result of the foregoing, among other errors, the value of the mortgage properties contained in the HVS appraisal was grossly overstated.  The parties involved in the LBO knew or should have known the HVS appraisal was flawed, resulted in a purported "fair value" of the mortgaged properties that was artificially inflated by billions of dollars, and therefore could not be relied upon.  Upon information and belief, many of the key assumptions made by HVS were provided to HVS by the Blackstone Pre-LBO Entity Defendants or the Blackstone Group Pre-LBO Individual Defendants in order to allow the values set forth in the HVS appraisal to be inflated.

207.   In short, the Blackstone Pre-LBO Entity Defendants, as equity holders in the pre-LBO Debtors, took all the cash they could get, while the Debtors and their estates were left insolvent, and the Debtors' new owners prepared to pay themselves hundreds of millions of dollars of the Debtors' desperately needed cash.  Both groups knew that the LBO was structured to fail.

2.     **The Company Intentionally Ignores the Separateness of Its Related Entities and the Requirements of the LBO Loan Documents.**

a.     **The Loan Proceeds' Uses Were Restricted. But The Parties Ignored The Restrictions and Paid Loan Proceeds Directly to the Sellers.**

208.   The mortgage loan agreement restricted the use of proceeds from the new mortgage loans, as follows:

> [B]orrower shall use the proceeds of the Loan solely to (a) repay or discharge any existing loans relating to the Properties, (b) pay all past-due Basic Carrying Costs, if any, with respect to the Properties, (c) make deposits into the Reserve Funds on the Closing Date in the amounts provided herein, (d) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender, (e) fund any working capital requirements of the Properties and (f) distribute the balance, if any, to borrower.

209.   The authorized uses, therefore, did not include making payments to the Blackstone Sellers and other Blackstone affiliates that received sale proceeds, as described above. Notwithstanding this provision, the mortgage loan proceeds were not received by any mortgage borrower. To the contrary, all mortgage loan proceeds were deposited into an escrow account and a substantial portion was paid out directly to one or more of the Blackstone Pre-LBO Entity Defendants, as described above, in violation of the restrictions contained in the mortgage loan agreement.

210.   The mezzanine loan agreements also restricted the use of proceeds from the new debt resulting from the LBO. The mezzanine loan agreements provided that the mezzanine loan proceeds were to be paid first to the more senior mezzanine borrower, then, ultimately, provided to the mortgage borrowers as equity contributions:

> Borrower shall use the proceeds of the Loan solely to (a) make an equity contribution to Mortgage Borrower [through Senior Mezzanine Borrower] in order to cause Mortgage Borrower to use such amounts for any use permitted pursuant to Section 2.1.5 of the Mortgage Loan Agreement, (b) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Lender and (c) distribute the balance, if any, to Borrower.

Notwithstanding these provisions, the mezzanine loan proceeds were not received by any mezzanine borrower and were never contributed, by equity contributions or otherwise, to the mortgage borrowers through any senior mezzanine borrower. To the contrary, all mezzanine loan proceeds were, like the mortgage loan proceeds, deposited into an escrow account and, as with the mortgage loan proceeds, a substantial portion was paid out directly to one or more of the Blackstone Pre-LBO Entity Defendants, as described above, in violation of the restrictions contained in the mezzanine loan agreements.

      **b.**      **Formalities Regarding the Post-LBO Debtors' Separateness and Accounting Are Violated.**

211.    The applicable loan agreements contained extensive "special purpose" entity and separateness representations and other covenants requiring, among other things, that each mortgage borrower, operating lessee entity and property owning entity would (i) not make any loans or advances to any person; (ii) pay debts from its assets as such debts become due; (iii) do all things necessary to observe organizational formalities; (iv) maintain all of its books, records, financial statements, and bank accounts separate from those of any other person; (v) except as expressly permitted under the applicable loan agreement or the Cash Management Agreement, not commingle assets; (vi) not guarantee or become obligated for the debts of any other person; (vii) not pledge assets for the benefit of any other person other than with respect to the applicable mortgage or mezzanine loans; (viii) remain solvent and maintain adequate capital in light of its contemplated business operations; (ix) maintain a sufficient number of employees in light of its contemplated business operations and pay the salaries of its own employees from its own funds; (x) not assume or incur any liabilities except the mortgage and mezzanine loans, certain other specified liabilities not germane to this Complaint, and "liabilities incurred in the ordinary course of business," subject to certain liability caps, which liabilities would not be more than 60 days past

the date incurred; and (xi) maintain its assets and liabilities in such a manner that it would not be costly or difficult to segregate, ascertain or identify its individual assets and liabilities from those of any other person.

212.     These requirements, however, were disregarded.   For example, after the closing, an opening balance sheet for DL-DW showed the impact of the LBO on DL-DW and the appropriate allocation of the price paid for the LBO. The mortgage and mezzanine debt was recorded at the ESI and Homestead accounting database levels, as opposed to being recorded by each legal entity mortgage borrower or mezzanine borrower.  Similarly, the subsidiaries' assets and liabilities, including hotel property and equipment, were recorded at the ESI and Homestead database level, rather than being recorded at the individual entity level and treated as owned by that entity.  In short, the Company ignored the fiction of legal separateness of its entities.

213.     If the Debtors had established and maintained separate books for each of the individual mortgage borrowers and mezzanine borrowers as of the LBO, then the accounting by the mortgage borrowers and mezzanine borrowers should have reflected:

- The mortgage debt and the related proceeds - at each legal entity level for the individual mortgage borrowers; allocated based on the release amounts included in the mortgage loan agreement; and

- The mezzanine debt and the related proceeds - at the legal entity level for the individual mezzanine borrowers - allocated based on the sum of the allocated release amounts included in the mortgage loan agreement for the mortgage borrowers directly below the relevant mezzanine borrower.

214.     The Debtors made no effort to maintain their separateness or fulfill the covenants of the LBO loan agreements.  The Debtors were treated internally at all relevant times as part of one company.  The Debtors had common officers and directors, and had no separate governance.  The Debtors conducted all material board of directors meetings on a consolidated

basis for the so-called "Extended Stay Hotels family of companies," which included the Debtors' direct equity owners.  In addition:

- The daily business and affairs of each of the Debtors were managed and controlled by HVM Manager, of which Lichtenstein was the sole member;

- The Debtors' operations were integrated and interdependent and each of the Debtors was run in the interest of the Buyer and the Debtors' ultimate equity owners;

- With few exceptions, all of the Debtors were wholly-owned by the Buyer;

- The Debtors did not have specific general ledger codes in their accounting system to track specific accounting activity for the mezzanine borrowers;

- None of the mortgage borrower entities or mezzanine borrower entities kept their own books and records, and adequate records of complete accounting activity related to each legal entity were not maintained;

- Debt to the mortgage and mezzanine lenders was recorded only at the ESI and Homestead levels, debt service was paid only from the Debtors' consolidated Cash Management Account, and the Debtors failed to properly record any financial or accounting activities (including debt service) relating to the mezzanine or mortgage loans;

- The Debtors' expenses were generally funded from the consolidated Cash Management Account and a single working capital reserve account;

- The Debtors failed to observe corporate formalities for intercompany transfers, which generally were not properly recorded;

- The mortgage borrowers were jointly and severally liable on the mortgage debt, and yet paid the mezzanine debt for which the mortgage borrowers had no liability;

- Mezzanine borrower entities were prevented from enforcing contribution rights against other Debtors until after all of the mezzanine debt and mortgage debt had been paid in full;

- The Debtors made substantial payments for the benefit of insiders;

- The Debtors failed to pay debts as they came due in the ordinary course, with certain liabilities being greater than 60 days outstanding at all relevant times from and after the date the LBO closed; and

- The Debtors were insolvent and undercapitalized on the date the LBO closed and at all relevant times thereafter.

**D.    Debt Yield and Financial Covenants Are Violated The Day The LBO Closed, and Key Differences Between the Debtors[32] Pre- and Post-LBO Debt Structures Cause Immediate Financial Distress.**

**1.    The Significance of a Debt Yield Event.**

215.    The Debtors' loan agreements provided for severe consequences if a "Debt Yield Event" occurred. The loan agreements defined "Debt Yield" roughly as a fraction:  (a) the numerator of which was net operating income less (i) assumed management, marketing, and franchise fees equal to 4% gross income, (ii) replacement reserve fund contributions equal to 4% gross income, and (iii) income generated by leased properties; and (b) the denominator of which was the combined total outstanding principal balances on the mortgage and mezzanine loans. In essence, the Debt Yield calculation was intended to provide an indication of the amount of cash generated by the mortgaged properties compared to the level of debt associated with those properties, and to measure the debtors' ability to generate enough cash to service the LBO debt.

216.    The Debtors' failure to meet specific Debt Yield benchmarks under the LBO loan agreements would cause the Debtors to have insufficient cash to pay their obligations as follows:

(1)    A so-called "Debt Yield Event" triggered a "Cash Trap Event."  This meant that excess cash from operations (after taxes, reserves, and debt service) was "trapped" as additional collateral for the lenders.  The cash was not available to pay costs of operations outside of the annual budget approved by the lenders under the Cash Management Agreement, including capital expenditures beyond a small reserve.  The annual budget did not allow for the payment of crucial expenses such as occupancy taxes, reserves and management fees, among other things;

(2)    If the Debt Yield fell below the so-called "Debt Yield Amortization Threshold," then the borrowers had to make substantial amortization payments to the lenders beginning on June 12, 2009; and

(3)    No equity distributions could be made (except to holders of Series A-1 preferred equity in BHAC Capital) by either the mortgage borrowers, the property owner entities, the operating lessee entities, or the mezzanine borrowers unless the Debt Yield equaled or exceeded 7.75%.

217.    A Cash Trap Event, triggering a "Cash Trap Event Period," occurred upon: (a) an event of default under the mortgage loan agreement or any mezzanine loan agreement; (b) a Debt Yield Event; or (c) HVM's filing for bankruptcy. A Cash Trap Event could be cured under certain circumstances including, if it was caused by a Debt Yield Event, the mortgage borrowers' achievement of certain Debt Yield numbers for six (6) consecutive months.

218.    On June 30, 2007, the Debt Yield was only 7.09%. Therefore, the Debt Yield was less than 7.5% immediately after the date the LBO closed, and there was, in substance if not form, a continuous Cash Trap Event Period within the meaning of the mortgage loan agreement. For the first six months after the LBO's closing (including the day the LBO closed) the only reason there was no technical Cash Trap Event Period was because a Debt Yield Event had no consequences under the pertinent loan agreements until the seventh payment date, scheduled to occur in January 2008. The Debt Yield percentage, however, was required to be reported to the Debtors' lenders on as monthly basis, including during the first six months after the LBO closed. But the LBO Buyer Entity Defendants and the LBO Buyer Individual Defendants (to the extent they were directors, officers or otherwise in control at the relevant times) did not report the Debt Yield percentage to the lenders as should have been done. Upon information and belief, this failure to report was intentional and allowed improper distributions to continue to be made to equity holders.

219.    The Debt Yield Event percentage would become even more difficult to achieve over time, as the required percentage was scheduled to grow from 7.5% (on the seventh payment date) to 8.1% (on the LBO loans' maturity date if certain options to extend the loans had been exercised by the Debtors). In short, the Debtors immediately failed the Debt Yield test under the LBO loan documents on the date the LBO closed, were unlikely to meet the test when it was

first scheduled to formally occur in January 2008, and the LBO Buyer Entity Defendants and the LBO Buyer Individual Defendants, during their tenures as fiduciaries, knew or should have known it.

### 2. The Post-LBO Debt Structure Improperly Restricts the Debtors' Cash.

220. Two significant differences between the pre- and post-LBO Cash Management Agreement and related agreements placed the Debtors at even graver risk of failure. First, the pre-LBO cash management agreement provided that management fees were higher in priority on the so-called "waterfall" than debt service on the mezzanine loans, and thus management fees would be paid before mezzanine loan debt service if there were insufficient funds to pay both. The post-LBO Cash Management Agreement provided just the opposite: mezzanine loan debt service was higher in priority than management fees, and was paid first if there were insufficient funds to pay both. This severely threatened the post-LBO Debtors' ability to maintain operations.

221. Management fees are not discretionary expenses for a hotel chain. Most of the hotels were indirectly owned by ESI, which was a REIT. A REIT is required to have an outside management company operate its hotels. However, management fees could be paid only if cash was available after debt service under the post-LBO structure. Therefore, any cash difficulties, and especially a Cash Trap Event, made it likely the Debtors would be unable to pay critical management fees and costs necessary to keep the Debtors' hotels open. If those fees and costs were not paid, the Debtors' hotels would close and the Debtors' entire business would abruptly shut down, causing waste and destruction of the Debtors' hotels' value. Nevertheless, the Blackstone Group Individual Defendants, Blackstone Group Pre-LBO Entity Defendants, DL-DW and the LBO Buyer Individual Defendants that became directors or officers of the Debtors at the time the LBO closed agreed to terms placing the Debtors, and their creditors, improperly at risk.

222.    The post-LBO Cash Management Agreement trapped 100% of excess cash flow during every Cash Trap Event Period, and defined excess cash flow in such a way as to trap the Debtors' cash prior to the payment of critical operating expenses.   The pre-LBO Cash Management Agreement provided for a similar formula, but the excess cash flow concept was different: the cash trap occurred only after critical operating expenses were paid.   Therefore, the post-LBO Debtors were placed in an untenable financial position to further the interests of the Defendants that were the Debtors' pre- and post-LBO owners, insiders or insiders' affiliates.

223.    Under the pre-LBO mortgage loan agreement, in proposing each annual budget, the borrowers needed to obtain the approval of only the servicer for the mortgage loan. Post-LBO, in proposing an annual budget, the borrowers were required to obtain the approval of both the mortgage lenders (and after securitization of the CMBS, the servicer for the debt certificate holders) and the most junior mezzanine lender.   This requirement placed the Debtors' need for cash to operate subordinate to the profit return for the junior mezzanine lenders, a situation which quite predictably caused great harm to the Debtors and their estates.

224.    All of these problems were or should have been foreseen by the Defendants involved in the LBO.

**3.    The Debtors Immediately Violate Covenants Regarding The Payment of Ordinary Course Debts.**

225.    The mortgage and mezzanine loan agreements contained extensive financial reporting covenants, which included:  (i) within 60 days after the end of each fiscal year, each borrower had to furnish its respective lender with certain annual financial statements audited by a "Big Four" accounting firm and prepared according to GAAP, along with an Officer's Certificate certifying whether there was an event of default under the applicable loan agreement and if so, what it was, how long it had existed, and what actions had been taken to remedy it; (ii)

within 20 days after each month, each borrower had to furnish its respective lender an occupancy report, monthly and year-to-date operating statements, a calculation of the Debt Yield on the last day of the month and the amount of all operating rent due for the month; (iii) within 30 days after each quarter and each month, each borrower had to furnish its respective lender with an officer's certificate stating that the monthly financials provided were accurate, that the representations and warranties with respect to certain special purpose entity requirements were correct and that ordinary course of business liabilities had not exceeded certain amounts and had been paid within 60 days of the date they were incurred; and (iv) within 30 days before the start of each fiscal year, the mortgage borrowers and property owner entities had to submit a proposed annual budget, which was subject to the written approval of the mortgage lenders and the "Most Junior Mezzanine Lender."   Until the proposed annual budget was approved by that lender, the most recent "Approved Annual Budget" applied.

226.    Several of these covenants were ignored or violated.   For example, no monthly Debt Yield reports were prepared or furnished during 2007 following the LBO, and the first such report was not prepared until January 2008.   Also, Rogers routinely submitted officer's certificates certifying each month after the LBO closed that ordinary course liabilities had not exceeded certain amounts and had been paid within 60 days of their incurrence.   In fact, there were ordinary course liabilities outstanding for longer than 60 days on the date the LBO closed and each month thereafter until the Debtors' eventual bankruptcy filing.   Each of these events was an event of default under the loan agreements.   In short, the Debtors were in technical default of their obligations the day the LBO closed.

**E.      The Lenders Make Demands of Lichtenstein to Facilitate the Sale of Loan Certificates.**

**1.      The Lenders Experience Difficulty Selling the LBO Debt.**

227.    The lenders that had committed to finance the LBO had always intended to sell most or all of the mortgage and mezzanine debt to third parties. Those efforts, however, were unsuccessful. As of the LBO's closing on June 11, 2007, the banks that financed the LBO held all or substantially all of the mezzanine and mortgage debt.

228.    Immediately after the LBO closed, the mortgage lenders marketed the CMBS for sale. At the beginning of those efforts, the market was active.  However, the market quickly softened, starting no later than late-July or early-August 2007. As a result, the banks were forced to take more aggressive steps to sell the CMBS debt including, for example, as early as August 2007, discounting the CMBS debt.

229.    The mezzanine debt also was not selling, and was being discounted by the mezzanine lenders.  The mezzanine lenders began offering to provide buyers of the mezzanine debt with financing ("repo financing") to help buyers purchase the debt.

230.    In addition to offering incentives to potential buyers of the CMBS and mezzanine debt, the lenders made certain demands on Lichtenstein and Lightstone regarding actions that the lenders claimed were needed to make the CMBS and mezzanine debt more marketable.

**2.    The Lenders Demand that Lightstone Stop Efforts to Sell Preferred Equity.**

231.    Before the LBO had closed, in May 2007  Lichtenstein was in discussions with certain entities regarding a sale of a substantial piece of equity in the post-LBO Debtors. Among others, Centerbridge Partners, L.P ("Centerbridge") was supposedly interested in purchasing equity, and was discussing with  Lichtenstein the need to relieve the Debtors from a $200 Million junior tranche of LBO debt.  Other potential investors being solicited on the Buyer's behalf at the time commented to  Lichtenstein or Lichtenstein's advisors that the proposed LBO was "too levered," that it "wouldn't take much to wipe them out," and thus declined interest.

Unsurprisingly, those pre-LBO discussions did not result in a sale of preferred equity. Nevertheless, the LBO proceeded.

232.    After the LBO closed, Lichtenstein continued efforts to sell equity. However, the lenders demanded that Lichtenstein cease those efforts because it was interfering with the lenders' efforts to sell their debt.  Upon information and belief, Lichtenstein complied with the lenders' demands, and ceased efforts to sell equity shortly after the LBO closed.

233.    In or around August 2007, in connection with the securitization of the mortgage loan that resulted from the LBO, Banc of America Securities LLC, together with three other banks, offered Commercial Mortgage Pass-Through Certificates in the amount of the $4.1 billion mortgage loan to institutional third-parties through a Confidential Offering Memorandum, dated August 17, 2007 (the "Mortgage Loan Issuance Offering Memorandum").

234.    Although the Mortgage Loan Issuance Offering Memorandum noted the ratings of the mortgage loan debt by Fitch, S&P, and Moody's as between BB and AAA, noticeably absent from the Mortgage Loan Issuance Offering Memorandum was any reference to the fact that, as described above, these rating agencies' July 2007 reports noted that the total debt of the LBO substantially exceeded the value of the Company's underlying assets.  According to S&P's and Fitch's July 2007 reports, they expressly valued the Company at $4.8 billion and $5.2 billion, respectively – approximately $3 billion less than the $8 billion purchase price.

235.    Moreover, the Mortgage Loan Issuance Offering Memorandum cited the results of the HVS appraisal, which the Sellers, the Buyer, participating lenders, and others involved in the LBO, as discussed above, knew or should have known was flawed, and which was based upon assumptions provided to HVS by the Blackstone Pre-LBO Entity Defendants or the

Blackstone Group Pre-LBO Individual Defendants in order to inflate the values in the HVS appraisal, as described above.

> **3.    The Alleged HPT Capital Lease is Declared in Default and The Lenders Demand That Lichtenstein "Resolve The Defaults or Else" to Facilitate The Banks' Efforts to Sell Their Paper.**

236.    Prior to the LBO, HVI(2) Incorporated ("HVI"), an entity under the Debtors' corporate umbrella, entered into a lease agreement ("HPT Lease"), pursuant to which HPT HSD Properties Trust ("HPT HSD") leased eighteen hotels to HVI. The HPT Lease ran through December 31, 2015, subject to renewal options. HVI was required by the HPT Lease to, among other things, (i) maintain certain specified net worth, and (ii) adhere to certain requirements if a change of control, such as the LBO, was to be effected.

237.    Immediately after the LBO closed, HPT HSD alleged that Lightstone had failed to comply with one or more of these requirements.  The Blackstone Group Individual Defendants, Blackstone Pre-LBO Entity Defendants and, to the extent they were directors, officers or anticipated equity owners at the time, the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants were or should have been well aware of this issue prior to the LBO's closing.

238.    One week after the LBO closed, on June 18, 2007, HPT HSD issued a notice of default under the HPT Lease and terminated the lease.  That same day, HPT HSD issued a press release announcing the alleged defaults and that it had terminated the lease.  This default was foreseeable prior to the LBO, caused great concern among the Debtors' lenders and caused the lenders to place further demands upon the Debtors.

239.    Shortly thereafter,  HPT HSD offered Lichtenstein the option to purchase the properties that were subject to the HPT Lease. To resolve the dispute, and to address the lenders' demands, on or around July 26, 2007, HFI Acquisitions Company LLC ("HFI"), an

affiliate of Lichtenstein, purchased 17 of the 18 leased hotel properties under the HPT Lease for approximately $192 Million. Approximately $170.5 Million of the $192 Million used in the HPT HSD transaction came from new mortgage and mezzanine loans to HFI from certain of the Debtors' lenders. In connection with the transaction, HFI was assigned all of HPT HSD's rights under the HPT Lease, including HPT HSD's rights in a $15.6 million security deposit. Upon information and belief, one or more of the Debtors had an interest in those funds. Also, Homestead guaranteed a portion of the rent under the HPT Lease and posted cash collateral for that guaranty totaling approximately $10 million. Upon information and belief, Blackstone Hospitality was also released from its obligations under a letter of credit that Blackstone Hospitality had, prior to the LBO, posted as security for rent and other obligations owed under the HPT Lease.

240. After the HFI transaction closed, HFI subsequently leased the purchased hotel properties to one or more of the Debtors. Upon information and belief, this enabled Lichtenstein, as the owner of HFI, to receive additional payments from the Debtors in the form of rents on those hotels.

**4.   DL-DW's Acquisition of the "LIBOR Floor Certificates."**

241. Because the mortgage lenders were having so much difficulty selling their debt, Wachovia and the borrower Debtors entered into a letter agreement amendment, dated August 31, 2007, that amended the mortgage loan agreement and the mezzanine loan agreements. The amendment adjusted provisions relating to the application of the proceeds from prepayments of the mortgage and mezzanine loans to make the debt more palatable to potential buyers. In exchange for the borrowers' consent to the amendment, the lenders agreed to issue to the Debtor borrowers (or their designees) Class X-A and X-B certificates from the securitization (collectively, the "LIBOR Floor Certificates"). The LIBOR Floor Certificates were investment grade (AAA), and represented the right to receive a payment stream, derived from the mortgage loan payments,

of the difference between the LIBOR "floor" amount, on the one hand, and actual LIBOR on the other hand.  Therefore, whenever LIBOR dropped below the floor, part of the money paid by the borrower Debtors on the mortgage debt would be paid over, in turn, to the holder of the LIBOR Floor Certificates.

242.    On November 2, 2007, the LIBOR Floor Certificates were issued, in physical form, and transferred directly to DL-DW, one of the ultimate equity owners of the Debtors, rather than to the Debtor borrowers making concessions and providing all payments under the loan agreements. Upon information and belief, no value was provided by DL-DW to the borrowers in exchange for these certificates and no accounting entries were made to reflect that property rightfully belonging to Debtor borrowers was being diverted to DL-DW.  At the time, the LIBOR Floor Certificates were valued at no less than approximately $25 Million.

243.    As LIBOR began dropping throughout 2008 and 2009, the LIBOR Floor Certificates became increasingly valuable to DL-DW because the amount of the "floor" was higher than the actual LIBOR-based loan payments.  This value, however, should have belonged to the Debtors, not DL-DW, because the Debtors were the obligors under the mortgage and mezzanine agreements, and were the parties who contracted to receive the certificates. The LIBOR Floor Certificates' issuance to DL-DW was an improper transfer of the Debtors' value to the Debtors' equity owners.

**F.    The Debtors' Post-LBO Performance Continues to be Predictably Dismal, But Substantial Distributions Are Nevertheless Made to Equity Holders.**

**1.    2007 Post-LBO Financial Performance.**

244.    Immediately after the LBO, the Debtors' financial performance continued to decline, performance metrics set forth in its budgets were missed, and the Debtors encountered significant (and predictable) economic problems. The LBO Buyer Entity Defendants and, during

their tenures as directors or officers of one or more of the Debtors, the LBO Buyer Individual Defendants, received regular financial and other reports on both a weekly and monthly basis (depending on the nature of the reports) after the LBO and therefore knew or should have known of relevant, material events relating to the Debtors' performance and inevitable downward spiral.

        a.      **2007 Financial Results.**

245.    The Debtors' 2007 post-LBO revenues were approximately $623 million, below the pro-forma budget of approximately $655 million prepared in connection with the LBO. The 2007 post-LBO EBITDA was approximately $327 million (or a 52% margin), as compared to a pro-forma budget EBITDA of $364 million (or a 56% margin).  During the second half of 2007, the Debtors experienced a continuing reduction in room demand, and the monthly ADR, OCC, and RevPAR were at or below budget in every month following the LBO in 2007.  Revenue growth reversed in the second half of 2007, and the Debtors missed projections for room revenue and property-level EBITDA in each of the last three quarters of 2007.

246.    The Debtors' performance relative to its selected competitive peer group reflected that, while the Debtors' occupancy rate was higher than those of some of their peers, the Debtors' revenue and room rates (as evidenced by RevPAR and ADR at the time) was below its peers by a significant amount:  10% to 22%.

247.    In addition to regular industry reports, the Debtors' management received weekly reports showing how the Debtors' deteriorating performance compared to the Debtors' peer group in the second half of 2007. During the November 15, 2007 board of directors meeting for the Debtors, it was reported that during the third quarter, certain metrics were below budget: RevPAR was below budget by 3% and property-level EBITDA was below budget by 5.7% year to date through September; RevPAR was below budget by 5.9% and property-level EBITDA was below budget by 10.5% for the third quarter 2007.  The LBO Buyer Entity Defendants and, during

their tenures as directors or officers of one or more of the Debtors, the LBO Buyer Individual Defendants, were thus aware that the Debtors' performance was not only below their peer group, but was also below internal targets.

248.    However, at a November 15, 2007 board meeting of the "Extended Stay Hotels family of companies," Kim "anticipated" double digit corporate EBITDA growth for 2008 and 2009, driven by anticipated RevPAR growth of more than 7% in both years, based on the Debtors' "re-branding" strategy. This re-branding strategy, however, was based upon having substantial funds available to spend on brand strategy initiatives in the first quarter of 2008. However, the projected Debt Yield calculation for the fourth quarter of 2007 and the first two quarters of 2008 were expected at that time to be below the minimum requirement under the LBO loan agreements.  Funding for re-branding was not likely to be available because the Debt Yield calculations would in turn trigger a Cash Trap Event, depriving the Debtors of the much needed cash.

249.    In addition, the Debtors' financial projections at the time reflected negative cash flows for the fourth quarter of 2007 and the first quarter of 2008.  These projected results should have alerted anyone looking at them with an unjaundiced eye that the optimistic growth "anticipated" by Kim was not going to occur in the short term, nor was the cash going to be available to fund the rebranding expenditures from operations.

250.    The Debtors' actual performance in late 2007 was below budgeted ADR, was not strong enough to mitigate the decline in OCC (also below budget at the time), and was adversely impacting the Debtors' liquidity situation.

**b.    Critical Capital Expenditures Are Not Funded.**

251.    In 2007, prior to the LBO, the Company spent approximately $67.1 million on capital expenditures.  However, during the post-LBO period, the Debtors did not (and, indeed,

could not) fund any of the incremental capital expenditures critical to the Debtors' achievement of the inflated projections discussed in Blackstone's January 2007 Information Memorandum. In fact, the Debtors were changing the pre-LBO re-branding strategy and re-branding their hotels under the Homestead name rather than the Extended Stay brand, contrary to the recommended strategy stated in Blackstone's Information Memorandum, and this new re-branding strategy was not going smoothly.

### c.    Late-2007:  A Cash Trap Event is Imminent.

252.    At a November 2007 board meeting, the LBO Buyer Individual Defendants finally acknowledged the Debt Yield Event and the pending Cash Trap Event as imminent issues. Senior management knew or should have known the Debtors would likely face a Debt Yield Event when the Debt Yield was to be reported on January 12, 2008.  The anticipated Debt Yield was below the required monthly Debt Yield from the fourth quarter 2007 through the second quarter 2008.

253.    The Debtors submitted a proposed 2008 budget for approval by the lenders in early-December 2007. This budget reflected an increase in the overall property-level expenses. The budget submitted also included significant anticipated future costs related to non-recurring, discretionary capital expenditures associated with the Debtors' proposed re-branding strategy. Due to the anticipated Debt Yield Event and the pending Cash Trap Event that would be triggered in early 2008, the budget sought to ensure that all costs would be covered through funds available in the "waterfall" described above and on the attached Exhibit E (the "Waterfall") through the 2008 budget submitted for lender approval.

### d.    2008 Budget Negotiations:  The Debtors Unsuccessfully Attempt to Gain Access to Cash They Should Have Had From the Closing of the Loans.

254.    In November 2007, the proposed annual budget for 2008 was due.  HVM prepared annual and monthly financial budgets for the Debtors, which were required to be approved by certain of the Debtors' lenders.  If the proposed annual budget was not approved by the lenders, then the most recently approved annual budget governed the Debtors' operations.  This, however, meant that the Debtors' cash was subject to the flawed Waterfall, and the Debtors were on the verge of a Cash Trap Event. Any cash remaining after the Waterfall was funded would not be provided to the Debtors. During a Cash Trap Event Period, excess cash that could have been transferred to the Debtors for operating expenses would be held by the lenders as additional collateral, leaving the Debtors unable to pay crucial operating expenses.  Lichtenstein, Kim, Teichman, DeLapp and Rogers, among others, were directly involved in the negotiations with the lenders regarding the 2008 proposed annual budget.

255.    The 2007 approved annual budget had been created prior to the LBO.  That budget had certain flaws that all parties should have known about.  However, the post-LBO Company had not been provided with the 2007 annual budget being used at the time.  That 2007 approved annual budget (i) did not include trust fund occupancy taxes (which totaled approximately $6-8 Million, or approximately 9.2% of room revenues, per month, and were collected by the Debtors and held in trust for taxing authorities), and (ii) did not allow for payment of necessary corporate overhead costs (e.g., reservation services, travel agent commissions and certain management fees), all of which were critical to the Debtors' ongoing operations because excess cash was to be trapped, and none of which could be paid during a Cash Trap Event Period.

256.    In November 2007, when it became apparent that trust fund occupancy taxes were being swept into the Cash Management Account for application in accordance with the Waterfall,  Rogers asked the lenders to treat those taxes as pass-through amounts, and to have the

amounts distributed back to the Debtors for payment to applicable governmental authorities.  The lenders responded that the occupancy taxes would have to be handled through the Debtors' working capital account. In other words, the occupancy taxes collected would come into the lender's cash collateral, but no disbursements would be made to pay them. Upon information and belief, these were "trust fund" obligations, meaning that they were not the Debtors' property.  That money belonged to various governments.  The taxes were collected by the Debtors and held "in trust" for the benefit of taxing authorities.  The lenders, however, knowingly expropriated the government's funds, held all cash and placed the Debtors in the position of wrongfully converting the government's funds to pay their lenders, all of which was pursuant to the agreements and documents executed in connection with the LBO.

257.    Corporate overhead represented approximately 16% of the total property and corporate expenses of the Debtors in late 2007. Without any changes to the budget for 2008, the Debtors were about to experience significant cash flow constraints during a Cash Trap Event Period, which, under the pertinent loan agreements, would last for a minimum of six months. Further, during a Cash Trap Event Period, the Debtors would have had to fund corporate overhead and occupancy taxes from working capital, if any was available, as those expenses would not be paid through the Waterfall.  These facts and circumstances were, or should have been, known to the LBO Buyer Entity Defendants and, to the extent they were directors or officers at the time, the LBO Buyer Individual Defendants, by late 2007, at the latest.

  e.    **Despite the Debtors' Financial Distress, Improper Distributions Are Made to Equity Holders in 2007.**

258.    The mortgage loan agreement provided that the Debt Yield, measured on a quarterly basis, had to be greater than 7.75% for equity distributions to be made.  But other agreements entered into in connection with the LBO provided that the holders of Series A-1

preferred equity in the Debtors would receive their equity distributions regardless of the Debtors' financial condition, and regardless of whether those distributions were in violation of applicable law.

259.     Upon information and belief, although the first Debt Yield calculation should have been completed and reported in July 2007, and monthly thereafter, no such calculation was reported to the lenders at any point in 2007.  Had the Debtors' management performed an appropriate Debt Yield calculation in July 2007, that calculation would have shown that, immediately following the LBO's closing, the Debt Yield was 7.09%, compared to a requirement of 7.5% needed to avoid a Cash Trap Event in early 2008 and 7.75% for any equity distributions to be permitted.  The first calculation of the Debt Yield performed and reported to the lenders was in January 2008 for the 12 month period ending December 31, 2007.  Foreseeably, the Debtors did not meet the minimum requirement of 7.75%..

260.     Notwithstanding the Debt Yield failure, the lack of any surplus, the Debtors' insolvency, and the future financial and operational declines that were or should have been foreseen by those running the Debtors at the time, the Debtors, directly or indirectly through affiliated entities, made the following cash distributions directly or indirectly through other entities in the Debtors' corporate structure totaling $8,835,000 to equity holders other than the A-1 Series Unit holders from June 11, 2007 through December 31, 2007:

**2007 Dividends or Distributions to A-2 and A-3 Series Units**

| Recipient | Date Paid | Amount |
|-----------|-----------|--------|
| **Series A-2 Units** | | |
| PGRT ESH Inc. | 7/30/2007 | $1,067,000 |
| PGRT ESH Inc. | 8/30/2007 | $1,033,000 |
| PGRT ESH Inc. | 9/27/2007 | $1,000,000 |
| PGRT ESH Inc. | 10/30/2007 | $1,033,000 |
| PGRT ESH Inc. | 11/29/2007 | $1,000,000 |

90

| | | |
|---|---|---|
| PGRT ESH Inc. | 12/28/2007 | $1,033,000 |
| | **2007 A-2 Total** | $6,167,000 |
| | | |
| **Series A-3 Units** | | |
| Lightstone Holdings LLC | 8/31/2007 | $2,668,000 |
| | **2007 A-3 Total** | $2,668,000 |

261.   In addition, during 2007 after the LBO closed, the Debtors made the following cash distributions directly or indirectly through other entities in the Debtors' corporate structure to the A-1 Series equity holders, totaling approximately $13.1 million, in violation of the loan agreements and applicable law:

| RECIPIENT | DATE PAID | AMOUNT |
|---|---|---|
| Arbor Commercial Mortgage LLC | 6/11/2007 | $233,333.33 |
| Polar Extended Stay (USA) L.P. | 7/13/2007 | 44,444.44 |
| Princeton ESH, LLC | 7/13/2007 | 44,444.44 |
| Arbor Commercial Mortgage LLC | 7/13/2007 | 1,661,111.11 |
| Polar Extended Stay (USA) L.P. | 7/26/2007 | 18,888.89 |
| Princeton ESH, LLC | 7/26/2007 | 18,888.89 |
| Arbor Commercial Mortgage LLC | 7/26/2007 | 358,888.89 |
| Arbor Commercial Mortgage LLC | 8/15/2007 | 713,333.33 |
| Arbor Commercial Mortgage LLC | 8/15/2007 | 20,000.00 |
| Polar Extended Stay (USA) L.P. | 8/15/2007 | 93,333.33 |
| Princeton ESH, LLC | 8/15/2007 | 93,333.33 |
| Arbor Commercial Mortgage LLC | 8/15/2007 | 1,250,000.00 |
| Arbor Commercial Mortgage LLC | 9/17/2007 | 713,333.33 |
| Polar Extended Stay (USA) L.P. | 9/17/2007 | 103,333.33 |
| Princeton ESH, LLC | 9/17/2007 | 103,333.33 |
| Arbor Commercial Mortgage LLC | 9/17/2007 | 1,250,000.00 |
| Arbor Commercial Mortgage LLC | 10/15/2007 | 450,000.00 |
| Glida One LLC | 10/15/2007 | 550,000.00 |
| Polar Extended Stay (USA) L.P. | 10/15/2007 | 100,000.00 |
| Princeton ESH, LLC | 10/15/2007 | 100,000.00 |
| Arbor Commercial Mortgage LLC | 10/15/2007 | 900,000.00 |
| Arbor Commercial Mortgage LLC | 11/15/2007 | 495,000.00 |
| Glida One LLC | 11/15/2007 | 568,333.33 |
| Polar Extended Stay (USA) L.P. | 11/13/2007 | 103,333.33 |
| Princeton ESH, LLC | 11/15/2007 | 103,333.33 |
| Arbor Commercial Mortgage LLC | 11/15/2007 | 900,000.00 |
| Arbor Commercial Mortgage LLC | 12/17/2007 | 450,000.00 |
| Glida One LLC | 12/17/2007 | 550,000.00 |

| | | |
|---|---|---|
| Polar Extended Stay (USA) L.P. | 12/17/2007 | 100,000.00 |
| Princeton ESH, LLC | 12/17/2007 | 100,000.00 |
| Arbor Commercial Mortgage LLC | 12/17/2007 | 900,000.00 |
| | **2007 A-1 Total** | $13,089,999.96 |

262. Also, (i) on July 17, 2007, DL-DW received a wire transfer from an LBO closing account totaling approximately $77,366,984, which amount, upon information and belief, represented an apparent "overfunding" of an LBO closing account, and (ii) on October 17, 2007, a post-LBO "purchase price adjustment" resulted in a $2,342,000 payment from Blackstone to DL-DW. Notwithstanding the fact that the LBO purchase price had been funded and paid on behalf of DL-DW with borrowings by the Debtors, these funds were improperly distributed to equity holders instead of being turned over to the Debtors. Upon information and belief, these amounts constituted additional improper value that was siphoned from the Debtors for DL-DW's and Lichtenstein's benefit at times when the Debtors were insolvent, inadequately capitalized and without adequate surplus.

**2. The Debtors' Condition Further Deteriorates Throughout 2008, But Prohibited Equity Distributions Continue.**

**a. 2008 Debt Yield Test and Formal Cash Trap Event.**

263. The first Debt Yield calculation reported to the lenders was provided to the lenders on January 21, 2008 for the period ending December 31, 2007. As alleged above, since the calculation reflected that the Debtors did not meet the minimum Debt Yield of 7.5% at that time, both a Debt Yield Event and a Cash Trap Event were triggered. Therefore, as of February 2008, any unallocated cash available after the Waterfall had been satisfied on a monthly basis was "trapped" by the lenders in a restricted cash collateral account. The fact that cash was now "trapped" put significant strain on the Debtors, and required the use of over $27 Million from a working capital reserve account in order to keep the Debtors temporarily afloat.

264.     In addition, in November 2007, the Debtors' projections reflected that the Debt Yield could not be maintained above the cure amount of 7.6% for a period of six months in order to eliminate the Cash Trap and reinstate the opportunity to receive any unallocated cash available after the Waterfall had been satisfied on a monthly basis.

### b.     March 2008 – the 9.15% Notes Become Due.

265.     On March 15, 2008, the 9.15% Notes matured and the principal balance of $30.9 million, together with accrued interest of approximately $1.4 million, came due.   The Debtors failed to pay those amounts when due, and a default was declared by the trustee for the noteholders, on March 24, 2008.

266.     On April 16, 2008, DL-DW secured a $22 million "loan" from affiliated investors in the Debtors.  All of the affiliated investors were insiders of the Debtors.  This new $22 million loan, together with additional funds from DL-DW, were used to pay off the matured 9.15% Notes.  But the new insider loan came with onerous terms: it was guaranteed by BHAC Capital and secured by the valuable LIBOR Floor Certificates owned by DL-DW, which should have been property of the Debtors.   Though the "loan" was therefore well collateralized, it nevertheless accrued interest at an annual rate of 25%.  The "loan" was to mature on May 1, 2011 (the "25% Note").  The following table is a summary of the insider "lenders" and participation in the 25% Note:

**Insiders' Interest in the 25% Note**

| Lender | Affiliate Relation | Participation | Amount |
|---|---|---|---|
| ABT-ESI LLC | Arbor | Lead Lender / Servicer | $ 5,225,000 |
| Park Avenue Funding | Lichtenstein | Co-Lender | 11,000,000 |
| Princeton ESH LLC | Princeton | Co-Lender | 550,000 |
| Mericash Funding LLC | Joseph Chetrit | Co-Lender | 5,225,000 |
| | | | $22,000,000 |

267.     Arbor, Lichtenstein, Princeton and Chetrit structured this transaction as a "loan" with onerous terms to benefit themselves to the Debtors' detriment, even though they should have put the funds into the Debtors as equity at the time the LBO closed so as to pay off the 9.15% Notes at that time, as had been originally contemplated.

268.     Concurrently with the execution of the 25% Note on April 16, 2008, the Debtors paid off the $31 million outstanding principal balance of the 9.15% Notes, together with the accrued interest of approximately $1.7 million and $100,000 of professional fees. The total payments of approximately $33 million were made using (a) the proceeds from the 25% Note of $22 million; plus (b) approximately $10.6 million of additional funds from DL-DW.  The Debtors accounted for activities related to the repayment of the 9.15% Notes and the securing of the 25% Note by recording the $22 million as additional "paid in capital" on the Debtors' books, with a corresponding intercompany note payable to DL-DW of approximately $10.6 million.

269.     DL-DW pledged the LIBOR Floor Certificates to the lenders of the 25% Note. The income generated from the LIBOR Floor Certificates went directly to make all interest and principal payments on the 25% Note, rather than DL-DW making payments separately. The maximum monthly principal repayment under the 25% Note was $416,666. Because cash income from the LIBOR Floor Certificates was greater than the principal and interest payments due (or even allowable) on the 25% Note, the excess income from the LIBOR Floor Certificates was deposited into a reserve bank account for the benefit of BHAC Capital Series A-1 Unitholders ("Floor Bonds Reserve Account"). As of December 31, 2008, $3.3 million of the principal on the 25% Note had been repaid in this fashion, leaving a remaining principal balance outstanding of $18.7 million, and an additional $3.6 million had been paid during 2008 as interest. Despite these

payments, the Floor Bonds Reserve Account contained a balance of $2.1 million as of December 31, 2008.

          **c.**      **The Debtors' Proposed 2008 Annual Budget.**

      270.    The Debtors had submitted a proposed 2008 annual budget for approval by the lenders in early December of 2007. The pertinent lenders objected to certain aspects of that proposed annual budget, including (a) certain revenue projections in light of the then-current economic climate and poor outlook for the industry; (b) proposed one-time capital expenditure expenses or corporate overhead costs that did not constitute property-level operating expenses; and (c) other costs that were not explained by the Debtors.   The Debtors then conducted discussions with the lenders regarding the objections.

      271.    While those discussions were ongoing, the lenders continued to use the 2007 approved annual budget when administering the Waterfall throughout early 2008.   This created additional financial strain on the Debtors, as funding for certain operating costs was not available through the Waterfall (e.g., reservation system, occupancy taxes, as described above), and the amounts disbursed were to the Debtors were lower than what was needed at the time to pay operating expenses.

      272.    On April 16, 2008, certain issues relating to the 2008 annual budget were resolved. As a result, the Debtors received some of the cash to which they should have been entitled dating back to January 1, 2008.  However, no provision was made to repair the damage caused to the Debtors during the latter half of 2007, when the Debtors were forced to operate under the 2007 approved annual budget of which the Debtors had never been provided a copy.  Thus, the Debtors' cash problems were far from solved, and both the LBO Buyer Entity Defendants and the LBO Buyer Individual Defendants that held fiduciary positions at that time, knew or should have known it. In fact, on May 1, 2008, after the 2008 annual budget had been approved, Lichtenstein

himself remarked that vendor payments were being delayed and that ". . . its demoralizing for the staff to have to be dodging vendors and local tax authorities who want their payments."

273.     On April 15, 2008, in exchange for the concessions granted by the lenders to facilitate budgeting of operating expenses, an amendment to the mortgage loan agreement was executed (the "Mortgage Loan Second Amendment"). The Mortgage Loan Second Amendment was between the same parties to the mortgage loan, except that by that time the original mortgage lenders had transferred their interest to Wachovia Bank Commercial Mortgage Trust in connection with the post-LBO securitization of the mortgage loan debt through CMBS.

274.     The Mortgage Loan Second Amendment added a new Section 5.2.14 to the original mortgage loan agreement, which contained extensive restrictions on the mortgage borrowers' use of income, cash, fees, proceeds, property or revenue from the mortgaged hotels (including disbursements to the mortgage borrowers of excess cash flow under the Cash Management Agreement) ("Restricted Excess Cash Flow").  The new Section 5.2.14 prohibited the mortgage borrowers' distribution of Restricted Excess Cash Flow except in limited circumstances.

275.     The Debtors finally retained both Weil Gotshal & Manges ("Weil") and Lazard Freres ("Lazard") in or around early 2008 as restructuring and insolvency professionals to assist with efforts to restructure the Debtors' suffocating LBO debt structure.

> **d.     As Events Unfold, the Debtors' Financial Condition Worsens and Liquidity Problems Become More Acute.**

276.     The softening of room demand experienced by the Debtors in 2007 continued into early 2008. OCC decreased again.  The extended-stay industry as a whole generally experienced ADR increase in the first half of 2008.  However, overall supply in the industry increased at rates far exceeding only modest increases in demand.  The 2008 approved annual

budget was not finalized until April 2008, and the Debtors were operating in a Cash Trap Event Period. All of these factors, among others, had a severe impact on the Debtors' liquidity.

277.   In the first quarter of 2008, liquidity became more constrained.  In January of 2008, the Debtors were required to transfer $8.1 million from their main operating account to the Cash Management Account to cover a shortfall in the Waterfall and ensure that certain obligations were met, including interest payments on the mezzanine loan.  Consequently, the general ledger balance of cash available to the Debtors to fund operating expenses as of March 31, 2008 decreased to $42.0 million from $52.4 million as of December 31, 2007.

278.   In the second quarter of 2008, OCC and RevPAR declined further. An "Audit Update" included in the May 15, 2008 board of directors package noted that: (a) debt waivers were required; and (b) significant liquidity concerns had to be addressed for audit issuance.  In addition, a cash flow forecast prepared by the Debtors predicted that the effect of LIBOR rates would significantly impact liquidity, such that cash at year end was projected to range from $19.5 million to $49.8 million, at best, depending on the LIBOR rates assumed.

279.   In fact, the LBO Buyer Entity Defendants and the LBO Buyer Individual Defendants that held director or officer positions as of July 2008, knew or should have known that the Debtors could be completely out of cash as soon as January 2009. The Company also anticipated that it would not meet certain Debt Yield amortization avoidance thresholds by June 2009, thereby triggering a requirement that the Debtors make amortization payments to the lenders, estimated at $51 million for 2009. This increase in anticipated cash needs when the Debtors' financial condition was rapidly declining caused the Debtors serious concern, as (i) all cash flows were subject to a Cash Trap and the Debtors were not projected to achieve a Debt Yield cure in 2008 or 2009, (ii)  the Debtors would have difficulty obtaining an unqualified audit opinion

at the end of 2008, which could result in a default under the pertinent LBO loan agreements, and (iii) approval of the 2009 proposed annual budget posed critical challenges given the questions raised by certain of the lenders with respect to the annual budget in late-2007 and early-2008.

280.    In the third quarter of 2008, as conditions worsened in part as a result of the Great Recession, RevPAR decreased again, and was lower than the Debtors' budget for that time. In the fourth quarter of 2008, ADR and OCC continued to decline, and RevPAR performance was far off of budgeted projections. As a result, fourth quarter 2008 revenue and property-level EBITDA performance had double-digit declines over the prior year.  By the end of 2008, the Debtors' total revenue and EBITDA had also dramatically declined.

281.    As a result of these financial difficulties, the Debtors' liquidity continued to deteriorate, and by December 31, 2008 the general ledger balance of cash available to fund operations had slipped to $26.5 million.  The LBO Buyer Entity Defendants and LBO Buyer Individual Defendants that were directors and officers at the time were all well aware of these events.

### e.    Dividends and Distributions to Equity Holders Continue in 2008, Despite the Debtors' Financial Distress.

282.    Notwithstanding the Debtors' precipitous financial and operational declines, the Debtors, directly or indirectly through affiliated entities, made the following substantial cash distributions directly, or indirectly through other entities in the Debtors' corporate structure, to equity holders or equity holders' affiliates, in violation of the loan agreements and applicable law:

### 2008 Improper Equity and Related Distributions

| RECIPIENT | DATE PAID | AMOUNT |
|---|---|---|
| Arbor Commercial Mortgage LLC & Ron Invest LLC | 1/15/2008 | $262,500.00 |
| Glida One LLC | 1/15/2008 | 473,611.11 |

| | | |
|---|---|---|
| Polar Extended Stay (USA) L.P. | 1/15/2008 | 86,111.11 |
| Princeton ESH, LLC | 1/15/2008 | 86,111.11 |
| Arbor Commercial Mortgage LLC | 1/11/2008 | 900,000.00 |
| Arbor Commercial Mortgage LLC | 2/20/2008 | 1,808,333.33 |
| Arbor Commercial Mortgage LLC | 3/17/2008 | 241,865.08 |
| Ron Invest LLC | 3/17/2008 | 42,063.49 |
| Glida One LLC | 3/17/2008 | 115,674.61 |
| Polar Extended Stay (USA) L.P. | 3/17/2008 | 21,031.75 |
| Princeton ESH, LLC | 3/17/2008 | 21,031.75 |
| Arbor Commercial Mortgage LLC | 3/12/2008 | 684,523.81 |
| Ron Invest LLC | 3/12/2008 | 119,047.62 |
| Glida One LLC | 3/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 3/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 3/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 4/15/2008 | 305,753.97 |
| Ron Invest LLC | 4/15/2008 | 53,174.60 |
| Glida One LLC | 4/15/2008 | 146,230.16 |
| Polar Extended Stay (USA) L.P. | 4/15/2008 | 26,587.30 |
| Princeton ESH, LLC | 4/15/2008 | 26,587.30 |
| Arbor Commercial Mortgage LLC | 4/11/2008 | 684,523.81 |
| Ron Invest LLC | 4/11/2008 | 119,047.62 |
| Glida One LLC | 4/11/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 4/11/2008 | 59,523.81 |
| Princeton ESH, LLC | 4/11/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 5/15/2008 | 500,000.00 |
| Arbor Commercial Mortgage LLC | 5/12/2008 | 684,523.81 |
| Ron Invest LLC | 5/12/2008 | 119,047.62 |
| Glida One LLC | 5/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 5/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 5/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 6/16/2008 | 27,418.63 |
| Ron Invest LLC | 6/16/2008 | 4,768.45 |
| Glida One LLC | 6/16/2008 | 13,113.26 |
| Polar Extended Stay (USA) L.P. | 6/16/2008 | 2,384.23 |
| Princeton ESH, LLC | 6/16/2008 | 2,384.23 |
| Arbor Commercial Mortgage LLC | 6/16/2008 | 508,264.53 |
| Arbor Commercial Mortgage LLC | 6/12/2008 | 684,523.81 |
| Ron Invest LLC | 6/12/2008 | 119,047.62 |
| Glida One LLC | 6/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 6/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 6/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 7/15/2008 | 500,000.00 |
| Arbor Commercial Mortgage LLC | 7/11/2008 | 684,523.81 |
| Ron Invest LLC | 7/11/2008 | 119,047.62 |
| Glida One LLC | 7/11/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 7/11/2008 | 59,523.81 |
| Princeton ESH, LLC | 7/11/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 8/15/2008 | 558,333.33 |
| Arbor Commercial Mortgage LLC | 8/12/2008 | 684,523.81 |
| Ron Invest LLC | 8/12/2008 | 119,047.62 |
| Glida One LLC | 8/12/2008 | 327,380.95 |

99

| | | |
|---|---|---|
| Polar Extended Stay (USA) L.P. | 8/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 8/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 9/15/2008 | 558,333.33 |
| Arbor Commercial Mortgage LLC | 9/12/2008 | 684,523.81 |
| Ron Invest LLC | 9/12/2008 | 119,047.62 |
| Glida One LLC | 9/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 9/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 9/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 10/15/2008 | 500,000.00 |
| Arbor Commercial Mortgage LLC | 10/10/2008 | 684,523.81 |
| Ron Invest LLC | 10/10/2008 | 119,047.62 |
| Glida One LLC | 10/10/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 10/10/2008 | 59,523.81 |
| Princeton ESH, LLC | 10/10/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 11/17/2008 | 558,333.33 |
| Arbor Commercial Mortgage LLC | 11/12/2008 | 684,523.81 |
| Ron Invest LLC | 11/12/2008 | 119,047.62 |
| Glida One LLC | 11/12/2008 | 327,380.95 |
| Polar Extended Stay (USA) L.P. | 11/12/2008 | 59,523.81 |
| Princeton ESH, LLC | 11/12/2008 | 59,523.81 |
| Arbor Commercial Mortgage LLC | 12/18/2008 | 1,750,000.00 |
| | 2008 A-1 Total | $21,349,999.99 |

283.    On August 14, 2008, the board of directors of the "Extended Stay Hotels family of companies" discussed that they had declared all dividends required to pay distributions to equity holders, and had also ratified all dividends paid by any of the companies up to that date. In fact, at that meeting, Teichman moved to declare dividends that were to be paid in the fourth quarter of 2008. That motion passed unanimously.  At the same time, the board "tabled" certain rebranding initiatives due to the companies' poor financial performance, and received detailed reports regarding the Debtors' poor financial performance in 2008 and anticipated continued decline in 2009.

284.    On November 13, 2008, the board of directors belatedly passed a resolution that purported to stop improper equity distributions, recognizing at that board meeting the "divergence of interests of the equity parties" from the interests of the Debtors and the "Extended Stay Hotels family of companies."

285.    In early December of 2008, the Debtors submitted for the lenders' approval a proposed 2009 annual budget that assumed a significant decline in room revenues and property-level EBITDA.  At this point, the Debtors were simply trying to "stay[] alive for another few weeks," as Lichtenstein later stated.  At a board meeting held on December 16, 2008, Chetrit suggested that there be "staff reduction[s] of hours . . . and that staff should be asked for a 20% reduction to make a significant impact upon cash flow."  Upon information and belief, this suggestion was made, *inter alia*, to increase cash available to continue improper distributions to equity holders, including entities owned or controlled by Chetrit, all to the detriment of the Debtors.

286.    Although the Debtors passed a resolution stopping equity distributions in late-2008 in light of the financial and liquidity crises, improper distributions to equity actually continued even after that resolution from a so-called "Preferred Equity Holder Reserve Account" that had been created at the LBO's closing and was "security" for certain equity holders. The Preferred Equity Holder Reserve Account was funded with $20 million of Debtors' funds at the LBO's closing, and certain equity holders could instruct that distributions be made from that reserve account to them.  If the account was used for such distributions, then BHAC Capital, using the Debtors' cash, was required to replenish the reserve back up to $20 million. The following table represents the distributions from the preferred equity reserve account to an Arbor affiliate *following* the November 13, 2008 board of directors meeting at which equity distributions were resolved to be stopped:

**Summary of Improper Distributions from the Preferred Equity Reserve Account**

| 12/18/2008 | Arbor Commercial Mortgage | $ | 1,750,000 |
|---|---|---|---|
| 1/20/2009 | Arbor Commercial Mortgage | | 1,808,333 |
| 2/20/2009 | Arbor Commercial Mortgage | | 1,808,333 |
| 3/11/2009 | Arbor Commercial Mortgage | | 15,178,971 |

|  | $ | 20,545,637 |
|---|---|---|

Eventually, in March 2009, as the Debtors continued their downward spiral, the Preferred Equity Reserve Account was liquidated and the balance was wired to the A-1 Series unit holders, as shown above.

287.    From the LBO's closing through the date the Preferred Equity Reserve Account was liquidated and given to the A-1 series unit holders, a total of no less than $100 million was improperly distributed to equity holders during periods of tremendous financial and liquidity stress.

288.    In addition to those amounts, upon information and belief Lightstone received so-called "asset management fees" throughout that same period totaling approximately $1 million per year.  This occurred even though Lightstone was not the Debtors' management company and HVM managed all aspects of the Debtors' daily operations.

289.    Before the LBO's closing, HVM and HVM Canada provided the operational, management, and administrative functions for all of the Extended Stay hotels. After the LBO's closing, all Extended Stay hotels continued to be managed by HVM, except for three properties in Canada, which were operated by HVM Canada.   HVM's management fee arrangement was different from the industry practice, and provided significantly higher management fees than those typically seen in the industry.  In spite of the substantial fees being paid to HVM and HVM's management of all aspects of the Debtors' day-to-day business, Lightstone (i.e., Lichtenstein) received management fees after the LBO totaling approximately $1 Million per year, for doing nothing. Moreover, HVM was managed by an entity known as "HVM Manager," which was itself owned and managed by Lichtenstein, HVM Manager's sole member.

3.    **2009 Post-LBO Performance through the Bankruptcy Filing Date.**

### a.      Shortfalls in the Waterfall Are Experienced.

290.    As a result of declining performance in December 2008 and January 2009, the receipts transferred to the Waterfall were not sufficient to cover the interest due on the mezzanine debt in January 2009. Consequently, the Debtors were forced to transfer $5.9 million from their main operating account to the Cash Management Account to cover the shortfall.  Only $19 million was distributed from the Cash Management Account to the Debtors for budgeted operating expenses in January 2009. This was the lowest monthly amount distributed to the Debtors since the LBO's closing. From mid December 2008 to late March 2009, the Debtors were forced to fund occupancy taxes and other expenses totaling approximately $20 million out of a cash reserve account.

### b.      Insider Obligations Are Paid In Full.

291.    In February 2009, the Debtors' advisors issued a memorandum to the Debtors' independent directors regarding the deteriorating liquidity situation, and on March 11, 2009, the boards of directors of DL-DW, BHAC, Homestead, and ESI met to discuss the insider 25% Note.   Teichman inexplicably informed the Boards that the 25% Note needed to be refinanced, even though it was not scheduled to mature until May 1, 2011, and thus should not have been considered a pressing issue at the time, and proposed that the 25% Note be paid off by transferring the LIBOR Floor Certificates (which had been stolen from the Debtors by DL-DW) to the holders of the 25% Note. That same day, the board approved this proposed transaction.

292.    On March 12, 2009, one day later, the so-called "Floor Bonds Agreement" was executed, pursuant to which the LIBOR Floor Certificates were assigned to ABT-ESI LLC, as lead lender under the insider 25% Note.   In connection with that agreement, all insider note interests (including those held by Lightstone Commercial, as successor by transfer to the interests originally possessed by Park Avenue Funding LLC) were contributed by the other 25% Note

lenders to ABT-ESI LLC.  ABT-ESI LLC was simultaneously restructured so that each of the other lenders became owners of ABT-ESI LLC in proportion to their respective rights and interests in the 25% Note.  Similarly, as part of the deal, the Series A-1 equity holders waived their rights to the $4,817,986 balance of the so-called "Floor Bonds Reserve Account," and the entire balance was required to be wire transferred to an account designated by Lightstone Commercial, which was to receive a Form 1099 in respect of this distribution.

293.    At the time the Floor Bonds Agreement was executed, the outstanding principal balance on the 25% Note was $17,416,674. The Floor Bonds Reserve Account then contained a balance of $4,817,986. The LIBOR Floor Certificates, which had apparently brought in at least $13 million in less than a year, were assigned an artificial value of $17,416,674, exactly equal to the balance of the 25% Note.  Upon information and belief, the actual value of the LIBOR Floor Certificates was significantly greater.

294.    The LIBOR Floor Certificates were therefore transferred to pay the 25% Note, and the Floor Bonds Reserve Account was emptied to make a separate payment to Lightstone Commercial.  In short, the valuable LIBOR Floor Certificates that should have belonged to the Debtors were transferred to DL-DW for no consideration, and then to insiders as ostensible repayment for the $22 million "loan" to DL-DW.  The remaining accumulated proceeds of the LIBOR Floor Certificates that had not been previously transferred to the insiders as payments on the $22 million loan, were diverted to insider Lightstone Commercial.  Insiders were thus paid richly as the Debtors moved toward their inevitable bankruptcy.  As described more fully below, bankruptcy was delayed for just over ninety days after the 25% Note was paid off, thus allowing the ninety-day preference period under the federal Bankruptcy Code to expire.

c.    **2009 Performance Worsens.**

295.    During the first and second quarters of 2009, the Debtors experienced steep declines in ADR, OCC, room revenue and property-level EBITDA.  As a result, the general ledger balance of cash available to the Debtors to fund operating expenses as of March 31, 2009 decreased to only approximately $16.2 million, from approximately $26.5 million as of December 31, 2008.

296.    In the second quarter of 2009, the Debtors continued capital expenditure freezes and instituted hiring freezes related to all full-time and part-time personnel.  As the liquidity situation worsened, the LBO Buyer Individual Defendants that remained as officers and directors at the time discussed actions to conserve cash. For example, in April of 2009, the board of directors of the "Extended Stay Hotels family of companies" discussed that vendor payments were being stretched to conserve cash. On April 30, 2009 the Debtors' outstanding accounts payable balance over 60 days old of $1.3 million was more than 10% of the total accounts payable balance of approximately $11 million, the highest percentage since the LBO.

297.    By no later than May 14, 2009, the board was aware that the Debtors might not have enough unrestricted cash to fund operations through the end of May 2009.  Further, the Debtors' declining cash position was expected to be exacerbated by the pending amortization triggered by the anticipated breach of the Debt Yield amortization threshold covenant, as described above. These additional payments would have to be funded through the Cash Management Account beginning with the June 13, 2009 Waterfall cycle. Although restructuring alternatives were discussed by the board, none identified how, in the absence of a restructuring or bankruptcy, the Debtors might obtain the funds needed to make the upcoming Debt Yield amortization payments, which would total over $50 million for the remainder of 2009.

298.    As of May 31, 2009, the general ledger cash balance available to fund operating expenses had dropped to approximately $4.6 million, down from approximately $26.5 million as of December 31, 2008.  In addition, the Debtors were incurring extensive restructuring expenses.  In June 2009, as a result of the severe liquidity situation and the imminent amortization payments, the Debtors were projected to completely deplete liquidity by the end of June 2009, and would be unable to meet payroll of approximately $9 million on Tuesday, June 19, 2009.

**G.    The Debtors File for Chapter 11 Protection Two Years and Four Days After the LBO's Closing, Just Over Ninety Days After Paying Off Insider Debt, and A Group of Investors Including Blackstone "Re-Acquires" the Debtors for $3.9 Billion.**

299.    Shortly after the June 11, 2009 two-year anniversary of the closing of the LBO, and after months of failed workout negotiations, the Debtors had to report whether the Debt Yield for 2009 was below the Debt Yield amortization threshold.  If so, the borrowers were going to be liable for the payment of additional monthly amortization payments estimated to total as much as $51 million for the remainder of 2009.  Given the Debtors' cash flow at the time, those amortization payments could not be made.

300.    In addition, a significant interest payment was due to be made to the mezzanine lenders as soon as Friday, June 12, 2009.  If that payment was made, then (i) the Debtors would be unable to survive the upcoming week, when payroll was due, and (ii) the Debtors would not have access to those funds as cash collateral in a chapter 11 case.

301.    The only way to avoid these issues was to file for chapter 11 bankruptcy protection. However, the first group of the Debtors' chapter 11 cases were filed on Monday, June 15, 2009, two years and four days after the LBO closed on June 11, 2007, and 93 days after paying off the insider 25% Note in full.

302.    Upon information and belief, at least part of senior management's motivation in 2009 for delaying the inevitable bankruptcy filings was to (i) do so after the statute

of limitations under 11 U.S.C. § 548 expired and the ninety day preference look-back period ran, and (ii) give equity holders as much time as possible to consummate a restructuring transaction that preserved at least some of their equity in the Debtors and, more importantly, extricated equity holders from their significant guarantee obligations under the LBO debt.

303.    Ironically, during the Debtors' bankruptcy cases, a group of investors including Blackstone "re-acquired" the Debtors for $3.9 billion, substantially less than the total amount of crushing debt the Debtors were caused to incur in the LBO for Blackstone's benefit prior to the bankruptcy. The post-bankruptcy transaction involving Blackstone was announced on or about April 2, 2010 and subsequently approved by the Bankruptcy Court as part of the Debtors' Plan on July 20, 2010.

## H.    The Debtors Were Dominated, Controlled and Manipulated by The Blackstone Group, The Buyer, and their Respective Affiliates, for Their Sole Benefit.

304.    Throughout the process that eventually drove them into bankruptcy, the Debtors were dominated and controlled by the Blackstone Pre-LBO Entity Defendants and Blackstone Group Individual Defendants before and in connection with the LBO, and by the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants post-LBO, in an attempt to siphon as much value from the Debtors as possible for the sole benefit of those parties and their affiliates, and without regard to the best interests or financial welfare of the Debtors and their creditors. The Debtors were treated as nothing more than a collective vehicle to be exploited.

305.    From the start, the Blackstone Pre-LBO Entity Defendants and Blackstone Group Individual Defendants manipulated the Debtors by preparing financial information and projections in connection with the Information Memorandum that positioned the Debtors for a sale that would leave them, insolvent and with crushing debt and insufficient capital for ongoing operations. Indeed, the projections provided by the Blackstone Pre-LBO Entity Defendants and

Blackstone Group Individual Defendants were based on strategies which they knew or should have known the Debtors would be unable to implement as a result of their foreseeable poor performance, financial condition and restricted cash flow following the LBO.

306.   As described above, the LBO was structured so as to allow the Blackstone Pre-LBO Entity Defendants to pull as much value out of the Debtors as possible without regard to the Debtors' solvency or ability to conduct profitable operations post-LBO.  The requirements and formalities under the LBO loan documents were ignored, thus allowing the Blackstone Pre-LBO Entity Defendants and Blackstone Group Individual Defendants to direct the distribution of $1.9 billion to themselves or their affiliates out of the Debtors' loan proceeds, after they had artificially driven up the sale price and the resulting amount of debt to be borne by the Debtors.

307.   Post-LBO, the formalities of the Debtors' separateness and accounting were ignored, as were the formalities regarding the flow of funds through the Cash Management Account, as the priority became paying and making distributions to equity holders at all costs. Further, the LBO was structured so as to allow the siphoning of value from the Debtors in the form of "asset management fees" for Lightstone entities, although the Debtors were managed by HVM (which was itself managed by HVM Manager, also a Lichtenstein entity after the LBO).

308.   The Debtors, meanwhile, were forced to pledge their assets as collateral for mortgage loans, despite the fact that they received none of the proceeds nor any benefit from the LBO. The Debtors were further saddled with new, onerous restrictions on their cash flow, which was now directed toward servicing the debt that benefited all of the Defendants instead of being available for the Debtors' operations.

309.   Ultimately, even the timing of the Debtors' eventual and inevitable bankruptcy filing was manipulated by the LBO Buyer Entity Defendants and LBO Buyer

Individual Defendants that were directors, officers or persons otherwise in control of the Debtors at the time, so as to attempt to insulate themselves from certain federal clawback claims to the detriment of the Debtors' estates and the Debtors' creditors.  The Debtors were therefore thoroughly dominated and controlled by the Defendants at all times relevant to this Complaint, and their respective affiliates, in a greed-driven scheme that served only to enrich the Blackstone Pre-LBO Entity Defendants and to bestow ownership and control, and the associated benefits derived therefrom, on the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants, all at the sole expense of the Debtors.

310.    Despite the fact that the Debtors' financial distress detailed throughout this Complaint was or should have been known to the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants during their respective tenures as directors, officers or persons otherwise in control of the Debtors, the bleeding of the Debtors' assets continued after the LBO was consummated by illegal distributions and dividends to the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants.

311.    In addition to the improper distributions of the Debtors' assets that were made to the Blackstone Pre-LBO Entity Defendants under the direction of the Blackstone Group Individual Defendants in connection with the LBO, the LBO Buyer Entity Defendants and LBO Buyer Individual Defendants helped themselves to the Debtors' assets at a time when the Debtors did not have a surplus and/or were insolvent, as described herein.  From the closing of the LBO in June 2007 through the filing of bankruptcy beginning in June 2009, the Debtors' assets were depleted by more than $100 million of substantial additional illegal and improper distributions, all of which were made when the authorizing and receiving parties knew or should have known that the Debtors did not have a surplus and were insolvent because the Debtors' poor performance,

distressed financial condition, cash flow issues and their resulting impact on Debtors' operations and expenditures was readily apparent.

312. The LBO and its aftermath were orchestrated, negotiated, structured and carried out by the Defendants as nothing more than a sham to enrich themselves and affiliates they owned or controlled at the expense of the Debtors, the Debtors' estates and the Debtors' creditors.

**I.      The Debtors' Assets Were Depleted By The Improper Distributions and Dividends.**

313. Despite the fact that the Debtors' financial distress and the debt yield issues detailed above were or should have been known to senior management as well as the Debtors' equity holders, the willful bleeding of the Debtors' assets continued after the LBO's consummation in the form of improper distributions and dividends.

314. In addition to the improper distributions of Debtor assets that were made to the Sellers in connection with the LBO, numerous other parties helped themselves to the Debtors' assets at a time when the Debtors did not have a surplus and/or were insolvent.

315. As is detailed above well over $100 million of improper dividends and other distributions of the Debtors' assets were made from the date the LBO closed in June 2007 and the date the Debtors began filing bankruptcy in June 2009.

**J.      The Sellers' and Buyer's Professionals Were Unjustly Enriched As Well.**

316. The Sellers, the Buyer and the equity unit holders were not the only parties to gorge themselves at the trough on the proceeds of the Debtors' loans.  Without regard to the fact that the Debtors obtained no direct or indirect benefit from the purported services they provided, the fees for the Buyer's and Sellers' Professionals were also paid directly by the Debtors from loan proceeds the Debtors borrowed at the LBO's closing.

317. Bank of America received approximately $3,971,658 in fees on behalf of the Sellers out of the loan proceeds.

318.    Citigroup received approximately $6,350,000 in fees on behalf of the Buyer out of the loan proceeds.

319.    Although they served only to advise on and facilitate a transaction that financially doomed the Debtors and which provided no value to the Debtors, Bank of America and Citigroup have been enriched by fees that were ultimately paid by the Debtors.

320.    Ebury received approximately $9,341,984 in fees and disbursements in connection with the loans made to the Debtors as part of the LBO.  These fees and disbursements were paid out of the proceeds of the loans the Debtors were forced to incur, despite the fact that the loans did not provide any direct or indirect benefit to the Debtors.

321.    The Trust is thus also entitled to recover the professional fees identified herein.

## CAUSES OF ACTION

### AS FOR A FIRST CAUSE OF ACTION

**(Breach Of Fiduciary and Contractual Duties Of Care, Loyalty and Good Faith –
Blackstone Pre-LBO Entity Defendants)**

322.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 321 as though fully set forth herein.

323.    Up to the date and time the LBO closed, and at all times relevant to this Complaint prior to that date, the Blackstone Pre-LBO Entity Defendants, as entities that owned, controlled and otherwise dominated the pre-LBO Debtors owed the pre-LBO Debtors the fiduciary and contractual duties of good faith, care and loyalty.

324.    The Debtors were either rendered insolvent or placed in the zone of insolvency as a result of or in connection with the LBO.  Each of the Blackstone Pre-LBO Entity Defendants therefore owed fiduciary and contractual duties to the Debtors and the Debtors'

creditors and not just to the Debtors' pre-LBO direct and indirect equity owners at the time of the LBO.

325.    Each of the Blackstone Pre-LBO Entity Defendants had the authority to control the management, affairs and direction of the Debtors up to the date the LBO closed. Each Blackstone Pre-LBO Entity Defendant, by virtue of its position, was capable of influencing and did in fact influence the acts and omissions giving rise to the claims alleged herein.

326.    Each Blackstone Pre-LBO Entity Defendant, acting both individually and collectively, breached its fiduciary and contractual duties to the Debtors by acting or omitting to act, as follows:

(a)    As to all Blackstone Pre-LBO Entity Defendants, orchestrating, negotiating and documenting, and causing or allowing the Debtors and the Debtors' affiliates to enter into, the LBO and incur substantial amounts of ruinous debt solely for the benefit of the Blackstone Pre-LBO Entity Defendants, and rendering the Debtors insolvent;

(b)    As to all Blackstone Pre-LBO Entity Defendants, causing or allowing one or more of the Blackstone Pre-LBO Entity Defendants to receive improper distributions from the Debtors in connection with the LBO totaling no less than approximately $1.9 billion in the aggregate, which distributions were paid for the Blackstone Pre-LBO Entity Defendants' benefit, out of the proceeds of loans the Debtors were forced to take on exclusively for the benefit of the Blackstone Pre-LBO Entity Defendants;

(c)     As to all Blackstone Pre-LBO Entity Defendants, engaging in multiple acts of self-dealing through the siphoning of $1.9 billion of value from the Debtors for the benefit of the Blackstone Pre-LBO Entity Defendants;

(d)     As to all Blackstone Pre-LBO Entity Defendants, causing or allowing the Debtors to enter into the LBO loan and other transaction documents that contained provisions that severely and adversely impacted the Debtors' ability to operate their businesses after the LBO closed;

(e)     As to all Blackstone Pre-LBO Entity Defendants, causing, allowing and otherwise actively participating in the dissemination of the materially misleading Information Memorandum in furtherance of the Blackstone Pre-LBO Entity Defendants' systematic effort to improperly drain over $1.9 billion of value from the Debtors;

(f)     As to all Blackstone Pre-LBO Entity Defendants, causing or allowing BRE.ESH, their affiliate, to receive the $200 million "rollover equity" interest in the post-LBO Debtors in exchange for nothing, while pre-LBO creditors of the Debtors remained unpaid at the time of and following the LBO's closing; and

(g̶f)     As to BHAC IV and BRE.HV, engaging in multiple acts of self-dealing, as direct controlling shareholders or members of the Debtors' entire pre-LBO enterprise, allowing themselves to be systematically dominated and controlled at all relevant times by

113

Blackstone Group, and acting or omitting to act solely out of concern for the interests of the Blackstone Group, as the Debtors' ultimate parent controlling shareholder or member.

327.    Each Blackstone Pre-LBO Entity Defendant's acts or omissions described herein was, alternatively, either fraudulent, willful, deliberate, knowing, in bad faith, reckless, or grossly negligent and in derogation of applicable law.   Each Blackstone Pre-LBO Entity Defendant's acts and omissions fell substantially below the standards generally practiced and accepted by other fiduciaries in similar circumstances.

328.    Each Blackstone Pre-LBO Entity Defendant's acts and omissions described herein directly and proximately caused harm to the Debtors, the Debtors' estates and the Debtors' creditors who are beneficiaries of the Trust, in an amount to be determined at trial but not less than $2.1 billion.

329.    By reason of each Blackstone Pre-LBO Entity Defendant's acts and omissions described herein, the Trust is entitled to recovery of actual, compensatory and consequential damages from the Blackstone Pre-LBO Entity Defendants, jointly and severally, in an amount to be determined at trial, but not less than $2.1 billion.

330.    Because the acts and omissions of the Blackstone Pre-LBO Entity Defendants were gross, wanton and malicious, the Trust is entitled to punitive damages of at least three times the actual damage, or $6.3 billion, or such other amount as the Court may determine after trial.

114

## AS FOR A SECOND CAUSE OF ACTION

## (Breach Of Fiduciary and Contractual Duties Of Care, Loyalty and Good Faith – LBO Buyer Entity Defendants)

331.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 321 as though fully set forth herein.

332.    From and after no later than the date and time the LBO closed, and at all relevant times thereafter, the LBO Buyer Entity Defendants, as entities that owned, controlled and otherwise dominated the post-LBO Debtors, owed the post-LBO Debtors and the Debtors' creditors the fiduciary and contractual duties of good faith, care and loyalty.

333.    The Debtors were either rendered insolvent or placed in the zone of insolvency as a result of or in connection with the LBO, and remained insolvent at all times from and after the date the LBO closed.  Each of the LBO Buyer Entity Defendants therefore owed fiduciary and contractual duties to the Debtors and the Debtors' creditors, and not just to the Debtors' post-LBO direct and indirect equity owners at all times after the date the LBO closed.

334.    Each of the LBO Buyer Entity Defendants had the authority to control the management, affairs and direction of the Debtors at all relevant times following the LBO's closing. Each LBO Buyer Entity Defendants, by virtue of its position of control, was capable of influencing and did in fact influence the acts and omissions giving rise to the claims alleged herein.

335.    Each of the LBO Buyer Entity Defendants, acting both individually and collectively, breached its fiduciary and contractual duties, as follows:

(a)     As to each LBO Buyer Entity Defendant, causing or allowing the Debtors to improperly pay substantial illegal dividends or other improper distributions of value from Debtors to the applicable LBO Buyer Entity Defendants and their affiliates described in this

115

Complaint at times when the Debtors were insolvent, including, without limitation, the payment of the following value from the Debtors:

(i)     distribution of the LIBOR Floor Certificates, which had a value at the time of no less than approximately $25 million, to DL-DW on or around no later than November 2, 2007, and subsequent payments received by DL-DW on account of those certificates, totaling no less than approximately $13 million;

(ii)    substantial payments of rent to Lightstone entities through HFI following the HFI acquisition of the hotel properties formerly subject to the HPT Capital Lease, beginning no later than approximately late-July 2007;

(iii)   distribution of over $77 million to DL-DW from the LBO closing account on or around July 17, 2007;

(iv)    distribution of approximately $2.3 million to DL-DW as a post-LBO "purchase price adjustment" on or around no later than October 17, 2007;

(v)     carrying out substantial equity distributions and dividends throughout 2007 totaling no less than approximately $23 million;

(vi)    causing the Debtors to take on the onerous obligations under the insider 25% Note on or around April 16, 2008, including,

116

without limitation, collateralizing the 25% Note with the LIBOR Floor Certificates that had been stolen from the Debtors by DL-DW, and causing the Debtors to make substantial "interest payments" and other payments to insiders or for insiders' benefit on account of the 25% Note totaling no less than approximately $5.7 million through the end of 2008;

(vii)     carrying out substantial equity distributions and dividends to one or more of the LBO Buyer Entity Defendants throughout 2008, totaling no less than approximately $21.3 million;

(viii)    causing or allowing the distribution of funds held in the Preferred Equity Reserve Account to insiders on the eve of bankruptcy, totaling no less than approximately $20.5 million in early 2009;

(ix)      causing or allowing the full, accelerated payoff of the insider 25% Note, which payoff totaled no less than approximately $17.4 million on the eve of the Debtors' eventual bankruptcy filing;

(x)       causing or allowing the distribution of funds from the Floor Bonds Reserve Account on the eve of the Debtors' eventual bankruptcy filing totaling approximately $4.8 million;

(xi)    causing or allowing the payment of substantial "asset management" fees totaling no less than approximately $1 million annually to Lightstone entities or Lichtenstein, despite the fact that HVM was managing the Debtors' daily business affairs; and

(xii)    causing or allowing the Debtors to delay the commencement of bankruptcy proceedings, with self-dealing motives, until (a) slightly more than two years after the LBO's closing, and (b) slightly more than 90 days after the payoff of the insider 25% Note, in an attempt to adversely impact the Debtors' ability to avoid and recover those transfers under the Bankruptcy Code for the benefit of the Debtors, the Debtors' estates and the Debtors' creditors.

(b)    As to each LBO Buyer Entity Defendant, orchestrating, negotiating and documenting, and causing or allowing the Debtors and the Debtors' affiliates to enter into, the LBO and incur substantial amounts of ruinous debt solely for the benefit of the Blackstone Pre-LBO Entity Defendants, and rendering the Debtors insolvent;

(c)    As to each LBO Buyer Entity Defendant, causing or allowing one or more of the Blackstone Pre-LBO Entity Defendants to receive improper distributions from the Debtors in connection with the LBO totaling no less than approximately $1.9 billion in the aggregate, which distributions were paid for the Blackstone Pre-LBO Entity

Defendants' benefit, out of the proceeds of loans the Debtors were forced to take on exclusively for the benefit of the Blackstone Pre-LBO Entity Defendants;

(d)     As to each LBO Buyer Entity Defendant, causing or allowing **the** BRE.ESH, an affiliate of the Blackstone Pre-LBO Entity Defendants, to receive the $200 million "rollover equity" interest in the post-LBO Debtors in exchange for nothing, while pre-LBO creditors of the Debtors remained unpaid at the time of and following the LBO's closing; and

(e)     As to each LBO Buyer Entity Defendant, causing or allowing the Debtors to enter into the LBO loan and other transaction documents that contained provisions that severely and adversely impacted the Debtors' ability to operate their businesses after the LBO closed while arranging for the Debtors to agree to provisions in the LBO loan and other transaction documents that would cause or allow the Debtors to be forced to make improper distributions to one or more of the LBO Buyer Entity Defendants regardless of the Debtors' dire financial condition or poor performance.

336.     Each LBO Buyer Entity Defendant's acts or omissions described herein was, alternatively, either fraudulent, willful, deliberate, knowing, in bad faith, reckless, or grossly negligent and in derogation of applicable law.  Each LBO Buyer Entity Defendant's acts and omissions fell substantially below the standards generally practiced and accepted by other fiduciaries in similar circumstances.

337.    Each LBO Buyer Entity Defendant's acts and omissions described herein directly and proximately caused harm to the Debtors, the Debtors' estates and the Debtors' creditors who are beneficiaries of the Trust, in an amount to be determined at trial but not less than $2.1 billion.

338.    By reason of each LBO Buyer Entity Defendant's acts and omissions described herein, the Trust is entitled to recovery of actual, compensatory and consequential damages from the LBO Buyer Entity Defendants, jointly and severally, in an amount to be determined at trial, but not less than $2.1 billion.

339.    Because the acts and omissions of the LBO Buyer Entity Defendants were gross, wanton and malicious, the Trust is entitled to punitive damages of at least three times the actual damage, or $6.3 billion, or such other amount as the Court may determine after trial.

## AS FOR A THIRD CAUSE OF ACTION

### (Breach Of Fiduciary and Contractual Duties Of Care, Loyalty and Good Faith – Blackstone Group Individual Defendants)

340.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 321 as though fully set forth herein.

341.    Up to the date the LBO closed, and at all relevant times prior to that date, the Blackstone Group Individual Defendants, as the individuals that were directors or officers, or otherwise controlled and managed the pre-LBO Debtors, owed the pre-LBO Debtors the fiduciary and contractual duties of good faith, care and loyalty.

342.    The Debtors were either rendered insolvent or placed in the zone of insolvency as a result of or in connection with the LBO.  Each of the Blackstone Group Individual Defendants therefore owed fiduciary and contractual duties to the Debtors and the Debtors'

creditors and not just to the Debtors' pre-LBO direct and indirect equity owners for which each of the Blackstone Group Individual Defendants also served as insiders.

343.    Each of the Blackstone Group Individual Defendants had the authority to control the management, affairs and direction of the Debtors up to the date the LBO closed. Each Blackstone Group Individual Defendant, by virtue of his position, was capable of influencing and did in fact influence the acts and omissions giving rise to the claims alleged herein.

344.    Each Blackstone Group Individual Defendant, acting both individually and collectively, breached his fiduciary and contractual duties to the Debtors by acting or omitting to act, as follows:

(a)    As to all Blackstone Group Individual Defendants, orchestrating, negotiating and documenting, and causing or allowing the Debtors and the Debtors' affiliates to enter into, the LBO and incur substantial amounts of ruinous debt solely for the benefit of the Blackstone Pre-LBO Entity Defendants, for which the Blackstone Group Individual Defendants also served as directors, officer or members of management, and rendering the Debtors insolvent;

(b)    As to all Blackstone Group Individual Defendants, causing or allowing one or more of the Blackstone Pre-LBO Entity Defendants to receive improper distributions from the Debtors in connection with the LBO totaling no less than approximately $1.9 billion in the aggregate, which distributions were paid for the Blackstone Pre-LBO Entity Defendants' benefit, out of the proceeds of loans the Debtors were forced to take on exclusively for the benefit of the

Blackstone Pre-LBO Entity Defendants for which the Blackstone Group Individual Defendants also served as directors, officer or members of management;

(c)     As to all Blackstone Group Individual Defendants, engaging in multiple acts of self-dealing and conflict of interest transactions through the siphoning of $1.9 billion of value from the Debtors for the benefit of the Blackstone Pre-LBO Entity Defendants for which the Blackstone Group Individual Defendants also served as directors, officer or members of management;

(d)     As to all Blackstone Group Individual Defendants, causing or allowing the Debtors to enter into the LBO loan and other transaction documents that contained provisions that severely and adversely impacted the Debtors' ability to operate their businesses after the LBO closed;

(e)     As to all Blackstone Group Individual Defendants, causing, allowing and otherwise actively participating in the dissemination of the materially misleading Information Memorandum in furtherance of the Blackstone Pre-LBO Entity Defendants' systematic effort to improperly drain over $1.9 billion of value from the Debtors;

(f)     As to all Blackstone Group Individual Defendants, causing or allowing BRE.ESH to receive the $200 million "rollover equity" interest in the post-LBO Debtors in exchange for nothing, while

122

pre-LBO creditors of the Debtors remained unpaid at the time of and following the LBO's closing; and

(f)    As to all Blackstone Group Individual Defendants, engaging in multiple acts of self-dealing and bad faith, allowing themselves to be systematically dominated and controlled at all relevant times by Blackstone Group, and acting or omitting to act solely out of concern for the interests of the Blackstone Group, the Debtors' ultimate parent controlling shareholder or member.

345.    Each Blackstone Group Individual Defendant's acts or omissions described herein was, alternatively, either fraudulent, willful, deliberate, knowing, in bad faith, reckless, or grossly negligent and in derogation of applicable law.  Each Blackstone Group Individual Defendant's acts and omissions fell substantially below the standards generally practiced and accepted by other fiduciaries in similar circumstances.

346.    Each Blackstone Group Individual Defendant's acts and omissions described herein directly and proximately caused harm to the Debtors, the Debtors' estates and the Debtors' creditors who are beneficiaries of the Trust, in an amount to be determined at trial but not less than $2.1 billion.

347.    By reason of each Blackstone Group Individual Defendant's acts and omissions described herein, the Trust is entitled to recovery of actual, compensatory and consequential damages from the Blackstone Group Individual Defendants, jointly and severally, in an amount to be determined at trial, but not less than $2.1 billion.

348.    Because the acts and omissions of the Blackstone Group Individual Defendants were gross, wanton and malicious, the Trust is entitled to punitive damages of at least

three times the actual damage, or $6.3 billion, or such other amount as the Court may determine after trial.

## AS FOR A FOURTH CAUSE OF ACTION

### (Breach Of Fiduciary and Contractual Duties Of Care, Loyalty and Good Faith – LBO Buyer Individual Defendants)

349.    Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 321 as though fully set forth herein.

350.    From and after no later than the date the LBO closed, and at all relevant times thereafter, the LBO Buyer Individual Defendants, during their respective tenures as directors, officers or persons that otherwise managed, owned, controlled and dominated the Debtors, owed the Debtors and the Debtors' creditors the fiduciary and contractual duties of good faith, care and loyalty.

351.    The Debtors were either rendered insolvent or placed in the zone of insolvency as a result of or in connection with the LBO, and remained insolvent at all times from and after the date the LBO closed. Each of the LBO Buyer Individual Defendants, during their respective tenures as directors, officers or persons that otherwise managed, owned, controlled and dominated the Debtors, therefore owed fiduciary and contractual duties to the Debtors and the Debtors' creditors, and not just to the Debtors' post-LBO direct and indirect equity owners at all times after the date the LBO closed.

352.    Each of the LBO Buyer Individual Defendants, during their respective tenures as directors, officers or persons that otherwise managed, owned, controlled and dominated the Debtors, had the authority to control the management, affairs and direction of the Debtors at all relevant times following the LBO's closing.  Each LBO Buyer Individual Defendant, during his tenure as a director, officer or person that otherwise managed, owned, controlled and dominated

124

the Debtors, by virtue of his position of control, was capable of influencing and did in fact influence the acts and omissions giving rise to the claims alleged herein.

353.    Each of the LBO Buyer Individual Defendants, during his tenure as a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors, acting both individually and collectively, breached his fiduciary and contractual duties, as follows:

(a)    As to each LBO Buyer Individual Defendant, causing or allowing the Debtors to improperly pay substantial illegal dividends or other improper distributions of value from Debtors to the applicable LBO Buyer Entity Defendants and, upon information and belief, in some cases, to himself, as described in this Complaint, at times when the Debtors were insolvent, including, without limitation, the payment of the following value from the Debtors:

(i)    distribution of the LIBOR Floor Certificates, which had a value at the time of no less than approximately $25 million, to DL-DW on or around no later than November 2, 2007, and subsequent payments received by DL-DW on account of those certificates, totaling no less than approximately $13 million;

(ii)    substantial payments of rent to Lightstone entities through HFI following the HFI acquisition of the hotel properties formerly subject to the HPT Capital Lease, beginning no later than approximately late-July 2007;

125

(iii)    distribution of over $77 million to DL-DW from the LBO closing account on or around July 17, 2007;

(iv)    distribution of approximately $2.3 million to DL-DW as a post-LBO "purchase price adjustment" on or around no later than October 17, 2007;

(v)    carrying out substantial equity distributions and dividends throughout 2007 totaling no less than approximately $23 million;

(vi)    causing the Debtors to take on the onerous obligations under the insider 25% Note on or around April 16, 2008, including, without limitation, collateralizing the 25% Note with the LIBOR Floor Certificates that had been stolen from the Debtors by DL-DW, and causing the Debtors to make substantial "interest payments" and other payments to insiders or for insiders' benefit on account of the 25% Note totaling no less than approximately $5.7 million through the end of 2008;

(vii)    carrying out substantial equity distributions and dividends to one or more of the LBO Buyer Entity Defendants throughout 2008, totaling no less than approximately $21.3 million;

(viii)    causing or allowing the distribution of funds held in the Preferred Equity Reserve Account to insiders on the eve of

126

bankruptcy, totaling no less than approximately $20.5 million in early 2009;

(ix)  causing or allowing the full, accelerated payoff of the insider 25% Note, which payoff totaled no less than approximately $17.4 million on the eve of the Debtors' eventual bankruptcy filing;

(x)  causing or allowing the distribution of funds from the Floor Bonds Reserve Account on the eve of the Debtors' eventual bankruptcy filing totaling approximately $4.8 million;

(xi)  causing or allowing the payment of substantial "asset management" fees totaling no less than approximately $1 million annually to Lightstone entities or Lichtenstein, despite the fact that HVM was managing the Debtors' daily business affairs; and

(xii)  causing or allowing the Debtors to delay the commencement of bankruptcy proceedings, with self-dealing motives, until (a) slightly more than two years after the LBO's closing, and (b) slightly more than 90 days after the payoff of the insider 25% Note, in an attempt to adversely impact the Debtors' ability to avoid and recover those transfers under the Bankruptcy Code for the benefit of the Debtors, the Debtors' estates and the Debtors' creditors.

(b)    As to each LBO Buyer Individual Defendant, to the extent he was a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors at the time, orchestrating, negotiating and documenting, and causing or allowing the Debtors and the Debtors' affiliates to enter into, the LBO and incur substantial amounts of ruinous debt solely for the benefit of the Blackstone Pre-LBO Entity Defendants, and rendering the Debtors insolvent;

(c)    As to each LBO Buyer Individual Defendant, to the extent he was a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors at the time, causing or allowing one or more of the Blackstone Pre-LBO Entity Defendants to receive improper distributions from the Debtors in connection with the LBO totaling no less than approximately $1.9 billion in the aggregate, which distributions were paid for the Blackstone Pre-LBO Entity Defendants' benefit, out of the proceeds of loans the Debtors were forced to take on exclusively for the benefit of the Blackstone Pre-LBO Entity Defendants;

(d)    As to each LBO Buyer Individual Defendant, to the extent he was a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors at the time, causing or allowing BRE.ESH to receive the $200 million "rollover equity" interest in the post-LBO Debtors in exchange for nothing, while

pre-LBO creditors of the Debtors remained unpaid at the time of and following the LBO's closing; and

(e)     As to each LBO Buyer Individual Defendant, to the extent he was a director, officer or person that otherwise managed, owned, controlled and dominated the Debtors at the time, causing or allowing the Debtors to enter into the LBO loan and other transaction documents that contained provisions that severely and adversely impacted the Debtors' ability to operate their businesses after the LBO closed while arranging for the Debtors to agree to provisions in the LBO loan and other transaction documents that would cause or allow the Debtors to be forced to make improper distributions to one or more of the LBO Buyer Entity Defendants regardless of the Debtors' dire financial condition or poor performance.

354.    Each LBO Buyer Individual Defendant's acts or omissions described herein was, alternatively, either fraudulent, willful, deliberate, knowing, in bad faith, reckless, or grossly negligent and in derogation of applicable law.  Each LBO Buyer Individual Defendant's acts and omissions fell substantially below the standards generally practiced and accepted by other fiduciaries in similar circumstances.

355.    Each LBO Buyer Individual Defendant's acts and omissions described herein directly and proximately caused harm to the Debtors, the Debtors' estates and the Debtors' creditors who are beneficiaries of the Trust, in an amount to be determined at trial but not less than $2.1 billion.

356.    By reason of each LBO Buyer Individual Defendant's acts and omissions described herein, the Trust is entitled to recovery of actual, compensatory and consequential damages from the LBO Buyer Individual Defendants, jointly and severally, in an amount to be determined at trial, but not less than $2.1 billion.

357.    Because the acts and omissions of the LBO Buyer Individual Defendants were gross, wanton and malicious, the Trust is entitled to punitive damages of at least three times the actual damage, or $6.3 billion, or such other amount as the Court may determine after trial.

### AS FOR A FIFTH CAUSE OF ACTION

### (Aiding, Abetting, Inducing or Participating in Breaches of Fiduciary Duties and Other Misconduct – All Defendants)

358.    Plaintiff incorporates by reference, repeats and re-alleges each and every allegation contained in paragraphs 1 through 357 of this Complaint as though fully set forth herein.

359.    Pleading in the alternative, each Defendant aided, abetted, induced, participated in or conspired to commit the breaches of fiduciary and contractual duties by one or more of the other Defendants, as described above.

360.    Each Defendant knew or knew should have known that the other Defendants' acts and omissions constituted breaches of fiduciary and contractual duties.

361.    With that knowledge, each Defendant provided material and substantial assistance in connection with, and knowingly participated in, the other Defendants' breach of their fiduciary duties and misconduct identified above.

362.    In providing such assistance, each of the Defendants acted in bad faith and with the actual intent to assist the other Defendants in their respective breaches of fiduciary duties.

363.    As a result, each of the Defendants is liable to the Plaintiff as an aider and abettor. Each Defendant's independent tortious acts or omissions as an aider and abettor directly

and proximately caused harm to the Debtors, the Debtors' creditors and the Debtors' estates in an amount to be determined at trial, but not less than $2.1 billion.

364.     By reason of Defendants' aiding and abetting activities, the Plaintiff is entitled to recovery of actual, compensatory, and consequential damages from Defendants, jointly and severally, in the amount estimated to be no less than $2.1 billion.

## AS FOR A SIXTH CAUSE OF ACTION

### (Waste – All Defendants)

365.     Plaintiff incorporates by reference, repeats, and re-alleges each and every allegation contained in paragraphs 1 through 357 of this Complaint as though fully set forth herein.

366.     Pleading in the alternative, each of the Defendant's acts or omissions described herein constituted a waste of assets of the Debtors.

367.     Each of the Defendant's acts or omissions described herein was, alternatively, either fraudulent, willful, deliberate, knowing, in bad faith, reckless, grossly negligent or negligent and in derogation of applicable law.

368.     Each of the Defendant's acts or omissions identified herein constituted the irrational squandering of the Debtors' assets and the value thereof.  There was no good faith basis upon which any of the Defendants could have concluded that those acts or omissions were beneficial to the Debtors.

369.     Each of the Defendants' acts or omissions identified herein directly and proximately caused harm to the Debtors in an amount no less than $2.1 billion.

370.     By reason of the Defendants' acts or omissions described herein, Plaintiff is entitled to recovery of actual, compensatory and consequential damages from Defendants, jointly and severally, in the amount to be determined at trial, but no less than $2.1 billion.

## AS FOR A SEVENTH CAUSE OF ACTION

### (Breaches of Fiduciary Duties Owed to Creditors – All Defendants)

371.    Plaintiff incorporates by reference, repeats and re-alleges each and every allegation contained in paragraphs 1 through 357 of this Complaint as though fully set forth herein.

372.    Pleading in the alternative, under applicable law, Defendants owed all creditors of the Debtors the fiduciary duties identified herein once the Debtors either became insolvent or entered the zone or vicinity of insolvency on or around no later than June 11, 2007 and at all relevant times thereafter.

373.    Defendants breached the fiduciary duties identified herein owed to the Debtors' creditors by committing the acts or omissions described herein.

374.    Each of the Defendant's acts or omissions described herein was, alternatively either fraudulent, willful, deliberate, knowing, in bad faith, reckless, grossly negligent or negligent and in derogation of applicable law.

375.    Each of the Defendant's acts or omissions identified herein directly and proximately caused generalized harm to all of the Debtors' creditors and claimant in the amount no less than $2.1 billion.

376.    By reason of the Defendants' acts or omissions described herein, Plaintiff is entitled to recovery of actual, compensatory and consequential damages from Defendants, jointly and severally, in an amount to be determined at trial, but not less than $2.1 billion on behalf of all of the Debtors' creditors and claimants.

377.    Because the acts or omissions of Defendants described herein were gross, wanton and malicious, the Trust is entitled to punitive damages of at least three times the actual damage, or $6.3 billion, or such other amount as the Court may determine after trial.

## AS FOR AN EIGHTH CAUSE OF ACTION

**(Unjust Enrichment – Against BHAC IV, LLC and BRE.HV Holdings LLC (the "Sellers"))**

378.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

379.    The Sellers have been unjustly enriched.  The Sellers wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors as well as indebtedness incurred by the Debtors.

380.    As is set forth above, the Sellers received approximately $1.9 billion in connection with the LBO, which in turn resulted in a significant depletion of the Debtors' assets in that the Debtors provided liens on all their assets for no consideration and incurred approximately $1.7 billion in additional secured debt.  After the proceeds of the loans made to Debtors in connection with the LBO were applied to extant debt, the Debtors received nothing and received no direct or indirect benefit for assuming the additional secured debt.

381.    All of the approximately $1.9 billion that enriched the Sellers came at the expense of the Debtors, and the Sellers have retained those monies.

382.    Equity and good conscience require full restitution of the monies received by the Sellers in connection with the Acquisition.  This includes not only the money itself that the Sellers received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A NINTH CAUSE OF ACTION

**(Illegal Distributions – Against BHAC IV, LLC and BRE.HV Holdings LLC (the "Sellers"))**

383.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

133

384.   As is set forth above, the Sellers received distributions totaling approximately $1.9 billion in connection with the LBO.  These distributions were made to the Sellers from funds that ultimately came from the Debtors.

385.   Each and every distribution made to the Sellers was made at a time when the Debtors did not have a surplus or were insolvent.

386.   The Sellers were on notice of the impropriety of every distribution they received in that the Sellers knew the Debtors did not have a surplus and/or would be rendered insolvent as a result of the LBO and the distributions made in connection therewith.

387.   The Sellers are therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the Delaware General Corporations Law ("DGCL") and/or Section 18-607 of the Delaware Limited Liability Company Act ("DLLCA").

## AS FOR A TENTH CAUSE OF ACTION

**(Illegal Dividends – Against Jonathan D. Gray, Robert L. Friedman, William Stein and Michael Chae (together, the "Pre-LBO Director Defendants"))**

388.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

389.   As is set forth above, the Sellers received distributions totaling approximately $1.9 billion in connection with the LBO, which were authorized and allowed by the Pre-LBO Director Defendants.   These distributions were made to the Sellers from funds that came from ESI, Homestead or other Debtors, which are each Delaware entities.

390.   Each and every distribution that the Pre-LBO Director Defendants authorized to be paid to the Sellers was made at a time when the Debtors did not have a surplus or were insolvent.

134

391. These distributions were willfully or negligently made by the Pre-LBO Director Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors.

392. The Pre-LBO Director Defendants are therefore liable for repayment of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR AN ELEVENTH CAUSE OF ACTION

### (Unjust Enrichment – Against BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC )

393. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

394. BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC have been unjustly enriched. BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC each wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors as well as indebtedness incurred by the Debtors.

395. As is set forth above, BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC are the three entities that actually received the approximately $1.9 billion in connection with the LBO. BHAC IV, LLC received $1,282,764,449 at the closing; Blackstone Hospitality Acquisitions, LLC received $489,546,289 at the closing; and Prime Hospitality, LLC received $4,110,604 at the closing, each from an LBO closing account at First American Title Insurance Company. In addition, BHAC IV, LLC received the earnest money of $85,611,012 directly from a Chicago Title Insurance Company escrow account used in connection with the LBO. The payment of these monies to BHAC IV LLC, Blackstone Hospitality

Acquisitions, LLC and Prime Hospitality, LLC resulted in a significant depletion of the Debtors' assets in that the Debtors provided liens on all their assets for no consideration and incurred approximately $1.7 billion in additional secured debt.  After the proceeds of the loans made to Debtors in connection with the LBO were applied to extant debt, the Debtors received nothing and received no direct or indirect benefit for assuming the additional secured debt.

396.    All of the approximately $1.9 billion that enriched the BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC came at the expense of the Debtors, and BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC have retained those monies.

397.    Equity and good conscience require full restitution of the monies received by BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC in connection with the LBO. This includes not only the money itself that BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A TWELFTH CAUSE OF ACTION

### (Illegal Distributions – Against BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC)

398.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

399.    As is set forth above, BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC received distributions totaling approximately $1.9 billion in connection with the LBO.  These distributions were made to BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC from funds that ultimately came from the Debtors.

400.    Each and every distribution made to BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC was made at a time when the Debtors did not have a surplus or were insolvent.

401.    BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC were on notice of the impropriety of every distribution they received in that BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC knew the Debtors did not have a surplus and/or would be rendered insolvent as a result of the LBO and the distributions made in connection therewith.

402.    BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC are therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A THIRTEENTH CAUSE OF ACTION

**(Illegal Dividends – Against Jonathan D. Gray, Robert L. Friedman, William Stein and Michael Chae (together, the "Pre-LBO Director Defendants"))**

403.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

404.    As is set forth above, BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC received distributions totaling approximately $1.9 billion in connection with the LBO, which were authorized and allowed by the Pre-LBO Director Defendants.    These distributions were made to BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC from funds that came from ESI, Homestead or other Debtors, which are each Delaware entities.

405.    Each and every distribution that the Pre-LBO Director Defendants authorized to be paid to BHAC IV LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC was made at a time when the Debtors did not have a surplus or were insolvent.

406.    These distributions were willfully or negligently made by the Pre-LBO Director Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors.

407.    The Pre-LBO Director Defendants are therefore liable for repayment of the unlawful distributions under Sections 160 and 174 of the DGCL and/or the DLLCA.

### AS FOR A FOURTEENTH CAUSE OF ACTION

**(Alter Ego Liability – The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC, and BRE/HV Holdings LLC (the "Blackstone Alter Ego Defendants"))**

408.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

409.    The Blackstone Alter Ego Defendants should be held liable for the debts and obligations of the Debtors because the Blackstone Alter Ego Defendants were the alter egos of the Debtors prior to and in connection with the LBO.

410.    The Blackstone Alter Ego Defendants dominated and controlled the Debtors and used that domination and control to cause the Debtors to incur extensive additional indebtedness of at least $1.7 billion and to make substantial transfers in connection with the LBO as set forth above.

411.    The Blackstone Alter Ego Defendants caused the Debtors to incur the additional indebtedness and to make the transfers in connection with the LBO all for the sole benefit of the Blackstone Alter Ego Defendants and to the detriment of the Debtors.

412.    The Blackstone Alter Ego Defendants are therefore liable for the debts and obligations of the Debtors.

### AS FOR A FIFTEENTH CAUSE OF ACTION

**(Alter Ego Liability – Against DL-DW Holdings LLC, Princeton ESH LLC, Atmar Associates, LLC, Lightstone Holdings, LLC and BRE/ESH Holdings, LLC (the "DL-DW Alter Ego Defendants"))**

413.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

414.    The DL-DW Alter Ego Defendants should be held liable for the debts and obligations of the Debtors because the DL-DW Alter Ego Defendants were the alter egos of the Debtors in connection with and following the LBO.

415.    The DL-DW Alter Ego Defendants dominated and controlled the Debtors and used that domination and control to cause the Debtors to incur extensive additional indebtedness of at least $1.7 billion, to make substantial transfers in connection with the LBO as set forth above, and to make the other improper equity dividends, distributions and other transfers, totaling in excess of $170 million, as described herein.

416.    The DL-DW Alter Ego Defendants caused the Debtors to incur the additional indebtedness and to make the transfers in connection with the LBO all for the sole benefit of the DL-DW Alter Ego Defendants and to the detriment of the Debtors.

417.    The DL-DW Alter Ego Defendants are therefore liable for the debts and obligations of the Debtors.

## AS FOR A SIXTEENTH CAUSE OF ACTION

### (Illegal Dividends and Distributions – Against BHAC Capital IV, LLC)

418.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

419.    As is set forth above, BHAC Capital IV, LLC received dividends and distributions totaling approximately $40,607,000 during 2007 and 2008.   These dividend payments were made to BHAC Capital IV, LLC from funds that came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc.

420.    Each and every dividend and distribution paid to BHAC Capital IV, LLC was made at a time when the Debtors did not have a surplus or were insolvent.

421.    BHAC Capital IV, LLC was on notice of the distressed condition of the Debtors as well as the fact that every dividend and distribution it received violated the terms of the applicable mortgage loan documents, and thus BHAC Capital IV, LLC was on notice of the impropriety of the dividends and distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those dividends.

422.    BHAC Capital IV, LLC is therefore liable for repayment of the unlawful dividends under Sections 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR AN SEVENTEENTH CAUSE OF ACTION

### (Unjust Enrichment – Against BHAC Capital IV, LLC)

423.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

424.    BHAC Capital IV, LLC has been unjustly enriched.  BHAC Capital IV, LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

140

425.    BHAC Capital IV, LLC depleted the assets of the Debtors by receiving dividends and distributions totaling approximately $40,607,000 during 2007 and 2008.  BHAC Capital IV, LLC was aware that the Debtors did not have a surplus and/or was insolvent at the time of the dividends, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

426.    BHAC Capital IV, LLC have been enriched at the expense of the Debtors and have retained the dividends and distributions totaling approximately $40,607,000.

427.    Equity and good conscience require full restitution of the monies received by the BHAC Capital IV from the Debtors.  This includes not only the money itself that BHAC Capital IV, LLC received, but also the proceeds of that money.  Any profits earned with the money it received must be returned to the Litigation Trust.

## AS FOR A EIGHTEENTH CAUSE OF ACTION

**(Illegal Distributions –Against Arbor Commercial Mortgage LLC and Arbor ESH II, LLC)**

428.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

429.    As is set forth above, Arbor Commercial Mortgage LLC received distributions totaling approximately $44,231,000 between 2007 and 2009.  This total includes approximately $10,295,000 in 2007; $15,140,000 in 2008; and $18,796,000 in 2009.

430.    These distributions were made to Arbor Commercial Mortgage LLC by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc. Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

431.     These distributions also include approximately $20,545,637 made to Arbor Commercial Mortgage LLC in 2008 and 2009 out of the Preferred Equity Reserve Account (the "PERA"), which were made after the ESI Board had passed a resolution halting equity distributions, and at a time when the Debtors did not have a surplus or were insolvent, from funds that ultimately came from ESI or other Debtors.  The PERA was funded as part of the LBO with money that was borrowed by the Debtors.

432.     Arbor ESH II LLC, as a member of BHAC Capital IV, LLC, was, upon information and belief, entitled to receive any distributions made to Arbor Commercial Mortgage LLC. To the extent any distributions made to Arbor Commercial Mortgage LLC were received by Arbor ESH II LLC, Arbor ESH III is liable for such distributions.

433.     Each and every distribution made to Arbor Commercial Mortgage LLC was made at a time when the Debtors did not have a surplus or were insolvent.

434.     Arbor Commercial Mortgage LLC was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus Arbor Commercial Mortgage LLC was on notice of the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

435.     Arbor Commercial Mortgage LLC is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-=607 of the DLLCA.

### AS FOR A NINETEENTH CAUSE OF ACTION

**(Unjust Enrichment – Against Arbor Commercial Mortgage LLC and Arbor ESH II, LLC)**

436.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

437.    Arbor Commercial Mortgage LLC has been unjustly enriched.   Arbor Commercial Mortgage LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

438.    Arbor Commercial Mortgage LLC depleted the assets of the Debtors by taking distributions totaling approximately $44,231,000 between 2007 and 2009.   Arbor Commercial Mortgage LLC was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

439.    Arbor ESH II LLC, as a member of BHAC Capital IV, LLC, was, upon information and belief, entitled to receive any distributions made to Arbor Commercial Mortgage LLC. To the extent any distributions made to Arbor Commercial Mortgage LLC were received by Arbor ESH II LLC, Arbor ESH III has been unjustly enriched as well and is liable for such distributions.

440.    Arbor Commercial Mortgage LLC has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $44,231,000.

441.    Equity and good conscience require full restitution of the monies received by Arbor Commercial Mortgage LLC, directly and indirectly, from the Debtors.  This includes not only the money itself that Arbor Commercial Mortgage LLC received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A TWENTIETH CAUSE OF ACTION

### (Illegal Distributions – Against PGRT ESH Inc.)

442.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

143

443.    As is set forth above, PGRT ESH Inc. received distributions totaling approximately $6,167,000 in 2007.  These distributions were made to PGRT ESH Inc. by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc. Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

444.    Each and every distribution made to PGRT ESH Inc. was made at a time when the Debtors did not have a surplus or were insolvent.

445.    PGRT ESH Inc. was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus PGRT ESH Inc. was on notice of the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

446.    PGRT ESH Inc. is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

### AS FOR A TWENTY-FIRST CAUSE OF ACTION

### (Unjust Enrichment – Against PGRT ESH Inc.)

447.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

448.    PGRT ESH Inc. has been unjustly enriched.  PGRT ESH Inc. wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

449.    PGRT ESH Inc. depleted the assets of the Debtors by taking distributions totaling approximately $6,167,000 in 2007.  PGRT ESH Inc. was aware that the Debtors did not

144

have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

450.    PGRT ESH Inc. has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $6,167,000.

451.    Equity and good conscience require full restitution of the monies received by PGRT ESH Inc., directly and indirectly, from the Debtors.  This includes not only the money itself that PGRT ESH Inc. received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A TWENTY-SECOND CAUSE OF ACTION

### (Illegal Distributions – Against Glida One LLC)

452.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

453.    As is set forth above, Glida One LLC received distributions totaling approximately $5,363,000 in 2007 and 2008.  This total includes approximately $1,668,000 in 2007 and $3,695,000 in 2008.

454.    These distributions were made to Glida One LLC by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc. Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

455.    Each and every distribution made to Glida One LLC was made at a time when the Debtors did not have a surplus or were insolvent.

456.    Glida One LLC was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage

loan documents, and thus Glida One LLC was on notice of the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

457.    Glida One LLC is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A TWENTY-THIRD CAUSE OF ACTION

### (Unjust Enrichment – Against Glida One LLC)

458.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

459.    Glida One LLC has been unjustly enriched.  Glida One LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

460.    Glida One LLC depleted the assets of the Debtors by taking distributions totaling approximately $5,363,000 in 2007 and 2008.  Glida One LLC was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

461.    Glida One LLC has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $5,363,000.

462.    Equity and good conscience require full restitution of the monies received by Glida One LLC, directly and indirectly, from the Debtors.  This includes not only the money itself that Glida One LLC. received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A TWENTY-FOURTH CAUSE OF ACTION

### (Illegal Distributions – Against Polar Extended Stay (USA) L.P.)

463.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

464.    As is set forth above, Polar Extended Stay (USA) L.P. received distributions totaling approximately $1,235,161 in 2007 and 2008.   This total includes approximately $563,333 in 2007 and $671,828 in 2008.

465.    These distributions were made to Polar Extended Stay (USA) L.P. by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc. Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

466.    Each and every distribution made to Polar Extended Stay (USA) L.P. was made at a time when the Debtors did not have a surplus or were insolvent.

467.    Polar Extended Stay (USA) L.P. was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus Polar Extended Stay (USA) L.P. was on notice of the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

468.    Polar Extended Stay (USA) L.P. is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A TWENTY-FIFTH CAUSE OF ACTION

### (Unjust Enrichment – Against Polar Extended Stay (USA) L.P.)

469.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

470.    Polar Extended Stay (USA) L.P. has been unjustly enriched.   Polar Extended Stay (USA) L.P. wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

471.    Polar Extended Stay (USA) L.P. depleted the assets of the Debtors by taking distributions totaling approximately $1,235,161 in 2007 and 2008.  Polar Extended Stay (USA) L.P. was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

472.    Polar Extended Stay (USA) L.P. has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $1,235,161.

473.    Equity and good conscience require full restitution of the monies received by Polar Extended Stay (USA) L.P., directly and indirectly, from the Debtors.  This includes not only the money itself that Polar Extended Stay (USA) L.P. received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A TWENTY-SIXTH CAUSE OF ACTION

### (Illegal Distributions – Against Princeton ESH, LLC)

474.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

148

475.     As is set forth above, Princeton ESH, LLC received distributions totaling approximately $1,235,161 in 2007 and 2008.  This total includes approximately $563,333 in 2007 and $671,828 in 2008.

476.     These distributions were made to Princeton ESH, LLC by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc. Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

477.     Each and every distribution made to Princeton ESH, LLC was made at a time when the Debtors did not have a surplus or were insolvent.

478.     Princeton ESH, LLC was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus Princeton ESH, LLC was on notice of the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

479.     Princeton ESH, LLC is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A TWENTY-SEVENTH CAUSE OF ACTION

### (Unjust Enrichment – Against Princeton ESH, LLC)

480.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

481.     Princeton ESH, LLC has been unjustly enriched.  Princeton ESH, LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

482.    Princeton ESH, LLC depleted the assets of the Debtors by taking distributions totaling approximately $1,235,161 in 2007 and 2008.  Princeton ESH, LLC was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

483.    Princeton ESH, LLC has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $1,235,161.

484.    Equity and good conscience require full restitution of the monies received by Princeton ESH, LLC, directly and indirectly, from the Debtors.  This includes not only the money itself that Princeton ESH, LLC received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A TWENTY-EIGHTH CAUSE OF ACTION

### (Illegal Distributions – Against Ron Invest LLC)

485.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

486.    As is set forth above, Ron Invest LLC received distributions totaling approximately $1,172,000 in 2008.

487.    These distributions were made to Ron Invest LLC by the shell entity BHAC Capital IV, LLC, or by HVM on behalf of BHAC Capital IV, LLC, from funds that ultimately came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc. Upon information and belief, these distributions also included funds derived from the proceeds of the LIBOR Floor Certificates discussed above.

488.    Each and every distribution made to Ron Invest LLC was made at a time when the Debtors did not have a surplus or were insolvent.

150

489.     Ron Invest LLC was on notice of the distressed condition of the Debtors as well as the fact that every distribution it received violated the terms of the applicable mortgage loan documents, and thus Ron Invest LLC was on notice of the impropriety of the distributions it received and the fact that the Debtors would be rendered further insolvent as a result of those distributions.

490.     Ron Invest LLC is therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

### AS FOR A TWENTY-NINTH CAUSE OF ACTION

### (Unjust Enrichment – Against Ron Invest LLC)

491.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

492.     Ron Invest LLC has been unjustly enriched.  Ron Invest LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

493.     Ron Invest LLC depleted the assets of the Debtors by taking distributions totaling approximately $1,172,000 in 2008.  Ron Invest LLC was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

494.     Ron Invest LLC has been enriched at the expense of the Debtors and have retained the distributions totaling approximately $1,172,000.

495.     Equity and good conscience require full restitution of the monies received by Ron Invest LLC, directly and indirectly, from the Debtors.  This includes not only the money itself that Ron Invest LLC received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

## AS FOR A THIRTIETH CAUSE OF ACTION

### (Illegal Distributions – Against Lightstone Holdings LLC)

496.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

497.    As is set forth above, Lightstone Holdings LLC received a distribution of approximately $2,668,000 on or about August 31, 2007.  This distribution was made to Lightstone Holdings LLC by the shell entity DL-DW Holdings, LLC from funds that, upon information and belief, ultimately came from ESI or other Debtors.

498.    The distribution made to Lightstone Holdings LLC was made at a time when the Debtors did not have a surplus or were insolvent.

499.    Lightstone Holdings LLC was on notice of the distressed condition of the Debtors as well as the fact that the distribution it received violated the terms of the applicable mortgage loan documents, and thus Lightstone Holdings LLC was on notice of the impropriety of the distribution it received and the fact that the Debtors would be rendered further insolvent as a result of that distribution.

500.    Lightstone Holdings LLC is therefore liable for repayment of the unlawful distribution under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A THIRTY-FIRST CAUSE OF ACTION

### (Unjust Enrichment – Against Lightstone Holdings LLC)

501.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

502.     Lightstone Holdings LLC has been unjustly enriched.  Lightstone Holdings LLC wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

503.     Lightstone Holdings LLC depleted the assets of the Debtors by taking a distribution of approximately $2,668,000 on or about August 31, 2007.  Lightstone Holdings LLC was aware that the Debtors did not have a surplus and/or were insolvent at the time of the distributions, which were further improper in that they were made in violation of the terms of the applicable mortgage loan agreements.

504.     Lightstone Holdings LLC has been enriched at the expense of the Debtors and has retained the distribution of approximately $2,668,000.

505.     Lightstone Holdings LLC has also been unjustly enriched by the management fees of $1 million per year it received from the Debtors despite the fact that HVM, and not Lightstone Holdings LLC, managed all aspects of the Debtors' daily operations.

506.     Equity and good conscience require full restitution of the monies received by Lightstone Holdings LLC, directly and indirectly, from the Debtors.  This includes not only the money itself that Lightstone Holdings LLC received, but also the proceeds of that money. Any profits earned with the money it received must be returned to the Litigation Trust.

## AS FOR A THIRTY-SECOND CAUSE OF ACTION

**(Illegal Distributions – Against Princeton ESH LLC, Atmar Associates LLC, Lightstone Holdings LLC and BRE.ESH Holdings LLC (together, the "DL-DW Holdings LLC Member Defendants"))**

507.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

508.     As is set forth above, Lightstone Holdings LLC received a distribution of approximately $2,668,000 on or about August 31, 2007.  This distribution was made to Lightstone

Holdings LLC by the shell entity DL-DW Holdings, LLC and upon information and belief was authorized by the DL-DW Holdings LLC Member Defendants from funds that, upon information and belief, ultimately came from ESI or other Debtors.

509.    The distribution made to Lightstone Holdings LLC was made at a time when the Debtors did not have a surplus or were insolvent.

510.    This distribution was willfully or negligently made by the DL-DW Holdings LLC Member Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors.

511.    The DL-DW Holdings LLC Member Defendants are therefore liable for repayment of the unlawful distribution under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

### AS FOR A THIRTY-THIRD CAUSE OF ACTION

**(Unjust Enrichment – Against ABT-ESI LLC, Park Avenue Funding LLC, Princeton ESH LLC, and Mericash Funding LLC, and Lightstone Commercial Management (together, the "25% Note Lender Defendants"))**

512.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

513.    The 25% Note Lender Defendants have been unjustly enriched.  The 25% Note Lender Defendants wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

514.    As is detailed above, in connection with the onerous terms of the 25% Note set by the 25% Note Lender Defendants and their insider affiliates, the 25% Note Lender Defendants in 2008 were paid an additional 15.85% interest (above the 9.15% interest on the original 9.15% Note) on the 25% Note from income generated by the LIBOR Floor Certificates whose value should have belonged to the Debtors.

515.    The 25% Note Lender Defendants have been enriched at the expense of the Debtors and have retained interest payments paid out of income generated by the LIBOR Floor Certificates, an amount equal to approximately $3,487,000.

516.    Equity and good conscience require full restitution of the monies received by the 25% Note Lender Defendants from the Debtors.  This includes not only the money itself that the 25% Note Lender Defendants received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Litigation Trust.

### AS FOR A THIRTY-FOURTH CAUSE OF ACTION

**(Illegal Distributions – Against the 25% Note Lender Defendants)**

517.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

518.    As is set forth above, in connection with the onerous terms of the 25% Note set by the 25% Note Lender Defendants and their insider affiliates, the 25% Note Lender Defendants in 2008 received distributions totaling approximately $3,487,000.  These distributions were paid using income derived by the LIBOR Floor Certificates that belonged to the Debtors.

519.    Each and every distribution made to the 25% Note Lender Defendants in 2008 was made at a time when the Debtors did not have a surplus or were insolvent.

520.    The 25% Note Lender Defendants were on notice of the distressed condition of the Debtors, the impropriety of the distributions they received, and that the Debtors would be rendered further insolvent as a result of those distributions.

521.    The 25% Note Lender Defendants are therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18-607 of the DLLCA.

## AS FOR A THIRTY-FIFTH CAUSE OF ACTION

### (Illegal Distributions – Against the 25% Note Lender Defendants)

522.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

523.    As is set forth above, the 25% Note Lender Defendants received distributions in the form of the LIBOR Floor Certificates and the balance of the Floor Bonds Reserve Account as part of an insider payoff of the 25% Note just before Debtor's bankruptcy totaling no less than $25,000,000. These distributions were paid from assets and funds that ultimately belonged to one or more of the Debtors, which are each Delaware entities.

524.    Each and every distribution made to 25% Note Lender Defendants was made at a time when the Debtors did not have a surplus or were insolvent.

525.    The 25% Note Lender Defendants were on notice of the distressed condition of the Debtors, the impropriety of the distributions they received, and that the Debtors would be rendered further insolvent as a result of those distributions.

526.    The 25% Note Lender Defendants are therefore liable for repayment of each of the unlawful distributions under Sections 160 and 174 of the DGCL and/or Section 18¬607 of the DLLCA.

## AS FOR A THIRTY-SIXTH CAUSE OF ACTION

### (Unjust Enrichment – Against the 25% Note Lender Defendants)

527.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

528.    The 25% Note Lender Defendants have been unjustly enriched.  The 25% Note Lender Defendants wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

156

529.     As is detailed above, the 25% Note Lender Defendants received the LIBOR Floor Certificates and the balance of the Floor Bonds Reserve Account as part of an insider payoff just before the bankruptcy of the Debtors.

530.     The 25% Note Lender Defendants have been enriched at the expense of the Debtors and have retained the proceeds of the LIBOR Floor Certificates and the Floor Bonds Reserve Account, an amount equal to no less than $25,000,000.

531.     Equity and good conscience require full restitution of the monies received by the 25% Note Lender Defendants from the Debtors.  This includes not only the money itself that the 25% Note Lender Defendants received, but also the proceeds of that money.  Any profits earned with the money it received must be returned to the Litigation Trust.

### AS FOR A THIRTY-SEVENTH CAUSE OF ACTION

**(Illegal Dividends – Against David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy R. Milone, Jr., Joseph Chetrit, Joseph Teichman and Joseph Martello (together, the "Extended Stay Director Defendants"))**

532.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

533.     As is set forth above, distributions and/or dividends totaling approximately $62,071,000 were made between 2007 and 2009, which were authorized and allowed by the Extended Stay Director Defendants.  These dividend and distributions were made from funds that came from ESI or other Debtors, including ESA P Portfolio Operating Lessee Inc., which are each Delaware entities.

534.     Each and every dividend that the Extended Stay Director Defendants authorized to be paid was made at a time when the Debtors did not have a surplus or were insolvent.

157

535.   These dividend payments were willfully or negligently made by the Extended Stay Director Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors, and despite the fact that these dividend payments violated the terms of the applicable mortgage loan documents.

536.   Upon information and belief, each of the various entities served by the interlocking Extended Stay Director Defendants adopted corporate standards of governance.

537.   The Extended Stay Director Defendants are therefore each individually liable for repayment of the unlawful dividends and distributions authorized when they were directors under Sections 160 and 174 of the DGCL.

## AS FOR A THIRTY-EIGHTH CAUSE OF ACTION

**(Illegal Dividends – Against David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Joseph Teichman, and Joseph Martello (together, the "Excessive Interest Director Defendants"))**

538.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

539.   As is set forth above, the 25% Note Lender Defendants in 2008 received distributions totaling approximately $3,487,000, which were authorized and allowed by the Excessive Interest Director Defendants.  These dividend and distributions were made from funds that came from ESI or other Debtors.

540.   The distributions that the Excessive Interest Director Defendants authorized to be paid were made at a time when the Debtors did not have a surplus or were insolvent.

541.   These distributions were willfully or negligently made by the Excessive Interest Director Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors.

542.    Upon information and belief, each of the various entities served by the interlocking Excessive Interest Director Defendants adopted corporate standards of governance.

543.    The Excessive Interest Director Defendants are therefore each individually liable for repayment of the unlawful dividends authorized when they were directors under Sections 160 and 174 of the DGCL.

## AS FOR A THIRTY-NINTH CAUSE OF ACTION

**(Illegal Dividends – Against David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy R. Milone, Joseph Chetrit, and Joseph Teichman(together, the "LIBOR Floor Certificate Director Defendants"))**

544.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

545.    As is set forth above, the 25% Note Lender Defendants received distributions in the form of the LIBOR Floor Certificates and the balance of the Floor Bonds Reserve Account as part of an insider payoff of the 25% Note just before Debtor's bankruptcy totaling no less than $25,000,000, which were authorized and allowed by the LIBOR Floor Certificate Director Defendants.  These dividend and distributions were made from funds that came from ESI or other Debtors.

546.    The distributions that the LIBOR Floor Certificate Director Defendants authorized to be paid were made at a time when the Debtors did not have a surplus or were insolvent.

547.    These distributions were willfully or negligently made by the LIBOR Floor Certificate Director Defendants despite the Debtors' lack of a surplus and the insolvent condition of the Debtors.

548.    Upon information and belief, each of the various entities served by the interlocking LIBOR Floor Certificate Director Defendants adopted corporate standards of governance.

549.    The LIBOR Floor Certificate Director Defendants are therefore each individually liable for repayment of the unlawful dividends authorized when they were directors under Sections 160 and 174 of the Delaware General Corporations Law ("DGCL").

### AS FOR A FORTIETH CAUSE OF ACTION

**(Unjust Enrichment – Against Bank of America, N.A ("Bank of America"))**

550.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

551.    Bank of America has been unjustly enriched.  Bank of America wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

552.    Bank of America received approximately $3,971,658 in servicer fees from the Seller.  These fees were paid out of the $7.4 billion the Debtors were caused to borrow from the mortgage and mezzanine lenders.  However, the Debtors received no direct or indirect benefits in exchange for the monies borrowed or the payments made to Bank of America.

553.    Bank of America has been enriched at the expense of the Debtors and has retained the fees totaling approximately $3,971,658.

554.    Equity and good conscience require full restitution of the monies received by Bank of America from the Debtors.  This includes not only the money itself that Bank of America received, but also the proceeds of that money.  Any profits earned with the money it received must be returned to the Litigation Trust.

### AS FOR A FORTY-FIRST CAUSE OF ACTION

**(Unjust Enrichment – Against Citigroup Global Markets Inc. ("Citigroup"))**

555.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

556.    Citigroup has been unjustly enriched.   Citigroup wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

557.    Citigroup received approximately $6,350,000 in fees in connection with services for the Buyer.  These fees were paid out of the $7.4 billion the Debtors were caused to borrow from the mortgage and mezzanine lenders.  However, the Debtors received no direct or indirect benefits in exchange for the monies borrowed or the payments made to Citigroup.

558.    Citigroup has been enriched at the expense of the Debtors and has retained the fees totaling approximately $6,350,000.

559.    Equity and good conscience require full restitution of the monies received by Citigroup from the Debtors.  This includes not only the money itself that Citigroup received, but also the proceeds of that money.  Any profits earned with the money it received must be returned to the Litigation Trust.

### AS FOR A FORTY-SECOND CAUSE OF ACTION

**(Unjust Enrichment – Against Ebury Finance Limited ("Ebury") )**

560.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 321 above.

561.    Ebury has been unjustly enriched.  Ebury wrongfully and unconscionably benefitted from the receipt of assets stripped from the Debtors.

562.    Ebury received approximately $9,341,984 in fees and disbursements in connection with loans the Debtors were forced to incur as a result of the LBO.  These fees were

161

paid out of the loan proceeds despite the fact that the Debtors received no direct or indirect benefits as a result of the loans.

563.   Ebury has been enriched at the expense of the Debtors and has retained the fees and disbursements totaling approximately $9,341,984.

564.   Equity and good conscience require full restitution of the monies received by Ebury from the Debtors.  This includes not only the money itself that Ebury received, but also the proceeds of that money.  Any profits earned with the money it received must be returned to the Litigation Trust.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff demands judgment against Defendants, as to the causes of action set forth above, as follows:

(i)      on the first cause of action, declaring that defendants The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC, BRE/HV Holdings LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC, in their own right or as successors-in-interest to and direct or indirect parent entities and funds that owned or controlled the Debtors prior to the LBO grossly, wantonly and maliciously breached their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors and the Debtors' creditors in light of the misconduct identified above, and awarding, jointly and severally, both compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion and punitive damages of three times the actual damage caused to the Debtors, or $6.3 billion, or such other amount as the Court may determine after trial; and

162

(ii)      on the second cause of action, declaring that defendants DL-DW Holdings, LLC, Lightstone Holdings, LLC, The Lightstone Group, LLC, PGRT ESH Inc., Lightstone Commercial Management, Arbor ESH II LLC, Arbor Commercial Mortgage, LLC, Princeton ESH LLC, Atmar Associates, LLC, Glida One LLC, Ron Invest LLC, Polar Extended Stay (USA) L.P., BHAC Capital IV, L.L.C. and BRE/ESH Holdings, LLC grossly, wantonly and maliciously breached their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors and the Debtors' creditors in light of the misconduct identified above, and awarding, jointly and severally, both compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion and punitive damages of three times the actual damage caused to the Debtors, or $6.3 billion, or such other amount as the Court may determine after trial; and

(iii)      on the third cause of action, declaring that defendants David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy Milone, Jr., Joseph Chetrit, Joseph Teichman, Joseph Martello, F. Joseph Rogers, David Kim and Gary DeLapp grossly, wantonly and maliciously breached their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors and the Debtors' creditors in light of the misconduct identified above, and awarding, jointly and severally, both compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion and punitive damages of three times the actual damage caused to the Debtors, or $6.3 billion, or such other amount as the Court may determine after trial; and

(iv)      on the fourth cause of action, declaring that defendants Jonathan D. Gray, William Stein, Michael Chae, Robert L. Friedman, Thomas Burdi, Gary Sumers, Dennis J. McDonagh and Alan Miyasaki grossly, wantonly and maliciously breached their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors and the Debtors' creditors in light of the misconduct identified above, and awarding, jointly and severally, both compensatory damages to

plaintiff in an amount to be determined at trial but not less than $2.1 billion and punitive damages of three times the actual damage caused to the Debtors, or $6.3 billion, or such other amount as the Court may determine after trial; and

(v)      on the fifth cause of action, declaring that defendants The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC, BRE/HV Holdings LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC, in their own right or as successors-in-interest to and direct or indirect parent entities and funds that owned or controlled the Debtors prior to the LBO, DL-DW Holdings, LLC, Lightstone Holdings, LLC, The Lightstone Group, LLC, PGRT ESH Inc., Lightstone Commercial Management, Arbor ESH II LLC, Arbor Commercial Mortgage, LLC, Princeton ESH LLC, Atmar Associates, LLC, Glida One LLC, Ron Invest LLC, Polar Extended Stay (USA) L.P., BHAC Capital IV, L.L.C. and BRE/ESH Holdings, LLC, as the entities that owned or controlled the Debtors on the date of and after the LBO, David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy Milone, Jr., Joseph Chetrit, Joseph Teichman, Joseph Martello, F. Joseph Rogers, David Kim and Gary DeLapp, as directors, officers, managers and control persons after the LBO, Jonathan D. Gray, William Stein, Michael Chae, Robert L. Friedman, Thomas Burdi, Gary Sumers, Dennis J. McDonagh and Alan Miyasaki, as directors, officers, managers or persons that owned or controlled the Debtors prior to the LBO, and Bank of America, N.A., Citigroup Global Markets Inc. and Ebury Finance Limited, knew or should have known that the other defendants' acts and omissions described above constituted breaches of fiduciary and contractual duties owed to the

Debtors, knowingly provided material assistance in connection with, and knowingly participated in, the other defendants' breaches of fiduciary and contractual duties in bad faith and with the actual intent to assist the other defendants in their respective breaches of fiduciary and contractual duties, and awarding, jointly and severally, compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion, or such other amount as the Court may determine after trial; and

(vi)     on the sixth cause of action, declaring that defendants The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC, BRE/HV Holdings LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC, in their own right or as successors-in-interest to and direct or indirect parent entities and funds that owned or controlled the Debtors prior to the LBO, DL-DW Holdings, LLC, Lightstone Holdings, LLC, The Lightstone Group, LLC, PGRT ESH Inc., Lightstone Commercial Management, Arbor ESH II LLC, Arbor Commercial Mortgage, LLC, Princeton ESH LLC, Atmar Associates, LLC, Glida One LLC, Ron Invest LLC, Polar Extended Stay (USA) L.P., BHAC Capital IV, L.L.C. and BRE/ESH Holdings, LLC, as the entities that owned or controlled the Debtors on the date of and after the LBO, David Lichtenstein, Bruno de Vinck, Peyton "Chip" Owen, Jr., Guy Milone, Jr., Joseph Chetrit, Joseph Teichman, Joseph Martello, F. Joseph Rogers, David Kim and Gary DeLapp, as directors, officers, managers and control persons after the LBO, and Jonathan D. Gray, William Stein, Michael Chae, Robert L. Friedman, Thomas Burdi, Gary Sumers, Dennis J. McDonagh and Alan Miyasaki, as directors, officers, managers or persons that owned or

controlled the Debtors prior to the LBO, irrationally squandered the Debtors' assets and the value

thereof and thus committed corporate waste, and awarding, jointly and severally, compensatory

damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion, or such

other amount as the Court may determine after trial; and

> (vii)    as to the seventh causes of action, declaring that defendants The Blackstone Group

L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P.,

Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc.,

Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP

L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV

LLC, BRE/HV Holdings LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality,

LLC, in their own right or as successors-in-interest to and direct or indirect parent entities and

funds that owned or controlled the Debtors prior to the LBO,  DL-DW Holdings, LLC, Lightstone

Holdings, LLC, The Lightstone Group, LLC, PGRT ESH Inc., Lightstone Commercial

Management, Arbor ESH II LLC, Arbor Commercial Mortgage, LLC, Princeton ESH LLC, Atmar

Associates, LLC, Glida One LLC, Ron Invest LLC, Polar Extended Stay (USA) L.P., BHAC

Capital IV, L.L.C. and BRE/ESH Holdings, LLC, as the entities that owned or controlled the

Debtors on the date of and after the LBO, David Lichtenstein, Bruno de Vinck, Peyton "Chip"

Owen, Jr., Guy Milone, Jr., Joseph Chetrit, Joseph Teichman, Joseph Martello, F. Joseph Rogers,

David Kim and Gary DeLapp, as directors, officers, managers and control persons after the LBO,

and Jonathan D. Gray, William Stein, Michael Chae, Robert L. Friedman, Thomas Burdi, Gary

Sumers, Dennis J. McDonagh and Alan Miyasaki, as directors, officers, managers or persons that

owned or controlled the Debtors prior to the LBO, grossly, wantonly and maliciously breached

their fiduciary and contractual duties of care, loyalty and good faith owed to the Debtors' creditors

in light of the misconduct identified above, and awarding, jointly and severally, both compensatory damages to plaintiff in an amount to be determined at trial but not less than $2.1 billion and punitive damages of three times the actual damage caused to the Debtors, or $6.3 billion, or such other amount as the Court may determine after trial; and

(viii)   on the eighth cause of action, declaring that defendants BHAC IV, LLC and BRE.HV Holdings LLC have been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1.9 billion to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(ix)   on the ninth cause of action, declaring that defendants BHAC IV LLC and BRE.HV Holdings LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1.9 billion; and

(x)   on the tenth cause of action, declaring that defendants Gray, Friedman, Chae and Stein authorized illegal dividends and distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1.9 billion; and

(xi)   on the eleventh cause of action, declaring that defendants BHAC IV, LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC have been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount up to $1.9 billion and to be determined at trial to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xii)   on the twelfth cause of action, declaring that defendants BHAC IV, LLC, Blackstone Hospitality Acquisitions, LLC and Prime Hospitality, LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount up to $1.9 billion and to be determined at trial; and

(xiii)   on the thirteenth cause of action, declaring that defendants Gray, Friedman, Chae and Stein authorized illegal dividends and distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1.9 billion; and

(xiv)   on the fourteenth cause of action, declaring that defendants The Blackstone Group L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP Inc., Blackstone Holdings III GP L.L.C., Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV L.P., BHAC IV LLC and BRE/HV Holdings LLC were the alter egos of the Debtors and are responsible for the debts and obligations of the Debtors, and awarding plaintiff compensatory damages in an amount to be determined at trial but not less than $1.7 billion; and

(xv)   on the fifteenth cause of action, declaring that defendants DL-DW Holdings LLC, Princeton ESH LLC, Atmar Associates, LLC, Lightstone Holdings LLC and BRE.ESH Holdings, LLC were the alter egos of the Debtors and are responsible for the debts and obligations of the Debtors, and awarding plaintiff compensatory damages in an amount to be determined at trial but not less than $1.9 billion; and

(xvi)   on the sixteenth cause of action, declaring that defendant BHAC Capital IV, LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $40,607,000; and

(xvii)   on the seventeenth cause of action, declaring that defendant BHAC Capital IV, LLC has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $40,607,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xviii)  on the eighteenth cause of action, declaring that defendants Arbor Commercial Mortgage LLC and Arbor ESH II, LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $44,231,000; and

(xix)   on the nineteenth cause of action, declaring that defendants Arbor Commercial Mortgage LLC and Arbor ESH II, LLC have been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $44,231,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xx)    on the twentieth cause of action, declaring that defendant PGRT ESH Inc. received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $6,167,000; and

(xxi)   on the twenty-first cause of action, declaring that defendant PGRT ESH Inc. has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $6,167,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxii)  on the twenty-second cause of action, declaring that defendant Glida One LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $5,363,000; and

(xxiii) on the twenty-third cause of action, declaring that defendant Glida One LLC has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $5,363,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxiv)  on the twenty-fourth cause of action, declaring that defendant Polar Extended Stay (USA) L.P. received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1,235,000; and

(xxv)   on the twenty-fifth cause of action, declaring that defendant Polar Extended Stay (USA) L.P. has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1,235,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxvi)  on the twenty-sixth cause of action, declaring that defendant Princeton ESH, LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1,235,000; and

(xxvii) on the twenty-seventh cause of action, declaring that defendant Princeton ESH, LLC has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1,235,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxviii)on the twenty-eighth cause of action, declaring that defendant Ron Invest LLC received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1,172,000; and

(xxix)  on the twenty-ninth cause of action, declaring that defendant Ron Invest LLC has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $1,172,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxx)   on the thirtieth cause of action, declaring that defendant Lightstone Holdings LLC received an illegal distribution and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $2,668,000; and

(xxxi)  on the thirty-first cause of action, declaring that defendant Lightstone Holdings LLC has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $2,668,000 plus any management fees paid by Debtors to Lightstone Holdings LLC to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxxii) on the thirty-second cause of action, declaring that the DL-DW Holdings LLC Member Defendants authorized illegal dividends and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $2,668,000; and

(xxxiii) on the thirty-third cause of action, declaring that the 25% Note Lender Defendants have been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $3,487,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxxiv) on the thirty-fourth cause of action, declaring that the 25% Lender Defendants received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $3,487,000; and

(xxxv) on the thirty-fifth cause of action, declaring that the 25% Note Lender Defendants received illegal distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $25,000,000; and

(xxxvi) on the thirty-sixth cause of action, declaring that the 25% Note Lender Defendants have been unjustly enriched at the Debtors' expense and awarding compensatory damages to

plaintiff in an amount to be determined at trial but not less than $25,000,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xxxvii)     on the thirty-seventh cause of action, declaring that defendants Lichtenstein, de Vinck, Owen, Milone, Chetrit, Teichman, and Martello authorized illegal dividends and distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $62,071,000; and

(xxxviii)     on the thirty-eighth cause of action, declaring that defendants Lichtenstein, de Vinck, Owen, Teichman, and Martello authorized illegal dividends and distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $3,487,000; and

(xxxix) on the thirty-ninth cause of action, declaring that defendants Lichtenstein, de Vinck, Owen, Milone, Chetrit, and Teichman authorized illegal dividends and distributions and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $25,000,000; and

(xl)     on the fortieth cause of action, declaring that defendant Bank of America has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $3,971,658 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xli)     on the forty-first cause of action, declaring that defendant Citigroup has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $6,350,000 to provide the plaintiff with the appropriate restitution for such unjust enrichment;

(xlii)   on the forty-second cause of action, declaring that defendant Ebury has been unjustly enriched at the Debtors' expense and awarding compensatory damages to plaintiff in an amount to be determined at trial but not less than $9,341,984 to provide the plaintiff with the appropriate restitution for such unjust enrichment; and

(xliii)   awarding the plaintiff such other and further relief as the Court may deem just and proper.

Dated:  June 14, 2011
        New York, New York

                              Respectfully submitted,

                              **BAKER & HOSTETLER LLP**


                              ~~*/s/ Marc D. Powers*~~ **By**
                              MARC D. POWERS
                              ~~E-mail: mpowers@bakerlaw.com~~
                              MATTHEW R. GOLDMAN
                              ~~E-mail: mgoldman@bakerlaw.com~~
                              BENJAMIN D. PERGAMENT
                              ~~E-mail: bpergament@bakerlaw.com~~
                              KATHRYN M. ZUNNO
                              ~~E-mail: kzunno@bakerlaw.com~~
                              ~~Baker & Hostetler LLP~~
                              45 Rockefeller Plaza
                              New York, New York  10111
                              Telephone:     212.589.4200
                              Facsimile:     212.589.4201
                              **E-mail mpowers@bakerlaw.com**


                                      AND
                              ~~BRIAN A. BASH (*pro hac vice* application~~
                              ~~forthcoming)~~

                              MICHAEL A. VANNIEL (*pro hac vice*
                              application forthcoming)
                              ALEXIS C. OSBURN (*pro hac vice*
                              application forthcoming)
                              Baker & Hostetler LLP
                              PNC Center
                              1900 East 9th Street, Suite 3200

Cleveland, OH  44114-3482
Telephone:      216.621.0200
Facsimile:       216.696-0740

*Counsel for Plaintiffs Extended Stay
Litigation Trust, and Hobart Truesdell and
Walker, Truesdell, Roth & Associates, as
Trustees of the Extended Stay Litigation
Trust*

EXHIBIT 4

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Marc D. Powers
mpowers@bakerlaw.com
Matthew R. Goldman
mgoldman@bakerlaw.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 Case No. |
| EXTENDED STAY, INC. *et al.*, | No. 09-13764 (JMP) |
| Debtors. | (Jointly Administered) |
| WALKER, TRUESDELL, ROTH & ASSOCIATES, as Trustee for and on behalf of the EXTENDED STAY LITIGATION TRUST, | |
| HOBART TRUESDELL, as Trustee for and on behalf of the Extended Stay Litigation Trust, and | Adv. Pro. No. _____ |
| THE EXTENDED STAY LITIGATION TRUST, | |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| THE BLACKSTONE GROUP, L.P., BLACKSTONE HOLDINGS I L.P., BLACKSTONE HOLDINGS II L.P., BLACKSTONE HOLDINGS III L.P., BLACKSTONE HOLDINGS IV L.P., BLACKSTONE HOLDINGS V L.P., BLACKSTONE HOLDINGS I/II GP INC., | |

BLACKSTONE HOLDINGS III GP L.L.C.,
BLACKSTONE HOLDINGS IV GP L.L.C.,
BLACKSTONE HOLDINGS V GP L.P.,
BLACKSTONE REAL ESTATE
PARTNERS IV L.P., BLACKSTONE
CAPITAL PARTNERS IV L.P., BHAC IV,
LLC, BRE/HV HOLDINGS, LLC,
BLACKSTONE HOSPITALITY
ACQUISITIONS, LLC,  PRIME
HOSPITALITY, LLC, DL-DW HOLDINGS,
LLC,  CITIGROUP GLOBAL MARKETS,
INC., BANK OF AMERICA, N.A., and
DOES 1 through 100, inclusive,

Defendants.

Plaintiffs, Walker, Truesdell, Roth & Associates, as Trustee for and on behalf of the Extended Stay Litigation Trust (the "Trust"), Hobart Truesdell, as Trustee for and on behalf of the Trust (collectively, the "Trustee") and the Trust, by the undersigned counsel, hereby file this Complaint, and allege as follows:

## NATURE OF ACTION

1.     The Plaintiffs bring this action to avoid transfers made in connection with the disastrous leveraged buyout (the "LBO") of the Extended Stay, Inc. and Homestead Village LLC family of companies (collectively, the "Company," and including the bankrupt debtor entities identified below) consummated on or about June 11, 2007, to recover damages for securities fraud, and to enforce subrogation rights.  The LBO, which was tainted from start to finish, caused the Company to lose billions of dollars in value between the closing of the LBO and the Company's bankruptcy filings on June 15, 2009 (the "Filing Date"), approximately two years later.  The LBO transaction was the cause of the Company ultimately filing for chapter 11 bankruptcy relief.

2.     The Company, a member of the hotel industry, was a profitable business prior to

the LBO.  After the LBO, however, the Company was burdened with a devastating additional debt load without any corresponding increase in assets.  It was rendered insolvent to enrich a small group of individuals and entities at the expense of the Company's preexisting and future non-LBO creditors.  The Company's preexisting equity holders, all of which were entities affiliated with The Blackstone Group L.P. were paid handsomely for their equity interests using Company assets, while the Debtors were left with crushing debt.  In addition to the debt burden, the Company faced increased severe restrictions on its ability to use and control its own cash flow because of the new terms imposed by the LBO debt.  The end result was that the Company no longer had the liquidity to survive, even in a more ordinary economy than the one that it was shortly about to face.

3.     The Company was exploited by the Sellers and the Buyer and used as a mechanism for assuming the massive debt that would fund the LBO so the Sellers and Buyers would profit at the Company's expense.  The approximately $8 billion dollar purchase price was funded almost entirely by debt the Company was forced to incur.  The purportedly arms-length transaction was anything but, as the grossly inflated purchase price was engineered by the Blackstone-affiliated Sellers looking to maximize their profits, working in concert with a Buyer that assumed little to no risk of loss.  In short, the purchase price that enriched the Sellers was far from justifiable.

4.     Blackstone and its related entities siphoned approximately $2.1 billion in value from the Debtors to Blackstone, rendering them insolvent, undercapitalized and unable to survive, and DL-DW Holdings, LLC purchased the equity in the Company from Blackstone by in essence using property of the Debtors to pay the price, rather than using its own funds.

5.     The Company also paid millions to professionals and lenders for their work in

connection with the consummation of the LBO transaction.   For none of these payments did the Company receive value or a benefit.

6.     Blackstone knew the Company was going to be rendered insolvent by the LBO transaction.  The Information Memorandum (defined below) it prepared for the Company, with the assistance of its professional and agents, included figures and projections for growth rates that were patently unreasonable—and belied by the actual performance of the Company at the time.  Upon information and belief, it is highly likely that Blackstone was well-positioned to, and did, anticipate the downturn in advance of the LBO.

7.     The LBO's failure was foreseeable from the start. Indeed, each of the three rating agencies that looked at the deal came to the same conclusion:  that the total capitalization of the LBO substantially exceeded the value of the Company's assets.   The Company was never, post-LBO, able to meet the financial standards necessary to prevent the lenders from sequestering all cash flow beyond certain specifically budgeted items, which budgeted items did not include even the minimum actual requirements for continuing to operate the business and to timely pay known Company obligations.  The only person who had been willing to bid on the Company at the ostensibly required price was itself a substantially leveraged entity, and one whose principals had little experience in either the hotel industry or in the rarified world of multi-billion-dollar syndicated transactions.   The deal had everything to do with the excesses of the financial marketplace in the last part of the boom years, and nothing to do with the Company's actual financial worth.

8.     The conduct of the Defendants left the Extended Stay entities hopelessly insolvent, inadequately capitalized and not able to pay their debts – even by future borrowing. Meanwhile, billions of dollars were diverted to or for the benefit of the Defendants in the form of

transfers of cash and/or the transfer of liens and pledges in property. The cost of the Defendants' misconduct and their own gains were ultimately born by the Extended Stay entities' creditors. The company predictably filed for bankruptcy approximately two years after the LBO transaction closed.

9.      Through this action, the Trust, established to bring claims against those responsible for the Company's demise as well as those who profited from it, and Trustee seek to recover damages caused by the Defendants and to avoid and recover the value of fraudulent transfers and obligations that were made to or for the benefit of the Defendants.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 157(a) and 1334(b) because the claims asserted arise in, arise under, and are related to the chapter 11 case, *In re Extended Stay, Inc., et al.*, 09-13764 (JMP), pending in the United States Bankruptcy Court for the Southern District of New York.

11.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this civil litigation action arises under the laws of the United States.

12.     Venue is proper pursuant to 28 U.S.C. §§ 1408, 1409, 1391(a)(2), 1391(a)(3), and 1391(b)(2)-(3) because this adversary proceeding arises under and in connection with cases pending under title 11 of the United States Code.

13.     This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A).

14.     Some of the claims asserted herein arise under section 17(a) of the Securities Act of 1933 (the "Securities Act"), and section l0(b) of the Securities Exchange Act of 1934 (the "Securities Exchange Act"), 15 U.S.C. §§ 78j and 77q, and SEC Rule 10b-5, 17 C.F.R. §

240.10b, promulgated thereunder by the SEC, as well as under the laws of the state of New York.  This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, section 22 of the Securities Act, section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, and pursuant to the supplemental jurisdiction of this Court, 28 U.S.C. § 1367.

15.     In respect of those claims, venue is also proper in the Southern District of New York pursuant to section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud and other wrongdoing and/or their effects have occurred within the Southern District of New York, and many of the named Defendants reside in and/or maintain principal executive offices in the Southern District of New York.

16.     In connection with the acts and omissions alleged in this Complaint, the named Defendants, directly or indirectly, used the mail and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### THE PARTIES

**A.     The Extended Stay Litigation Trust, the Trustee and the Debtors**

17.     **The Extended Stay Litigation Trust** is a post-confirmation litigation trust established by the Extended Stay Litigation Trust Agreement, dated as of October 8, 2010 (the "Litigation Trust Agreement") in the United States Bankruptcy Court for the Southern District of New York, Case No. 09-13764 (JMP) (the "Bankruptcy Court").  The Trust Agreement was executed as part of the Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated as of June 8, 2010 and confirmed on or about July 20, 2010 (the "Plan") in the chapter 11 bankruptcy case of *In re Extended Stay, Inc. et al.* (the "Chapter 11 Cases").

18.    The Trust was established for the benefit of the creditors of the Debtors (collectively, the "Litigation Trust Beneficiaries").  Pursuant to the Plan and the Bankruptcy Court Order approving the Plan, the Trust has title to all assets described in Section 1.89 of the Plan, as well as all assets transferred to the Trust pursuant to the "ESI Settlement Agreement," incorporated into the Plan.  These assets include, but are not limited to, any potential claims, causes of actions, charges, suits or rights of recovery of the Debtors and ESI (as defined below) referenced in the Examiner's Report of Ralph R. Mabey, examiner in the Chapter 11 Cases, filed with the Bankruptcy Court on April 8, 2010 (the "Litigation Trust Assets").  In that Examiner's Report, the examiner set forth his assertions of the facts leading up to the Chapter 11 Cases and causes of action that could be asserted against various parties arising therefrom, including the causes of action asserted against the Defendants herein.

19.    Claims against certain specified entities in named capacities are excluded from the Litigation Trust Assets as a result of settlement embodied in the Plan.  Nonetheless, the claims transferred to the Litigation Trust are protected against impairment by, among other things, paragraph 75 of the Confirmation Order, which provides

> 75. Nothing in the Plan, this Order, the ESI Settlement or the ESI Settlement Order will have the effect of impairing, enhancing, or altering either (i) the rights, remedies or defenses (or the enforceability thereof) of any defendant with respect to any rights, remedies, claims, causes of action (or interests therein) that are transferred to the Litigation Trust, or (ii) the rights, remedies, claims or causes of action (or interests therein) of any Debtor or ESI that are so transferred; it being understood that the effect of the Plan, this Order, the ESI Settlement and the ESI Settlement Order is to be "litigation neutral" with respect to all such rights, remedies, defenses, claims and causes of action.

20.    **Hobart Truesdell and Walker, Truesdell Roth & Associates** (collectively, the "Trustee" as defined above) were duly appointed as the Trustee of the Trust in accordance with

and pursuant to the Trust Agreement and the Bankruptcy Court Order confirming the Plan.  The Trustee and the Trust are authorized to commence all claims and causes of action formerly owned by the Debtors, which have now been indefeasibly vested in the Trust, including all causes of action asserted herein.  The Trustee and the Trust exercise all pertinent rights of the Debtors that may be relevant to this Complaint.  The Trustee likewise has standing to assert all claims and causes of action set forth herein as a representative of the Debtors, pursuant to the Plan and the ESI Settlement Agreement, and section 1123(b)(3)(B) of the Bankruptcy Code, to the extent that as to any causes of action herein failed to be transferred to the Litigation Trust because of an enforceable restriction on transferability under applicable non-bankruptcy law, and brings this cause of action in that capacity to the extent of any such failure to transfer.

21.    The  Trustee's principal place of business is located at 380 Lexington Avenue, Suite 1014, New York, New York 10168.  The Trustees were appointed as Trustees of the Trust in New York County, effective as of October 8, 2010.

22.    For purposes of this Complaint, the following entities are the "Debtors:" ESA 2005 Operating Lessee Inc.; ESA 2005 Portfolio L.L.C.; ESA 2005-San Jose L.L.C.; ESA 2005-Waltham L.L.C.; ESA 2007 Operating Lessee Inc.; ESA Acquisition Properties L.L.C.; ESA Alaska L.L.C.; ESA Business Trust; ESA Canada Beneficiary Inc.; ESA Canada Operating Lessee Inc.; ESA Canada Properties Borrower L.L.C.; ESA Canada Properties Trust; ESA Canada Trustee Inc.; ESA FL Properties L.L.C.; ESA Management L.L.C.; ESA MD Beneficiary L.L.C.; ESA MD Borrower L.L.C.; ESA MD Properties Business Trust; ESA Mezz 10 L.L.C.; ESA Mezz 2 L.L.C.; ESA Mezz 3 L.L.C.; ESA Mezz 4 L.L.C.; ESA Mezz 5 L.L.C.; ESA Mezz 6 L.L.C.; ESA Mezz 7 L.L.C.; ESA Mezz 8 L.L.C.; ESA Mezz 9 L.L.C.; ESA Mezz L.L.C.; ESA MN Properties L.L.C.; ESA Operating Lessee Inc.; ESA P Mezz 10 L.L.C.; ESA P

8

Mezz 2 L.L.C.; ESA P Mezz 3 L.L.C.; ESA P Mezz 4 L.L.C.; ESA P Mezz 5 L.L.C.; ESA P Mezz 6 L.L.C.; ESA P Mezz 7 L.L.C.; ESA P Mezz 8 L.L.C.; ESA P Mezz 9 L.L.C.; ESA P Mezz L.L.C.; ESA P Portfolio Holdings L.L.C.; ESA P Portfolio L.L.C.; ESA P Portfolio MD Beneficiary L.L.C. ; ESA P Portfolio MD Borrower L.L.C.; ESA P Portfolio MD Trust; ESA P Portfolio Operating Lessee Inc.; ESA P Portfolio PA Properties L.L.C.; ESA P Portfolio TXNC GP L.L.C.; ESA P Portfolio TXNC Properties L.P.; ESA PA Properties L.L.C.; ESA Properties L.L.C.; ESA TX Properties L.P.; ESA TXGP L.L.C.; ESA UD Properties L.L.C.; ESH/Homestead Mezz 10 L.L.C.; ESH/Homestead Mezz 2 L.L.C.; ESH/Homestead Mezz 3 L.L.C.; ESH/Homestead Mezz 4 L.L.C.; ESH/Homestead Mezz 5 L.L.C.; ESH/Homestead Mezz 6 L.L.C.; ESH/Homestead Mezz 7 L.L.C.; ESH/Homestead Mezz 8 L.L.C.; ESH/Homestead Mezz 9 L.L.C.; ESH/Homestead Mezz L.L.C.; ESH/Homestead Portfolio L.L.C.; ESH/HV Properties L.L.C.; ESH/MSTX GP L.L.C.; ESH/MSTX Property L.P.; ESH/TN Member Inc.; ESH/TN Properties L.L.C.; ESH/TX Properties L.P.; ESH/TXGP L.L.C.; Extended Stay Hotels L.L.C.; Extended Stay, Inc.; and Homestead Village L.L.C.   Because the Plan covered all Debtors other than Extended Stay, Inc., the Debtors, with the exclusion of Extended Stay, Inc., are referred to as the "Plan Debtors."   All of the Debtors filed for bankruptcy on June 15, 2009, except the following Debtors who filed on February 18, 2010: ESH/MSTX GP L.L.C., ESH/TXGP L.L.C., ESA TXGP L.L.C., ESA P Portfolio TXNC GP L.L.C., and ESH/TN Member Inc.

23.     Two of the Debtors are of particular significance.  Extended Stay, Inc. ("ESI") is a Delaware corporation and a Debtor in the Chapter 11 Cases.  A majority of the Debtors' pre- and post-LBO corporate organization was comprised of entities indirectly or directly owned by ESI, including, without limitation, all or substantially all of the real estate investment trust ("REIT")

portion of the Debtors' businesses.  Post-LBO, BHAC Capital IV, LLC ("BHAC Capital") was the direct majority owner of ESI.  At all times relevant to this Complaint, ESI was managed by a board of directors that was comprised exclusively of insiders.  Those directors were affiliated with direct or indirect equity holders of ESI.

24.     Homestead Village, L.L.C. ("Homestead") is a Delaware limited liability company and is a Debtor in the Chapter 11 Cases.  The portion of the Debtors' pre- and post-LBO corporate organization that was not within the ESI corporate chain was comprised of entities indirectly or directly owned by Homestead.   Beginning shortly after the LBO, Homestead was also an owner (although not the sole owner) of BHAC Capital and, therefore, an indirect owner of ESI.  At all times relevant to this Complaint, Homestead was managed by a corporate-style board of directors, had no independent outside directors, and was managed by insiders.

**B.     The Sellers and Blackstone Entity Defendants**

25.     **The Blackstone Group, L.P.** (individually, and in its capacity as a successor-in-interest to and direct or indirect parent of entities and funds within its pre-IPO Real Estate or Corporate Private Equity operations, "Blackstone Group" or "Blackstone") was, upon information and belief, the direct or indirect owner and controlling entity of the nominal sellers in the LBO, a successor in interest to the Blackstone affiliates that were the direct or indirect owners or controlling entities of the nominal sellers in the LBO and an entity that derived a substantial benefit in connection with its IPO as a result of the LBO.

26.     From and after no later than approximately June 18, 2007, Blackstone Group was also the indirect owner of a substantial "rollover equity" interest in the post-LBO Debtors. Blackstone Group is a publicly traded limited partnership, organized under the laws of the State of Delaware.  As of March 31, 2011, according to recent SEC filings, Blackstone Group had

10

managed assets of approximately $150 billion.  Blackstone Group's principal place of business is located at 345 Park Avenue, New York, New York 10154.

27.     At all times relevant to this Complaint, Blackstone's business was organized into four business segments:  Corporate Private Equity, Marketable Alternative Asset Management, Financial Advisory Services and Real Estate.  Upon information and belief, at all times relevant to this Complaint, Blackstone's pre-LBO investment in the Debtors was managed and controlled by a combination of Senior Managing Directors in Blackstone's Real Estate and Corporate Private Equity business segments.  Prior to Blackstone's June 21, 2007 IPO, Blackstone Group's entire business consisted of separately owned predecessor entities controlled directly or indirectly by Blackstone's founders, Stephen Schwarzman and Peter Peterson, and Blackstone's Senior Managing Directors.

28.     On or around March 5, 2004, two Blackstone investment funds, Blackstone Real Estate Partners IV ("BREP IV") and Blackstone Capital Partners IV ("BCP IV" and, together with BREP IV, "BREP/BCP IV"), on their own behalves and on behalf of or through certain entities owned or controlled by BREP/BCP IV, purchased Extended Stay America, Inc. Extended Stay America, Inc. was, at that time, a publicly traded corporation.  In connection with the acquisition, Extended Stay America, Inc. and, upon information and belief, other related entities, were "taken private" by Blackstone and were merged into certain other Blackstone entities, including, BHAC Capital IV, LLC and BHAC Capital Acquisition IV, Inc.

29.     At all times relevant to this Complaint, the Blackstone Real Estate Group managed and controlled around six general real estate opportunity funds.  Upon information and belief, BREP IV was such a fund at the time of the LBO and was the primary fund within which the pre-LBO Debtors and their immediate controlling Blackstone entities (as described below)

11

were organized.  After the LBO and Blackstone's IPO, certain Blackstone SEC filings reference the Blackstone entity that nominally owned Blackstone's "rollover equity" in the post-LBO Debtors as being a part of the "BREP IV" fund.

30.    No later than June 18, 2007, Blackstone Group and its affiliates reorganized their corporate structure in preparation for Blackstone's IPO (the "Blackstone IPO Restructuring"). The Blackstone IPO Restructuring had been planned months before it was actually implemented. Blackstone ultimately went public on June 21, 2007.  These initiatives had been started prior to the LBO's closing and were completed within weeks of the LBO's closing.

31.    Upon information and belief, at all relevant times prior to the Blackstone IPO Restructuring, ESI and Homestead, and their respective subsidiaries and affiliates, including the pre-LBO Debtors, were nominally owned and controlled, directly or indirectly, by numerous Blackstone affiliated entities or funds, including BREP/BCP IV.  Upon information and belief, certain of Blackstone's Senior Managing Directors managed or controlled, for Blackstone's benefit, all aspects of Blackstone's pre-IPO and pre-LBO investment in the Debtors through one or more nominally owned and controlled Blackstone affiliated entities, funds and predecessors-in-interest, including BREP/BCP IV.

32.    In connection with the Blackstone IPO Restructuring and IPO, Blackstone carried out a series of other reorganization transactions.    Blackstone's then-existing owners "contributed" to Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P. and Blackstone Holdings V L.P. (collectively "Blackstone Holdings," identified as Defendants below) each of the operating entities included in Blackstone Group's historical combined financial statements.  Upon information and belief, BREP IV, BCP IV and any other funds or Blackstone affiliated entities that may have directly or indirectly

managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to one or more of the Blackstone Holdings entities.

33.     In connection with the Blackstone IPO Restructuring, four additional entities were established as the immediate parent entities of Blackstone Holdings (collectively, the "Blackstone Disregarded Entities"): Blackstone Holdings I/II GP Inc. (the immediate parent of Blackstone Holdings I L.P. and Blackstone Holdings II L.P.), Blackstone Holdings III GP L.L.C. (the immediate parent of Blackstone Holdings III L.P.), Blackstone Holdings IV GP L.P. (the immediate parent of Blackstone Holdings IV L.P.) and Blackstone Holdings V GP L.P. (the immediate parent of Blackstone Holdings V L.P.).

34.     The Blackstone Group L.P. owns 100% of the equity of the Blackstone Disregarded Entities.  As of the time of the Blackstone IPO, The Blackstone Group L.P. owned no less than approximately 22% of Blackstone Holdings through the Blackstone Disregarded Entities.  As of the time of the Blackstone IPO, certain Blackstone Senior Managing Directors owned no less than approximately 78% of Blackstone Holdings.

35.     After the Blackstone went public, Blackstone's organizational structure was as set forth in the chart attached hereto as Exhibit A and incorporated herein by reference.  Upon information and belief, at all times relevant to this Complaint, the BREP IV and BCP IV funds and their respective affiliated entities were included in the "Operating Entities" identified at the bottom of the post-IPO Blackstone organizational chart set forth in Exhibit A.  Upon information and belief, the post-IPO Blackstone organizational chart set forth in Exhibit A accurately and generally depicts Blackstone's organizational structure as of the date of this Complaint.

36.     In essence, as a result of the Blackstone IPO Restructuring, Blackstone was reorganized as a holding partnership.  Blackstone, through the Blackstone Disregarded Entities,

holds equity interests in Blackstone Holdings, which in turn owns all Blackstone operating entities.  Through the Blackstone Disregarded Entities, Blackstone Group is the sole general partner of all Blackstone Holdings partnerships and, accordingly, operates and controls all business and affairs of Blackstone Holdings and, indirectly, all operating subsidiaries in the Blackstone business enterprise.

37.     After the Blackstone IPO Restructuring and the IPO, management fees, transaction fees, carried interest, incentive fees and other fees received by any subsidiary entities or funds of Blackstone Group and Blackstone Holdings, including BREP IV, BCP IV and BRE.ESH (as defined below – the Blackstone entity that nominally held Blackstone's so-called "rollover equity" in the post-LBO Debtor enterprise), inured primarily to Blackstone Group's benefit and to the benefit of various Blackstone Senior Managing Directors.

38.     At all times relevant to this Complaint, a "real estate investment committee" at the top of Blackstone's Real Estate Group business segment was responsible for reviewing, analyzing and approving all aspects of the LBO.  Upon information and belief, at all times relevant to this Complaint, that real estate investment committee consisted in substantial part of certain Senior Managing Directors in Blackstone's Real Estate and Private Equity operations. As described below, those Senior Managing Directors orchestrated the LBO for Blackstone's benefit.

39.     At all times relevant to this Complaint, Blackstone Group directly or indirectly controlled or participated in, through Blackstone Group Senior Managing Directors and other principals placed into positions of authority within the Debtors' corporate organization, all major business decisions made by or on behalf of the Debtors, including the decision to enter into and implement the LBO.

40.    **Blackstone Holdings I L.P.** is a Delaware limited partnership and one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings I L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements. Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings I L.P., a subsidiary of Blackstone. Blackstone Holdings I L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

41.    **Blackstone Holdings II L.P.** is a Delaware limited partnership and one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings II L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements. Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings II L.P., a subsidiary of Blackstone. Blackstone Holdings II L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

42.    **Blackstone Holdings III L.P.** is a Delaware limited partnership and one of the

Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings III L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements. Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings III L.P., a subsidiary of Blackstone. Blackstone Holdings III L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

43.   **Blackstone Holdings IV L.P.** is, upon information and belief, a limited partnership organized under the laws of Quebec or Canada, and is one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings IV L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements.  Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings IV L.P., a subsidiary of Blackstone.  Upon information and belief, Blackstone Holdings IV L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

44.   **Blackstone Holdings V L.P.** is, upon information and belief, a limited

partnership organized under the laws of Quebec or Canada, and is one of the Blackstone subsidiaries described above that was created in connection with Blackstone Group's IPO. Upon information and belief, in connection with the Blackstone IPO Restructuring, Blackstone's then-existing owners contributed to Blackstone Holdings V L.P. one or more of the operating entities included in Blackstone Group's historical combined financial statements. Upon information and belief, some or all of the assets or liabilities of BREP IV, BCP IV and any other fund or Blackstone affiliated entity that may have directly or indirectly managed or controlled ESI, Homestead or their respective Debtor subsidiaries at any time relevant to this Complaint were "contributed" to Blackstone Holdings V L.P., a subsidiary of Blackstone. Upon information and belief, Blackstone Holdings V L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

45.     **Blackstone Holdings I/II GP Inc.** is a Delaware corporation and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO. Upon information and belief, Blackstone Holdings I/II GP Inc.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

46.     **Blackstone Holdings III GP L.L.C.** is a Delaware limited liability company and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO. Upon information and belief, Blackstone Holdings III GP L.L.C.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

47.     **Blackstone Holdings IV GP L.P.** is a Delaware limited partnership and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO. Upon information and belief, Blackstone Holdings IV GP L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

48.   **Blackstone Holdings V GP L.P.** is, upon information and belief, a limited partnership organized under the laws of Quebec or Canada, and is one of the Blackstone entities described above that was created in connection with Blackstone Group's IPO.  Upon information and belief, Blackstone Holdings V GP L.P.'s principal place of business is located at 345 Park Avenue, New York, New York 10154.

49.   **Blackstone Real Estate Partners IV L.P.** is, or was at all times relevant to this Complaint, a limited partnership organized under the laws of the State of Delaware.  Blackstone Real Estate Partners IV L.P.'s principal place of business is, or was at all times relevant to this Complaint, located at 345 Park Avenue, New York, New York 10154.

50.   **Blackstone Capital Partners IV L.P.** is, or was at all times relevant to this Complaint, a limited partnership organized under the laws of the State of Delaware.  Blackstone Real Estate Partners IV L.P.'s principal place of business is, or was at all times relevant to this Complaint, located at 345 Park Avenue, New York, New York 10154.

51.   **BHAC IV, LLC** ("BHAC IV") was a seller in the LBO.  At the time of the LBO, BHAC IV was an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group.  BHAC IV received distributions in connection with the LBO as a nominal seller in the LBO.  BHAC IV is a limited liability company organized under the laws of the State of Delaware and remains an affiliate of Blackstone Group.  Upon information and belief, BHAC IV is a shell entity that conducts no operations.  BHAC IV's principal place of business is located at 345 Park Avenue, New York, New York 10154.

52.   **BRE/HV Holdings, LLC** ("BRE/HV") was a seller in the LBO.  At the time of the LBO, BRE/HV was an affiliate of Blackstone Group.  BRE/HV received distributions in connection with the LBO as a nominal seller in the LBO.  BRE/HV is a limited liability company

organized under the laws of the State of Delaware and was and remains an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group.  Upon information and belief, BRE/HV is a shell entity that conducts no operations.  BRE/HV's principal place of business is located at 345 Park Avenue, New York, New York 10154.

53.     **Blackstone Hospitality Acquisitions, LLC** ("Blackstone Hospitality") was an affiliate of the sellers in the LBO.  Although it was not itself a "seller" in connection with the LBO, Blackstone Hospitality received significant distributions of cash proceeds in connection with the LBO.  Blackstone Hospitality is a limited liability company organized under the laws of the State of Delaware.  Upon information and belief, Blackstone Hospitality is a shell entity that conducts no operations, but rather is (or at least was) used by Blackstone Group in connection with certain acquisition activities carried out by Blackstone Group in the hospitality industry.  Upon information and belief, Blackstone Hospitality was and remains an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group.  Blackstone Hospitality's principal place of business is located at 102 Townsend Drive, Weimar, Texas 78962.

54.     **Prime Hospitality, LLC** ("Prime") was an affiliate of the sellers in the LBO and Blackstone Group.   Prime was, upon information and belief, a seller of certain assets in connection with the LBO.  Prime is a limited liability company organized under the laws of the State of Delaware. Prime received distributions in connection with the LBO. While those distributions were related, upon information and belief, to a Gwinnett County hotel previously owned by Prime that was being included as an asset in the LBO, the LBO Purchase Agreement contained the provisio that "Neither Company [ESI or Homestead] nor any Subsidiary shall be responsible for the payment of any fees or purchase price in connection with" the conveyance. (LBO Purchase Agreement, Section 5.13.) Upon information and belief, Prime was and remains

19

an affiliate and direct or indirect wholly-owned subsidiary of Blackstone Group. Prime's principal place of business is located at 700 Route 46 East, Fairfield, New Jersey 07004 or 16850 Bear Valley Road, Victorville, California 92395.

55.     BHAC IV and BRE/HV are sometimes referred to herein as the "Sellers." The Sellers together with Blackstone Hospitality and Prime are sometimes collectively referred to in this Complaint as the "Blackstone Seller Entity Defendants." Blackstone Group, Blackstone Holdings, the Blackstone Disregarded Entities, BREP IV and BCP IV are sometimes collectively referred to in this Complaint as the "Blackstone Parent Entity Defendants." The Blackstone Seller Entity Defendants together with the Blackstone Parent Entity Defendants are sometimes collectively referred to in this Complaint as the "Blackstone Pre-LBO Entity Defendants." At all times relevant to the Complaint, the Blackstone Seller Entity Defendants were owned, controlled or dominated in all respects by Blackstone Group, the Blackstone Parent Entity Defendants or Blackstone Group predecessors-in-interest and affiliates, and all business dealings by each of those entities were conducted solely for the benefit of Blackstone Group and to the detriment of the Debtors and their creditors.

**C.     The Professional Defendants**

56.     **Bank of America, N.A. (**"Bank of America"**)** is a national banking association with its principal place of business at 100 N. Tryon Street, Charlotte, North Carolina 28225. Bank of America provided services to the Sellers in connection with the LBO and was paid with Debtor funds.

57.     **Citigroup Global Markets, Inc.** ("Citigroup") is a corporation organized under the laws of the State of Delaware with its principal place of business at 388 Greenwich Street, 17th Floor, New York, New York 10013. Citigroup provided services to the Buyer in connection with the LBO and was paid with Debtor funds.

20

D.     **The Buyer Defendant**

58.     **DL-DW Holdings, LLC** ("DL-DW" or "Buyer") was the nominal buyer of the Sellers' membership interests in BHAC IV and BRE/HV in the LBO.  DL-DW is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 460 Park Avenue, Suite 1300, New York, New York 10022.  DL-DW was formed for the purpose of carrying out the LBO and, all times relevant to this Complaint, was owned or controlled by David Lichtenstein ("Lichtenstein") who, at all times relevant to this Complaint, was the Chairman of the Board of Directors and Chief Executive Officer and President of the Debtor entities.  Following the closing of the LBO, DL-DW was the sole direct member of Homestead and exercised at least indirect ownership or control over BHAC Capital, the majority shareholder of ESI, and ESI.

59.     The true names and capacities of Defendants, sued as DOES 1 through 100, inclusive, are presently unknown to the Plaintiffs.  The Plaintiffs, therefore, sue those Defendants under such fictitious names.  When their true names and capacities are ascertained, leave will be asked to amend this Complaint by inserting the same.  The Plaintiffs are informed and therefore believe that each of the fictitiously named Defendants received certain of the transfers that are the subject of this complaint or are the entities for whose benefit the transfers were made, and are responsible for the return of them.  Each reference in this Complaint to Defendant or Defendants refers also to all Defendants sued under fictitious names.

## **FACTS COMMON TO ALL COUNTS**

A.     **The Debtors Were Profitable Prior to the LBO**

60.     Prior to the LBO, the Debtors owned the leading mid-priced extended-stay hotel business in the United States, with 684 hotels located in 44 states.  Prior to the LBO, the Debtors were profitable and able to pay their debts in the ordinary course of business.  The Debtors'

financial performance from 2005 through the date of the LBO was generally positive.   The Debtors' business was encumbered by secured debt totaling approximately $3.3 billion and mezzanine debt totaling approximately $2.1 billion.   The Debtors also owed approximately $39 million to certain subordinated noteholders.

61.     Prior to the LBO, the Debtors' corporate organization was similar to their organization after the LBO.   All or substantially all of the Debtors' entities and operations ran through either the Homestead or ESI corporate ownership chain, as described above.   Homestead and ESI were directly and nominally owned by BRE/HV and BHAC IV, respectively.   BRE/HV and BHAC IV were, in turn, directly or indirectly owned and controlled by Blackstone Group (or Blackstone Group's predecessors-in-interest, as described above), their ultimate parent and the ultimate parent of all pre-LBO entities related to the pre-LBO Debtors and relevant to this Complaint.

62.     By the end of 2006, the Debtors' portfolio of hotels had an average age of approximately 7.5 years, though many of the hotels were around nine years old and were showing signs of significant wear and tear.   In January 2007, the Information Memorandum, was prepared to provide information to a limited number of parties regarding a possible acquisition of "Extended Stay Hotels" (the "Information Memorandum," as described and discussed more fully below).   The Information Memorandum was created by Blackstone Group, Bear Stearns & Co., Inc., Banc of America Securities LLC and Merrill Lynch & Co., Inc., and characterized the hotels' condition as "excellent."   But it was or ought to have been clear to Blackstone, the Blackstone Parent Entity Defendants, the Sellers, the Debtors' pre-LBO management and others involved in the LBO that substantial capital expenditures would be needed in the near future.

63.     Pre-LBO, the Debtors' hotel properties were managed by HVM, L.L.C.

("HVM"). The Debtors' hotels were then operated under six different brand names, although Blackstone had begun re-branding the portfolio to change all of the properties to one of three names: ExtendedStay Deluxe, ExtendedStay America, or ExtendedStay Economy.  Around one-third of the portfolio remained to be re-branded at the time Blackstone commenced efforts to sell the pre-LBO Debtors.  At the time, the cost to conclude the re-branding was expected to be substantial, although those costs were never provided for in the post-LBO budgets.

64.      While economic trends in the hospitality industry generally had been positive in the years leading up to the LBO, certain of those trends reversed in late-2006 and continued to decline in early-2007.  This led some analysts to project a downturn in the hospitality industry as a whole for the near-term.  In certain key industry performance metrics at the time, the Debtors lagged behind their competitors during 2006.

65.      It was or ought to have been clear to the Blackstone Parent Entity Defendants, the Sellers and others involved in preparing to market the LBO that (i) the Debtors' financial performance was declining in early 2007 as part of industry and economic trends that had begun in 2006, (ii) those trends were likely to continue after the LBO concluded, and (iii) the Debtors were already lagging behind their competitors.

**B.      Blackstone Decides to Sell the Debtors**

**1.      Blackstone Prepares and Circulates an Information Memorandum that Contains Intentionally Misleading Financial Information and Projections Designed to Sell the Debtors Prior to Blackstone's IPO**

66.      Blackstone commenced its marketing effort by preparing the Information Memorandum for a sale of ownership of the Debtors as part of "Extended Stay Hotels."  Upon information and belief, preparation of the Information Memorandum began during the latter half of 2006.  The timing of Blackstone's decision to sell the Debtors was driven in part, upon information and belief, by Blackstone's initial public offering, or IPO, which was imminent at

the time.  The Information Memorandum prepared and circulated by Blackstone to assist with disposing of the Debtors contained materially false and misleading statements.

67.     Blackstone filed its IPO registration statement with the SEC on or around March 22, 2007.  Blackstone ultimately went public on June 21, 2007, eleven days after the LBO closed.  Upon information and belief, Blackstone wanted to carry out the sale of the Company prior to the IPO and stood to enhance its IPO valuation.

68.     The Information Memorandum represented that it was prepared from information furnished by the Debtors and from publicly available sources.  However, upon information and belief, Blackstone Group with the assistance of its professionals and advisors (i) created or compiled the financial information and projections in the Information Memorandum, (ii) prepared the non-financial, narrative content of the Information Memorandum, and (iii) was responsible for distribution of the Information Memorandum to potential buyers.

69.     The Information Memorandum contained an overview of the Debtors, and the reasons why Blackstone Group claimed the Debtors were a good investment opportunity for buyers.  The Information Memorandum represented that Extended Stay would increase revenues through re-branding, marketing and acquisition initiatives.  Blackstone and the others involved in the marketing of the Debtors knew or should have known at all relevant times that these initiatives could be successful only if the Debtors were left with sufficient capital and liquidity after the transaction to implement them.

70.     Prior to the LBO, the Debtors' capital expenditures generally fell into two categories.  The first category was maintenance associated with 444 hotels that were initially branded as "Homestead" or "Extended Stay America."  As to those 444 hotels, the five year historical investment in maintenance capital expenditures averaged approximately 4.3% of

revenues, or $145.3 million in the aggregate from 2002 to 2006.  The second category was capital upgrades for the Debtors' remaining 238 hotels – branded as StudioPlus, Crossland, Wellesley and others.  As to those 238 hotels, capital expenditures totaled approximately $129.6 million from 2004 to 2006.  Total capital expenditures as a percentage of revenues were, in fact, approximately 10.2% for 2006 and 8.3% for 2005, both of which were significantly higher than the 4.5% projected capital expenditure levels that were set forth in the Blackstone Information Memorandum.  Indeed, actual capital expenditures for the period from January 2007 through June 10, 2007, the eve of the LBO, were approximately 5.3% of revenues, higher than that projected by the Information Memorandum.

71.    The Information Memorandum contained materially misleading projections regarding the Debtors' future financial performance.  The Information Memorandum projected total revenue and property-level EBITDA growth rates of approximately 9.84% and 13.35%, respectively.   However, Blackstone knew or should have known that the Debtors' actual financial performance at the time was, and was expected to be in light of performance trends in late-2006 and early-2007, well below the projections set forth in the Information Memorandum.

72.    Upon information and belief, all of this information was available to the Defendants involved in the transaction prior to the LBO's closing.  At the time, the Debtors used Smith Travel Research ("STR") reports to benchmark their aggregate financial performance against the Debtors' chosen competitive set.  On a weekly basis, the Debtors reported their hotel activity to STR. STR then provided the Debtors with weekly trend reports that displayed up to six years of monthly performance data for the Debtors and their competitors.

73.    The STR reports, and other weekly financial reports shared with the Blackstone Pre-LBO Entity Defendants, included detailed analyses regarding the Debtors' basic financial

performance metrics, including occupancy rates (or "OCC:" the quotient of the total number of nights stayed by all customers divided by the total available room nights), average daily rate ("ADR:" the quotient of total room revenues divided by occupied room nights (which provides the "room rate" for all occupied rooms)), revenue per available room ("RevPAR:" the product of OCC and ADR, which shows the revenue efficiency of a hotel), demand (the total of all room nights stayed by all hotel customers), and supply (the product of total available rooms and the number of total days in a year). The STR reports also measured each hotel property's performance, and the aggregated performance of the chosen competitive set with indices and rankings. In light of these, and other reports, the Blackstone Pre-LBO Entity Defendants knew or should have known that the projections they were presenting in the Information Memorandum were unachievable and, therefore, misleading.

74. The projections contained in the Information Memorandum also improperly accounted for significant operating expenses, upon information and belief, so as to "hide" those expenses and make the operating hotels appear to be more profitable than they actually were. Among other things, the Information Memorandum inappropriately placed a significant amount of property-related expenses, including occupancy taxes, "above the line" at the corporate level. This had the practical effect of overstating the net operating income of the hotel properties. Since the lenders were prepared to lend based upon the property-level financial performance of the hotels, the effect of this misstatement was to increase the available debt in the LBO to amounts which would be impossible for the Debtors to service.

75. Likewise, the growth projections in the Information Memorandum were ostensibly based upon the post-LBO Debtors having adequate capital and liquidity to complete the re-branding, marketing and other initiatives that had been commenced by Blackstone prior to

the LBO, as detailed in the Information Memorandum.   However, based upon information available at the time, the Blackstone Pre-LBO Entity Defendants (i) knew or should have known that the numbers contained in the Information Memorandum were inaccurate, (ii) nevertheless intended that prospective buyers rely upon those misleading numbers, and (iii) knew or should have foreseen that, given the artificially increased debt to be imposed upon the Debtors in connection with the transaction (including the increased debt attributable to overstatement of net operating income, as described above), the post-LBO Debtors would not have sufficient capital or liquidity to carry out these strategies.

76.     The Blackstone Pre-LBO Entity Defendants and the Debtors' senior management knew or should have known that the Information Memorandum contained false and misleading financial information, as well as false, misleading, and unachievable projections.

### 2. The Stapled Financing Package Attached to the Information Memorandum Anticipated a Much Smaller Debt Load than the LBO Ultimately Imposed

77.     Blackstone had arranged for so-called "stapled financing" through several lenders (collectively, the "Stapled Financing Lenders") in connection with the LBO.  "Stapled" financing refers to a financing package that is "stapled" to an offering memorandum and is available to a buyer for a specific transaction.  Among other things, the stapled financing typically indicates the expected debt capacity of the business being sold, and how much equity the buyer will need to provide to obtain the stapled financing.

78.     The Stapled Financing Lenders were prepared to finance up to $6.8 billion of the purchase price for a transaction. The stapled financing provided that the loan-to-value ratio could not exceed 87.5% when combined with the assumption of certain capital lease obligations of $200 million.  As described more fully below, the loan-to-value ratio following the eventual LBO's closing was at least 95%, substantially more than that contemplated by the stapled

financing attached to the Information Memorandum.  This additional debt was fatal to the Debtors' continued profitable existence.

3.  **Lichtenstein "Wins" an Accelerated Bidding Process After Woefully Inadequate Due Diligence**

79.  Blackstone coordinated the distribution of the misleading Information Memorandum to approximately 150 potential buyers.  Lightstone Holdings, LLC, The Lightstone Group, LLC, and Lightstone Commercial Management (collectively "Lightstone") and an affiliate of Arbor Commercial Mortgage, LLC ("Arbor"), among others, signed confidentiality agreements in February 2007, permitting them access to due diligence information.

80.  Around that same time, Blackstone informed potential purchasers that written, non-binding indications of interest had to be submitted within an accelerated time frame.  Upon information and belief, Blackstone accelerated the time frame for bid submission (versus a typical time frame for a transaction of the LBO's size and complexity) in an attempt to coordinate the LBO closing with the launch of Blackstone's IPO planned for June 2007.

81.  Citigroup or an affiliate of Citigroup was at the time engaged, or about to be engaged, as one of two Global Coordinators on Blackstone's IPO, at the same time as it was acting as the Buyer's advisor for the LBO.  This engagement meant Citigroup would share with Morgan Stanley the largest split of the approximately $170 million of fees associated with the IPO, as well as have the ability to purchase a significant number of Blackstone IPO shares on "insider" terms.  Citigroup had a vested interest in the success of the Blackstone IPO.  Upon information and belief, Citigroup and some or all of Blackstone's other professionals sought to optimally position Blackstone prior to its going public, and to do so by, among other things, announcing around the time of the IPO, the consummation of a large, marquee sale of the

"Extended Stay Hotels family of companies," for which Blackstone stood to reap substantial gains above its original equity investment.

82.     Upon information and belief, Citigroup and Blackstone were therefore highly motivated to identify a buyer willing to pay a significant premium to the then-current value of the Company.  Fortunately for Citigroup and Blackstone, there was a client in Citigroup's client base that would serve as the "mark:"  Lichtenstein.

83.     Citigroup brought Lichtenstein into the deal in or around February 2007. Thereafter, Citigroup was instrumental in encouraging Lichtenstein to embark on the LBO, and was instrumental in keeping Lichtenstein in the deal.  Citigroup assured Lichtenstein that it had previously underwritten the properties to be acquired in the LBO, that the deal was "substantiated" by an appraisal, and that Citigroup's team had already vetted the deal.  Indeed, when Lichtenstein commissioned an independent valuation of the Company which contradicted the information and projections in the Information Memorandum, Citigroup dismissed that valuation and questioned Lichtenstein's judgment in relying on a relatively obscure source over the collective "wisdom" of Citigroup and the other financial institutions involved in the deal. Lichtenstein, ultimately, did not care, as the LBO was to be done using funds borrowed by the Debtors, and Lichtenstein and his affiliates were going to put little cash into the deal.

84.     On or around March 1, 2007, Blackstone received four indications of interest, including one from Lichtenstein that proposed to pay $7.6 billion.  Subsequently, the field was narrowed further to the two parties willing and able to consider concluding a transaction within a short time frame imposed by Blackstone.  On March 25, 2007, Blackstone and its advisors demanded that definitive proposals for a transaction be submitted by the remaining potential buyers by no later than April 11, 2007.

85.     On April 12, 2007, Lightstone formally offered to purchase 100% of the membership interests of one or more of the Sellers for $8 billion, net of the assumption of certain capital lease obligations.  This was the only definitive proposal Blackstone received.  Blackstone quickly accepted Lightstone's proposal.

86.     On or around April 17, 2007, DL-DW and the Sellers executed a definitive acquisition agreement (the "Acquisition Agreement").   Under the terms of the Acquisition Agreement, BHAC agreed to sell to DL-DW 100% of BHAC's membership interests in BHAC Capital, the parent company of ESI.   Under the terms of the same Acquisition Agreement, BRE/HV agreed to sell to DL-DW 100% of BRE/HV's membership interests in BRE/Homestead Village L.L.C. ("BRE/Homestead").  Upon information and belief, BRE/Homestead was the pre-LBO name of Debtor Homestead.  Upon information and belief, Lichtenstein and/or Lightstone changed the entity name from "BRE/Homestead Village L.L.C." to "Homestead Village, LLC" on or shortly after the LBO closing.

87.     Lightstone proposed to finance the overwhelming majority of the purchase price with debt of $7.4 billion and, at best, cash of only $400 million into the deal.   This cash component was used to pay Blackstone and closing costs.  The amount was therefore woefully insufficient to support the artificially inflated purchase price and the future needs of the now highly leveraged company.  An additional equity amount of $200 million was "rollover equity" provided to BRE.ESH for Blackstone's benefit.  That interest did not represent any new cash or other value for the Debtors.  The $200 million of Blackstone "rollover equity" in the "new" Debtors was included because it was the only way to reach the $8 billion purchase price insisted upon by Blackstone.

88.     Notwithstanding the dangerous debt levels of the proposed LBO, the sale was

nevertheless structured to allow the Buyer's insiders to siphon value from the post-LBO Debtors regardless of their performance. One of Lichtenstein's affiliated entities was to reap substantial "asset management" fees post-LBO, even though HVM was to continue managing all aspects of the Debtors' day-to-day business. The sale proposed a cash management system that would allow post-LBO equity holders to receive improper distributions from the Debtors even if the Debtors' financial condition deteriorated. And, the Buyer obtained ownership of the Debtors while putting in little cash.

89.     Blackstone, at best, turned a blind eye to the post-LBO structure because Blackstone was eager to strip out $1.9 billion cash from the Debtors while maintaining a post-LBO equity interest that Blackstone would receive in the LBO in exchange for nothing. Counsel advising the Debtors in the transaction was simultaneously representing Blackstone Group and Blackstone Group affiliates in the same transaction.

90.     The financial institutions advocating and knowingly participating in the transaction sought the significant fees they would receive in connection with financing the transaction. Those financial institutions were also planning to simply sell the debt as soon as the LBO closed, and thereafter have no risk for the failure they knew or should have known was likely to occur.

91.     Moreover, upon information and belief, the financial institutions agreeing to fund the LBO had long-standing relationships with Blackstone and sought to curry favor with Blackstone so as to cement possible roles in Blackstone's IPO and possible future transactions Blackstone might carry out with respect to its portfolio companies. Indeed, affiliates of Wachovia (as defined below) and Bank of America, among others, each were involved in Blackstone's IPO.

92.     Three rating agencies, Fitch Ratings ("Fitch"), Standard & Poor's ("S&P") and Moody's Investors Service ("Moody's"), issued presale reports relating to the securitization of the $4.1 billion of senior secured debt.  In these reports, each of the rating agencies noted that the total debt of the LBO substantially exceeded the value of the Company's underlying assets.

93.     Specifically, Fitch, S&P, and Moody's concluded that the LBO total was, respectively, 141.6%, 153.4% and 158.4% of the value of the Company's underlying assets.  In fact, these three rating agencies approximated the loan-to-value of the senior secured debt alone to be in the range of 78.4% and 87.8% of the value of the Company's underlying assets.

94.     These three rating agencies also estimated the implied value of the Company to be substantially <u>less</u> than the approximately $8 billion purchase price.  According to these third-party rating agencies, the $8 billion purchase price exceeded the Company's actual value by approximately $3 billion.

95.     Upon information and belief, the parties involved in negotiating, documenting and closing the LBO knew or should have known of the rating agencies' likely determinations well in advance of the LBO's closing.

96.     Lichtenstein later aptly summarized the improper conduct of the various parties involved in formulating the LBO and their attitudes about what was about to be done to the Debtors and their creditors:

> at the end of the day, nobody put a gun to my head and said sign the documents. But it was like a lot of— it was - it was a brew that was cooked with a lot of people's help. Like the banks just said it's not - you know, blow the damn stuff out. It's - we really don't care, just sell the paper as fast as you can. Citibank just said pay us as many fees as you can. And I said I'm getting 95, 99 percent financing. Okay? So it was a combination; there were a lot of people who [erred] here.

97.     In short, no one involved at the time was looking out for the Debtors' interests.

**4.     The LBO Debt Increases Prior to Closing**

98.     The initial Acquisition Agreement required that most of the pre-LBO debt be satisfied by DL-DW at closing of the LBO, including two sets of subordinated notes owed by ESI at the time.  One set, known as the "9.15% Notes," was due on March 15, 2008 (only nine months later) and totaled approximately $31 million.  The second set, known as the "9.875% Notes," was due in June 2011 and totaled approximately $8.2 million.

99.     However, on May 31, 2007, on the eve of the LBO's closing, the parties entered into an Amendment to the Acquisition Agreement in which they removed entirely any obligation to ensure that the outstanding subordinated notes were paid off as part of the LBO.  Thus, when the LBO closed, no funds were escrowed to pay those notes, the notes remained unsatisfied and were reflected on the June 11, 2007 balance sheet of the "new" Debtors as assumed obligations.

100.     Although Lightstone's April 12, 2007 LBO proposal had contemplated that certain capital lease obligations would be assumed by the Buyer in the LBO, and that the post-LBO Debtors ultimately would purchase the hotel properties to which the capital lease related, this, similarly, did not happen.  As a result, and as described more fully below, the landlord under that capital lease declared defaults under that lease within a few days after the LBO closed.

**C.     The LBO Closes, Blackstone Receives Approximately $2.1 Billion of Value and the Debtors Receive Nothing But Substantial Additional Debt and a New Owner With No Hotel Industry Experience**

**1.     The Debtors' Post-LBO Corporate and Debt Structure Generally**

101.     The LBO closed on June 11, 2007 at the law offices of Blackstone and the pre-LBO Debtors' counsel, Simpson Thacher & Bartlett LLP, both located in New York, New York.

102.     In connection with the closing of the LBO and the terms of the Acquisition Agreement, on or about June 11, 2007, BHAC and DL-DW executed an agreement under which BHAC transferred all of its limited liability membership interests in BHAC Capital to DL-DW.

103.     Also on June 11, 2007, and also in connection with the closing of the LBO and

33

the terms of the Acquisition Agreement, BRE/HV and DL-DW executed an agreement under which BRE/HV transferred all of its limited liability membership interests in BRE/Homestead (later renamed Homestead), to DL-DW.

104.    On or around June 29, 2007, the Debtors' ownership structure was "restructured," as had been contemplated previously by the Buyer.  Pursuant to that planned "restructuring," DL-DW's direct membership interests in BHAC Capital were transferred to Homestead.   In addition, several of the LBO Buyer Entity Defendants invested in BHAC Capital and, therefore, received a percentage of BHAC Capital's membership interests, resulting in DL-DW's and, indirectly, Homestead's membership interests in BHAC Capital, being reduced.   Upon information and belief, the new investors in BHAC Capital paid less than fair consideration or reasonably equivalent value for their membership interests in that entity.

105.    A chart showing the Debtors' corporate organizational structure following the restructuring described in the preceding paragraph is attached as Exhibit B and incorporated herein by reference.   Upon information and belief, the corporate organizational structure described in Exhibit B hereto existed until the Debtors eventually (and inevitably) filed bankruptcy beginning on June 15, 2009.

106.    The Debtor's post-LBO debt structure can be summarized as follows: (a) a mortgage loan in the amount of $4.1 billion, secured by encumbrances on the mortgaged properties; and (b) ten tranches of mezzanine loans, in an aggregate amount of $3.3 billion, each tranche owed by an indirect owner of the operating hotels secured by the equity in the borrower beneath that owner. The debt structure was designed to permit the securitization of the mortgage loan by the mortgage lenders' sale of so-called "CMBS" (commercial mortgage backed securities) to third parties, many of which currently are Litigation Trust Beneficiaries.

### a. The Mortgage Loan Structure

107.  The mortgage loan agreement was between the mortgage lenders and 21 mortgage borrowers, as summarized on the chart attached hereto as Exhibit C and incorporated herein by reference.  All but three of the mortgage borrowers owned properties.  The parent entities of the three non property-owning mortgage borrowers were also parties to, but not borrowers under, the mortgage loan agreement.  In addition, four Debtor operating lessee entities were parties to, but not borrowers under, the mortgage loan agreement.  The mortgage borrowers signed a single consolidated mortgage note in the amount of $4.1 billion, and the mortgage borrowers were jointly and severally liable for the mortgage debt.

108.  Each of the 18 property-owning mortgage borrowers and property owners secured the mortgage loan by first-priority encumbrances on their respective properties.  The mortgage lenders, however, did not begin perfecting their mortgage liens with appropriate filings until June 22, 2007, and continuing thereafter through at least July 2007.  The mortgage loan agreement, mortgage note, and related security instruments were cross-collateralized and cross-defaulted.  Therefore, upon information and belief, although the entities that actually owned the Debtors' hotel properties were not all borrowers under the new mortgage loan agreements, all properties owned by any of the Debtors were nevertheless directly pledged as collateral for the mortgage loans.  Upon information and belief, the entities that owned the hotel properties received none of the mortgage loan proceeds and, like the rest of the Debtors, received no value from the LBO.

### b. The Mezzanine Loan Structure

109.  Ten mezzanine loan agreements, labeled A to J, were executed in connection with the LBO.  The total mezzanine debt borrowed in the LBO was approximately $3.3 billion.  Each mezzanine loan agreement was between the applicable mezzanine lender and three equal-level mezzanine entities, one from each of the three ownership chains, as reflected on the chart

35

attached as Exhibit D and incorporated herein by reference.  Each of the 10 mezzanine loans (collectively, the "Mezzanine Loans") was structured as follows.  A set of three mezzanine borrowers signed a single consolidated mezzanine note in the amount of that particular mezzanine loan.  Each of the three mezzanine borrowers was jointly and severally liable under that mezzanine note and mezzanine loan agreement.  Each of the three mezzanine borrowers was "the legal and beneficial owner of all direct interests in" the entity beneath it (which, except for the Mezzanine A borrowers, was always a mezzanine borrower in the next level of mezzanine loan).

110.   Each mezzanine borrower entered into a pledge and security agreement in connection with the LBO granting the mezzanine lender a first priority security interest in its equity interests in the borrower directly beneath it in its respective ownership chain, in an account that would be used to hold payment funds, and in certain proceeds.  The mezzanine borrowers were essentially shell entities that simply held equity interests in other shell entities (except for the lowest level of mezzanine borrowers – the Mezzanine A borrowers – who were shell entities that, with limited exceptions, directly owned the Mortgage Borrower entities, i.e., the entities in which the hotel real estate and related operating assets actually resided).  The mezzanine borrower entities (collectively, the "Mezzanine Borrowers") served no practical purpose other than to facilitate the existence of multiple levels of mezzanine loans.

111.   Although the Mezzanine Loans did not directly encumber the mortgaged hotels and the hotels' owner entities were not borrowers under the Mezzanine Loans, the mezzanine loan structure indirectly and improperly gave the mezzanine lenders subordinate interests in the hotels.  The Mezzanine Loan structure (i) caused or allowed the mezzanine lenders to be paid directly from the proceeds of the operating hotels out of the Cash Management Account (as

defined and described below), (ii) required the most junior mezzanine lender's approval of the Debtors' proposed annual budget even though the most junior mezzanine lender was not a lender to the mortgage borrowers, (iii) required the Mezzanine Borrowers to repay the Mezzanine Loans before any mortgaged properties could be released, and (iv) provided that, if any mortgage borrower paid more than its allocable share of the mortgage loan, such mortgage borrower could not exercise its contribution rights against other mortgage borrowers unless the Mezzanine Loans were paid in full.  Moreover, as alleged below, debt service on the Mezzanine Loans was set up to be paid from the Cash Management Account before certain critical operating expenses.

112.   As described above, the rating agencies reviewing the LBO, even prior to its consummation, concluded that the Debtors' value was woefully insufficient to support the mezzanine loans on the date the LBO closed.

c.   **The Cash Management Account**

113.   The LBO imposed requirements that all cash generated by the hotels would be swept and used to pay debt service on both the new mortgage loans and the new Mezzanine Loans, even though the entities that owned the hotels were neither borrowers nor obligors under the Mezzanine Loans.   Those requirements were reflected in the main cash management agreement ("Cash Management Agreement") executed in connection with the LBO that established a "Cash Management Account."   That Cash Management Account was in the name of "ESP P Portfolio LLC [a Debtor] for the Benefit of Wachovia Bank" ("Wachovia").   The Cash Management Account was located at Wachovia at all times relevant to this Complaint.

114.   The mortgage lenders were granted a first priority security interest in the Cash Management Account.   The mortgage borrowers, property owners, operating lessees, and HVM, as the Debtors' management company, were required to deposit all rents, receipts payable, and all other amounts received in connection with the hotels' operations into applicable property and

clearing accounts, which were to be swept daily into the single, commingled Cash Management Account.  Distribution of funds from the Cash Management Account was governed by the Cash Management Agreement.

115.    The mezzanine loan agreements acknowledged that the Cash Management Account was controlled by the mortgage lenders.  Provided no event of default had occurred, the mortgage lenders were to apply all funds in the Cash Management Account in accordance with the Cash Management Agreement.  Although the mezzanine lenders had no direct interest in the hotels, the mezzanine lenders were nevertheless paid directly with funds from the commingled Cash Management Account, which contained cash assets of the operating hotels only.  The funds did not belong to the Mezzanine Borrowers (as described below).  The mezzanine lenders were nevertheless paid with those funds, prior to the payment of critical hotel operating expenses.

116.    The Cash Management Agreement contained detailed requirements regarding the flow of funds through the cash management system.  Numerous subaccounts of the Cash Management Account (each a "Subaccount") were maintained by the agent for the mortgage lenders on a ledger-entry basis.  All such Subaccounts were merely book entries, and all the funds were commingled in the single Cash Management Account at all times relevant to this Complaint.  On each business day, the agent for the mortgage lenders was required to apply all funds on deposit in the Cash Management Account in the amounts and according to the priorities set forth in the Cash Management Agreement.  A chart showing the flow of funds through the Debtors' post-LBO cash management system is attached as Exhibit E and incorporated by reference.

### d.    Pertinent Guarantee Obligations of the Debtors' Insiders

117.    Lichtenstein, Lightstone, ESI and Homestead (collectively, the "Guarantors") executed guarantees in favor of the respective lenders, guaranteeing certain of the respective

borrowers' obligations under the mortgage loan and each mezzanine loan.  The Guarantors were liable under the guarantees to the extent of the lenders' damages arising out of various "bad boy" circumstances, including: (a) the borrowers' breach of any of the special purpose entity/separateness covenants (described below); and (b) the borrowers' filing for bankruptcy. To the extent the Guarantors' obligations were triggered by a borrower's bankruptcy filing, the Guarantors' aggregate liability was capped at $100 million.

### e.    Blackstone's Improper Receipt of Loan Proceeds

118.    At closing, the Sellers, who were owned, controlled, managed or dominated by Blackstone Group at the time, instructed that the funds borrowed by the Debtors in the LBO were to be used to retire certain, but not all, existing debt and pay the Sellers' fees and expenses associated with the transaction.  After retiring some, but not all, of the existing pre-LBO debt and paying the Sellers' fees and expenses associated with the LBO, the Sellers, which were Blackstone affiliates, received cash totaling nearly $1.9 billion (apart from Blackstone's rollover equity interest), as follows:

### Blackstone Entities' Cash Receipts

| | | |
|---|---|---|
| BHAC IV, LLC | Purchase Price payable to Seller | $1,282,764,450 |
| Blackstone Hospitality Acquisitions LLC | Purchase Price payable to Seller | $489,546,290 |
| Prime Hospitality LLC | Balance of the Gwinnett purchase price after payment of debt costs and closing costs | $4,110,604 |
| BHAC IV, LLC | Earnest Money Deposit payable to Seller | $85,611,012 |
| **Blackstone Entities' Cash Receipts** | **Total** | **$1,862,032,356** |

The reference above to cash receipts by Prime for the Gwinnett purchase price relates to a hotel that was owned by a Blackstone affiliate.  The Gwinnett hotel was included in the hotels sold to

the Buyer.  The closing of the Gwinnett property sale occurred simultaneously with the closing of the LBO.  In addition, even though Blackstone Hospitality was not a seller under the Acquisition Agreement, it received over $489 million of loan proceeds.

119.    The borrower Debtors were not required under the Acquisition Agreement to pay the purchase price to the Sellers.  That was the Buyer's responsibility.  Moreover, as described below, under the loan agreements the Debtors appear to have been *prohibited* from using loan proceeds for that purpose, even though everyone knew that the money being borrowed by the Debtors was the only source of funding for the LBO purchase price.  Nevertheless, all Defendants caused the Debtors to improperly pay the purchase price on the Buyer's behalf with substantial borrowings the Debtors were obligated to repay.  Upon information and belief, the Debtors then were caused to improperly, and in violation of the loan agreements, distribute these funds to the Blackstone Pre-LBO Entity Defendants even though they no longer owned the Company.

120.    In addition to the payments made to the Blackstone Pre-LBO Entity Defendants described above, the Debtors used borrowed funds to pay a total of no less than approximately $150 million of fees and other amounts to the lenders, professionals and advisors involved in the deal.  Those fees included lender loan and underwriting fees, so-called "hedge costs," property specific escrowed amounts, which included taxes, insurance, escrow fees, an interest payment due at closing, environmental fees and holdbacks, certain reserves, title-related expenses and the professionals' fees incurred by all involved parties.

           **f.**     **The Debtors Become Encumbered by Substantial Additional Debt for Blackstone's Benefit**

121.    All but $200 million of the $1.9 billion in payments to the Blackstone Group entities identified above came from loans made to the Debtors that they were unable to repay,

and that rendered them insolvent and undercapitalized at closing.  The total post-LBO mortgage debt borne by the Debtors (for Blackstone's benefit) increased over pre-LBO levels by $749.4 million and the total mezzanine debt increased over pre-LBO levels by $905.3 million.

122.   After the LBO, the Debtors were overleveraged as a result of being subject to a significantly greater amount of debt than they were immediately prior to the LBO.  Virtually all of the Debtors' assets were over-leveraged.  The Debtors' debt load was significantly higher than that typical for hospitality REITs at the time.  Given these facts, the Defendants involved in the transaction or with the Debtors at the time knew or should have known that the Debtors would have no cash for necessary operating, marketing, maintenance, capital improvements and other expenditures, and no ability to secure additional loans or liquidity to meet their ongoing needs.

123.   The borrowing capacity of the Debtors post-LBO was almost non-existent. Although the Debtors did maintain a working capital reserve of approximately $50 million, a pre-LBO line of credit in the amount of up to $105 million that previously provided for hotel acquisition funding was not available post-LBO.  Moreover, there were no provisions in the limited liability company agreements for DL-DW or BHAC to make additional capital calls from any investors after the LBO's closing, nor were there any commitments for capital infusions in the loan agreements.  Therefore, the liquidity needed for capital expenditures, maintenance, upgrades, re-branding and expansion (all of which were critical if the Debtors were to have any chance whatsoever to achieve the financial performance "projected" by Blackstone in the Information Memorandum) was likely, and foreseeably, unavailable.

124.   The parties involved in the LBO attempted to justify their conduct with an appraisal of the Debtors' assets, performed by HVS International ("HVS"), which purported to value the Debtors' assets at approximately $8 billion.  That HVS appraisal was flawed for the

following reasons, among others: the projected total revenue growth was overstated; the appraisal improperly assumed that the Debtors' room expense rate would continue to decrease; EBITDA growth was unreasonably projected; the appraisal assumed financing, which was much less expensive than actually incurred in the LBO; and the appraisal's projected capital expenditures were dramatically underestimated.

125.    As a result of the foregoing, among other errors, the value of the mortgage properties contained in the HVS appraisal was grossly overstated. The parties involved in the LBO knew or should have known the HVS appraisal was flawed, resulted in a purported "fair value" of the mortgaged properties that was artificially inflated by billions of dollars and, therefore, could not be relied upon. Upon information and belief, many of the key assumptions made by HVS were provided to HVS by the Blackstone Pre-LBO Entity Defendants in order to allow the values set forth in the HVS appraisal to be inflated.

126.    In short, the Blackstone Pre-LBO Entity Defendants, as equity holders in the pre-LBO Debtors, took all the cash they could get, while the Debtors and their estates were left insolvent, and the Debtors' new owners prepared to pay themselves hundreds of millions of dollars of desperately needed cash. Both group knew that the LBO was structured to fail.

**2.    The Company Ignores the Separateness of Its Related Entities and the Requirements of the LBO Loan Documents**

**a.    The Loan Proceeds' Uses Were Restricted, But The Parties Ignored The Restrictions and Paid Loan Proceeds Directly to the Sellers**

127.    The mortgage loan agreement restricted the use of proceeds from the new mortgage loans, as follows:

> [B]orrower shall use the proceeds of the Loan solely to (a) repay or discharge any existing loans relating to the Properties, (b) pay all past-due Basic Carrying Costs, if any, with respect to the Properties, (c) make deposits into the Reserve Funds on the Closing Date in the amounts provided herein, (d) pay costs and

> expenses incurred in connection with the closing of the Loan, as
> approved by Lender, (e) fund any working capital requirements of
> the Properties and (f) distribute the balance, if any, to borrower.

128.   The authorized uses, therefore, did not include making payments to the Sellers and other Blackstone affiliates that received sale proceeds, as described above.  Notwithstanding this provision, the mortgage loan proceeds were not received by any mortgage borrower.  On information and belief, to the contrary, all mortgage loan proceeds were deposited into an escrow account held at JPMorgan Chase Bank in the name of "First American Title Insurance Company of New York Preferred Division Escrow" (the "First American Escrow Account"), and a substantial portion of the mortgage loan proceeds was paid out directly to one or more of the Blackstone Pre-LBO Entity Defendants in violation of the restrictions contained in the mortgage loan agreement, as described above and in the chart attached hereto as Exhibit F, and taken from the Examiner's Report.

129.   The mezzanine loan agreements also restricted the use of proceeds from the new debt resulting from the LBO.  The mezzanine loan agreements provided that the mezzanine loan proceeds were to be paid first to the more senior mezzanine borrower, then, ultimately, provided to the mortgage borrowers as equity contributions:

> Borrower shall use the proceeds of the Loan solely to (a) make an
> equity contribution to Mortgage Borrower [through Senior
> Mezzanine Borrower] in order to cause Mortgage Borrower to use
> such amounts for any use permitted pursuant to Section 2.1.5 of the
> Mortgage Loan Agreement, (b) pay costs and expenses incurred in
> connection with the closing of the Loan, as approved by Lender
> and (c) distribute the balance, if any, to Borrower.

130.  Notwithstanding these provisions, the Mezzanine Loan proceeds were not received by any Mezzanine Borrower and were never contributed, by equity contributions or otherwise, to the mortgage borrowers through any senior Mezzanine Borrower.  To the contrary,

all Mezzanine Loan proceeds were, like the mortgage loan proceeds, deposited into the First American Escrow Account and, as with the mortgage loan proceeds, a substantial portion was paid out directly to one or more of the Blackstone Pre-LBO Entity Defendants, as described above, in violation of the restrictions contained in the mezzanine loan agreements.

> **b.** **Formalities Regarding the Post-LBO Debtors' Separateness and Accounting Are Violated**

131.    The applicable loan agreements contained extensive "special purpose entity" and separateness representations and other covenants, requiring, among other things, that each mortgage borrower, operating lessee entity and property owning entity would (i) not make any loans or advances to any person; (ii)  pay debts from its assets as such debts become due; (iii) do all things necessary to observe organizational formalities; (iv) maintain all of its books, records, financial statements, and bank accounts separate from those of any other person; (v) except as expressly permitted under the applicable loan agreement or the Cash Management Agreement, not commingle assets; (vi) not guarantee or become obligated for the debts of any other person; (vii) not pledge assets for the benefit of any other person other than with respect to the applicable mortgage or mezzanine loans; (viii) remain solvent and maintain adequate capital in light of its contemplated business operations; (ix) maintain a sufficient number of employees in light of its contemplated business operations and pay the salaries of its own employees from its own funds; (x) not assume or incur any liabilities except the mortgage and mezzanine loans, certain other specified liabilities not germane to this Complaint, and "liabilities incurred in the ordinary course of business," subject to certain liability caps, which liabilities would not be more than 60 days past the date incurred; and (xi) maintain its assets and liabilities in such a manner that it would not be costly or difficult to segregate, ascertain or identify its individual assets and liabilities from those of any other person.

132.    These requirements, however, were disregarded.  For example, after the closing, an opening balance sheet for DL-DW showed the impact of the LBO on DL-DW and the appropriate allocation of the price paid for the LBO. The mortgage and mezzanine debt was recorded at the ESI and Homestead accounting database levels, as opposed to being recorded by each legal entity mortgage borrower or mezzanine borrower.  Similarly, the subsidiaries' assets and liabilities, including hotel property and equipment, were recorded at the ESI and Homestead database level, rather than being recorded at the individual entity level and treated as owned by that entity.  In short, the Company ignored the fiction of legal separateness of its entities.

133.    If the Debtors had established and maintained separate books for each of the individual mortgage borrowers and mezzanine borrowers as of the LBO, then the accounting by the mortgage borrowers and mezzanine borrowers should have reflected:

- The mortgage debt and the related proceeds - at each legal entity level for the individual mortgage borrowers - allocated based on the release amounts included in the mortgage loan agreement; and

- The mezzanine debt and the related proceeds - at the legal entity level for the individual mezzanine borrowers - allocated based on the sum of the allocated release amounts included in the mortgage loan agreement for the mortgage borrowers directly below the relevant mezzanine borrower.

134.    The Debtors made no effort to maintain their separateness or fulfill the covenants of the LBO loan agreements.  The Debtors were treated internally at all relevant times as part of one company.  The Debtors had common officers and directors, and had no separate governance. The Debtors conducted all material board of directors meetings on a consolidated basis for the so-called "Extended Stay Hotels family of companies," which included the Debtors' direct equity owners.  In addition:

- The daily business and affairs of each of the Debtors were managed and controlled by HVM Manager, of which Lichtenstein was the sole member;

45

- The Debtors' operations were integrated and interdependent and each of the Debtors was run in the interest of the Buyer and the Debtors' ultimate equity owners;

- With few exceptions, all of the Debtors were wholly-owned by the Buyer;

- The Debtors did not have specific general ledger codes in their accounting system to track specific accounting activity for the mezzanine borrowers;

- None of the mortgage borrower entities or mezzanine borrower entities kept their own books and records, and adequate records of complete accounting activity related to each legal entity were not maintained;

- Debt to the mortgage and mezzanine lenders was recorded only at the ESI and Homestead levels, debt service was paid only from the Debtors' consolidated Cash Management Account, and the Debtors failed to properly record any financial or accounting activities (including debt service) relating to the mezzanine or mortgage loans;

- The Debtors' expenses were generally funded from the consolidated Cash Management Account and a single working capital reserve account;

- The Debtors failed to observe corporate formalities for intercompany transfers, which generally were not properly recorded;

- The mortgage borrowers were jointly and severally liable on the mortgage debt, and yet paid the mezzanine debt for which the mortgage borrowers had no liability;

- Mezzanine borrower entities were prevented from enforcing contribution rights against other Debtors until after all of the mezzanine debt and mortgage debt had been paid in full;

- The Debtors made substantial payments for the benefit of insiders;

- The Debtors failed to pay debts as they came due in the ordinary course, with certain liabilities being greater than 60 days outstanding at all relevant times from and after the date the LBO closed; and

- The Debtors were insolvent and undercapitalized on the date the LBO closed and at all relevant times thereafter.

**D.    Debt Yield and Financial Covenants Are Violated The Day The LBO Closed, and Key Differences Between the Debtors' Pre- and Post-LBO Debt Structures Cause Immediate Financial Distress**

**1.    The Significance of a Debt Yield Event**

135.    The Debtors' loan agreements provided for severe consequences if a "Debt Yield Event" occurred.   The loan agreements defined "Debt Yield" roughly as a fraction: (a) the numerator of which was net operating income less (i) assumed management, marketing, and franchise fees equal to 4% gross income, (ii) replacement reserve fund contributions equal to 4% gross income, and (iii) income generated by leased properties; and (b) the denominator of which was the combined total outstanding principal balances on the mortgage and mezzanine loans.   In essence, the Debt Yield calculation was intended to provide an indication of the amount of cash generated by the mortgaged properties compared to the level of debt associated with those properties, and to measure the debtors' ability to generate enough cash to service the LBO debt.

136.    The Debtors' failure to meet specific Debt Yield benchmarks under the LBO loan agreements would cause the Debtors to have insufficient cash to pay their obligations as follows:

(1)    A so-called "Debt Yield Event" triggered a "Cash Trap Event."   This meant that excess cash from operations (after taxes, reserves, and debt service) was "trapped" as additional collateral for the lenders.   The cash was not available to pay costs of operations outside of the annual budget approved by the lenders under the Cash Management Agreement, including capital expenditures beyond a small reserve.   The annual budget did not allow for the payment of crucial expenses such as occupancy taxes, reserves and management fees, among other things;

(2)    If the Debt Yield fell below the so-called "Debt Yield Amortization Threshold," then the borrowers had to make substantial amortization payments to the lenders beginning on June 12, 2009; and

(3)    No equity distributions could be made (except to holders of Series A-1 preferred equity in BHAC Capital) by either the mortgage borrowers, the property owner entities, the operating lessee entities, or the mezzanine borrowers unless the Debt Yield equaled or exceeded 7.75%.

137.    A Cash Trap Event, triggering a "Cash Trap Event Period," occurred upon: (a) an event of default under the mortgage loan agreement or any mezzanine loan agreement; (b) a Debt Yield Event; or (c) HVM's filing for bankruptcy.   A Cash Trap Event could be cured under certain circumstances, including, if it was caused by a Debt Yield Event, the mortgage

borrowers' achievement of certain Debt Yield numbers for six (6) consecutive months.

138.   On June 30, 2007, the Debt Yield was only 7.09%.  Therefore, the Debt Yield was less than 7.5% immediately after the date the LBO closed, and there was, in substance if not form, a continuous Cash Trap Event Period within the meaning of the mortgage loan agreement. For the first six months after the LBO's closing (including the day the LBO closed), the only reason there was no technical Cash Trap Event Period was because a Debt Yield Event had no consequences under the pertinent loan agreements until the seventh payment date, scheduled to occur in January 2008.  The Debt Yield percentage, however, was required to be reported to the Debtors' lenders on as monthly basis, including during the first six months after the LBO closed. But the Buyer and its principals did not report the Debt Yield percentage to the lenders as should have been done.  Upon information and belief, this failure to report was intentional and allowed improper distributions to continue to be made to equity holders.

139.   The Debt Yield Event percentage would become even more difficult to achieve over time, as the required percentage was scheduled to grow from 7.5% (on the seventh payment date) to 8.1% (on the LBO loans' maturity date if certain options to extend the loans had been exercised by the Debtors).  In short, the Debtors immediately failed the Debt Yield test under the LBO loan documents on the date the LBO closed, were unlikely to meet the test when it was first scheduled to formally occur in January 2008, and the Buyer and its principals knew or should have known it.

### 2.    The Post-LBO Debt Structure Improperly Restricts the Debtors' Cash

140.   Two significant differences between the pre- and post-LBO Cash Management Agreement and related agreements placed the Debtors at even graver risk of failure.  First, the pre-LBO cash management agreement provided that management fees were higher in priority on the so-called "waterfall" than debt service on the mezzanine loans, and thus management fees

48

would be paid before mezzanine loan debt service if there were insufficient funds to pay both. The post-LBO Cash Management Agreement provided just the opposite: mezzanine loan debt service was higher in priority than management fees, and was paid first if there were insufficient funds to pay both.   This severely threatened the post-LBO Debtors' ability to maintain operations.

141.   Management fees are not discretionary expenses for a hotel chain.   Most of the hotels were indirectly owned by ESI, which was a REIT.   A REIT is required to have an outside management company operate its hotels.   However, management fees could be paid only if cash was available after debt service under the post-LBO structure.   Therefore, any cash difficulties, and especially a Cash Trap Event, made it likely the Debtors would be unable to pay critical management fees and costs necessary to keep the Debtors' hotels open.   If those fees and costs were not paid, the Debtors' hotels would close and the Debtors' entire business would abruptly shut down, causing waste and destruction of the Debtors' hotels' value.   Nevertheless, the Blackstone Pre-LBO Entity Defendants, DL-DW, and the Buyer's principals agreed to terms placing the Debtors, and their creditors, improperly at risk.

142.   The post-LBO Cash Management Agreement trapped 100% of excess cash flow during every Cash Trap Event Period, and defined excess cash flow in such a way as to trap the Debtors' cash prior to the payment of critical operating expenses.   The pre-LBO Cash Management Agreement provided for a similar formula, but the excess cash flow concept was different:  the cash trap occurred only after critical operating expenses were paid.   Therefore, the post-LBO Debtors were placed in an untenable financial position to further the interests of the Defendants that were the Debtors' pre- and post-LBO owners, insiders or insiders' affiliates.

143.   Under the pre-LBO mortgage loan agreement, in proposing each annual budget,

the borrowers needed to obtain the approval of only the servicer for the mortgage loan. Post-LBO, in proposing an annual budget, the borrowers were required to obtain the approval of both the mortgage lenders (and after securitization of the CMBS, the servicer for the debt certificate holders) and the most junior mezzanine lender.  This requirement placed the Debtors' need for cash to operate subordinate to the profit return for the junior mezzanine lenders, a situation which quite predictably caused great harm to the Debtors and their estates.

144.   All of these problems were or should have been foreseen by the Defendants involved in the LBO.

3.    **The Debtors Immediately Violate Covenants Regarding The Payment of Ordinary Course Debts**

145.   The mortgage and mezzanine loan agreements contained extensive financial reporting covenants, which included:  (i) within 60 days after the end of each fiscal year, each borrower had to furnish its respective lender with certain annual financial statements audited by a "Big Four" accounting firm and prepared according to GAAP, along with an Officer's Certificate certifying whether there was an event of default under the applicable loan agreement and if so, what it was, how long it had existed, and what actions had been taken to remedy it; (ii) within 20 days after each month, each borrower had to furnish its respective lender an occupancy report, monthly and year-to-date operating statements, a calculation of the Debt Yield on the last day of the month and the amount of all operating rent due for the month; (iii) within 30 days after each quarter and each month, each borrower had to furnish its respective lender with an officer's certificate stating that the monthly financials provided were accurate, that the representations and warranties with respect to certain special purpose entity requirements were correct and that ordinary course of business liabilities had not exceeded certain amounts and had been paid within 60 days of the date they were incurred; and (iv) within 30 days before the start of each

50

fiscal year, the mortgage borrowers and property owner entities had to submit a proposed annual budget, which was subject to the written approval of the mortgage lenders and the "Most Junior Mezzanine Lender."  Until the proposed annual budget was approved by that lender, the most recent "Approved Annual Budget" applied.

146.    Several of these covenants were ignored or violated.  For example, no monthly Debt Yield reports were prepared or furnished during 2007 following the LBO, and the first such report was not prepared until January 2008.  Also, F. Joseph Rogers ("Rogers"), the Assistant Secretary or Vice President of the Debtors, routinely submitted officer's certificates certifying each month after the LBO closed that ordinary course liabilities had not exceeded certain amounts and had been paid within 60 days of their incurrence.  In fact, there were ordinary course liabilities outstanding for longer than 60 days on the date the LBO closed and each month thereafter until the Debtors' eventual bankruptcy filing.  Each of these events was an event of default under the loan agreements.  In short, the Debtors were in technical default of their obligations the day the LBO closed.

**E.    The Lenders Make Demands of Lichtenstein to Facilitate the Sale of Loan Certificates**

   **1.    The Lenders Experience Difficulty Selling the LBO Debt**

147.    The lenders that had committed to finance the LBO had always intended to sell most or all of the mortgage and mezzanine debt to third parties. Those efforts, however, were unsuccessful.  As of the LBO's closing on June 11, 2007, the banks that financed the LBO held all or substantially all of the mezzanine and mortgage debt.

148.    Immediately after the LBO closed, the mortgage lenders marketed the CMBS for sale.  At the beginning of those efforts, the market was active.  However, the market quickly softened, starting no later than late-July or early-August 2007.  As a result, the banks were forced

to take more aggressive steps to sell the CMBS debt including, for example, as early as August 2007, discounting the CMBS debt.

149.    The mezzanine debt also was not selling, and was being discounted by the mezzanine lenders.  The mezzanine lenders began offering to provide buyers of the mezzanine debt with financing ("repo financing") to help buyers purchase the debt.

150.    In addition to offering incentives to potential buyers of the CMBS and mezzanine debt, the lenders made certain demands on Lichtenstein and Lightstone regarding actions that the lenders claimed were needed to make the CMBS and mezzanine debt more marketable.

### 2.    The Lenders Demand that Lightstone Stop Efforts to Sell Preferred Equity

151.    Before the LBO had closed, in May 2007 Lichtenstein was in discussions with certain entities regarding a sale of a substantial piece of equity in the post-LBO Debtors.  Among others, Centerbridge Partners, L.P. ("Centerbridge") was supposedly interested in purchasing equity, and was discussing with  Lichtenstein the need to relieve the Debtors from a $200 million junior tranche of LBO debt.  Other potential investors being solicited on the Buyer's behalf at the time commented to  Lichtenstein or Lichtenstein's advisors that the proposed LBO was "too levered," that it "wouldn't take much to wipe them out," and thus declined interest. Unsurprisingly, those pre-LBO discussions did not result in a sale of preferred equity. Nevertheless, the LBO proceeded.

152.    After the LBO closed, Lichtenstein continued efforts to sell equity.  However, the lenders demanded that Lichtenstein cease those efforts because it was interfering with the lenders' efforts to sell their debt.  Upon information and belief, Lichtenstein complied with the lenders' demands, and ceased efforts to sell equity shortly after the LBO closed.

153.    In or around August 2007, in connection with the securitization of the mortgage loan that resulted from the LBO, Banc of America Securities LLC, together with three other

banks, offered Commercial Mortgage Pass-Through Certificates in the amount of the $4.1 billion mortgage loan to institutional third-parties through a Confidential Offering Memorandum, dated August 17, 2007 (the "Mortgage Loan Issuance Offering Memorandum").

154.   Although the Mortgage Loan Issuance Offering Memorandum noted the ratings of the mortgage loan debt by Fitch, S&P, and Moody's as between BB and AAA, noticeably absent from the Mortgage Loan Issuance Offering Memorandum was any reference to the fact that, as described above, these rating agencies' July 2007 reports noted that the total debt of the LBO substantially exceeded the value of the Company's underlying assets.  According to S&P's and Fitch's July 2007 reports, they expressly valued the Company at $4.82 billion and $5.23 billion, respectively – over $3 billion less than the $8 billion purchase price.

155.   Moreover, the Mortgage Loan Issuance Offering Memorandum cited the results of the HVS appraisal, which the Sellers, the Buyer, participating lenders, and others involved in the LBO, as discussed above, knew or should have known was flawed, and which was based upon assumptions provided to HVS by the Blackstone Pre-LBO Entity Defendants in order to inflate the values in the HVS appraisal.

**3.    The Alleged HPT Capital Lease is Declared in Default and the Lenders Demand that Lichtenstein "Resolve The Defaults or Else" to Facilitate the Banks' Efforts to Sell Their Paper**

156.   Prior to the LBO, HVI(2) Incorporated ("HVI"), an entity under the Debtors' corporate umbrella, entered into a lease agreement ("HPT Lease"), pursuant to which HPT HSD Properties Trust ("HPT HSD") leased eighteen hotels to HVI.  The HPT Lease ran through December 31, 2015, subject to renewal options. HVI was required by the HPT Lease to, among other things, (i) maintain certain specified net worth, and (ii) adhere to certain requirements if a change of control, such as the LBO, was to be effected.

157.   Immediately after the LBO closed, HPT HSD alleged that Lightstone had failed to

comply with one or more of these requirements.  The Blackstone Pre-LBO Entity Defendants, the Buyer, and their respective principals were or should have been well aware of this issue prior to the LBO's closing.

158.   One week after the LBO closed, on June 18, 2007, HPT HSD issued a notice of default under the HPT Lease and terminated the lease.  That same day, HPT HSD issued a press release announcing the alleged defaults and that it had terminated the lease.  This default was foreseeable prior to the LBO, caused great concern among the Debtors' lenders and caused the lenders to place further demands upon the Debtors.

159.   Shortly thereafter, HPT HSD offered Lichtenstein the option to purchase the properties that were subject to the HPT Lease.  To resolve the dispute, and to address the lenders' demands, on or around July 26, 2007, HFI Acquisitions Company LLC ("HFI"), an affiliate of Lichtenstein, purchased 17 of the 18 leased hotel properties under the HPT Lease for approximately $192 million.  Approximately $170.5 million of the $192 million used in the HPT HSD transaction came from new mortgage and mezzanine loans to HFI from certain of the Debtors' lenders. In connection with the transaction, HFI was assigned all of HPT HSD's rights under the HPT Lease, including HPT HSD's rights in a $15.96 million security deposit.  Upon information and belief, one or more of the Debtors had an interest in those funds.  Also, Homestead guaranteed a portion of the rent under the HPT Lease and posted cash collateral for that guaranty totaling approximately $10 million.  Upon information and belief, Blackstone Hospitality was also released from its obligations under a letter of credit that Blackstone Hospitality had, prior to the LBO, posted as security for rent and other obligations owed under the HPT Lease.

160.   After the HFI transaction closed, HFI subsequently leased the purchased hotel

properties to one or more of the Debtors.  Upon information and belief, this enabled Lichtenstein, as the owner of HFI, to receive additional payments from the Debtors in the form of rents on those hotels.

### 4.   DL-DW's Acquisition of the "LIBOR Floor Certificates"

161.   Because the mortgage lenders were having so much difficulty selling their debt, Wachovia and the borrower Debtors entered into a letter agreement amendment, dated August 31, 2007, that amended the mortgage loan agreement and the mezzanine loan agreements.  The amendment adjusted provisions relating to the application of the proceeds from prepayments of the mortgage and mezzanine loans to make the debt more palatable to potential buyers.  In exchange for the Debtor borrowers' consent to the amendment, the lenders agreed to issue to the borrowers (or their designees) Class X-A and X-B certificates from the securitization (collectively, the "LIBOR Floor Certificates").  The LIBOR Floor Certificates were investment grade (AAA) and represented the right to receive a payment stream, derived from the mortgage loan payments, of the difference between the LIBOR "floor" amount, on the one hand, and actual LIBOR on the other hand.  Therefore, whenever LIBOR dropped below the floor, part of the money paid by the borrower Debtors on the mortgage debt would be paid over, in turn, to the holder of the LIBOR Floor Certificates.

162.   On November 2, 2007, the LIBOR Floor Certificates were issued, in physical form, and transferred directly to DL-DW, one of the ultimate equity owners of the Debtors, rather than to the Debtor borrowers making concessions and providing all payments under the loan agreements.  Upon information and belief, no value was provided by DL-DW to the borrowers in exchange for these certificates and no accounting entries were made to reflect that property rightfully belonging to the Debtor borrowers was being diverted to DL-DW.  At the time, the LIBOR Floor Certificates were valued at no less than approximately $25 million.

163.   As LIBOR began dropping throughout 2008 and 2009, the LIBOR Floor Certificates became increasingly valuable to DL-DW because the amount of the "floor" was higher than the actual LIBOR-based loan payments.  This value, however, should have belonged to the Debtors, not DL-DW, because the Debtors were the obligors under the mortgage and mezzanine agreements and were the parties who contracted to receive the certificates.  The LIBOR Floor Certificates' issuance to DL-DW was an improper transfer of the Debtors' value to the Debtors' equity owners.

**F.   The Debtors' Post-LBO Performance Continues to be Predictably Dismal, But Substantial Distributions Are Nevertheless Made to Equity Holders**

**1.   2007 Post-LBO Financial Performance**

164.   Immediately after the LBO, the Debtors' financial performance continued to decline, performance metrics set forth in its budgets were missed, and the Debtors encountered significant (and predictable) economic problems.  The Debtors' senior management received regular financial and other reports on both a weekly and monthly basis (depending on the nature of the reports) after the LBO and therefore knew or should have known of relevant, material events relating to the Debtors' performance and inevitable downward spiral.

**a.   2007 Financial Results**

165.   The Debtors' 2007 post-LBO revenues were approximately $623 million, below the pro-forma budget of approximately $655 million prepared in connection with the LBO.  The 2007 post-LBO EBITDA was approximately $327 million (or a 52% margin), as compared to a pro-forma budget EBITDA of $364 million (or a 56% margin).  During the second half of 2007, the Debtors experienced a continuing reduction in room demand, and the monthly ADR, OCC, and RevPAR were at or below budget in every month following the LBO in 2007.  Revenue growth reversed in the second half of 2007, and the Debtors missed projections for room revenue

and property-level EBITDA in each of the last three quarters of 2007.

166.    The Debtors' performance relative to its selected competitive peer group reflected that, while the Debtors' occupancy rate was higher than those of some of their peers, the Debtors' revenue and room rate (as evidenced by RevPAR and ADR at the time) was below its peers by a significant amount: 10% to 22%.

167.    In addition to regular industry reports, the Debtors' management received weekly reports showing how the Debtors' deteriorating performance compared to the Debtors' peer group in the second half of 2007.  During the November 15, 2007 board of directors meeting for the Debtors, it was reported that during the third quarter, certain metrics were below budget: RevPAR was below budget by 3% and property-level EBITDA was below budget by 5.7% year to date through September; RevPAR was below budget by 5.9% and property-level EBITDA was below budget by 10.5% for the third quarter 2007.  The Debtors' principals were thus aware that the Debtors' performance was not only below their peer group, but was also below internal targets.

168.    However, at a November 15, 2007 board meeting of the "Extended Stay Hotels family of companies," David Kim ("Kim"), Executive Vice President and Chief Investment Officer of the "Extended Stay Hotels family of companies," including Homestead and ESI, "anticipated" double digit corporate EBITDA growth for 2008 and 2009, driven by anticipated RevPAR growth of more than 7% in both years, based on the Debtors' "re-branding" strategy. This re-branding strategy, however, was based upon having substantial funds available to spend on brand strategy initiatives in the first quarter of 2008.  However, the projected Debt Yield calculations for the fourth quarter of 2007 and the first two quarters of 2008 were expected at that time to be below the minimum requirement under the LBO loan agreements.  Funding for

re-branding was not likely to be available because the Debt Yield calculations would in turn trigger a Cash Trap Event, depriving the Debtors of the much needed cash.

169.   In addition, the Debtors' financial projections at the time reflected negative cash flows for the fourth quarter of 2007 and the first quarter of 2008.  These projected results should have alerted anyone looking at them with an unjaundiced eye that the optimistic growth "anticipated" by Kim was not going to occur in the short term, nor was the cash going to be available to fund the rebranding expenditures from operations.

170.   The Debtors' actual performance in late 2007 was below budgeted ADR, was not strong enough to mitigate the decline in OCC (also below budget at the time), and was adversely impacting the Debtors' liquidity situation.

### b.      Critical Capital Expenditures Are Not Funded

171.   In 2007, prior to the LBO, the Company spent approximately $67.1 million on capital expenditures.  However, during the post-LBO period, the Debtors did not (and, indeed, could not) fund any of the incremental capital expenditures critical to the Debtors' achievement of the inflated projections discussed in Blackstone's January 2007 Information Memorandum.  In fact, the Debtors were changing the pre-LBO re-branding strategy and re-branding their hotels under the Homestead name rather than the Extended Stay brand, contrary to the recommended strategy stated in Blackstone's Information Memorandum, and this new re-branding strategy was not going smoothly.

### c.      Late-2007:  A Cash Trap Event is Imminent

172.   In a November 2007 board meeting, the Debtors' principals finally acknowledged the Debt Yield Event and the pending Cash Trap Event as imminent issues.   Senior management knew or should have known the Debtors would likely fail the Debt Yield Test where it was to be reported on January 12, 2008.  The anticipated Debt Yield was below the required monthly Debt

Yield from the fourth quarter 2007 through the second quarter 2008.

173.   The Debtors submitted a proposed 2008 budget for approval by the lenders in early-December 2007. This budget reflected an increase in the overall property-level expenses. The budget submitted also included significant anticipated future costs related to non-recurring, discretionary capital expenditures associated with the Debtors' proposed re-branding strategy. Due to the anticipated Debt Yield Event and the pending Cash Trap Event that would be triggered in early 2008, the budget sought to ensure that all costs would be covered through funds available in the "waterfall" described above and on the attached Exhibit E (the "Waterfall") through the 2008 budget submitted for lender approval.

> **d.**    **2008 Budget Negotiations:  The Debtors Unsuccessfully Attempt to Gain Access to Cash They Should Have Had From the Closing of the Loans**

174.   In November 2007, the proposed annual budget for 2008 was due.  HVM prepared annual and monthly financial budgets for the Debtors, which were required to be approved by certain of the Debtors' lenders.  If the proposed annual budget was not approved by the lenders, then the most recently approved annual budget governed the Debtors' operations. This, however, meant that the Debtors' cash was subject to the flawed Waterfall, and the Debtors were on the verge of a Cash Trap Event.  Any cash remaining after the Waterfall was funded would not be provided to the Debtors. During a Cash Trap Event Period, excess cash that could have been transferred to the Debtors for operating expenses would be held by the lenders as additional collateral, leaving the Debtors unable to pay crucial operating expenses.

175.   The 2007 approved annual budget had been created prior to the LBO.  That budget had certain flaws that all parties should have known about.  However, the post-LBO Company had not been provided with the 2007 annual budget being used at the time.  That 2007 approved annual budget (i) did not include trust fund occupancy taxes (which totaled

approximately $6-8 million, or approximately 9.2% of room revenues, per month, and were collected by the Debtors and held in trust for taxing authorities), and (ii) did not allow for payment of necessary corporate overhead costs (e.g., reservation services, travel agent commissions and certain management fees), all of which were critical to the Debtors' ongoing operations because excess cash was to be trapped, and none of which could be paid once there was a Cash Trap Event Period.

176.    In November 2007, when it became apparent that trust fund occupancy taxes were being swept into the Cash Management Account for application in accordance with the Waterfall,  Rogers asked the lenders to treat those taxes as pass-through amounts, and to have the amounts distributed back to the Debtors for payment to applicable governmental authorities.  The lenders responded that the occupancy taxes would have to be handled through the Debtors' working capital account. In other words, the occupancy taxes collected would come into the lender's cash collateral, but no disbursements would be made to pay them. Upon information and belief, these were "trust fund" obligations, meaning that they were not the Debtors' property. That money belonged to various governments.  The taxes were collected by the Debtors and held "in trust" for the benefit of taxing authorities.  The lenders, however, knowingly expropriated the government's funds, held all cash and placed the Debtors in the position of wrongfully converting the government's funds to pay their lenders, all of which was pursuant to the agreements and documents executed in connection with the LBO.

177.    Corporate overhead represented approximately 16% of the total property and corporate expenses of the Debtors in late 2007.  Without any changes to the budget for 2008, the Debtors were about to experience significant cash flow constraints during a Cash Trap Event Period, which, under the pertinent loan agreements, would last for a minimum of six months.

Further, during a Cash Trap Event Period, the Debtors would have had to fund corporate overhead and occupancy taxes from working capital, if any was available, as those expenses would not be paid through the Waterfall.  These facts and circumstances were, or should have been, known to the Debtors and their principals by late 2007, at the latest.

> e.   **Despite the Debtors' Financial Distress, Improper Distributions Are Made to Equity Holders in 2007**

178.   The mortgage loan agreement provided that the Debt Yield, measured on a quarterly basis, had to be greater than 7.75% for equity distributions to be made.  But other agreements entered into in connection with the LBO provided that the holders of Series A-1 preferred equity in the Debtors would receive their equity distributions regardless of the Debtors' financial condition, and regardless of whether those distributions were in violation of applicable law.

179.   Upon information and belief, although the first Debt Yield calculation should have been completed and reported in July 2007, and monthly thereafter, no such calculation was reported to the lenders at any point in 2007.   Had the Debtors' management performed an appropriate Debt Yield calculation in July 2007, that calculation would have shown that, immediately following the LBO's closing, the Debt Yield was 7.09%, compared to a requirement of 7.5% needed to avoid a Cash Trap Event in early 2008 and 7.75% for any equity distributions to be permitted.  The first calculation of the Debt Yield performed and reported to the lenders was in January 2008 for the 12 month period ending December 31, 2007. Foreseeably, the Debtors did not meet the minimum requirement of 7.75%.

180.   Notwithstanding the Debt Yield failure, the lack of any surplus, the Debtors' insolvency, and the future financial and operational declines that were or should have been foreseen by those running the Debtors at the time, the Debtors, directly or indirectly through

affiliated entities, made the following cash distributions directly or indirectly through other entities in the Debtors' corporate structure totaling $8,835,000 to equity holders other than the A-1 Series Unit holders from June 11, 2007 through December 31, 2007:

**2007 Dividends or Distributions to A-2 and A-3 Series Units**

| Recipient | Date Paid | Amount |
|---|---|---|
| **Series A-2 Units** | | |
| PGRT ESH Inc. | 7/30/2007 | $1,067,000 |
| PGRT ESH Inc. | 8/30/2007 | $1,033,000 |
| PGRT ESH Inc. | 9/27/2007 | $1,000,000 |
| PGRT ESH Inc. | 10/30/2007 | $1,033,000 |
| PGRT ESH Inc. | 11/29/2007 | $1,000,000 |
| PGRT ESH Inc. | 12/28/2007 | $1,033,000 |
| **2007 A-2 Total** | | **$6,167,000** |
| | | |
| **Series A-3 Units** | | |
| Lightstone Holdings LLC | 8/31/2007 | $2,668,000 |
| **2007 A-3 Total** | | **$2,668,000** |

181.   In addition, during 2007 after the LBO closed, the Debtors made the following cash distributions directly or indirectly through other entities in the Debtors' corporate structure to the A-1 Series equity holders, totaling approximately $13.1 million, in violation of the loan agreements and applicable law:

| RECIPIENT | DATE PAID | AMOUNT |
|---|---|---|
| Arbor Commercial Mortgage LLC | 6/11/2007 | $233,333.33 |
| Polar Extended Stay USA L.P. | 7/13/2007 | $44,444.44 |
| Princeton ESH, LLC | 7/13/2007 | $44,444.44 |
| Arbor Commercial Mortgage LLC | 7/13/2007 | $1,661,111.11 |
| Polar Extended Stay USA L.P. | 7/26/2007 | $18,888.89 |
| Princeton ESH, LLC | 7/26/2007 | $18,888.89 |
| Arbor Commercial Mortgage LLC | 7/26/2007 | $358,888.89 |
| Arbor Commercial Mortgage LLC | 8/15/2007 | $713,333.33 |
| Arbor Commercial Mortgage LLC | 8/15/2007 | $20,000.00 |
| Polar Extended Stay USA L.P. | 8/15/2007 | $93,333.33 |
| Princeton ESH, LLC | 8/15/2007 | $93,333.33 |
| Arbor Commercial Mortgage LLC* | 8/15/2007 | $1,250,000.00 |
| Arbor Commercial Mortgage LLC | 9/17/2007 | $713,333.33 |

| Polar Extended Stay USA L.P. | 9/17/2007 | $103,333.33 |
|---|---|---|
| Princeton ESH, LLC | 9/17/2007 | $103,333.33 |
| Arbor Commercial Mortgage LLC* | 9/17/2007 | $1,250,000.00 |
| Arbor Commercial Mortgage LLC | 10/15/2007 | $450,000.00 |
| Glida One LLC | 10/15/2007 | $550,000.00 |
| Polar Extended Stay USA L.P. | 10/15/2007 | $100,000.00 |
| Princeton ESH, LLC | 10/15/2007 | $100,000.00 |
| Arbor Commercial Mortgage LLC* | 10/15/2007 | $900,000.00 |
| Arbor Commercial Mortgage LLC | 11/15/2007 | $495,000.00 |
| Glida One LLC | 11/15/2007 | $568,333.33 |
| Polar Extended Stay USA L.P. | 11/13/2007 | $103,333.33 |
| Princeton ESH, LLC | 11/15/2007 | $103,333.33 |
| Arbor Commercial Mortgage LLC* | 11/15/2007 | $900,000.00 |
| Arbor Commercial Mortgage LLC | 12/17/2007 | $450,000.00 |
| Glida One LLC | 12/17/2007 | $550,000.00 |
| Polar Extended Stay USA L.P. | 12/17/2007 | $100,000.00 |
| Princeton ESH, LLC | 12/17/2007 | $100,000.00 |
| Arbor Commercial Mortgage LLC* | 12/17/2007 | $900,000.00 |
| **2007 A-1 Total** | | **$13,089,999.96** |

Transfers marked with an asterisk above were sent to Arbor Commercial Mortgage LLC from the Cash Management Account, by ESA P Portfolio Operating Lessee Inc. fbo BHAC Capital IV, LLC.

182.    Also, (i) on July 17, 2007, DL-DW received a wire transfer from an LBO closing account totaling approximately $77,366,984, which amount, upon information and belief, represented an apparent "overfunding" of an LBO closing account, and (ii) on October 17, 2007, a post-LBO "purchase price adjustment" resulted in a $2,342,000 payment from Blackstone to DL-DW.  Notwithstanding the fact that the LBO purchase price had been funded and paid on behalf of DL-DW with borrowings by the Debtors, these funds were improperly distributed to equity holders instead of being turned over to the Debtors.  Upon information and belief, these amounts constituted additional improper value that was siphoned from the Debtors for DL-DW's

and Lichtenstein's benefit at times when the Debtors were insolvent, inadequately capitalized and without adequate surplus.

### 2. The Debtors' Condition Further Deteriorates Throughout 2008, But Prohibited Equity Distributions Continue

#### a. 2008 Debt Yield Test and Formal Cash Trap Event

183.    The first Debt Yield calculation reported to the lenders was provided to the lenders on January 21, 2008 for the period ending December 31, 2007.  As alleged above, since the calculation reflected that the Debtors did not meet the minimum Debt Yield of 7.5% at that time, both a Debt Yield Event and a Cash Trap Event were triggered.  Therefore, as of February 2008, any unallocated cash available after the Waterfall had been satisfied on a monthly basis was "trapped" by the lenders in a restricted cash collateral account.  The fact that cash was now "trapped" put significant strain on the Debtors, and required the use of over $27 million from a working capital reserve account in order to keep the Debtors temporarily afloat.

184.    In addition, in November 2007, the Debtors' projections reflected that the Debt Yield could not be maintained above the cure amount of 7.6% for a period of six months in order to eliminate the Cash Trap and reinstate the opportunity to receive any unallocated cash available after the Waterfall had been satisfied on a monthly basis.

#### b. March 2008: The 9.15% Notes Become Due

185.    On March 15, 2008, the 9.15% Notes matured and the principal balance of $30.9 million, together with accrued interest of approximately $1.4 million, came due. The Debtors failed to pay those amounts when due, and a default was declared by the trustee for the noteholders, on March 24, 2008.

186.    On April 16, 2008, DL-DW secured a $22 million "loan" from affiliated investors in the Debtors.  All of the affiliated investors were insiders of the Debtors.  This new $22 million

loan, together with additional funds from DL-DW, were used to pay off the matured 9.15%
Notes.  But the new insider loan came with onerous terms: it was guaranteed by BHAC Capital,
secured by the valuable LIBOR Floor Certificates owned by DL-DW, which should have been
property of the Debtors.  Though the "loan" was therefore well collateralized, it nevertheless
accrued interest at an annual rate of 25%.  The "loan" was to mature on May 1, 2011 (the "25%
Note").   The following table is a summary of the insider "lenders" and participation in the 25%
Note.

### Insiders' Interests in the 25% Note

| Lender | Affiliate Relation | Participation | Amount |
|---|---|---|---|
| ABT-ESI LLC | Arbor | Lead Lender / Servicer | $5,225,000 |
| Park Avenue Funding LLC | Lichtenstein | Co-Lender | $11,000,000 |
| Princeton ESH LLC | Princeton | Co-Lender | $550,000 |
| Mericash Funding LLC | Joseph Chetrit | Co-Lender | $5,225,000 |
| **Total** | | | **$22,000,000** |

187.    Arbor,  Lichtenstein, Princeton and Chetrit structured this transaction as a "loan"
with onerous terms to benefit themselves to the Debtors' detriment, even though they should
have put the funds into the Debtors as equity at the time the LBO closed so as to pay off the
9.15% Notes at that time, as had been originally contemplated.

188.    Concurrently with the execution of the 25% Note on April 16, 2008, the Debtors
paid off the $31 million outstanding principal balance of the 9.15% Notes, together with the
accrued interest of approximately $1.7 million and $100,000 of professional fees. The total
payments of approximately $33 million were made using (a) the proceeds from the 25% Note of
$22 million; plus (b) approximately $10.6 million of additional funds from DL-DW.   The
Debtors accounted for activities related to the repayment of the 9.15% Notes and the securing of

the 25% Note by recording the $22 million as additional "paid in capital" on the Debtors' books, with a corresponding intercompany note payable to DL-DW of approximately $10.6 million.

189.    DL-DW pledged the LIBOR Floor Certificates to the lenders of the 25% Note. The income generated from the LIBOR Floor Certificates went directly to make all interest and principal payments on the 25% Note, rather than DL-DW making payments separately.   The maximum monthly principal repayment under the 25% Note was $416,666.   Because cash income from the LIBOR Floor Certificates was greater than the principal and interest payments due (or even allowable) on the 25% Note, the excess income from the LIBOR Floor Certificates was deposited into a reserve bank account for the benefit of BHAC Capital Series A-1 Unitholders ("Floor Bonds Reserve Account").   As of December 31, 2008, $3.3 million of the principal on the 25% Note had been repaid in this fashion, leaving a remaining principal balance outstanding of $18.7 million, and an additional $3.6 million had been paid during 2008 as interest.   Despite these payments, the Floor Bonds Reserve Account contained a balance of $2.1 million as of December 31, 2008.

### c.    The Debtors' Proposed 2008 Annual Budget

190.    The Debtors had submitted a proposed 2008 annual budget for approval by the lenders in early December of 2007.   The pertinent lenders objected to certain aspects of that proposed annual budget, including (a) certain revenue projections in light of the then-current economic climate and poor outlook for the industry; (b) proposed one-time capital expenditure expenses or corporate overhead costs that did not constitute property-level operating expenses; and (c) other costs that were not explained by the Debtors.   The Debtors then conducted discussions with the lenders regarding the objections.

191.    While those discussions were ongoing, the lenders continued to use the 2007 approved annual budget when administering the Waterfall throughout early 2008. This created

additional financial strain on the Debtors, as funding for certain operating costs was not available through the Waterfall (*e.g.*, reservation system, occupancy taxes, as described above), and the amounts disbursed were to the Debtors were lower than what was needed at the time to pay operating expenses.

192.    On April 16, 2008, certain issues relating to the 2008 annual budget were resolved.  As a result, the Debtors received some of the cash to which they should have been entitled dating back to January 1, 2008.  However, no provision was made to repair the damage caused to the Debtors during the latter half of 2007, when the Debtors were forced to operate under the 2007 approved annual budget of which the Debtors had never been provided a copy. Thus, the Debtors' cash problems were far from solved, and the Debtors and their principals knew or should have known it.  In fact, on May 1, 2008, after the 2008 annual budget had been approved, Lichtenstein himself remarked that vendor payments were being delayed and that "... its demoralizing for the staff to have to be dodging vendors and local tax authorities who want their payments."

193.    On April 15, 2008, in exchange for the concessions granted by the lenders to facilitate budgeting of operating expenses, an amendment to the mortgage loan agreement was executed (the "Mortgage Loan Second Amendment").  The Mortgage Loan Second Amendment was between the same parties to the mortgage loan, except that by that time the original mortgage lenders had transferred their interest to Wachovia Bank Commercial Mortgage Trust in connection with the post-LBO securitization of the mortgage loan debt through CMBS.

194.    The Mortgage Loan Second Amendment added a new Section 5.2.14 to the original mortgage loan agreement, which contained extensive restrictions on the mortgage borrowers' use of income, cash, fees, proceeds, property or revenue from the mortgaged hotels

(including disbursements to the mortgage borrowers of excess cash flow under the Cash Management Agreement) ("Restricted Excess Cash Flow").  The new Section 5.2.14 prohibited the mortgage borrowers' distribution of Restricted Excess Cash Flow except in limited circumstances.

195.    The Debtors finally retained both Weil, Gotshal & Manges ("Weil") and Lazard Freres ("Lazard") in or around early 2008 as restructuring and insolvency professionals to assist with efforts to restructure the Debtors' suffocating LBO debt structure.

### d.    As Events Unfold, the Debtors' Financial Condition Worsens and Liquidity Problems Become More Acute

196.    The softening of room demand experienced by the Debtors in 2007 continued into early 2008. OCC decreased again, the extended-stay industry as a whole generally experienced ADR increase in the first half of 2008.  However, overall supply in the industry increased at rates far exceeding only modest increases in demand.  The 2008 approved annual budget was not finalized until April 2008, and the Debtors were operating in a Cash Trap Event Period.  All of these factors, among others, had a severe impact on the Debtors' liquidity.

197.    In the first quarter of 2008, liquidity became more constrained.  In January of 2008, the Debtors were required to transfer $8.1 million from their main operating account to the Cash Management Account to cover a shortfall in the Waterfall and ensure that certain obligations were met, including interest payments on the Mezzanine Loans. Consequently, the general ledger balance of cash available to the Debtors to fund operating expenses as of March 31, 2008 decreased to $42.0 million from $52.4 million as of December 31, 2007.

198.    In the second quarter of 2008, OCC and RevPAR declined further.  An "Audit Update" included in the May 15, 2008 board of directors package noted that: (a) debt waivers were required; and (b) significant liquidity concerns had to be addressed for audit issuance.  In

addition, a cash flow forecast prepared by the Debtors predicted that the effect of LIBOR rates would significantly impact liquidity, such that cash at year end was projected to range from $19.5 million to $49.8 million, at best, depending on the LIBOR rates assumed.

199.    In fact, the Debtors' principals knew or should have known that the Debtors could be completely out of cash as soon as January 2009.  The Company also anticipated that it would not meet certain Debt Yield amortization avoidance thresholds by June 2009, thereby triggering a requirement that the Debtors make amortization payments to the lenders, estimated at $51 million for 2009.  This increase in anticipated cash needs when the Debtors' financial condition was rapidly declining caused the Debtors serious concern, as (i) all cash flows were subject to a Cash Trap and the Debtors were not projected to achieve a Debt Yield cure in 2008 or 2009, (ii) the Debtors would have difficulty obtaining an unqualified audit opinion at the end of 2008, which could result in a default under the pertinent LBO loan agreements, and (iii) approval of the 2009 proposed annual budget posed critical challenges given the questions raised by certain of the lenders with respect to the annual budget in late-2007 and early-2008.

200.    In the third quarter of 2008, RevPAR decreased again, and was lower than the Debtors' budget for that time.  In the fourth quarter of 2008, ADR and OCC continued to decline, and RevPAR performance was far off of budgeted projections. As a result, fourth quarter 2008 revenue and property-level EBITDA performance had double-digit declines over the prior year.   By the end of 2008, the Debtors' total revenue and EBITDA had also dramatically declined.

201.    As a result of these financial difficulties, the Debtors' liquidity continued to deteriorate, and by December 31, 2008 the general ledger balance of cash available to fund operations had slipped to $26.5 million.

### e. Dividends and Distributions to Equity Holders Continue in 2008, Despite the Debtors' Financial Distress

202. Notwithstanding the Debtors' precipitous financial and operational declines, the Debtors, directly or indirectly through affiliated entities, made the following substantial cash distributions directly, or indirectly through other entities in the Debtors' corporate structure, to equity holders or equity holders' affiliates, in violation of the loan agreements and applicable law:

### 2008 Improper Equity and Related Distributions

| RECIPIENT | DATE PAID | AMOUNT |
|---|---|---|
| Arbor Commercial Mortgage LLC & Ron Invest LLC | 1/15/2008 | $262,500.00 |
| Glida One LLC | 1/15/2008 | $473,611.11 |
| Polar Extended Stay USA L.P. | 1/15/2008 | $86,111.11 |
| Princeton ESH, LLC | 1/15/2008 | $86,111.11 |
| Arbor Commercial Mortgage LLC | 1/11/2008 | $900,000.00 |
| Arbor Commercial Mortgage LLC | 2/20/2008 | $1,808,333.33 |
| Arbor Commercial Mortgage LLC | 3/17/2008 | $241,865.08 |
| Ron Invest LLC | 3/17/2008 | $42,063.49 |
| Glida One LLC | 3/17/2008 | $115,674.61 |
| Polar Extended Stay USA L.P. | 3/17/2008 | $21,031.75 |
| Princeton ESH, LLC | 3/17/2008 | $21,031.75 |
| Arbor Commercial Mortgage LLC | 3/12/2008 | $684,523.81 |
| Ron Invest LLC | 3/12/2008 | $119,047.62 |
| Glida One LLC | 3/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 3/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 3/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 4/15/2008 | $305,753.97 |
| Ron Invest LLC | 4/15/2008 | $53,174.60 |
| Glida One LLC | 4/15/2008 | $146,230.16 |
| Polar Extended Stay USA L.P. | 4/15/2008 | $26,587.30 |
| Princeton ESH, LLC | 4/15/2008 | $26,587.30 |
| Arbor Commercial Mortgage LLC | 4/11/2008 | $684,523.81 |
| Ron Invest LLC | 4/11/2008 | $119,047.62 |
| Glida One LLC | 4/11/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 4/11/2008 | $59,523.81 |
| Princeton ESH, LLC | 4/11/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 5/15/2008 | $500,000.00 |
| Arbor Commercial Mortgage LLC | 5/12/2008 | $684,523.81 |
| Ron Invest LLC | 5/12/2008 | $119,047.62 |
| Glida One LLC | 5/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 5/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 5/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 6/16/2008 | $27,418.63 |
| Ron Invest LLC | 6/16/2008 | $4,768.45 |

| | | |
|---|---|---|
| Glida One LLC | 6/16/2008 | $13,113.26 |
| Polar Extended Stay USA L.P. | 6/16/2008 | $2,384.23 |
| Princeton ESH, LLC | 6/16/2008 | $2,384.23 |
| Arbor Commercial Mortgage LLC | 6/16/2008 | $508,264.53 |
| Arbor Commercial Mortgage LLC | 6/12/2008 | $684,523.81 |
| Ron Invest LLC | 6/12/2008 | $119,047.62 |
| Glida One LLC | 6/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 6/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 6/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 7/15/2008 | $500,000.00 |
| Arbor Commercial Mortgage LLC | 7/11/2008 | $684,523.81 |
| Ron Invest LLC | 7/11/2008 | $119,047.62 |
| Glida One LLC | 7/11/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 7/11/2008 | $59,523.81 |
| Princeton ESH, LLC | 7/11/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 8/15/2008 | $558,333.33 |
| Arbor Commercial Mortgage LLC | 8/12/2008 | $684,523.81 |
| Ron Invest LLC | 8/12/2008 | $119,047.62 |
| Glida One LLC | 8/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 8/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 8/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 9/15/2008 | $558,333.33 |
| Arbor Commercial Mortgage LLC | 9/12/2008 | $684,523.81 |
| Ron Invest LLC | 9/12/2008 | $119,047.62 |
| Glida One LLC | 9/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 9/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 9/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 10/15/2008 | $500,000.00 |
| Arbor Commercial Mortgage LLC | 10/10/2008 | $684,523.81 |
| Ron Invest LLC | 10/10/2008 | $119,047.62 |
| Glida One LLC | 10/10/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 10/10/2008 | $59,523.81 |
| Princeton ESH, LLC | 10/10/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 11/17/2008 | $558,333.33 |
| Arbor Commercial Mortgage LLC | 11/12/2008 | $684,523.81 |
| Ron Invest LLC | 11/12/2008 | $119,047.62 |
| Glida One LLC | 11/12/2008 | $327,380.95 |
| Polar Extended Stay USA L.P. | 11/12/2008 | $59,523.81 |
| Princeton ESH, LLC | 11/12/2008 | $59,523.81 |
| Arbor Commercial Mortgage LLC | 12/18/2008 | $1,750,000.00 |
| **2008 A-1 Total** | | **$21,349,999.99** |

203.   In early December of 2008, the Debtors submitted for the lenders' approval a proposed 2009 annual budget that assumed a significant decline in room revenues, and property-level EBITDA. At this point, the Debtors were simply trying to "stay[] alive for another few weeks," as  Lichtenstein later stated.  At a board meeting held on December 16, 2008, Chetrit suggested that there be "staff reduction[s] of hours . . . and that staff should be asked for a 20%

reduction to make a significant impact upon cash flow."  Upon information and belief, this suggestion was made, *inter alia*, in order to increase cash available to continue improper distributions to equity holders, including entities owned or controlled by Chetrit, all to the detriment of the Debtors.

204.    Although the Debtors passed a resolution stopping equity distributions in late-2008 in light of the financial and liquidity crises, improper distributions to equity actually continued even after that resolution from a so-called "Preferred Equity Holder Reserve Account" that had been created at the LBO's closing and was "security" for certain equity holders.  The Preferred Equity Holder Reserve Account was funded with $20 million of the Debtors' funds at the LBO's closing, and certain equity holders could instruct that distributions be made from that reserve account to them. If the account was used for such distributions, then BHAC Capital, using the Debtors' cash, was required to replenish the reserve back up to $20 million. The following table represents the distributions from the preferred equity reserve account to an Arbor affiliate *following* the November 13, 2008 board of directors meeting at which equity distributions were resolved to be stopped:

### Summary of Improper Distributions from the Preferred Equity Reserve Account

| | | |
|---|---|---|
| 12/18/2008 | Arbor Commercial Mortgage LLC | $1,750,000 |
| 1/20/2009 | Arbor Commercial Mortgage LLC | $1,808,333 |
| 2/20/2009 | Arbor Commercial Mortgage LLC | $1,808,333 |
| 3/11/2009 | Arbor Commercial Mortgage LLC | $15,178,971 |
| **Total** | | **$20,545,637** |

Eventually, in March 2009, as the Debtors continued their downward spiral, the Preferred Equity Reserve Account was liquidated and the balance was wired to the A-1 Series unit holders, as

shown above.

205.    From the LBO's closing through the date the Preferred Equity Reserve Account was liquidated and given to the A-1 series unit holders, a total of no less than $100 million was improperly distributed to equity holders during periods of tremendous financial and liquidity stress.

206.    In addition to those amounts, upon information and belief, Lightstone Holdings LLC received so-called "asset management fees" throughout that same period totaling approximately $1 million per year.  This occurred even though Lightstone Holdings LLC was not the Debtors' management company and HVM managed all aspects of the Debtors' daily operations.

207.    Before the LBO's closing, HVM and HVM Canada provided the operational, management, and administrative functions for all of the Extended Stay hotels. After the LBO's closing, all Extended Stay hotels continued to be managed by HVM, except for three properties in Canada, which were operated by HVM Canada.  HVM's management fee arrangement was different from the industry practice, and provided significantly higher management fees than those typically seen in the industry.  In spite of the substantial fees being paid to HVM and HVM's management of all aspects of the Debtors' day-to-day business, Lightstone Holdings LLC  (i.e., Lichtenstein) received management fees after the LBO totaling approximately $1 million per year, for doing nothing.  Moreover, HVM was managed by an entity known as "HVM Manager," which was itself owned and managed by Lichtenstein, HVM Manager's sole member.

**3.      2009 Post-LBO Performance through the Bankruptcy Filing Date**

        **a.      Shortfalls in the Waterfall Are Experienced**

208.    Conditions worsened in the latter part of 2008 in part as a result of the Great

Recession.  Moreover, as a result of declining performance in December 2008 and January 2009, the receipts transferred to the Waterfall were not sufficient to cover the interest due on the mezzanine debt in January 2009.  Consequently, the Debtors were forced to transfer $5.9 million from their main operating account to the Cash Management Account to cover the shortfall.  Only $19 million was distributed from the Cash Management Account to the Debtors for budgeted operating expenses in January 2009.  This was the lowest monthly amount distributed to the Debtors since the LBO's closing. From mid December 2008 to late March 2009, the Debtors were forced to fund occupancy taxes and other expenses totaling approximately $20 million out of a cash reserve account.

### b.    Insider Obligations Are Paid In Full

209.    In February 2009, the Debtors' advisors issued a memorandum to the Debtors' independent directors regarding the deteriorating liquidity situation, and on March 11, 2009, the boards of directors of DL-DW, BHAC Capital, Homestead, and ESI met to discuss the insider 25% Note.  Joseph Teichman ("Teichman"), the Secretary and General Counsel of the Debtors, inexplicably informed the Boards that the 25% Note needed to be refinanced, even though it was not scheduled to mature until May 1, 2011, and thus should not have been considered a pressing issue at the time, and proposed that the 25% Note be paid off by transferring the LIBOR Floor Certificates (which had been stolen from the Debtors by DL-DW) to the holders of the 25% Note.  That same day, the boards approved this proposed transaction.

210.    On March 12, 2009, one day later, the so-called "Floor Bonds Agreement" was executed, pursuant to which the LIBOR Floor Certificates were assigned to ABT-ESI LLC, as lead lender under the insider 25% Note.  In connection with that agreement, all insider note interests (including those held by Lightstone Commercial Management, as successor by transfer to the interests originally possessed by Park Avenue Funding LLC) were contributed by the other

25% Note lenders to ABT-ESI LLC.  ABT-ESI LLC was simultaneously restructured so that each of the other lenders became owners of ABT-ESI LLC in proportion to their respective rights and interests in the 25% Note.  Similarly, as part of the deal, the Series A-1 equity holders waived their rights to the $4,817,986 balance of the so-called "Floor Bonds Reserve Account," and the entire balance was required to be wire transferred to an account designated by Lightstone Commercial, which was to receive a Form 1099 in respect of this distribution.

211.    At the time the Floor Bonds Agreement was executed, the outstanding principal balance on the 25% Note was $17,416,674.  The Floor Bonds Reserve Account then contained a balance of $4,817,986.  The LIBOR Floor Certificates, which had apparently brought in at least $13 million in less than a year, were assigned an artificial value of $17,416,674, exactly equal to the balance of the 25% Note.  Upon information and belief, the actual value of the LIBOR Floor Certificates was significantly greater.

212.    The LIBOR Floor Certificates were therefore transferred to pay the 25% Note, and the Floor Bonds Reserve Account was emptied to make a separate payment to Lightstone Commercial.  In short, the valuable LIBOR Floor Certificates that should have belonged to the Debtors were transferred to DL-DW for no consideration, and then to insiders as ostensible repayment for the $22 million loan to DL-DW.  The remaining accumulated proceeds of the LIBOR Floor Certificates that had not been previously transferred to the insiders as payments on the $22 million loan, were diverted to insider Lightstone Commercial.  Insiders were thus paid richly as the Debtors moved toward their inevitable bankruptcy.  As described more fully below, bankruptcy was delayed for just over ninety days after the 25% Note was paid off, thus allowing the ninety-day preference period under the federal Bankruptcy Code to expire.

c.      **2009: Performance Worsens**

213.    During the first and second quarters of 2009, the Debtors experienced steep

declines in ADR, OCC, room revenue and property-level EBITDA.  As a result, the general ledger balance of cash available to the Debtors to fund operating expenses as of March 31, 2009 decreased to only approximately $16.2 million, from approximately $26.5 million as of December 31, 2008.

214.    In the second quarter of 2009, the Debtors continued capital expenditure freezes and instituted hiring freezes related to all full-time and part-time personnel. As the liquidity situation worsened, the Debtors' officers and directors at the time discussed actions to conserve cash. For example, in April of 2009, the board of directors of the "Extended Stay Hotels family of companies" discussed that vendor payments were being stretched to conserve cash. On April 30, 2009 the Debtors' outstanding accounts payable balance over 60 days old of $1.3 million was more than 10% of the total accounts payable balance of approximately $11 million, the highest percentage since the LBO.

215.    By no later than May 14, 2009, the board was aware that the Debtors might not have enough unrestricted cash to fund operations through the end of May 2009.  Further, the Debtors' declining cash position was expected to be exacerbated by the pending amortization triggered by the anticipated breach of the Debt Yield amortization threshold covenant, as described above.  These additional payments would have to be funded through the Cash Management Account beginning with the June 13, 2009 Waterfall cycle. Although restructuring alternatives were discussed by the board, none identified how, in the absence of a restructuring or bankruptcy, the Debtors might obtain the funds needed to make the upcoming Debt Yield amortization payments, which would total over $50 million for the remainder of 2009.

216.    As of May 31, 2009, the general ledger cash balance available to fund operating expenses had dropped to approximately $4.6 million, down from approximately $26.5 million as

of December 31, 2008.  In addition, the Debtors were incurring extensive restructuring expenses. In June 2009, as a result of the severe liquidity situation and the imminent amortization payments, the Debtors were projected to completely deplete liquidity by the end of June 2009, and would be unable to meet payroll of approximately $9 million on Tuesday, June 19, 2009.

### G.    The Failed Workout Negotiations

#### 1.    Initial Mortgage Debt Workout Negotiations

217.    Immediately after the November 13, 2008 meeting of the Debtors' board of directors, Lazard began attempts to engage the Debtors' mortgage debt certificate holders (the "Certificate Holders") in workout discussions.  Those discussions were far too little, far too late, as the Debtors were telling third parties – e.g., Centerbridge – even prior to the November 13, 2008 board meeting that the debtors had to have a restructuring plan in place by the end of 2008.

218.    In connection with early-2009 restructuring efforts, meetings were held with Centerbridge, its financial advisor, Houlihan Lokey ("Houlihan"), and Centerbridge's counsel, Fried Frank Harris Shriver & Jacobson LLP ("Fried Frank"), each of which were representing some of the Certificate Holders.  In January 2009, the Debtors agreed to pay certain fees and expenses incurred by Fried Frank and Houlihan.

219.    In late-January 2009, Fried Frank presented a restructuring proposal ("Fried Frank January Proposal") to the Debtors that contemplated a comprehensive restructuring of the Debtors in connection with a chapter 11 bankruptcy filing.  With respect to Lichtenstein's guarantees, the Fried Frank January Proposal provided that the parties were to discuss the satisfaction of his obligations in connection with a chapter 11 filing and that there was a possibility for a limited recourse indemnity in the form of the issuance of common stock to Lichtenstein in the post-chapter 11 corporate entity.

220.    Throughout the first quarter of 2009, the Debtors exchanged restructuring

proposals with their various lender groups.  Those proposals generally proposed to (i) give the beneficial owners of the LBO mortgage debt a combination of reduced secured debt plus a mezzanine portion, (ii) give the mezzanine debt holders equity in exchange for their debt, and (iii) replace existing equity with reorganized equity and warrants; and (4) grant existing equity holders releases and indemnities from all guarantees.  Further, the Debtors' proposals generally assumed the reinstatement of the existing capital lease (involving the properties owned by Lichtenstein), and the negotiation of a satisfactory cash collateral agreement that provided sufficient cash to fund the Debtors' 2009 business plan (whether in or out of chapter 11).  Although the Debtors' proposals sought substantial concessions from, in essence, the Certificate Holders that were the beneficiaries of the debt, most of those persons were never provided with the proposals themselves.

### 2.    Mezzanine Debt Negotiations

221.    In February 2009, Lazard sent a restructuring proposal (the "February 2009 Mezzanine Proposal") to Fortress Investment Group, LLC, direct or indirect owner of the junior-most tranche of the mezzanine debt, and others.  Under the February 2009 Mezzanine Proposal, the Debtors proposed to (1) reinstate the $4.1 billion mortgage loan on its existing terms, (2) replace the $3.3 billion in mezzanine debt with a combination of mezzanine debt and equity; (3) replace existing equity with a combination of mezzanine debt and equity; and (4) grant equity holders releases from all existing guarantees, including Lichtenstein, from personal guarantees. The February 2009 Mezzanine Proposal required approval of 100% of the mezzanine lenders.  As with the  January 2009 proposals to the mortgage holders, Lazard never received a formal response.

### 3.    "Conveyance-in-Lieu" Transaction Negotiations and the Trade Payables Default

222.    In late January and early February 2009, the Company began discussions with a subset of the senior mezzanine lenders (collectively, the "Mezz B-E Lenders"). These lenders together held, at a minimum, all of the mezzanine debt in tranches B-E, totaling approximately $1.6 billion of the total $3.3 billion of mezzanine debt.  After exchanging several draft term sheets, on April 20, 2009, Lichtenstein and Ivan Kaufman of Arbor Realty Trust, Inc., among others, met with representatives of the Mezz B-E Lenders regarding what would later come to be commonly referred to as the "CIL Transaction." Over the course of the next few weeks, several drafts of the documents governing the CIL Transaction were exchanged.  On May 14, 2009, the Debtors' board of directors voted in favor of the resolution approving execution of an agreement permitting the consummation of the CIL Transaction.

223.    On May 19, 2009, an "agreement" by and between certain mezzanine borrowers and lenders, and Lichtenstein, Lightstone, Homestead, and ESI as guarantors, was executed, providing, among other things, that the parties would, upon the occurrence of certain necessary conditions precedent, consummate the CIL Transaction. At a meeting of the board of the Debtors held the next day,  Lichtenstein represented that the deal was "far superior for the Company than any deal that was available with the mortgage lenders."

224.    Also on May 19, 2009, the lenders ("Mezzanine B Lenders") under the mezzanine B loan ("Mezzanine B Loan") declared an event of default because a Debtor borrower had failed to maintain its special purpose entity status by failing to pay, within the permissible time period prescribed in the Mezzanine B Loan, approximately $3.5 million in trade payables ("Trade Payables Default").  The Mezzanine B Lenders alleged that the borrower under the Mezzanine B Loan failed to comply with the requirement that ordinary course of liabilities not be permitted to remain unpaid longer than sixty (60) days past the date they were incurred with respect to the

$3.5 million in trade payables.  The Trade Payables Default was the death knell to any attempts to consummate the CIL Transaction, and the Debtors' directors or officers at the time knew it.

225.    After the LBO closed in June 2007, there always had been payables that were greater than 60 days outstanding.  Thus, there likely had been a continuing Trade Payables Default since the closing of the LBO.  On a monthly basis, however, Rogers signed certificates certifying that the representations and warranties of the borrower under the Mezzanine B Loan (and all of the other Mezzanine Loans and the mortgage loan) were true and correct as of the date of the certificate.  These monthly certificates were inaccurate in light of the Trade Payables Default and the fact that such a default had been ongoing since the day the LBO closed.

226.    Actions were then instituted by third parties in two separate courts seeking to enjoin the consummation of the CIL Transaction. Temporary restraining orders were entered in each action that brought a halt to attempts to consummate the CIL Transaction.

227.    On May 12, 2009, Centerbridge and others contacted Wachovia about the following defaults under the mortgage loan agreement:  (i) the debtors' failure to deliver timely audited financial statements, (ii) the debtors' failure to deliver a fully compliant monthly officer's certificate, (iii) the Debtors' failure to obtain an unqualified opinion of a "Big Four" accounting firm, and (iv) the Debtors' failure to maintain SPE status.  These defaults were incurable, so the Debtors' directors or officers at the time therefore knew or should have known that the Debtors could not exercise an option to extend the mortgage loan in June 2009 provided for in the mortgage loan agreement and could not continue to operate without a chapter 11 filing. Nevertheless, they delayed filing bankruptcy.

228.    On May 15, 2009, Lazard received a restructuring proposal from, among others, Centerbridge.  Drafts of that proposal were exchanged through the remainder of May and into

June 2009. Throughout this time, Centerbridge, among others, continued to put pressure on the Debtors to file for chapter 11 protection and to cease efforts to carry out the CIL Transaction.

**G.      The Debtors File for Chapter 11 Protection Two Years and Four Days After the LBO's Closing, Just Over Ninety Days After Paying Off Insider Debt, and a Group of Investors Including Blackstone "Re-Acquires" the Debtors for $3.9 Billion**

229.      Shortly after the June 11, 2009 two-year anniversary of the closing of the LBO, and after months of failed workout negotiations, the Debtors had to report whether the Debt Yield for 2009 was below the Debt Yield amortization threshold. If so, the borrowers were going to be liable for the payment of additional monthly amortization payments estimated to total as much as $51 million for the remainder of 2009. Given the Debtors' cash flow at the time, those amortization payments could not be made.

230.      In addition, a significant interest payment was due to be made to the mezzanine lenders as soon as Friday, June 12, 2009. If that payment was made, then (i) the Debtors would be unable to survive the upcoming week, when payroll was due, and (ii) the Debtors would not have access to those funds as cash collateral in a chapter 11 case.

231.      The only way to avoid these issues was to file for chapter 11 bankruptcy protection.  However, the first group of the Debtors' chapter 11 cases were filed on Monday, June 15, 2009, two years and four days after the LBO closed on June 11, 2007, and ninety-three days after paying off the insider 25% Notes in full.

232.      Upon information and belief, at least part of senior management's motivation in 2009 for delaying the inevitable bankruptcy filings was to (i) do so after the statute of limitations under 11 U.S.C. § 548 expired and the ninety day preference look-back period ran, and (ii) give equity holders as much time as possible to consummate a restructuring transaction that preserved at least some of their equity in the Debtors and, more importantly, extricated equity holders from their significant guarantee obligations under the LBO debt.

233.     Ironically, during the Debtors' bankruptcy cases, a group of investors including Blackstone "re-acquired" the Debtors for $3.9 billion, substantially less than the total amount of crushing debt the Debtors were caused to incur in the LBO for Blackstone's benefit prior to the bankruptcy.  The post-bankruptcy transaction involving Blackstone was announced on or about April 2, 2010 and was subsequently approved by the Bankruptcy Court as part of the Debtors' Plan, on July 20, 2010.

## THE TRANSFERS

**A.     Transfers and Obligations at Issue**

234.     The following are the transfers that this Complaint seeks to avoid.

**1.     The Seller Transfers**

235.     At the closing of the LBO, approximately $2.1 billion of the $7.4 billion borrowed by the Debtors was paid to or for the benefit of the Sellers, almost $1.9 billion in cash to three entities: BHAC IV, Blackstone Hospitality, and Prime (the "Seller Cash Transfers").  Of that $1.9 billion, BHAC IV received approximately $1,368,375,462, Blackstone Hospitality received approximately $489,546,290, and Prime received approximately $4,110,604.   In addition, the Sellers received equity in the new entities valued at $200,000,000 (the "Seller Equity Rollover," and collectively with the Seller Cash Transfers, the "Seller Transfers").  The Seller Transfers did not come from an account held in the name of the Debtor borrowers, but instead were made from the First American Escrow Account, where the proceeds of the LBO loan funds were deposited.   The Debtors did not receive any direct or indirect benefit in exchange for the Seller Transfers.   The Seller Transfers were also for the benefit of the Buyer, the sole obligor on the Purchase Agreement obligations.

**2.     Transfers to the Professionals**

236.     **The Bank of America Transfer**.  Of the $7.4 billion borrowed by the Debtors as

part of the LBO transaction, approximately $3,971,658 was transferred to Bank of America from the First American Escrow Account in the form of servicer fees, for which the Debtors received no direct or indirect benefits (the "Bank of America Transfer"), and which transfer, upon information and belief, paid an obligation incurred by the Sellers and was, in any event, directed by the Sellers to be paid out of the LBO proceeds to which they would not otherwise have been entitled.

237.   **The Citigroup Transfer**.  Of the $7.4 billion borrowed by the Debtors as part of the LBO transaction, approximately $6,350,000 was transferred to Citigroup from the First American escrow account in the form of fees, for which the Debtors received no direct or indirect benefits (the "Citigroup Transfer"), and which, upon information and belief, paid an obligation incurred by the Buyer.

238.   Bank of America and Citigroup are collectively referred to herein as the "Professionals."   The Bank of America Transfer and the Citigroup Transfer are collectively referred to as the "Professional Transfers."   All Professional Transfers were incurred for the benefit of the Sellers and/or the Buyers.

239.   In addition to the foregoing, the Trustee seeks to avoid any other LBO transfer to or for the benefit of Buyer or the pre-LBO equity interests or their related entities that is not expressly set out herein.

## B.   The Transfers Were Fraudulent Transfers

240.   The LBO transactions, including the Seller Transfers and the Professional Transfers, (collectively, the "LBO Transfers" or the "Transfers") were made with the actual intent to hinder, delay or defraud some or all of the Debtors' then existing or future creditors, and are, therefore, subject to avoidance and recovery under §§ 544, 548, 550 and 551 of the Bankruptcy Code, and §§ 276, and 278-279 of the New York Debtor & Creditor Law.  They also

meet the criteria for constructive fraudulent transfers under §§ 544, 548, 550 and 551 of the Bankruptcy Code, §§ 273-275 and 278-279 of the New York Debtor & Creditor Law, and § 3304(a) & (b) of the Federal Debt Collection Procedure Act.

241.    The LBO was designed to use the assets of the Debtors to make payments to or for the benefit of the Sellers at the risk and expense of the creditors of the Debtors.  These creditors included, but were not limited to, the lenders under the pre-existing bond issues of ESI. The highly complex structure of the LBO was expressly designed to make it as difficult as possible for any such creditors to make recoveries from the participants in the LBO in the likely event of the eventual financial collapse of Debtors.

242.    All of the participants in the initial LBO knew, or should have known, that the transaction would leave the Debtors insolvent or with unreasonably small usable capital.  The cash flow projections of the Debtors that were necessary to prevent Cash Trap Events (and eventual amortization payments) were dependant on growth and on actions, such as the rebranding initiative, that were dependant on more capital than was actually accessible by Debtors.  The initial budget lacked such basic categories as payment of trust fund taxes and placed payment of mezzanine debt ahead of payment of the management fees on which the Debtors depended for every facet of their existence.  There was no provision for repayment of bond debt that would soon fall due and no reasonable prospect of obtaining additional loans for that purpose due to the high leverage.  The Debtors were deprived of a line of credit that previously had been available to smooth over cash flow issues.  The deal proceeded based upon greed alone.

243.    However bad the initial budget was, once a Cash Trap Event occurred, the Debtors would be so starved of cash that a financial plan that relied on achieving growth

projections could be nothing more than fantasy.  Thereafter, however, unless the Debtors could grow their way out of the Cash Trap Event by meeting the necessary financial criteria for six months, the cash situation would become even worse because they would be obligated to make principal reduction payments on both the mortgage and mezzanine loans.  Nonetheless, once the LBO concluded, Debtors could not meet the criteria necessary to avoid a Cash Trap Event, and were never able to meet it again.  They were only temporarily saved by delayed reporting. Although equity distributions continued, cash was actually "trapped" beginning February of 2008, which put a significant strain on the Debtors.  Defendants were on notice, *i.e.*, knew or should have known, that the LBO transaction would and did render the Debtors insolvent.  At a minimum,  Defendants were reckless in not knowing, or reasonably should have known that the transfers described above were fraudulent.

244.    The Debtors received nothing of value in exchange for the $749.4 million in increased mortgage debt and the $905.3 million in increased mezzanine debt that they incurred as a result of the LBO.  They exchanged their existing owner for another who had little or no experience in the hotel business and offered no prospect of any sort of benefits that could ever be likely to enhance the balance sheet.  The debt that they paid off was replaced with additional debt that was not only higher in amount, but was under more onerous restrictions that were likely to (and did) prevent adequate cash flow to keep the business operating as it should.  In short, the LBO was an unmitigated disaster for the Debtors for reasons that should have been obvious to all.

## COUNT I
***Avoidance and Recovery of Actual Fraudulent Transfers under § 544, 550 and 551 of the Bankruptcy Code and §§ 276, 276-a and 278 and/or 279 of the New York Debtor & Creditor Law against the Blackstone Seller Entity Defendants and the Buyer***

245.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

246.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

247.    The Seller Transfers constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

248.    The Sellers and/or the Buyer caused the Debtors to make the Seller Transfers, with the actual intent to hinder, delay or defraud some or all of the Debtors' then existing or future creditors.

249.    The Seller Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Buyer and Seller, pursuant to §§ 276, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.  The Seller Transfers were for the benefit of Buyer, the sole obligor on the Purchase Agreement obligations and are, therefore, avoidable and recoverable as to the Blackstone Seller Entity Defendants and the Buyer.

250.    Each of the Seller Transfers was received with actual intent to hinder, delay or defraud creditors of some or all of the Debtors at the time of each of the Seller Transfers, and/or future creditors of the Debtors.

251.    As a result of the foregoing, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers; (b) directing that the Seller Transfers be set

aside; (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries; and (d) recovering attorneys' fees from the Blackstone Seller Entity Defendants and the Buyer.

## COUNT II
### Avoidance and Recovery of Constructive Fraudulent Transfers under § 544, 550 and 551 of the Bankruptcy Code and §§ 273 and 278 and/or 279 of the New York Debtor & Creditor Law against the Blackstone Seller Entity Defendants and the Buyer

252.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

253.   At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

254.   The Seller Transfers constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

255.   The Debtors did not receive fair consideration for the Seller Transfers.

256.   The Debtors were insolvent at the time they made the Seller Transfers or, in the alternative, the Debtors became insolvent as a result of the Seller Transfers.

257.   The Seller Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Buyer and Seller, pursuant to §§ 273, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.  The Seller Transfers were for the benefit of Buyer, the sole obligor on the Purchase Agreement obligations and are, therefore, avoidable and recoverable as to the Blackstone Seller Entity Defendants and the Buyer.

258.   As a result of the foregoing, pursuant to §§ 273, 278, and/or 279 of the New York

Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers; (b) directing that the Seller Transfers be set aside; (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries.

## COUNT III
### Avoidance and Recovery of Constructive Fraudulent Transfers under § 544, 550 and 551 of the Bankruptcy Code and §§ 274 and 278 and/or 279 of the New York Debtor & Creditor Law against the Blackstone Seller Entity Defendants and the Buyer

259.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

260.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

261.     The Seller Transfers constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

262.     The Debtors did not receive fair consideration for the Seller Transfers.

263.     At the time the Debtors made the Seller Transfers, the Debtors were engaged, or were about to engage in a business or transaction for which the property remaining in their hands, after the Seller Transfers, was an unreasonably small capital.

264.     The Seller Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Buyer and Seller, pursuant to §§ 274, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.  The Seller Transfers were for the benefit of Buyer, the sole obligor on the Purchase Agreement obligations

and are, therefore, avoidable and recoverable as to the Blackstone Seller Entity Defendants and the Buyer.

265.    As a result of the foregoing, pursuant to §§ 274, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers; (b) directing that the Seller Transfers be set aside; (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries.

## COUNT IV
### *Avoidance and Recovery of Constructive Fraudulent Transfers under § 544, 550 and 551 of the Bankruptcy Code and §§ 275 and 278 and/or 279 of the New York Debtor & Creditor Law against the Blackstone Seller Entity Defendants and the Buyer*

266.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

267.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

268.    The Seller Transfers constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

269.    The Debtors did not receive fair consideration for the Seller Transfers.

270.    At the time the Debtors made the Seller Transfers, the Debtors had incurred, were intending to incur, or believed that they would incur debts beyond their ability to pay them as the debts matured.

271.    The Seller Transfers constitute a fraudulent transfer avoidable and recoverable by

the Trustee, from the Buyer and Seller, pursuant to §§ 275, 278, and/or 279 of the New York

Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.  The Seller

Transfers were for the benefit of Buyer, the sole obligor on the Purchase Agreement obligations

and are, therefore, avoidable and recoverable as to the Blackstone Seller Entity Defendants and

the Buyer.

272.     As a result of the foregoing, pursuant to §§ 275, 278, and/or 279 of the New York

Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is

entitled to a judgment against the Blackstone Seller Entity Defendants and the Buyer: (a)

avoiding and preserving the Seller Transfers; (b) directing that the Seller Transfers be set aside;

(c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity

Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries.

## COUNT V
### *Violations of the Federal Debt Collection Procedure Act under 28 U.S.C. §§ 3304(a) & (b) and §§ 544, 550 and 551 of the Bankruptcy Code against the Blackstone Seller Entity Defendants and the Buyer*

273.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

274.     The Seller Transfers were made by the Debtors, after the Debtors incurred a debt

owed to the United States insofar as the Internal Revenue Service has a claim against the Debtors

for miscellaneous penalties.

275.     The Internal Revenue Service has claims against ESI for miscellaneous penalties,

ESA Management LLC for miscellaneous penalties, ESA Operating Lessee Inc. for corporate

income taxes, and ESA P Portfolio Operating Lessee Inc. for corporate income taxes.

276.     The Seller Transfers were in violation of the Federal Debt Collection Procedure

Act §§ 3304(a) insofar as the Debtors received less than a reasonably equivalent value in

exchange for the Seller Transfers, and the Debtors were or became or insolvent as a result of the Seller Transfers.

277.     The Seller Transfers were in violation of the Federal Debt Collection Procedure Act §§ 3304(b) insofar as the Debtors received less than a reasonably equivalent value in exchange for the Seller Transfers, and the Debtors either:

>    a.     Were engaged or about to engage in a business or transaction that left the Debtors with unreasonably small assets; or
>
>    b.     Intended to incur or believed or reasonably should have believed that the Debtors would incur debts beyond the Debtors' ability to pay as they came due.

278.     The Seller Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Buyer and Seller, pursuant to §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 3304(a) & (b) of the Federal Debt Collection Procedure Act.  The Seller Transfers were for the benefit of Buyer, the sole obligor on the Purchase Agreement obligations and are, therefore, avoidable and recoverable as to the Blackstone Seller Entity Defendants and the Buyer.

279.     As a result of the foregoing, pursuant to §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 3304(a) & (b) of the Federal Debt Collection Procedure Act, the Trustee is entitled to a judgment against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers; (b) directing that the Seller Transfers be set aside; and (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries.

## COUNT VI
***Avoidance and Recovery of Actual Fraudulent Transfers under § 544, 550 and 551 of the Bankruptcy Code and §§ 276, 276-a and 278 and/or 279 of the New York Debtor & Creditor Law against the Professionals, Sellers and the Buyer***

280.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

281.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

282.    The Professional Transfers constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

283.    The Sellers and/or the Buyer caused the Debtors to make the Professional Transfers, with the actual intent to hinder, delay or defraud some or all of the Debtors' then existing or future creditors.

284.    The Professional Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Professionals, Sellers and the Buyer, pursuant to §§ 276, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.

285.    Each of the Professional Transfers was received with actual intent to hinder, delay or defraud creditors of some or all of the Debtors at the time each of the Professional Transfers, and/or future creditors of the Debtors.

286.    The Professional Transfers were for the benefit of Sellers or the Buyer.

287.    As a result of the foregoing, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set

aside; (c) recovering the Professional Transfers, or the value thereof, from the Professionals and

the Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries; and

(d) recovering attorneys' fees from the Professionals and the Sellers and the Buyer.

<u>**COUNT VII**</u>
*Avoidance and Recovery of Constructive Fraudulent Transfers under § 544, 550 and 551*
*of the Bankruptcy Code and §§ 273 and 278 and/or 279 of the New York Debtor &*
*Creditor Law against the Professionals, Sellers and the Buyer*

288.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

289.    At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against the Debtors that were and are allowable

under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of

the Bankruptcy Code.

290.    The Professional Transfers constitute a conveyance by the Debtors as defined

under § 270 of the New York Debtor & Creditor Law.

291.    The Debtors did not receive fair consideration for the Professional Transfers.

292.    The Debtors were insolvent at the time they made the Professional Transfers or, in

the alternative, the Debtors became insolvent as a result of the Professional Transfers.

293.    The Professional Transfers constitute a fraudulent transfer avoidable and

recoverable by the Trustee, from the Professionals, Sellers and the Buyer, pursuant to §§ 273,

278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the

Bankruptcy Code.

294.    The Professional Transfers were for the benefit of Sellers or the Buyer.

295.    As a result of the foregoing, pursuant to §§ 273, 278, and/or 279 of the New York

Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is

entitled to a judgment against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries.

## COUNT VIII

### Avoidance and Recovery of Constructive Fraudulent Transfers under § 544, 550 and 551 of the Bankruptcy Code and §§ 274 and 278 and/or 279 of the New York Debtor & Creditor Law against the Professionals, Sellers and the Buyer

296.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

297.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

298.    The Professional Transfers constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

299.    The Debtors did not receive fair consideration for the Professional Transfers.

300.    At the time the Debtors made the Professional Transfers, the Debtors were engaged, or were about to engage in a business or transaction for which the property remaining in their hands, after the Professional Transfers, was an unreasonably small capital.

301.    The Professional Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Professionals, Sellers and the Buyer, pursuant to §§ 274, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code.

302.    The Professional Transfers were for the benefit of Sellers or the Buyer.

303.    As a result of the foregoing, pursuant to §§ 274, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers, and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries.

## COUNT IX

### *Avoidance and Recovery of Constructive Fraudulent Transfers under § 544, 550 and 551 of the Bankruptcy Code and §§ 275 and 278 and/or 279 of the New York Debtor & Creditor Law against the Professionals, Sellers and  the Buyer*

304.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

305.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against the Debtors that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

306.    The Professional Transfers constitute a conveyance by the Debtors as defined under § 270 of the New York Debtor & Creditor Law.

307.    The Debtors did not receive fair consideration for the Professional Transfers.

308.    At the time the Debtors made the Professional Transfers, the Debtors had incurred, were intending to incur, or believed that they would incur debts beyond their ability to pay them as the debts matured.

309.    The Professional Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Professionals, Sellers or the Buyer, pursuant to §§ 275, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the

Bankruptcy Code.

310.    The Professional Transfers were for the benefit of Sellers or the Buyer.

311.    As a result of the foregoing, pursuant to §§ 275, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries.

### <u>COUNT X</u>
*Violations of the Federal Debt Collection Procedure Act under 28 U.S.C. §§ 3304(a) & (b) and §§ 544, 550 and 551 of the Bankruptcy Code against Professionals, Sellers and the Buyer*

312.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

313.    The Professional Transfers was made by the Debtors, after the Debtors incurred a debt owed to the United States insofar as the Internal Revenue Service has a claim against the Debtors for miscellaneous penalties.

314.    The Internal Revenue Service has claims against ESI for miscellaneous penalties, ESA Management LLC for miscellaneous penalties, ESA Operating Lessee Inc. for corporate income taxes, and ESA P Portfolio Operating Lessee Inc. for corporate income taxes.

315.    The Professional Transfers were in violation of the Federal Debt Collection Procedure Act §§ 3304(a) insofar as the Debtors received less than a reasonably equivalent value in exchange for the Professional Transfers, and the Debtors were or became or insolvent as a result of the Professional Transfers.

316.    The Professional Transfers were in violation of the Federal Debt Collection

Procedure Act §§ 3304(b) insofar as the Debtors received less than a reasonably equivalent value in exchange for the Professional Transfers, and the Debtors either:

        c.    Were engaged or about to engage in a business or transaction that left the Debtors with unreasonably small assets; or

        d.    Intended to incur or believed or reasonably should have believed that the Debtors would incur debts beyond the Debtors' ability to pay as they came due.

317.    The Professional Transfers constitute a fraudulent transfer avoidable and recoverable by the Trustee, from the Professionals, Sellers or the Buyer, pursuant to §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 3304(a) & (b) of the Federal Debt Collection Procedure Act.

318.    The Professional Transfers were for the benefit of Sellers or the Buyer.

319.    As a result of the foregoing, pursuant to §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 3304(a) & (b) of the Federal Debt Collection Procedure Act, the Trustee is entitled to a judgment against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; and (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries.

## COUNT XI
### Subrogation to the Rights of the Sellers against the Buyer

320.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

321.    Pursuant to the Purchase Agreement between the Buyer and Sellers, the Buyer was required to pay approximately $1.9 billion in cash to the Sellers (or at their direction) above the amounts being used to retire pre-existing debt, and additionally to pay the Buyer's and

Sellers' Professional fees (collectively, the "Purchase Contractual Obligations").

322.    In fact, the Purchase Contractual Obligations were paid for by the Debtors, under compulsion, owing to the control exercised over them by the Sellers and, post-LBO, the Buyer, from proceeds of the mortgage loans and mezzanine loans as to which they became borrowers.

323.    The control compelled Debtors to act solely in the interests of the Sellers and the Buyer and not in their own interests.

324.    Debtors were not obligees of the Purchase Contractual Obligations.

325.    Accordingly, Debtors should be subrogated to the rights of the Sellers, against the Buyer, under the Purchase Agreement.

## COUNT XII
### *Disallowance of Claims under § 502(d) of the Bankruptcy Code against the Blackstone Seller Entity Defendants, Buyer and Professionals*

326.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

327.    The Blackstone Seller Entity Defendants, Buyer and Professionals are transferees of one or more transfers avoidable under §§ 544, 547 or 548 of the Bankruptcy Code, or are entities from which property is recoverable under § 550 of the Bankruptcy Code, and have not paid the amount or turned over the property for which they are liable.

328.    As a result of the foregoing, pursuant to § 502(d) of the Bankruptcy Code, the Trustee is entitled to disallow any filed or scheduled claims of the Defendants.

## COUNT XIII
### *Securities Violations under § 10(b) of the Securities Exchange Act  and Rule 10b-5 against the Blackstone Pre-LBO Entity Defendants and DL-DW*

329.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

330.   The Trustee asserts this Count against the Blackstone Pre-LBO Entity Defendants and DL-DW for violations of § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

331.   As alleged herein, the Blackstone Pre-LBO Entity Defendants and DL-DW, individually, directly and indirectly, in connection with the purchase or sale of securities, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal the Debtors' true anticipated financial condition prior to, during, and in connection with the LBO, and post-LBO.  The Blackstone Pre-LBO Entity Defendants and DL-DW employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of conduct that were intended to reap financial windfalls from the sale of the Debtors, while these defendants knew or recklessly ignored the fact that the LBO they created would render the Debtors insolvent, and thereafter result in bankruptcy.

332.   The main purpose of the scheme to defraud was to denude the assets of the Debtors and provide for the Blackstone Pre-LBO Entity Defendants to obtain $1.9 billion in value from the Acquisition and for DL-DW and its affiliates to reap hundreds of millions of distributions post-LBO.

333.   The Blackstone Pre-LBO Entity Defendants and DL-DW acted with scienter, in that they either had actual knowledge of the effect of the LBO given the reports by the ratings agencies and the actual performances of the Debtors in early 2007, or acted with reckless disregard for the truth.

334.   The Blackstone Pre-LBO Entity Defendants and DL-DW had the opportunity and motive to commit the wrongful acts alleged herein.  The Blackstone Pre-LBO Entity Defendants, by virtue of their positions controlled the Information Memorandum, press releases, public

filings, communications with potential buyers and other statements issued by the Debtors in relation to the LBO transaction.

335.   The Blackstone Pre-LBO Entity Defendants and DL-DW are liable as direct participants in the wrongs complained of herein.

336.   The acts and practices of the Blackstone Pre-LBO Entity Defendants and DL-DW were intentional or reckless and done for the purposes of enriching themselves and concealing the Debtors' true operating and financial condition.

337.   The acts and practices of the Blackstone Pre-LBO Entity Defendants and DL-DW were the proximate cause of the LBO, and hence of the Debtors' injury.

338.   The Debtors were or became insolvent as a result of the LBO transaction, and the bankruptcy estate suffered damages in an amount to be proven at trial, but not less than $2.1 billion.

339.   As a result of the foregoing, pursuant to § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, the Trustee is entitled to a judgment against the Blackstone Pre-LBO Entity Defendants and DL-DW for compensatory damages and any damages pursuant to violations of the Securities Exchange Act.

### COUNT XIV
#### *Securities Violations under § 17(a) of the Securities Act against the Blackstone Pre-LBO Entity Defendants*

340.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

341.   The Trustee asserts this Count against the Blackstone Pre-LBO Entity Defendants for violations of § 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

342.   As alleged herein, the Blackstone Pre-LBO Entity Defendants, individually,

directly and indirectly, in connection with the offer or sale of securities, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal the Debtors' true anticipated financial condition prior to, during, and in connection with the LBO, and post-LBO.   The Blackstone Pre-LBO Entity Defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of conduct that were intended to reap financial windfalls from the sale of the Debtors, while these defendants knew or recklessly ignored the fact that the LBO they created would render the Debtors insolvent, and thereafter result in bankruptcy.

343.   The main purpose of the scheme to defraud was to denude the assets of the Debtors and provide for the Blackstone Pre-LBO Entity Defendants to obtain $1.9 billion in value from the Acquisition and to reap hundreds of millions of dollars in distributions post-LBO.

344.   The Blackstone Pre-LBO Entity Defendants acted with scienter, in that they either had actual knowledge of the effect of the LBO given the reports by the ratings agencies and the actual performances of the Debtors in early 2007, or acted with reckless disregard for the truth.

345.   The Blackstone Pre-LBO Entity Defendants had the opportunity and motive to commit the wrongful acts alleged herein.   The Blackstone Pre-LBO Entity Defendants, by virtue of their positions controlled the Information Memorandum, press releases, public filings, communications with potential buyers and other statements issued by the Debtors in relation to the LBO transaction.

346.   The Blackstone Pre-LBO Entity Defendants are liable as direct participants in the wrongs complained of herein.

347.   The acts and practices of the Blackstone Pre-LBO Entity Defendants were intentional or reckless and done for the purposes of enriching themselves and concealing the

Debtors' true operating and financial condition.

348.   The acts and practices of the Blackstone Pre-LBO Entity Defendants were the proximate cause of the LBO, and hence of the Debtors' injury.

349.   The Debtors were or became insolvent as a result of the LBO transaction, and the bankruptcy estate suffered damages in an amount to be proven at trial, but not less than $2.1 billion.

350.   As a result of the foregoing, pursuant to § 17 of the Securities Act, 15 U.S.C. § 77q(a), the Trustee is entitled to a judgment against the Blackstone Pre-LBO Entity Defendants W for compensatory damages and any damages pursuant to violations of the Securities Act.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

*i.*     On the First Claim for Relief, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial, but not less than $2.1 billion against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers; (b) directing that the Seller Transfers be set aside; (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries; and (d) recovering attorneys' fees from the Blackstone Seller Entity Defendants and the Buyer;

*ii.*     On the Second Claim for Relief, pursuant to §§ 273, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial, but not less than $2.1 billion against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers ; (b) directing

that the Seller Transfers be set aside; (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries;

     *iii.*    On the Third Claim for Relief, pursuant to §§ 274, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but not less than $2.1 billion against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers ; (b) directing that the Seller Transfers be set aside; (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries;

     *iv.*    On the Fourth Claim for Relief, pursuant to §§ 275, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but not less than $2.1 billion against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers; (b) directing that the Seller Transfers be set aside; (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries;

     *v.*    On the Fifth Claim for Relief, pursuant to §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 3304(a) & (b) of the Federal Debt Collection Procedure Act, judgment in an amount to be determined at trial but not less than $2.1 billion against the Blackstone Seller Entity Defendants and the Buyer: (a) avoiding and preserving the Seller Transfers; (b) directing that the Seller Transfers be set aside; and (c) recovering the Seller Transfers, or the value thereof, from the Blackstone Seller Entity Defendants and the Buyer for the benefit of the Litigation

Trust and its creditor beneficiaries;

*vi.*    On the Sixth Claim for Relief, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but not less than $10,321,658 against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries; and (d) recovering attorneys' fees from the Professionals, Sellers and the Buyer;

*vii.*    On the Seventh Claim for Relief, pursuant to §§ 273, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but not less than $10,321,658 against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries;

*viii.*    On the Eighth Claim for Relief, pursuant to §§ 274, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but not less than $10,321,658 against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries;

*ix.*     On the Ninth Claim for Relief, pursuant to §§ 275, 278, and/or 279 of the New York Debtor & Creditor Law, and §§ 544(b), 550(a), and 551 of the Bankruptcy Code, judgment in an amount to be determined at trial but not less than $10,321,658 against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; and (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries;

*x.*     On the Tenth Claim for Relief, pursuant to §§ 544(b), 550(a) and 551 of the Bankruptcy Code and § 3304(a) & (b) of the Federal Debt Collection Procedure Act, judgment in an amount to be determined at trial but not less than $10,321,658 against the Professionals, Sellers and the Buyer: (a) avoiding and preserving the Professional Transfers; (b) directing that the Professional Transfers be set aside; and (c) recovering the Professional Transfers, or the value thereof, from the Professionals, Sellers and the Buyer for the benefit of the Litigation Trust and its creditor beneficiaries;

*xi.*     On the Eleventh Claim for Relief, pursuant to common law contract and subrogation law, a judgment against the Buyer in the amount of the Seller Transfers;

*xii.*     On the Twelfth Claim for Relief, pursuant to § 502(d) of the Bankruptcy Code, disallowance of the claims of the Blackstone Seller Entity Defendants, Buyers, and Professionals;

*xiii.*     On the Thirteenth Claim for Relief, pursuant to § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, judgment in an amount to be determined at trial, but not less than $2.1 billion, against the Blackstone Pre-LBO Entity Defendants and DL-DW for compensatory damages and any

damages pursuant to violations of the Securities Exchange Act;

*xiv.*     On the Fourteenth Claim for Relief, pursuant to § 17 of the Securities Act, 15 U.S.C. § 77q(a), judgment in an amount to be determined at trial, but not less than $2.1 billion, against the Blackstone Pre-LBO Entity Defendants for compensatory damages and any damages pursuant to violations of the Securities Act;

*xv.*     On all Claims for Relief, pursuant to federal common law and New York Civil Practice Law and Rules §§ 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the transfers were received;

*xvi.*     On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of the liquidating trust;

*xvii.*     Awarding the Trustee all applicable interest, costs, attorneys' fees and disbursements of this action; and

*xviii.*     Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.


Dated: New York, New York
      June 14, 2011

Respectfully submitted,

**BAKER & HOSTETLER LLP**

*/s/ Marc D. Powers*
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Marc D. Powers
mpowers@bakerlaw.com
Matthew R. Goldman
mgoldman@bakerlaw.com
George Klidonas
gklidonas@bakerlaw.com

AND

Brian A. Bash (*pro hac vice* application forthcoming)
bbash@bakerlaw.com
Wendy J. Gibson (*pro hac vice* application forthcoming)
wgibson@bakerlaw.com
Baker & Hostetler LLP
PNC Center
1900 East 9th Street, Suite 3200
Cleveland, OH 44114-3482
Telephone:    (216) 621-0200
Facsimile:    (216) 696-0740

*Counsel for Plaintiffs Extended Stay Litigation Trust, and Hobart Truesdell and Walker, Truesdell, Roth & Associates, as Trustees of the Extended Stay Litigation Trust*

# EXHIBIT A



## OPERATING ENTITIES

(1)  The Blackstone Group L.P. common unitholders will have only limited voting rights and will have no right to elect our general partner or its directors, except for the State Investment Company, which will have no voting rights in respect of any of its common units. Our existing owners will indirectly hold special voting units in The Blackstone Group L.P. that will entitle them, on those few matters that may be submitted for a vote of The Blackstone Group L.P. common unitholders, to participate in the vote on the same basis as the common unitholders. We will initially issue a single special voting unit to Blackstone Partners L.L.C., an entity wholly-owned by our senior managing directors, that provides it with an aggregate number of votes that is equal to the aggregate number of vested and unvested Blackstone Holdings partnership units held by the limited partners of Blackstone Holdings on the relevant record date. See "Material Provisions of The Blackstone Group L.P. Partnership Agreement—Meetings; Voting."

(2)  Blackstone Holdings I/II GP Inc. holds a portion of its interests in Blackstone Holdings I L.P. and Blackstone Holdings II L.P. through wholly-owned subsidiaries organized as Delaware limited partnerships and Delaware limited liability companies.

(3)  The Blackstone Group L.P. holds Blackstone Holdings IV GP L.P. and Blackstone Holdings V GP L.P. through wholly-owned subsidiaries organized as Delaware limited partnerships and Delaware limited liability companies.

# EXHIBIT B



**Corporate Structure of Debtors**

# EXHIBIT C

### Summary of Pre and Post-LBO Mortgage Debt

| Mortgage Borrower | Payoff Amount | New Debt | Difference |
|---|---|---|---|
| ESA 2005 Portfolio L.L.C. | $83,175,203 | $73,966,369 | (9,208,834) |
| ESA 2005-San Jose L.L.C. | 11,092,362 | 14,909,595 | 3,817,233 |
| ESA 2005- Waltham L.L.C. | 12,215,677 | 10,611,061 | (1,604,616) |
| ESA Alaska L.LC. | 36,721,553 | 42,129,064 | 5,407,511 |
| ESA Acquisition Properties L.L.C. | 32,285,382 | 37,039,636 | 4,754,254 |
| ESA Canada Properties Trust | 42,680,978 | - | (42,680,978) |
| ESA Canada Properties borrower L.L.C. | - | 43,074,603 | 43,074,603 |
| ESA FL Properties, L.L.C. | 29,694,951 | 53,588,108 | 23,893,157 |
| ESA MD Borrower L.L.C. | 0,09,3 | 51,742,056 | 11,532,745 |
| ESA MN Properties L.L.C | 5,943,985 | 11,077,201 | 5,133,216 |
| ESA P Portfolio L.L.C. | 1,454,513,493 | 1,644,091,269 | 189,577,776 |
| ESA P Portfolio MD Borrower L.L.C. | 62,765,385 | 67,868,768 | 5,103,383 |
| ESA P Portfolio PA Properties L.LC. | 49,945,630 | 56,883,343 | 6,937,713 |
| ESA P Portfolio TXNC Properties L.P. | 165,258,912 | 231,919,959 | 66,661,047 |
| ESA PA Properties L.L.C | 15,442,706 | 23,660,878 | 8,218,172 |
| ESA Properties, L.L.C. | 524,163,473 | 788,096,085 | 263,932,612 |
| ESA TX Properties L.P. | 76,406,016 | 133,373,679 | 56,967,663 |
| ESH/Homestead Portfolio L.L.C. | 83,781,941 | 90,901,914 | 7,119,973 |
| ESH/HV Properties L.L.C. | 544,241,841 | 620,741,761 | 76,499,920 |
| ESH/MSTX Property L.P. | 2,872,538 | 4,359,990 | 1,487,452 |
| ESH/TN Properties L.L.C. | 16,496,143 | 21,064,531 | 4,568,388 |
| ESA TX Properties LP. | 60,676,727 | 78,900,066 | 18,223,339 |
| **Total Mortgage Debt of borrowers** | **$3,350,584,208** | **$4,099,999,936** | **$749,415,728** |

# EXHIBIT D

**Chart of Mezzanine Borrowers**
**For Each of the 10 Mezzanine Loans**

| Mezzanine Loan | Borrowers |
|---|---|
| Mezzanine Loan A | ESA Mezz, LLC<br>ESA P Mezz, LLC<br>ESH/Homestead Mezz, LLC |
| Mezzanine Loan B | ESA Mezz 2, LLC<br>ESA P Mezz 2, LLC<br>ESH/Homestead Mezz 2, LLC |
| Mezzanine Loan C | ESA Mezz 3, LLC<br>ESA P Mezz 3, LLC<br>ESH/Homestead Mezz 3, LLC |
| Mezzanine Loan D | ESA Mezz 4, LLC<br>ESA P Mezz 4, LLC<br>ESH/Homestead Mezz 4, LLC |
| Mezzanine Loan E | ESA Mezz 5, LLC<br>ESA P Mezz 5, LLC<br>ESH/Homestead Mezz 5, LLC |
| Mezzanine Loan F | ESA Mezz 6, LLC<br>ESA P Mezz 6, LLC<br>ESH/Homestead Mezz 6, LLC |
| Mezzanine Loan G | ESA Mezz 7, LLC<br>ESA P Mezz 7, LLC<br>ESH/Homestead Mezz 7, LLC |
| Mezzanine Loan H | ESA Mezz 8, LLC<br>ESA P Mezz 8, LLC<br>ESH/Homestead Mezz 8, LLC |
| Mezzanine Loan I | ESA Mezz 9, LLC<br>ESA P Mezz 9, LLC<br>ESH/Homestead Mezz 9, LLC |
| Mezzanine Loan J | ESA Mezz 10, LLC<br>ESA P Mezz 10, LLC<br>ESH/Homestead Mezz 10, LLC |

# EXHIBIT E

## Flow of Funds pursuant to the Cash Management Agreement and Mortgage Loan Agreement



# EXHIBIT F

First-In-First-Out Analysis of First American Closing Account

(1) Text in Blue Relates to Transfers Made on Behalf of the Buyer
(2) Text in Red Relates to Transfers Made on Behalf of the Seller
(3) Text in Black Relates to Transfers Made on Behalf of the Buyer and Seller

| Payment Description | Date | Time (EST) | Amount Incoming (Outgoing) | Credit Identifier | Cumulative Credits | Cumulative Charges | Source of Charge (by Credit Identifier) | Cumulative Account Balance |
|---|---|---|---|---|---|---|---|---|
| (1) Ebury Finance Limited New Loan Net of Interest and Fees & Disbursements | 6/11/2007 | 9:27 AM | $ 1,222,890,072.00 | A | $ 1,222,890,072.00 | - | | $ 1,222,890,072.00 |
| (1) Bear Stearns New Loan Net of Interest and Fees & Disbursements | 6/11/2007 | 9:40 AM | 84,804,151.49 | B | 1,307,694,223.49 | - | | 1,307,694,223.49 |
| (1) Bear Stearns New Loan Net of Interest and Fees & Disbursements | 6/11/2007 | 9:55 AM | 1,800,000,000.00 | C | 3,107,694,223.49 | | | 3,107,694,223.49 |
| (1) Wachovia New Loan Net of Pool-Level Transaction Costs | 6/11/2007 | 9:59 AM | 3,009,375,375.00 | D | 6,117,069,598.69 | - | | 6,117,069,598.69 |
| (1) Bank of America New Loan Net of Interest and Fees & Disbursements | 6/11/2007 | 10:11 AM | 1,223,951,634.25 | E | 7,341,021,232.74 | - | | 7,341,021,232.74 |
| (1) Citigroup Fees | 6/11/2007 | 10:12 AM | (4,100,000.00) | | 7,341,021,232.74 | (4,100,000.00) | A | 7,336,921,232.74 |
| (1) Citigroup Fees | 6/11/2007 | 10:15 AM | (2,250,000.00) | | 7,341,021,232.74 | (6,350,000.00) | A | 7,334,671,232.74 |
| (1) Boyer's Deposit - David Lichtenstein | 6/11/2007 | 10:46 AM | 120,000,000.00 | F | 7,461,021,232.74 | (6,350,000.00) | | 7,454,671,232.74 |
| (1) Boyer's Deposit - Lightstone Group | 6/11/2007 | 11:23 AM | 16,970,167.00 | G | 7,477,991,399.74 | (6,350,000.00) | | 7,471,641,399.74 |
| (1) Recording Fees and Taxes to Madison Mahnet Title, LLP | 6/11/2007 | 11:41 AM | (124,997.97) | | 7,477,991,399.74 | (6,474,997.97) | A | 7,471,516,401.77 |
| (3) Co-Insurers Portion of Premium & Endorsements - Fidelity Title Insurance | 6/11/2007 | 11:41 AM | (13,392.64) | | 7,477,991,399.74 | (6,488,390.61) | A | 7,471,503,009.13 |
| (3) Co-Insurers Portion of Premium & Endorsements - Commonwealth Land Title | 6/11/2007 | 11:41 AM | (24,553.17) | | 7,477,991,399.74 | (6,512,943.78) | A | 7,471,478,455.96 |
| (3) Co-Insurers Portion of Premium & Endorsements - Lawyers Title | 6/11/2007 | 11:44 AM | (24,553.17) | | 7,477,991,399.74 | (6,537,496.95) | A | 7,471,453,902.79 |
| (3) Co-Insurers Portion of Premium & Endorsements - Chicago Title Insurance Co. | 6/11/2007 | 11:44 AM | (13,392.64) | | 7,477,991,399.74 | (6,550,889.59) | A | 7,471,440,510.15 |
| (1) Boyer's Financial Analyst to Slinger | 6/11/2007 | 12:09 PM | (250,000.00) | | 7,477,991,399.74 | (6,800,889.59) | A | 7,471,190,510.15 |
| (1) Entity Searched to NRAI | 6/11/2007 | 1:27 PM | (48,707.03) | | 7,477,991,399.74 | (6,849,596.62) | A | 7,471,141,803.12 |
| (1) Boyer's Legal Fees to Day Pitney LLP | 6/11/2007 | 1:31 PM | (7,250.00) | | 7,477,991,399.74 | (6,857,346.62) | A | 7,471,134,653.12 |
| (1) Boyer's Legal Fees to Foley & Lardner LLP | 6/11/2007 | 1:39 PM | 1,639,948.67 | H | 7,479,631,348.41 | (6,857,346.62) | | 7,472,774,601.79 |
| (1) Boyer's Legal Fees to Foley & Lardner LLP | 6/11/2007 | 1:56 PM | (11,912.50) | | 7,479,631,348.41 | (6,869,259.12) | A | 7,472,762,689.29 |
| (1) Boyer's Deposit - Universal Master Servicing | 6/11/2007 | 2:08 PM | 175,000,000.00 | I | 7,654,631,348.41 | (6,869,259.12) | | 7,647,762,689.29 |
| (2) Services to Bank of America, N.A | 6/11/2007 | 2:08 PM | (617,680.81) | | 7,654,631,348.41 | (7,486,939.93) | A | 7,647,144,408.48 |
| (2) Services to Bank of America, N.A | 6/11/2007 | 2:12 PM | (3,353,976.97) | | 7,654,631,348.41 | (10,840,916.90) | A | 7,643,790,431.51 |
| (2) Securities to Wilmington Trust Company | 6/11/2007 | 2:46 PM | (691,860,442.47) | | 7,654,631,348.41 | (702,701,359.37) | A | 6,951,929,989.04 |
| (2) EuroHypo AG, New York - Loan Payoff | 6/11/2007 | 2:46 PM | (31,353,110.00) | | 7,654,631,348.41 | (734,036,469.37) | A | 6,920,594,879.04 |
| (2) Wells Fargo - Loan Payoff | 6/11/2007 | 2:46 PM | (69,006,924.57) | | 7,654,631,348.41 | (803,043,393.94) | A | 6,851,587,944.47 |
| (2) Bank of America, N.A - Loan Payoff Net of Escrow Credit | 6/11/2007 | 2:46 PM | (42,680,977.50) | | 7,654,631,348.41 | (845,724,381.41) | A | 6,808,906,966.97 |
| (2) Bank of America, N.A - Loan Payoff Net of Escrow Credit | 6/11/2007 | 2:46 PM | (2,637,292.19) | | 7,654,631,348.41 | (848,361,673.57) | A | 6,806,269,674.84 |

| Payment Description | Date | Time (EST) | Amount Incoming (Outgoing) | Credit Identifier | Cumulative Credits | Cumulative Charges | Source of Charge (by Credit Identifier) | Cumulative Account Balance |
|---|---|---|---|---|---|---|---|---|
| (2) Eurohypo AG, New York - Loan Payoff | 6/11/2007 | 3:01 PM | (170,826,890.00) | | 7,654,631,348.41 | (1,019,188,563.57) | A | 6,635,442,784.84 |
| (2) Northern Trust Company, Chicago, IL - Loan Payoff | 6/11/2007 | 3:01 PM | (304,295,166.67) | | 7,654,631,348.41 | (1,323,483,730.24) | A,B,C | 6,331,147,618.17 |
| (2) Bank of America, N.A. - Loan Payoff Net of Escrow Credit | 6/11/2007 | 3:01 PM | (4,377,366,192.51) | | 7,654,631,348.41 | (5,700,849,922.75) | C,D | 1,953,781,425.66 |
| (2) Cash to Seller | 6/11/2007 | 3:10 PM | (1,282,764,449.51) | | 7,654,631,348.41 | (6,983,614,372.26) | D,E | 671,016,976.15 |
| (2) Cash to Seller | 6/11/2007 | 3:10 PM | (4,110,604.41) | | 7,654,631,348.41 | (6,987,724,976.67) | E | 666,906,371.74 |
| (1) Wachovia New Loan - Property Specific Escrow Sub-Accounts | 6/11/2007 | 3:14 PM | (44,968,606.37) | | 7,654,631,348.41 | (7,032,693,583.04) | E | 621,937,765.37 |
| (1) Canada - Lender Counsel to Borden Ladner Gervais LLP | 6/11/2007 | 3:21 PM | (43,908.87) | | 7,654,631,348.41 | (7,032,737,491.91) | E | 621,893,856.50 |
| (1) Environment Review to Cadwalader Wickersham & Taft | 6/11/2007 | 3:21 PM | (250,000.00) | | 7,654,631,348.41 | (7,032,987,491.91) | E | 621,643,856.50 |
| (1) UCC's to Commonwealth Land Title Insurance Co. | 6/11/2007 | 3:21 PM | (1,404,022.00) | | 7,654,631,348.41 | (7,034,391,513.91) | E | 620,239,834.50 |
| (1) Insurance Review to BACIA | 6/11/2007 | 3:21 PM | (25,000.00) | | 7,654,631,348.41 | (7,034,416,513.91) | E | 620,214,834.50 |
| (1) Fee to Helix Financial Group LLC | 6/11/2007 | 3:21 PM | (273,200.00) | | 7,654,631,348.41 | (7,034,689,713.91) | E | 619,941,634.50 |
| (1) Tax Review to PricewaterhouseCoopers | 6/11/2007 | 3:21 PM | (369,000.00) | | 7,654,631,348.41 | (7,035,058,713.91) | E | 619,572,634.50 |
| (1) Tax Review to Union Commerce | 6/11/2007 | 3:21 PM | (79,936.00) | | 7,654,631,348.41 | (7,035,138,649.91) | E | 619,492,698.50 |
| (1) PCA and Phase I to IVI Due Diligence Service, Inc. | 6/11/2007 | 3:21 PM | (1,553,630.94) | | 7,654,631,348.41 | (7,036,692,280.85) | E | 617,939,067.56 |
| (1) PCA, Phase I, Scimatic to EMG | 6/11/2007 | 3:21 PM | (1,750,900.00) | | 7,654,631,348.41 | (7,038,443,180.85) | E | 616,188,167.56 |
| (2) Cash to Seller | 6/11/2007 | 3:21 PM | (489,546,289.86) | | 7,654,631,348.41 | (7,527,989,470.71) | E,F,G,H,I | 126,641,877.70 |
| (1) Zoning to the Planning and Zoning Resource Group | 6/11/2007 | 3:24 PM | (148,938.48) | | 7,654,631,348.41 | (7,528,138,409.19) | I | 126,492,939.22 |
| (1) Buyer's Legal Fee to Herrick Feinstein | 6/11/2007 | 3:36 PM | (1,200,000.00) | | 7,654,631,348.41 | (7,529,338,409.19) | I | 125,292,939.22 |
| (1) Buyer's Legal Fee to Proskauer Rose | 6/11/2007 | 3:36 PM | (1,250,000.00) | | 7,654,631,348.41 | (7,530,588,409.19) | I | 124,042,939.22 |
| (1) Buyer's Legal Fee to Dechert, LP | 6/11/2007 | 3:36 PM | (2,100,000.00) | | 7,654,631,348.41 | (7,532,688,409.19) | I | 121,942,939.22 |
| (1) Buyer's Financial Analyst to Duff & Phelps | 6/11/2007 | 3:36 PM | (90,634.00) | | 7,654,631,348.41 | (7,532,779,043.19) | I | 121,852,305.22 |
| (1) Title Consultant Fee to Avrohom Hoschander | 6/11/2007 | 3:36 PM | (205,200.00) | | 7,654,631,348.41 | (7,532,984,243.19) | I | 121,647,105.22 |
| (2) Legal Fees to Sutherland, Asbill & Brennan LLP | 6/11/2007 | 3:39 PM | (1,500.00) | | 7,654,631,348.41 | (7,532,985,743.19) | I | 121,645,605.22 |
| (1) Buyer's Legal Fee to Skadden Arps | 6/11/2007 | 3:46 PM | (200,000.00) | | 7,654,631,348.41 | (7,533,185,743.19) | I | 121,445,605.22 |
| (1) Servicer's Legal Fees to Cadwalader Wickersham & Taft | 6/11/2007 | 3:46 PM | (75,000.00) | | 7,654,631,348.41 | (7,533,260,743.19) | I | 121,370,605.22 |
| (2) Accountants Fees to Causey, Demgen & Moore | 6/11/2007 | 3:46 PM | (4,500.00) | | 7,654,631,348.41 | (7,533,265,243.19) | I | 121,366,105.22 |
| (2) Servicer's Legal Fees to Alston & Bird | 6/11/2007 | 3:46 PM | (215,000.00) | | 7,654,631,348.41 | (7,533,480,243.19) | I | 121,151,105.22 |
| (2) Successor Borrower's Legal Fees to Dechert LLP | 6/11/2007 | 3:46 PM | (20,000.00) | | 7,654,631,348.41 | (7,533,500,243.19) | I | 121,131,105.22 |
| (2) Consultant Fees to Chatham Financial | 6/11/2007 | 3:46 PM | (7,500.00) | | 7,654,631,348.41 | (7,533,507,743.19) | I | 121,123,605.22 |
| (2) Agency Review to Fitch, Inc. | 6/11/2007 | 3:46 PM | (7,500.00) | | 7,654,631,348.41 | (7,533,515,243.19) | I | 121,116,105.22 |

| | Payment Description | Date | Time (EST) | Amount Incoming (Outgoing) | Credit Identifier | Cumulative Credits | Cumulative Charges | Source of Charge (by Credit Identifier) | Cumulative Account Balance |
|---|---|---|---|---|---|---|---|---|---|
| (2) | Agency Review to Moody's Investors Service | 6/11/2007 | 3:46 PM | (8,500.00) | | 7,654,631,348.41 | (7,533,533,743.19) | 1 | 121,097,605.22 |
| (2) | Rating Agency Review to Standard & Poors | 6/11/2007 | 3:46 PM | (5,000.00) | | 7,654,631,348.41 | (7,533,528,743.19) | 1 | 121,102,605.22 |
| (2) | S&P's Legal Fees to Dechel, LLP | 6/11/2007 | 3:46 PM | (5,000.00) | | 7,654,631,348.41 | (7,533,533,743.19) | 1 | 121,097,605.22 |
| (2) | Agency Review to DBRS, Inc | 6/11/2007 | 3:50 PM | (5,000.00) | | 7,654,631,348.41 | (7,533,538,743.19) | 1 | 121,092,605.22 |
| (1) | Lender Legal Fee to Cadwalader Wickersham & Taft | 6/11/2007 | 3:56 PM | (3,000,000.00) | | 7,654,631,348.41 | (7,536,538,743.19) | 1 | 118,092,605.22 |
| (1) | Buyer's Legal Fees to Cadwalader Wickersham & Taft | 6/11/2007 | 3:56 PM | (3,000,000.00) | | 7,654,631,348.41 | (7,536,538,743.19) | 1 | 118,092,605.22 |
| (1) | Insurance Premiums Due at Closing to Insurance | 6/11/2007 | 4:25 PM | (658,170.00) | | 7,654,631,348.41 | (7,537,196,913.19) | 1 | 117,434,435.22 |
| (3) | Title Fees Premium & Endorsements to Madison Malawsh Title, LLP | 6/11/2007 | 5:57 PM | (7,320,299.81) | | 7,654,631,348.41 | (7,544,517,213.00) | 1 | 110,114,135.41 |
| (1) | Buyer's Legal Fees to Troutman Sanders LLP | 6/11/2007 | 5:57 PM | (7,421.00) | | 7,654,631,348.41 | (7,544,524,634.00) | 1 | 110,106,714.41 |
| (1) | Refund of Excess Closing Funds (Exhibit 1 of FATCO 1-12-10 Production) | 6/11/2007 | 5:57 PM | (78,103,898.86) | | 7,654,631,348.41 | (7,570,576,067.54) | 1 | 84,035,280.87 |
| (1) | Buyer's Legal Fees to Fragor & Benson LLP | 6/11/2007 | 5:57 PM | (6,775.00) | | 7,654,631,348.41 | (7,544,531,409.00) | 1 | 110,099,939.41 |
| (3) | Co-Insurers Portion of Premium & Endorsements - Fidelity Title Insurance | 6/11/2007 | 6:00 PM | (788,122.25) | | 7,654,631,348.41 | (7,649,448,088.65) | 1 | 5,182,359.76 |
| (3) | Co-Insurers Portion of Premium & Endorsements - Chicago Title Insurance Co. | 6/11/2007 | 6:00 PM | (768,122.25) | | 7,654,631,348.41 | (7,650,216,210.90) | 1 | 4,415,137.51 |
| (1) | Buyer's Legal Fees to Kunak Rock LLP | 6/11/2007 | 5:57 PM | (4,150.00) | | 7,654,631,348.41 | (7,544,535,559.00) | 1 | 110,095,789.41 |
| (3) | Co-Insurers Portion of Premium & Endorsements - Lawyers Title | 6/11/2007 | 6:00 PM | (1,408,186.57) | | 7,654,631,348.41 | (7,651,624,397.47) | 1 | 3,006,950.94 |
| (1) | Buyer's Legal Fees to Drinker Biddle & Reath LLP | 6/11/2007 | 5:57 PM | (3,760.00) | | 7,654,631,348.41 | (7,544,539,309.00) | 1 | 110,092,039.41 |
| (3) | Co-Insurers Portion of Premium & Endorsements - Commonwealth Land Title | 6/11/2007 | 6:06 PM | (1,408,186.57) | | 7,654,631,348.41 | (7,653,032,584.04) | 1 | 1,598,764.37 |
| (1) | Buyer's Legal Fees to Nexsan Pruet Adams Kleemeier, LLC | 6/11/2007 | 5:57 PM | (8,700.00) | | 7,654,631,348.41 | (7,544,548,009.00) | 1 | 110,083,339.41 |
| (1) | Buyer's Legal Fees to Ruhm & Rudman | 6/11/2007 | 5:57 PM | (8,500.00) | | 7,654,631,348.41 | (7,544,556,509.00) | 1 | 110,074,839.41 |
| (3) | Title Fees Premium & Endorsements to Madison Malawsh Title, LP | 6/11/2007 | 5:57 PM | (26,015,808.54) | | 7,654,631,348.41 | (7,570,572,317.54) | 1 | 84,099,030.87 |
| (1) | Buyer's Legal Fees to Hanck & Eppenberger, LLC | 6/11/2007 | 6:00 PM | (3,750.00) | | 7,654,631,348.41 | (7,570,576,067.54) | 1 | 84,035,280.87 |
| (1) | Buyer's Legal Fees to Catlett & Stodola | 6/12/2007 | N/A (Paid w/ Check) | (5,000.00) | | 7,654,631,348.41 | (7,653,037,584.04) | 1 | 1,593,764.37 |
| (1) | Buyer's Legal Fees to Bradshaw, Fowler, Proctor & Fairgrave | 6/12/2007 | N/A (Paid w/ Check) | (5,000.14) | | 7,654,631,348.41 | (7,653,042,593.18) | 1 | 1,588,755.23 |
| (1) | Buyer's Legal Fees to Evans Keane LLP | 6/12/2007 | N/A (Paid w/ Check) | (8,848.23) | | 7,654,631,348.41 | (7,653,051,441.41) | 1 | 1,579,907.00 |
| (1) | Buyer's Legal Fees to Neal, Gerber & Eisenberg LLP | 6/12/2007 | N/A (Paid w/ Check) | (20,350.00) | | 7,654,631,348.41 | (7,653,071,791.41) | 1 | 1,559,557.00 |
| (1) | Buyer's Legal Fees to Hoeppner, Wagner & Evans LLP | 6/12/2007 | N/A (Paid w/ Check) | (3,928.75) | | 7,654,631,348.41 | (7,653,075,720.16) | 1 | 1,555,628.25 |
| (1) | Buyer's Legal Fees to Goodell, Stratton, Edmonds & Palmer LLP | 6/12/2007 | N/A (Paid w/ Check) | (3,675.00) | | 7,654,631,348.41 | (7,653,079,395.16) | 1 | 1,551,953.25 |
| (1) | Buyer's Legal Fees to Curtis, Thaxter, Stevens, Broder & Micoleau LLC | 6/12/2007 | N/A (Paid w/ Check) | (3,000.00) | | 7,654,631,348.41 | (7,653,082,395.16) | 1 | 1,548,953.25 |
| (1) | Buyer's Legal Fees to Watkins, Ludlam, Winter & Stennis | 6/12/2007 | N/A (Paid w/ Check) | (5,841.00) | | 7,654,631,348.41 | (7,653,088,236.16) | 1 | 1,543,112.25 |
| (1) | Buyer's Legal Fees to Hurley, Toews, Styles, Hamblin & Panter | 6/12/2007 | N/A (Paid w/ Check) | (4,978.03) | | 7,654,631,348.41 | (7,653,093,214.19) | 1 | 1,538,134.22 |
| (1) | Buyer's Legal Fees to Henderson & Morgan, LLC | 6/12/2007 | N/A (Paid w/ Check) | (12,380.25) | | 7,654,631,348.41 | (7,653,105,594.44) | 1 | 1,525,753.97 |

| Payment Description | Date | Time (EST) | Amount Incoming (Outgoing) | Credit Identifier | Cumulative Credits | Cumulative Charges | Source of Charge (by Credit Identifier) | Cumulative Account Balance |
|---|---|---|---|---|---|---|---|---|
| (1) Buyer's Legal Fees to Commercial Law Group | 6/12/2007 | N/A (Paid w/ Check) | (7,432.71) | | 7,654,631,348.41 | (7,653,113,027.15) | 1 | 1,518,321.26 |
| (1) Buyer's Legal Fees to Walter Lansden Dortch & Davis LLP | 6/12/2007 | N/A (Paid w/ Check) | (13,000.00) | | 7,654,631,348.41 | (7,653,126,027.15) | 1 | 1,505,321.26 |
| (1) Buyer's Legal Fees to Locke, Lidell & Sapp LLP | 6/12/2007 | N/A (Paid w/ Check) | (4,372.00) | | 7,654,631,348.41 | (7,653,130,399.15) | 1 | 1,500,949.26 |
| (1) Buyer's Legal Fees to Mathieson, Mortenson, Olsen & Jeppson | 6/12/2007 | N/A (Paid w/ Check) | (8,214.30) | | 7,654,631,348.41 | (7,653,138,613.45) | 1 | 1,492,734.96 |
| (1) Buyer's Legal Fees to Otten, Johnson, Robinson, Neff & Ragonetti | 6/12/2007 | N/A (Paid w/ Check) | (800.00) | | 7,654,631,348.41 | (7,653,139,413.45) | 1 | 1,491,934.96 |
| (1) Buyer's Legal Fees to Baker, Donelson, Bearman, Caldwell & Berkowitz | 6/12/2007 | N/A (Paid w/ Check) | (1,973.50) | | 7,654,631,348.41 | (7,653,141,386.95) | 1 | 1,489,961.46 |
| (1) Accounting Fees to Amper, Politziner & Mattia | 6/12/2007 | N/A (Paid w/ Check) | (31,500.00) | | 7,654,631,348.41 | (7,653,172,886.95) | 1 | 1,458,461.46 |
| (1) Search Fee to Choice Point Services | 6/13/2007 | N/A (Paid w/ Check) | (131,011.74) | | 7,654,631,348.41 | (7,653,303,898.69) | 1 | 1,327,449.72 |
| (1) Post Closing Deposit - Wachovia Bank | 6/26/2007 | 4:35 PM | 579,989.92 | ✓ | 7,655,211,338.33 | (7,653,303,898.69) | | 1,907,439.64 |
| (1) Buyer's Fee to Rubin & Rudman LLP | 6/28/2007 | 3:38 PM | (4,000.00) | | 7,655,211,338.33 | (7,653,307,898.69) | ✓ | 1,903,439.64 |
| (1) Buyer's Fee to Venable, Baetjer & Howard | 6/28/2007 | 5:55 PM | (7,226.50) | | 7,655,211,338.33 | (7,653,315,125.19) | ✓ | 1,896,213.14 |
| (1) Buyer's Fee to Kelly, Elefant | 6/28/2007 | 5:55 PM | (2,823.25) | | 7,655,211,338.33 | (7,653,317,948.44) | ✓ | 1,893,389.89 |
| (1) Buyer's Fee to Steel, Rives | 6/28/2007 | 5:55 PM | (8,150.00) | | 7,655,211,338.33 | (7,653,326,098.44) | ✓ | 1,885,239.89 |
| (1) Buyer's Fee to Voys, Sater, Seymour | 6/28/2007 | 5:55 PM | (8,645.70) | | 7,655,211,338.33 | (7,653,334,744.14) | ✓ | 1,876,594.19 |
| (1) Buyer's Fee to Bankston Gronning | 6/28/2007 | 5:55 PM | (25,236.00) | | 7,655,211,338.33 | (7,653,359,980.14) | ✓ | 1,851,358.19 |
| (1) Buyer's Fee to Mancuso & Logan | 6/28/2007 | 5:55 PM | (29,475.00) | | 7,655,211,338.33 | (7,653,389,455.14) | ✓ | 1,821,883.19 |
| (1) Buyer's Fee to Richards, Layton Finger | 6/28/2007 | 5:55 PM | (434,800.00) | | 7,655,211,338.33 | (7,653,824,255.14) | ✓ | 1,387,083.19 |
| (1) Buyer's Fee to NRAI Services, LLC | 6/28/2007 | 5:55 PM | (20,358.47) | | 7,655,211,338.33 | (7,653,844,613.61) | ✓ | 1,366,724.72 |
| (1) Buyer's Fee to Perkins, Coie, Brown | 6/28/2007 | N/A (Paid w/ Check) | (15,000.00) | | 7,655,211,338.33 | (7,653,859,613.61) | ✓ | 1,351,724.72 |
| (1) Buyer's Fee to Holland & Knight | 6/28/2007 | N/A (Paid w/ Check) | (20,250.00) | | 7,655,211,338.33 | (7,653,879,863.61) | ✓ | 1,331,474.72 |
| (1) Buyer's Fee to Liskow & Lewis | 6/28/2007 | N/A (Paid w/ Check) | (4,025.00) | | 7,655,211,338.33 | (7,653,883,888.61) | ✓ | 1,327,449.72 |
| **Total Incoming (Outgoing)** | | | $ 1,327,449.72 | | | | | |
| Funds Retained by FATICO for Title Fees, Premium, & Endorsements | | | (1,327,449.72) | | | | 1 | |
| **Total** | | | $ (0.00) | | | | | |

Sources:
FATICO Final Settlement Statement and Exhibit Detail.

EXHIBIT 5

SUPREME COURT FOR THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| WALKER, TRUESDELL, ROTH & ASSOCIATES, as Trustee for and on behalf of the Extended Stay Litigation Trust, <br><br> HOBART TRUESDELL, as Trustee for and on behalf of the Extended Stay Litigation Trust, and <br><br> THE EXTENDED STAY LITIGATION TRUST, <br><br>     Plaintiffs, <br> vs. <br><br> THE BLACKSTONE GROUP, L.P., *et al.* <br><br>     Defendants. | Index No.:   651667/2011 |

## NOTICE OF FILING OF NOTICE OF REMOVAL

PLEASE TAKE NOTICE that, on July 1, 2011, Defendants The Blackstone Group, L.P., Blackstone Holdings I L.P., Blackstone Holdings II L.P., Blackstone Holdings III L.P., Blackstone Holdings IV L.P., Blackstone Holdings V L.P., Blackstone Holdings I/II GP, Inc., Blackstone Holdings III GP LLC, Blackstone Holdings IV GP L.P., Blackstone Holdings V GP L.P., Blackstone Real Estate Partners IV L.P., Blackstone Capital Partners IV LP, BHAC IV, LLC, BRE/HV Holdings LLC, Blackstone Hospitality Acquisitions LLC, Prime Hospitality, LLC, Michael Chae, Robert L. Friedman, Jonathan Gray, Dennis J. McDonagh, Alan Miyasaki, William Stein, and Gary Sumers (collectively, the "Blackstone Defendants") filed a Notice of Removal of this action, a copy of which is attached and served upon you, in the Office of the Clerk of the United States District Court for the Southern District of New York.

Dated:  July 1, 2011                                Respectfully submitted,

                                                    _Richard M. Cieri_
                                                    _____

                                                    Richard M. Cieri
                                                    KIRKLAND & ELLIS LLP
                                                    601 Lexington Avenue
                                                    New York, NY 10022-4611
                                                    Telephone:    (212) 446-4800
                                                    FACSIMILE:  (212) 446-4900

                                                    *Attorneys for the Defendants*

TO: MARC D. POWERS
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone:    (212) 589-4200
*Attorneys for Hobart Truesdell, Trustee for*
*The Extended Stay Litigation Trust*


CLERK
Supreme Court of the State of New York
County of New York
60 Centre Street
New York,  NY 10007

SUPREME COURT FOR THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

WALKER, TRUESDELL, ROTH &
ASSOCIATES, as Trustee for and on behalf of
the Extended Stay Litigation Trust,

HOBART TRUESDELL, as Trustee for and
on behalf of the Extended Stay Litigation
Trust, and

THE EXTENDED STAY LITIGATION
TRUST,

     Plaintiffs,

vs.

THE BLACKSTONE GROUP, L.P., *et al.*

     Defendants.

Index No.:    651667/2011

**AFFIDAVIT OF SERVICE**

---

STATE OF NEW YORK    )
                   ) ss.:
COUNTY OF NEW YORK   )

     Richard M. Cieri, being duly sworn, deposes and says:

     1.     That I am over eighteen years of age, am a partner at Kirkland & Ellis LLP, and am not a party to this action.

     2.     That on the 1st day of July, 2011, I served a true and correct copy of the Notice of Filing of Notice of Removal, annexed hereto, by prepaid first class mail upon:

                 Marc D. Powers
                 Baker & Hostetler LLP
                 45 Rockefeller Plaza
                 New York, NY 10111
                 212-589-4200

by depositing the same in an official depository of the United States Postal Service maintained at 909 Third Avenue, New York, NY 10022.

*Richard M. Cieri*

                      Richard M. Cieri

Sworn to before me this
1st day of July, 2010

Notary Public

BETH FRIEDMAN LURIE
NOTARY PUBLIC, State of New York
No. 4763035
Qualified in Nassau County
Commission Expires Sept. 30, 20 13